UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
BRUCE BEHRENS, KATHLEEN BEHRENS,
SHERRY SCHEFFERT AND DAVID SCHEFFERT,
RICHARD WAKEFORD on behalf of themselves and all
other similarly situated,

                     Plaintiffs,

               -against-

JPMORGAN CHASE BANK, N.A., U.S. BANK, N.A.,
CHICAGO MERCANTILE EXCHANGE, INC.
MILLENIUM TRUST COMPANY a/k/a MILLENIUM
TRUST CO. LLC,  RUSSELL WASENDORF,. RUSSELL
WASENDORF, JR. STEVEN BREWER a/k/a STEVEN
JOHN BREWER,, GARLON MAXWELL, AMBER
MAXWELL, PERRY COMEAU, John Does #1-40.

                  Defendants.
--------------------------------------------------------------------X

Civil Action No.

JURY TRIAL
DEMANDED

**COMPLAINT**

Dated: July 11, 2016

Susan J. Levy, Esq.
Attorneys for Plaintiffs
40 East 10th Street
Suite 2K
New York, New York 10003
Tel: (212) 962-1782
Fax: (212) 962-3711
susanjlevy@aol.com

TABLE OF CONTENTS

SUMMARY OF ACTION.................................................................................................1

JURISDICTION AND VENUE.................................................................................. .10

THE PARTIES.................................................................................................... 11

Class Plaintiffs.................................................................................................11

Defendants.......................................................................................................14

PROCEDURAL HISTORY                                                                        17

FACTUAL ALLEGATIONS.................................................................. ....................  17

Background of the Investor Class Members........................................................17

2005 Opening of the Customer Accounts Based on Fraudulent
Inducement and Minimization of Risks.............................................................  21

Crossland and Millenium Trust Company-March 2007 to August 2008............................ 25

Untoward Conduct During the Week of October 2, 2008 through October
8, 2008 consisting of Violation of the CME Margin Rules 930 D,E and K,
Overwhelmingly Demonstrate a RICO Conspiracy.............................................................. 28

Because PFG and Millenium Failed to use the 70%-30% Rule to Invest the
IRA fund, this conduct shows Intentional Conduct...  .........................................................32

Causation and Damages........................................................................................ 33

Rico Ponzi Scheme Part One-Substantive Allegations.........................................................33

PFG's Theft of $200 Million in Customer Funds and the Governing Regulatory Framework. 34

PFG's Misuse of  Customer Funds Over the Years................................................................36

Actions of U.S. Bank Leading to the Loss of Customer Funds by PFG  and Its Affiliates.     39

PFG's Two Primary US.BankAccounts...............................  .................................. 40

U.S. Bank Accounts of Wasendorf and PFG's Affiliates........................................................ 41

U.S. Bank Knew that PFG Was Not Treating the 1845 Account as a Customer Segregated
Account........................................................................................................ .    44

i

JP Morgan's Unlawful Transfers From the 5265 Account Into the US Bank 1845 Account......44

U.S. Bank Did Not Act Despite Many Additional Red Flags and U.S. Bank Did Not Receive Balance Confirmation Requests.................................................................................47

U.S. Bank knew That PFG Was Not Earning Revenue From the 1845 Account and Was Not Profitable.................................................................................................................50

Wasendorf Insisted That U.S. Bank Communicate Only With Him About PFG and its Accounts......................................................................................................................50

PFG's Record of Regulatory Violations.......................................................................51

U.S. Bank Did Nothing to Prevent the Theft............................................................... 53

Intentional Conduct of JPMorgan Leading to the Loss of Customer Funds.............................. 54

Rico Ponzi Scheme-Part 2................................................................. ...................... 57

Participation by Millenium Trust Co. And Their Aiding and Abetting......................................57

An IRA is a Federally Created Trust Imposing Duties on Millenium, as IRA Trustee, to Prevent This Type of Investment Fraud ....................................................58

The Federally Created Minimum Fiduciary Standards of Conduct For the IRAs At Issue Here. .60

Millenium's Failures...................................................................................................61

Red Flags that would have been visible if Defendants had properly managed the IRA and Pension Fund Accounts of Plaintiffs and the Class......................................................62

Motivation..................................................................................................................65

EQUITABLE TOLLING OF THE STATUTES OF LIMITATIONS........................................... 66

CLASS ALLEGATIONS..................................................................................................67.

FIRST CLAIM FOR RELIEF
    FRAUD BY OMISSION (AGAINST DEFENDANT U.S. BANK)........................................ 72

SECOND CLAIM FOR RELIEF
    FRAUD BY OMISSION (Against Defendant JP MORGAN)................................................ .74

THIRD CLAIM FOR RELIEF
    VIOLATION OF THE ILLINOIS FIDUCIARY OBLIGATIONS ACT, 760 Ill. Comp. Stat
    §65.1 *et seq.,* or alternatively, of various states' enactments of the Uniform Fiduciaries Act
    (Against U.S.Bank)....................................................................................................................76

FOURTH CLAIM FOR RELIEF
    BREACH OF CONTRACT(Against JPMorgan)....................................................................78

FIFTH CLAIM FOR RELIEF
    BREACH OF FIDUCIARY DUTY (Against U.S. Bank)........................................................79

SIXTH CLAIM FOR RELIEF
    BREACH OF FIDUCIARY DUTY (Against JPMorgan)........................................................81

SEVENTH CLAIM FOR RELIEF81
    FRAUD (Against Wasendorf, Sr.)............................................................................. 82

EIGHTH CLAIM FOR RELIEF
    BREACH OF FIDUCIARY DUTY (against Wasendorf, Sr. and Wasendorf, Jr.)....................84

NINTH CLAIM FOR RELIEF
    CONVERSION (Against Wasendorf, Sr.)..............................................................................86

TENTH CLAIM FOR RELIEF
    AIDING AND ABETTING DIRECT VIOLATIONS OF THE COMMODITY EXCHANGE
    ACT (Against Wasendorf, Jr.)................................................................................................87

ELEVENTH CLAIM FOR RELIEF
    AIDING AND ABETTING BREACH OF FIDUCIARY DUTY Duty
    (Against Wasendorf, Jr.)........................................................................................................89

TWELFTH CLAIM FOR RELIEF
    DIRECT VIOLATIONS OF THE COMMODITY EXCHANGE ACT
    (Against Wasendorf, Sr.)........................................................................................................91

THIRTEENTH CLAIM FOR RELIEF
    VIOLATIONS OF Sections 4b(a)(1)(A) and © of the CEA, as amended; FRAUD BY
    MISAPPROPRIATION) (AGAINST WASENDORF, SR.)....................................... .93

FOURTEENTH CLAIM FOR RELIEF
    (Violations of Section 4b(a)(2)(A),(B) and © of the CEA, 7 U.S.C.§6b(a)(2)(A)(B) and ©
    (Fraud in Connection with Commodity Futures Contracts)(Against Wasendorf, Sn, Wasendorf,Jr.,
    Brewer, Garlon Maxwell, and Amber Maxwell.............................................................................94

As Against Wasendorf Sn................................................................................95
As Against Wasendorf Jr. And Steven Brewer.............................................96
As Against Garlon Maxwell and Amber Maxwell.......................................96

FIFTHTEENTH  CLAIM FOR RELIEF
Aiding and Abetting-Under the CEA, 7 U.S.C.§25(a) and 13(c)(A)(As Against defendants
Brewer and Comeau)..........................................................    ...97

SIXTEENTH CLAIM FOR RELIEF.................................................
Breach of Contract under Federal Law and Breach of Federally Imposed Contractual Duties
To Hold Assets and Not Commingle (Against Millenium Trust)..................................................98

SEVENTEENTH CLAIM FOR RELIEF
Breach of Fiduciary Duty under Federal Law and Breach of Fiduciary Dutes Imposed by Federal
Law (Against Millenium Trust)............................................... 101

EIGHTEENTH CLAIM FOR RELIEF
Breach of Contract to Hold Assets and Not Commingle under State Law.................................102

NINETEENTH CLAIM FOR RELIEF
Breach of Fiduciary duty under state law (Against Millenium Trust)....................................... .102

TWENTIETH CLAIM FOR RELIEF
Ordinary and Gross Negligence under State Law (Against Millenium Trust)......................... ..103

TWENTY-FIRST CLAIM FOR RELIEF
Unjust Enrichment and Restitution under Federal and State Law (Against all Defendants)..... 103

TWENTY-SECOND CLAIM FOR BENEFITS
Bad Faith Failure to Maintain a Stable and Objective Contract Market an to Enforce
its Rules and the Commodities Exchange Act in Violation of 7 U.S.C.§7(b), Et.Seq.
(Agains the CME)...........................................................................104

TWENTY-THIRD CLAIM FOR RELIEF
Vicarious Liability-(Against All Defendants)................................................................107

TWENTY-FOURTH CLAIM FOR RELIEF   Rico violations 18 U.S.C.§ 1962© (Against All
Defendants)........................................................    .107

        THE ENTERPRISE ..........................................................................107
        THE RACKETEERING VIOLATION .........................................  ........................ 109
        PATTERN OF RACKETEERING ACTIVITY..................................... ........................112
        RACKETEERING ACTIVITY.......................................................... ........................112

RACKETEERING ACTS INVOLVING WIRE FRAUD..........................................................112
RACKETEERING ACTS INVOLVING MAIL FRAUD..........................................................113
RACKETEERING ACTS INVOLVING MONEY LAUNDERING....................................... 114

TWENTY-FIFTH CLAIM FOR RELIEF
RICO §1962(d) Conspiracy (Against All Defendants)..................................................................115
RICO RELIEF.............................................................................................................................116

TWENTY-SIXTH CLAIM FOR RELIEF (STATE & COMMON LAW PENDANT CLAIMS)   116

Intentional Infliction of Emotional Distress (Against All Defendants)...........................................116

TWENTY-SEVENTH CLAIM FOR RELIEF
Punitive Damages (Against All Defendants)..................................................................................117
JURY DEMAND...........................................................................................................................118

DAMAGES AND OTHER RELIEF..............................................................................................118

Plaintiffs allege as follows upon personal knowledge as to Plaintiffs' own acts, and upon information and belief as to all other matter.

1. Plaintiffs are Bruce Behrens and Kathleen Behrens and Sherri Scheffert and David Scheffert, and Richard Wakeford (collectively "Plaintiffs"), by and through their attorney Susan J. Levy, Esq., for their Class Action Complaint against Defendants, JP Morgan Chase Bank, N.A., U.S. Bank, N.A. The Chicago Mercantile Exchange, Millenium Trust Company, Russell Wasendorf, Senior, Russell Wasendorf, Jr., Steven John Brewer, Garlon Maxwell, Amber Maxwell, Perry Comeau and John Does #1-40 (collectively, as "defendants") on behalf of themselves and other similarly situated individuals or businesses who held accounts at Peregrine Financial prior to July, 2012 and who found their accounts worthless or nearly worthless.

2. Class members are those who invested with Peregrine Financial Group through Brewer Financial Group using Garlon Maxwell and Amber Maxwell (husband and wife) and Perry Comeau as trading agents. The Class also extends to all persons who appeared before the NFA for abitrations of these claims, and had decisions rendered against them by NFA arbitrators.

3. The trading at issue occurred over the Chicago Mercantile Exchange which is a designated Board of Trade pursuant to the Commodities Exchange Act 7 U.S.C. § 7. Et. Seq.

## SUMMARY OF ACTION

4. This Claim is brought under the Racketeering Influenced and Corrupt Organization Statute 18 U.S.C. § 1961, Et. Seq. based in part on the predicate acts of mail fraud 18 U.S.C. §1341 and wire fraud, 18 U.S.C. §1343 as well as pendant State law claims sounding in breach of fiduciary duty and Fraud by Omission against Millenium Trust Company, JP Morgan Chase and US Bank, N.A. and Violations of the Commodities Exchange Act against the Chicago

-1-

Mercantile Exchange 7 U.S.C. § 7, Et. Seq.

5. This RICO Conspiracy among and between the defendants allowed Russell
Wasendorf, Sn., (the Bernie Madoff of the Midwest), and others upon information and belief to
pilfer and steal at least $215 Million dollars from their segregated customer accounts over the
span of 20 years and including plaintiffs' accounts at Peregrine in 2008. (The "RICO Ponzi
Scheme.).

6. These segregated customer accounts are required to be carefully protected under
17 C.F.R. §1.20.

7. The segregated funds at issue in this Class Action were stolen from plaintiffs
from 2007 through 2008. (The Relevant Class Period.) After these funds were stolen,
Wasendorf and his cronies and co-conspirators gave marching orders to their loyal lieutenants,
the trading advisors and other Introducing Broker, and agents who had control over plaintiffs'
customer account especially during the time when margin calls were issued during the week of
October 2, 2008 through October 8, 2008. Those defendants charged with the handling of
plaintiffs' accounts including the notification of their margin call purposefully took action to
terminate each customer's account by failing to even tell them that their accounts were in a
margin deficit on a timely basis so that each customer ended up with a zero balance or a
deficient balance whereby the customer owed the FCM money in the end.

8. In the first part of this RICO conspiracy, plaintiffs' money was stolen from
purported "customer segregated accounts" maintained by Peregrine Financial Group ("PFG"
hereinafter) with JPMorgan and U.S. Bank (the "Banks," hereinafter). The theft from the
accounts at JPMorgan and U.S. Bank could not have occurred without the Banks' full

-2-

cooperation and breaches of their legal duties including breach of fiduciary duty and Fraud by

Omission.  Because these customer segregated accounts are special accounts, the law require

these banks to afford each customer and class member herein a special duty of care.

9.  JPMorgan who also held plaintiffs' customer monies in a customer segregated

account ending in 5265, intentionally and knowingly transferred millions of dollars in PFG

customer money to U.S. Bank's 1845 account for the use of Wasendorf, Sn. personally including

plaintiffs.  After the transfer from the JP Morgan Chase 5265 Segregated Customer Account into

the unsegregated Non-Customer 1845 account at U.S. Bank,  Wasendorf Sn.  was easily able to

pocket customer moneys and skirt the law notably 17 C.F.R. § 1.20 which imposes a special duty

on banks to ensure that customer segregated monies do not get commingled with house money.

10.  After the diversion of funds, Wasendorf, Sn., who in turn diverted these

funds to his own unauthorized uses such as buying homes, restaurants and office buildings and

living a lavish lifestyle.

11.  U.S. Bank maintained various accounts for PFG and Wasendorf, Sn. who was

considered a preferred and favored customer, including a purported customer segregated

account, and a "house" account.

12.  U.S. Bank allowed Wasendorf Sn. to use this 1845 Segregated Customer

account as pledged collateral for a personal loan non-related to customers; and U.S. trust even

took $30,000.00 in processing fees from the 1845 account that was not a result of processing

customer related business.

13.  U.S. Bank allowed PFG to portray an account, known as the 1845 account,

with U.S. Bank as a customer segregated account to the public, and routinely accepted deposits

of customers funds designated for deposit to a "customer segregated account." into the 1845

account.

14. U.S. Bank concurrently allowed Wasendorf, Sn. to use the same account, the 1845 account as a non-segregated account or personal piggy bank and conduit for the diversion of funds transferred from JPMorgan to Wasendorf Sn.'s personal use.

15. Without any due diligence and blind compliance, JPMorgan allowed customer monies to be transferred during the relevant time frame to U.S. Bank's 1845 account without ever knowing or verifying what type of account the 1845 really was and not knowing if it was supposed to be a customer segregated account for the exclusive use and benefit of the customers not for funding Wasendorf's lavish lifestyle.

16. Thus, the moment JPMorgan initiated these transfers on the word of Wasendorf, the monies were as good as gone, and were gone very soon thereafter.

17. Defendants JPMorgan and U.S. Bank's conduct was a direct and proximate cause of plaintiffs' losses because had JPMorgan and US Bank followed the clear laws relating to maintaining customer segregated accounts, pursuant to 17 CFR 1.20, these defendants never would have made **any** transfers to Wasendorf, Sn. for his personal use, and therefore none of plaintiffs' accounts would have been stolen, looted and wiped out to a zero balance, as they were unknowingly to plaintiffs in the first part of this RICO Ponzi Scheme that ran over an approximate 20 year period.

18. In part Two of this RICO Ponzi Conspiracy, after stealing customer money from customer segregated accounts at JPMorgan and U.S. Bank, with JP Morgan and U.S. Bank's apparent blessing and consent, Wasendorf, Sn. in effect depleted these customer balances including the balances of customer plaintiffs herein leaving them with a zero-balance or a deficiency in their account.

19. In the Second part of this RICO Ponzi Scheme, Wasendorf, Sn. had to figure out a way to get rid of these very customers at Peregrine whom he had just robbed, because Wasendorf, Sn. and his co-conspirators could not just tell their customers to go away because they had no more funds to use as margin to initiate and maintain futures and/or option positions. In part two of this Ponzi RICO Scheme to protect JPMorgan and U.S. Bank who allowed this scheme to continue for over a decade and would have continued but for Wasendorf's attempted suicide on July 9, 2012, Wasendorf, and his coconspirators gave marching orders to a cadre of loyal and crooked brokers who are known in the commodities industry as CTAs or Commodity Trading Advisors and IBs, Introducing Brokers, and other agents to find a clever way to purposely create losses in each customer's accounts, so that each customer would just disappear from the market place allowing Wasendorf and his co-conspirators to laugh all the way to the bank.

20. Stated otherwise, in the Second part of this RICO Ponzi Scheme, defendants had to come up with a strategy to purposefully end each customers' investment career including plaintiffs' herein by making their account balances actually go to zero.

21. In Part Two of this RICO Ponzi Scheme, defendants violated the CME Margin Rules 930(D), (E) and (K), by failing in good faith to ever inform plaintiffs herein that they were in a margin deficiency during the week of October 2, 2008 to October 8, 2008, and thus never giving them a chance to resolve this deficiency until their accounts were closed as worthless. This conduct is not only contrary to the Rules of the Exchange but in violation of good faith; and certainly a fair inference of intentional conduct can be drawn under the totality of the circumstances.

22. Notably, defendants' egregious conduct under normal circumstances would have been a severe detriment to their own interests to preserve net capital in the case of a

-5-

customer default. In fact, the Peregrine Customer Agreement provides for the application of the

CME rules for its own protection. See Customer Agreement annexed hereto as Exhibit 1. Thus,

PFG's abrogation of CME Rules 930 D, E. and K is also a violation of its own Customer

Agreement as well and raises a question of why PFG did not want to protect its own net capital

which would have been used to pay back the CME in the case of a customer default. The answer

appears to be that in this case, there was intentional conduct to destroy plaintiffs' positions.

23. Defendant, the Chicago Mercantile Exchange, acted in bad faith in failing to

enforce its own rules namely CME Rule 930 D, E, and K thus proximately causing plaintiffs'

loses. Thus, they too are liable for actual damages pursuant to 7 U.S.C § 7(b), Et. Seq.

24. Peregrine was a major FCM, Future Commission Merchant and clearing

member or with clearing privileges whose business was coveted by the CME. The Chicago

Mercantile Exchange appears to have turned a blind eye to the conduct of their esteemed

colleague Russell Wasendorf, Sn. and therefore persons in charge of PFG's account acted in bad

faith in allowing under-margined accounts to be traded including the initiation of new positions

even with a Margin Call outstanding, on October 2, 2008, October 3, 2008 and finally on

October 6, 2008 in blatant violation of the Rules, in the case of Mrs. Scheffert's Margin account.

See Expert's Report dated July 7, 2016 annexed hereto as Exhibit 2. Under well-settled rules

namely CME Rule 930D, after one hour of being on a Margin Call, all trades that constituted the

initiation of new positions should have been stopped by the Chicago Mercantile Exchange, other

than liquidation only trades according to CME Rule 930C.

25. Instead, the Chicago Mercantile Exchange allowed trading by the initiation of

new positions even while the Schefferts were on a Margin Call starting on Wednesday, October

2, 2008. On October 2, 2008, no professional involved in these accounts ever called the

Schefferts to apprise them of their Margin call. Under CME Rules 930D, 930E and 930K all

-6-

trading should have stopped in the Schefferts' accounts when a margin deficiency arose on October 2, 2008.

26. By failing to stop trading, the CME caused the Schefferts' accounts to go to almost zero by October 8, 2008. Had the CME enforced its plain rules, the losses to the Schefferts would have been limited to approximately $50,000.00 instead of approximately $350,000.00, their total life savings. See Expert's Report annexed hereto as Exh 2.

27. Because the CME is unquestionably the King of the Jungle in the Commodities Futures trading business, it sets the Rules by which all other entities including Wasendorf and PFG had to abide.

28. The CME is also the ultimate buyer and seller of all transactions over their Exchange, which are novated onto the books of the CME on a nightly basis. The CME is supposed to monitor all trades over its Exchange on a daily basis to protect the integrity of the market including plaintiffs' life savings. It is unfathomable that persons responsible at the CME missed that approximately 35 account holders where the initiation of new positions continued while the accounts were on margin calls .

29. In fact, under CME Rule 930(K), the CME considers one hour to be reasonable notice to account holders to apprise them of their margin deficiency and liquidate the customer's account. These plaintiffs were never apprised by anyone over the phone of any margin deficiencies although letters were sent to Millenium and to the Schefferts in Mission, Texas which never even reached the plaintiff, the Schefferts who were in Oelwein, Iowa, their main residence at the time. See Margin Call Notices annexed hereto as Exhibit 3.

30. The Margin Call Notices annexed hereto as Exhibit 3 were clearly designed not to reach the plaintiffs and therefore show intentional conduct in that Defendants really did

-7-

not want the customers to be able to satisfy the margin calls and instead wanted their accounts to shut down with severe losses.

31.  Indeed, if one hour is considered a reasonable time to resolve a margin deficiency, certainly phone calls must be forth coming immediately to notify plaintiffs that their accounts are in jeopardy.

32.  The Margin  Handbook authored by the National Futures Association states clearly: "Margin Calls shall be made within one business day after the required occurrence of the event giving rise to the call."  See Excerpt from Margin Handbook, Exhibit 4  annexed hereto. Thus, the customers had to be informed by October 3, 2008.  Unless such notice were hand delivered or Federal Expressed, this obligation to give notice in one day was ignored by Defendants.

33.  Prompt phone calls to customers are the industry standard and norm in the case of a Margin Call that is issued to the customer.  These calls are required to satisfy the CME's rule that one hour's notice is sufficient notice prior to shutting down a customer account.

34.  The extreme unusual situation where these plaintiffs were never even called nor made aware that their accounts were on margin call shows that intentional conduct was used by Defendants to purposefully wipe out plaintiffs' accounts.

35.  Because the goal of Wasendorf, Sn. and his co-conspirators was to destroy not preserve customer accounts, the CME's cooperation by suspending their sacrosanct rules 930E, D and K demonstrate bad faith.

36.  Once the customers' accounts had a zero balance, the customer accounts were closed, and the named plaintiffs and other class members left the market devastated both emotionally and physically having lost their life savings—after a lifetime of hard work.  All the

-8-

while the defendants continued to perpetuate this massive Ponzi Scheme for at least another four years unabated.

37.  With respect to Millenium Trust Co, LLC., it participated in the RICO Conspiracy by allowing plaintiffs' Traditional IRA money to be invested in these risky derivative transactions which were bound to lose eventually.  In addition, Millenium also violated pendant state law, such as negligence and breach of fiduciary duty since as the IRA custodians of Plaintiff's IRA accounts, Millenium was charged with Fiduciary duties and duties of reasonable care to ensure that the moneys in these investor's portfolio were being properly managed and invested.

38.  Millenium willfully signed off on documentation allowing the Schefferts' entire IRA savings to be invested in an irresponsible manner where all assets were used to purchase and sell put and call options, a strategy that fails 95% of the time, upon information and belief.

39.  Because Millenium was a RICO conspirator with Peregrine and Brewer in this RICO Conspiracy, it never fulfilled its mandatory fiduciary duty and ordinary duty of care to plaintiffs to prevent plaintiffs from investing in such an unsuitable and unlawful manner, as they were required to due as IRA custodians.

40.  The advisors, Introducing brokers and FCMs such as defendants Steven Brewer, Russell Wasendorf, Jr., Amber Maxwell, Garlon Maxwell and Perry Comeau who were authorized to trade or act in connection with plaintiffs= accounts were either never registered with the NFA as required by law, (although they claimed an exemption, but never bothered to file the exemption either) and/or had shady backgrounds and/or and had numerous violations against them.  For example, Garlon Maxwell had filed for bankruptcy in 2005 just prior to trading plaintiffs'accounts as an investment advisor and was fined $25,000.00 for violating the

Rules of the State of Iowa regarding investment advisors. See Decision and Orders annexed hereto as Exhibit 5. He also had federal tax liens asserted against him and simply had no business trading millions of dollars on behalf of unwitting customers.

41. These CTA's Amber Maxwell and Garlon Maxwell should not even have been allowed to handle any customer money at all. Each committed Fraud by downplaying the risks of their investment strategy allowing plaintiffs to believe that their was making conservative investments.

42. Perry Comeau, a nurse anesthetist and resident of Oelwein, Iowa decided to become a self-anointed Introducing broker and/or investment advisor. He aided and abetted the Maxwells by also encouraging and facilitating the Class to invest in these high risk investments. He personally helped plaintiffs set up their accounts with the Maxwells using the Internet with the various FCMs, and he even entered into a management agreement and powers of attorneys with some of Plaintiffs as well herein.

43. Steven Brewer of Brewer Financial Group, a now defunct company participated as the Introducing Broker who introduced the plaintiffs accounts held by Millenium and others to Peregrine where the customers eventually lost their life savings. Steven Brewer also participated as a RICO conspirator and committed Fraud in connection with plaintiffs' customer accounts by purposefully and falsely assuring plaintiffs that Brewer Financial Group would satisfy all margin calls on behalf of the customers. Brewer entered into an agreement with co-conspirator Russell Wasendorf, Jr. to cover all margin calls, but when the time came to make good on his signed agreement, no margin calls were covered and Steven Brewer, proximately caused plaintiffs to lose their entire life savings, on purpose. See Agreement Sec,2s between Stephen Brewer and Wasendorf, Jr. annexed hereto as Exhibit 6.

## JURISDICTION AND VENUE

44. This is a class action brought pursuant to Federal Rule of Civil Procedure. 23(a) and (b) (3).

45. This Court has subject matter jurisdiction over this Class Action arising under the Racketeering Influenced and Corrupt Organization Statute 18 U.S.C. § 1965(a) and (b); under the Commodities Exchange Act 7 U.S. C. § 25, Et. Seq. and pendant law claims based on the Supplemental Jursidiction of this Court pursuant to 28 U.S.C. § 1367(a) and Federal Rule of Civil Procedure 18(a).

46. This Court has personal jurisdiction over each and every defendant because one defendant JP MORGAN CHASE does business in New York and has its principal place of business in New York. Under 18 U.S.C. § 1965(a) and (b) as long as personal jurisdiction is proper over one member of this RICO Conspiracy, than personal jurisdiction may be asserted based on nationwide service of process against **all** other defendants pursuant to the ends of justice. Because personal jurisdiction is proper over JPMORGAN, all other RICO defendants are subject to in personam jurisdiction in this Court.

## THE PARTIES

### Class Plaintiffs

47. Plaintiffs Sherri Scheffert and David Scheffert reside in Oelwein, Iowa. (pronounced "Ol-wine") They have been married for 50 years. They also spend the winter months in Texas, from November through April due to Dave's health problems.

48. In August of 2007, the Schefferts in their 60s, and wanting to retire with a steady income invested their entire nest egg, representing their entire life savings with defendants by opening three accounts with Peregrine Financial Group. which were purposefully lost in this RICO Ponzi Scheme in one week, during the week of October 2, 2008 to October 9,

-11-

2008. These accounts were as follows:

|  | Account number | Original |
|---|---|---|
| **Investment** | | |
| Sherri Scheffert I | xxxx0 | $185,843.10 |
| David Scheffert IRA | xxxx 1 | $130,253.27 |
| David and Sherri Scheffert joint account | xxxx 8 | $47,715.00 |
| **Total:** | | **$363,811.40** |

49. Kathleen and Bruce Behrens, husband and wife, also residents of Oelwein, Iowa invested their life savings with defendants in what they perceived to be conservative and safe investments by opening up an account with Peregrine, introduced by Brewer Financial Group to be managed by Garlon Maxwell, Amber Maxwell, with the assistance of Perry Comeau.

50. Mr. Bruce Behrens was retired from owning a company called Culligans Water Company where he conditioned water. Both he and Mrs. Behrens were High School graduates as well.

51. The Behrens also invested their entire life savings in the amount of approximately $202,061.60 as follows:

<u>**Original Investment**</u>

Kathleen Behrens IRA:     $52,340.47

Bruce Behrens IRA:     $36,809.13

Bruce and Kathleen Behrens Joint: $112,912.00

-12-

**Total:**                                    _____

$202,051.60

52.   Richard Wakeford, was 64 years old when he opened an account with Peregrine. Mr. Wakeford is also a resident of Oelwein, Iowa, lost approximately $240,000.00 in this Ponzi Scheme, which also represented his savings over a life time which he wanted to keep secure.

53.   Mr. Wakeford worked for 35 years as a General Contractor. He graduated from High School and did attend technical school in North Dakota called the School of Science where he studied Architectural drafting. However, he had no financial background to speak of and was a trusting and unsophisticated investor. He had both a regular account as well as a traditional IRA account in the amount of $66,000.00 with Millenium Trust.

54.   During the week of October 2, 2008 through October 9, 2008, these entire investments were wiped out due to purposeful conduct by the CTA or Commodity trading advisors, Garlon and Amber Maxwell who were never even registered as required under the Commodities Exchange Act, 7 U.S.C.§6(k) during the relevant time period and should not have been allowed to invest or give investment advice.

55.   During the week of October 2, 2008 through October 8, 2008, each plaintiffs' account fell into a margin deficit triggering a margin call. However, defendants purposefully failed to properly notify plaintiffs of these margin calls or losses in each one's account in a timely manner as mandated by CME Rule 930E which also requires margin call notices to be made within one business day. Had each plaintiff been notified, by telephone on October 3, 2008, the next day after the Margin Call was first issued, each would have closed his or her account thus preserving most of the assets which were not fully dissipated until October 8, 2008.

56.   However, to make sure that plaintiffs had no chance to save any of their

-13-

assets which had to disappear as per this RICO Ponzi scheme, part one, plaintiffs did not even have the protection of the CME rules which were apparently suspended when it came to allowing this Ponzi Scheme to flourish wiping out these investors' life savings.

57. To make matters worse, defendants continued to violate the clear mandates of the CME rules which prohibit all trading during a margin call except for liquidation only trades. See CME Rule 930D. Rather, during this one week period of the undisclosed margin calls, the CME allowed trading to continue to bleed plaintiffs' account down to zero. For example, the Schefferts' accounts continued to be actively traded in violation of the CME rule 930D and new positions were initiated on October 2, 2008, October 3, 2008 and October 6, 2008. See Expert's Report annexed hereto as Exhibit 2.

58. The investment advisors, the Maxwells, continued to purposefully cause losses in each plaintiff's account by selling naked puts and/or naked calls in each plaintiff's account during the volatile week of October 2 through October 8, 2008, not just using 10%, but 100% of each clients' monies which ensured a total collapse of each account.

59. It is well-settled in the Commodities Futures Industry that naked puts and calls will cause losses 95% of the time. So, this strategy was a perfect strategy to wipe out plaintiffs' remaining account balances so that Wasendorf Sn. and his co-conspirators could nicely reconcile their books after having previously pocketed the investment funds in plaintiffs' accounts with the cooperation of JPMorgan Chase and U.S. Bank.

60. Now both books of the ponzi scheme showing plaintiffs' actual balance (a zero balance) due to Wasendorf Sn. and his cronies pocketing the plaintiffs' life savings by dipping into customer segregated accounts and the actual customer money for investments in their customer accounts all ended up with zero balances, making this the perfect crime.

**Defendants**

-14-

61. Russell R. Wasendorf Sn. was the CEO and owner of PFG since he first created the company Peregrine Financial Group a/k/a PFG Best in approximately 1990 when this RICO Ponzi Scheme first commenced upon information and belief. He was registered with the National Futures Association ("NFA" hereinafter) as a principal and an associated person of PFG since 1992 under NFA Ids 0049753 and 0089948.

62. Russell R. Wasendorf Sn. currently resides in Terre Huate, Indiana, upon information and belief in a Federal Penitentiary. He is serving a 50 year sentence, the maximum, for stealing customer funds out of these segregated customer accounts which he treated like his own personal slush funds. He would never have been able to accomplish this heinous scheme without the acquiescence of co-defendants of JPMorgan and U.S. Bank.

63. When he attempted to commit suicide on or about July 9, 2012, he left a self-serving suicide note stating in relevant part: "I have committed fraud." However, he did not go far enough because he tried to arrogate to himself this fraud, when there were many John Does involved upon information and belief.

64. U.S. Bank N.A. is a nationally chartered bank organized under the laws of Delaware with its principal place of business in Minneapolis, Minnesota. U.S. Bank maintains a an office in the Southern District of New York. The "U.S. Bank" name has been used since 1891 and, since that time, as a result of a series of mergers and acquisitions, has covered an increasingly large number of banking institutions. U.S. Bank's parent company, U.S. Bancorp, was formed on or about February 27, 2001, when Firstar Corporation purchased U.S. Bankcorp. Although Firstar was the surviving company, the combined entity changed its name to U.S. Bancorp. Defendant U.S. Bank is liable as a successor in interest for the conduct of Firstar.

65. JPMorgan Chase Bank, N.A. ("JPMorgan") is a nationally chartered bank

-15-

that is organized under the laws of Delaware with its principal place of business in New

York, New York.  JPMorgan maintains several branches in this District.  PFG maintained at

least 36 accounts at JPMorgan, including at least one customer segregated funds account.

JPMorgan's parent company JPMorgan Chase & Co., is an amalgamation of over 1200

predecessor entities including the Chase Manhattan Corporation and J. P. Morgan & Co.

which merged in December 2000.  On or about July 1, 2004, JP Morgan Chase & Co.

acquired the Bank One Corporation including Bank One's subsidiary, Bank One, N.A., which

combined with JPMorgan.  Defendant JPMorgan is liable as a successor in interest for the

conduct of Chase and Bank One.

66.  The Chicago Mercantile Exchange Inc. (the "CME") is a Delaware

Corporation which its principal place of business in Chicago, Illinois.

67.  The CME is a registered Board of Trade as defined under the

Commodities Exchange Act, 7 U.S.C. § 7, Et. Seq.

68.  Defendant CME charged plaintiffs Exchange Fees every time plaintiffs

traded over the CME Exchange.

69.  In order to trade over the CME, plaintiffs had to associate themselves with

a clearing house member who would place the customer trades.

70.  PFG was a clearing house member of the CME upon information and

belief.

71.  Defendant CME is the ultimate buyer and seller of every contract or

option traded over the Exchange due to the Novation process.

72.  Defendant CME has promulgated Rules in the CME rulebook that all

participants must follow while trading over the CME.  Most importantly are the CME

rulebook's rules, 930 D, E, and K regarding margin and margin calls which set forth

procedures by which transacting parties must follow where an account is under margined, including the cessation of all initiating new positions until a margin deficiency is resolved.

73.  Defendant Millenium Trust Company a/k/a Millenium trust Co. LLC ("Millenium") is an Illinois Trust Company with its principal place of business in Oak Brook, Illinois.

74.  During the relevant time period, Millenium Trust Company served as the IRA custodians for plaintiff retirement accounts or Traditional IRAs and owed plaintiffs a fiduciary duty and duty of ordinary care and a special duty of care to protect these funds and make sure they were being properly invested.

75.  Defendant Steven Brewer is a resident of Illinois.  During the relevant time period, he was the principal and owner of Brewer Futures Group, LLC. ("BFG" hereinafter) which was the Introducing Broker who introduced plaintiffs' accounts to Peregrine Financial Group.76.  BFG also guaranteed that all margin deficiencies on behalf of the customers would be funded by BFG.

77.  BFG was registered with the NFA (NFA I.D. No. 0300729) during the relevant time period. BFG charged fees and commissions on plaintiffs' accounts. . BFG was registered with the CFTC and a member of the NFA doing business with plaintiffs.

78.  BFG is no longer in existence having gone bankrupt just like Peregrine Financial Group, the FCM who settled and cleared the accounts of Plaintiffs after BFG introduced their accounts.

79.  BFG was also suspended from membership at the NFA in 2010 for failing to pay a fine levied against it by the NFA for misconduct in the amount of $100,000.00.

80.  In 2004, the NFA also levied a fine against BFG and its principal Steven John Brewer in the amount of $30,000.00 also for misconduct; and in 2007 prior to BFG

-17-

acting as an Introducing Broker for plaintiffs herein, it was again fined $45,000.00 for misconduct in connection with its membership at the NFA.

81. The SEC also instituted legal proceeding against Steven Brewer and other Brewer entities for fraudulent offerings of unregistered securities from 2009 through 2010. See United States Securities and Exchange Commission v. Steven Brewer, Et. Al., 1:10-cv-06932 (N.D. Illinois 2010.)

82. Defendant Amber Maxwell resides in Saratoga Springs, Utah. During the relevant time period, she held herself out to members of the Class as a bona fide Investment Advisor including as a Commodities Trading Advisor as defined under 7 U.S.C. § 1, Et. Seq. She invested customer funds on behalf of plaintiffs' and created losses in their segregated customer accounts.

83. Defendant Garlon Maxwell, the husband of Amber Maxwell, resides in Saratoga Springs, Utah. During the relevant time frame, he also held himself out to members of the Class as a bona fide Investment Advisor including as a Commodities Trading Advisor as defined under 7 U.S.C. § 1, Et. Seq. He invested customer funds on behalf of plaintiffs' and created losses in their segregated customer accounts.

84. Perry Comeau resides in Oelwein, Iowa. During the relevant time period he held himself out as a bona fide investment advisor to the members of the Class and assisted the Maxwells in managing the Classes' accounts. He assisted the investing of customer funds on behalf of plaintiffs' and created losses in their segregated customer accounts.

85. Russell Wasendorf, Jr. resides in Florida. During the relevant time frame, he was CFO of Peregrine Financial Group and participated in this RICO Conspiracy by taking customer funds from Millenium Trust and others on behalf of plaintiffs to purposefully

make disappear in this ponzi scheme.

## PROCEDURAL HISTORY

86. Recently, U.S. Bank and JPMorgan settled a Class Action in the approximate amount of $44 million dollars to cover 24,000 purported Class members who had opened accounts at Peregrine as of July, 2012 and lost their proceeds in part 1 of this RICO Ponzi Scheme. See *In Re Peregrine Financial Group Customer Litigation*, 12-cv-5546 (N.D.Ill. 2012). Although some similar claims do exist in that case, this case is distinct from the prior Class Action which specifically excluded the Class members herein. Rather, the Settlement Class only included 4(d) customers who actually owned money, property or securities at the time Peregrine went bankrupt on or about July 10, 2012. Because none of the plaintiffs herein owned money, securities or property in 2012, the instant class members were excluded from the previous settlement.

87. Recently, in or about June, 2016, some plaintiffs learned that they would not be participating in the current Class Settlement. As stated because this instant class of plaintiffs are not bona fide 4(d) customers, they have been excluded from the Class and now must bring their own cause of action.

88. The instant Class members in this case never received any notices or other information about the Prior Class Action Settlement including opt-out notices; and therefore they are not bound by the previous class settlement, upon information and belief

## FACTUAL ALLEGATIONS

### Background of the Investor Class Members

89. This Class Action represents a group of approximately 35 parties including husbands and wives who all resided in Oelwein, Iowa during the relevant time period from approximately 2005 through the end of 2008. This Class lost approximately $3.5 million

-17·b-

dollars in this RICO Ponzi Scheme.

90.   Olwein, Iowa is a town of approximately 5000 people in the heartland of America.  Olwein's charm and size produce for the most part the type of citizens that we think of as ideal Americans, kind, trusting and decent.  However, it was these very qualities that allowed the corrupt RICO defendants, to take terrible advantage of their brethren, plaintiffs, herein.

91.   Plaintiffs are unsophisticated investors to put it kindly.  But they do have common sense and wanted to make prudent investments for their future. Most of them did not have the advantage of a college education and just graduated from high school before either serving in the United States Military or else working in a blue collar profession where there is not a big emphasis or reading and analyzing financial statements and disclosure documents.

92.   Plaintiffs Sherri Scheffert and David Scheffert are high school graduates who graduated from high school in Oelwein in 1964.

93.   After graduating from high school, they got married.  Sherri worked for 30 years for the phone company as a customer representative, and Dave Scheffert worked in various jobs including as a welder, machine worker, assembler and electrician.  He was fortunate enough to eventually own a live stock pre mix business which distributions cattle feed, livestock feed and/or chicken feed.  He has also worked as a truck driver.

94.   Having worked for a lifetime with the intention of saving for their retire-ment, there came a time in 2005 when they heard about a neighbor in Oelwein, Perry Comeau who represented that he knew some very good and competent investment professionals, named defendants Garlon Maxwell and his wife Amber Maxwell.

95. Because the Schefferts were not sophisticated investors, they were very interested in having professional help in managing their nest egg which took a lifetime to

save up to. Their total combined savings was in the approximately amount of $350,000.00

96. Plaintiffs Kathleen Behrens and Bruce Behrens also residents of Olwein, Iowa also saved conservatively during their marriage to also have a combined retirement income of approximately $250,000.00.

97. Bruce Behrens was the owner and operator of a business known as Culligan Water Conditioning, a water conditioning concern. He sold his business in 1999 and wanted safe, conservative and prudent investments for his retirement nest egg. He received approximately $150,000.00 for the sale of his business.

98. Both the Behrens and the Schefferts had plans to retire in 2005.

99. After learning at a group get together of investors that their accounts had been wiped out, in October, 2008, Mr. Behrens contacted someone he knew to find work and immediately had to come out of retirement to make ends meet. He was offered a position doing manual labor in particularly working on a roof top. Mr. Behrens accidentally fell off the roof while working on it and suffered severe and serious injuries including a fractured portion of his spine as a result of having to go back to work, since men in their 60s should not be doing construction jobs on rooftops. However, because of this Rico Ponzi Scheme which victimized Mr. Behrens, he was forced into a position where he had to make ends meet any way he could within the bounds of the law, and he paid a dear price with his health in addition to his monetary losses.

100. By the time Mr. Behrens learned that he was on a Margin Call by letter, he was lying in a hospital bed with nearly every bone in his body broken. The CME and all of the other defendants involved are liable for these physical injuries. The other plaintiffs suffered extreme emotional distress as well, and awards should be made for this distress too.

101. Because Oelwein is a small town, most people know each other and word

-19-

travels fast.

102.  Perry Comeau, a nurse anesthetist at the local hospital decided to travel to Utah to take a class taught by Garlon Maxwell called "Teach me to Trade." He took five one week classes totaling $20,000.00 in tuition. Each week he traveled to Utah, except for the last class that was held in Las Vegas, Nevada.

103.  At this class "Teach Me To Trade," Garlon Maxwell had approximately 150 students and held himself out to Perry Comeau as an investment professional. Perry Comeau decided to let Garlon Maxwell invest for him.

104.  In Oelwein, Perry represented that Garlon Maxwell with his wife Amber Maxwell were professional money managers who could handle their accounts. Perry Comeau stated that his returns were solid. The Maxwells then traveled over 1000 miles from Utah to Iowa to hold seminars in a local steakhouse to impress the crowd and solicit their investments.

105.  Perry Comeau aided and abetted Garlon and Amber Maxwell in soliciting accounts and completing the opening documentation.

106.  At Bill's Steakhouse, in Oelwine, Garlon Maxwell represented to the crowd, that his winning strategy was risk averse and risk was limited because he only invested 10% of each one's total principal in order to limit the losses in each one's account.  He also explained that with his solid trading strategy, he could make profits both when the markets went up as well as when they went down.

107.  He charged a 22% incentive fee for his investment advisory services.

108.  However, Perry Comeau was only charged 17%, a 5% reduction in fees for Mr. Comeau's assistance with opening up these customer accounts.

109.  Garlon Maxwell did not have to go into detail about how he intended to gain profits when his strategy was buying out of the money naked calls and puts, a strategy that is

-20-

extremely risky where most people lose approximately 95% of the time, upon information and belief.

110. Neither Garlon Maxwell, Amber Maxwell or Perry Comeau ever bothered to tell plaintiffs that naked puts and calls are extremely risky, and they downplayed the risks of these investments.

111. Garlon Maxwell and Amber Maxwell with the help of Perry Comeau induced these unwitting members of the investing public to commit their life savings based on these clear misrepresentations and material omissions which constitute fraudulent inducement under horn book law and which is a violation of the Anti-Fraud Provisions of the Commodities Exchange Act. See 7 U.S.C. §§ 6(b), 6(m), 6(o).

### 2005 Opening of the Customer Accounts Based on Fraudulent Inducement and Minimization of Risks

112. Based on the downplaying of the risks of investing as well as the misrepresentation that only 10% of each one's funds would be invested at one time, plaintiffs proceeded to open investment accounts, first at Interactive Brokers, Inc. a Futures Commission Merchant.

113. To open these accounts, each set of plaintiffs were assisted by either Perry Comeau or the Maxwells who set up their accounts over the internet and helped them fill out the required paper work which consisted of preprinted and small font boiler plate documents.

114. Because plaintiffs are not big readers, they relied on the verbal explanations of the Maxwells and Perry Comeau and just signed on the dotted line. They were not instructed to read documents, and signed documents in the basement of Perry's home. Plaintiffs did not

-21-

scrutinize these opening documents because they perceived them to be unintelligible and in small print, and they preferred verbal explanations by the investment advisors whom had traveled from Utah to Iowa to explain the details to them personally.

115. Stated otherwise, because they had spent a substantial amount of time listening to Garlon Maxwell explain the trading strategy at Bill's Steak house, they viewed the opening documents as the same type of documents one would sign to open a credit card for example by just signing on the dotted line.

116. They were never instructed by anyone to review the documents prior to signing them, so instead they relied on the verbal representations made to them to explain the documents.

117. In addition, some of the documents were unwittingly signed in blank by plaintiffs to be filled in later.

118. Their accounts at Interactive Brokers, Inc. were opened in approximately 2005. Interactive Brokers appears to be an on line broker where the Maxwells could place trades on behalf of the customers themselves over the internet.

119. However, there came a time when Interactive Brokers, Inc. became aware that neither Garlon Maxwell, Amber Maxwell and Perry Comeau were registered to trade contracts on behalf of third parties such as plaintiffs herein.

120. Interactive Brokers, Inc. knew that the commodities laws required all CTA's or Commodities Trading Advisors to be registered with the National Futures Association to even be allowed to trade on behalf of customers. Thus, upon information and belief, when Interactive

-22-

learned that neither Garlon, Amber nor Perry were licensed Commodities Trading Advisors, Interactive asked them to terminate their accounts with Interactive Brokers immediately.

121. In addition, the Commodities Exchange Act also imposes strict liability on any principal for the acts of their agents. 7 U.S.C. § 2(a)(1)(B). Thus, if the CTA's were unregistered, Interactive could be held liable for any damages on a strict vicarious liability basis, since the CTAs have been considered agents of the FCMs. Again, Interactive did not want to risk that problem, upon information and belief.

122. The exception to registration in Iowa did not apply--where an unregistered advisor could handle up to 5 accounts, because the Maxwells were handling more than that limit. The Maxwells were asked to leave Interactive Brokers, upon information and belief.

123. It does not appear that the Maxwells attempted to even register as CTAs in 2005, and they thought they could fall under the exception to registration which states that if one is just trading for friends or close family members (15 persons or less), and not holding herself out to the public as an trader, they would be exempt from registering.

124. However, whether or not an exemption from registration existed, and the overwhelming evidence rejected by the NFA arbitrators showed that registration was required because Garlon Maxwell and Amber Maxwell were originally strangers to these Iowans not friends at all–even including Perry Comeau who just met him at a seminar where Mr. Maxwell held himself out to Mr. Comeau as an investment professional upon information and belief.

125, Garlon Maxwell had a negative history and had the customers been informed of Garlon Maxwell's history, they never would let him handle their funds. However, the

-23-

customers did not have the following information that perhaps Interactive Brokers did have when the accounts were handled:

1. Garlon Maxwell had filed for Bankruptcy in 2004 and received a discharge on March 22, 2005.  See Exhibit 5 annexed hereto.

2. Garlon Maxwell had Federal Tax liens for a 16 year tax period from  1989 through 2005.

3. Garlon Maxwell, Amber Maxwell and Perry Comeau were being investigated by the Iowa Department of insurance for infractions relating to their purported status as Investment advisors in the State of Iowa. Fines were levied against each of them with cease and desist orders in 2007 in the respective amounts of $25,000.00 (Garlon Maxwell),  $15,000.00 (Amber Maxwell) and $20,000.00 (Perry Comeau). See Orders annexed hereto as Exhibit 6.     .

126.  Notwithstanding these fines and cease and desist order, not one of these defendants ceased nor desisted, but they continued with avengence to violate the laws of the United States and eventually destroy plaintiff's life savings.

127.  These three defendants were ideal for Wasendorf, Sn.'s scheme.

128.  For example, when Peregrine Financial Group, Inc. ("PFG") requested that Garlon Maxwell fill out forms for their review, Maxwell did not fill in the box where it was asked if he ever had gone bankrupt. But, PFG was not concerned with doing honest due diligence, because Wasendorf wanted co-conspirators who would agree to hide customer stolen monies

129.  Thus, Garlon and Amber Maxwell had perfect track records to meet Wasendorf's needs,

-24-

because Wasendorf and PFG could not actually do the advising of clients themselves, they need the held of these CTAs to purposefully end customer accounts and needed the assistance of trades and brokers.

130. Amber Maxwell was also never registered as a CTA during any time when these customers accounts were being traded by her or by her assistance to her husband Garlon Maxwell.

131. Garlon Maxwell was never registered in any capacity with the NFA during the life of these customer accounts either.

132. Perry Comeau was also not registered with the NFA during the life of these customer accounts, upon information and belief.

133. The Maxwells intended to receive large commissions on these customer accounts, as did Brewer, PFG, Millenium and the CME. Perry Comeau would receive reduction in his own trading fees, as his commission.

## Crossland and Millenium Trust Company-March, 2007 to August 2008

134. After the group of investors were asked to leave Interactive Brokers, who understood their liability for allowing unregistered advisors to trade in the customer accounts, Amber and Garlon Maxwell found Crossland, Inc. who agreed to act as the group's FCM and settle their trades.

135. In March, 2007, transfer documents were signed to initiate transfers from Interactive Brokers to Crosslands, Inc.

136. However, now Perry Comeau, Amber Maxwell and Garlon Maxwell divvied up the customers so that it would look like each advisor had less than 15 accounts, and would fit into the exemption, although Garlon and Amber still held themselves out to these customers as members of the public which should not have entitled them to the exemption.

-25-

137. Because many if not most of the group's assets were in Traditional IRA accounts, Millenium an IRA trustee was used to help transfer these accounts to Crossland. Millenium Trust Co. Inc. became the IRA Trustee for the group and was required to sign off on the documents along with the individual customers pursuant to Section 408 of the Internal Revenue Code. See Documents signed by Millenium Trust Co. annexed hereto as Exhibit 7.

138. However, Millenium by even signing off on these documents obviously did not conduct any due diligence whatsoever and even signed a limited power of attorney allowing Amber Maxwell to trade the Schefferts' accounts even though she had just been fined by the Iowa Department of Insurance and was not registered with the NFA when these accounts were opened. See Account registration documents signed by Millenium annexed hereto as Exhibit 7.

139. Had Millenium bothered to do some due diligence they would have easily seen this untoward conduct unfolding rapidly, and would have had time to save the Schefferts and class members from this ultimate disaster. In fact, on one document signed by Millenium, there is a disclosure telling all signatories to carefully review these investments. Millenium had a duty to do this review on behalf of the Schefferts before signing off on these investments.

140. By flouting their obligations as a Fiduciary under Section 408 of the Internal Revenue Code, it appears that they too played a part in this RICO conspiracy. For one thing, it was Garlon not Amber who was trading the Schefferts' accounts, and Millenium signed off giving Amber not Garlon the authority to trade.

141. Shortly after Millenium got involved as the IRA trustee for the group, Garlon Maxwell and Amber Maxwell met Steven Brewer of Brewer Futures Group who perhaps introduced

the Maxwells to Russell Wasendorf. Sn.

142.   Shortly after opening accounts at Crossland in April, 2007, the Maxwells told the group that they wanted to transfer all of the accounts to PFG using Brewer to introduce their accounts.  The Maxwells and Comeau told the group they could save on fees by leaving Crossland.  They had only been at Crossland for a few months before this move was initiated by the Maxwells.

143.   However, because the Maxwells were not registered as Introducing Brokers, they could not even trade in the accounts or bring the accounts to PFG.  So, instead, Steven Brewer of Brewer Futures Group agreed to serve as Introducing Broker on behalf of the Maxwells and gave the Maxwells a platform on which they could execute trades at Peregrine, the FCM.

144.   Steven Brewer entered into an agreement with Russell Wasendorf Jr. this time agreeing that if there were any margin calls on any of the customer accounts, Brewer would cover these deficiencies for the customers.  He then would contact the customers to satisfy these margin deficiencies.  See Agreement Between Steven Brewer and Russell Wasendorf, Jr. annexed hereto as Exhibit 8 .

145.   More customer agreements and transfer documents were signed and the accounts were transferred in August, 2007 to PFG through the Introducing Broker Brewer, to be traded by Garlon Maxwell with the assistance of Amber Maxwell and Perry Comeau.

146.   These accounts remained opened until October 8, 2008 when all the customers account values were wiped out.

147.   During this time, the accounts were traded using options, puts and call. Such a strategy was extremely risky and lost 95% of the time, upon information and belief.  These types of

-27-

investments are extremely unsuitable for conservative retirees such as Class members herein. See Expert Report dated July 7, 2016 annexed hereto as Exhibit 2.

148. Millenium should have fulfilled their fiduciary obligations and investigated these investments to see that they were not appropriate for an IRA account. Instead Millenium collecting fees and commissions, signed off on these investments and allowed the imprudent trading to continue even in these IRA accounts until the week of October 2, 2008 through October 8, 2008 where all accounts were wiped out, sending these investors home penniless and having to still pay their bills.

### Untoward Conduct During the Week of October 2, 2008 through October 8, 2008 consisting of Violations of the CME Margin Rules 930 D, E and K, Overwhelmingly Demonstrate a RICO Conspiracy

149. Because the CME has iron clad rules that are entirely enforced regarding when a customer's trading activity must stop in his or her account, the blatant disregard of these well-settled rules certainly show the intentional conduct to do plaintiffs under herein.

150. In fact, the CME rules 930 D, E, and K which require all under margined accounts to stop trading except for liquidation only trades. Put otherwise, once a customer falls into a margin deficiency, he or she is not allowed to put on new positions, but can only close out positions to decrease his margin requirements and/or wire money into his or her account to preserve present positions.

151. These rules are not altruistic because they are designed to preserve the assets of the CME who is the ultimate buyer and seller of all products traded on its Exchange due to the novation process.

-28-

152. The CME is supposed to Monitor all open positions on a daily basis and prevent under margined accounts from remaining open. But not in this case.

153. The FCMs such as Peregrine and others also have adopted these same rules in their customer agreements also for the non-altruistic reason of also preserving its assets because in the case of a Margin Deficiency the FCMs and Clearing Members and all members are strictly liable to the CME for such shortfalls. See PFG Customer Agreement annexed hereto as Exhibit 1 .

154. That is why theses CME rules are so strictly enforced normally. However, these rules also have a key benefit for customers who will have an opportunity to close his or her account rather than risk sending in more money.

155. In this particular case, there were two egregious courses of conduct that not only violated the CME rules but good faith where plaintiffs fell into a Margin Deficit leading to a Margin Call beginning on October 2, 2008, a Wednesday.  On that day for example a Margin Call was issued on Sherri Schefferts IRA Account in the amount of approximately $52 650.00.  See Margin Call letters annexed hereto as Exhibit 3.

156. Under normal circumstances, and acting in good faith, all trading would have stopped immediately on October 2, 2008, and the Schefferts would have been called by telephone immediately to satisfy this Margin Call.  All defendants had their phone numbers. Because the Schefferts did not have any extra cash to satisfy this Margin call. They would have instructed their brokers to stop trading and terminate their accounts.  Their main concern was always preservation of Capital.  Because their balance at the close of business on October 2, 2008 was $281,762.46, their losses would have been limited to approximately $52,650.00.

-29-

157. Not only was no phone call ever made to the Schefferts by any of defendants, but a letter was sent to their address in Mission, Texas, although they were right there in Oelwein, Iowa on October 2, 2008.

158. The mailing of a letter certainly was intended to violate CME Rule 930K since it certainly takes more than one hour for a letter to arrive through the U.S. postal service. How could defendants comply with this CME rule 930K which only allows customers one hour to satisfy a margin call if they are mailing out Margin Call notices instead of calling the customers as is the well-established custom in the Industry?

159. In fact, PFG's own Compliance and Procedure Manual clearly states that Margin calls should be made to the customer by the AP, Associated Persons. It states in Section 16.6 that each AP should call the customer promptly over the telephone and advise them of the margin call. The AP shall also find out how the customer intends to deal with the Margin Call. See PFG's Compliance and Procedure Manual annexed hereto as Exhibit 9.

160. Because the defendants normally would be liable for any deficiencies in the customer accounts, defendants would be incentivized to pick up the phone and follow the rules of law and afford the customers one hour to either make arrangements to satisfy a margin call or to close their customer accounts.

161. However, where the intent is to destroy these customer accounts, then no such calls would be forthcoming as in this case herein.

162. Although this type of misconduct might be attributable to negligence on one or perhaps two occasions, there were approximately 35 customers similarly situated for one week. Such an

-30-

oversight is unfathomable based on negligence, but likely based on Fraud and bad faith conduct.

163. More evidence of this Rico Conspiracy is demonstrated by conduct the following day on October 3, 2008, a Thursday. Despite being on a Margin Call from the preceding day, on this day, again neither the Schefferts nor any of the Class members received any type of phone call as is mandatory in these type of situations.

164. More evidence of this intentional conduct to wipe out plaintiffs' accounts is demonstrated on October 2, 2008, October 3, 2008, and October 6, 2008. New positions were initiated in the Schefferts' accounts in violation of CME Rule 930D. See Expert Report and Spread Sheets for the Schefferts annexed hereto as Exhibit 2.

165. One wonders how a broker could continue to initiate new positions where there is a short fall in the customer account? However, on October 2, 2008, 30 put options contract were written on behalf of the Schefferts on the E-mini S&P 500 index with a strike price of $1000.00.

166. On October 3, 2008, a Friday, the Schefferts were still in a Margin Call, and again none of the defendants called the Schefferts. On this day, their margin deficiency went from approximately $50,000.00 from the day before to approximately $160,000.00. Notwithstanding this continued Margin deficiency and with a Margin Call outstanding, the RICO defendants, PFG, CME and the CTAs continued to write naked put options, initiating another 30 new positions on October 3, 2008. The initiation of these new positions was another violation of CME rules, 930D in particular, and is more evidence of intentional conduct to create losses in these unwitting customers' accounts.

167. That weekend, October 4, 2008 and October 5, 2008, the Schefferts still had no

-31-

idea that their life savings were being wiped out. Apparently, someone at PFG was working that A Sunday, but did not call the Schefferts who were home. Instead, on Sunday, October 5, 2008, Peregrine sent another letter this time Millenium, a co-conspirator who did nothing to satisfy this margin deficiency. It appears that this letter was a just a cover up showing that some effort was made. Normally letter head has the address on the top. The date, not the day of the week is also listed on the letterhead. On this letter of October 5, 2008, nobody signed this letter although it was produced by Peregrine to the Schefferts at some point.

168. Again, the mailing of a letter on Sunday October 5, 2008 to Millenium Trust did nothing to apprise the Schefferts of the terrible situation they were in.

169. On Monday, October 7, 2008, the Schefferts still ignorant that their life as they knew it was over, incurred more losses in their accounts. By October 8, 2008, their remaining balance was approximately $13,000, a loss of 96% of their portfolio in one week. See Expert reports and spread sheets annexed hereto as Exhibit 2.

### Because PFG and Millenium Failed to use the 70%-30% Rule to Invest the IRA fund, This Conduct shows Intentional Conduct

170. Because an accepted norm among commodity firms is to only allow 30% of 70% to be invested in commodities futures contracts that exist in an IRA, the fact that plaintiffs were allowed to invest much more than that shows intentional conduct to purposefully terminate plaintiffs' account. In other words, in a portfolio of $100,000.00, only $21,000.00 should be used as Margin to initiate positions. Again this conservative rule is to protect the FCMs and/or CME who have liability for any deficiencies in the customer's account. Because investors of IRA proceeds are not liable for any deficiencies under the law, the FCMs would be responsible for these amounts.

-32-

171. In addition, because a margin call may require the addition of fresh cash, and IRA rules only allow approximately $5000.00 per calendar year to be contributed to a traditional IRA, any margin call over $5000.00 would cause a customers' account to be immediately closed under CME rules 930K.

172. Thus, the complete disregard for such safeguards for the defendants themselves, supports a strong inference that they were not concerned with protecting their own potential losses, but were very interested in getting rid of these customers' accounts.

### Causation and Damages

173. As a direct result of this RICO Ponzi Scheme the class member lost approximately $3,500,000.00 where margin calls were issued without any notification to them leading within one week to a total destruction of their accounts.

### RICO PONZI SCHEME PART ONE-SUBSTANTIVE ALLEGATIONS

174. On or about September 24, 2007, and during the relevant time period, plaintiffs, and class members were directed by PFG to send their investments funds to JP Morgan's Segregated Customer Account ending in 5265. See Wiring instructions annexed hereto as Exhibit 10.

175. For Example, Millenium Trust as IRA custodian on behalf of the Schefferts' IRA account caused to be transferred approximately $228,000.00 from their custodial account to JP Morgan Chase to account number 5330355265 for further credit to PFG, Inc. Customer Segregated Funds. See Account transfer form annexed here to as Exhibit 10      .

176. JPMorgan improperly transferred millions of dollars in PFG customer money including Plaintiff's from a customer segregated account at JPMorgan to an account at U.S. Bank

-33-

controlled by Wasendorf, who in turn diverted these funds to his own unauthorized uses.

177. U.S. Bank concurrently allowed Wasendorf to use the same account as a personal piggy bank and conduit for the diversion of funds transferred from JPMorgan to Wasendorf's personal use.

**PFGs Theft of $200 Million in Customer Funds**

**and the Governing Regulatory Framework**

178 .   Wasendorf established PFG in 1990.  During the relevant time period, PFG maintained its offices in Chicago, Illinois and in Cedar Falls, Iowa.  PFG is not named as a defendant because the company has filed for bankruptcy and naming the company would violate the automatic stay. 11 U.S.C. § 362.

179.  From its inception until its bankruptcy, PFG was a registered futures commission merchant or FCM.  An FCM is an individual or organization that, among other things, solicits or accepts orders to buy or sell futures contracts or options on futures contracts, and accepts money or other assets from customers to support those orders.  FCMs receive money, securities, and other property from their customers to margin, guarantee, or secure the customers' futures and options trades.

180.  FCMs like PFG are regulated by the Commodity Futures Trading Commission (CFTC), a federal agency, and the National Futures Association (NFA), a not-for-profit industry membership corporation that operates under the supervision of the CFTC.  The CFTC regulates trading on the eleven United States futures exchanges, as well as commodity exchange members and FCMs.  The NFA is responsible for overseeing the qualifications, proficiency, financial condition, retail sales practices, and business conduct of FCMs.

181.  The Commodity Exchange Act (CEA) and CFTC regulations require FCMs to maintain segregated and secure accounts for their customers' funds.  17 C.F.R. § 1.20(a).

182.  Customer funds may not be commingled with the firm's operational funds and may not be used to margin or guarantee the trades or contracts, or to secure or extend the credit of,

-35-

any other person or entity. *See id.*; *see also* 7 U.S.C. § 6d(a)(2).

183. FCMs must file monthly financial reports with the CFTC known as "1-FR" reports. These reports require FCMs to provide financial statements that show, among other things, the amount of customer funds the FCM has in segregated bank accounts.

184. The financial statements filed with the 1-FR at the end of the year must be audited. Since 2001, PFG always used the same accountant to perform its audits—The VerajaSnelling Company—a one-person firm run out of the owner's home in Glendale Heights, Illinois.

### PFG's Misuse of Customer Funds Over the years,

185. PFG received more than $200 million from customers and deposited the funds in accounts at JPMorgan, U.S. Bank, and several other banks. But instead of keeping its customers' funds segregated as required by CFTC regulations, PFG withdrew money from the customer funds account at U.S. Bank and converted the money for the use of PFG, its affiliates, and Wasendorf Sn. personally. Many of the transfers were made to the bank accounts of PFG-related entities, including other corporations that Wasendorf Sn. owned or controlled.

186. To conceal and continue its misuse of customer funds, Wasendorf established a post office box in Cedar Falls to intercept mail directed to U.S. Bank, including mail sent by the NFA and PFG's auditor. By forging bank statements and other documents that reported the balance in its U.S. Bank accounts, PFG was able to represent to the NFA and its auditor that it maintained a customer segregated account that eventually contained over two hundred million dollars, when in fact the balance was typically under $10 million. PFG was able to continue representing itself as operating in compliance with governing regulations to its

regulators, its customers, and the general public while it pilfered its customers' money.

**The Regulatory Framework Applicable to the Banks**

187.   Under relevant banking regulations, a bank is required to collect and maintain certain information concerning their customers.  The bank must maintain procedures that allowed it to "form a reasonable belief that it knows the true identity of each customer."  31 C.F.R. § 1020.220(a)(1), (2).   To accomplish this goal, the bank is required to collect information about the holder of each account.  31 C.F.R. § 1020.220(a)(2).  When an account is opened by an entity rather than an individual, the bank must obtain information about the individuals with authority or control over the account.  31 C.F.R. § 1020.220(a)(2)(ii)©.   188.

Pursuant to federal regulations, the bank must develop, administer, and maintain a program that ensures and monitors the bank's compliance with the Bank Secrecy Act (BSA).  12 C.F.R. § 21.21.  The plan must be approved by the board of directors and noted in the board meeting minutes.  The program must include a system of internal controls designed to ensure ongoing compliance, independent testing of the bank's compliance, daily coordination and monitoring of compliance by a designated person, and training of appropriate personnel.

189.  A bank must also develop a Customer Due Diligence (CDD) program that assists in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, and which provides the bank with a way to identify unusual or suspicious transactions for each customer.  The CDD program allows the bank to maintain an awareness of the unique financial details of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

190.  The bank must ensure compliance as a condition of employment and incorporate

-37-

compliance with the BSA and its implementing regulations into job descriptions and performance evaluations for its employees. The bank must also train all operational personnel whose duties may require knowledge of the BSA, including tellers and wire room personnel, on the BSA, including identification of various "red flags" discussed below.

191. The bank must identify a BSA Compliance Officer who is a senior bank official and who is responsible for coordinating and monitoring complete compliance with the BSA. FDIC Rules & Regulations § 326.8. The BSA Compliance Officer is required to designate an individual at each office or branch to monitor the bank's day-to-day compliance with the BSA.

192. Because the Banks provided services to PFG, a high-risk account/customer, the Banks were required to enhance their procedures, including applying a risk rating to PFG. To determine PFG's risk rating, the Banks were required to obtain customer information to develop a "customer transaction profile" that incorporated an understanding of normal and expected activity for PFG's business operations.

193. Since March 2002, the CFTC has posted on its website a monthly report providing information about each registered FCM, including: (I) the FCM's adjusted net capital; (ii) the FCM's net capital requirement; (iii) the FCM's excess net capital; (iv) the amount of customer funds required to be segregated; and (v) the amount of funds required to be held in a foreign futures and foreign options secured account.

194. The Banks knew that FCMs are highly regulated by the CFTC and NFA, and that they are required to maintain customer funds in segregated and secured accounts are separated from the firm's funds. *See* 17 C.F.R. § 1.20(a). The customer funds are required to be

-38-

segregated, held for the exclusive benefit of the customer, and otherwise protected from misappropriation or unauthorized use. *See id.*; *see also* 7 U.S.C. § 6d(a)(2). These requirements ensure that customer funds are protected if an FCM attempts to divert or otherwise mishandle customer funds, or declares bankruptcy. Both events have occurred in this case.

195. The Banks knew that when customer funds are deposited in a bank, they are to be deposited under an account name that clearly shows they are customer funds, segregated as required by the CEA. *See* 17 C.F.R. § 1.20. The Banks knew that any account held out as or named a customer segregated account would reasonably lead others to conclude the account maintained customer funds that were being segregated and protected consistent with the CEA rules and regulations. The Banks also knew that customer funds maintained in a segregated account could not lawfully be transferred to a personal account of the Wasendorfs or a "house" account maintained by PFG.

196. The Banks knew that PFG was a fiduciary to its customers with respect to the money they entrusted to PFG.

### Actions of U.S. Bank Leading to the Loss of Customer Funds by PFG and Its Affiliates

197. PFG was based in Cedar Falls, Iowa. With a population of fewer than 50,000 people, Cedar Falls is not a major business center. Wasendorf, Sn. was well known around town as a successful businessman. He was believed to have amassed substantial personal wealth from successful investments in Romanian real estate. He operated a restaurant "My Verona," a popular Cedar Falls restaurant, and presented a facade of prosperity to the public.

198. U.S. Bank entrusted primary responsibility for managing its relationship with PFG to Hope Timmerman, an "Assistant Relationship Manager" who worked at the bank's

-39-

Cedar Falls branch.

199. Ms. Timmerman and other U.S. Bank personnel perceived Wasendorf, Sn. as a successful, desirable bank client with the potential to be a profitable, high-growth client.

200. Ms. Timmerman and U.S. Bank believed it was important to maintain Wasendorf's and PFG's goodwill in order to protect U.S. Bank's relationship with them.

### PFG's Two Primary U.S. Bank Accounts

201. PFG opened two of its accounts with Firstar, U.S. Bank's predecessor, between 1992 and 1994. The first of these accounts was established as a customer segregated funds account. It had an account number ending with the digits 1845 and is referred to as the "1845 Account." The second account was designated by both PFG and Firstar as PFG's "house" account. Firstar documents expressly labeled the account as PFG's house account, as reflected by an April 2002 letter addressed to PFG's "house account." A house account, sometimes referred to as a "proprietary account," is an account maintained by an FCM for itself and for its own funds and those of its affiliates. An FCM typically designates an account as a "house" account, because it has other accounts at the same banking institution that hold customer segregated funds, which cannot be intermingled with the house account funds.

202. The 1845 Account was designated by both PFG and Firstar as a customer segregated funds account. The designation appeared on official Firstar documents, including a letter sent by Firstar to PFG acknowledging that the account held customer segregated funds.

203. In December 1994, PFG entered into a "Master Repurchase Agreement (Public Securities Association Prototype)" with Firstar. The agreement governed the investment of the customer segregated funds held in the 1845 Account and expressly recognized that the

-40-

1845 Account was a customer segregated account. Firstar engaged in repurchase transactions with PFG using the customer segregated funds in the 1845 Account for years after the execution of the 1994 agreement. Sometime around April 2002, PFG's accounts with Firstar began to be referred to as U.S. Bank accounts. The 1845 Account maintained the same account number through and following the transition.

204.   PFG's records contain a July 5, 2001, letter from U.S. Bank to PFG stating that the 1845 Account was titled "Peregrine Financial Group, Inc., Customer Segregated Account." The letter is signed "Hope Timmerman."

205.   While the 1845 Account was a Firstar account, and continuing into 2004 after the account became a U.S. Bank account, PFG wrote checks out of the 1845 Account using checks that identified the 1845 Account as a customer segregated account. Firstar and U.S. Bank received copies of these checks identifying the 1845 Account as a customer segregated account once they were deposited or cashed by the payees.

206.   PFG also wrote checks drawn on the house account that identified the account as PFG's house account, and Firstar and U.S. Bank received copies of the checks once they were deposited or cashed by the payees.

**U.S. Bank Accounts of Wasendorf and PFG's Affiliates**

207.   U.S. Bank maintained several additional accounts for entities and individuals affiliated with Wasendorf and PFG, including personal accounts of Wasendorf and his family members and accounts for his other companies.

208.   On or about September 10, 2008, the same time Class members deposited $3.5 million dollars at JPMORGAN's Wassnefor Account ending in 5265, U.S. Bank lent

-41-

Wasendorf Sn. and/or his affiliated company, Wasendorf Construction, more than $6,000,000 to build a new headquarters building for PFG in Cedar Falls.

209. As security for the loan, U.S. Bank relied on the funds on deposit in the 1845 account, even though the 1845 Account was a purported customer segregated account and should not have been used as collateral for a business loan.

210. U.S. Bank also maintained accounts for Wasendorf & Associates, a publishing business, Wasendorf's restaurant, My Verona, and Wasendorf Air, the company created by Wasendorf, Sn.

211. U.S. Bank Knew PFG Was Holding Out the 1845 Account As Its Segregated Customer Account.

212. U.S. Bank knew that most or all of the funds in the 1845 Account were customer deposits that came from one of two sources: (I) deposits of checks at the Cedar Falls branch, or (ii) wire transfers from a PFG JPMorgan customer segregated account ending in 5265 into the 1845 Account.                    ]

213. PFG deposited checks on a daily or near daily basis into the 1845 Account.  The amounts typically ranged from $500 to more than $25,000.  The checks were drawn on accounts that belonged to many different individuals and entities across the country and were clearly identifiable as customer funds directed to an FCM.

214. PFG told its customers to make their checks payable to "Peregrine Financial Group, Inc.," or "PFGBEST Cust. Seg. Acct." A significant number of the checks PFG deposited in the 1845 Account were drawn to the "PFGBEST Cust. Seg. Acct." designation, and many others had memo notations or other written statements stating they were customer funds

215.  Upon information and belief, Millenium Trust on behalf of the Schefferts and other Class members, made out the checks or wires that were sent to JPMORGAN for the "PFGBEST Cust. Seg. Acct."

216.  PFG stamped the checks deposited into the 1845 Account with "PAY TO THE **ORDER OF US BANK FOR DEPOSIT ONLY PEREGRINE FINANCIAL GROUP, INC., CUSTOMER SEGREGATED ACCOUNT 621011845," or words to that effect.**

217.  When PFG deposited the checks into the 1845 Account, PFG also submitted U.S. Bank deposit slips that stated "Customer Segregated Account" or some variation thereof.  PFG bundled the checks and deposited them in person at either the walk-up or drive-up counter at the Cedar Falls branch.  An example of the deposit slip used by PFG for the 1845 Account appears below:



-43-

**U.S. BANK Knew That PFG Was Not Treating the 1845
Account as a Customer Segregated Account**

218.    PFG's deposits to the 1845 Account were customer funds subject to the

segregated and/or secured account requirements, but PFG's frequent and substantial withdrawals

were inconsistent with the types of transactions typical for a customer segregated account.

219.  PFG's deposits to the 1845 Account were customer funds subject to the segregated

and/or secured account requirements, but PFG's frequent and substantial withdrawals were

inconsistent with the types of transactions typical for a customer segregated account.

220.  During the above time period, PFG made hundreds of withdrawals from the 1845

Account, most ranging from tens of thousands of dollars up to several millions of dollars

followed up with a similarly sized withdrawal shortly thereafter.

221.  PFG also made frequent electronic fund transfers and telephone transfers from the

1845 Account.

**Jpmorgan's  Unlawful Transfers from the 5265 Account to the Us Bank 1845 Account.**

222. U.S. Bank received wire transfers from JPMorgan customer segregated accounts

including 5265 into the 1845 Account.  These transfers showed that the money being transferred

into the 1845 account consisted of customer segregated funds.  U.S. Bank statements described

the source of the transfers as

-44-

"JPMCHASE*PFG CUST SEG ACCT" and "BANKONENA*CHI IL *PFGCUSTSEG."

223.    U.S. Bank nevertheless allowed Wasendorf Sn. unfettered access to the money transferred by JPMorgan, despite the fact that the wires received from JPMorgan made it clear the money was being transferred from a customer segregated account.

224.    PFG consistently withdrew substantial sums from the 1845 Account in single transactions during the relevant time period.  U.S. Bank knows that FCMs rarely, if ever, make withdrawals and transfers of this type that were frequently made from their customer segregated accounts.

225.  Rather, the CFTC regulations only allow FCMs to deposit their own funds into their customer segregated accounts, since any excess funds will further protect customers in a volatile market.  Thus, The FCM's excess funds are the **only** funds the FCM is permitted to withdraw for its own use.  17 C.F.R. § 1.23.

226.  U.S. Bank had no basis for believing that the transfers into and out of the 1845 Account involved PFG excess funds and there was no inquiry, documentation or other evidence to support the conclusion that withdrawals were legal.  Rather, the obvious conclusion was that these withdrawals constituted unlawful conversions which the Bank defendants herein had a special duty and a fiduciary duty to discover and stop.

227.  Since a number of sizeable transfers from the 1845 Account were made to Wasendorf Construction, to which U.S. Bank had recently extended a mortgage loan exceeding $6 million, in September, 2008 contemporaneouly with the Plaintiffs' transfer of funds to PFG through JPMORGAN and U.S. BANK, by allowing these transfers, U.S. Bank facilitated the

-45-

prospects for repayment of its loan to Wasendorf Construction, thus directly benefiting from the transfers. Thus, a reasonable inference of intent and motive can be inferred from this distasteful fact to JPMorganand U.S. Bank.

228. U.S. Bank also allowed Wasendorf to pledge funds in the 1845 Account to guarantee loans for his own benefit or the benefit of his business entities, including Wasendorf Construction's mortgage on the building PFG used for its offices in September, 2008 when the plaintiffs' herein funded their accounts.

229. The Federal Financial Institutions Examination Counsel (FFIEC) has identified "red flags" that should cause a bank or its employees to inquire further and potentially file a suspicious activity report. PFG's 1845 Account triggered at least the following "red flags":

        a. Inconsistent deposit and withdrawal activity;

        b. Frequent deposits or withdrawals with no apparent business source;

        c. Transactions that are not consistent with the customer's business;

        d. Intrabank transfers between accounts owned or controlled by common individuals;

        e. Large balances in non-interest bearing accounts;

        f. Appearance of using account as a temporary repository for funds;

        g. Deposits and immediate requests for wire transfers or cash shipments; and

        h. Large deposits and balances.

-46-

230. The FFIEC also recommends that banks perform enhanced due diligence of certain accounts and customers that present a greater potential for violations of the BSA, including FCMs like PFG. U.S. Bank allowed money to be transferred out of the 1845 Account and into Wasendorf's accounts despite these red flags.

### U.S. Bank Did Not Act Despite Many Additional Red Flags and U.S. Bank Did Not Receive Balance Confirmation Requests.

231. U.S. Bank knows that the CFTC and the NFA require FCMs to maintain a minimum amount of "adjusted net capital." Adjusted net capital is a critical measure for FCMs. If it falls below proscribed limits, the FCM must "transfer all customer accounts and immediately cease doing business as a futures commission merchant" until it can reestablish the minimum threshold. *See* 17 C.F.R. § 1.17(a)(4).

232. To track net capital, the CFTC and the NFA require FCMs to submit monthly unaudited financial statements and annual audited financial statements. *See* 17 C.F.R. § 1.10. FCMs file 1-FR forms on a monthly and yearly basis. The forms state the FCM's net capital requirement and actual net capital. U.S. Bank also knows that the NFA sends balance confirmation requests to banks that hold a material portion of an FCM's net capital to monitor the FCM's compliance. The NFA also sends balance confirmation requests if there are suspicious circumstances, suspected fraud, or past improper behavior by the FCM.

233. FCMs' auditors also routinely send balance confirmation requests to banks as part of the certified auditing process. U.S. Bank is familiar with the auditing process performed according to AICPA or PCAOB standards, including the need for balance confirmations as part of that process.

-47-

234. U.S. Bank personnel are trained and tasked to intake, evaluate, and respond to balance confirmation requests from the NFA and from FCMs' auditors.

235. Because documents relating to U.S. Bank and PFG's accounts were diverted to the post office box Wasendorf set up, U.S. Bank did not did not routinely receive balance confirmation requests for PFG's accounts from the NFA or PFG's auditor.

236. However, because U.S. Bank should have been expecting these requests for balance confirmations from the NFA, U.S. Bank should not be excused from failing to follow up to make sure the NFA had the correct addresses. Thus, U.S. Bank should be charged with knowing that it must fill out these essential documents on a timely basis. Thus, when it did not receive such request on a timely basis, U.S. BANK's compliance team should have called the NFA to receive these mandatory documents. Thus, a reasonable inference of intentional conduct can be inferred based on Fraud by Omission against U.S. Bank.

237. Finally, in May 2011, however, U.S. Bank received a balance confirmation request from the NFA for the 1845 Account. This balance confirmation form was emailed by PFG's chief compliance officer to Hope Timmerman at U.S. Bank's Cedar Falls branch. The email said:

Dear Hope, Our Regulator the National Futures Association is currently conducting their annual audit of PFGBEST. Attached is the confirmation that needs to be completed. If you would be so kind to get these processed and emailed back to me and Lauren Boehm I would appreciate it. Lauren Boehm from the NFA will also be sending them via US Mail. NFA would appreciate an original hardcopy mailed back to them also. Thank you and have a nice week.

238. The balance confirmation form bore the post office box address established by Wasendorf, rather than U.S. Bank's actual address, and identified the 1845 Account as

-48-

"Peregrine Financial Group, Inc. Customer Segregated Account."

239. U.S. Bank filled out the form, stating that the account balance was $7,181,336.36, did not change the address or the name of the account, and forwarded the form to both PFG and the NFA.

240. Since the blank copy of the balance confirmation form that was mailed to U.S. Bank, and referenced in the email to Hope Timmerman, was sent to the post office box address established by Wasendorf, U.S. Bank never received it by regular mail.

241. When Wasendorf Sn. learned that the form had been emailed to U.S. Bank he forged a new form that showed a balance of $220 million to be faxed to the NFA to replace the one U.S. Bank had completed.

242. In the months that followed, U.S. Bank received no further balance confirmation requests from PFG, the NFA, or PFG's auditor. U.S. Bank did not follow up to determine why it had not received the confirmation form or why no further forms were ever sent to it.

243. U.S.Bank should have followed up, realizing the wrong and invented address was on the form; and had US Bank been acting in good faith and fulfilling its fiduciary duty, it would have immediately made sure that incorrect post office box was removed from the form, and called the NFA to discuss why the wrong address was on the form.

244. Thus, from May 11, 2011 to July 9, 2012, US Bank allowed this massive fraud to continue when the evidence was right before it and hiding in plain sight.

-49-

**U.S. Bank Knew That PFG Was Not Earning Revenue
From the 1845 Account and Was Not Profitable.**

245. U.S. Bank knows that FCMs ordinarily depend on revenue from customer segregated accounts through interest earnings or repurchase agreements. While PFG executed at least one repurchase agreement with Firstar, in the years leading up to PFG's bankruptcy in 2012, PFG was not earning interest on the 1845 Account and was not engaging in repurchase agreements with the 1845 Account funds.

246. U.S. Bank knew from PFG's 1-FR forms that PFG was maintaining a material portion of its reported net capital—typically well in excess of 10% of its total reported net capital—in the 1845 Account.

247. U.S. Bank also knew that PFG was not profitable from its inception through at least 2005 and that, during the few years that PFG accrued profits, those profits were only about $1-2 million annually.

248. Wasendorf represented to U.S. Bank that PFG was able to stay in operation despite many years of losses because he was supporting PFG with money he had earned through his successful investments in Romanian real estate.

**Wasendorf Insisted That U.S. Bank Communicate Only
With Him About PFG and Its Accounts**

249. Wasendorf Sn. told U.S. Bank that all communications, including written and telephonic communications, regarding the 1845 Account should be directed to and made exclusively with him. He further mandated that no one at U.S. Bank should speak with any PFG personnel, including the other senior officers of the company, regarding the 1845 Account.

-50-

Wasendorf Sn. also imposed similar restrictions on PFG personnel not to contact U.S. Bank, and allowed them to do so only periodically and at his direction.

250. U.S. Bank personnel knew they were not to deal with anyone other than Wasendorf Sn. and knew it was rare for anyone else from PFG to contact U.S. Bank about PFG's accounts. U.S. Bank knew that Wasendorf's demand that he be the only interface with the bank was highly unusual, particularly since PFG had many employees and Wasendorf was the owner of the company, and because there were other signatories to the 1845 Account. U.S. Bank also knew that by drastically limiting communications between itself and all other PFG personnel including the two other signatories on the 1845 Account, it would be easier for fraud to occur relating to PFG and its accounts with U.S. Bank.

### PFG's Record of Regulatory Violations

251. PFG's history of regulatory violations was available from the NFA's publicly available database of its members' disciplinary history. Some of these violations related to PFG's segregation of customer funds and reporting of net capital.

252. In December 1996, the NFA's Business Conduct Committee ("BCC") issued a disciplinary complaint against PFG and a number of its associated persons alleging that they made misleading sales solicitations. The complaint also charged PFG with using misleading promotional material and failing to maintain copies of promotional material. In addition, the complaint alleged that PFG failed to correctly perform segregated funds computations, maintain adequate segregated funds, and report to NFA that the firm was under segregated. The complaint also charged PFG with supervisory failures. PFG settled, agreeing to pay a $75,000 fine, tape record all of its associated persons' conversations for two years, create

-51-

the position of Director of Compliance, and submit all promotional material to NFA prior to first use.

253. In connection with the 1996 NFA disciplinary complaint, the NFA reportedly cited radio commercials in which PFG brokers claimed that the firm could turn a $10,000 investment into $80,000 in a matter of months.

254. In 2000, PFG agreed to pay a $90,000 fine to settle a CFTC administrative proceeding alleging that PFG failed to notify the CFTC that its adjusted net capital was below the minimum required and the CFTC's "early warning threshold." The CFTC also alleged that PFG failed to keep accurate books and records and filed an inaccurate capital computation with the CFTC.

255. In June 2004, the BCC issued a disciplinary complaint alleging that PFG failed to audit Dominick Concilio, a conditionally registered sole proprietor introducing broker guaranteed by PFG. PFG agreed to pay a $5,000 fine and adopt new procedures to ensure compliance with the NFA's order.

256. In February 2012, the court-appointed receiver for a Ponzi scheme run by Trevor Cook sued PFG. The receiver alleged that PFG routinely ignored red flags about the operation of the Ponzi scheme and permitted the fraudster to open, manage and maintain trading accounts at PFG. Before his scheme was uncovered in 2009, over $190 million was stolen from investors, including about $30 million through accounts held at PFG. The discovery of the scheme was widely publicized. CNN, the Minnesota Star Tribune, and The New York Times all ran stories. PFG's involvement was a matter of public record and discussion as well.

-52-

257. In February 2012, the BCC issued a disciplinary complaint against PFG, its president, Wasendorf Jr., and its chief compliance officer. The BCC alleged that PFG failed to supervise four of its guaranteed introducing brokers, or GIBs, who engaged in deceptive sales practices and made trade recommendations that maximized commissions without regard for the best interests of their customers. To settle the matter, PFG agreed to pay a $700,000 fine and refrain from any new guarantee agreements with introducing brokers for two years. PFG also agreed to hire an independent consultant to review its procedures for supervising its GIBs and retail customer accounts, and to designate an individual to act as its full-time anti-money laundering officer. The NFA publicly reported PFG's $700,000 fine and PFG included the fine on its financial statements, including statements it provided to U.S. Bank.

**U.S. Bank Did Nothing to Prevent the Theft**

258. As part of the mortgage transaction with U.S. Bank for Wasendorf Construction, PFG and Wasendorf provided substantial information to U.S. Bank about PFG's business, including copies of its certified audits, 1-FR reports, and quarterly financial information such as balance sheet and income statement summaries. Many of these documents reported the amount of customer segregated funds held by PFG. U.S. Bank charged PFG a monthly "Analysis Service Charge" for the 1845 Account, indicating that U.S. Bank performed a series of account analyses on PFG's behalf.

259. U.S. Bank has provided banking services to other FCMs in addition to PFG. It is familiar with the operating restrictions imposed on FCMs by the governing rules and regulations under the CEA and other relevant legislation.

260. Despite its knowledge of PFG's conduct and financial position and the numerous red flags known to it, U.S. Bank took no action to prevent PFG's theft of customer money. U.S. Bank allowed PFG to deposit hundreds of checks into the 1845 Account, processed hundreds of transfers into and out of the 1845 Account, and never declined to authorize a withdrawal from the 1845 Account and never declined to accept the deposit of funds it knew to be customer deposits into the account.

261. At the time PFG declared bankruptcy, U.S. Bank had over 30,000 pages of records related to accounts held by PFG, Wasendorf, and the other entities owned or controlled by Wasendorf.

**Intentional Conduct of JPMorgan Leading to the Loss of Customer Funds**

262. JPMorgan operated under the same legal framework and had access to the same publicly available information concerning PFG as U.S. Bank.

263. From at least 2007 through the date of PFG's collapse, PFG deposited or instructed its customers, including plaintiffs and class members herein, to deposit customer funds into an account at JPMorgan ending in 5265 by wire transfer or by mailing a check to PFG's office. (During the same time period, however, checks from PFG customers that were sent to PFG's Iowa headquarters were typically deposited into the U.S. Bank account). Customer money sent to JPMorgan was deposited into one of four customer segregated accounts, including money sent to JPMorgan by plaintiffs herein.

264. JPMorgan had an extensive banking relationship with PFG. JPMorgan held over 30 other accounts for PFG, including several foreign exchange accounts, accounts for precious metals trading, and "house" accounts. JPMorgan knew that PFG was an FCM.

-54-

265. Because JPMorgan provided banking services to PFG and other FCMs, JPMorgan knew that FCMs are highly regulated by the CFTC and NFA, and that they are required to maintain customer funds for the exclusive benefit of their customers in segregated and secured accounts that are separate from the firm's funds. *See* 17 C.F.R. § 1.20(a); *see also* 7 U.S.C. § 6d(a)(2).

266. JPMorgan was required to provide NFA regulators with confirmations of the balances of PFG's customer segregated accounts and to otherwise ensure that PFG's customer funds were properly segregated. In addition, JPMorgan (like U.S. Bank) is required to maintain procedures that allow it to know the true identity of each of its customers, ensure compliance with the BSA and other banking laws and regulations, and monitor accounts that show signs of suspicious activity.

267. JPMorgan expressly undertook to comply with the requirements of the CEA and CFTC regulations applicable to customer segregated fund accounts. JPMorgan was required to provide PFG at the time the accounts were opened with written acknowledgment that the bank had been informed that the four accounts contained funds belonging to commodity or options customers and had to be treated in accordance with the CEA and CFTC regulations. *See* 17 C.F.R §§ 1.20, 1.49. By its own acknowledgement, JPMorgan had a contractual obligation to hold customer money according to the CEA and CFTC regulations, and knew that the money could be lawfully used for the benefit of PFG's customers only.

268. JPMorgan breached its obligations to customers of PFG by transferring customer funds to the 1845 Account. JPMorgan failed to contact U.S. Bank to verify that the 1845 Account was in fact a customer segregated account. Despite outward appearances, and its own practice of allowing PFG to treat the 1845 Account as a customer segregated funds account,

-55-

U.S. Bank did not consider the 1845 Account to be a customer segregated account, and instead U.S. Bank believed Wasendorf was free to treat the money in the 1845 account as his personal property, and disclaimed any obligation associated with a customer segregated account.

269. Thus, JPMorgan by transferring money from its segregated accounts including the 5265 accounts, where plaintiffs and class members had deposited their funds, to the 1845 Account, JPMorgan aiding and abetted Wasendorf's criminal conversion of funds where Wassendorf, Sn. easily diverted millions in PFG customer funds to his own benefit.

270. Bank One, N.A., and later JPMorgan made repeated transfers to the 1845 Account for Wasendorf's personal benefit, in highly suspicious amounts. The wires typically transferred customer funds in multiples of $1,000,000:

      a.     An $8,000,000 transfer on December 13, 2005;

      b.     Transfers of $5,000,000 and $10,000,000 in January and February 2007;

      c.     A $5,000,000 transfer in January 2008; and

      d.     A $7,000,000 transfer in January 2009.

271. The last transfer in particular coincided temporarily with the losses incurred by plaintiffs herein and the Class Members who happened to lose their money during this time frame.

272. The size and frequency of these transfers made it obvious the transfers were not being made to PFG customers and were not instances of PFG removing its own excess funds from the customer segregated account. The wire transfers were suspicious for several reasons. They were

-56-

irregular, for large, round amounts, and transferred to another bank even though JPMorgan held three other customer segregated accounts for PFG. In addition, JPMorgan had a contractual obligation to hold the money according to CEA and CFTC rules, which require it to be held only in proper, customer segregated accounts. But despite these suspicious circumstances and its obligations, JPMorgan transferred millions in PFG customer funds to a non-segregated account under the exclusive control of Wasendorf, in breach of contractual obligations undertaken by JPMorgan for the benefit of Plaintiffs.

273. Thus, as a direct and proximate result of Wassendorf Sn.'s conspiracy with US Bank and JP Morgan, customer funds literally went missing and ended up in the coiffers of Wassendorf and others.

274. The Bank Defendants collected fees for their assistance and these fees added up handsomely over the years, upon information and belief.

### RICO PONZI SCHEME- PART 2

275. In the Second Phase of this RICO Ponzi Scheme, defendants other than JPMORGAN and US BANK, acted intentionally to make sure the plaintiffs left the markets with zero balances while also leading them to believe these losses were just due to natural market volatility. By making it look like legitimate losses, there would be no suspicion that these customers had just been robbed in part 1 of this RICO Ponzi Scheme.

276. The motivation for the behavior of all defendants was substantial fees derived by ostensibly legitimate courses of dealing such as Exchange fees, NFA fees, Incentive Fees and

other commissions which never would have been earned absent participation in this Fraud which allowed business to be given to the various defendants. Each defendant acted to preserve its business relationship to get more business in the future whether legitimate or not.

277. Others apparently exited the industry after a time having decided to quit while still ahead.

### Participation by Millenium Trust Co. and their aiding and abetting

278. Upon Information and belief, Millenium Trust acted purposefully in setting up plain tiffs to lose their entire life savings by allowing their IRA monies to even be invested in such imprudent and risky investments consisting of purchasing naked puts and calls which are inherently a losing bet and lose 95% of the time.

279. Besides being part in this RICO conspiracy by engaging in mail and wire fraud as part of this scheme to defraud plaintiffs, as an alternative theory of liability Millenium breached their fiduciary obligations to plaintiffs and should not have allowed one penny to be sent to JPMorgan for further use by PFG

### An IRA Is A Federally Created Trust Imposing Duties on Millenium, as IRA Trustee, to Prevent This Type of Investment Fraud.

280. Because Millenium controlled plaintiffs' IRA accounts, they woefully failed to exercise their fiduciary duties in blindly signing off on the transfer documents allowing Peregrine to invest their IRA funds in

-58-

high risk options contracts. See Customer Documents signed by Millenium
annexed hereto as Exhibit 7.       .

281. Individual Retirement Accounts came into existence in 1974,
when they were created by the federal government in a statute known as the
Employee Retirement Income Security Act of 1974, Pub. L. 93-406, Title II, Sept.
2, 1974, codified at 29 U.S.C. § 1001 *et seq.* An IRA is a "trust created or organized
in the United States for the exclusive benefit of an individual or his beneficiaries,
but only if the written governing instrument creating the trust instruments contains
the following requirements: ... (2) The trustee is a bank [as defined by statute] or such
other person who demonstrates to the satisfaction of the Secretary that the manner
in which such other person will administer the trust will be consistent with the
requirement of this section. (3) No part of the trust funds will be invested in life
insurance contracts. (4) The interest of an individual in the balance in his account is
non forgettable. (5) The assets of the trust will not be commingled with other property
except in a common trust or common investment fund..." Code § 408(a) (2008); *see
also,* 26 C.F.R. Treas. Reg. §1.408-2(a-b).

282. The "written governing instrument creating the trust" in this case
was Defendants' Millenium's standardized form contract that was entered by several
Class Members upon information and belief. This contract was drafted in its entirety
by defendant Millenium Trust upon information and belief. This non-negotiable

-59-

contract was presented on a take-it-or-leave-it basis to Class Members and was not drafted, amended or negotiated in any way by Plaintiffs or Class Members.

### The Federally Created Minimum Fiduciary Standards Of Conduct For The IRAs At Issue Here

283.  Section 408 and the federal regulations promulgated thereunder , including 26 C.F.R. § 1.408-2, use the language and terminology of trust law (such as "participant," "beneficiary," "fiduciary" and "trustee") in specifying the trust and the relationship that any form contract or "written governing instrument creating the trust" was required to use under federal law, defendant Millenium Trust was obligated to comply with the following minimum standards and owed the following duties to preserve the Trust res of each Plaintiff and Class Member:

a.      The fiduciary duty to acquire and hold particular investments specified by the trust instrument. Treas. Reg. 1.408-2(e)(viii)(6)(i)(A).

b.      The fiduciary duty to keep custody of investments and, except for investments pooled in a common investment fund in accordance with the provisions of the Treasury Regulations, to refrain from commingling the investments of each account with any other property. Treas. Reg. 1.408-2(e)(v)(A).

c.      The fiduciary duty to deposit assets of accounts requiring safekeeping in an adequate vault. Treas. Reg. 1.408-2(e)(v)(B).

-60-

d.      The fiduciary duty to determine the assets held by it in trust and the value of such assets at least once in each calendar year and no more than 18 months after the preceding valuation. Treas. Reg. 1.408-2(e)(5)(ii)(E).

e.      The fiduciary duty to receive, issue receipts for, and safely keep securities. Treas. Reg. 1.408-2(e)(4)(ii)(A).

**Millenium's Failures**

284.   In addition to its failures previously alleged herein, Millenium also:

a. failed to perform Generally Accepted Auditing Standard ("GAAS") "audit using whatever tests of the books and records were considered necessary by a qualified public accountant;

b failed to perform contractually obligated administrative review;

c. failed to provide contractually obligated and federally mandated annual reports of all transaction related to the IRA;

285.   Millenium failed to work closely with the plaintiffs' and other class members to understand their investment objectives and to understand that these investments were completely unsuitable for this group of plaintiffs and class members herein.

-61-

286. Millenium employees did not properly read the customer agreements and disclosure documents to prevent plaintiffs from making these unsuitable investments in their retirement accounts and blindly signed off on these documents without fulfilling their fiduciary obligations as IRA, Custodial IRA Trustees. Millenium failed to act as a trustee to the Plaintiffs IRA accounts by seeding all their fiduciary responsibility to unregistered advisors including Garlon Maxwell, Amber Maxwell and Perry Comeau as well as representatives from Brewer Futures Group and PFG.

287. Such blatant disregard for their Custodial obligations creates a clear inference that there was bad faith conduct ongoing and that Millenium was part of this RICO Conspiracy based on the total dereliction of its duties as IRA trustee.

288. Indeed, during the week of October 2, 2008 through October 8, 2008, Millenium did nothing to contact plaintiffs, although letters were sent to Millenium on October 2, 2008 and should have been received by October 3, 2008. Thus, Millenium should have received these letters and immediately notified plaintiffs on October 3, 2008 or by over the weekend. See Margin Call notice sent to Millenium Trust dated October 2, 2008.

289. Had Millenium immediately acted to stop trading upon a margin call, they would have preserved most of the assets in the plaintiffs IRA accounts.

**Red Flags that would have been visible if Defendants had properly managed the IRA and pension fund accounts of Plaintiffs and the Class**

290. Defendants had a duty to safeguard and manage the IRA's

-62-

accounts of Plaintiffs and the Class in a professional and fiduciary manner in accordance with industry standards and in accordance with state and federal laws. If Millenium had fulfilled its duties to its customers it would have completed a full review of the trading strategy and they would have inquired into the backgrounds of the Maxwells before allowing them to trade in plaintiffs accounts.

291.   Defendants would have learned that the Maxwells were non registered to trade futures options contracts and that Garlon Maxwell had a discharge in Bankruptcy and was not an appropriate person to handle money, as well as federal tax liens as well as a fine and cease and desist order from the Iowa Department of Insurance.  Millenium also would have found out that Amber Maxwell was also unregistered and also had a fine and cease and desist order against her as well.  See Iowa Department of Insurance Cease and Desists Orders annexed hereto as Exhibit 6.

292.   Such untoward activities were a red flag that shows that Millenium could have stopped Class Members from being the victimizes of this RICO Ponzi scheme.

293.   Instead, defendant, Millenium, used the Maxwells and Comeau as their general purpose agents to seek out and advise Plaintiffs and the Class to transfer IRA and pension fund monies to Millenium and then Peregrine in order to earn fees and other income. Millenium violated their fiduciary duties to Plaintiffs

and the Class by giving the Maxwells and Comeau unfettered access to all of the monies that had been deposited in such accounts by Plaintiffs and the Class.

294. If Millenium had performed even a modicum of due diligence in investigating the qualifications and background of the Maxwells, Steven Brewer and Comeau, they would have found such a sufficiently large "red flag" in their lack of professional accomplishment and standing that no prudent fiduciary or custodian, acting in the best interests of his client, would ever have allowed the Maxwells to continue as they did.

295 Instead Millenium, asleep at the switch, failed to exercise their fiduciary and custodial duties by allowing the Maxwells and Comeau along with Peregrine to use them as a clearinghouse to loot the IRA accounts of Plaintiffs and the Class.

296. If Millenium had been performing their duties in a legally sufficient and proper manner, they would have become aware of the "red flag" that the Maxwells was failing to provide prudent investments to funds Millenium customers' retirement accounts.

**Foreseeability**

297. Where the custodian does not sufficiently hold in custody or otherwise safe-keep or preserve the assets and income entrusted to it, nor takes reasonable steps to verify periodically the actual status of those assets, the retirement income from those assets not secure. Instead, those assets and income are m jeopardy of being commingled or dissipated.

-64-

298. In addition to being extremely foreseeable, such dissipations have actually occurred repeatedly where breaches of duties to hold and not commingle occur. These and many other incidents made it even more foreseeable to Defendants that their failure to follow standard industry procedures exposed Class Members to substantial losses. But Defendants still did not change their wrongful conduct of failing to hold, failing to question about, and failing to monitor and preserve the assets entrusted to them.

299. Milleniun is chargeable with the same knowledge that any professional IRA custodian should have gathered and maintained regarding the people and entities with which Millenium entrusted their clients' monies. Millenium breached their duties to preserve their customers' IRA accounts by ignoring the numerous red flags surrounding the Garlons' and Comeau's past as well Pergrine and Brewer Futures Group and by allowing these entitites to take possession of and then convert Plaintiffs' IRA accounts.

**Motivation**

300. Defendant Millenium had motivation to ignore red flags and disregard their fiduciary duties to ensure a continued business relationship with P e r e g r i n e a n d B r e w e r.

301. Defendant Millenium used its position of trust and respectability to make plaintiffs feel that their investments were safe and being properly guarded and accounted for. It is particularly egregious that while defendants Millenium collected fees and turned a blind eye to what was really going on, they facilitated the activities of con-men like Wasendorf who could have never looted the investment accounts of innocent investors on the scale that he did but for the ability to hide behind defendants' supposed fiduciary reputation and respectability.

302. Now, it is abundantly clear to Class Members that the simple goal of this Ponzi scheme was to take investors' money, steal it or otherwise squander it, and use new investors' money to make principal and interest payments to the existing investors lucky enough to redeem their investments and/or to take interim payments in cash.

303. While the scheme was ongoing, however, Millenium was in a unique position to examine the accounts and to stop the Wasendorf Ponzi scheme. Instead, as set forth herein, Millenium chose to view Wasendorf and the Wasendorf Affiliates as its valued customers, and to treat their real customers, Plaintiffs and the Class, as mere nuisances.

304. As a direct result of defendant Millennial's conduct, plaintiffs were cause to lose their entire IRA and life saving.

## EQUITABLE TOLLING OF THE STATUTES OF LIMITATION

305. Plaintiffs and the proposed Class members did not discover the facts constituting Defendants' violations until after July 31, 2012 when they received a letter in the Mail from an attorney Paul Thomas, Esq. stating that they had a potential claim. This claim arose after Wasendorf's attempted suicide on July 9, 2012 and his admission of fraud which triggered a robust investigation of PFG. Plaintiffs learned of the actions of PFG and Wasendorf, and the actions and inaction of the Defendants, through extensive media coverage, personal interviews and their independent investigation

306. Plaintiffs and Class members could not reasonably have discovered the facts constituting Defendants' violations until after the law enforcement and regulatory investigations began on July 9, 2012. Until then, Plaintiffs and Class members did not

-66-

understand the nature of the total conduct giving rise to the Class Action claims alleged herein.

307. In addition, the Statute is further tolled herein because a Class Action was also commenced in 2012, *In Re Peregrine Financial Group Customer Litigation,* 1:12-cv-05546, plaintiffs herein reasonably thought that they would be included in that Class Action. However, when plaintiffs recently learned in June of 2016 that they were not part of 2012 Class Action, they wanted to pursue their claims and put an end to the on-going nightmare that they have been experiencing.

308. Because Plaintiffs and Class members could not have reasonably discovered the facts constituting Defendants' violations until July 9, 2012, and because they did not know that they would be excluded form the Class until June, 2016, their claims have recently accrued and any applicable statutes of limitations should be equitably tolled.

### CLASS ACTION ALLEGATIONS

309. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of PFG futures account holders or customers who held open commodity futures or options positions, swaps, and/or cash collateral or cash deposits for futures collateral in their PFG accounts in 2007 through 2008 and who had their accounts handled by the Maxwells and have not received a return of 100% of their funds from PFG, its affiliates, or the Defendants. Excluded from the Class are all Defendants, all members of the immediate families of the Defendants, all other officers, directors, and managing agents of the Defendants including all PFG affiliates and subsidiaries.

-67-

  f. The Class satisfies the requirements of Rule 23(a), as well as

    23(b)(1)(B) and 23(b)(3).

  g. Numerosity. The members of the Class are so numerous that

    joinder of all members is impracticable. The size of the Class,

    which is estimated to consist of 35 individuals and business

    entities, can only be ascertained with exact specificity through

    discovery.

  h. Typicality. Plaintiffs' claims are typical of the claims of the

    members of the Class as all members of the Class are similarly

    affected by Defendants' wrongful conduct.

  i. Adequacy. Plaintiffs will fairly and adequately protect the

    interests of the members of the Class and have retained counsel

    competent and experienced in comple commericial litigation, and

    commodities related litigation.

   310. Commonality and Predominance. Common questions of law and
fact exist as to all members of the proposed class and predominate over any questions solely
related to each individual.

   311. The questions of law and fact common to the class with respect to the Bank
defendants include:

    a. whether Defendants Wasendorf and Wasendorf Jr. breached duties to

-68-

the Plaintiffs and the members of the proposed class;

1. whether the Wasendorfs are liable to the proposed class;

2. whether the Wasendorfs' assets are sufficient to compensate the members of the proposed class for their losses, and if not, whether the assets of the Wasendorfs should be equitably divided among all class members according to their respective losses;

iii. whether U.S. Bank knew or should have known that PFG was representing that an account maintained by PFG with U.S. Bank was a customer segregated account;

iv. whether U.S. Bank in fact maintained a customer segregated account for the benefit of PFG's customers;

v. whether U.S. Bank is estopped from denying that it maintained a customer segregated account for the benefit of PFG's customers;

vi. whether U.S. Bank disregarded "red flags" suggesting that PFG and Wasendorf might be using the services of U.S. Bank to perpetrate a fraud on their customers;

vii. Whether U.S. Bank had a duty to customers of PFG;

-69-

viii. whether U.S. Bank breached a legal duty to customers
of PFG;

ix. whether any breach of duty on the part of U.S. Bank
is the legal cause of any damages suffered by
customers of PFG;

x. whether PFG represented to customers of PFG that it
maintained a customer segregated account with
JPMorgan;

xi. whether customers of PFG transferred or deposited
funds with JPMorgan, in reliance on PFG's
representations that it maintained a customer
segregated account with JPMorgan;

xii whether PFG in fact maintained a customer
segregated account with JPMorgan;

xiii. whether JPMorgan improperly transferred funds
from a customer segregated account to a non-
segregated account under the personal control
Wasendorf or a non-segregated account of an
entity he controlled;

xiv. whether JPMorgan knew or should have known of

-70-

any diversion or misuse of customer funds on

deposit with JPMorgan;

xv. whether JPMorgan disregarded "red flags"

suggesting that PFG and Wasendorf might

be using the services of JPMorgan to

perpetrate a fraud on their customers;

xvi.   whether JPMorgan owed a legal duty to

customer of PFG;

xvii.  whether JPMorgan breached a legal duty to PFG;

xviii.   whether any breach of duty on the part of

JPMorgan is the legal cause of any damages

suffered by customers of PFG; and

xxi.  whether Plaintiffs an Class members are entitled to

damages

312.  Other common questions regarding the other defendants herein are listed in this
Complaint under the Section listing all Plaintiffs'Claims for Relief.

313.  The Class may be certified under Rule 23(b)(3).  Questions of law or fact
common to class members predominate over any questions affecting only individual members.
A class action under Rule 23(b)(3) is also superior to all other available methods for the fair
and efficient adjudication of this controversy.

-71-

314. The expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no unusual difficulty in the management of this Action as a class action.

## FIRST CLAIM FOR RELIEF
### Fraud by Omission (Against Defendant U.S. Bank)

315. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

316. U.S. Bank failed to disclose to Plaintiffs and to other members of the proposed class all of the facts known to U.S. Bank as set forth above, including that (I) PFG was holding the 1845 Account out to be a customer segregated account, (ii) the 1845 Account was not actually designated a customer segregated account, (iii) PFG was using other persons' and entities' mistaken belief that the 1845 Account was a customer segregated account to draw customer funds into the 1845 Account, and (iv) PFG was misappropriating the customer funds in the 1845 Account by failing to segregate them and by spending them or allowing them to be spent for the benefit of PFG, its affiliates, Wasendorf, and other non-PFG customers.

317. U.S. Bank had a legal duty to disclose its knowledge because it had superior knowledge of the above facts and far more experience dealing with FCMs, segregation requirements, and related requirements than PFG's customers. In addition, Plaintiffs and other members of the proposed class trust and have confidence in banks like U.S. Bank to disclose such knowledge. Further, U.S. Bank is in a position of influence and superiority over and a fiduciary to Plaintiffs and the other members of the proposed class.

318. U.S. Bank's knowledge, had it been disclosed, would have been material

-72-

to Plaintiffs and the other members of the proposed class. The facts known to U.S. Bank, stated above and throughout the complaint, substantially affected the interests of the Plaintiffs and the other members of the proposed class, and the non-disclosure of that knowledge induced Plaintiffs and other members of the proposed class to act, including by mailing or wiring their money to PFG or continuing to entrust their money to PFG. Plaintiffs and the other members of the proposed class would not have mailed or wired their money to PFG or continued to entrust their money to PFG had U.S. Bank disclosed its knowledge to them.

319. U.S. Bank knew that Plaintiffs and other members of the proposed class did not share U.S. Bank's knowledge of the facts stated above and throughout the complaint and knew that Plaintiffs and other members of the proposed class would not have expected those facts to be true. Alternatively, U.S. Bank acted with reckless disregard for the truth.

320. U.S. Bank acted with intent to deceive and an intent to induce action by Plaintiffs and other members of the proposed Class because, among other things, the necessary and foreseeable consequences of U.S. Bank's failure to disclose its knowledge was that Plaintiffs and other members of the proposed class left their money with PFG and continued to entrust their money to PFG.

321. Plaintiffs and other members of the proposed class acted in justifiable reliance on U.S. Bank's failure to disclose its knowledge when they mailed or wired PFG their money or when they continued to entrust their money to PFG. Plaintiffs and other members of the proposed class acted in a manner consistent with how a reasonably prudent person in their position would have acted, particularly given (I) their lack of access to the facts U.S. Bank knew, (ii) U.S. Bank's fiduciary status, (iii) U.S. Bank's concealment of the

-73-

information, (iv) their inability to detect the fraud, and (v) the nature of the omitted information. Had U.S. Bank disclosed its knowledge to Plaintiffs and the other members of the proposed class, they would not have mailed or wired their money to PFG or would not have continued to entrust money.

322,    As a direct result and proximate result of U.S. Bank's failure to disclose its knowledge, Plaintiffs and other members of the proposed class suffered and will continue to suffer damages.

## SECOND CLAIM FOR RELIEF
**Fraud by Omission (Against Defendant JPMORGAN)**

323.  Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

324.  JPMORGAN failed to disclose to Plaintiffs and to other members of the proposed class all of the facts known to JPMORGAN as set forth above, including that (I) PFG was holding the 1845 Account out to be a customer segregated account, (ii) the 1845 Account was not actually designated as customer segregated account, (iii) PFG was using other persons' and entities' mistaken belief that the 1845 Account was a customer segregated account to draw customer funds into the 1845 Account, and (iv) PFG was misappropriating the customer funds in the 1845 Account by failing to segregate them and by spending them or allowing them to be spent for the benefit of PFG, its affiliates, Wasendorf, and other non-PFG customers.

325.  JPMORGAN had a legal duty to disclose its knowledge because it had superior  knowledge of the above facts and far more experience dealing with FCMs, segregation requirements, and related requirements than PFG's customers. In addition, Plaintiffs and other members of the proposed class have trust and have confidence in banks like JPMORGAN to

-74-

disclose such knowledge. Further, JPMORGAN is in a position of influence and superiority over PFG and a fiduciary to Plaintiffs and the other members of the proposed class.

326. JPMORGAN's knowledge, had it been disclosed, would have been material to Plaintiffs and the other members of the proposed class. The facts known to U.S. Bank, stated above and throughout the complaint, substantially affected the interests of the Plaintiffs and the other members of the proposed class, and the non-disclosure of that knowledge induced Plaintiffs and other members of the proposed class to act, including by mailing or wiring their money to PFG through accounts at JPMORGAN or continuing to entrust their money to PFG.

327. Plaintiffs and the other members of the proposed class would not have mailed or wired their money to PFG or continued to entrust their money to PFG had JPMorgan disclosed its knowledge to them.

328. JPMorgan knew that Plaintiffs and other members of the proposed class did not share JPMorgan's knowledge of the facts stated above and throughout the complaint and knew that Plaintiffs and other members of the proposed class would not have expected those facts to be true. Alternatively, JPMorgan acted with reckless disregard for the truth.

329. JPMorgan acted with intent to deceive and an intent to induce action by Plaintiffs and other members of the proposed Class because, among other things, the necessary and foreseeable consequences of JPMorgan's failure to disclose its knowledge was that Plaintiffs and other members of the proposed class would mail or wire their money to PFG through JPMorgan or continue to entrust their money to PFG through JPMorgan.

-75-

330. Plaintiffs and other members of the proposed class acted in justifiable reliance on U.S. Bank's failure to disclose its knowledge when they mailed or wired PFG their money or when they continued to entrust their money to PFG. Plaintiffs and other members of the proposed class acted in a manner consistent with how a reasonably prudent person in their position would have acted, particularly given (I) their lack of access to the facts U.S. Bank knew, (ii) U.S. Bank's fiduciary status, (iii) U.S. Bank's concealment of the information, (iv) their inability to detect the fraud, and (v) the nature of the omitted information. Had U.S. Bank disclosed its knowledge to Plaintiffs and the other members of the proposed class, they would not have mailed or wired their money to PFG or would not have continued to entrust money to PFG.

331. As a direct and proximate result of JP Morgan's failure to disclose its knowledge, plaintiffs and other members of the proposed class suffered and will continue to suffer damages.

THIRD CLAIM FOR RELIEF
**Violation of the Illinois Fiduciary Obligations Act, 760 Ill. Comp. Stat. § 65.1 *et seq.*, or, alternatively, of various states' enactments of the Uniform Fiduciaries Act (Against U.S. Bank)**

332. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

333. PFG owed a fiduciary duty to its customers, including Plaintiffs.

334. U.S. Bank knew that PFG was an FCM in possession of customer funds and that PFG owed a fiduciary duty to its customers.

335. PFG deposited checks that were made payable to itself as a fiduciary into the 1845 Account. PFG also deposited checks and other funds that it possessed as a fiduciary

into the 1845 Account. PFG deposited these checks and funds into the 1845 Account even though the 1845 Account was not designated as a fiduciary account or a customer segregated account at the time.

336. PFG breached its fiduciary duty to Plaintiffs and other members of the proposed class. U.S. Bank allowed PFG to deposit checks into the 1845 Account and accepted wire transfers from the JPMorgan customer segregated account into the 1845 Account. U.S. Bank further allowed PFG to withdraw funds from the 1845 Account for use other than for the Customers to whom the funds belonged. U.S. Bank had actual knowledge of PFG's breach of fiduciary duty and misappropriating its customers' funds. U.S. Bank had express fact information that the funds were being used for private purposes in violation of the fiduciary relationship. Alternatively, U.S. Bank acted in bad faith because it knew of obvious circumstances indicating that PFG was breaching its fiduciary duty to Plaintiffs and other members of the proposed class but deliberately refrained from investigating PFG's activities so as to avoid knowledge that PFG was breaching its fiduciary duty. In doing so, U.S. Bank acted in a commercially unjustifiable manner because, among other things, it disregarded and refused to learn facts readily available to it that indicated PFG was breaching its fiduciary duty and misappropriating customer funds. It was bad faith for U.S. Bank to remain passive.

337. The actual and foreseeable result of U.S. Bank's conduct was the loss of the funds belonging to Plaintiffs and the other members of the proposed class, who have suffered and will continue to suffer damages as a result.

-77-

## FOURTH CLAIM FOR RELIEF
**Breach of Contract (Against JPMorgan)**

338. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

339. JPMorgan entered into a contract for banking services with PFG. The contract obligated JPMorgan to ensure the appropriate segregation and protection of customer segregated funds, including the funds held in the JPMorgan account ending in 5265.

340. JPMorgan sent a letter to PFG acknowledging that the account ending in 5265 contained customer funds to be segregated and protected. The letter between JPMorgan and PFG further obligated JPMorgan to ensure the appropriate segregation and protection of customer segregated funds. The purposes of segregating funds include safeguarding the funds deposited by customers in the event an FCM such as PFG attempts to divert or otherwise mishandle customer funds, or declares bankruptcy.

341. Plaintiffs The Schefferts, The Behrens, and Richard Wakeford and other members of the proposed class were direct, intended third party beneficiaries of the contract entered into between PFG and JPMorgan.

342. Plaintiffs and other members of the proposed class wired funds directly to the PFG customer segregated account at JPMorgan ending in 5265 or mailed checks for deposit into that account.

343. JPMorgan breached its contractual obligations to PFG and, by extension, Plaintiffs and other members of the proposed class. In addition to the conduct set forth above, JPMorgan breached its contractual obligations by facilitating transfers of millions of dollars in customer

-78-

funds from the customer segregated account to the 1845 Account. Even though the 1845 Account was not a customer segregated account at the time of the transfers.

344.   The actual and foreseeable result of JPMorgan's breach of its contractual obligations was the non-segregation and loss of the funds belonging to Plaintiffs and other members of the proposed class, who have suffered and will continue to suffer damages as a result.

## FIFTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty (Against U.S. Bank)

345.   Plaintiffs incorporate by reference all of the foregoing allegations as if more fully set forth herein. U.S. Bank was on actual or inquiry notice that a diversion of fiduciary funds by Wasendorf and PFG would occur or was ongoing.

346.   U.S. Bank knowingly breached its fiduciary duties to PFG's commodity customers by, among other things:

> (a) Accepting for deposit funds that were designated for a customer
> segregated account by Plaintiffs and proposed class members and
> depositing them instead into PFG's non-customer segregated account
> (the 1845 Account).

> (b) Failing to identify, monitor, or exercise due diligence related to
> discrepancies and inconsistencies concerning PFG's deposits of
> Plaintiffs' funds;

> © Failing to implement and adhere to compliance and monitoring protocols
> concerning PFG's use of Plaintiffs' funds;

-79-

(d) Failing to identify, monitor, or exercise due diligence related to the

regulatory and compliance "red flags" identified herein;

   (e) Failing to identify, monitor, or exercise due diligence related to PFG; not

   treating the 1845 Account as a customer segregated account;

   (f) Failing to prevent PFG and Wasendorf from using funds designated for

   customer segregated accounts for the operational expenses of PFG;

   (g) Failing to prevent PFG and Wasendorf from using funds designated for

   customer segregated accounts for PFG, its affiliates, Wasendorf, and other

   non-PFG customers;

   (h) Failing to notify Plaintiffs, PFG management, PFG's auditor, or any

   governmental entity or regulator about PFG and Wasendorf's

   misappropriation of funds designated for customer segregated accounts;

   and,

   (I) Causing and allowing customer assets to be misappropriated for the use

   of PFG, its affiliates, Wasendorf, and other non-PFG customers.

347. As a direct and proximate consequence of the conduct of U.S. Bank

described in this complaint, Plaintiffs and other members of the proposed class have lost a

significant portion of the money, securities, and property they paid and delivered to PFG to

margin, guarantee, or secure their commodity or options trading or to support securities

transactions have been denied the use of their customer funds and property since no later than

July 9, 2011, and have been damaged thereby in an amount to be determined at trial.

-80-

## SIXTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty (Against JPMorgan)

348. Plaintiffs incorporate and re-allege each of their previous allegations as though fully set forth herein.

349. JPMorgan was on actual or inquiry notice that a diversion of fiduciary funds by Wasendorf and PFG would occur or was ongoing.

350. JPMorgan knowingly breached its fiduciary duties to PFG's commodity customers by, among other things, allowing PFG and Wasendorf to transfer funds that were designated and held by JPMorgan in a customer segregated account on behalf of Plaintiffs and proposed class members, into PFG's non-customer segregated account (the 1845 Account);

(a) Failing to identify, monitor, or exercise due diligence related to discrepancies and inconsistencies concerning PFG's deposits of Plaintiffs' and proposed class members;

(b) Failing to implement and adhere to compliance and monitoring protocols concerning PFG's use of Plaintiffs' and proposed class members' funds;

© Failing to notify Plaintiffs, other members of the proposed class, PFG management, PFG's auditor, or any governmental entity or regulator about Wasendorf 's and PFG's misappropriation of funds designated for customer segregated accounts.

351. As a direct and proximate consequence of the conduct of JPMorgan, as described in this complaint, Plaintiffs and the members of the proposed class have lost a significant portion

of the money, securities, and property they paid and delivered to PFG to margin, guarantee, or secure their commodity or options trading or to support securities transactions, have been denied the use of their customer funds and property since no later than July 9, 2011, and have been damaged thereby at an amount to be determined at trial.

### SEVENTH CLAIM FOR RELIEF
**Fraud (against Wasendorf, Sn.)**

352. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

353. Wasendorf made or caused PFG to make false and misleading representations to Plaintiffs and members of the proposed class concerning customer funds. Wasendorf represented or caused PFG to represent that customer funds would be kept in customer segregated accounts and would only be used for the benefit of customers. This representation was false when made because PFG and Wasendorf were not properly segregating customer money but instead using the funds for the benefit of PFG, its affiliates, Wasendorf, and other non-PFG customer entities. The misrepresentations were material because they induced Plaintiffs and other members of the proposed class to provide their money to PFG and to continue entrusting PFG with their money.

354. Wasendorf failed to disclose that he was misappropriating customer funds from the 1845 Account and using those funds for the benefit of himself and other non-PFG customer entities.

355. This information was material because Plaintiffs and other members of the proposed class would not have deposited their money with PFG or continued to entrust their

-82-

money with him or his agents or companies had they known these facts.

356. Wasendorf had a legal duty to disclose his knowledge because he owed a fiduciary duty to Plaintiffs and members of the proposed class. In addition, he had superior knowledge of the above facts and was in a position of influence and superiority over Plaintiffs and the other members of the proposed class.

357. Wasendorf admitted that he acted with fraudulent intent and intent to deceive Plaintiffs and other members of the proposed class. Wasendorf knew that plaintiffs and members of the proposed class did not know that he was misappropriating money from their accounts and knew that Plaintiffs and other members of the proposed class would not have expected those facts to be true.

358. Plaintiffs and other members of the proposed class acted in justifiable reliance on Wasendorf's misrepresentations and omissions when they mailed or wired PFG their money or when they continued to entrust their money to PFG. Plaintiffs and other members of the proposed class acted in a manner consistent with how a reasonably prudent person in their position would have acted, particularly given (I) their lack of access to the facts Wasendorf knew, (ii) Wasendorf's fiduciary status, (iii) Wasendorf's concealment, (iv) their inability to detect the fraud, and (v) the nature of the omitted information. Had Plaintiffs and the other members of the proposed class known that Wasendorf's misrepresentations were false or had he disclosed his knowledge to them, they would not have mailed or wired their money to PFG or would not have continued to entrust their money to PFG.

359. As a direct and proximate result of Wasendorf's fraudulent misrepresentations and

failures to disclose his knowledge, Plaintiffs and other members of the proposed class suffered and will continue to suffer damages.

## EIGHTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty (Against Wasendorf and Wasendorf, Jr.)

360. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

361. As senior officers and/or directors of PFG, Wasendorf and Wasendorf Jr. were responsible for preserving the safety and security of monies, securities, and property that Plaintiffs and the members of the proposed class paid, delivered, and entrusted to them and to PFG to allow such customers to trade commodity futures and options contracts through PFG.

362. Wasendorf and Wasendorf Jr. exercised dominion and control over PFG's commodity customers' funds and property and were charged with the duty and responsibility to adopt, implement, and enforce stringent rules and procedures to segregate and separately maintain such property and to ensure that those assets were not used or applied for any improper purpose, including to fulfill or satisfy the financial obligations and liabilities of PFG or its affiliates.

363. As such, Wasendorf and Wasendorf Jr. owed PFG's commodity customers, including Plaintiffs and the members of the proposed class, a fiduciary duty to preserve and protect their customer funds and property, to segregate and separately maintain these assets (including 4d and 30.7 funds), to act solely in the customer's best interests in connection with its custody and control of their assets, and to avoid any self-dealing or conduct on behalf PFG to the

-84-

detriment of customers.

364. Further, as the sole shareholder of PFG, Wasendorf owed PFG and its customer and creditors additional fiduciary duties arising from his effective control of PFG and from the insolvency of PFG.

365. Wasendorf and Wasendorf Jr. breached their fiduciary duties to Plaintiffs and the other members of the proposed class by, among other things, intentionally, knowingly, recklessly, willfully or negligently:

a. Using or directing, authorizing, or causing the use of, the funds of PFG's commodity customers for the benefit of PFG, its affiliates, Wasendorf, and other non-PFG custom

b. Using, or directing, authorizing, or causing the use of, the commodity customers' funds to margin or guarantee the trades or contracts or to secure or extend the credit of PFG, its affiliates, Wasendorf, and other non-PFG customers;

c. Commingling the funds of PFG's commodity customers with the funds of PFG and its affiliates and/or third-parties;

d. Employing procedures at PFG that did not ensure that customer funds, deposited for commodity futures trading, including 4d and 30.7 funds, would be treated as belonging exclusively to customers;

e. Obligating PFG customer funds for purposes other than to purchase, margin, guarantee, secure, transfer, adjust or settle trades, contracts or commodity option transactions of such customers;

f. Maintaining in a separate account or accounts money, securities and property in an

-85-

amount not sufficient to cover or satisfy all of PFG's current obligations to its foreign futures or foreign options customers; and

g.   Commingling foreign futures or foreign options customer funds with the money, securities or property of PFG, with proprietary accounts of PFG and its affiliates, and using such funds to secure or guarantee the obligations of, or extend credit to, PFG or its affiliates or the proprietary accounts of PFG or its affiliates.

366.   As a direct and proximate consequence of the conduct of Wasendorf and Wasendorf Jr. as described in this complaint, Plaintiffs and the other members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to PFG to margin, guarantee, or secure their commodity or options trading or to support securities transactions, have been denied the use of their customer funds and property since no later than July 9, 2011, and have been damaged thereby at an amount to be determined at trial.

## NINTH CLAIM FOR RELIEF
### Conversion (Against Wasendorf, Sn.)

367. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

368.   The funds Plaintiffs and members of the proposed class deposited with PFG were intended solely for the benefit of Plaintiffs and members of the proposed class.

370.   The funds belonging to Plaintiffs and members of the proposed class were specific and identifiable. Each Plaintiff and member of the proposed class deposited a determinable

-86-

amount of funds with PFG.

371.  Wasendorf wrongfully assumed control, dominion or ownership over funds belonging to Plaintiffs and members of the proposed class.  Plaintiffs and members of the proposed class never authorized Wasendorf to use their funds for his benefit or the benefit of PFG, its affiliates, or other non-PFG customer entities.  In fact, Wasendorf admitted that he stole millions of dollars from Plaintiffs and members of the proposed class.

372.  Plaintiffs and members of the proposed class have an absolute and unconditional right to immediate possession of the property.

373.  Plaintiffs and members of the proposed class have suffered and will continue to suffer damages as a direct and proximate result of Wasendorf's unlawful conversion of their funds.

### TENTH CLAIM FOR RELIEF
### Aiding And Abetting Direct Violations Of The Commodity Exchange Act (Against Wasendorf Jr.)

374.  Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

375.    Plaintiffs bring this Count against Wasendorf Jr. under Sections 13 and 25(a) of the CEA (7 U.S.C. §§ 13c, 25(a)) for aiding and abetting direct violations of the CEA and applicable CFTC regulations by PFG and Wasendorf.

376.  Wasendorf Jr. willfully aided, abetted, counseled, induced, violations by PFG and Wasendorf of Section 4d of the CEA (7 U.S.C. § 6d) and Sections 1.20(a), 1.20©, and 30.7(a) of the CFTC Regulations regarding the segregation and maintenance of customer funds, and acted in concert and combination with PFG and each other in such violations by, among other things,

intentionally, knowingly, recklessly, or willfully:

> (a) Using, or directing, authorizing, or causing the use of, the customer funds of PFG's commodity customers for the benefit of PFG, its affiliates, Wasendorf, and other non-PFG customers;

> (b) Using, or directing, authorizing, or causing the use of, the customer funds of PFG's commodity customers to margin or guarantee the trades or contracts, or to secure or extend the credit, of PFG or its affiliates, and/or any other customer or person other than the PFG customer for whom the property was held;

> (a) Commingling the funds of PFG's commodity customers with the funds of PFG, its affiliates, Wasendorf, and other non-PFG customers;

> (b) Employing procedures at PFG that did not ensure that customer funds, deposited for commodity futures trading, including 4d and 30.7 funds, would be treated as belonging exclusively to commodity customers; and

> © Obligating PFG customer funds for purposes other than to purchase, margin, guarantee, secure, transfer, adjust or settle trades, contracts or commodity option transactions of such customers.

377. Wasendorf Jr. participated directly or indirectly through PFG in commodities transactions by receiving deposits, money, securities, or property from the Plaintiffs and the members of the proposed class in connection with or with the expectation of a contract of sale of commodities for future delivery and otherwise participated in the transactions set forth in Section 25 of the CEA (7 U.S.C. § 25(a)(1)(A)-(D)).

378. PFG was capable of operating and meeting its obligations under the CEA and CFTC regulations only through its senior management, including Wasendorf Jr. who had control over PFG and direct supervisory responsibility and authority to ensure that PFG properly implemented and carried out the customer segregation requirements imposed under the CEA and CFTC regulations.

379. As a direct and proximate consequence of Wasendorf Jr. conduct as described in this complaint, Plaintiffs and the members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to PFG to margin, guarantee, or secure their commodity or options trading, have been denied the use of their customer funds since no later than July 9, 2012, and have been damaged thereby at an amount to be determined at trial.

## ELEVENTH CLAIM FOR RELIEF
**Aiding and Abetting Breach of Fiduciary Duty (Against Wasendorf Jr.)**

380. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein. As set forth herein, by misappropriating the funds that Plaintiffs and other members of the proposed class deposited with PFG, Wasendorf breached his fiduciary duty to Plaintiffs and other members of the proposed class.

381. In his capacity as President and Chief Operating Officer of PFG, Wasendorf Jr. substantially and materially assisted Wasendorf Sn. in breaching his fiduciary duty to Plaintiffs and other members of the proposed class in the following respects:

(a)     Wasendorf Jr. falsely reassured PFG clients that PFG abided by all

-89-

regulations mandated by the CFTC and the rules of NFA. He also represented

that PFG held customer funds in segregated accounts that were always separate

from operational funds. He also stated that PFGBEST reported daily and monthly

to the regulators concerning customer segregated funds.

382.  However, Wasendorf Jr. did not monitor, safeguard, or exercise any due
diligence related to customer segregated funds deposited with PFG;

383.  Wasendorf Jr. did not monitor, safeguard, or exercise any due diligence related
to operating funds deposited with non-PFG entities with which Wasendorf Sn. was affiliated;

(a) Wasendorf Jr. did not implement any procedural or internal safeguards or

protocol to prevent the misuse or misappropriation of customer segregated funds;

(b)  Wasendorf Jr. caused and allowed customer assets to be misappropriated for

the use of PFG, its affiliates, Wasendorf, and other non-PFG customers;

© Wasendorf Jr. caused and allowed the funds of PFG's customers to margin or

guarantee the trades or contracts, or to secure or extend the credit, of PFG or its

affiliates, and/or any other customer or person other than the PFG customer for

whom the property was held;

(d) Wasendorf Jr. caused and allowed the commingling the funds of PFG's

customers with the funds of PFG and its affiliates and/or third-parties;

(e)  Wasendorf Jr. caused and allowed unlawful transfers of customer funds and

property;

384.  Wasendorf Jr. caused PFG to operate without appropriate liquidity and to risk

-90-

infrastructure to protect customer funds and property;

385. By virtue of his substantial and material assistance to Wasendorf, upon information and belief Wasendorf Jr. was aware of his role in Wasendorf's breach of fiduciary duty and he acted knowingly in assisting Wasendorf.

386. As a direct and proximate consequence of Wasendorf Jr.'s conduct as described in the foregoing and throughout this complaint, Plaintiffs and other members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to PFG and have been denied the use of their assets, and have been damaged thereby at an amount to be determined at trial.

## TWELFTH CLAIM FOR RELIEF
### Direct Violations of the Commodity Exchange Act (Against Wasendorf Sn.)

387. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

388. Plaintiffs bring this Count against Wasendorf Sn. for direct violations of Section 4d of the CEA (7 U.S.C. § 6d) and Sections 1.20(a), 1.20© and 30.7(a) of CFTC regulations regarding the segregation and maintenance of customer funds and CFTC Regulation 166.3 for failure to properly supervise persons or entities under their direction and control by PFG, by and through Wasendorf.

389. Defendant Wasendorf Sn. directly violated Section 4d of the Commodity Exchange Act and applicable CFTC regulations by, among other things, expressly directing the transfer of commodity customer funds for an unlawful purpose in direct violation of the CEA's

-91-

prohibition against utilizing customer funds other than for the benefit of customers.

390. At the time that Wasendorf specifically directed the transfers of customer funds, he had control and dominion over such funds and was acting on behalf of PFG's FCM unit, which was engaged in transactions with commodities customers as set forth in Section 22 the CEA (7 U.S.C. § 25). Wasendorf, while acting on behalf of and directing the actions of PFG with respect to commodity customers' funds, directed the transfer of such funds in a manner that caused the use of the funds of PFG's customers to margin or guarantee the trades or contracts, or to secure or extend the credit, of PFG or its affiliates, and/or any other customer or person other than the PFG customer for whom the property was held.

391. Section 22 of the CEA (7 U.S.C. § 25 ("Section 25") expressly provides private rights of action for violations of the CEA, including violations of Section 4d (7 U.S.C. § 6d) of the act and Sections 1.20(a), 1.20© and 30.7(a) of CFTC regulations regarding the segregation and maintenance of customer funds.

392. Wasendorf was acting on behalf of and directing the actions of PFG with respect to customers' commodities transactions by receiving deposits, money, securities, or property from the Plaintiffs and the proposed class members' in connection with or with the expectation of a contract of sale of commodities for future delivery and otherwise participated in the transactions set forth in Section 25 of the Commodity Exchange Act (7 U.S.C. § 25(a)(1)(A)(D)).

393. PFG was capable of operating and meeting its obligations under the CEA and CFTC regulations through its senior management, including Wasendorf, who had dominion over PFG and direct supervisory responsibility and authority to ensure that PFG properly implemented

-92-

and carried out the customer segregation requirements and related obligations imposed under the CEA and CFTC regulations.

394. As a direct and proximate consequence of Wasendorf's misconduct as admitted by Wasendorf and described in this complaint, Plaintiffs and the members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to PFG to margin, guarantee, or secure their commodity or options trading, have been denied the use of their assets during the relevant time frame, and have been damaged thereby at an amount to be determined at trial.

## THIRTEENTH CLAIM FOR RELIEF
### Violations of Section 4b(a)(1)(A) and (C) of the CEA, as amended, Fraud by Misappropriation (Against Wasendorf, Sn.)

395. Plaintiffs repeats and reallege each of the above-stated paragraphs and incorporates them by reference as of the set forth herein.

396. Section 4b(a)(1)(A), © of the CEA, as amended, 7 U.S.C. §6b(a)(1)(A), ©, makes it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person: (A) to cheat or defraud or attempt to cheat or defraud such other person; or © willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for such other person.

397. By misappropriating customer funds for purposes other than those intended by its

-93-

customers, PFG, by and through Wasendorf, violated Section 4b(a)(1)(A), © of the CEA, as amended, 7 U.S.C. § 6b(a)(1)(A), ©.

398. Wasendorf controlled PFG and willfully aided, abetted, counseled, commanded, induced, and procured the acts constituting the violations by PFG alleged in this count.

399. Wasendorf is therefore additionally liable for PFG's violations of Section 4b(a)(1)(A), © of the CEA, as amended, 7 U.S.C. § 6b(a)(1)(A), © and pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b).

400. Each and every day that PFG and/or Wasendorf misappropriated customer funds for purposes other than those intended by its customers constitutes a separate and distinct violation of Section 4b(a)(1)(A), © of the CEA, as amended, 7 U.S.C. §6b(a)(1)(A), ©.

401. As a direct and proximate result of the wrongful conduct of the Defendants named in this Claim for relief, Plaintiffs and the other proposed class members suffered substantial damages. Plaintiffs and the proposed class members who deposited with or paid to PFG money, securities, or property in order to engage in commodity futures or options contract trading on or subject to the rules of a designated contract market in the United States are each entitled to actual damages for the violations of the CEA alleged herein.

FOURTEEN CLAIM FOR RELIEF
**Violations of Section 4b(a)(2)(A), (B) and (C) of the CEA, 7 U.S.C. § 6b(a)(2)(A)(B) and (c) Fraud in Connection with Commodity Futures Contracts (Against Wasendorf, Sn., Wasendorf, Jr. Brewer, Garlon Maxwell, and Amber Maxwell)**

402. Plaintiffs incorporates by reference all of the foregoing allegations as if

fully set forth herein.

403. Section 4b(2)(A), (B) and © of the CEA, 7 U.S.C. § 6b(a)(2) makes it

unlawful:

> [F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or other agreement, contract, or transaction subject to paragraphs (1) and (2) of section 7a (g) of this title, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market -- (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; © willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person....

### As Against Wasendorf Sn.

404. Wasendorf and PFG, individually or in concert, in or in connection

with commodity futures contracts made for or on behalf of other persons, cheated or

defrauded, or attempted to cheat or defraud, customers and willfully deceived or attempted

to deceive customers by, among other things, knowingly making transfers of customer

segregated funds in a manner designed to avoid detection, improperly diverting customers'

cash and commingling it with PFG own funds, willfully making or causing to be made false

reports or statements or willfully entering or causing to be entered false records, and

converting customers funds for its own use in violation of 7 U.S.C. § 6b(a)(2)(A), (B), and

©.

405. As a direct and proximate result of the wrongful conduct of Wasendorf, Plaintiffs and

the other proposed class members suffered and will continue to suffer damages.

406. Plaintiffs and the members of the proposed class who deposited with or paid to PFG money, securities, or property in order to engage in commodity futures or options contract trading other than on or subject to the rules of a designated contract market in the United States are each entitled to actual damages for the violations of the CEA alleged herein.

## As Against Wasendorf Jr. And Steven Brewer

407. These defendants entered into an agreement stating that in the case of plaintiffs's accounts falling into a deficit and being issued a Margin Call, Brewer Financial Group would immediately cover such Margin Deficits in customers accounts. See Agreement annexed hereto as Exhibit 8. This agreement was fraudulent and designed to lure members of the public into the false sense of security that their account would be protected. However, when margin calls were issued, PFG supposedly told Brewer, but no customers were ever notified. In addition, Brewer committed fraud in misrepresenting that he would cover the deficiencies when he did not cover the margin deficits and allowed the customers' accounts to be lost.

## As Against Garlon Maxwell and Amber Maxwell

408. In misrepresenting to the Class members and plaintiffs their experience and personal background as well as the fact that neither was registered under the commodities exchange act. They also committed Fraud in underplaying the grave risks of investing in naked put and call options and by failing to only invest 10% of each customer's funds in this very high risk investments, as they had stated they would to reduce risk.

-96-

## FIFTEENTH CLAIM FOR RELIEF

## Aiding and Abetting -Under the CEA, 7 U.S.C. § 25(a) and 13(c)(A)(As Against defendants Brewer and Comeau)

409 Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

410. Because defendants Brewer and Comeau knowingly rendered substantial assistance in perpetrating this commodities fraud, they are liable under the Commodities Exchange Act for aiding and abetting. Without each defendants' assistance the fraud listed in this Complaint could not have succeeded.

411. Defendant Perry Comeau afforded this extraordinary assistance to Garlon Maxwell and Amber Maxwell in helping contact the Class members and setting up meeting with the Class in Iowa and arranging the Maxwell's trip from Utah; in helping to set up the Class members' accounts in the basement of Perry Comeau's home. Because some of the plaintiffs including the Schefferts did not have access to a computer, Perry Comeau used his email address as the contact address on the opening documents for the Schefferts. Eventually, defendant Comeau entered into his own management agreement with the Schefferts and had them sign over a power of attorney as well.

412. Although Comeau was not registered as a commodities trading advisor he carried customer accounts as a CTA so that the Maxwells would not have more than 15 persons each as customers to attempt to fall within the CEA exemption from registration.

413. Notwithstanding a cease and desist order from the Iowa Department of Insurance to stop acting as an investment advisor issued in 2007, Comeau disregarded this order and continued to

assist, set up and encourage plaintiffs' to invest with the Maxwell.

414.   Comeau's conduct in aiding and abetting the Maxwells, directly caused the plaintiffs and the class members to sustain losses of their investments.

415. Defendant Steven Brewer aided and abetted Wasendorf and Peregrine and the Maxwells by failing to call or have is APs (Associated Persons) call any of the plaintiffs and/or class members after Peregrine informed him and his agents as their AP (Associated Person) that the customers were on a Margin Call on October 2, 2008.

416.   By failing to notify by telephone any of the customers by phone, none could satisfy a margin call and therefore the Class members lost most of their life savings.

## SIXTEENTH CLAIM   FOR RELIEF

### Breach of Contract under Federal Law and Breach of Federally Imposed Contractual Duties to Hold Assets and Not Commingle (Against Millennium Trust)

417.   Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein   .

418.   There is a substantial federal interest in the proper establishment and administration of IRA custodial accounts and in preserving and maintaining the security of individuals' retirement savings.

(a)   Defendant Millennium acknowledged the substantial federal interest m the IRA agreements recognizing that the IRAs are governed by the Internal Revenue Code.

(b)   Federal law imposes the obligations on trustees (including directed and other trustees), that have been previously alleged. See, *e.g.,* 26 C.F.R. §§ 1.408-2(e);

-98-

iJl 22supra alleging other sources.

© Separately or in combination with the foregoing, the Defendants agreed to the following duties, among others, in their following standardized contracts:

(d) By reason of the foregoing, Defendants further agreed to perform and also had the fundamental common law duties of a trustee to preserve and maintain trust assets. These duties encompass the duties to determine exactly what property forms the subject matter of the trust and use reasonable diligence to discover The location of the trust property and keep it safe and under sufficient control.

(e) Federal law also includes the duty to avoid commingling the assets of the trust with other assets which is exactly what happened when plaintiffs money were transferred from JPMORGAN to U.S. Bank's 1845 account. Such duty arose here by reason of the Code §408(a)(5) ("The assets of the trust will not be commingled with other property except in a common trust fund or common investment fund .") and the pertinent Treasury Regulations. 26 C.F.R. §§ 1.408-2(b)(5)(I) (same).

(f) Defendant Millennium had the duty to exercise control over the custody of the assets to preserve them and ensure that they were secure. This includes, but is not limited to; (a) checking with Depository Trust Corporation or others to confirm the assets' existence; (b) otherwise ensuring no commingling or dissipation of the assets of each trust; © and taking other reasonable steps (as previously alleged) to ensure that the assets were, in fact, being preserved and maintained.

-99-

(g) Defendant Millennium failed to perform a contractually obligated administrative review of Garlon Maxwell, Amber Maxwell, Brewer Futures Group and PFG proffered investments before the Plaintiffs invested in Peregrine and the Maxwells and/or as part of their retirement accounts.

(h) Defendant Millennium failed to perform a contractual obligation by having a business relationship or affiliation with the investment Issuer/seller that the Plaintiffs selected, Garlon Maxwell and Amber Maxwell, in the Case, Brewer Financial and PFG.

(i) Defendant Millennium failed to perform due diligence to discover that Garlon Maxwell and Amber Maxwell were unregistered commodities trading advisors under the Commodities Exchange Act and these defendants had cease and desist orders issued against them in 2007. See Exhibit 6 annexed hereto.

419. Defendant Millennium systematically breached all their foregoing contractual and other obligations.

420. Because Defendant Millennium systematically breached the foregoing contractual obligations to hold and preserve Plaintiffs' funds and not allow them to be commingled, it was very foreseeable that a third party could or would be able simply to take and convert, commingle, and dissipate the res of each Trust. In fact, the res of each Trust was taken by a third party (Wasendorf, Sn.)

-100-

421.  As a direct, foreseeable and proximate result of Defendants' breaches of contract under federal common law, Plaintiffs and each Class member suffered losses.

## SEVENTEENTH CLAIM FOR RELIEF

**Breach of Fiduciary Duty under Federal Law and Breach of Fiduciary Duties Imposed by Federal Law (Against Millennium Trust.)**

422.  Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein.

423.  As trustee of Plaintiffs' IRA accounts, Defendant owed Plaintiffs and Class Members a fiduciary duty under federal regulations and common law. By reason of their fiduciary relationship, Defendant Millennium owed Plaintiffs and Class Members the duties of good faith, fair dealing, loyalty, due care, extreme candor, and honesty with respect to the exercise of the Defendant's discretion and duties under the Trust, and their conduct relating to the Trust res.

424.  Defendant breached these fiduciary duties by failing to preserve and keep safe the Trust res for each of the Class Members and allowing them to be commingled and converted.

425.  Defendant Millennium did not review the risk disclosure documents that they signed and did not apprise the Class of the serious risks of investing in these sorts of investments.

426.  As a foreseeable result of these breaches, a third party (Wasendorf) was able to commingle and convert Class Members' funds, and Plaintiffs and each Class member suffered losses.

-101-

427. Defendant Millennium is liable for, and Plaintiffs and Class Members are entitled to, actual and punitive damages in an amount to be determined at trial attributable to the conduct of Defendant that was reckless, willful, wanton, and without regard to the rights of Plaintiffs and Class Members.

## EIGHTEENTH CLAIM FOR RELIEF.

### Breach of Contract to Hold Assets and Not Commingle under State Law
### (Against Millennium Trust)

428. Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein.

429. In addition or the alternative to the foregoing claims, Defendant also is liable for breach of contract under state law.

430. As a foreseeable, direct and proximate result of Defendant's breaches of contract under state law, Plaintiffs and each Class member suffered losses and damages.

## NINETEETH CLAIM FOR RELIEF

### Breach of Fiduciary duty under state law (Against Millennium Trust)

431. Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein.

432. Defendant's foregoing breaches of fiduciary duties also violate state law fiduciary standards which include the duties of good faith, extreme candor, honesty, fair dealing, loyalty, due care and to investigate red flags. These duties mirror, incorporate and add to the federal duties

-102-

alleged herein.

433. As a foreseeable, direct and proximate result of Defendant's breaches of fiduciary duty under state common law, Plaintiffs and each Class member suffered losses and are entitled to actual and punitive damages.

## TWENTIETH CLAIM FOR RELIEF

**Ordinary and Gross Negligence under State Law (Against Millennium Trust)**

434. Plaintiffs incorporate by reference each and every allegation set for forth above as though fully set forth herein.

435. Defendant's foregoing extreme departures from the standards of ordinary care also violate state common law prohibitions against negligence, and constitute gross negligence.

436. As a foreseeable, direct and proximate result of Defendant's ordinary and gross negligence under state common law, Plaintiffs and each Class member suffered losses

## TWENTY-FIRST CLAIM FOR RELIEF

**Unjust Enrichment and Restitution under Federal and State law
(Against all defendants)**

437. Plaintiffs incorporate by reference each and every allegation set forth above as though fully set forth herein.

438. By reason of the foregoing, Defendants are obligated to make restitution as well as pay back their unjust enrichment to each Class member under federal common law and State

-103-

Common Law.

## TWENTY-SECOND CLAIM FOR RELIEF

**Bad Faith Failure to Maintain a Stable and Objective Contract Market and to Enforce its Rules and the Commodities Exchange Act in Violation of 7 U.S.C. § 7(b), Et. Seq.(Against the CME).**

439. Plaintiffs incorporate by reference each and every allegation as if fully set forth above.

440. The CME Board of Governors ("the Governors" or "Regulators" hereinafter) failed in bad faith and/or with constructive bad faith, extreme arbitrariness and or recklessness to prevent Peregrine and the Maxwells from continuing to initiate new positions and in failing to stop all trading on October 2, 2008 and in failing to then shut down plaintiffs' under margined accounts. The extensive violations of CME rules 930 D, E, and K is overwhelming evidence that bad faith was involved under the totality of the circumstances, and such oversights could not have been attributed to mere negligence.

441. The CME and its Governors violated in bad faith and/or constructive bad faith their duties to enforce Section 7 U.S.C.§7(b)(3) of the Commodities Exchange Act that requires contract markets or boards of trade protect the members of the public from the wrongful conduct at issue herein:

442. Section 7 U.S.C. § 7(b)(3) states in pertinent part

"Fair and equitable trading

      The board of trade shall establish and enforce

-104-

> trading rules to ensure fair and equitable trading
> through the facilities of the contract market, and
> the capacity to detect, investigate and discipline
> any person that violates the rules.. . ."

443. From approximately October 2, 2008 through October 8, 2008, the CME board of

defendant did not take any measures including emergency measures as it is supposed to under 17

C.F.R.§ 1.41 to shut down trading in plaintiffs' undermargined accounts.

444. Had the CME done so, Plaintiffs would never have lost their entire life savings.

445. Instead, the trading was continuing to generate fees, commissions, perks dues and

other monetary benefits for the CME, and thus they completely ignored their responsibilities to

the public to maintain a fair and equitable contract market for everyone not just certain

individuals such as Wasendorf, Brewer, the Maxwells, Millennium, U.S. Bank and JPMorgan

Chase.

446. As such, it was the CME's duty to maintain a stable and orderly market for the Class

members benefit.

447. The CME also had actual and/or constructive Knowledge of the unlawful trading

conduct as well as the violation of Margin Rules, CME 930 D,E,and K, since the CME is

supposed to monitor trading on a daily basis and has access to all of the trading records, upon

information and belief.

448. Indeed, in the CME's published literature on its Website entitled "CME Clearing

Financial Safeguards," it states *inter alia:*

-105-

"Intra-Day Monitoring

"CME Clearing monitors intra-day price movements
and trading activity throughout the trading session.
To assess the impact of these prices changes on clearing members,
intra-day mark to market calculations are performed on clearing member
and customer positions and reviewed by CME Clearing throughout the day and
overnight."

## Market Regulation

"Through CME Group's Market Regulation Department, CME Clearing's risk management team
has access to specific account position information for clearing members' large individual
customer accounts. Such position information, which is maintained on a highly confidential basis,
allows the identification of concentrated positions as they arise and the aggregation of positions
that may be owned by common principals through several different clearing members.
Knowledge of concentrated or high risk positions coupled with information routinely gathered on
the cash and/or related derivative markets, enables CME Cleaning to respond rapidly to market
situations that might adversely affect financial integrity of CME Clearing or the financial stability
of a clearing member."

449. These above-representations appear fraudulent, because of the lack of monitoring

of the plaintiffs and Class members positions from October 2, 2008 through October 8, 2008

which should have caused the CME to shut down all trading within one hour's time on October 2,

2008.

450. It would be impossible for the CME to claim negligence when they admittedly reviewed

trades all day according to their own published guidelines cited above.

451. Such lapses are extremely arbitrary and reckless demonstrating bad faith and/or

constructive bad faith upon information and belief.

452. Plaintiffs have sustained losses in their customer account in the amount of no less than
$3,500.000.00.

-106-

## TWENTY-THIRD CLAIM FOR RELIEF

### Vicarious Liability- (Against All Defendants)

453.  Under common law, as well as 7 U.S.C.§ 2(a)(1)(A), defendants who are employers

or principals are strictly liable and independently responsible for the actions of their employees or

agents, and board of governors herein.

## TWENTY-FORTH CLAIM FOR RELIEF

### RICO VIOLATION18 U.S.C. § 1962(c)(Against All Defendants)

454.  Plaintiffs incorporate by reference each and every  allegation as if fully set forth

above.

455. Defendants listed below are all "persons" capable of holding a legal or beneficial

interest in property within the meaning of 18 U.S.C. § 1961(3).  Defendants listed below have

violated 18 U.S.C. § 1962© by committing multiple acts described below.

### THE ENTERPRISE

456.  At all relevant times, defendants Russell Wasendorf, Sn, Russell Wasendorf, Jr.

U.S. Bank, JPMorgan, Steven Brewer, Millennium Trust, the CME, Garlon Maxwell, Amber

Maxwell and Perry Comeau (referred to herein as the "RICO Defendants"), associated in fact

with each other, and with others known and unknown so as to constitute an "Enterprise" within

the meaning of 18 U.S.C. Sections 1961(4).

457.  At all times relevant to this Complaint, the Enterprise was engaged in, and its

activities affected, interstate and foreign commerce. The "association in fact" Enterprise had a

-107-

structure and organization and existed apart from its predicate acts. The Enterprise had relationships among those associated with the enterprise and longevity sufficient to permit these associates to pursue the Enterprise's purpose. Each RICO Defendant is distinct and separate from the association-in-fact Enterprise of which they are a component part. The RICO Defendants associated with the Enterprise through its involvement in the underlying racketeering offenses as well as through the continuous concealment and promotion of the activities of the Enterprise.

458. The RICO Defendants, and others known and unknown, associated with each other for the common purpose of defrauding Plaintiffs and others. In furtherance of the activities of the Enterprise, the RICO Defendants committed numerous acts, as described herein, which constituted violations of wire fraud, mail fraud, and the money laundering statutes.

459. The participants of the Enterprise, including the RICO Defendants, are and/or were all in the business of buying and selling futures and option contracts or providing funds and or investment advise for the purpose of buying and selling future and options contracts sold in the United States and globally, and was engaged in and whose activities affected interstate commerce both presently and/or at the times relevant to this Class Complaint within the meaning of 18 U.S.C.§§ 1961(4) and 1962©.

460. The RICO Defendants accomplished their goals by defrauding and manipulating customers, by the various means described in this Class Complaint and through illegal practices described in this Class Complaint causing plaintiffs and Class members to lose their life

-108-

savings.

461. The RICO Defendants participated in the conduct of the affairs of the Enterprise by directing the activities of the Enterprise, including failing to stop the conduct of their employees and agents who were blatantly violating the laws.

## THE RACKETEERING VIOLATION

462. From in or about 2005 and continuing up through at least year October, 2008, the aforesaid RICO Defendants, each of whom are persons associated with, or employed by the Enterprise, did knowingly and unlawfully conduct or participate, directly or indirectly, in the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and § 1961(5), all in violation of 18 U.S.C. § 1962©.

463. Plaintiff alleges that RICO Defendants engaged in the alleged criminal activities with the intent to defraud Plaintiffs of their business and property. The RICO Defendants also worked with others to defraud Plaintiffs of money or property by concealing material facts from Plaintiffs resulting in loss of Plaintiff's property and monies.

## PATTERN OF RACKETEERING ACTIVITY

464. Plaintiffs allege that the RICO Defendants, in collusion and in combination with each other, collusively agreed to a scheme whereby monies would be obtained from the members of the public for the ostensible purposes of investments. Fees and commissions would be taken by each RICO defendant, the monies were transferred to Wasendorf, Sn. personally and

-109-

then the customers' accounts were forced to go down to zero, and the customers would leave the market penniless as a result of this scheme to defraud.

465. The RICO Defendants' scheme to defraud was knowingly made and reasonably calculated with the intent to deceive and defraud persons of ordinary prudence and comprehension, including plaintiffs.

466. The RICO Defendants' scheme to defraud was knowingly made with intent to induce and did induce plaintiffs to invest in options contracts that traded over the Chicago Mercantile Exchange based upon such misrepresentations, concealment, suppressions or omissions, to wit, the falsity that these investments were sound and the fact that these investments were destined to lose eventually inducing Plaintiffs to purchase or sell such option contracts and then forcing plaintiffs to off set these positions at steep losses, and failing to notify plaintiffs of margin calls issued on these investments which would have given plaintiffs the chance to stop all trading and minimize their loses

467. The RICO Defendants' scheme to defraud was made with the purpose of gaining millions of dollars in profits from customers including Plaintiffs that would not have been gained but for the RICO Defendants' conduct and omissions alleged herein in this Class Complaint.

468. Plaintiffs allege that the course of conduct engaged in by the RICO Defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5). Plaintiffs can show the relatedness prong because the predicate acts have the "similar purposes, results,

-110-

participants, or methods of commission or are related to the affairs of the Enterprise."

469. Plaintiff alleges that the continuity of the pattern of racketeering activity is closed-ended inasmuch as a series of related predicate offenses extended over at least 4 years (a substantial period of time).

470. In furtherance of the unsuitable trading practices to destroy value in plaintiffs accounts alleged in this Complaint from on or about 2005 through October, 2008, and beyond, the RICO Defendants unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises would and did transmit and/or caused to be transmitted by means of wire communications in interstate commerce, writings, signs, signals, pictures and sounds for the purpose of executing such Scheme and artifice, to wit, each RICO Defendant caused account statements and other monetary information related to the plaintiffs trading accounts to be determined over the phone lines and also allowed orders to be placed over the phone lines and via mobile devices and/or the internet to purchase and to sell E-Mini SP 500 options over the CME exchange.

471. Each RICO Defendant caused or actually sent statements, disclosure documents, customer agreements and/or confirmation statements to customers, year-end tax statements, moneys due to customer redemption requests, and each RICO Defendant caused false and misleading information to be given to plaintiff through the mails, phone lines or internet and failed to inform plaintiffs of material information relating to each one's account under the legal theory of Fraud by Omission and some or all of defendants used the internet to entice unwitting

-111-

participants to participate in these investments and commit their monetary capital to such investments during the relevant time period.

## RACKETEERING ACTIVITY

472. Within the Southern District of New York, and elsewhere, the RICO Defendants committed the following racketeering activity:

### Racketeering Acts Involving Wire Fraud

473. From on or about January 1, 2005 through October 9, 2008, the RICO Defendants committed multiple racketeering acts of wire fraud, resulting from the RICO Defendants having devised, and intending to devise a scheme and artifice to defraud, for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, causing to be generated and sent by email or regular mail daily and monthly statement, Margin Call Notices, year end summaries and tax statements as well as redemptions to their investors throughout the United States and globally who owned held accounts with such Defendants to apprise them of their profits or losses earned in the investments made in accounts set up by defendants Millennium, the Maxwells, Perry Comeau and non-defendants Brewer Futures Group and PFG.

474. These RICO Defendants participated in creating a situation where plaintiffs would loose their money either by tendering it to Russell Wasendorf, Sn. by transferring these funds to his accounts for his personal use and then setting plaintiffs up to sustain losses in their customer accounts. Each transaction caused there to be generated

-112-

electronic evidence of those monetary transfers which eventfully were made known to plaintiffs, including within the United States. The RICO Defendants also caused to be sent daily and monthly statements, tax statements and redemptions sent by email to customers throughout the United States and outside the United States.

475. On a daily basis some or all of the RICO Defendants used the wires to publish these artificially inflated prices as part of the conduct of the Enterprise alleged herein.

**Racketeering Acts Involving Mail Fraud.**

476. From on or about January 1, 2005 through October 9, 2008, the RICO Defendants committed multiple racketeering acts of mail fraud, especially on October 2, 2008, and October 5, 2008 resulting from the RICO Defendants having devised, and intending to devise a scheme and artifice to defraud, for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, each RICO Defendant benefitted, from sending plaintiffs late Margin Call Notices intended not to get to the customers in time for them to salvage the remaining balances in each ones account so that their investment careers would be terminated once and for all and so that the proceeds of their investments would be untrackable. Defendants intentionally used the Postal Service to mail or caused to be mailed: (1) customer daily and monthly statements (2) year-end tax statements to their customers, and (3) redemption checks to customers who requested such redemptions, and Margin Call Notices. These RICO Defendants also caused to be mailed moneys from new customers who wanted to open accounts to invest in these investments based on fraudulent representations that these

-113-

investments were safe.

477. Each time the RICO Defendants purchased more positions out of the out of the proceeds of their unlawful activity, *e.g.* short term profits or premiums received when selling an option contact, a confirmation statement or email was generated and mailed by each RICO Defendant, and/or cash was transferred in or out of their margin accounts to reflect these monetary transactions, also generating a mailed statement upon information and belief.

478. Each RICO Defendant did cause, and did agree to cause Plaintiffs herein to sustain severe financial losses between October 2, 2008 and October 8, 2008 when their predatory trading, and the RICO Defendants desiring to get rid of plaintiffs accounts took losing positions so that when the market moved even lower the plaintiffs accounts would be terminated and it would be made to look like the losses were just due to natural market volatility rather than purposeful conduct.

479. Thus, Plaintiffs were injured when the RICO Defendants caused their accounts to be terminated and did not even call plaintiffs to alert them that they were on a Margin Call starting on October 2, 2008.

### Racketeering Acts Involving Money Laundering

Section 1956 Violations

480. From on or about January, 2005 through October 8, 2008, the RICO Defendants committed multiple acts of money laundering within the meaning of 18 U.S.C. Sections

-114-

1956 in that:

> (A) the RICO Defendants, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such financial transactions which in fact involved proceeds of a specified unlawful activity, namely mail fraud (18 U.S.C. § 1341) and/or wire fraud (18 U.S.C. § 1343), knowing that the transactions were designed in whole or in part to promote the carrying on of the foregoing specified unlawful activity, in violation of 18 U.S.C. §1956(a)(1)(A)(I).

481.  Each RICO Defendant, with specific intent used the unlawful profits and proceeds of plaintiffs customers' accounts including commissions and fees generated to promote further investments in the financial markets to generate more profits in violation of 18 USC § 1956.

482.  The RICO Defendants used the profits of their manipulative conduct on other occasions during the relevant time period.

483. Each of the RICO Defendants knowingly and with criminal intent aided and abetted each other in using the proceeds of plaintiffs customers' accounts including fees and commissions generated by these accounts to initiate other investments and profits in Financial instruments during the relevant time period.

484. Each RICO Defendant engaged in such transactions on more than two occasions during the relevant time.

## TWENTY-FIFTH CLAIM FOR RELIEF

**RICO § 1962(d) Conspiracy (Against All Defendants)**

485.   Plaintiffs incorporate by reference each and every  allegation as if fully set forth above.

486.   Plaintiff alleges that commencing on or before August, 2005, and during and continuing at all times through at least year 2012, the RICO Defendants, conspired to violate section 1962©, i.e., each Defendant agreed that a conspirator would conduct or participate in the affairs of the Enterprise through a pattern of racketeering, including acts indictable under 18 U.S.C. §§ 1341; 1343,  and 1956, as more fully described above.  Plaintiffs allege that the conspiratorial objective of that mutual agreement was intended to obtain Plaintiffs' interests in business and/or property, and that such conspiratorial conduct violates RICO § 1962(d)

**RICO RELIEF**

487.   By reason of RICO Defendants' violation of 18 USCA § 1962© and (d), Plaintiffs are entitled pursuant to 18 U.S.C.A § 1964©, to threefold the damages sustained in connection herewith, and reasonable attorneys' fees, and other relief deemed appropriate by this Court.

## STATE LAW AND COMMON LAW PENDANT CLAIMS

### TWENTY-SIXTH CLAIM FOR RELIEF

**Intentional Infliction of Emotional Distress (Against All Defendants)**

488.   Plaintiffs incorporate by reference each and every  allegation as if fully set forth above.

489.   Based on the foregoing facts pled herein, defendants intentionally caused plaintiffs

-116-

great distress by purposefully setting them up to lose their savings in this RICO scheme.

490.  The defendants purposefully needed to lure members of the public including Plaintiffs into this scheme to continue to provide funds to support Wasendorf's lavish lifestyle as well as the other defendants herein.

491.  These defendants intentionally used outrageous conduct that is shocking and engaged in this RICO scheme knowing that other members of the public were fully invested at during the relevant time period.

492.  These Defendants all knew that in order for them to eventually profit, other parties such as Plaintiff would have to sustain losses and would sustain severe losses since they knew plaintiffs investments would and purposefully fail.

493.  These defendants knew that plaintiff and others would experience severe shock and loses as a result of this Scheme.

494.  Defendants callously inflicted monetary and emotional damages onto Plaintiffs.

495.  As a result, plaintiffs have suffered due to this Scheme and their losses and realization that they were victims of felonious conduct have caused extreme emotional distress with physical manifestations that will be proven at trial.

### TWENTY-SEVENTH CLAIM FOR RELIEF
**Punitive Damages-(Against All Defendants)**

496.  Plaintiffs incorporate by reference each and every allegation as if fully set forth above.

-117-

497. By reason of the foregoing willful and unconscionable acts causing severe monetary losses and emotional distress, and as a matter of public policy to punish defendants for such conduct, plaintiffs seek punitive damages for their loses. Punitive damages are sought in excess of the jurisdictional limits of this honorable Court to be determined at time of trial by a jury.

## JURY DEMAND

498. Plaintiff requests a jury trial to resolve the outstanding issues in this case.

## DAMAGES AND OTHER RELIEF

499. Based on the foregoing, plaintiffs demand judgement on their Complaint because they were caused to lose their entire investment in the amount of no less than $3,500,000.00. Plaintiffs have suffered monetary damages in excess of the jurisdictional limits of this the Court and in an amount to be determined, and are entitled to recovery of such damages as follows:

500. On the Third, Fourth, Fifth, Sixth, Eight Ninth, Tenth, Eleventh, Twelfth, Thirteenth, Sixteenth, Seventeenth, Eighteen, Nineteenth, Twentieth, Twenty-Second, and Twenty-third Claims- $3,500,000.00 plus pre and post judgment interest at New York's Statutory Rate of 9% as well as lost profits to be determined at time of trial and in excess of the jurisdictional limitation of this Court.

501. On the First, Second Seventh, Twenty-Fourth, Twenty-Fifth, Twenty-sixth and Twenty Seventh causes of action -treble damages to be determined at time of

-118-

trial, plus, attorneys fees, costs, disbursements and statutory interest.

502. On the Twenty-First cause of action, plaintiffs request the imposition of a constructive trust as to all defendants over the proceeds linked to the unlawful conduct and out of those proceeds, plaintiff should recover an amount within the jurisdiction of this Court and no less than her actual damages.

503. On all counts including costs, interest, attorneys fees and disbursements to be determined at the time of trial; and for all further and other relief that this Court deems just and proper.

Respectfully Submitted,

July 11, 2016

/s/ Susan J. Levy
Susan Levy, Esq.
Attorney for Plaintiffs herein
40 East 10th Street, Suite 2K
New York, New York 10003
212-962-1782 (tel)
212-962-3711 (fax)
Susanjlevy@aol.com

-119-