UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

BRUCE BEHRENS, KATHLEEN BEHRENS,
SHERRI SHEFFERT AND DAVID SCHEFFERT,
RICHARD WAKEFORD on behalf of themselves and all
other similarly situated,

                Plaintiffs,

     -against-

JPMORGAN CHASE BANK, N.A., U.S.BANK, N.A.,
CHICAGO MERCANTILE EXCHANGE, INC., THE
CME GROUP, INC.,  MILLENIUM TRUST COMPANY
a/k/a MILLENIUM TRUST CO. LLC, RUSSELL
WASENDORF, RUSSELL WASENDORF, JR.,
STEVEN BREWER A/K/A STEVEN JOHN
BREWER, GARLON MAXWELL, AMBER
MAXWELL, PERRY COMEAU, NATIONAL
FUTURES ASSOCIATION, PAUL THOMAS,
John Does # 1-40,

                Defendants.

-------------------------------------------------------------------X

SECOND
AMENDED
COMPLAINT

Civil Action No.
16-CV-5508(VSB)

JURY TRIAL
DEMANDED

Hon, Vernon S. Broderick

Dated: November 30, 2017

                Susan J. Levy, Esq.
                Attorneys for Plaintiffs
                40 East 10th Street
                Suite 2k
                New York, new York 10003
                Tel: (212) 962-1965
                Fax: (212) 962-3711
                susanjlevy@aol.com

## TABLE OF CONTENTS

SUMMARY OF PONZI SCHEME...................................................................................3

    How Commodities Futures and Options are Traded Over Exchanges.......................7

    Segregated Accounts are Fundamental to Futures and Options Trading..................17

    The Handling of Customer Segregated Accounts by the Commodities Futures Professionals17

JURISDICTION AND VENUE.....................................................................................20

THE PARTIES AND RELEVANT NON-PARTIES....................................................20

    Class Plaintiffs..........................................................................................................20

    Defendants and Non-Party Co-Conspirators...........................................................27

PROCEDURAL HISTORY............................................................................................45

SUBSTANTIVE ALLEGATIONS................................................................................47

Fraudulently Inducing Members of the Public to Invest in the Commodities
Markets........................................................................................................................47

    a. 2005 Opening of the Customer Accounts-Sub Class Members A and B,
       Based on Fraudulent Inducement and Minimization of Risks...................48

    b. Crossland and Millenium Trust Company-March, 2007 to August 2008...................53

    c. Untoward Conduct During the Week of October 2, 2008 through October 8,
       2008 consisting of Violations of the CME Margin Rules  930 D, E and K
       Overwhelmingly Demonstrate a RICO conspiracy......................................55

    d. Because PFG and Millenium Failed to use the 70%-30% Rule to Invest the
       IRA Fund, This Conduct was Intentional.....................................................59

    e. Other instances of Fraudulent Inducement Based on Naked Puts and Calls
       bound to lose 95% of the Time.....................................................................60

Role of JP Morgan Chase, N.A. and US Bank, NA in this RICO Conspiracy.............65

    Unlawful Loans Approved By US Bank Shows Money Laundering............................70

i

Role of Wasendorf Sn. And PFG in the Theft of $215 Million Dollars During the Relevant Time Frame............................................................................................73

   a. PFG'S Misuse of Customer Funds from 1992 to 2012 and Concealment of The Fraud..................................................................................................................74

The Regulatory Framework Applicable to the Banks....................................................74

Additional Facts Pled with Particularity Regarding U.S. Bank Leading to the Loss of Customer Funds by PFG and its Affiliates...................................................................76

   a. PFG's Two Primary U.S. Bank Accounts including the 1845 Customer Segregate Account.............................................................................................77

   b. Particular Facts of U.S. Bank's Relationship with Wasendorf and his Affiliates.......79

U.S. Bank knew That PFG Was Not Treating the 1845 Account as a Customer Segregated Account, but like a personal and business account..................................................81

JP Morgan's Unlawful Transfers from the 5265 Account to the US Bank 1845 Account.........81

U.S. Bank Did Not Act Despite Red Flags, and It Did Not Get Balance Confirmation Requests...................................................................................................................84

U.S. Bank Knew That PFG was Not Earning Revenue From the 1845 Account and Was Not Profitable...........................................................................................................87

Intentional Conduct of JPMorgan Chase, NA (JPMC) Leading to The Loss of Customer Funds..........................................................................................................90

Role of the CME and CME Group.............................................................................93

Undersegregation of PFG During the Relevant Time Period...................................99

Participation by Millenium Trust............................................................................106

Federally Created Minimum Fiduciary Standards of Conduct for The IRAs........................107

Millenium's Failures.............................................................................................108

Red Flags That Were Ignored By Millenium.........................................................110

ii

Foreseeability...........................................................................................................111

Motivation.................................................................................................................112

Causation and Damages............................................................................................113

Role of the IRA Fiduciary Millenium Trust.............................................................113

Claim Against the National Futures Association for Violations of the Commodities
Exchange Act in violation of 7 U.S.C.§ 21 and 7 U.S.C. § 25.................................114

Background of the National Futures Association.......................................................116

NFA purposefully or recklessly failed to discover that Wasendorf's customer
Segregated accounts were misstated..........................................................................120

NFA's Bad Faith Failure to discover Wasendorf's Theft of Customer Segregated
Accounts....................................................................................................................122

Because the NFA was highly biased against Customers and Acted in Favor of PFG, It
Acted in Bad Faith and did not fulfill its mandate to provide a Fair and Equitable Arbi-
tration Forum and therefore the Customers were caused to lose their Arbitration Cases
and Fail to Recover their losses.................................................................................127

The Arbitrators Were Biased thus Denying Claimants A Fair Hearing.................133

Because of the Conflict of Interest, Legal Malpractice and Fraud of Paul Thomas, Esq.
Claimant's NFA Counsel, Claimants were caused to Lose their Valid Arbitration
Claims.......................................................................................................................135

EQUITABLE TOLLING OF THE STATUTES OF LIMITATION...........................142

CLASS ACTION ALLEGATIONS..............................................................................148

CLAIM  I    (Principal-Agent Liablity In Violation of The Commodity Exchange Act)
Pursuant to 7 U.S.C. § 1, Et. Seq (As against all defendants)...............................152

CLAIM  II   Fraud by Omission Against Defendant U.S.Bank and JP Morgan
(The "Bank Defendants" hereinafter)......................................................................152

CLAIM  III  Violation of the Illinois Fiduciary Obligations Act, 760 Ill. Comp. Stat. §65/1
et seq., or, alternatively, of various states' enactments of the Uniform
Fiduciaries Act. (Against The Bank Defendants).....................................................156

CLAIM IV  Breach of Fiduciary Duty (Against the Bank Defendants)......................................156

CLAIM V  Violations of Section 4(d)(b) of the Commodity Exchange Act, 7 U.S.C.§ 6 (d)(b) and Violations of 17 C.F.R. 1.20 for Improper Use and Holding of Segregated Customer Monies (Against the Bank Defendants, and the Wasendorfs, Sn. And Jr.)......................................................................................157

CLAIM VI  Fraud (Against Wasendorf, Sn.)..............................................................159

CLAIM VII Breach of Fiduciary Duty (Against Wasendorf Sn and Wasendorf Jr.).................161

CLAIM VIII Conversion (Against Wasendorf Sn)......................................................164

CLAIM IX  Violations of Section 4b(a)(1)(A) and © of the CEA, as amended, (Fraud by Misappropriation) (Against Wasendorf, Sn)........................................165

CLAIM X  Violation of Section 4b(a)(2)(A),(B) and (C) of the CEA (Fraud in Connection with Commodity Futures Contracts) (Against Wasendorf Sn.)........166

CLAIM XI  Violation of Sections 4(b)(a)(1)(A) and ( C ) and 4b(a)(2)(A),(B) and ( c) of the CEA (Fraud in Connection with Commodity Futures Contracts) (Against Maxwell Garlon, Amber Garlon and Perry Comeau)............................168

CLAIM XII  Aiding and Abetting Direct Violations Of The Commodity Exchange Act (Against Wasendorf Jr.).......................................................................168

CLAIM XIII Aiding and Abetting Breach of Fiduciary Duty (Against Wassendorf Jr.)...........170

CLAIM XIV Direct Violations of the Commodity Exchange Act Section 4(d)(b), and 17 CFR 1.20 Et. Seq.( Against Wasendorf,Sn).....................................172

CLAIM XV  Negligence (Against Wasendorf, Jr.).....................................................174

CLAIM XVI  Aiding and Abetting Violations of the Commodity Exchange Act Pursuant to 7 U.S.C.§ 25(a) and 7 U.S.C. § 13(c)(A)(Against all defendants except Wasendorf, Sn. And Jr.........................................................176

CLAIM XVII Breach of Contract under Federal Law and Breach of Federally Imposed Contractual Duties to Hold Assets and Not Commingle Assets (Against Defendant Millenium Trust)...............................................................179

CLAIM XVIII Breach of Fiduciary Duty under Federal Law and Breach of Fiduciary Duties Imposed by Federal Law (As against Defendant Millenium)..................181

CLAIM XIX    Breach of Contract to Hold Assets and Not Commingle under State Law
             (As Against Defendant Millenium).....................................................................182

CLAIM XX     Breach of Fiduciary Duty Under State Law (As Against Defendant
             Millenium)...........................................................................................................183

CLAIM XXI    Ordinary and Gross Negligence under State Law (Against Millenium
             Trust) ..................................................................................................................183

CLAIM XXII   Unjust Enrichment and Restitution under Federal and State Law
             (As against All Defendants)...............................................................................184

CLAIM XXIII  Intentional Infliction of Emotional Distress and Consequential Damages
             (As Against All Defendants)..............................................................................184

CLAIM XXIV   Punitive Damages (As Against All Defendants)..............................................184

CLAIM XXV    Violations of the Commodity Exchange Act, 7 U.S.C.§§25(b)(1) and (2)
             (As against the Defendant CME).......................................................................185

CLAIM XXVI   First Rico Violation-18 U.S.C. § 1962© (Against Fraudulent
             Inducement Defendants)....................................................................................187

             The Enterprise....................................................................................................188

             Conducting Affairs of the Enterprise.................................................................189

             The Racketeering Violation................................................................................190

             Racketeering Acts Involving Wire Fraud...........................................................191

             Racketeering Acts Involving Mail Fraud...........................................................191

             Pattern of Racketeering......................................................................................193

             Injury to Plaintiffs..............................................................................................194

CLAIM XXVII Second Rico Violation-18 U.S.C.§ 1962(d)
             (Against Fraudulent Inducement Defendants for RICO Conspiracy.................194

             ENTERPRISE......................................................................................................194

             CONDUCTING AFFAIRS OF ENTERPRISE..............................................195

RACKETEERING CONSPIRACY VIOLATION.........................................................195

CLAIM XXVIII  Third  Rico Violation- 18 U.S.C.§ 1962© (Against Wasendorf
    Sn., JPMorgan Chase, and US Band (Ponzi Scheme Defendants)..............................196

    THE ENTERPRISE..................................................................................................196

    THE RACKETEERING VIOLATION........................................................................198

    Racketeering Acts Involving Wire Fraud......................................................................198

    Racketeering Acts Involving Mail  Fraud.....................................................................199

    Racketeering, Acts Involving, Money Laundering.........................................................200

    Pattern of Racketeering...............................................................................................201

    INJURY TO PLAINTIFFS...............................,...........................................................202

CLAIM XXIX Fourth Rico Violation- 18 U.S.C.§ 1962(d)
    ( vs Ponzi Scheme Defendants-Rico Conspiracy)..........................................................202

    THE ENTERPRISE..................................................................................................202

    CONDUCTING AFFAIRS OF ENTERPRISE..............................................................203

    RACKETEERING CONSPIRACY VIOLATION.........................................................203

CLAIM XXX   Against CME Group for Common Law Fraud...................................................204

CLAIM XXXI   Against CME Group for negligence and gross negligence..............................205

CLAIM XXXII Against CME Group Breach of Contract...........................................................206

CLAIM XXXIII Against Paul Thomas for Legal Malpractice....................................................207

CLAIM XXXIV Against NFA for Violations of the Commodities Exchange Act 7 U.S.C.
    §§ 21, 25, Et. Seq. For Failure to Enforce the Commodity Exchange Act
    And For Violating NFA Rules and By-laws....................................................................208

CLAIM XXXV Breach of Fiduciary Duty Against the CME Group...........................................209

DEMAND FOR JURY TRIAL....................................................................................210

PRAYER FOR RELIEF..............................................................................................................210

Plaintiffs allege as follows upon personal knowledge as to Plaintiffs' own acts, and upon information and belief as to all other matter.

1. Plaintiffs are Bruce Behrens Kathleen Behrens, Sherri Scheffert, David Scheffert, and Richard Wakeford (collectively "Plaintiffs"), by and through their attorney Susan J. Levy, Esq., for their Class Action Complaint against Defendants, JP Morgan Chase Bank, N.A., U.S. Bank, N.A. The Chicago Mercantile Exchange, (The "CME"), The CME Group, Inc. ("CME Group"),Millenium Trust Company, Russell Wasendorf, Senior, Russell Wasendorf, Jr., Steven John Brewer, Garlon Maxwell, Amber Maxwell, Perry Comeau, National Futures Association, Paul Thomas, and John Does #1-40 (collectively, as "defendants") on behalf of themselves and other similarly situated individuals or businesses who held accounts at Peregrine Financial prior to July, 2012 and who found their accounts worthless or nearly worthless.

2. The advisors, Introducing brokers and FCMs such as defendants Steven Brewer, Russell Wasendorf, Jr., Amber Maxwell, Garlon Maxwell and Perry Comeau who were authorized to trade or act in connection with plaintiffs accounts were either never registered with the NFA as required by law, (although they claimed an exemption, but never bothered to file the exemption either) and/or had shady backgrounds and/or and had numerous violations against them. For example, Garlon Maxwell had filed for bankruptcy in 2005 just prior to trading plaintiffs'accounts as an investment advisor and was fined $25,000.00 for violating the Rules of the State of Iowa regarding investment advisors. He also had federal tax liens asserted against him and simply had no business trading millions of dollars on behalf of unwitting customers.

3. These CTA's Amber Maxwell and Garlon Maxwell should not even have been allowed to handle any customer money at all. Each committed Fraud by downplaying the risks of their investment strategy allowing plaintiffs to believe that they was making conservative

-1-

investments.

4. On or about September 24, 2007, and during the relevant time period, plaintiffs, and Oelwine Subclass members A and B were directed by PFG to send their investments funds to JP Morgan's Segregated Customer Account ending in 5265.

5. Included in these funds at JPMorgan were IRA monies that eventually were transferred into the U.S. Bank's 1845 account and then converted by Wasendorf with the assistance of co-defendants.

6. Millenium Trust as IRA custodian on behalf of the Schefferts' IRA account caused to be transferred approximately $228,000.00 from their custodial account to JP Morgan Chase to account number ending in 5265 for further credit to PFG, Inc. Customer Segregated Funds.

7. Class members are those who invested with Peregrine Financial Group through Introducing Brokers or directly through Peregrine Financial Group, Inc. from 2007 to 2008 and/or individuals who were not furnished with proof of claims in the related Class Action entitled *In Re Peregrine.Financial Group Litigation*, 12-cv-5546 (N.D.Ill. 2012.) or those who were decertified.

a. Sub Class A Members- Those customers who invested with Peregrine Financial Group  from 2007 through 2008 (Perry Comeau is excluded from this Sub Class and excluded as a Class member.).

b. Subclass B Members are defined as those customers in Subclass A who also suffered from personal injuries as consequential damages and/or emotional distress injuries requiring medical treatment or the use of antidepressant medications or an increase in previously prescribed medication  in connection with the stress associated with the loss of their investments.

-2-

8.    Sherri Scheffert and Bruce Behrens are Class Representative for Subclass B

Members.

9.    The trading at issue occurred over the Chicago Mercantile Exchange which is

a designated Board of Trade pursuant to the Commodities Exchange Act 7 U.S.C. § 7. Et. Seq.

Transactions also occurred off-Exchanges in Forex Markets.

10.    The CME Group, Inc. wholly own and operates the CME.

## **SUMMARY OF PONZI SCHEME**

11.    This Claim is brought *inter alia* under the Racketeering Influenced and Corrupt Organization

Statute 18 U.S.C. '§ 1961, Et. Seq. based in part on the predicate acts of mail fraud 18 U.S.C.

§1341 and wire fraud, 18 U.S.C. §1343, money laundering, 18 U.S.C. § 1956 as well as Pendant

State law claims sounding in breach of fiduciary duty and Fraud by Omission against Millenium

Trust Company, JP Morgan Chase, NA and US Bank, N.A. and Violations of the Commodities

Exchange Act against the Chicago Mercantile Exchange 7 U.S.C. § 7, Et. Seq. and the National

Futures Association and Common Law Claims against the CME Group, Inc., an unregistered C

Corporation that runs the CME.

12.    This RICO Conspiracy among and between the defendants allowed Russell

Wasendorf, Sn., Russell Wasendorf, Jr., U.S. Bank, N.A., JPMorgan Chase Bank NA ("JPMC"

hereinafter), Millenium and others upon information and belief to pilfer and steal at least $215

Million dollars by a variety of means and methods including but not limited to:(1) transferring

customer funds out of Customer Segregated Accounts in violation of Federal Laws for non-

customer and unlawful uses including personal conversion of customer money by Russell

Wasendorf, Sn. and his related companies and the Bank Defendants, the payment of salaries to

loyal employees, the payment of banking fees, clearing fees, trustee fees, interest on loans, loan

-3-

origination fees and the repayment of loans, (3) Destroying Customer Accounts in a variety of ways involving Futures Contracts and using FOREX trading with JPMC as the Prime Broker who also during the relevant time period was manipulating the FOREX market in an effort to promote this RICO conspiracy and to aid and abet co-defendants-- to ensure trading losses in the FOREX customer accounts, and then (3) creating phony and/or illegitimate trading losses in each customer's account to make it appear as though each customer had legitimate trading losses when in reality these losses were conjured up after-the-fact through agreements among and between RICO defendants, and/or felonious market manipulation and/or due to conscious avoidance when each actor had a legal duty to investigate the obvious red flags pointing out such egregious criminal conduct.  This Scheme was so perfect that it allowed each defendant to literally steal hard-earned moneys from IRA funds as well over a 20 year period. All the while, the customers were led to believe that they were merely experiencing normal trading losses in their customer account in the regular course of business and based on market risk.

13.  This RICO PONZI Scheme lasted over 20 years form approximately 1992 to 2012 and included plaintiffs' losses at Peregrine in September and October of 2008. (The RICO Ponzi Scheme.)

14.  For several months prior to the debacle in October, 2008, plaintiffs were receiving normal monthly trading statements showing that all was well in their accounts and no major losses had occurred.

15.  The RICO conspirators all had a community of interests in reaping large fees from each corporation's interrelated conduct and community of purpose to take advantage of unwitting members of the investing public who relied on the good faith of these corporate giants to obey Standards of Law and Fiduciary Ethics.  For example, these RICO defendants all reaped

-4-

profits in the way of bank transfer fees, IRA custodian fees, mortgage fees, clearing fees and broker fees. These types of fees can be legitimately generated by Futures and Options trading as well as FOREX trading. However, in this RICO scheme, these fees were nothing more than money laundering activities pretending to be legitimate fees.

16. With respect to Futures customers, the Scheme required apparent trades to be initiated over the CME Exchange, whereas for FOREX trading, off-exchange transactions were also used with counter parties such as Peregrine Financial Group ("PFG" hereinafter).

17. Under either scenario, the goal of the RICO conspirators was to ensure that the customers' accounts were completely and intentionally destroyed so that the stolen customer monies that were previously pocketed by defendants would not be apparent to the clients.

18. These customer accounts were destroyed by a variety of means and methods including but not limited to: (1) the use of fictitious trades to shadow trade the actual market to give the appearence to plaintiffs that they lost due to real transactions, (2) trading without the requiste margin or with margin from other investors or the plaintiffs herein whereby each customer's account acquired positiosn in risky out-of-the money puts and calls that eventually lost 95% of the time, (3) manipulating the market to cause losses for the customer and gains for PFG such as in the FOREX markets.

19. Each co-defendant played an essential role in allowing this Scheme to last 20 years. Because neither the CME nor the PFG which is an FCM can actually hold segregated or separate customer monies, the role of the Depository Banks in this case JPMorgan Chase, NA and U.S. BANK, NA to hold customer segregated monies was essential to accomplish this Scheme thus generating more unlawful bank fees and interest for themselves under the guise of legitimacy.

20. Because each RICO Conspirator was motivated by generating exorbitant fees, they

-5-

conspired and executed a plan to allow customer accounts to be eventually destroyed in the Futures and Options Markets, the OTC Metals and FOREX markets over a long period of time in excess of 10 years.

21. Each RICO Conspirator and RICO defendant acted in Bad Faith and with Conscious Avoidance of the laws and regulations of the United States that were being breached, because during the course of this twenty year period, there came a time where each RICO conspirator must have realized what was happening, but despite Actual Knowledge, and certainly constructive knowledge, each RICO Defendant disobeyed their obligations to investigate and turned a blind eye to what was happening all around them and preferred to allow this very profitable RICO PONZI SCHEME to continue unabated at the great expense of Plaintiffs who had their life-savings dissipated intentionally, and their emotional well-being and in at least one case of Mr. Behren's, his physical well-being shattered.

22. This RICO Ponzi Scheme can be summarized in several parts including but not limited to: (1) Wasendorf, Sn., Wasendorf, Jr. Perry Comeau, Maxwells and his network of crooked brokers fraudulently inducing members of the public to invest in Futures and Options Contracts; (2) The Depository Banks breaching Customer Segregation laws and allowing Wasendorf, Sn. to take possession of customer segregated monies for his own profits and then to distribute the proceeds of this theft to his co-conspirators in the form of payment of fees and interest on loans; (3) The purposeful destruction of customer accounts by a variety of methods involving violations of CME and NFA rules; (4) The Conscious Avoidance by the CME, CME Group and NFA who had a duty to investigate and stop the unlawful conduct by using the CME Emergency rules to shut down undermargin trading, but instead CME and CME group consciously avoided confronting this 20 fraud by setting up special Omnibus Trading rules to accommodate this

Scheme by allowing PFG an undercapitalized and under segregated FCM that should have been terminated in 1992 to continue to conduct business over the CME Exchange to generate enormous fees for the CME; (5) JPMorgan Chase Bank, NA.'s ("JPMC" hereinafter) conduct in manipulating the FOREX market in furtherance of this scheme to destroy customer accounts and generate unlawful gains for the RICO defendants; and (6) JPMC's leaking of confidential information to Wasendorf, Sn. upon information and belief to allow his cadre of brokers to easily destroy customer accounts as in this case, by waiting to short puts until the very time period when Lehman Brothers was filing for bankruptcy, sending the market down to new lows, and (7) the later cover up by RICO defendant Paul Thomas, Esq. so that the Claimants and Plaintiffs herein would be sure to lose their NFA arbitration cases to continue to cover up the Wasendorf's, theft of moneys.

**How Commodities Futures and Options Are Traded Over Exchanges**

23.  To understand how this RICO Ponzi Scheme operated, one must understand the world of Commodities trading where these devastating losses occurred.

24.  Commodities Futures Investing is quite distinct from what most people understand regarding investing in securities such as stocks and bonds. In traditional securities markets, an investor can only lose his or her initial investment; whereas in futures and options trading, an investor can lose much more than his or her initial investment[1]

---

[1]For example, if an investor purchases 100 shares of IBM at $10 per share for a total monetary investment of $1000.00, the most one can lose on that stock investment is $1000.00. However, if a Commodities investor sells a put for $1000.00 depending on the terms of the contract, he or she could incur a liability of much more than $1000.00 and in the case of the Schefferts, they lost approximately $50,000.00 on a sale of one put in October, 2008. If the price of the underlying commodity drops significantly prior to the option expiring, the investor will cover at a deep loss as in this case. Therefore, in Futures and Options investing, the use of Margin means that an investor can lose much more than his or her initial investment and

25. Unlike in Securities investing, the lifeblood of Futures and Options trading involves the use of Margin which is also referred to as Security or Cash. To enter into a Futures Contract for example, an investor must post initial margin. After the position is initiated, the investor must post maintenance margin, an amount normally less than initial margin, in his or her account until the contract is offset prior to expiry.

26. In order to enter into a Futures or Options Contract, the investor must also comply with the terms of the contract. The CME defines the terms of each Futures Contract and defines how much margin is required to enter into and/or sustain a contract position. Each long contract requires the investor to place cash in the customer's segregated account initially held by the FCM and the Depository Bank in customer segregated funds; or if the contract is a short sale, then cash will be received initially into the account to be off set at a later date prior to expiry of the contract

27. Because contract values vary on a day-to-day basis, an investor may experience either Excess Margin or a Margin Deficiency in his or her trading account on a daily basis or even intra-day. Such calculations are called mark-to-marketing. Where a Margin Deficiency occurs, then the FCM, Clearing Member or CME itself can impose a Margin Call on the investor requiring the investor, CTA or Introducing Broker to send in cash to satisfy a margin deficiency or to liquidate positions. If the investor ignores the Margin Call, the FCM, CME and Clearing member have a right to terminate the account usually at a great loss to the customer.

28. However, under no circumstances under CME Rule 930 may an investor initiate new

theoretically the loss can be infinite unlike in securities investing. Unfortunately, many members of the investing public do not even understand the basic fundamentals of Futures and Options trading, due to the failure of industry professionals to explain how such investing works. If the real elements were explained to investors, perhaps nobody would even invest at all.

-8-

positions when such person is on a Margin Call or in a Margin Deficiency, as is what happened in this case with respect to the Scheffert's account for example, except, the CTA's continued trading even when the Schefferts and others were in a Margin Deficiency which makes no sense if one is trying to preserve capital, but makes perfect sense if one wants to deplete and destroy a customer account pursuant to a RICO PONZI Scheme.

29. The CME instituted Rule 930 unalturistically to protect itself and understandably so, because if a customer is in a Margin Deficiency or in a Margin Call and cannot or will not meet the Margin Call for more funds to be transferred into the segregated customer account, the CME, FCM or Clearing House member may unilaterally terminate the customer's account after a reasonable time has passed for the customer to act, and the CME rules even state that under some circumstances as little as one hour is a reasonable time to meet a Margin Call.

30. Despite this well-established rule CME 930, in the case of these Class sub members A, B, and C, these rules were ignored which is a red flag, because Rule 930K is to protect the CME; and the Industry almost never ignores this rule. However, this rule was ignored in this case, and the clients accounts were traded while in margin deficits until there was no principal left at all nor a deficiency balance.

31. Thus, a fair inference can and should be drawn that there was criminal conduct occurring whereby Wasendorf, Sn. and his brokers were actually trying to dissipate accounts down to zero as they did. Had they obeyed CME margin rules under 930 that were incorporated by reference in their own PFG handbook, and had the CME or the Clearing member handing the PFG Omnibus Account forced a cessation of trading to protect itself, these accounts would have ceased all trading thus limiting the losses precipitously and showing the integrity of the Futures Markets, since the CME is charged with the duty of maintaining a stable contract market.

-9-

32. The failure to inspect PFG's accounts to observe that these accoutns were grossly undermargined because PFG did not have sufficient net capital to even trade the volume of customer accounts that were being traded during the relevant time frame, is a strong indication that the PFG accounts were being traded unlawfully and in violation of CME rules requiring sufficient margin in each account to even place a trade. Thus, a reasonable inference can be drawn that there was knowledge that the CME and CME group, PFG or any counter party would not incur losses on these Class member trades because these trades were in fact fictitious anyway and recorded on separate books only representing shadow trading.

33. In fact, in the NFA Complaint against PFG, Russell Wasendorf, Jr. Susan O'Meara and Nolan Schiff, NFA Case No. 12-BCC-001 dated February 8, 2012, one of the allegations against these respondents was that it failed to supervise trading accounts, and

> "[P]ermitted tradeds to be placed in certain PFG forex accounts for which PFG did not collect and maintain the required miniumum security [margin] deposits."

34. An Decision was entered fining PFG and the others $700,000.00 for various violations including this one.

35. A fair inference can and should be drawn that PFG that these trades must have been fictitious because trades cannot be placed without the proper margin or security deposits.

36. Wasendorf and his co-conspirators certainly had the means to implement fictitious and shadow trades because CME Group provided PFG with access to the Globex which would have allowed them to track in real time actual market prices and see actual market volume so that Wasendorf just like forging NFA account verfication forms could easily forge account statements to customers to make it appear that real trades had occurred in each customer account when in fact Wasendorf had alreayd pocketed plaintiffs monies.

-10-

37. Because Wasendorf clearly pocketed plaintiffs moneys from customer segregated accounts, reason dictates that he would have had to engage in fictitious trading for the marjority of the relevant time period because had he placed legitimate trades in the Futures markets and lost customer monies as he did, the legitimate counterparties would have been entitlted to receive the proceeds of these transactions rather than Wasendorf.

38. Thus, to ensure success at the Ponzi Scheme, Wasendorf could not have risked actually putting customer money in the market, but wanted to ensure that he gained profits from his theft of customer monies.

39. Alternatively, to make it look like PFG was handling large volume of customer accounts, to give the false impression that PFG was a financially sound company, when it was not and operating at a loss, some of PFG customer trading might have been real on occassion rather than fictitious in which case, PFG's Omnibus Clearing member, CME, or CME Group should have seen that these accounts were grossly undermargined by overseeing Wasendorf's accounts and looking at the actual trading to see that there was insufficient margin to sustain customer positions thus requiring PFG to be suspended and expelled from the CME.

40. This scenario described in #39 would have certainly been true with respect to customer IRA accounts where the CME or FCM is estopped from suing a customer for any deficiencies in an IRA account that so many of plaintiffs herein maintained during the relevant time period.

41. Ultimately whether the trades were real or fictitious or a combination of both, PFG had to set up the customers to engage in sure-fire bets that would lose, like out- of- the money puts and calls to get rid of the customers whose accounts had been used for Wasendorf's profits. Thus, Wasendorf, Sn. had to maintain a separate set of PONZI Scheme books to accomplish this Scheme, Wasendorf, Sn. had to ensure customer losses in each one's accounts eventually. As

-11-

part of this Scheme the customer accounts had to be closed out, since the monies in their 1845 segregated accounts ($215 million) had already been diverted by Wasendorf either by taking the cash out and using it personally or by allowing trades to go forward in the Market to generate fees for the CME, CME Group and to generate trading fees for brokers.

42. In fact, when this Ponzi Scheme was detected in 2012, there was in actuality approximately $7,000,000.00 in customer segregated monies and 14,000 customers. Therefore, there was only about $500 per customer account, too little to even be used to post-initial margin in most if not all cases. Therefore, it appears that the vast majority of customer accounts were shadow traded based on fictitious trading.

43. If the customer gained a trading profit, for example, the perpetrators would not have been able to close out the customer's account, as they needed to do to complete this RICO Ponzi Scheme. Although Co-defendants could temporarily move money around if necessary as they constantly did like a shell game, eventually, the customer had to show a total trading loss because there were no monies actually left in their accounts

44. Because of difficulty in bookkeeping with respect to 24,000 customers during this 20 year ponzi scheme, it would have been extremely difficult to track which customer's money was stolen by Wasendorf and which money was used to do actual trades. Therefore, each customer had to eventually lose and be dismissed from the market place.

45. Because the transfer from U.S.Bank and JP Morgan Chase that were stolen by Wasendorf Sn. were in round lots, the customer accounts were combined with each other and each indivual customer's account balance was disregarded during these transfers. Therefore, all customers had to be eventually terminated so that this Ponzi Scheme could continue undiscovered.

-12-

46. If the customer's account actually traded and did lose money when using naked out of the money puts and calls due to natural market volatility and risk, PFG might not have had enough funds to even have been satisfy legitimate counterpartie. Therefore, most of the trading had to be ficitious to avoid the situation whereby PFG would default in paying a legitimate counter party who would have had to be anonymous because all trading over an Exchange must be anonymous; and any trading off an Exchange where the counter party is known between party and the counter party is strictly prohibited under the Commodities Exchange Act (Except for Forex trading at the time which did allow off exchange transactions).

47. By using ficititious trading, PFG avoided the risk of having to satisfy counterparty monetary obligations and could just pocket the customer stolen money for Wasendorf Sn.

48. More, evidence that these customer trades were fictitious and falsified and just represented shadow trading, off-the-books and on a set of falsified books just maintained exclusively for this PONZI scheme is evidenced in part by the fact that by Schedule F. Schedule F was filed in the Peregrine Bankruptcy Case, a document consisting of 3962 pages and shows that for each Guaranteed Introducing Broker who introduced accounts to PFG and who would have and should have been entitled to fees for its introduced customer's transactions, the only entries on this Schedule F were "unknown." for the fees claimed. If no fees were being claimed for these transactions, then clearly no transactions were being entered into in real time. *See Portions of Amended Schedule F relating to Introducing Brokers* annexed hereto as Exhibit 1.

49. Later on, some of these "unknown" amounts referring to commissions owed to Introducing Brokers were changed to the amount of "0." However, the "0" amount fairs no better to explain why Introducing Brokers' fees were"0" but does support the inference that these

-13-

accounts were not producing any fees because they were fictitious. These "0" balance entries further lend support to an evidentiary inference that there were no actual trades to generate any fees to any brokers; hence these trades were all fictitious and off-the-books as shadow-trading only. *See* Portions of Amended Schedule F showing Unsecured and Non-Priority PFG claims of Introducing Brokers, annexed hereto as Exhibit 2.

50. Because the PFG customer statements clearly indicate that Broker fees (and Introducing Broker fees) were deducted for each customer's trading activity, clearly the failure to claim any Introducing Broker fees in Schedule F supports the existence of a complete fraud and Ponzi Scheme because no fees were actually paid, although fees were recorded on falsified customer statement to make this Ponzi Scheme appear legitimate to the members of the public.

51. More evidence supporting a clear inference that there were no actual trading going on in this Ponzi scheme is demonstrated by literally numerous blank entries for customer accounts recorded on Schedule F. Because in reality there were no funds in these customer accounts, the actual recorded entries are blank; whereas the false statements sent to the customers had shadow trading entries, that were eventually dissipated to zero to match their actual accounts due to the Ponzi Scheme and recorded on Schedule F. Annexed hereto as Exhibit 1 are portions of Schedule F that show blank customer accounts with nothing in them.

52. Alternatively, had these trades been real, someone other than the customer's must have been posting margin and must have somehow ensured that PFG was also the counter party on these Exchange trades. This alternative scenario would also establish extreme violations of law, since all trading must be anonymous over the Exchange.

53. With respect to the FOREX customers that were also subject to this PONZI Scheme, these transactions were at the times in 2008 off-exchange (unlike Future contracts which are

-14-

only over an Exchange) and between counter parties. The only way for this Scheme to work with respect to the FOREX investors would be to ensure that PFG was the counter party to all of PFG customers' transactions; and in fact, this Scheme was set up to ensure that PFG was the counter party for each FOREX transaction.

54. To set up PFG as the dummy counter party to all of its customer's FOREX transactions, JPMC co-defendant and co-conspirator herein entered into a Foreign Exchange and Bullion Authorization Agreement, ("FEBA Agreement" hereinafter) the last version of which is annexed hereto as Exhibit 3.

55. Under this FEBA Agreement JPMC would allow PFG to act as the counter party for all FOREX transactions with PFG customers. Except it was JPMC not PFG who was a FOREX dealer and prime broker, and it was JPMC not PFG who had the actual expertise in trading FOREX currencies including an entire expert trading desk at JPMC devoted to FOREX. PFG was only an FCM with no ostensible expertise in trading Foreign currencies, and did not appear to have a FOREX desk devoted to Foreign Exchange transactions upon information and belief; and had to rely on JPMC for FOREX trading advice to serve as a Counter party for PFG customers in FOREX transactions.

56. In effect, JPMC set up PFG to be the counter party but was in effect just a pass through to JPMC who was the actual Prime Dealer and Prime Broker making the FOREX market on behalf of its co-conspirator PFG.

57. So, in furtherance of this Scheme and with the expertise and assistance of co-defendant JPMC, PFG became quite a successful FOREX counter party and profited handsomely on its FOREX transactions with its FOREX customers; and approximately 77% of the time PFG was successful.

-15-

58. While JPMC was helping PFG with FOREX trading and set them up as pass through dealers, from 2003 to 2013 and during the relevant time period JPMC was also manipulating the FOREX market which is defined as a felony, and thus JPMC knew exactly which way these FOREX trades would end up due to market manipulation of the FOREX market, and obviously shared this knowledge with PFG again because these co-conspirators knew that to accomplish their RICO Ponzi Scheme, they had to ensure that the customers would be on the wrong side of the trades and experience a total loss in their FOREX accounts as well as Futures accounts.

59. When a Class action was instituted involving market manipulation of the FOREX markets in *In Re Foreign Exchange Benchmark Antitrust Litigation*, 13-CV-7789 (S.D.N.Y. 2013), JPMC and its parent JPMorgan Chase & Co., not PFG was named as a party-defendant for actively manipulating the FOREX market and settling prices unlawfully through private chat rooms among dealers.

60. JPMC and its parent JPMorgan Chase & Co. acted as one and shared responsibility for all FOREX trading upon information and belief.

61. Eventually JPMorgan Chase & Co. on behalf of itself and its subsidiaries and affiliates entered into a Plea agreement with the Department of Justice on May 19, 2015. A copy of that Plea Agreement is annexed hereto as Exhibit 4.

62. However, because PFG knew that it could destroy customer FOREX accounts due to the unlawful knowledge and information shared with it by manipulating the market, this Scheme was a surefire way to make sure that PFG could reduce the previously stolen customer accounts proceeds to zero in a tidy fashion.

63. JPMC made hefty fees acting as a Forex prime broker for PFG and claimed $77,462.10 in Forex fees for the one month of June, 2012, for example. This fee was a happy pay back

-16-

given to its co-conspirator for ensuring success for the RICO PONZI Scheme based on JPMC's market manipulation of the FOREX markets during the relevant time period. **Customer Segregated Accounts are Fundamental To Futures and Options Trading**

64. Futures and Options Customers hold cash funds for investing in Customer Segregated Accounts. These Segregated Customer accounts are required to be carefully protected under Section 4(d)(b) of the Commodities Exchange Act, (the "Act") codified as 7 U.S.C. § 6(d)(b) and 17 C.F.R. §1.20(a).

65. Customer Segregated Accounts are customer monies that are deposited in Banks (Depositories) to be held for the sole benefit of the individual commodities investor such as plaintiffs herein. Such Customer Segregated Funds cannot be used for any other purposes other than for the customer's investments in Futures and Options markets.

**The Handling of Customer Segregated Accounts by the Commodities Futures Professionals**

66. Plaintiffs' Customer Segregated Funds were handled in part by Peregrine Financial Group, Inc. "Peregrine" hereinafter or "PFG") who was authorized to handle these Customer Segregated Accounts by virtue of the fact that Peregrine was a registered Futures Commission Merchant ("FCM") duly registered with the National Futures Association.

67. The National Futures Association is a Not-For-Profit Registered Association that assists the CFTC in regulating the Commodities Industry in part by requiring commodities professionals be registered with the NFA in order to participate in this industry as a professional.

68. Futures Commission Merchant is defined in relevant part under the Commodities Exchange Act, 7 U.S.C. §1a(28) as "an individual, association, partnership, corporation, or trust–that is engaged in soliciting or accepting orders for the purchase or sale of a commodity for

-17-

future delivery; a security futures product, a swap, any agreement. . . and any commodity option authorized under section 6c of this title."

69. Although a Future Commission Merchants ("FCMs" hereinafter) can buy and sell future and option contracts for customers and settle trades on behalf of customers, FCMs do not hold customer money. Rather, FCMs establish accounts with Commercial Banks in which to deposit and hold customer monies and act as a Depository for Customer Monies.

70. Where customer monies are held by a Bank or Depository such funds are called Customer Segregated Funds and must be used only for the customer's benefit.

71. In order to Establish a Commodities Trading Account at an FCM, a customer is typically introduced to the FCM by what is known as an Introducing Brokers and fees are exchanged with introducing brokers in connection with customer trading. Introducing Brokers are defined under §1(a)(31) of the Commodities Exchange Act ("CEA" hereinafter) in part as any persons who engage in soliciting or accepting orders on behalf of commodities customers."

72. Introducing Brokers are either guaranteed by the FCM and such brokers are called "Guaranteed Introducing Brokers" ("GBIs" hereinafter); whereas other Introducing Brokers are referred to as Independent Introducing Brokers ("IIB" hereinafter).

73. Customer Accounts of Guaranteed Introducing Brokers are guaranteed by the FCM, so that if a Margin Call occurs and the customer fails to satisfy the Call, the FCM will transfer funds to shore up a short fall; whereas Independent Introducing Brokers, have the requisite net capital to satisfy all customer obligations including the ability to satisfy a customer margin call.

74. During the Relevant Time Period, PFG conducted business with approximately 113 Guaranteed Introducing Brokers throughout the United States. PFG also had relationships with Independent Introducing Brokers such as Brewer Futures Group, Inc.

75. These numerous Introducing Brokers would bring customer accounts into PFG to be traded by CTA, Commodity Trading Advisors.

76. PFG could also introduce customers directly to itself through PFGBest which is equivalent to an Introducing Broker.

77. In addition to the Introducing Brokers, Class Members were solicited by Commodities Trading Advisors, ("CTAs" hereinafter) defendants Garlon Maxwell, Amber Maxwell and Perry Comeau who in this case were unregistered during the relevant time period.

78. A Commodities Trading Advisor is defined in relevant part under 7 U.S.C.§ 1(a)(12) as any person who for compensation or profit, engages in the business of advising others, either directly or through publications, writings or electronic medical as to the value of or advisability of trading in *inter alia* futures contracts and options.

79. Commodities Trading Advisors cannot settle trades, but can only place trades through an FCM who is authorized to settle trades for customers.

80. The segregated funds at issue in this Class Action were stolen from plaintiffs, Sub Class A & B members from 2007 through 2008. After these funds were stolen, Wasendorf Sn. and his cronies and co-conspirators gave instructions to their trading advisors and other Introducing Brokers, and agents who had control over plaintiffs' customer account especially during the time when margin calls were issued during the week of October 2, 2008 through October 8, 2008. Those defendants charged with the handling of plaintiffs' accounts including the notification of their Margin Calls purposefully took action to terminate each customer's account by failing to even tell the plaintiffs that their accounts were in a margin deficit on a timely basis so that each customer ended up with a zero balance or a deficient balance whereby the customer owed the FCM money in the end.

-19-

## JURISDICTION AND VENUE

81.  This is a class action brought pursuant to Federal Rule of Civil Procedure. 23(a) and (b) (3).

82.  This Court has subject matter jurisdiction over this Class Action arising under the Racketeering Influenced and Corrupt Organization Statute 18 U.S.C. § 1965(a) and (b); under the Commodities Exchange Act 7 U.S. C. § 25, Et. Seq. and pendant law claims based on the Supplemental Jursidiction of this Court pursuant to 28 U.S.C. § 1367(a) and Federal Rule of Civil Procedure 18(a).

83.  This Court has personal jurisdiction over each and every defendant because one defendant JP MORGAN CHASE does business in New York and has its principal place of business in New York.  Under 18 U.S.C. § 1965(a) and (b) as long as personal jurisdiction is proper over one member of this RICO Conspiracy, then personal jurisdiction may be asserted based on nationwide service of process against **all** other defendants pursuant to the ends of justice.  Because personal jurisdiction is proper over JPMORGAN, all other RICO defendants are subject to in personam jurisdiction in this Court.

84.  This Court has personal jurisdiction over the National Futures Association, as a Registered Futures Association, who does business in this District and maintains an office at 120 Broadway, New York, New York 10271.

85.  This Court also has Jursidiction over The CME Group. Inc. who does business in this District through its NYMEX division.

## THE PARTIES and RELEVANT NON-PARTIES

### Class Plaintiffs

86.  Plaintiffs Sherri Scheffert and David Scheffert reside in Oelwein, Iowa. (pronounced

-20-

"Ol-wine") They have been married for 50 years. They also spend the winter months in Texas, from November through April due to Dave's health problems.

87. In August of 2007, the Schefferts in their 60s, and wanting to retire with a steady income invested their entire nest egg, representing their entire life savings with defendants by opening three accounts with Peregrine Financial Group. which were purposefully lost in this RICO Ponzi Scheme in one week, during the week of October 2, 2008 to October 9, 2008.

88. In opening these accounts, the Schefferts were introduced by Steven Brewer of Brewers Futures Group, Inc., a now defunct company ("BFG" hereinafter.) BFG introduced these non-IRA accounts.

89. With respect to the IRA Accounts, Millenium Trust, acted as the Introducing Broker for these accounts, because only an IRA Trustee or Custodian could allow IRA monies to be invested in the Futures Market.

90. However, Millenium Trust was never registered upon information and belief with the NFA as an Introducing Broker. Thus, Millenium Trust had no right to even get involved in the Introduction of these accounts to PFG, other than to help PFG and Wasendorf, Sn. commit serious, felonious crimes of converting customer money.

91. Millenium Trust therefore violated NFA Rule 205 by conducting business in the Commodities Futures trading business without being registered to do so.

92. The Schefferts accounts were as follows during the relevant time period.

|  | **Sub-Account number** | **Investment** |
| --- | --- | --- |
| Sherri Scheffert IRA | 30700 | $185,843.10 |
| David Scheffert IRA | 30701 | $130,253.27 |
| David and Sherri Scheffert joint account | 30708 | $47,715.00 |

-21-

**Total:**          $363,811.40

93.  As soon as BFG, Millenium, Perry Comeau, Garland Maxwell and

Amber Maxwell convinced the Oelwine group of investors, Class plaintiffs herein, to transfer

their commodities trading accounts which were doing just fine from 2005 to 2007 from their

previous FCMs, Crossland (and prior to that the group's accounts were held by the FCM

Interactive Brokers), BFG and/or PFG gave the customers written instructions to send their

customer funds to Peregrine's Customer segregated account at JPMorgan Chase, NA account

number ending in 5265.

94.  Because the Class only was investing in Derivative Contracts they were

instructed to send their monies into JPMORGAN's 5265 customer segregated account; however

the instruction sheet had separate instructions for investors who desired to trade FOREX

contracts which relate to contracts based on currencies and Foreign Exchange.

95.  Therefore, upon information and belief, FOREX customer monies were kept

in a separate customer account at JPMorgan, unlike regular Futures and Options Traders who

kept their funds in the 5265 account at JPMorgan and the 1845 account at US Bank. Both

Accounts were for the benefit of Peregrine Customers including their IRA monies as well.

96.  Class member's monetary transfers into the JPMorgan 5265 account were

made in approximately September, 2007, right at the height of the unlawful 20 year PONZI

Scheme.

97.  These transfers into the Peregrine Customer Segregated account 5265 held at

JPMorgan Chase, NA during the relevant time frame did not just go into the 5265 account as one

aggregated transfer, rather these accounts each had their own sub-account number corresponding

to the owners of each account. So, for example, the Schefferts had three sub-accounts, including

-22-

each one's IRA monies sent in to JPMC with Millenium's stamp of approval as IRA Trustee/Custodian.

98. The Schefferts' also had a non-ira joint account representing their other life savings as husband and wife over a life time of savings and this account also had a separate sub-account number.

99. The three sub-account numbers corresponding to each one's account were 30070, 30071 and 30078.

100. Each of the other Class members also had their accounts transferred to the JP Morgan, NA customer Segregated Account #5265 with corresponding sub-account numbers.

101. Therefore, when JPMorgan received these monies, it was clear that these monies were customer monies and related to individual sub-accounts including IRA monies.

102. These sub account numbers were required by the written records requirement of the CEA which requires records to be kept in connection with customer segregated accounts as well as Commodities Futures Trading Accounts held at FCMs.

103. Kathleen and Bruce Behrens, husband and wife, also residents of Oelwein, Iowa invested their life-savings with defendants in what they perceived to be conservative and safe investments by opening up an account with Peregrine, introduced by Brewer Financial Group and Millenium Trust to be managed by Garlon Maxwell, Amber Maxwell, with the assistance of Perry Comeau, all unregistered trading agents with cease and desist orders against them issued by the State of Iowa, directing these individuals to stop trading investors' accounts.

104. Kathleen and Bruce Behrens also had three sub-accounts established at JPMC.

105. Mr. Bruce Behrens was retired from owning a company called Culligans Water Company where he conditioned water. Both he and Mrs. Behrens were High School graduates as

-23-

well.

106. Mr. Behrens had served in the Military after graduating from High School and then got involved in a private business concern until he retired and sold his business.

107. The Behrens also invested their entire life savings in the amount of approximately $202,061.60 as follows:

|  | **Original Investment** |
|---|---|
| Kathleen Behrens IRA: | $52,340.4 |
| Bruce Behrens IRA: | $36,809.13 |
| Bruce and Kathleen Behrens Joint: | $112, 912.00 |

**Total:**            $202.051.60

108. Richard Wakeford, was 64 years old when he opened an account with Peregrine. Mr. Wakeford is also a resident of Oelwein, Iowa. He lost approximately $139,022.00 in this Ponzi Scheme, which also represented his savings, including his IRA monies, that he accumulated over a life time which he wanted to keep secure. He sent his investment funds to JPMorgan Chase, NA just like the others, and also had sub-account numbers associated with his own names and account.

109. Mr. Wakeford worked for 35 years as a General Contractor. He graduated from High School and did attend technical school in North Dakota called the School of Science where he studied Architectural drafting. However, he had no financial background to speak of and was a trusting and unsophisticated investor. He had both a regular account as well as a traditional IRA account in the amount of $66,000.00 with Millenium Trust.

110. Prior to transferring these customer sub-accounts to JPMorgan Chase, NA,

-24-

in September, 2007, the Class members had already been investing in futures and options contracts since 2005 where Garlon Maxwell and Amber Maxwell with the assistance of Perry Comeau charged a 22% incentive fee.

111. Upon information and belief, this incentive fee was based on the profits by these CTA's. From 2005 to 2007 the accounts remained relatively flat and the investors were making modest income or their accounts were not falling drastically in value.

112. The Oelwine Class believed that only 10% of their principal was at risk at any given time based on these trading strategies.

113. Only after the CTA defendants convinced the Class to transfer their accounts to PFG, did the severe losses in their trading accounts begin, because the C TA's strategy had changed and now they were co-conspirators in this RICO PONZI Scheme.

114. As such, now these CTA defendants were not looking to preserve capital, rather they were instructed to and agreed to knowingly destroy capital, and then Wasendorf, Sn., the CTAs, Brewer and others would divvy up the customer's accounts among themselves.

115. During the week of October 2, 2008 through October 9, 2008, these entire investments were wiped out due to purposeful conduct by the CTA or Commodity trading advisors, Garlon and Amber Maxwell who were never even registered as required under the Commodities Exchange Act, 7 U.S.C.§6(k) during the relevant time period and should not have been allowed to invest or give investment advice.

116. During the week of October 2, 2008 through October 8, 2008, each plaintiffs' account fell into a margin deficit triggering a margin call. However, defendants purposefully failed to properly notify plaintiffs of these margin calls or losses in each one's account in a timely manner as mandated by CME Rule 930E which also requires margin call notices to be made

-25-

within one business day. Had each plaintiff been notified, by telephone on October 3, 2008, the next day after the Margin Call was first issued, each would have closed his or her account thus preserving most of the assets which were not fully dissipated until October 8, 2008.

117. However, to make sure that plaintiffs had no chance to save any of their assets which had to disappear as per this RICO Ponzi scheme, plaintiffs did not even have the protection of the CME rules which were apparently suspended when it came to allowing this Ponzi Scheme to flourish, wiping out these investors' life savings.

118. To make matters worse, The CME and CME Group continued to violate the clear mandates of the CME rules which prohibit all trading during a margin call except for liquidation only trades. See CME Rule 930D. Rather, during this one week period of the undisclosed margin calls, the CME and CME Group allowed trading to continue to bleed plaintiffs' account down to zero. For example, the Schefferts' accounts continued to be actively traded in violation of the CME rule 930D and new positions were initiated on October 2, 2008, October 3, 2008 and October 6, 2008.

119. The investment advisors, the Maxwells, continued to purposefully cause losses in each plaintiff's account by selling naked puts and/or naked calls in each plaintiff's account during the volatile week of October 2 through October 8, 2008, not just using 10%, but 100% of each clients' monies which ensured a total collapse of each account.

120. It is well-settled in the Commodities Futures Industry that naked puts and calls will cause losses 95% of the time. So, this strategy was a perfect strategy to wipe out plaintiffs' remaining account balances so that Wasendorf Sn. and his co-conspirators could nicely reconcile their books after having previously pocketed the investment funds in plaintiffs' accounts with the cooperation of JPMorgan Chase and U.S. Bank.

-26-

121. Now both books of the ponzi scheme showing plaintiffs' actual balance (a zero balance) due to Wasendorf Sn. and his cronies pocketing the plaintiffs' life-savings by dipping into customer segregated accounts and the actual customer money for investments in their customer accounts all ended up with zero balances, making this the perfect crime.

**Defendants and Non-Party Co-Conspirators**

**Russell R. Wasendorf, Sn.**

110. Russell R. Wasendorf Sn. was the CEO and owner of Peregrine Financial Group since he first created the company Peregrine Financial Group a/k/a PFG Best in approximately 1990 when this RICO Ponzi Scheme first commenced upon information and belief. He was registered with the National Futures Association ("NFA" hereinafter) as a principal and an associated person of PFG since 1992 under NFA Ids 0049753 and 0089948.

111. Russell R. Wasendorf Sn. currently resides in Terre Huate, Indiana, upon information and belief in a Federal Penitentiary. He is serving a 50 year sentence, the maximum, for his participation in stealing customer funds out of these segregated customer accounts. He would never have been able to accomplish this heinous scheme without the acquiescence of co-defendants of JPMorgan and U.S. Bank, Millenium, the CTA's, Steven Brewer the CME and many other John Does.

112. When he attempted to commit suicide on or about July 9, 2012, he left a self-serving suicide note stating in relevant part: "I have committed fraud." However, he did not go far enough because he tried to arrogate to himself this entire fraud, when there were many John Does with the requisite intent and knowledge to share the blame upon information and belief.

113. Peregrine Financial Group, LLC. ("PFG" hereinafter) was an FCM during the

-27-

relevant time period. During the relevant time frame, PFG was a major FCM and one of the largest non-bank FCM's in the United States. During the relevant time frame, PFG had approximately 24,000 customers who maintained customer segregated accounts or customer separate accounts.

**U.S.Bank N.A.**

114. U.S. Bank N.A. is a nationally chartered bank organized under the laws of Delaware with its principal place of business in Minneapolis, Minnesota. U.S. Bank maintains an ATM machine in this district. The "U.S. Bank" name has been used since 1891 and, since that time, as a result of a series of mergers and acquisitions, has covered an increasingly large number of banking institutions.

115. U.S. Bank's parent company, U.S. Bancorp, was formed on or about February 27, 2001, when Firstar Corporation purchased U.S. Bankcorp. Although Firstar was the surviving company, the combined entity changed its name to from Firstar to U.S. Bancorp.

116. Prior to doing business with US Bank, PFG did business with Firstar, US BANK's successor-in-interest by Merger.

117. Defendant U.S. Bank is liable as a successor in interest for the conduct of Firstar.

118. U.S.Bank entered into a Consent Order dated February 4, 2015 in which it consented to the accuracy of the Facts in the Summary Judgment Order of Judge Linda Reade regarding its role in the Wasendorf Ponzi Scheme. *See CFTC v. U.S. Bank, N.A.*, Consent Order, 6:13-cv-02041-LRR, Doc. #147 (N.D.IA 2013.)

119. The facts to which U.S. Bank, N.A.consented regarding their role in this RICO Ponzi Scheme are described in the Summary Judgment Order of Judge Linda Reade. *See*

-28-

*C.F.T.C. v. U.S. Bank, N.A.,* 13-cv-2041-LRR, Docket Entry # 112 (N.D. IA 2013.)

120.  According to the U.S.Bank-CFTC consent order, U.S. Bank cannot deny any of the facts consented to in any public forum such as in this instant lawsuit.

**JP Morgan Chase Bank, N.A.**

121.  JPMorgan Chase Bank, N.A. (""JPMC" hereinafter) is a nationally chartered bank that is organized under the laws of Delaware with its principal place of business in New York, New York.  JPMC maintains several branches in this District.  PFG maintained at least 36 accounts at JPMorgan, including at least one customer segregated funds account.  JPMorgan's parent company JPMorgan Chase & Co., is an amalgamation of over 1200 predecessor entities including the Chase Manhattan Corporation and J. P. Morgan & Co. which merged in December 2000.  On or about July 1, 2004, JP Morgan Chase & Co. acquired the Bank One Corporation including Bank One's subsidiary, Bank One, N.A., which combined with JPMorgan.  Defendant JPMorgan is liable as a successor in interest for the conduct of Chase and Bank One.

122.  JPMC is a wholly owned subsidiary of JPMorgan Chase & Co. JPMorgan Chase & Co. is a Delaware Corporation headquartered in New York, New York. JPMorgan Chase & Co. is a global financial services company and bank with $2.6 trillion in assets as of December 31, 2014. JPMorgan Chase & Co.'stock is traded on the New York Stock Exchange (JPM ticker symbol.)

123.  During the relevant time period, JPMC and PFG entered into a Foreign Exchange and Bullion Authorization Agreement.  This agreement is annexed hereto as Exhibit 3 is the JPMC-PFG  FOREX ("FX" hereinafter) Agreement.

124.  According to this FX agreement, in exchange for fees JPMC would act as a prime broker for all FOREX and METALS transactions including the transaction of trades in

-29-

Futures and Options over the CME Exchange engaged in by PFG on behalf of PFG and its customers.

125. In exchange for these prime brokerage fees, JPMC received fees from PFG.

126. As of the date of the filing of the Peregrine Petition in Bankruptcy, JPMC claimed fees outstanding in the amount of $94,185.08 in FX Fees.

127. Upon information and belief, JPMC engaged its affiliate JPMorgan Securities, LLC. ("JPMS" hereinafter) to act as the Clearing Member to effectuate all FX trades and Metals Trades over the CME and NYMEX Exchanges.

128. JPMorgan Securities, LLC. ("JPMS" hereinafter) is and was at all times hereinafter mentioned upon information and belief a Clearing House Member duly registered with the CME as a clearing house member.

129. JPMorgan Securities, LLC is also a wholly-owned subsidiary of JPMorgan Chase & Co., and is a limited liability Company. JPMS is registered with the Securities and Exchange Commission as a broker-dealer and has been registered since 1985 and as an investment advisor since 1965.

130. CME also had a banking relationship with JPMorgan Chase, NA who held accounts for the CME and therefore monies were constantly being transferred back and forth from the CME to JPMorgan CHASE N.A. and between JPMORGAN CHASE, NA, US BANK, NA, PFG and CME in connection with the exorbitant fees generated by PFG and as a result of this Racketeering Conspiracy.

131. CME also had a relationship with JPMorgan Securities, LLC. who was during the relevant time period the Clearing House Member who cleared Future transactions over the CME Exchange.

-30-

### CME and The CME Group, Inc.

132. At all times hereinafter mentioned upon information and belief, The Chicago Mercantile Exchange Inc. (the "CME") is a Delaware Corporation which its principal place of business in Chicago, Illinois.

133. The CME or Chicago Mercantile Exchange is a registered Board of Trade and designated contract market as defined under the Commodities Exchange Act, 7 U.S.C. § 7, Et. Seq.

134. The CME is a wholly-owned subsidiary of The CME Group, Inc.

135. The CME Group, Inc. (The "CME Group") is a Delaware C Corporation with its principal place of business in Chicago, Illinois.

136. The CME Group, Inc. also does business in New York at its New York Office at 300 Vesey Street, New York, New York 10282.

137. At all times hereinafter mentioned upon information and belief, both the CME and its parent, The CME Group, Inc. share office space at their offices in Chicago, Illinois.

138. Defendant the CME Group also owns and operates a variety of Contract Derivative Markets including: The Chicago Board of Trade (the Comex or CME), the New York Mercantile Exchange (NYMEX), and the Kansas City Board of Trade.

139. The CME Group, Inc.'s total revenue for 2016 was $3.4 billion dollars and its Net Income was $1.5 billion dollars in 2016.

140. The CME Group, Inc. is a publically held corporation and is traded over the NASDAQ under the ticket symbol CME.

141. Both The CME Group and its subsidiary, the CME are for profit C corporations whose duty to its Shareholders is to maximize shareholder value. (Collectively referred to as

-31-

CME or CME defendants.)

142. The CME Group, Inc. has established the CME Rule book which applies to all of its Boards of Trade including the CME.

143. The CME Group has harmonized all of the Rules of the other contract markets including the CBOT, NYMEX and CME into one Rulebook "making the rules parallel in structure, numbering, and language where possible." (Quoting from the CME Website/Rulebooks.)

144. The CME Group wholly owns and operates the CME along with the NYMEX and CBOT.

145. The CME Group is a C Corporation and has not been registered with the CFTC as a board of trade or designated Contract Market pursuant to 7 U.S.C. § 7, Et. Seq.

146. The CME Group has never made application to the CFTC to comply with 7 U.S.C. § 7.

147. The CME Group has a Market Regulation Deparment that monitors and surveilles the CME to ensure that the CME fulfills it self-regulatory responsibilities.

148. The CME Group's Market Regultaion Department controls all aspects of the CME's business operations including all trading activities.

149. The CME Group has access to all of the CME's computers and can monitor in real time all trades occuring over the CME Exchange.

150. The CME Group, Inc. acts on behalf of the CME.

151. The CME Group on behalf of itself and the CME entered into the Co-Location Agreement on behalf of the Chicago Mercantile Exchange. *See* Co-Location Agreement between CME Group and PFG annexed hereto as Exhibit 5.

-32-

152. The CME Group. Inc. manages and controls the CME and runs the CME like a Division.

153. Defendant CME is also a board of trade registered and approved by the CFTC to act as a Contract Market under 7 U.S.C. §7, et. seq.

154. As a registered contract market pursuant to 7 U.S.C.§ 7, the CME has a duty to maintain a stable contract market free of manipulation and fraud.

155. Clearly, a conflict of interest exists between the CME Group's obligations to collect as much in fees as possible to maximize shareholder value as would any C corporation, and its subsidiary, the CME's obligation to maintain a fair and stable contract market which would have required it to kick out PFG many years ago as a customer of the Exchange, since PFG was under capitalized and under segregated at all times during its 20 year relationship at the CME.

156. To generate profits, the CME charges Exchange Fees for the privilege of trading over the various CME Group Exchanges.

157. In addition, in order to maintain its Status of an approved Contract Market, the CME is required to set up rules to govern and regulate the trading of futures and options contracts. This rule-making authority has been given to them by Congress and the CFTC.

158. However, it is the CME Group, an undesignated contract market that has never been approved by the CFTC as a validly designted contract market that actually regulates and controls the CME where the failure to enforce CME Rule 930.

159. Therefore, the CME Group, Inc. and its wholly owned Subsidiary Contract Market the CME wear two hats: one as a C corporation to maximize shareholder value, and the other hat as a quasi-government regulator charged with regulating the futures and options markets for the protection of the investing public.

-33-

160. The CME Group, Inc. has developed a Rule book that governs all of its subsidiaries including the CME. This CME Rulebook governs all of the protections, operations and procedures that are used to regulate the trading and settlement of futures and options over the Exchanges as well as other derivative contracts trading over the CME and other Exchanges owned and operated by The CME Group, Inc.

161. The CME rule book only allows Clearing House Members to trade Futures and Options contracts over the Exchanges. Therefore, an FCM such as PFG in order to transact over the Exchanges had to either be a Clearing House Member or associate itself with a Clearing House Member through an Omnibus Trading Account.

162. To become a Clearing (or Clearing House) member requires approval by the CME and CME Group, Inc  The CME and CME Group, Inc. require clearing members to have substantial amounts of Net Capital to support Margin Requirements. This large net capital requirement protects the Clearing House from losses based on customer defaults where a customer cannot satisfy a margin call or cure a Margin Deficiency.

163. One reason that the CME wants protection from ultimate liability is because every night at the end of the trading day, the CME novates each and every contract and options position onto its own books. So, the CME is the ultimate buyer and seller and owner of each and every trade performed over its Exchange.

164. To gain admission to the CME Group, Inc.'s Clearing House Member group, requires the payment of an entrance fee, just like in a private club.

165. If an FCM does not meet the financial requirements to be accepted as a Clearing House Member, it can still gain the status of member or operate as a non-member, upon information and belief. A Member or Non-Member, unlike a Clearing Member, cannot clear

-34-

trades itself and has to associate itself with a Clearing Member who will clear a member on non-member's trades for it. This arrangement generates fees to be paid by the Non-Clearing customer or Member to the CME Clearing House Member to clear trades on the FCM-Member's behalf and its customer's behalf.

166. One crucial rule in the CME rulebook is Rule 930, and its subdivisions in  Rule 930 D, E, and K regarding Margin requirements (referred to as a performance bond) and Margin Calls which set forth procedures which transacting parties must follow where an account is under margined, including the cessation of initiating new positions until a Margin Deficiency is resolved.

167. The CME Group made material representaions to the members of the public including Plaintiffs herein that they would monitor and surveille the market actitivies of their customers trading over the CME Exchange.

168. In the CME Clearing Risk Management and Financial Safeguards publication offered to the public, the CME Group stated that its surveilles the CME through another wholly owned subsidiary, CME Clearing.

169. CME Group stated: "CME Clearing 's integrated clearing function is designed to ensure the safety and soundness of our markets."

170. CME Group does not just monitor Clearing members but also has access to Clearing member's large individual customer accounts and monitors those accounts as well. CME has stated on page 16 of its handbook entitlted CME Clearing Risk Managment and Financial Safeguards:

> "Through CME Group's Market Regulation department, CME Clearing's Risk Managment team has access to specific account position information for Clearing Members' large individual customer accounts.  Such position information which

-35-

is mainatined on a highly confidential basis, allows the identification of concentrated positions as they arise and the agggregation of positiosn that may be owned by common principals through several different Clearing Members.

171. During the relevantt ime period, CME clearing had full access to inspect and monitor the trades that were being conducted by PFG, a non-clearing FCM.

172. During the Relevant time period, PFG was considered a large individual customer or equivalent to a large individual customer and CME clearing was required to monitor PFG to determine whether PFG held large concentrated positions as part of its standard market regulation.

173. CME and CME Group during the relevant time period had access to the account positions maintained by PFG and could actively monitor PFG's positions in real time.

**Millenium**

174. Defendant Millenium Trust Company a/k/a Millenium Trust Co. LLC ("Millenium") is an Illinois Trust Company with its principal place of business in Oak Brook, Illinois.

175. During the relevant time period, Millenium Trust Company served as the IRA custodian for plaintiff retirement accounts or Traditional IRAs and owed plaintiffs a fiduciary duty and duty of ordinary care and a special duty of care to protect these funds and make sure they were being properly invested.

176. However, the evidence shows that Millenium Trust also acted as an unregistered Introducing Broker who helped introduce these IRA accounts to PFG. No representative from Millenium ever met with these Class members, and they delegated to Perry Comeau, an unregistered CTA, the task of having the clients sign the opening documents for Millenium without ever distributing to the Class members the Millenium Adoption agreement (Customer

-36-

Agreement.)

177. Millenium Trust disregarded all of its duties as an IRA trustee and/or custodian by allowing these investments to proceed and by allowing Perry Comeau who was barred in the State of Iowa as an Investment professional from acting in any way to promote and secure these IRA accounts with Peregrine through Millenium who rubber stamped these future option investments.

178. Defendant Millenium Trust also acted with Conscious Avoidance in refusing to investigate the clear red flags that showed that these investments were completely unsuitable for these clients. For example, knowing that it would be impossible for any customer to satisfy a margin call in excess of $5,000.00 because under IRA rules, $5000.00 was the annual maximum contribution ($6,500 today) that one could even make into an IRA account. Thus, Millenium allowing these investors to proceed without any warnings that their accounts could easily be destroyed if a margin call exceeded $5,000.00. This conduct shows malicious intent based on Conscious Avoidance on behalf of Millenium to allow and encourage these IRA investments at PFG.

### Steven Brewer

179. Defendant Steven Brewer is a resident of Illinois. During the relevant time period, he was the principal and owner of Brewer Futures Group, LLC. ("BFG" hereinafter) which was the Introducing Broker who introduced plaintiffs' accounts to Peregrine Financial Group.

180. At some point, Brewer met with the Maxwell CTAs, and convinced the group to transfer their accounts to Peregrine. The Maxwells and Perry Comeau explained that the fees charged by the other FCM was too high, and that they could lower their fees by switching to PFG.

-37-

181. BFG and a relationship with PFG and the two entities had entered into a Clearing Agreement which stated in pertinent part that BFG would introduce trading customers to PFG in exchange for Introducing Broker fees, and that PFG would clear these trades over the CME Exchange. *See Peregrine Financial Group, Inc. Clearing Agreement for Introducing Broker* annexed hereto as Exhibit 6.

182. No where in that agreement does it state that PFG is a non-clearing member who actually is not allowed to clear trades absent another clearing member taking full responsibility for clearing PFG customer trades.

183. As part of the BFG-PFG Clearing Agreement, BFG was supposed to guarantee that all margin deficiencies on behalf of these customers would be funded by BFG. However, at no time did BFG ever act to satisfy any Margin Calls made on the Class member's accounts.

184. PFG stated in Plaintiffs' NFA arbitrations that BFG was notified of Plaintiffs' margin calls and that BFG represented that it would timely cover these margin calls for Plaintiffs.

185. BFG was registered with the NFA (NFA I.D. No. 0300729) during the relevant time period.

186. BFG is no longer in existence having gone bankrupt just like Peregrine Financial Group, the FCM who settled and cleared the accounts of Plaintiffs after BFG introduced their accounts.

187. BFG had a long history of violations and was first found liable for misconduct by the NFA on March 15, 2007 for a host of violations including failure to keep proper books and records. *See* NFA case No 06-BCC-008.

188. In 2004, the NFA also levied a fine against BFG and its principal Steven John

-38-

Brewer in the amount of $30,000.00 also for misconduct; and in 2007 prior to BFG acting as an Introducing Broker for plaintiffs herein, it was again fined $45,000.00 for misconduct in connection with its membership at the NFA. By the time the NFA suspended BFG a fine of $100,000.00 was due and owing.

189. Instead of correcting its problems, after the March 15, 2007 Order in good faith, BFG and Steven Brewer continued to violate in bad faith rules and laws, and on November 1, 2010 the NFA had expelled BFG from membership thus ending Steven Brewer's career as a Commodities Associated Person. *See NFA Case No* 09-BCC-014, *Notice of Suspension of Membership and Associate Membership Pursuant to NFA Compliance Rule 3-14©.*

190. When BFG and Steven Brewer introduced the Class members' accounts' to PFG in approximately September of 2007, BFG was in the midst of violating NFA rules and by 2010, BFG was expelled frm the NFA, just two years after these Class members' losses.

191. However, Steven Brewer quickly reinvented himself by establishing the broker-dealer Brewer Investment Group, LLC., Brewer Financial Services, LLC and Brewer Investment Advisors, LLC and established a broker-dealer which ended up offering $5.4 million dollars worth of securities which eventually went missing leaving approximately 74 investors to file claims in Bankruptcy against Steven Brewer and his entities.

192. Included in these 74 investors were the Wasendorfs, Sn. and Jr. who invested approximately $1 million dollars in the Brewer notes, upon information and belief, probably as a pay back for the help Steven Brewer afforded them in this RICO Scheme, since as it turns out, upon information and belief, fees were not even being generated to Introducing Brokers such as Steven Brewer because of the fictitious trades that were occuring. *See, Amended Schedule F (excerpts)* annexed hereto as Exhibits 1, 2.

193.  The SEC also instituted legal proceedings against Steven Brewer and other Brewer entities for fraudulent offerings of unregistered securities from 2009 through 2010.  See *United States Securities and Exchange Commission v. Steven Brewer, Et. Al.,* 1:10-cv-06932 (N.D. Ill.__

**Amber Maxwell and Garlon Maxwell**

194.  Defendant Amber Maxwell resides in Saratoga Springs, Utah.  During the relevant time period, she held herself out to members of the Class as a bona fide Investment Advisor including as a Commodities Trading Advisor as defined under 7 U.S.C. § 1, Et. Seq. She invested customer funds on behalf of plaintiffs' and created losses in their segregated customer accounts.

195.  Defendant Garlon Maxwell, the husband of Amber Maxwell, resides in Saratoga Springs, Utah.  During the relevant time frame, he also held himself out to members of the Class as a bona fide Investment Advisor including as a Commodities Trading Advisor as defined under 7 U.S.C. § 1, Et. Seq.  He invested customer funds on behalf of plaintiffs' and created losses in their segregated customer accounts.

**Perry Comeau**

196.  Perry Comeau resides in Oelwein, Iowa. During the relevant time period he held himself out as a bona fide investment advisor to the members of the Class and assisted the Maxwells in managing the Classes' accounts.  He assisted the investing of customer funds on behalf of plaintiffs' and created losses in their segregated customer accounts

197. Perry Comeau, a nurse anesthetist at the local hospital decided to travel to Utah to take a class taught by Garlon Maxwell called "Teach me to Trade."  He took five one week classes totaling $20,000.00 in tuition.  Each week he traveled to Utah, except for the last  class that was held in Las Vegas, Nevada.

-40-

198. At this class "Teach Me To Trade," Garlon Maxwell had approximately 150 students and held himself out to Perry Comeau as an investment professional. Perry Comeau decided to let Garlon Maxwell invest for him.

199. In Oelwein, Iowa Perry represented that Garlon Maxwell with his wife Amber Maxwell were professional money managers who could handle their accounts. Perry Comeau stated that his returns were solid. The Maxwells then traveled over 1000 miles from Utah to Iowa to hold seminars in a local steakhouse to impress the crowd and solicit their investments.

200. Perry Comeau aided and abetted Garlon and Amber Maxwell in soliciting accounts and completing the opening documentation.

201. At Bill's Steakhouse, in Oelwine, Iowa, Garlon Maxwell represented to the Sub Class members A and B that his winning strategy was risk averse and risk was limited because he only invested 10% of each one's total principal in order to limit the losses in each one's account. He also explained that with his solid trading strategy, he could make profits both when the markets went up as well as when they went down. He charged a 22% incentive fee for his investment advisory services.

202. However, Perry Comeau was only charged 17%, a 5% reduction in fees for Mr. Comeau's assistance with opening up these customer accounts in the basement of his home.

203. At all times herein mentioned, Garlon Maxwell, Amber Maxwell and Perry Comeau had cease and desist orders against each one and had been fined and were not allowed to act as investment advisors in the State of Iowa. In spite of these cease and desist orders, they continued to represent the Class members.

204. Perry Comeau assisted plaintiffs in setting up their accounts and signing account opending documentation. During the relevant time period, Perry Comeau was acting as a

-41-

Commoditiy Trading Adivor and eventually became registered as such by the NFA.

205. As such during the relevant time period, Comeau was obligated to furnish plaintiffs with A supplemental disclosure statement under NFA Rule 2-30 explaining that this type of investing was simply too risky for these plaintiffs, but Comeau did not.

206. Comeau also was the one to sign up plaintiffs IRA accounts with Millenium for the purposes of investing in futures contracts. At no time did Comeau present the plaintiffs with copies of the Millenium Adoption Agreements or other customer agreemetns but did present them with the signature pages only and instructed them to sign these solitary pages.

### Russell Wasendorf, Jr.

207. Russell Wasendorf, Jr. resides in Orlando, Florida. During the relevant time frame, he was Chief Operating Officer and President of Peregrine Financial Group and participated in this RICO Conspiracy by taking customer funds from Millenium Trust and others on behalf of Plaintiffs to purposefully make disappear in this ponzi scheme.

208. In May, 2011 a few months before the collapse of Peregrine, Russell Wasendorf Jr. was fined $700,000.0 along with PFG, Susan O'Meara and Eric Schiff for violating a variety of NFA rules relating to misconduct with respect to allowing this Ponzi Scheme to florish. *See* NFA order dated February 8, 2012, NFA Case N. 12-BCC-001 This fine was paid in full. *See* NFA BCC Decision annexed hereto as Exhibit 10.

209. Included in the violations committed were a variety of misconduct that shows that this ponzi scheme was in full force such as allowing customers to invest in risky out of the money puts and calls that are bound to lose 95% of the time as well as placing trades without sufficient margin.

210. Wasendorf, Jr. monthly salary was: $18,750.00 from PFG, $10,863.22 from PFG

-42-

for Monthly Executive bonus-Gross Amount and $14,977.80 as a Payout on rewe Business-Gross amount.

211. Wasendorf Jr.'s monthly gross salary based in part on stolen customer segregated monies was $44,591.02 a month to help run Peregrine Financial Group, Inc. during the relevant time frame.

212. With respect to the monthly payments of $14,977.80 per month from Steven Brewer who was found by the NFA to not maintain records, clearly this payback was in furtherance of this RICO conspiracy where the Wasendorfs had tendered approximatley $1,000,000.00 to Steven Brewer from customer segregated monies in exchange for his agreement to repay the Wasendorf's on a monthly basis. Clearly, they were sharing in wrongully stolen customer proceeds as part of this RICO ponzi Scheme and in consideration of Steven Brewer introducing Plaintiffs' accounts to PFG and making sure the Plaintiffs did not know about their margin calls so Plaintiffs' accounts would easily be destroyed as part of this RICO Conspiracy.

213. Wasendorf, Jr. verified as true and correct several documents in the Plaintiff's NFA arbitration proceedings including "Respondent Peregrine financial Group, Inc.'s Motion to Dismiss Claimants' Final Amended Staements fo Claim" dated October 10, 2010 where Mr. Ivarone argued that "as a result of adverse market movement, the Claimants' account herein were subject o margin calls in early October of 2008."

214. As Chief Operating Officer and President of PFG, Wasendorf, Jr. was charged with knowing the financial position of PFG which turned out to contain extremely fraudulent information including FR-1s filed on a monthly basis with the CFTC showing PFG's capitalization and the amount of customer segregated funds on hand.

-43-

215. It was part of Russel Wasendorf Jrs' role as President of PFG to monitor cash positions and financial statements of PFG and he is charged with knowing the true finanicial position of PFG.

216. Russel Wasendorf, Jr. also personally guaranteed his Father's loan from U.S. Bank in the amount of $9,000,000.00 in 2008 when plaintiffs life savings were lost.

217. Claiming that U.S.Bank defrauded Russel Wasendorf, Jr. Russel Wasendorf Jr. sued U.S.Bank himself, but mysteriously dropped that law suit.

218. As president of PFG, Wasendorf, Jr. ran the day-to-day operations of PFG and had to sign off on many documents which would have revealed the fraud or at least the vast undersegration that existed in customer segregated accounts.

219. Therefore, as president, Wasendorf, Jr. had a duty to immediately stop the conduct but based on conscious avoidence continued to aid and abet his father, Wasendorf, Sn.

### Paul William Thomas

220. Attorney Paul William Thomas resides in California.

221. Attorney Paul William Thomas resides in the State of California. During the relevant time period, Paul William Thomas represented both defendat Perry Comeau and Plaintiffs herein before the National Futures Association with respect to each Plaintiffs' customer arbitrations.

222. Attorney Paul Thomas, Esq. met with plaintiffs in their home state of Iowa to solicit their business and was retained by plaintiffs to pursue their claims for compensation against PFG before the NFA.

### National Futures Association

223. The National Futures Association is a Registered Futures Association pursuant to

-44-

the Commodities Exchange Act 7 U.S.C.§ 21.

224. The National Futures Association is a not-for-profit corporation incorporated in the State of Delarware that serves as the only registered futures assocition established pursuant to 7 U.S.C. § 21.

## **PROCEDURAL HISTORY**

225. U.S. Bank and J.P.Morgan settled a Class Action in the approximate amount of $44 million dollars to cover 14,000 purported Class members who had opened accounts at Peregrine as of July, 2012 and lost their proceeds in only part of this RICO Ponzi Scheme. See *In Re Peregrine Financial Group Customer Litigation*, 12-CV-5546 (N.D.Ill. 2012). Although this case includes the claims from the prior class action, this case also makes more detailed allegations in desribing the entire ponzi scheme whereas the Prior Class Action focuses on one part of the RICO ponzi scheme. The prior Class Action eventually excluded the Class members herein and the Settlement Class eventually included 4(d) customers who actually owned money, property or securities at the time Peregrine went bankrupt on or about July 10, 2012. Because none of the plaintiffs herein owned money, securities or property in 2012, after having their accounts destroyed leaving a zero balance, the instant class members were excluded from the previous settlement.

226. The Plan of Allocation as well as the Proof of Claim forms in the previous class action clearly indicate that these Plaitniffs were included as Class Members who held "other claims" and/or "Alowed Claims."

227. Indeed according to the Commodity Futures Customer Claim Form for Peregrine Financial Group Inc. It states in relevant part:

-45-

"IF YOU DO NOT HAVE A CUSTOMER CLAIM BASED ON A FUTURES
ACCOUNT, PLEASE DO NOT USE THIS FORM.

SEPARTATE CLAIM FORMS MUST BE FILED FOR OTHER TYPES OF
CLAIMS, INCLUDING FOR CLIAMS RELATED TO A FOREIGN
EXCHANGE ACCOUNT OR A PRECIOS METAL ACCOUNT WITH PFG.

PLEASE ALSO NOTE THAT IF YOU HOLD (1) A CLAIM AGAINST
PFG BASED ON A FUTURES ACCOUNT, AND (2) A CLAIM AGAINST PFG
BASED ON ANY OTHER RELATIONSHIP WITH PFG (SUCH AS A
FOREGIN EXCHANGE ACCOUNT, A PRECIOUS METAL ACCOUNT OR
OTHER CLAIM), YOU SHOULD USE THIS FORM SOLELY TO FILE YOUR
CLAIM BASED ON A FUTRES ACCOUNT AND USE A SEPARATE CLAIM
FOR (OR FORMS TO FILE A CLAIM (OR CLAIMS) AGAINST PFG BASED
ON ANY OTHER APPLICABLE RELATIONSHIP. [Sic]

228. In another Claim Form, it states:

"If you have previously filed a "Bankruptcy Proof of Claim Form" and your
claim has been allowed ("Allowed Claim") in the bankruptcy case captioned *In re
Peregrine Fiancial Group, Inc.* Case No. 12-B-27488 ("the Bankruptcy Case"),
then you do not need to complete this Commodity Futures Customer Claim Form-
Peregrine Financial Group, Inc.-U.S.Bank Settlement ("Class Action Proof of
Claim.)"

229. In this case, Class Plaintiffs both had "Other Claims" and/or "Allowed Claims" but

never received any proof of claim forms and were effectively decertfied from the class.

230. In approximately June of 2016, some Class plaintiffs learned that they would not be

participating in the current Class Settlement. As stated because this instant class of plaintiffs are

not bona fide 4(d) customers, they have been excluded from the Class and now must bring their

own cause of action.

231. The instant Class members in this case never received any notices or other

information about the Prior Class Action Settlement including opt-out notices; and therefore they

are not bound by the previous class settlement, upon information and belief. Thus, these instant

Class members were in effect decertified from the Prior Class Action.

## SUBSTANTIVE ALLEGATIONS

232.  Wasendorf, Sn. had to figure out a way to get rid of these very customers at Peregrine whom he had just robbed, because Wasendorf, Sn. and his co-conspirators could not just tell their customers to go away because they had no more funds to use as Margin to initiate and maintain futures and/or option positions.  In furtherance of this Ponzi RICO Scheme to protect JPMorgan, U.S. Bank and CME who allowed this scheme to continue for over a decade and would have continued but for Wasendorf Sns' attempted suicide on July 9, 2012, Wasendorf, and his co-conspirators gave marching orders to loyal and crooked brokers who are known in the commodities industry as CTAs or Commodity Trading Advisors and IBs, Introducing Brokers, and other agents to find a clever way to purposely create losses in each customer's accounts, so that each customer would just disappear from the market place allowing Wasendorf and his co-conspirators to laugh all the way to the bank.

**Fraudulently Inducing Members of the Public to Invest in the Commodities Markets.**

233.  As part of this RICO Ponzi Scheme, it was essential that a cadre of Introducing brokers (Including Millenium Trust) and CTAs succeed in luring members of the public into the Commodities Futures Markets to fund this RICO Ponzi Scheme.

234. In addition to Garlon Maxwell, Amber Maxwell, Perry Comeau, Steven Brewer, and Millenium Trust, PFG and the Wasendorfs associated themselves with over 113 other Introducing Brokers and CTAs who also lured members of the investing public into investments that were bound to fail.

235.  The modus operandi of these co-conspirators who lured in  customers into the commodities markets over this two decade period-- where there were at least 24,000 customers

-47-

trading through PFG, was simple: the brokers would fraudulently induce customers into thinking that they were investing in sound and safe investments, with limited risk, that would eventually mature over time with preservation of capital.

236. Instead, when the time came, these brokers and CTAs would purposefully enter into naked puts and calls such as "bull spreads: which are derivative contracts that lose 95% of the time. Therefore, these strategies of buying naked puts and calls also referred to as bulls spreads are a surefire recipe for disaster.

237. The unwitting investors believed that the brokers and CTAs had their best interests at heart because the brokers after all are ostensibly making fees linked to the success of each investor's account; however in reality, the brokers preferred to take the risk out of their fee structure which are linked to profitable trades. Rather, these brokers and CTAs purposefully dumped their clients' accounts using out-of-the money, naked puts and calls or option spreads which eventually lose 95% of the time.

238. Because Mr. Wasendorf Sn. has already taken the proceeds of the trades out of the accounts, the accounts were actually being shadow-traded upon information and belief and the brokers and CTA's needed to just produce a zero balance in each customer's account. Then Wasendorf, Sn. and these brokers and CTAs would divvy up the stolen proceeds.

## a. 2005 Opening of the Customer Accounts-Sub Class Members A and B, Based on Fraudulent Inducement and Minimization of Risks.

239. Garlon Maxwell, Amber Maxwell and Perry Comeau had convinced the Oelwein Sub Class members (A and B) that their trading strategy was safe and prudent and only risked 10% of the plaintiffs capital at any on time.

240. Prior to switching FCMs and Introducing Brokers to Brewer Futures Group and

-48-

Peregrine Financial Group, Inc., the Maxwells and Perry Comeau had traded through two other FCMs, Interactive Brokers and Crosslands from 2005 through 2007.

241. During this time, 2005 through 2007, the Oelwein Class members were doing just fine and had not sustained devastating losses in their accounts. It appears that the Maxwells were adhering to their representation that only 10% of the principal was being traded at a time, thus limiting risk.

242. Garlon Maxwell did not have to go into detail about how he intended to gain profits because the Oelwein Class Members were unsophisticated, although they did understand his clear representations that these were prudent investments.

243. Neither Garlon Maxwell, Amber Maxwell or Perry Comeau ever bothered to tell plaintiffs that naked puts and calls are extremely risky, and they downplayed the risks of these investments.

244. Garlon Maxwell and Amber Maxwell with the help of Perry Comeau induced these unwitting members of the investing public to commit their life savings based on these clear misrepresentations and material omissions which constitute fraudulent inducement under horn book law and which is a violation of the Anti-Fraud Provisions of the Commodities Exchange Act. See 7 U.S.C. §§ 6(b), 6(m), 6(o).

245. Based on the downplaying of the risks of investing as well as the misrepresentation that only 10% of each one's funds would be invested at one time, plaintiffs proceeded to open investment accounts, first at Interactive Brokers, Inc., a Futures Commission Merchant.

246. To open these accounts, each set of plaintiffs were assisted by either Perry Comeau or the Maxwells who set up their accounts over the internet and helped them fill out the required paper work which consisted of preprinted and small font boiler plate documents.

-49-

247. Plaintiffs relied on the verbal explanations of the Maxwells and Perry Comeau and just signed on the dotted line without reading the fine print on the paper work. Class members were not instructed to read documents, and signed documents in the basement of Perry's home. Plaintiffs did not scrutinize these opening documents because they perceived them to be unintelligible and in small print, and they preferred verbal explanations by the investment advisors whom had traveled from Utah to Iowa to explain the details to them personally.

248. Stated otherwise, because they had spent a substantial amount of time listening to Garlon Maxwell explain the trading strategy at Bill's Steak house, they viewed the opening documents as the same type of documents one would sign to open a credit card for example by just signing on the dotted line.

249. In addition, some of the documents were unwittingly signed in blank by plaintiffs to be filled in later.

250. Perry Comeau also had the Sub Class members A and B sign opening documents for their IRA monies for Millenium Trust.

251. Their accounts at Interactive Brokers, Inc. were opened in approximately 2005. Interactive Brokers appears to be an on line broker where the Maxwells could place trades on behalf of the customers themselves over the internet.

252. However, upon information and belief, there came a time when Interactive Brokers, Inc. became aware that neither Garlon Maxwell, Amber Maxwell and Perry Comeau were registered to trade contracts on behalf of third parties such as plaintiffs herein.

253. Interactive Brokers, Inc. knew that the commodities laws required all CTA's or Commodities Trading Advisors to be registered with the National Futures Association to even be allowed to trade on behalf of customers. Thus, upon information and belief, when Interactive

-50-

learned that neither Garlon, Amber nor Perry were licensed Commodities Trading Advisors, Interactive asked them to terminate their accounts with Interactive Brokers immediately.

254. In addition, the Commodities Exchange Act also imposes strict liability on any principal for the acts of their agents. 7 U.S.C. § 2(a)(1)(B). Thus, if the CTA's were unregistered, Interactive Brokers could be held liable for any damages on a strict vicarious liability basis, since the CTAs have been considered agents of the FCMs. Again, Interactive did not want to risk that problem, upon information and belief.

255. The exception to registration in Iowa did not apply--where an unregistered advisor could handle up to 5 accounts, because the Maxwells were handling more than that limit. The Maxwells were asked to leave Interactive Brokers, upon information and belief.

256. It does not appear that the Maxwells attempted to even register as CTAs in 2005, and they thought they could fall under the exception to registration which states that if one is just trading for friends or close family members (15 persons or less), and not holding herself out to the public as a trader, they would be exempt from registering.

257. However, whether or not an exemption from registration existed, and the overwhelming evidence rejected by the NFA arbitrators showed that registration was required because Garlon Maxwell and Amber Maxwell were originally strangers to these Iowans not friends at all–even including Perry Comeau who just met him at a seminar where Mr. Maxwell held himself out to Mr. Comeau as an investment professional upon information and belief.

258. Garlon Maxwell had a negative history and had the customers been informed of Garlon Maxwell's history, they never would let him handle their funds. However, the customers did not have the following information that perhaps Interactive Brokers did have when the accounts were handled:

      a.. Garlon Maxwell had filed for Bankruptcy in 2004 and received a

          discharge on March 22, 2005.

      b. Garlon Maxwell had Federal Tax liens for a 16 year tax period from 1989

          through 2005.

      c. Garlon Maxwell, Amber Maxwell and Perry Comeau were being investigated

by the Iowa Department of insurance for infractions relating to their purported

status as Investment advisors in the State of Iowa. Fines were levied against each

of them with cease and desist orders in 2007 in the respective amounts of

$25,000.00 (Garlon Maxwell), $15,000.00 (Amber Maxwell) and $20,000.00

(Perry Comeau).

    259. Notwithstanding these fines and cease and desist order, not one of these defendants ceased nor desisted, but they continued with a avengence to violate the laws of the United States and eventually destroy plaintiffs' life savings.

    260. These three defendants were ideal candidates for Wasendorf, Sn.'s scheme.

    261. For example, when Peregrine Financial Group, Inc. ("PFG") requested that Garlon Maxwell fill out forms for their review, Maxwell did not fill in the box where it was asked if he ever had gone Bankrupt. But, PFG was not concerned with doing honest due diligence, because Wasendorf wanted co-conspirators who would agree to hide customer stolen monies

    262. Thus, Garlon and Amber Maxwell had perfect track records to meet Wasendorf's needs, because Wasendorf and PFG could not actually do the advising of clients themselves, they needed the help of these CTAs to purposefully end customer accounts and needed the assistance of traders and brokers.

    263. Amber Maxwell was also never registered as a CTA during any time when these

-52-

customers accounts were being traded by her or by her assistance to her husband Garlon Maxwell.

264. Garlon Maxwell was never registered in any capacity with the NFA during the life of these customer accounts either.

265. Perry Comeau was also not registered with the NFA during the life of these customer accounts, upon information and belief.

266. The Maxwells intended to and did receive large commissions on these customer accounts, as did, PFG, Millenium and the CME. Perry Comeau would receive reduction in his own trading fees, as his commission.

### b. Crossland and Millenium Trust Company-March, 2007 to August 2008

267. In March, 2007, transfer documents were signed to initiate transfers from Interactive Brokers to Crosslands, Inc. The Oelwein Class remained with Crosslands for just 7 months until they eventually ended up at PFG.

268. However, now Perry Comeau, Amber Maxwell and Garlon Maxwell divvied up the customers so that it would look like each advisor had less than 15 accounts, and would fit into the Federal exemption, although Garlon and Amber still held themselves out to these customers as members of the public which should not have disqualified them for the exemption.

269. Because many if not most of the group's assets were in Traditional IRA accounts, Millenium an IRA trustee was used to help transfer these accounts to PFG. Millenium Trust Co. Inc. became the IRA Trustee for the group and was required to sign off on the documents along with the individual customers pursuant to Section 408 of the Internal Revenue Code.

270. However, Millenium by even signing off on these documents obviously did not conduct any due diligence whatsoever and even signed a limited power of attorney allowing Amber Maxwell to trade the Schefferts' accounts even though she had just been fined $15,000.00 by the Iowa

-53-

Department of Insurance and was not registered with the NFA when these accounts were opened.

271. Had Millenium bothered to do some due diligence they would have easily seen this untoward conduct unfolding rapidly, and would have had time to save the Schefferts and class members from this ultimate disaster. In fact, on one document signed by Millenium, there is a disclosure telling all signatories to carefully review these investments. Millenium had a duty to do this review on behalf of the Schefferts before signing off on these investments.

272. By flouting their obligations as a Fiduciary under Section 408 of the Internal Revenue Code, it appears that Millenium too played a part in this RICO conspiracy. For one thing, it was Garlon not Amber who was trading the Schefferts' accounts, and Millenium signed off giving Amber not Garlon the authority to trade.

273. Shortly after Millenium got involved as the IRA trustee for the group, Garlon Maxwell and Amber Maxwell met Steven Brewer of Brewer Futures Group who perhaps introduced the Maxwells to Russell Wasendorf. Sn.

274. Millenium collecting fees and commissions, signed off on these investments and allowed the imprudent trading to continue even in these IRA accounts until the week of October 2, 2008 through October 8, 2008 where all accounts were wiped out, sending these investors home penniless and having to still pay their bills.

275. Shortly after opening accounts at Crossland in April, 2007, the Maxwells told the group that they wanted to transfer all of the accounts to PFG using Brewer to introduce their accounts. The Maxwells and Comeau told the group they could save on fees by leaving Crossland. They had only been at Crossland for a few months before this move was initiated by the Maxwells.

276. However, because the Maxwells were not registered as Introducing Brokers, they

-54-

could not even trade in the accounts or bring the accounts to PFG. So, instead, Steven Brewer of Brewer Futures Group agreed to serve as Introducing Broker on behalf of the Maxwells and gave the Maxwells a platform on which they could execute trades at Peregrine, the FCM.

277. Steven Brewer entered into an agreement with Russell Wasendorf Jr. this time agreeing that if there were any margin calls on any of the customer accounts, Brewer would cover these deficiencies for the customers. He then would contact the customers to satisfy these margin deficiencies. See Cleaning Agreement Between Steven Brewer and Russell Wasendorf, Jr. Section 2(s)(t) annexed hereto as Exhibit 6.

278. More customer agreements and transfer documents were signed and the accounts were transferred in August, 2007 to PFG through the Introducing Broker Brewer, to be traded by Garlon Maxwell with the assistance of Amber Maxwell and Perry Comeau.

279. These accounts remained opened until October 8, 2008 when all the customers account values were wiped out.

280. During this time, the accounts were fictiuosly traded using options, out-of-the money, naked puts and call. Such a strategy was extremely risky and lost 95% of the time. These types of investments are extremely unsuitable for conservative retirees such as Class members herein.

### c. Untoward Conduct During the Week of October 2, 2008 through October 8, 2008 consisting of Violations of the CME Margin Rules 930 D, E and K, Overwhelmingly Demonstrate a RICO Conspiracy.

281. CME rules 930 D, E, and K require all under margined accounts to stop trading except for liquidation only trades. Put otherwise, once a customer falls into a margin deficiency, he or she is not allowed to initiate new positions, but can only close out positions to decrease his margin requirements and/or wire money into his or her account to preserve present positions.

282. The CME is supposed to monitor all open positions on a daily basis and prevent under-margined accounts from remaining open. But not in this case, because the CME's own rules allowed for an exception to its CME rulebook as part of the CME's Omnibus Sub-Account rules. *See* CME Rule Book 930J.

283. Beside the CME, all FCMs such as Peregrine also have adopted this industry standard in their Customer Agreements also for the non-altruistic reason of also preserving the FCM's assets because in the case of a Margin Deficiency the FCMs and Clearing Members, and all members are strictly liable to the CME for such shortfalls.

284. CME rules are normally strictly enforced. However, these rules also have a key benefit for customers who will have an opportunity to close his or her account rather than risk sending in more money. So, the rule is an industry standard and all parties can gain a benefit from this Rule.

285. In this particular case, there were two egregious courses of conduct that not only violated the CME margin rules but good faith where plaintiffs fell into a Margin Deficit leading to a Margin Call beginning on October 2, 2008, a Wednesday. On that day for example a Margin Call was issued on Sherri Scheffert's IRA Account in the amount of approximately $52 650.00.

286. Under normal circumstances, and acting in good faith, all trading would have stopped immediately on October 2, 2008, and the Schefferts would have been called by telephone immediately to satisfy this Margin Call. All defendants had the Scheffert's phone numbers. Because the Schefferts did not have any extra cash to satisfy this Margin call, they would have instructed their brokers to stop trading in their accounts and they would have preserved their remaining Capital. Their main concern was always preservation of Capital. Because they believed only 10% of their capital was at risk, they would have lost at most 10% of their life-savings not 100%.

287. Had trading stopped in this case, the Schefferts' balance at the close of business on

-56-

October 2, 2008 was $281,762.46, their losses would have been limited to approximately $52,650.00.

288. Not only was no phone call ever made to the Schefferts by any of defendants, but a letter was sent to their address in Mission, Texas, although they were right there in Oelwein, Iowa on October 2, 2008.

289. The mailing of a letter certainly was intended to violate CME Rule 930K since it certainly takes more than one hour for a letter to arrive through the U.S. postal service. How could defendants comply with this CME rule 930K which only allows customers one hour to satisfy a margin call if they are mailing out Margin Call notices instead of calling the customers as is the well-established custom in the Industry?

290. In fact, PFG's own Compliance and Procedure Manual clearly states that Margin calls should be made to the customer by the AP, Associated Persons. It states in Section 16.6 that each AP should call the customer promptly over the telephone and advise them of the margin call. The AP shall also find out how the customer intends to deal with the Margin Call.

291. Because the defendants normally would be liable for any deficiencies in the customer accounts, defendants would be incentivized to pick up the phone and follow the rules of law and afford the customers one hour to either make arrangements to satisfy a margin call or to close their customer accounts.

292. However, where the intent is to destroy these customer accounts, then no such calls would be forthcoming as in this case herein.

293. Although this type of misconduct might be attributable to negligence on one or perhaps two occasions, there were approximately 35 customers accounts similarly situated for one week. Such an oversight is unfathomable based on negligence, but likely based on Fraud and bad faith conduct.

294. More evidence of this Rico Conspiracy is demonstrated by conduct the following day on

-57-

October 3, 2008, a Thursday. Despite being on a Margin Call from the preceding day, on this day, again neither the Schefferts nor any of the Class members received any type of phone call as is mandatory in these types of situations.

295. More evidence of this intentional conduct to wipe out plaintiffs' accounts is demonstrated on October 2, 2008, October 3, 2008, and October 6, 2008. New positions were initiated in the Schefferts' accounts in violation of CME Rule 930D.

296. One wonders how a broker could continue to initiate new positions where there is a short fall in the customer account? However, on October 2, 2008, 30 put options contract were written on behalf of the Schefferts on the E-mini S&P 500 index with a strike price of $1000.00.

297. On October 3, 2008, a Friday, the Schefferts were still in a Margin Call, and again none of the defendants called the Schefferts. On this day, their margin deficiency went from approximately $50,000.00 from the day before to approximately $160,000.00. Notwithstanding this continued Margin deficiency and with a Margin Call outstanding, the RICO defendants, PFG and the CTAs continued to write naked put options, initiating another 30 new positions on October 3, 2008. The initiation of these new positions was another violation of CME rules, 930D in particular, and is more evidence of intentional conduct to create losses in these unwitting customers' accounts.

298. That weekend, October 4, 2008 and October 5, 2008, the Schefferts still had no idea that their life savings were being wiped out. Apparently, someone at PFG was working that Sunday, but did not call the Schefferts who were home. Instead, on Sunday, October 5, 2008, Peregrine sent another letter this time to Millenium, a co-conspirator who did nothing to satisfy this margin deficiency. It appears that this letter was a just a cover up showing that some effort was made. Normally letter head has the address on the top. The date, not the day of the week is

-58-

also listed on the letterhead. On this letter of October 5, 2008, nobody signed this letter although it was produced by Peregrine to the Schefferts at some point.

299. Again, the mailing of a letter on Sunday October 5, 2008 to Millenium Trust did nothing to apprise the Schefferts of the terrible situation they were in.

300. On Monday, October 7, 2008, the Schefferts still ignorant that their life as they knew it was over, incurred more losses in their accounts. By October 8, 2008, their remaining balance was approximately $13,000, a loss of 96% of their portfolio in one week

301. Clearly because of the blatent violation of margin rules, a reasonable inference can and should be drawn that these trades were fictitious and meant to elimate these customers from PFG since Wasendorf had already pocketed plaintiffs' money.

### d. Because PFG and Millenium Failed to use the 70%-30% Rule to Invest the IRA Fund, This Conduct was Intentional.

302. Millenium should have fulfilled their fiduciary obligations and investigated these investments to see that they were not appropriate for an IRA account. Instead Millenium collecting fees and commissions, blindly signed off on these future commodities investments and allowed the imprudent trading to continue even in these IRA accounts until the week of October 2, 2008 through October 8, 2008 where all accounts were wiped out, sending these investors home penniless and having to still pay their bills.

303. Because an accepted norm among commodity firms is to only allow 30% of 70% to be invested in commodities futures contracts that exist in an IRA, the fact that plaintiffs were allowed to invest much more than that shows intentional conduct to purposefully terminate plaintiffs' account. In other words, in a portfolio of $100,000.00, only $21,000.00 should only be used as Margin to initiate positions. Again this conservative rule is to protect the FCMs

-59-

and/or CME who have liability for any deficiencies in the customer's account. Because investors of IRA proceeds are not liable for any deficiencies under the law, the FCMs would be responsible for these amounts.

304. In addition, because a margin call may require the addition of fresh cash, and IRA rules only allow approximately $5000.00 per calendar year to be contributed to a traditional IRA, any margin call over $5000.00 would cause a customers' account to be immediately closed under CME rules 930K.

305. Thus, the complete disregard for such safeguards for the defendants themselves, supports a strong inference that they were not concerned with protecting their own potential losses, but were very interested in getting rid of these customers' account.

### e. **Other instances of Fraudulent Inducement Based on Naked Puts and Calls bound to lose 95% of the Time**

306. In addition to the Oelwein Class members, this Scheme also effected other PFG customers as well. Although PFG customers who had valid accounts as of 2012 were apparently included in a previous class action, the rest of the investors not included in the Class can now also recover in this case.

307. Other examples of the same type of conduct that befell the Oelwein Class Members is clearly demonstrated by other Introducing Brokers who Introduced accounts to PFG during the relevant time period including but not limited to Clash Financial, LLC, Oxford Trading Group, LLC, California Capital Trading Group, LLC; Patriot Financial Markets, LLC, Empire and Financial LLC.

308. In these other cases of other Introducing Brokers trading on behalf of customers through PFG or directing their accounts, evidence was adduced that proved that these other

-60-

Introducing Brokers also put their customers in naked puts and calls readily destroying each customer's accounts.

309. One example of this persistent pattern of Racketeering activity to fraudulently induce customers to enter losing investments occurred in October, 2009 by an introducing Broker who traded through PFG, Oxford Trading Group, NFA ID #414318. Here an AP of Oxford Trading, Eric Clary fraudulently induced a customer named Allen Dollarhide to enter into naked puts and calls resulting in severe losses to his customer account.

310. Clary and others at Oxford Trading Group made fraudulent statements to Allen Dollerhide such as that Clary "had made many clients large profits and that all of his accounts on average made profits of 140%." *See* NFA Case No. 10-BCC-020 at 9 (August 10, 2009.) In addition, Clary never explained the risks of investing in these types of options.

311. After Mr. Dollarhide made an initial investment in October, 2009, Clary insisted that Mr. Dollarhide needed to continue to invest so as not to miss highly profitable opportunities.

312. Mr. Dollarhide believing Clary's prevarications that he had to move quickly to take advantage of the opportunities presented to him, Clary recommended buying buy options on wheat based on news reports that there was an infestation of locusts in South Africa as support for his recommendation.

313. Mr. Dollarhide made three deposits into his account totaling $53,000.00 between October 30th and November 10, 2009. By the end of February, 2010, Mr. Dollarhide had lost more than $41,500.00-nearly $27,000.00 was attributable to commissions and fees. This insane allocation to commissions and fees was actually an attempt to hide the Ponzi Scheme. All of Mr. Dollarhide's investments consisted of bull call spreads (naked options) which lose 95% of the time.

-61-

314. Another example of this pattern of Racketeering activity occurred with respect to another PFG introducing broker, California Capital Trading Group, ("CCTG") NFA ID #386834 where one of its Associated Persons ("APs") fraudulently induced a member of the investing public Peter Tovenati to make extremely risky investments in naked derivative options that lose 95% of the time.

315. Mr. Tovenati, like the Oelwein Sub Class members, had no previous experience investing. He opened an account in March, 2009 with an AP ("Associated Person"), Mr. Morales, with California Capital Trading Group. Mr. Tovenati, like the Schefferts, Behrens and Mr. Wakeford, relied on his Investment Advisor's advice 100% to make investment decisions. Based on the bald misrepresentations of risk, Mr. Morales induced Mr. Tovenati to make six deposits into his trading account over fourteen months totaling $68,6333.00. After Mr. Morales perpetuated this Fraud, Mr. Tovenati only had $375.00 left in his customer account which was closed in June of 2010.

316. Morales and CCTG booked $51,682.00 in commissions and fees to cover up their fraud. Again, the way these investments were purposefully lost was by having the customers purchase naked out-of the-money call options which are bound to lose value 95% of the time.[2]

317. On February 6, 2006, an Introducing Broker Los Angeles Trading Group Inc. filed a complaint with the CFTC based on losses of commissions in the amount of $200,000.00 it would have received for Introducing Brokers fees, but for the fact that its clients were forced by PFG to let the CTA Empire Futures, LLC. trade its account down to zero.

---

[2] Vista Trading Advisors, Inc. (NFA ID # 397384) another PFG Introducing Broker was held liable for similar frauds by its AP. *See In the Matter of Vista Trading Advisors, Inc.* NFA No. 10-BCC-021. (August 10, 2010).

318.  Although PFG was an FCM, it argued that according to its Clearing Agreement

with Los Angeles Trading Group, Inc., PFG could force the customers to let Empire direct its

accounts, which eventually were lost.

319.  The allegations in the Los Angeles Trading ("LATG" hereinafter) Complaint

accused Empire of purposefully destroying the customer's account that had been established in

April, 2004 which ended up also destroying any of Los Angeles Trading's commissions in the

amount of $200,000.00.  When Los Angeles Trading Group, Inc. tried to cancel Empire as the

CTA, LATG was prevented from doing so by PFG who argued that PFG could direct the

account based on their clearing agreement with LATG.  Eventually, the positions all lost by

October, 2004, just six months later.

320.  The Los Angeles Trading Group, Inc. Complaint states in paragraph 12:

> "Pursuant to Respondent's [PFG] insistence, every customer of
> Complainant was directed to utilize the services of the Respondent PFG's
> highly touted CTA, Empire.  Shortly after Complainants's referral of its
> customers to Empire, Empire began a reckless trading scenario which
> exceeded the customers' risk tolerance, exceeded the stated products to be
> traded and exceeded the stated trading strategy to be utilized by the CTA.
> Each Complainant's referred customers lost most if not all of their
> investment within a short period of time."

321.  The Complaint further alleges in paragraph 15:

> " By October, 2004, Respondents [PFG], through Empire had destroyed
> Complainant's customer base, by losing more of their account equity than
> the customers had agreed to risk, forcing them to instruct Complaint to
> close their accounts."  *See* Complaint filed with the CFTC entitled *Los
> Angeles Trading Group, Inc. v. Peregrine Financial Group, Et. Al.*  File
> February 7, 2007.

322. Another example of how customer accounts' were purposefully destroyed included

PFG's disregard for the customer's instructions to stop trading in her account; instead PFG

allowed the accounts to be traded in an unauthorized fashion eventually destroying the equity in

-63-

customers account as in one reported case where a customer placed $500,000.00 in an PFG account only to be used for savings and instructed PFG to only purchase a U.S. treasury bond. Instead, PFG linked this savings account to another Futures trading account and eventually without client authorization debited the entire $500,000.00 despite the testimony of the complainant that she had not authorized trading in this savings account. *See Chenli Chu v. James Francis Kelly and Peregrine Financial Group, Inc.* CFTC Docket No.: 07-R029 (Oct. 7, 2009.)

323. Class Plaintiff, David Scheffert, also specifically instructed PFG, Brewer and Garlon Maxwell to stop trading in his and his wife's accounts around his wife's birthday in the Spring of 2008. PFG and its co-conspirators completely disregarded this instruction, and continued to trade out the accounts to a zero balance. Clearly, the CTAs could not abide by these instruction, and violated 17 CFR 166.2 by refusing to stop trading. However, because there was no money in the Schefferts' accounts, the CTAs had to continue to wipe out these accounts and perpetuate this Scheme.

324. When the Oelwein customer's accounts were destroyed in October, 2008, Mr. Scheffert actually thought his funds were safe based on his prior instructions to stop trading in the Spring of 2008. However, PFG and the co-defendants totally disregarded these instructions and continued to dessicate Mr. Scheffert's account.

325. In another example of misconduct to purposefully destroy customer accounts and pocket customer monies, claims of using a master board were alleged, by at least one investor, Mr. Richard Chaput who claimed that without his knowledge or authorization, Brewer Futures Group through PFG put an unauthorized contract in Mr. Chaput's customer account that Mr. Chaput eventually had to offset at a loss. When Mr. Chaput complained that this contract just

-64-

appeared in his account was an error, and he never entered into this position, nothing was ever done about it. Mr. Chaput claimed that there was a Master Board used by PFG to allocate gains and losses among customer accounts. *See Claim of Richard Chaput*, Filed October 29, 2012 *In Re Peregrine financial Group, Inc.*

326. Therefore, through a variety of means and methods, PFG with its Introducing Brokers, CTAs and others meticulously destroyed customer accounts during the relevant time period and never even actually traded these customer accounts over any Exchanges.

**Role of JPMorgan Chase, N.A. and US Bank, NA in this RICO Conspiracy**

327. This RICO Ponzi Scheme including the monies in the total amount of $215,000,000.00 over a twenty year time frame from 1992 through 2012 from these customer accounts at JPMorgan Chase NA and U.S. Bank, and this Scheme could not have occurred without the Banks' full cooperation and breaches of their legal duties including breaches of fiduciary duty and Fraud by Omission and violation of 7 USC 6(d)(b)2 and 17 CFR 1.20(a).

328. The motivation for the behavior of all defendants was substantial fees derived by ostensibly legitimate courses of dealing such as Exchange fees, NFA fees, Incentive Fees and other commissions which never would have been earned absent participation in this Fraud which allowed business to be given to the various defendants. Each defendant acted to preserve its business relationship to get more business in the future whether legitimate or not.

329. Because these customer segregated accounts are special accounts, the law requires these banks to afford each customer and class member herein a special duty of care to make sure these accounts are safely held as in the equivalent of a vault or safety deposit box and not given to Mr. Wasendorf, Sn. to live the life of Riley and then to distribute these customer segregated monies to the banks and CME and NFA as "fees."

-65-

330. JPMorgan Chase, NA ("JPMC" hereinafter) just like US Bank, NA, also held Sub Class A and B. customer monies in a customer segregated account ending in 5265 during the relevant time period, and intentionally and knowingly transferred millions of dollars in PFG customer money including the Oelwine Class Plaintiffs to U.S. Bank's 1845 account for the sole conversion and/or use of the RICO defendants who allowed Wasendorf, Sn. to personally take the monies including plaintiffs during the relevant time period.

331. Later, Wasendorf, Sn. would distribute the stolen customer segregated proceeds to co-defendants by way of fees which were made to look legitimate but were not at all legitimate and constitute money laundering.

332. For example, after the transfer from the JP Morgan Chase 5265 Segregated Customer Account into the account that Wasendorf used as unsegregated, non-customer account, the 1845 account at U.S. Bank, (although 1845 was a segregated account in reality and should have been treated as such.); Wasendorf Sn. was easily able to pocket customer moneys and skirt the law. Notably 7 U.S.C. §6(d)(b) and 17 C.F.R. § 1.20 were disregarded, there provisions impose a special duty on banks to ensure that customer segregated monies do not get commingled with house money.

333. After the diversion of funds, Wasendorf, Sn., who in turn diverted these funds to his own unauthorized uses such as buying homes, a jet, restaurants and office buildings and living a lavish lifestyle, and funding his numerous other companies and the construction of an office building.

334. U.S. Bank held 30 accounts for Wasendorf and related companies to PFG during the relevant time period including business accounts, (house accounts or proprietary accounts), personal accounts and segregated customer accounts and Wasendorf, Sn. was considered a

-66-

preferred and favored customer.

335. U.S. Bank allowed Wasendorf Sn. to use this 1845 Segregated Customer account as pledged collateral for a personal loan not related to customers.

336. U.S. Bank also stole from the 1845 accounts itself when it debited approximately $30,000.00 in bank processing fees from the 1845 account that were not a result of processing customer related business, but was based on non-customer transactions.

337. U.S. Bank routinely accepted deposits of customers segregated funds into the 1845 account and designated for deposit to a "customer segregated account.

338. However, when transfers were made out of the 1845 customer segregated account, the internal computers at US Bank removed the "customer segregated account" information and just called it a Peregrine Account for outgoing transfers.

339. By removing the words "segregated account," U.S. Bank intentionally tried to hide what it was doing by using the 1845 monies for non-customer purposes and by transferring customer monies to non-customer accounts such as Wasendorf Constructions Accounts, Connie Wasendorf's personal account and/or Wasendorf and Associate's accounts.

340. JPMC also routinely transferred monies from its customer segregated account held for PFG (the 5265 account) where Class members initially deposited their life-savings. These wire transfers were from the 5262 JPMC segregated account to the 1845 U.S. Bank customer segregated account and included:

    a. A $25,000,000.00 transfer on November 1, 2005

    b. An $8,000.000.00 transfer on December 13, 2005

    c. Transfers of $5,000,000.00 and $10,000,000.00. in January and February

       2007.

d. A $5,000,000.00 transfer in January, 2008

e. A $7,000.000.00 transfer in January, 2009

*See* List of Bank Transfers to and from the 1845 Account annexed hereto as Exhibit 7.

341.   These round lot numbers clearly show that these JPMC transfers were not based on customer sub-accounts which had odd numbers, but represented transfers in bulk for non-customer purposes.

342.   JPMC during the relevant time period was also engaging in the same unlawful pattern of Racketeering Activity with respect to its segregated customer accounts held for the now defunct Lehman Brothers, Inc.. With respect to Lehman Brothers, JPMC was also using customer segregated accounts for non-customer uses like collateralizing loans to Lehman Brothers, Inc. JPMC eventually was caught and paid a $20 million dollar fine for improperly using of customer segregated accounts for its own benefit. *See JPMorgan Consent Order, CFTC No. 12-17* (April 4, 2012) annexed hereto as Exhibit 8.

343.   From June 2008 through July 2012,  US Bank allowed withdrawals of $161,971,259.11 from the customer 1845 segregated account for non-customer purposes.

344.   Of this $161,971,259.11 amount, $108,500.000.00 was withdrawn via 20 wire transfers in a coordinated fashion from the Customer Segregated Account at JPMC account number 5265 including Class members' segregated monies.

345.   The Banks knew that each customer had a sub account number and name attached to each sub account, including the words "IRA" for IRA accounts showing that these accounts belonged to members of the public.  Thus, each time a transfer was made out of a customer segregated account over the wires, wire fraud was committed; and the Banks knew that they were transferring actual customer monies that were supposed to be kept segregated for customer's use

-68-

only under 7 U.S.C. § 4(d)(b) and 17 CFR § 1.20.

346. From June 2008 through July 2012, Wasendorf withdrew a net amount of
$35,665,995.40 from the 1845 account for non-customer purposes.

347. Although PFG could co-mingle house money in a customer segregated account to
shore up the account for example, if a Margin Deficiency existed pursuant to 17 C.F.R.1.23, PFG
could only withdraw its house money from the 1845 and 5265 accounts. The evidence shows that
only 6% of the 1845 account derived from house money and 94% of the funds were customer
monies that could not be used or transferred for non-customer purposes.

348. Wasendorf Sn. continually instructed a loyal employee at US Bank, Hope
Timmerman to transfer money out of the 1845 customer account into his other business and
personal accounts and freely made transfers for his own use and the use of his business such as:

   a. On June 13, 2008 Wasendorf telephoned Timmerman and requested that U.S.
Bank transfer $400,000.00 from the 1845 Account into a US Bank account for a Wasendorf
business account called "Wasendorf & Associates." That request was processed and the transfer
was made.

   b. On December 31, 2010, Wasendorf, Sn. requested and US Bank transfer
$2,469,692 from the 1845 Account to Connie Wasendorf's US Bank personal savings account to
fund the settlement of his divorce.

   c. On June 27, 2008 Wasendorf made a counter withdrawal for a cashier's check
made out to one of his vendors related to Wasendorf Construction, Anfinson & Luce Trust in the
amount of $563,956.02.

   d. On December 1, 2008, Wasendorf, Sn. only had a balance of $7,109.83 in the
Wasendorf Construction account at US Bank ending in 0329. To pay an obligation, Wasendorf,

-69-

Sn. just transferred customer monies from the segregated customer account 1845 in the amount of $370,000.00. On the same date, he then wrote a check in the amount of $371,823.96. No other deposits were made to the business account ending 0329 during that time period.

349. US Bank through their employee Hope Timmerman aided and abetted Wasendorf Sn. and formed an association in fact with Wasendorf, Sn. and allowed US Bank not only Wasendorf to gain illegal profits from the 1845 account which they knew Wasendorf would eventually destroy in phony customer futures and options trading.

350. To help cover up this Ponzi Scheme Hope Timmerman would herself on multiple occasions fill out the withdrawal slips and sign the signature line as "known customer." Clearly, this conduct was intended to help cover up the fact that Wasendorf, Sn. was making the withdrawal.

351. This courtesy was returned, when Wasendorf, Sn. took the liberty of signing Hope Timmerman's name on the income verification forms sent to the NFA who audited PFG. The NFA was PFG's DSRO (Designated Self-Regulatory Organization.)

**Unlawful Loans Approved By US Bank Shows Money Laundering**

352. More egregiously, US Bank through its employee Hope Timmerman and other bank personnel wrongfully approved two loans made to Wasendorf, Sn. during the relevant time period. First, Timmerman approved a construction loan made to Wasendorf Construction Company on September 4, 2008 in the amount of $6.4 million dollars to build an office building for Peregrine, as well as another separate loan in the amount of $3 million dollars.

353. However, PFG had office space, and therefore in hindsight the obvious reason for this "construction loan" was to generate illegal loan origination fees and interest for US Bank in consideration of all the unlawful transfers US Bank made for Wasendorf, Sn.

-70-

354. Upon information and belief, these two illicit loans generated $290,000.00 in interest for US Bank to receive under the guise of a legitimate transaction but actually was unlawful.

355. In fact, neither Wasendorf Construction nor Wasendorf, Sn. had the financials to justify extending these loans. In evaluating whether there was sufficient collateral for a loan, Timmerman had access to the Wasendorf's personal tax returns, financial statements, Peregrine's financial statements, Wasendorf Construction's financial statements, CFTC form 1-FRs[3].

356. After reviewing this information, Timmerman reported these numbers in a Standard Credit Display (SCD), and US Bank approved these loans.

357. In September, 2008, at the time when the loans were executed, the Customer Segregated 1845 account had approximately $33 million dollars in it; whereas the Peregrine house account only had less than $250,00.00. Thus, the 1845 account clearly was used to collateralize the Construction Loan and other personal loans in the combined amount of $9,400,000.00. This use of the Customer funds was completely unlawful and in contravention of 7 USC 6(d)(b), since the segregated customer funds could not be used for non-customer purposes like collateralizing a loan to build an office building for PFG.

358. In 2011, the 1845 account again had the most assets, and the 2011 guarantee also used the balances in the 1845 segregated customer account in the SCD which is unlawful. For example, as of August, 2011, there was $5 million to $7.1 million in the 1845 customer segregated account and only $680,000.00 in Peregrine's House Account which is a business account. Therefore a loan of $9,400,000.00 could not have been made without consideration of

---

[3] FCM's such as PFG are required to complete Form 1-Frs on a monthly basis and submit these forms to the CFTC. Form 1-Frs detail the FCM's assets, including the amount of customer funds deposited with the FCM.

-71-

the customer segregated accounts to be used as collateral.

359.  On September 9, 2008, a Guarantee was executed in favor of US Bank in consideration of these loans and allowing US Bank to use the 1845 customer segregated monies as collateral for the loan which would have given US Bank a right to set off the loan upon a default from the customer segregated 1845 account.  These guarantees were executed in 2008 and restated in 2011 and stated as follows;

"Collateral;Setoff. [Peregrine] grants to [US Bank] a security interest in all property in which [Peregrine] has an ownership interest which in now or in the future in possession of [US Bank] to secure payment under this Guarantee. [Peregrine] hereby authorizes [US Bank] to secure payment under this Guarantee . [Peregrine] hereby authorizes [US Bank], without further notice to anyone, to charge any account of [Peregrine] for the amount of any and all obligations due under this Guaranty, and grants [US Bank] a contractual right to set off (without notice or demand) amounts due hereunder against all depository account balances, case and other properly now or hereafter in the possession of [US Bank] and the right to refuse to allow withdrawals from any account. (collectively "Setoff")"

2008 Guaranty (emphasis added.)

360.  In 2011, upon information and belief, the $3,000,000.00 personal loan was unlawfully repaid to US Bank indirectly out of the 1845 Customer Segregated Account, when for example Wasendorf transferred $3,005,150. from the1845 account on February 18, 2010 to the Wasendorf Construction account and then eventually retired the second loan from this transfer from the 1845 account to the Wasendorf Construction Account.

361.  Because US Bank knew that transfers out of customer segregated accounts were making their way into the pockets of US Bank such as in the form of a repayment of a loan, US Bank consciously avoided these facts and therefore they too were acting with Wasendorf, Sn. as a RICO defendant.

362.  Because US Bank knew that the funds had been transferred from the 1845 account to

a house account, it was clear to US Bank that customer monies were being wrongfully used for unlawful purposes such as repayment of a construction loan.

## Role of Wasendorf Sn. and PFG in the Theft of $215 Million Dollars During the Relevant Time Frame.

363.  Wasendorf established PFG in 1990.  During the relevant time period, PFG maintained its offices in Chicago, Illinois and in Cedar Falls, Iowa.  PFG is not named as a defendant because the company has filed for bankruptcy and naming the company would violate the automatic stay. 11 U.S.C. § 362.

364.  From its inception until its bankruptcy, PFG was a registered futures commission merchant or FCM.  As an FCM it could solicit or accept orders to buy or sell futures contracts or options on futures contracts, and could accept money or other assets from customers to support those orders.  FCMs receive money, securities, and other property from their customers to margin, guarantee, or secure the customers' futures and options trades.

365.  The Commodity Exchange Act (CEA) and CFTC regulations require FCMs to maintain segregated and secure accounts for their customers' funds.  17 C.F.R. § 1.20(a).

366.  Customer funds may not be commingled with the firm's operational funds and may not be used to margin or guarantee the trades or contracts, or to secure or extend the credit of any other person or entity. *See id.*; *see also* 7 U.S.C. § 6d(a)(2).

367.  FCMs must file monthly financial reports with the CFTC known as "1-FR" reports.  These reports require FCMs to provide financial statements that show, among other things, the amount of customer funds the FCM has in segregated bank accounts.

368.  The financial statements filed with the 1-FR at the end of the year must be audited.  Since 2001, PFG always used the same accountant to perform its audits—The VerajaSnelling

-73-

Company—a one-person firm run out of the owner's home in Glendale Heights, Illinois.

### a. PFG's Misuse of Customer Funds from 1992 to 2012 and Concealment of The Fraud.

369.   To conceal and continue its misuse of customer funds, Wasendorf established a post office box in Cedar Falls to intercept mail directed to U.S. Bank, including mail sent by the NFA and PFG's auditor.  By forging bank statements and other documents that reported the balance in its U.S. Bank accounts, PFG was able to represent to the NFA and its auditor that it maintained a customer segregated account that eventually contained over two hundred million dollars, when in fact the balance was typically under $10 million.  PFG was able to continue representing itself as operating in compliance with governing regulations to its regulators, its customers, and the general public while it pilfered its customers' money.

**The Regulatory Framework Applicable to the Banks**

370.   Under relevant banking regulations, a bank is required to collect and maintain certain information concerning their customers.  The bank must maintain procedures that allowed it to "form a reasonable belief that it knows the true identity of each customer."  31 C.F.R. § 1020.220(a)(1), (2).   To accomplish this goal, the bank is required to collect information about the holder of each account.  31 C.F.R. § 1020.220(a)(2).  When an account is opened by an entity rather than an individual, the bank must obtain information about the individuals with authority or control over the account.  31 C.F.R. § 1020.220(a)(2)(ii)C.

371.   Pursuant to federal regulations, the bank must develop, administer, and maintain a program that ensures and monitors the bank's compliance with the Bank Secrecy Act (BSA).  12 C.F.R. § 21.21.  The plan must be approved by the board of directors and noted in the board meeting minutes.  The program must include a system of internal controls designed to ensure

-74-

ongoing compliance, independent testing of the bank's compliance, daily coordination and monitoring of compliance by a designated person, and training of appropriate personnel.

372. A bank must also develop a Customer Due Diligence (CDD) program that assists in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, and which provides the bank with a way to identify unusual or suspicious transactions for each customer. The CDD program allows the bank to maintain an awareness of the unique financial details of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

373. The bank must ensure compliance as a condition of employment and in corporate compliance with the BSA and its implementing regulations into job descriptions and performance evaluations for its employees. The bank must also train all operational personnel whose duties may require knowledge of the BSA, including tellers and wire room personnel, on the BSA, including identification of various "red flags" discussed below.

374. The bank must identify a BSA Compliance Officer who is a senior bank official and who is responsible for coordinating and monitoring complete compliance with the BSA. FDIC Rules & Regulations § 326.8. The BSA Compliance Officer is required to designate an individual at each office or branch to monitor the bank's day-to-day compliance with the BSA.

375. Because the Banks provided services to PFG, a high-risk account/customer, the Banks were required to enhance their procedures, including applying a risk rating to PFG. To determine PFG's risk rating, the Banks were required to obtain customer information to develop a "customer transaction profile" that incorporated an understanding of normal and expected activity for PFG's business operations.

376. Since March 2002, the CFTC has posted on its website a monthly report providing

-75-

information about each registered FCM, including: (I) the FCM's adjusted net capital; (ii) the FCM's net capital requirement; (iii) the FCM's excess net capital; (iv) the amount of customer funds required to be segregated; and (v) the amount of funds required to be held in a foreign futures and foreign options secured account.

377. The Banks knew that FCMs are highly regulated by the CFTC and NFA, and that they are required to maintain customer funds in segregated and secured accounts are separated from the firm's funds. *See* 17 C.F.R. § 1.20(a). The customer funds are required to be segregated, held for the exclusive benefit of the customer, and otherwise protected from misappropriation or unauthorized use. *See id.*; *see also* 7 U.S.C. § 6d(a)(2). These requirements ensure that customer funds are protected if an FCM attempts to divert or otherwise mishandle customer funds, or declares bankruptcy. Both events have occurred in this case.

378. The Banks knew that when customer funds are deposited in a bank, they are to be deposited under an account name that clearly shows they are customer funds, segregated as required by the CEA. *See* 17 C.F.R. § 1.20. The Banks knew that any account held out as or named a customer segregated account would reasonably lead others to conclude the account maintained customer funds that were being segregated and protected consistent with the CEA rules and regulations. The Banks also knew that customer funds maintained in a segregated account could not lawfully be transferred to a personal account of the Wasendorfs or a "house" account maintained by PFG.

379. The Banks knew that PFG was a fiduciary to its customers with respect to the money they entrusted to PFG.

**Additional Facts Pled with Particularity Regarding U.S. Bank Leading to the Loss of Customer Funds by PFG and its Affiliates**

### a. **PFG's Two Primary U.S. Bank Accounts including the 1845 Customer Segregated Account**

380. PFG opened two of its accounts with Firstar, U.S. Bank's predecessor, between 1992 and 1994. The first of these accounts was established as a customer segregated funds account. It had an account number ending with the digits 1845 and is referred to as the "1845 Account." The second account was designated by both PFG and Firstar as PFG's "house" account. Firstar documents expressly labeled the account as PFG's house account, as reflected by an April 2002 letter addressed to PFG's "house account." A house account, sometimes referred to as a "proprietary account," is an account maintained by an FCM for itself and for its own funds and those of its affiliates. An FCM typically designates an account as a "house" account, because it has other accounts at the same banking institution that hold customer segregated funds, which cannot be intermingled with the house account funds.

381. The 1845 Account was designated by both PFG and Firstar as a customer segregated funds account. The designation appeared on official Firstar documents, including a letter sent by Firstar to PFG acknowledging that the account held customer segregated funds.

382. Firstar, the predecessor in interest to US Bank, provided Peregrine with an acknowledgment letter signed by then Vice-President of Firstar Clifford Mortenson who stated:

> "You have opened [the 1845 Account], as well as a safekeeping account, with both designated "Peregrine Financial Group Inc. Custom Segregated Account." You have advised us that the funds deposited in the [1845 Account] constitute monies belonging or accruing to your futures and options customers which you are required to segregate from your own funds under the Commodity Exchange Act... You have further advised that the securities and other property deposited in the safekeeping account above described constitute investments of funds of your futures and options customers and securities deposited with you by those futures and options customers to margin, guarantee or secure the trades or contracts of you futures and options customers that all

-77-

> such securities and other property are to be segregated and kept
> apart from your own securities and property.

> We hereby acknowledge your notice that monies, securities and other
> property deposited in the accounts above described are those of you
> futures and options customers and are being held in accordance with the
> provisions of the Commodity Exchange Act... We further acknowledge
> that the monies securities and property contained in such accounts shall no
> be subject to any right of offset or lien in our favor for or on account of
> any indebtedness, obligations or liability owing by you to us."

*See CFTC v. US Bank, N.A.*, 13-cv-2041, Summary Judgment Order Doc. #112, pp. 7-8
(11/19/14 N.D. Iowa)

383. In December 1994, PFG entered into a "Master Repurchase Agreement (Public

Securities Association Prototype)" with Firstar. The agreement governed the investment of the

customer segregated funds held in the 1845 Account and expressly recognized that the 1845

Account was a customer segregated account. Firstar engaged in repurchase transactions with

PFG using the customer segregated funds in the 1845 Account for years after the execution of

the 1994 agreement. Sometime around April 2002, PFG's accounts with Firstar began to be

referred to as U.S. Bank accounts. The 1845 Account maintained the same account number

through and following the transition.

384. PFG's records contain a July 5, 2001, letter from U.S. Bank to PFG stating that the

1845 Account was titled "Peregrine Financial Group, Inc., Customer Segregated Account." The

letter is signed "Hope Timmerman."

385. While the 1845 Account was a Firstar account, and continuing into 2004 after the

account became a U.S. Bank account, PFG wrote checks out of the 1845 Account using checks

that identified the 1845 Account as a customer segregated account. Firstar and U.S. Bank

received copies of these checks identifying the 1845 Account as a customer segregated account

once they were deposited or cashed by the payees.

386. PFG also wrote checks drawn on the house account that identified the account as PFG's house account, and Firstar and U.S. Bank received copies of the checks once they were deposited or cashed by the payees.

**b. Particular facts of U.S. Bank's relationship with Wasendorf and his Affiliates.**

387. U.S. Bank maintained several additional accounts for entities and individuals affiliated with Wasendorf and PFG, including personal accounts of Wasendorf and his family members and accounts for his other companies.

388. U.S. Bank also maintained accounts for Wasendorf & Associates, a publishing business, Wasendorf's restaurant, My Verona, and Wasendorf Air, the company created by Wasendorf, Sn.

389. U.S. Bank knew PFG was holding out the 1845 Account as its Segregated Customer Account.

390. U.S. Bank knew that most or all of the funds in the 1845 Account were customer deposits that came from one of two sources: (I) deposits of checks at the Cedar Falls branch, or (ii) wire transfers from a PFG JPMorgan customer segregated account ending in 5265 into the 1845 Account.

391. PFG deposited checks on a daily or near daily basis into the 1845 Account. The amounts typically ranged from $500 to more than $25,000. The checks were drawn on accounts that belonged to many different individuals and entities across the country, and were clearly identifiable as customer funds directed to an FCM.

392. PFG told its customers to make their checks payable to "Peregrine Financial Group, Inc.," or "PFGBEST Cust. Seg. Acct." A significant number of the checks PFG deposited in the 1845 Account were drawn to the "PFGBEST Cust. Seg. Acct." designation, and many others had

-79-

memo notations or other written statements stating they were customer funds.

393. Upon information and belief, Millenium Trust on behalf of the Schefferts, Plaintiffs, and other Class members, made out the checks or wires that were sent to JPMORGAN for the "PFGBEST Cust. Seg. Acct."

394. PFG stamped the checks deposited into the 1845 Account with "PAY TO THE ORDER OF US BANK FOR DEPOSIT ONLY PEREGRINE FINANCIAL GROUP, INC., CUSTOMER SEGREGATED ACCOUNT 621011845," or words to that effect.

395. An example of the Deposit Slips for the 1845 Account appears below as follows:



396. When PFG deposited the checks into the 1845 Account, PFG also submitted U.S.Bank deposit slips that stated "Customer Segregated Account" or some variation thereof. PFG bundled the checks and deposited them in person at either the walk-up or drive-up counter at the Cedar Falls branch. An Example of the deposit slip used by PFG for the 1845 Account appears below:

-80-



**US Bank knew That PFG Was Not Treating the 1845
Account as a Customer Segregated Account, but like a personal and business account**

397.  PFG's deposits to the 1845 Account were customer funds subject to the segregated and/or secured account requirements, but PFG's frequent and substantial withdrawals were inconsistent with the types of transactions typical for a customer segregated account.

398.  During the above time period, PFG made hundreds of withdrawals from the 1845 Account, most ranging from tens of thousands of dollars up to several millions of dollars followed up with a similarly sized withdrawal shortly thereafter. *See* List of Withdrawals from the 1845 Accountannexed hereto as Exhibit 8.

399.  PFG also made frequent electronic fund transfers and telephone transfers from the 1845 Account.

**JPMorgan's  Unlawful Transfers from the 5265 Account to the U.S. Bank 1845 Account.**

400. U.S. Bank received wire transfers from JPMorgan customer segregated accounts including 5265 into the 1845 Account.  These transfers showed that the money being transferred

-81-

into the 1845 account consisted of customer segregated funds.  U.S. Bank statements described the source of the transfers as

"JPMCHASE*PFG CUST SEG ACCT" and "BANKONENA*CHI IL *PFGCUSTSEG."

401.    U.S. Bank nevertheless allowed Wasendorf Sn. unfettered access to the money transferred by JPMorgan, despite the fact that the wires received from JPMorgan made it clear the money was being transferred from a customer segregated account.

402.  PFG consistently withdrew substantial sums from the 1845 Account in single transactions during the relevant time period.  U.S. Bank knows that FCMs rarely, if ever, make withdrawals and transfers of this type that were frequently made from their customer segregated accounts.

403.  Rather, the CFTC regulations only allow FCMs to deposit their own funds into their customer segregated accounts, since any excess funds will further protect customers in a volatile market.  Thus, The FCM's excess funds are the **only** funds the FCM is permitted to withdraw for its own use.  17 C.F.R. § 1.23.

404.  U.S. Bank had no basis for believing that the transfers into and out of the 1845 Account involved PFG excess funds and there was no inquiry, documentation or other evidence to support the conclusion that withdrawals were legal.  Rather, the obvious conclusion was that these withdrawals constituted unlawful conversions which the Bank defendants herein had a special duty and a fiduciary duty to discover and stop.

405.  Since a number of sizeable transfers from the 1845 Account were made to Wasendorf Construction, to which U.S. Bank had recently extended a mortgage loan exceeding $6 million, in September, 2008  during the relevant time when Sub Class Members' A and B

-82-

transfered funds to PFG through JPMORGAN and U.S. BANK, by allowing these transfers, U.S. Bank facilitated the prospects for repayment of its loan to Wasendorf Construction, thus directly benefiting from the transfers. Thus, a reasonable inference of intent and motive can be inferred from this distasteful transfers from JPMorgan to U.S. Bank to Wasendorf Construction and then back to US Bank to repay the $3,000,000.00 off in 2011.

406. The Federal Financial Institutions Examination Counsel (FFIEC) has identified "red flags" that should cause a bank or its employees to inquire further, and potentially file a suspicious activity report. PFG's 1845 Account triggered at least the following "red flags" during the relevant time period:

      a. Inconsistent deposit and withdrawal activity;

      b. Frequent deposits or withdrawals with no apparent business source;

      c. Transactions that are not consistent with the customer's business;

      d. Intrabank transfers between accounts owned or controlled by common individuals;

      e. Large balances in non-interest bearing accounts;

      f. Appearance of using account as a temporary repository for funds;

      g. Deposits and immediate requests for wire transfers or cash shipments; and

      h. Large deposits and balances.

407. The FFIEC also recommends that banks perform enhanced due diligence of certain accounts and customers that present a greater potential for violations of the BSA, including FCMs like PFG. U.S. Bank allowed money to be transferred out of the 1845 Account and into Wasendorf's accounts despite these red flags.

-83-

**U.S. Bank Did Not Act Despite Red Flags, and It Did Not Get Balance Confirmation Requests**.

408.  U.S. Bank knows that the CFTC and the NFA require FCMs to maintain a minimum amount of "adjusted net capital." Adjusted net capital is a critical measure for FCMs. If an FCM's adjusted net capital falls below proscribed limits, the FCM must "transfer all customer accounts and immediately cease doing business as a futures commission merchant" until it can reestablish the minimum threshold. *See* 17 C.F.R. § 1.17(a)(4).

409.  To track net capital, the CFTC and the NFA require FCMs to submit monthly unaudited financial statements and annual audited financial statements. *See* 17 C.F.R. § 1.10. FCMs file 1-FR forms on a monthly and yearly basis. The forms state the FCM's net capital requirement and actual net capital. U.S. Bank also knows that the NFA sends balance confirmation requests to banks that hold a material portion of an FCM's net capital to monitor the FCM's compliance.

410.  The NFA also sends balance confirmation requests if there are suspicious circumstances, suspected fraud, or past improper behavior by the FCM.

411.  FCMs' auditors also routinely send balance confirmation requests to banks as part of the certified auditing process. U.S. Bank is familiar with the auditing process performed according to AICPA or PCAOB standards, including the need for balance confirmations as part of that process.

412.  U.S. Bank personnel are trained and tasked to intake, evaluate, and respond to balance confirmation requests from the NFA and from FCMs' auditors.

413.  Because documents relating to U.S. Bank and PFG's accounts were diverted to the post office box Wasendorf set up, U.S. Bank did not did not routinely receive balance confirmation requests for PFG's accounts from the NFA or PFG's auditor.

414.  However, because U.S. Bank should have been expecting these requests for balance confirmations from the NFA, U.S. Bank should not be excused from failing to follow up

-84-

to make sure the NFA had the correct addresses. Thus,  U.S. Bank should be charged with knowing that it must fill out these essential documents on a timely basis. Thus, when it did not receive such requests on a timely basis, U.S. BANK's compliance team should have called the NFA to receive these mandatory documents. Thus, a reasonable inference of intentional conduct can be inferred based on Fraud by Omission and Conscious Avoidance of U.S. Bank.

415. U.S. Bank has provided banking services to other FCMs in addition to PFG. It is familiar with the operating restrictions imposed on FCMs by the governing rules and regulations under the CEA and other relevant legislation.

416. In fact, upon information and belief, during the relevant time frame,  US Bank acted as the depository Bank for at least 7 other Future Commission Merchants that held customer segregated accounts. Therefore, US Bank should have wondered why it never received any income verification notices from the NFA with respect to PFG when it was receiving other requests to fulfill its compliance requirements with respect to the other FCMs who were its customers.

417. Finally, in May 2011, however, U.S. Bank received a balance confirmation request from the NFA for the 1845 Account. This balance confirmation form was emailed by PFG's chief compliance officer to Hope Timmerman at U.S. Bank's Cedar Falls branch. The email said:

Dear Hope, Our Regulator the National Futures Association is currently conducting their annual audit of PFGBEST. Attached is the confirmation that needs to be completed. If you would be so kind to get these processed and emailed back to me and Lauren Boehm I would appreciate it. Lauren Boehm from the NFA will also be sending them via US Mail. NFA would appreciate an original hardcopy mailed back to them also. Thank you and have a nice week.

418. The balance confirmation form bore the falsified post office box address established

-85-

by Wasendorf, rather than U.S. Bank's actual address, and identified the 1845 Account as

"Peregrine Financial Group, Inc. Customer Segregated Account."

419. U.S. Bank filled out the form in May, 2011, stating that the Segregated Account balance was $7,181,336.36, and did not change the address or the name of the account, and forwarded the form to both PFG and the NFA.

420. Since the blank copy of the balance confirmation form that was mailed to U.S. Bank, and referenced in the email to Hope Timmerman, was sent to the post office box address established by Wasendorf, U.S. Bank never received it by regular mail but did receive it by email.

421. When Wasendorf Sn. learned that the form had been emailed to U.S. Bank he forged a new form that showed a balance of $220 million to be faxed to the NFA to replace the one U.S. Bank had completed.

422. In the months that followed, U.S. Bank received no further balance confirmation requests from PFG, the NFA, or PFG's auditor. U.S. Bank did not follow up to determine why it had not received the confirmation form or why no further forms were ever sent to it.

423. More disturbingly, US Bank never notified the NFA of its correct mailing address although it knew that the P.O. Box stated on the falsified form did not belong to US Bank. Did not U.S.

424. U.S.Bank should have followed up, realizing the wrong and invented address was on the balance confirmation form; and had US Bank been acting in good faith and fulfilling its fiduciary duty, it would have immediately made sure that the incorrect post office box was removed from the form, and called the NFA to discuss why the wrong address was on the form.

425. Rather, U.S. Bank conveniently left the incorrect P.O.Box address on the form that it

-86-

returned to the NFA hoping to prolong this Fraud for enough time to at least get the rest of the Construction Loan repaid by Wasendorf, Sn.

426. Thus, from May 11, 2011 to July 9, 2012, US Bank allowed this massive fraud to continue when the evidence was right before it and hiding in plain sight.

## U.S. Bank Knew That PFG Was Not Earning Revenue From the 1845 Account and Was Not Profitable.

427. U.S. Bank knows that FCMs ordinarily depend on revenue from customer segregated accounts through interest earnings or repurchase agreements. While PFG executed at least one repurchase agreement with Firstar, in the years leading up to PFG's bankruptcy in 2012, PFG was not earning interest on the 1845 Account and was not engaging in repurchase agreements with the 1845 Account funds.

428. U.S. Bank knew from PFG's 1-FR forms that PFG was maintaining a material portion of its reported net capital—typically well in excess of 10% of its total reported net capital—in the 1845 Account.

429. U.S. Bank also knew that PFG was not profitable from its inception through at least 2005 and that, during the few years that PFG accrued profits, those profits were only about $1-2 million annually.

430. Wasendorf represented to U.S. Bank that PFG was able to stay in operation despite many years of losses, because he was supporting PFG with money he had earned through his successful investments in Romanian real estate.

## PFG's Record of Regulatory Violations

-87-

431. PFG's history of regulatory violations was available from the NFA's publicly available database of its members' disciplinary history. Some of these violations related to PFG's segregation of customer funds and reporting of net capital.

432. In December 1996, the NFA's Business Conduct Committee ("BCC") issued a disciplinary complaint against PFG and a number of its associated persons alleging that they made misleading sales solicitations. The complaint also charged PFG with using misleading promotional material and failing to maintain copies of promotional material. In addition, the complaint alleged that PFG failed to correctly perform segregated funds computations, maintain adequate segregated funds, and report to NFA that the firm was under segregated. The complaint also charged PFG with supervisory failures. PFG settled, agreeing to pay a $75,000 fine, tape record all of its associated persons' conversations for two years, create the position of Director of Compliance, and submit all promotional material to NFA prior to first use.

433. In connection with the 1996 NFA disciplinary complaint, the NFA reportedly cited radio commercials in which PFG brokers claimed that the firm could turn a $10,000 investment into $80,000 in a matter of months.

434. In 2000, PFG agreed to pay a $90,000 fine to settle a CFTC administrative proceeding alleging that PFG failed to notify the CFTC that its adjusted net capital was below the minimum required and the CFTC's "early warning threshold." The CFTC also alleged that PFG failed to keep accurate books and records and filed an inaccurate capital computation with the CFTC.

435. In June 2004, the NFA's Business Conduct Committee issued a disciplinary complaint alleging that PFG failed to audit Dominick Concilio, a conditionally registered sole

proprietor introducing broker guaranteed by PFG. PFG agreed to pay a \$5,000 fine and adopt new procedures to ensure compliance with the NFA's order.

436. In February 2012, the court-appointed receiver for a Ponzi scheme run by Trevor Cook sued PFG. The receiver alleged that PFG routinely ignored red flags about the operation of the Ponzi scheme and permitted the fraudster to open, manage and maintain trading accounts at PFG. Before his scheme was uncovered in 2009, over \$190 million was stolen from investors, including about \$30 million through accounts held at PFG. The discovery of the scheme was widely publicized. CNN, the Minnesota Star Tribune, and The New York Times all ran stories. PFG's involvement was a matter of public record and discussion as well.

437. In February 2012, the NFA's Business Conduct Committee ("BCC" hereinafter.) issued a disciplinary complaint against PFG, its president, Wasendorf Jr., and its chief compliance officer, Susan O'Meara that resulted in a fine of \$700,000.00. The BCC alleged that PFG failed to supervise four of its guaranteed introducing brokers, or GIBs, who engaged in deceptive sales practices and made trade recommendations that maximized commissions without regard for the best interests of their customers. To settle the matter, PFG agreed to pay a \$700,000 fine and refrain from any new guarantee agreements with introducing brokers for two years. PFG also agreed to hire an independent consultant to review its procedures for supervising its GIBs and retail customer accounts, and to designate an individual to act as its full-time anti-money laundering officer. The NFA publicly reported PFG's \$700,000 fine and PFG included the fine on its financial statements, including statements it provided to U.S. Bank.

438. Despite its knowledge of PFG's conduct and financial position and the numerous red flags known to it, U.S. Bank took no action to prevent PFG's theft of customer money. U.S. Bank allowed PFG to deposit hundreds of checks into the 1845 Account, processed hundreds of

-89-

transfers into and out of the 1845 Account, and never declined to authorize a withdrawal from the 1845 Account and never declined to accept the deposit of funds it knew to be customer deposits into the account. *See* List of transfers to the 1845 Account annexed hereto as Exh. 7.

439. At the time PFG declared bankruptcy, U.S. Bank had over 30,000 pages of records related to accounts held by PFG, Wasendorf, and the other entities owned or controlled by Wasendorf.

## Intentional Conduct of JPMorgan Chase, NA (JPMC) Leading to The Loss of Customer Funds

440. JPMorgan Chase N.A. ("JPMC" or "JP Morgan") operated under the same legal framework and had access to the same publicly available information concerning PFG as U.S. Bank.

441. From at least 2007 through the date of PFG's collapse in July, 2012, PFG deposited or instructed its customers, including plaintiffs and class members herein, to deposit customer funds into an account at JPMorgan ending in 5265 by wire transfer or by mailing a check to PFG's office. (During the same time period, however, checks from PFG customers that were sent to PFG's Iowa headquarters were typically deposited into the U.S. Bank account). Customer money sent to JPMorgan was deposited into one of four customer segregated accounts, including money sent to JPMorgan by plaintiffs herein.

442. Between June, 2008 and July, 2012, $94,000,000.00 was wire transferred in 12 separate traunches from JPMorgan's Customer Segregated Accounts into the U.S.Bank 1845 Account.

443. JPMorgan had an extensive banking relationship with PFG. JPMorgan held over 30 other accounts for PFG, including several foreign exchange accounts, accounts for precious metals trading, and "house" accounts. JPMorgan knew that PFG was an FCM.

444. Because JPMorgan provided banking services to PFG and other FCMs, JPMorgan knew that FCMs are highly regulated by the CFTC and NFA, and that they are required to maintain customer funds for the exclusive benefit of their customers in segregated and secured accounts that are separate from the firm's funds. *See* 17 C.F.R. § 1.20(a); *see also* 7 U.S.C. § 6d(a)(2).

445. JPMorgan was required to provide NFA regulators with confirmations of the balances of PFG's customer segregated accounts and to otherwise ensure that PFG's customer funds were properly segregated. In addition, JPMorgan (like U.S. Bank) is required to maintain procedures that allow it to know the true identity of each of its customers, ensure compliance with the BSA and other banking laws and regulations, and monitor accounts that show signs of suspicious activity.

446. JPMorgan expressly undertook to comply with the requirements of the CEA and CFTC regulations applicable to customer segregated fund accounts. JPMorgan was required to provide PFG at the time the accounts were opened with written acknowledgment that the bank had been informed that the four accounts contained funds belonging to commodity or options customers and had to be treated in accordance with the CEA and CFTC regulations. *See* 17 C.F.R §§ 1.20, 1.49. By its own acknowledgement, JPMorgan had a contractual obligation to hold customer money according to the CEA and CFTC regulations, and knew that the money could be lawfully used for the benefit of PFG's customers only.

447. JPMorgan breached its obligations to customers of PFG by transferring customer funds to the U.S. Bank 1845 Account. JPMorgan failed to contact U.S. Bank to verify that the 1845 Account was in fact a customer segregated account. Despite outward appearances, and its own practice of allowing PFG to treat the 1845 Account as a customer segregated funds account,

-91-

U.S. Bank did not consider the 1845 Account to be a customer segregated account, and instead

U.S. Bank believed Wasendorf was free to treat the money in the 1845 account as his personal

property, and disclaimed any obligation associated with a customer segregated account.

448. In fact, Hope Timmerman of U.S.Bank testified as follows concerning the 1845 account:

> "Q: Peregrine Financial Group, Inc. and that's the account ending in 1845. Do you
>   know the purpose of that account?
>
> A: No.
>
> Q: And the source of the funds that went into that account?
>
> A: No.
>
> Q: And that was a business checking account?
>
> A: Business commercial checking account.

*See CFTC v. US Bank, N.A.*, 13-cv-2041, Summary Judgment Order Doc. #112, p.11 (11/19/14 N.D. Iowa)

449. Another U.S. Bank Employee Douglas Boe, the Senior Vice President of Commericial

Lending and Relatinship Manager for the Peregrine/Wasendorf Relationship in Cedar Rapids testified

as follows:

> "Q: Are you familiar with customer segregated accounts?
>
> A: I have no idea what that means. Until--Until all this stuff went down. I had no
>    idea what that meant.
>
> Q: What's your persent understnading of what a customer segregated account is?
>
> A: I truly do not knowwhat it means to have a segregated account. I did not believe I
>    had one, so I'm not aware of the policies, procedures, and rules that would govern
>    such an account.
>
> Q: What about the definition? I mean what's your understanding as to--Do you have
>    any understanding as to what customer segregated account means?
>
> A: No
>
> Q: Do you kow if you've ever had a client that had a customer segregated account?
>
> A: No."

*See CFTC v. US Bank, N.A.*, 13-cv-2041, Summary Judgment Order Doc. #112, pp. 7-8 (11/19/14 N.D. Iowa.

450. Thus, JPMorgan without investgating the fact that US Bank was not treating the 1845 account as a customer segregated account unlawfully transferred customer money from its segregated accounts including the JPMC 5265 accounts in an amount of no less than $94,000,000.00 during the relevant time period into the US Bank 1845 account, where plaintiffs and class members had deposited their funds.

451. JPMorgan aided and abetted Wasendorf's criminal conversion of funds where Wassendorf, Sn. easily diverted millions in PFG customer funds to his own benefit.

452. Thus, as a direct and proximate result of Wassendorf Sn.'s conspiracy with U.S. Bank and JP Morgan, customer funds literally went missing and ended up in the coffers of Wasendorf and many others.

**Role of the CME and CME Group.**

453. Because PFG developed a close relationship with personnel at CME over their 20 year interaction, the CME aided and abetterd Wasendorf, Sn. by creating the Omnibus Sub Account rules wrongfully allowing PFG to trade over the CME during the relevant time frame or at least allowing PFG to hold itself out to the members of the public as an FCM with the ability to clear trades, although many if not most trades in this Ponzi Scheme were actually fictitious upon informataion and belief.

454. In fact, during the relevant time period, Wasendorf Sn. personally forged close connections with at least one executive at the CME namely one Jack Sanders a former Chairman of the Chicago Mercantile Exchange.

455. Upon information and belief, after Jack Sanders, left his chairman position at the

-93-

CME, his Clearing firm helped Wasendorf, Sn. and PFG clear trades over the CME during the relevant time period.

456. Both Sanders and Wasendorf, Sn. served as Board Members of the NFA and had a working relationship.

457. In addition, during the relevant time period, Russell Wasendorf, Jr. worked at the CME prior to joining PFG.

458. Although the CME defendants had actual knowlegde by 1996 that PFG was undercapitalized and carrying undersegregated accounts, based on public regulatory actions taken against PFG and the fines imposed on PFG by the CFTC and NFA for such misconduct, the CME defendants devised a unique method for PFG, their esteemed collegue to continue in business and carry customer accounts as an FCM and settle customer trades.

459. The CME is a quasi-government regulator who has been given rule-making authority by Congress to help enforce the laws and rules of the United States enumerated in 7 U.S.C.§ 1, Et Al. Seq. and 17 C.F.R. §1, Et. Seq.

460. 7 U.S.C. §7 sets forth the obligations of the CME which has been designated as a Contract Market and Board of Trade to help regulate commondities trading activities.

461. For example, 7 U.S.C. §7(d)(10) imposes the duty on the CME as a board of trade to provide rules and procedures to monitor trading and keep records:

> **"(10) Trade Information:** The board of trade shall maintain rules and procedures to provide for the recording of safe storage of all identifying trade information in manner that enables the contract market to use the information:
>
> (A) to assist in the prevention of customer and market abuses; and
>
> (B) to provide evidence of any violations of the rules of the

-94-

contract market"

462. 7 U.S.C. §7(d)(11) also provides:

"(11) **Financial Integrity of Transactions**  The Board of Trade  shall establish and enforce:

(A)  rules and protections for ensuring the financial integrity of transactions entered into on or through the facilities of the contract market including the clearance and settlement of  transactions  with a derivatives clearing organization); and"

(B)  rules to ensure--

(i)  the financial integrity of any

(I)  futures commission merchant

(II)  Introducing Broker; and

(III)  The protection of customer funds.

463.  Despite this clear mandate from Congress to the CME to establish rules to ensure the stability of these Designated Contract Markets/Boards of Trade in this case concerning the futures and options trading industry, the CME intentionally disregarded this mandate and instead set up rules,  Ombinbus Sub-Account rules,  to allow PFG an undersegregated and undercapitalize FCM and Wasendorf, Sn. to embark and continue on a path of immoral and unlawful conduct for a long period of time; while the CME was reaping large fees in exchange under the guise of normal businss conduct.

464.  At first glance, the CME  rules contained in the CME rulebook appear to ensure the financial safeguards required by Congress to avoid the terrible unlawful conduct at issue herein.

465.  The CME Clearing Fianncial Safeguards publication sets forth safeguards allowing the CME to monitor all trades on a daily and intraday basis to detect unlawful conduct such as disruptive trading practices that are defined in CME Rule 575 and/or spoofing, wash sales,

-95-

fictitious sales, market manipulation or other unlawful conduct. The Financial Safeguard System

Handbooks states on page 13:

> "Intra-Day monitoring
>
> CME Clearing monitors intra-day price movement and trading activity throughout the trading session. To assess the impact of these price changes on clearing members intra-day mark to market calculations are performed on clearing members and customer positions and reviewed by CME clearing throughout the day and overnight."

466. In addition, the Financial Safeguard Handbook also sets forth the fact that pursuant to

7 U.S.C.§7, Et. Seq. the CME also engages in Financial Surveillance at page 12 of the Handbook it

states in relevant part:

> "Recognizing the need to monitor the financial condition of clearing members, CME clearing's Audit Department in conjunction with other self-regulartory organizations operates sophisticated financial surveillance program. The program has several important aspects, as outlined below:, , , Reporting...Inspection...Information Sharing."

*See CME Clearing Financial Safeguards*, p.12.

467. The CME describes a Clearing Member as follows:

> "Clearing members are highly capitalized, closely monitored, and carefully selected companies that stand behind all trades made thorugh the CME Group Exchanges. Clearing members assume full financial and performance responsibility for all transactions executed through them and cleared by CME clearing, whether it is for the account of a customer, a member or their own account."

*see*, www.cmegroup.com/company/membership/clearing.html.

468. Although, PFG was trading over the CME Exchange as a non-clearing member upon

information and belief, it had to be affiliated with a Clearing Member who was supposed to

monitor PFG's tradng activities.

-96-

469. With respect to PFG's ability to trade over the Globex, again a Clearng Member had to supervise all PFG Globex Activity as well during the relevant time period.

470. However, in this case CME Group without any Clearing House Memberas a co-signatory entered into a Globex Co-Location Agreement with PFG, giving PFG the privilege to use the Globex and there appears to be no requriement for any Clearing House Member to supervise such activities.

471. However, despite these well-publized safeguards, in this RICO Scheme, the CME completely disregarded its obligations and mandate as a Contract Market and Board of Trade under 7 U.S.C. § 7 to maintain a fair and stable Contract Markets and failed to stop PFG's disruptive trade practices such as fictious trading as it is requried to do under CME rule 575; and instead passed a set of other rules known as Omnibus rules which allowed PFG to skirt the regular rules including CME Rules 930 D.E.and K and 575 and then to completely defraud investors over this 20 year period by trading under an Omnibus SubAccount.

472. Therefore, as a matter of fact, the CME was not monitoring PFG's trading activities during the relevant time frame and allowed PFG to continue to trade undermargin accounts in direct violation of CME 930 which was not applied to PFG under the Omnibus rules.

473. In fact, although PFG held itself out as a Clearing firm in its Introducing Broker Agreements and in public statements, in fact, PFG was not a Clearing member at all upon information and belief.

474. However, even with respect to non-clearing members such as PFG, CME as a designated Contract Market had rules in place to also monitor non-clearing members such as PFG during the relevant time period to ensure that anyone trading over the CME was not cheating and defrauding members of the public in any way. For example, the CME and CME Group had in

-97-

place a Business Conduct Committee that can take Emergency Actions to immediately shut down

trading under a variety of circumstances present in this case, when plaintiffs' life saving were

being depleted and where PFG was at all times undersegrated and therefore did not have the funds

to even sustain margin requirements in the first place. Under these circumstances, had CME and

CME Group been fulling its oblgations to monitor the entire market, it would have certainly

enforced its Emergency Rules to shut down PFG's condcut during the relevant time frame.

475.  CME Rule 402.C, Sections 4, 5,and 7 were also violated in this case and these

provisions certainly applied to Plaintiffs' case.  The CME through the Business Conduct

Committee could have and should have taken Emergency action to stop the ongoing violations

occuring in Plaintiffs' account and which applied to Clearing members, members and non-

members alike.

476.  CME Rule 402.C.5 applied to this case and states:

> "The BCC is authorized to determine whether an emergency exists and whether
> emergency action is warranted.  The followign events and/or conditions may
> constitute emergencies.
>   5.  Any circumstances in which it appears thta at Member or any otehr person or
>       entity has failed to perform contracts or is in such financial or oeprational
>       condition or is conducting business in such a manner that such person or
>       entity cannot be permitted to continue in business without jeoparpardizing the
>       safety of customer funds, Members or the Exchange."

477.  CME and CME Group personnel were also authorized to expell or stop members or

non-members who committed offenses listed in CME Rule 432 including Section (B)(1) to engage

in fraud or bad faith condcut;(B)(2) to engage in conduct or proceedings inconsistent with just and

equitable pricniplas of trade; (C) to engage in dishjonest conduct, and/or(D)  to create or report a

false or fictious trade.

478.  Becasue CME failed to expell PFG as a customer despite PFG clear violations of

432(B)(1)(2)(C) and (D) by Wasendorf Sn., who used the CME to conduct its business and destroy

customer accounts for over a 20 year period, CME did not comply with its mandates under 7 U.S.C. §7 and is liable to plaintiffs herein pursuant to 7 U.S.C.§25(b)(1)(A).

479. Clearly, based on the facts that PFG was utterly undersegregated during the relevant time period, it did not have margin requirements to sustain trades, therefore one of three unlawful acts was necessary to allow PFG to continue to trade either: (1) the trades were fictious and were tracked and recorded in real time using the information from the Globex, (2) Agents and/or Employees at the CME allowed PFG to place trades without sufficient margin in place, (3) other entitites such as PFG's Clearing Member spotted cash to act as collateral or margin to place trades, having counterparties prearrange transactions. In each scenario, the conduct described is entirely violative of the CME rules requriing Emergency Action to stop the conduct and preserve plaintiffs' life-saving. Thus had the CME and/or CME Group been doing its proper market surveillence, PFG's nefarious conduct would have easily been discovered requiring immediate emergency action to shut Wasendorf and PFg down immeidatley.

480. Had CME and CME Group enforced its own Emergency Rules and other rules for Market Regulation as recited supra, Plaitniffs would not have lost their entire life savings beasue PFG would not have been allowed to trade.

**Undersegregation of PFG During the Relevant Time period.**

481. Because clearing house members must maintain at least $5,000.000.00 in capital for clearing trades, it is obvious that PFG which was always undersegregated and undercapitalized did not have the financial integrity nor high capitalization to fulfill the CME requirements. *See* CME Rule 970.

482. The fact that PFG publically filed FR-1s in September, 2004, for example, that are scrutinized by the CME and CME Group stating that it had $111,173,782.00 in customer

-99-

segregated funds and excess net capital of $7,872,278.00, should have raised a strong red flag to the CME and CME Group that there was Fraud occuring in violation of CME Rule 432(B)(1) because based on these numbers, PFG certainly would have and should have applied for Clearning membership as of 2004.

483. PFG's decision not to apply for Clearing Membership should have raised suspicion because by preferring to trade through another Clearing firm required more payments of clearing fees, since the clearing firms charge fees for their clearing services.

484. However, when PFG filed for bankruptcy in 2012 Schedule F was filed that shows all unsecured and non-priorty claims such as Clearing fees. However, PFG's Schedule F does not appear to have any Clearing Firm listed who would be clearing trades for PFG as an Omnibus Clearing Firm or Carrying Firm. Thus, it appears based on a review of Schedule F, there was in fact no Clearing firm actually trading and clearing options trades on behalf of PFG's customer trading accounts. This fact perfectly coincides with the allegations herein that the trades had to be fictitious, and therefore were not even being cleared over any Exchanges by an CME Clearning firm at all. [4]

485. However, the sound rules described above where the CME is acting as a regulator to provide a fair and stable contract market fell by the wayside when these Omnibus Trading Sub-Accounts were authorized and implemented by itself and CME Group its owner. These Omnibus Rules allowed PFG or other FCMS to clear trades through other Clearing House Members.

486. Becasue the CME Group appears to control the Rulebook, this Omnibus Provision

---

[4] It is possible that this author just did not see the Clearing member listed on Schedule F despite her thoroughout review. Since Schedule F is almost 4000 pages, her eye might have missed the entry of any Clearning fees claimed by any CME clearning member as of the date of the PFG Bankruptcy fiing.

is that of the CME Group, not a Designated Contract Market and has never applied for regisration for such status. However, CME Group owns and controls the CME and imposed that rule on CME during the relevant time period in violation of the CME self-regulatory manadate.

487. These Omnibus Rules demonstrate the fraudulent nature of CME Group's representation to the public that they will ensure the integrety of the markets. Clearly, these Omnibus rules allowed for Wasendorf's 20 year ponzi scheme.

488. The way these opaque Omnibus rules are set up, the FCM such as PFG does not even have to establish initial margin requirements for each contract position established, but instead can just trade using the lesser amount of maintenance margin. Therefore, right off-the- bat, the FCM trading under an Omnibus subaccount is subject to a different set of rules and a preferential standard, requring less not more financial integrity, and less financial soundness compared to other market participants who do have to post initial margin when entering into a long contract. Thus, this Omnibus Subaccount rule is entirely unfair, arbitrary and capricious and preferential to firms like PFG who are undersegregated and undercapitalized and should not have even been allowed to trade at all.

489. In addition, the carrying FCM who actually clears the trades for the non-clearing FCM, does not have to monitor or scrutinize each customer's trade and only has to consider the gross amounts listed for each Omnibus subaccount. This "grossing up" rule which is not allowed for regular Clearing firms again allows the Clearing Omnibus firm and CME to completely ignore the trading conduct going on inside each customer's account as in the PFG customers' account where there were in fact extreme abuses occuring over a twenty year period. Non Omnibus accounts are not entitled to this "grossing" effect and thus cannot skirt the regulations upon information and belief

-101-

490. For example, if PFG was trading as a Omnibus subaccount with Clearing firm "X, " clearing firm X could consider the gross amount of monies in the PFG subaccount. If PFG had $1,000,000.00 in its house account and $700,000.00 was lost on behalf of Class Plaintiffs, the Schefferts, the Behrens and Richard Wakeford, the Clearing FCM would only have to consider that there would be a gross amount of excess margin of $300,000.00 ($1,000,000.00-$700,000.00). Under these insane Omnibus Subaccount rules, the Clearing FCM would not even have to report anything to anyone and would not have to look at any of the trades either to see as in this case, that the customers' accounts were being traded in an unlawful way; and after each customer was in a margin deficiency and under Rule 930 should have been required to have all trading cease.

491. According to the Omnibus Subaccount rules, Rule 930K, D, and E would not even apply, because these rules only apply to Clearing House members not non-members trading as FCM or non-clearing members as part of the Omnibus Sub-Accounts.

492. The Omnibus rules were an intentional and bad faith mechanism to allow PFG to trade and generate enormous fees for a lot of entities including co-defendants herein and giving PFG the legitimacy it need to accomplish this RICO Scheme.

493. In fact, the Ombibus Rules prohibit in some cases the Clearing member from even seeing what is going on in the customer's Omnibus Sub-Account and the rules state that under certain circumstances the Trader Administrator: "Cannot view trading sub accounts where the trading is not the trading sub account owner." *See Omnibus Support Information.* annexed hereto as Exhibit 9.

494. However, this arrangment was more to cover up what was really happening such as using fictious trading to pull off this Ponzi Scheme, so in effect, the Clearing firm was not clearing all the ficitious trades which were recorded on another set of books just used for this RICO Ponzi

Scheme.

495. Another obvious red flag that would have exposed Wasendorf Sn.'s massive fraud immediately would have been to compare the actual amount of trading going on in a PFG subaccount with its stated Customer Segregated accounts to see this massive fraud. For example, if only $2,000,000.00 worth of trading was going on inside a subaccount, where PFG's stated segregated funds were $200,000,00.00, then this discrepancy would show that there was unlawful conduct occuring like ficitious trades on a separate set of books. This suspicion would be so because the customer segregated funds are for customer trades, and therefore the amount of trades should be nearly equivalent to the funds segregated for customer trading. A much lesser amount, would raise the obvious question of where is all the rest of the money going, and why is the volume so low.

496. It appears that based on the set up of these Omnibus Rules, no records were kept or reviewed by the Clearing firm or CME to show these discrepencies and only the "gross" amounts were recorded. Clearly, PFG could put its own capital or money it stole from the 1845 account into its own account to offset the trading violations ongoing in the Omnibus Subaccounts.

497. Thus, the imposition of the Omnibus Subaccount rules reduced the mandate given to the CME under 7 U.S.C.§ 7d(11) to"ensure the financial intergrity ofany-futures commission merchant, introducing broker and the protection of customer funds" to a nullity.

498. The CME also acted in extreme bad faith in purposefully creating this Omnibus Sub-Account Rules to accomodate Wasendorf, Sn. when Congress gave the CME rule-making authority to maintain a fair and equitable contract market, not aid and abet RICO conspirators for over a twenty year period.

499. At any time CME could have and should have expelled Peregrine as a customer of its

Exchange due to continued violations of Peregrine with respect to violations of Margin Rules and other infractions such as maintaining under segregated customer accounts in its customer segregated accounts as far back as 1999.

500. CME also acted in bad faith by failing to monitor the activities of Peregrine, a significant FCM in the Industry for nearly a decade and routinely turned a blind eye and gave Peregrine special status by allowing it to trade directly over the CME Globex through a co-location agreement even though it was a non-clearing member not a clearing member upon information and belief; and therefore perpetuated this Fraud on the Public for a long period of time and for over a decade.

501. The CME group with full authority and on behalf of the CME entered into a Co-Location Agreement with PFG during the relevant time period and allowed PFG to easily defraud customers by purposefully giving PFG access to the Globex, the CME's electronic trading Platform.

502. Although PFG was trading under an Omnibus Subaccount, it appears that the Co-Location Agreement is directly with the CME and no Clearing Firm or Carrying members is mentioned in this Co-Location Agreement, although a Clearing Firm should have been named as the Carrying Firm but was not. *See* Co-Location Agreement annexed hereto as Exhibit 5.

503. Thus, it appears that through this Co-Location Agreement, Peregrine was given full privileges as if it were a Clearing Member, due to its Co-Location Agreement with CME Gruop which in exchange for a monthly fee of approximately $28,000.00, allowed PFG to directly link into the CME's Globex Electronic Trading Platform making it easy to trade freely to destroy customer accounts and clear trades electronically.

504. Furthermore, a review of this Co-location Agreement, demonstates that PFG as a

-104-

customer was actually required to meet the same obligations as Clearing members, since it was

given a Co-Location Agreement. Paragraph 13.13 states that all Exchange Rules shall apply to the

Customer (PFG):

> "**Exchange Rules.** Customer hereby acknowledges and affirms that the Services
> provided hereunder are subject to the Exchange Rules. In the event of a
> conflict or inconsistency between the Exchange Rules and this Agreement, the
> Exchange Rules Shall govern."

505. Thus, under this Co-location Agreement ¶ 13.13 CME Rule 930 applied to PFG

although it was not a Clearing House Member.

506. Therefore, PFG was also subject to the Rules of the Exchange applicable to Clearing

members including Rules 930D, E and K which were breached and allowed this Fraud to go on

for over 10 years right under the CME's supervision.

507. Therefore, the CME Group in its desire to earn fees and maximize profits, allowed

PFG, an under capitalized and under segregated FCM, to freely trade over the Globex during the

Relevant Time Period and allowed this Fraud to continue unabated, since it appeared to the

members of the public that PFG was properly engaging in trading activity when in fact it was

using fictious trades that never made it to the globex to wipe out customer accounts.

508. By failing to stop trading, CME, CME Group or its agent,the Cleaning firm who

allowed PFG to maintain an Omnibus Account caused the Schefferts' accounts to go to almost

zero by October 8, 2008. Had the CME or the clearing firm holding PFG's account enforced its

plain rules under 930 to PFG, the darling of the industry, the losses to the Schefferts would have

been limited to approximately $50,000.00 instead of approximately $350,000.00, their total life

savings.

509. Alternatively, PFG's trades on behalf of the Schefferts were actually ficitious and

never even happened, because there was insufficient margin to support any trading in PFG's

customer accounts. As such, the Clearing member who carried PFG's accounts failed to monitor activity in the PFG Omnibus Account and spot evidence of fictious trading activity as did the CME group as well who conduct market oversignt over the CME.

510. The fact that the CME set up this Omnibus Account rules shows the bad faith and intent of the CME to aid and abet Wasendorf, Sn by allowing such blatantly unethical grossing of positions to exist in Omnibus accounts. Thus, in fact, the CME by weakening its rules and basically erasing Margin Requirement Rules, CME Rule 930, from all Omnibus accounts actually facilitated such criminals like Wasendorf, Sn. to freely engage in criminal conduct by wiping out customer accounts all-the- while letting this criminal conduct to hide and percolate in Omnibus accounts.

**Participation by Millenium Trust**

511. Upon Information and belief, Millenium Trust acted purposefully in setting up plaintiffs to lose their entire life savings by allowing their IRA monies to even be invested in such imprudent and risky investments consisting of purchasing naked puts and calls which are inherently a losing bet and lose 95% of the time.

512. Besides being part in this RICO conspiracy by engaging in mail and wire fraud as part of this scheme to defraud plaintiffs, as an alternative theory of liability Millenium breached their fiduciary obligations to plaintiffs and should not have allowed one penny to be sent to JPMorgan for further use by PFG

513. An IRA is a Federally Created Trust Imposing Duties on Millenium, as IRA Trustee and/or Custodian, to Prevent This Type of Investment Fraud.

514. Because Millenium controlled plaintiffs' IRA accounts, they woefully failed to exercise their fiduciary duties in blindly signing off on the transfer documents allowing Peregrine

-106-

to invest their IRA funds in high risk options contracts

515. Defendant Millenium also breached the Commodity Exchange Act by acting as an Introducing Broker for PFG and by associating itself with Defendant Perry Comeau to act as Milleniums' agent to complete the forms necessary to introduce the Class's account to PFG.

516. Individual Retirement Accounts came into existence in 1974, when they were created by the federal government in a statute known as the Employee Retirement Income Security Act of 1974, Pub. L. 93-406, Title II, Sept. 2, 1974, codified at 29 U.S.C. § 1001 *et seq*. An IRA is a "trust created or organized in the United States for the exclusive benefit of an individual or his beneficiaries, but only if the written governing instrument creating the trust instruments contains the following requirements: ... (2) The trustee is a bank [as defined by statute] or such other person who demonstrates to the satisfaction of the Secretary that the manner in which such other person will administer the trust will be consistent with the requirement of this section. (3) No part of the trust funds will be invested in life insurance contracts. (4) The interest of an individual in the balance in his account is non forgettable. (5) The assets of the trust will not be commingled with other property except in a common trust or common investment fund..." Code § 408(a) (2008); *see also,* 26 C.F.R. Treas. Reg. §1.408-2(a-b).

517. The "written governing instrument creating the trust" in this case was Defendants' Millenium's standardized form contract that was entered by several Class Members upon information and belief. This contract was drafted in its entirety by defendant Millenium Trust upon information and belief. This non-negotiable contract was presented on a take-it-or-leave-it basis to Class Members and was not drafted, amended or negotiated in any way by Plaintiffs or Class Members.

**Federally Created Minimum Fiduciary Standards Of Conduct For The IRAs**

-107-

518.  Section 408 and the federal regulations promulgated thereunder, including 26 C.F.R. § 1.408-2, use the language and terminology of trust law (such as "participant," "beneficiary," "fiduciary" and "trustee") in specifying the trust and the relationship that any form contract or "written governing instrument creating the trust" was required to use under federal law, defendant Millenium Trust was obligated to comply with the following minimum standards and owed the following duties to preserve the Trust res of each Plaintiff and Class Member.

519.  The fiduciary duty to acquire and hold particular investments specified by the trust instrument.   Treas. Reg.  1.408-2(e)(viii)(6)(i)(A).

520.  The fiduciary duty to keep custody of investments, and except for investments pooled in a common investment fund in accordance with the provisions of the Treasury Regulations, to refrain from commingling the investments of each account with any other property.   Treas. Reg. 1.408-2(e)(v)(A).+

521.  The fiduciary duty to deposit assets of accounts requiring safekeeping in an adequate vault. Treas. Reg. 1.408-2(e)(v)(B).

a. The fiduciary duty to determine the assets held by it in trust and the value of such assets at least once in each calendar year and no more than 18 months after the preceding valuation.   Treas. Reg. 1.408-2(e)(5)(ii)(E).

b. The fiduciary duty to receive, issue receipts for, and safely keep securities. Treas. Reg. 1.408-2(e)(4)(ii)(A).

**Millenium's Failures**

522. In addition to its failures previously alleged herein, Millenium also:

a. failed to perform Generally Accepted Auditing Standard ("GAAS") "audit using whatever tests of the books and records were considered necessary by a qualified public

-108-

accountant;

b failed to perform contractually obligated administrative review;

c. failed to provide contractually obligated and federally mandated annual reports of all transactions related to the IRA;

523. Millenium failed to work closely with the plaintiffs and other class members to understand their investment objectives and to understand that these investments were completely unsuitable for this group of plaintiffs and class members herein.

524. Millenium employees did not properly read the customer agreements and disclosure documents to prevent plaintiffs from making these unsuitable investments in their retirement accounts and blindly signed off on these documents without fulfilling their fiduciary obligations as IRA, Custodial IRA Trustees.Millenium failed to act as a trustee to the Plaintiffs IRA accounts by seeding all their fiduciary responsibility to unregistered advisors including Garlon Maxwell, Amber Maxwell and Perry Comeau as well as representatives from Brewer Futures Group and PFG.

525. Such blatant disregard for their Custodial obligations creates a clear inference that there was bad faith conduct ongoing and that Millenium was part of this RICO Conspiracy based on the total dereliction of its duties as IRA trustee.

526. Indeed, during the week of October 2, 2008 through October 8, 2008, Millenium did nothing to contact plaintiffs, although letters were sent to Millenium on October 2, 2008 and should have been received by October 3, 2008. Thus, Millenium should have received these letters and immediately notified plaintiffs on October 3, 2008 or by over the weekend. See Margin Call notice sent to Millenium Trust dated October 2, 2008.

527. Had Millenium immediately acted to stop trading upon a margin call, they would

-109-

have preserved most of the assets in the plaintiffs IRA accounts.

**Red Flags That Were Ignored By Millenium.**

528. Defendants had a duty to safeguard and manage the IRA's accounts of Plaintiffs and the Class in a professional and fiduciary manner in accordance with industry standards and in accordance with state and federal laws. If Millenium had fulfilled its duties to its customers it would have completed a full review of the trading strategy and they would have inquired into the backgrounds of the Maxwells before allowing them to trade in plaintiffs accounts.

529. Defendants would have learned that the Maxwells were non registered to trade futures options contracts and that Garlon Maxwell had a discharge in Bankruptcy and was not an appropriate person to handle money, as well as federal tax liens, as well as a fine and cease and desist order from the Iowa Department of Insurance. Millenium also would have found out that Amber Maxwell was also unregistered and also had a fine and cease and desist order against her as well.

530. Such untoward activities were a red flag that shows that Millenium could have stopped Class Members from being the victims of this RICO Ponzi scheme.

531. Instead, defendant, Millenium, used the Maxwells and Comeau as their general purpose agents to seek out and advise Plaintiffs and the Class to transfer IRA and pension fund monies to Millenium and then Peregrine in order to earn fees and other income. Millenium violated their fiduciary duties to Plaintiffs and the Class by giving the Maxwells and Comeau unfettered access to all of the monies that had been deposited in such accounts by Plaintiffs and the Class.

532. If Millenium had performed even a modicum of due diligence in investigating the

-110-

qualifications and background of the Maxwells, Steven Brewer and Comeau, they would have found such a sufficiently large "red flag" in their lack of professional accomplishment and standing that no prudent fiduciary or custodian, acting in the best interests of his client, would ever have allowed the Maxwells to continue as they did.

533. Instead Millenium, asleep at the switch, failed to exercise their fiduciary and custodial duties by allowing the Maxwells and Comeau along with Peregrine to use them as a clearinghouse to loot the IRA accounts of Plaintiffs and the Class.

534. If Millenium had been performing their duties in a legally sufficient and proper manner, they would have become aware of the "red flag" that the Maxwells was failing to provide prudent investments to funds in Millenium customers' retirement accounts.

**Foreseeability**

535. Where the custodian does not sufficiently hold in custody or otherwise safe-keep or preserve the assets and income entrusted to it, nor takes reasonable steps to verify periodically the actual status of those assets, the retirement income from those assets is not secure. Instead, those assets and income are in jeopardy of being commingled or dissipated.

536. In addition to being extremely foreseeable, such dissipations have actually occurred repeatedly where breaches of duties to hold and not commingle occur. These and many other incidents made it even more foreseeable to Defendants that their failure to follow standard industry procedures exposed Class Members to substantial losses. But Defendants still did not change their wrongful conduct of failing to hold, failing to question about, failing to follow the rules, and failing to monitor and preserve the assets entrusted to them.

537. Millenium is chargeable with the same knowledge that any professional IRA custodian should have gathered and maintained regarding the people and entities with which

-111-

Millenium entrusted their clients' monies. Millenium breached their duties to preserve their customers' IRA accounts by ignoring the numerous red flags surrounding the Maxwells' and Comeau's past as well as Peregrine and Brewer Futures Group, and by allowing these entities to take possession of and then convert Plaintiffs' IRA accounts.

**Motivation**

538. Defendant Millenium had motivation to ignore red flags and disregard their fiduciary duties to ensure a continued business relationship with Peregrine and Brewer

539. Defendant Millenium used its position of trust and respectability to make plaintiffs feel that their investments were safe and being properly guarded and accounted for. It is particularly egregious that while defendant Millenium collected fees and turned a blind eye to what was really going on, they facilitated the activities of con-men like Wasendorf who could have never looted the investment accounts of innocent investors on the scale that he did but for the ability to hide behind defendants' supposed fiduciary reputation and respectability

540. Now, it is abundantly clear to Class Members that the simple goal of this Ponzi scheme was to take investors' money, steal it or otherwise squander it, and use new investors' money to make principal and interest payments to the existing investors lucky enough to redeem their investments and/or to take interim payments in cash.

541. While the scheme was ongoing, however, Millenium was in a unique position to examine the accounts and to stop the Wasendorf Ponzi scheme. Instead, as set forth herein, Millenium chose to view Wasendorf and the Wasendorf Affiliates as its valued customers, and to treat their real customers, Plaintiffs and the Class, as mere nuisances.

542. As a direct result of defendant Millennial's conduct, plaintiffs were cause to lose their entire IRA and life savings,

-112-

a. In fact, the RICO Scheme listed in ##a-e occurred after Russell Wasendorf, Sn. had actually already stolen the entire customer sub-accounts. He was able to pocket customer monies initially because his Co-Conspirators, defendants U.S. BANK, NA and JPMORGAN CHASE, N.A., literally allowed him full-access to customer segregated accounts for his own personal use. He therefore easily could and did pocket customer segregated funds for himself and his co-conspirators, Introducing Brokers and CTAs, Exchanges and Depository Banks, and an IRA trust Company with whom he eventually shared the proceeds of the customers' stolen monies by way of distributing " transaction fees."

b. Thus, these Customer Segregated accounts which are afforded a high degree of protection in Depository Banks were unlawfully depleted and used for the benefit of the RICO defendants instead of the customers. The evidence is clear that these customer monies were routinely turned over to Mr. Wasendorf Sn. who in turn eventually distributed these converted customer monies to the other RICO defendants and co-conspirators over a twenty year period..

**Causation and Damages**

543. As a direct result of this RICO Ponzi Scheme the Class Members lost approximately $3,300,000.00, where margin calls were issued without any notification to them leading within one week to a total destruction of their accounts

**Role of the IRA Fiduciary Millenium Trust.**

544. With respect to Millenium Trust Co, LLC., it participated in the RICO Conspiracy acting as an unregistered Introducing Broker and by allowing plaintiffs' Traditional IRA money to be invested in these risky derivative transactions which were bound to lose eventually. In addition, Millenium also violated pendant state law, such as negligence and breach of fiduciary duty since as the IRA custodians of Plaintiff's IRA accounts, Millenium was charged with

-113-

Fiduciary duties and duties of reasonable care to ensure that the moneys in these investor's portfolio were being properly managed and invested.

## Claim Against the National Futures Association For Violations of the Commodities Exchange Act in violation of 7 U.S.C. § 21 and 7 U.S.C. § 25

545.  Plaintiffs bring a private right of action against the NFA, a Registered Futures Association pursuant to the Commodities Exchange Act, § 22, 7 U.S.C. § 25(b)(2) and 7 U.S.C. § 21 for NFA's bad faith, intentional, reckless and/or negligent failure to protect the members of the investing public including Plaintiffs herein by:

a. Failing to discover and disclose to the public the falsified reporting of Wasendorf, Sn. on behalf of PFG concerning customer segregated accounts during the relevant time frame in amounts much greater than PFG's actual Customer Segregated Accounts which would have revealed Wasendorf and PFG's major ponzi Scheme for over 20 years in violation of NFA Compliance Rule in violation of NFA Compliance Rule 2-2(d), NFA By-law 1001, Section 1(a)(b)(C), Section 4(a)(b)© and (d), NFA Compliance Rule 2-4 for violations of Just and Equitable principals of Trade, and NFA By-law 301.

b.  Failing to immediately shut down PFG and Wasendorf for their breach of Just and Equitable Principals of Trade pursuant to NFA Compliance Rule 2-4; The well-documented violations occurred in 1996 and 2000 and orders were entered by the NFA and CFTC which should have provided for expulsion of PFG and Wasendorf from the Futures Industry at that time for clear violations of law that require removal under 7 U.S.C.§ 21(a)(3)(C), and NFA By-law 301.

c.  Allowing Steven Brewer and Brewer Futures Group, Inc. to continue in operation after Orders were levied against them in 2004 and on March 15, 2007 prior to Plaintiffs' losses. Expulsion from the Commodities Industry was also required based on these Orders and the violations of NFA rules noted in those orders pursuant to 7 U.S.C. §21(a)(3)©, and NFA By-Law

-114-

3-01.

d. Allowing PFG, Brewer Futures Group, Inc., Steven Brewer, Russel Wasendorf, Sn. Russel Wasendorf, Jr., and Perry Comeau to act as Futures professionals, Associated Persons, Future Commission Merchants and/or Introducing Brokers in 2008 when plaintiffs' customer accounts were transferred to Peregrine. Such conduct was in violation of 7 U.S.C.§ 21(b)(3)(A)(B)(C) and (D) as well as 7 U.S.C. § 21(b)(4), as well as NFA Compliance Rule 2-4, and NFA By-law 301 and NFA Compliance Rule 2-24 and NFA Registration Rule 401.

e. Granting registration status pursuant to NFA Rule 2-24 and Registration Rule 401 to Perry Comeau or his company Black Inc. Trading when he was subject to an Cease and Desist Order issued by the Iowa Department of Insurance and was not proficient in Options and testified under oath that he simply did not understand the investments made by the Maxwells on behalf of Plaintiffs.

f. Failing to provide a fair and equitable arbitration process of members of the Investing Public in violation of NFA Code of Arbitration and 7 U.S.C. § 21(b)(10).

g. Failing to fairly allocate dues among its members in violation of 7 U.S.C.§ 21(b)(6), rather instead imposing unfair and unequitable filing fees on customers forcing them to bear a disproportionate burden which should not have been imposed on the members of the investing public as they were;

546. As a direct and proximate cause of these bad faith violations, Plaintiffs were caused to lose their life savings because the NFA allowed this unlawful conduct to continue. The NFA's conduct also proximately caused plaintiffs to be deprived of a full and fair recovery in their NFA arbitrations which would have made them whole but for the violations of the NFA.

547. NFA acted in bad faith by allowing these violations to continue for approximately

-115-

20 years from 1992 to 2012, when PFG and Wasendorf Sn. were finally suspended and terminated as NFA members.

## Background of the National Futures Association

548.  National Futures Association ("NFA") is a Futures Association duly registered with the CFTC pursuant to 7 U.S.C. § 21(a) and (b).

549.  As such, the NFA was and is required to protect the members of the investing public by establishing its own rules as well as enforcing the laws and regulations of the United States including Chapter 1 of the Title 7 of the United States Code, the Commodities Exchange Act, as well as the Commission Rules ("CFTC Rules") as set forth in 17 C.F.R. § 1, Et. Seq.

550.  These mandates are set forth in 7 U.S.C. § 21(b)(1)-(13) which require the NFA to establish rules to protect members of the public.

551.  The members of the investing public such as Plaintiffs herein have a private right of action against the NFA pursuant to 7 U.S.C.§ 25(b)(2) where the NFA has acted in bad faith in enforcing either its rules or the laws and regulations of the United States that should have been enforced by NFA.

552.  7 U.S.C. § 25(b)(2) creates a private right of action against the NFA and states in relevant part:

> "A registered futures association that fails to enforce any bylaw or rule that is required under section 21 of this title or in enforcing any such bylaw or rule violates this chapter or any Commission rule, regulation, or order shall be liable for actual damages sustained by a person that engaged in any transaction specified in subsection (a) of this section to the extent of such person's actual losses that resulted from such transaction and were caused by such failure to enforce or enforcement of such bylaw or rule."

553.  7 U.S.C. § 21 clearly sets forth the individual mandates that the NFA as a Registered Futures Association must address and regulate in order to maintain its credentials as a valid Registered Futures Associations. For example, under 7 U.S.C. § 21(b)(1), the NFA can only

-116-

maintain its status as a registered futures association if:

> "[S]uch association is in the public interest and that it will be able to comply with the provisions of this section and the rules and regulations thereunder and to carry out the purpose of this section...."

554. In addition, the NFA, as a registered futures association under 7 U.S.C. § 21(b)(3) and by-law 301, **must** discontinue any member who is found to have violated just and equitable principles of trade and that has sustained an order against it from the NFA. 7 U.S.C. § 21(b)(3) states in relevant part:

> "[T]he rules of the association provide that, except with the approval or at the direction of the Commission in cases in which the Commission finds it appropriate in the public interest so to approve or direct, no person shall be admitted to or continued in membership in such association, if such person–
>
> (A) has been and is suspended or expelled from a registered futures association or from a registered entity or has been and is barred or suspended from being associated with all members of such association or from being associated with all members of such registered entity, for violation of any rule of such association or registered entity which prohibits any act or transaction constituting conduct inconsistent with just and equitable principles of trade, or requires any act that omission of which constitutes conduct inconsistent with just and equitable principals of trade. . . .
>
> (B) is subject to an order of the Commission denying, suspending, or revoking his registration pursuant to section 9 of this title or expelling or suspending him from membership in a registered futures association or a registered entity or barring or suspending him from being associated with a futrues commission merchant;
>
> (C) whether prior or subsequent to becoming a member, by his conduct while associated with a member, was a cause of any suspension, expulsion, or order of the character described in clause (A) or (B) which is in effect with respect to such member, and in entering such a suspension, explusion, or order, the Commission or any such registered entity or association shall have jurisdiction to determine whether or not any person was a cause thereof, or
>
> (D) has associated with him any person who is known, or in the exercise of reasonable care should be known, to him to be a person who would be

-117-

ineligible for admission to or continuance in membership under clauses (A), (B), or (C) of this paragraph.

555.  Therefore, according to the clear mandate of 7 U.S.C. § 21(b)(3)(A)-(D), and NFA By-law 301, the NFA as a registered futures association **had** to expel or suspend NFA members who violated just and equitable principles of trade or had Orders outstanding against them as did PFG, Wasendorf, Steven Brewer and Brewer Futurs Group, Inc. and Perry Comeau prior to 2008.

556.  Rather, the NFA completely rejected their mandate and allowed members such as Steven Brewer, Russel Wasendorf, Sn. Brewer Futures Group, Inc., Perry Comeau and PFG to continue to operate as commodities futures professional and FCMs in full force and effect and to continue to defraud customers such as plaintiffs herein despite Court and NFA Orders against each one prior to 2008 that should have been cause for the NFA to abide by its mandate under 7 U.S.C. 21 (b)(3) causing it to pass rules to revoke or bar these defendants' membership from the NFA which would have terminated these defendants from operations by 2008 thus avoiding plaintiffs losses.

557.  Rather, NFA, completely neglected to enforce rules to ensure that these defendants, Brewer, Wasendorf and Comeau in particular would be expelled, and failed to enforce its NFA Compliance Rule 2-4 and By-Law 301 that mandated that all industry professionals abide by just and equitable principals of trade as clearly set forth above and in NFA Compliance Rule 2-4. Rather, in each case,  defendants despite Orders against them were allowed to continue to practice rather than be shut down as was intended by Congressional Mandate and NFA By-laws and Rules.

558.  In fact, Steven Brewer who was fined over $100,000.00 by NFA for a number of violations including failure to keep records and undercapitalization clearly violated NFA's rule requiring

each member to abide by just and equitable principles of trade and By-law 301. Although Brewer was eventually expelled by NFA, after Plaintiffs lost their life-savings, Brewer's expulsion from NFA was not for his willful misconduct, but only for his failure to pay this approximately $100,000.00 fine to the NFA.

559. Upon information and belief, had Brewer simply paid this $100,000.00 fine, he would still be a valid member of the NFA today despite his egregious violations of law.

560. In fact, no where in 7 U.S.C. § 21(b)(3)(A)-(D) is the NFA allowed to impose monetary fines, but rather they must expel or suspend violators for misconduct under their clear mandate.

561. NFA arrogated to itself this ability to levy fines which went to pay its salaries and bonuses and there is no evidence that it ever established a fund for customer protection to reimburse customers who have been defrauded.

562. For example, in 2012 shortly after Claimants or Plaintiffs herein were caused to lose their NFA arbitrations, the Business Conduct Committee of the NFA levied a $700,000.00 fine against PFG and Russel Wasendorf, Jr., Susan O'Meara and Nolan Schiff for nearly identical conduct to which these Plaintiffs complained herein where crooked other brokers using PFG as their FCM defrauded customers into entering naked puts and calls, which are bound to lose and did lose.

563. Conspicuously absent from the NFA BCC Complaint was any claim against Russel Wasendorf, Sn. who was the mastermind of the this operation. Certainly, NFA did not want to shine a light on Wasendorf Sn, although he had ultimate responsiblity for PFG.

564. At the time the NFA just said that these trades were deceptive practices and did not attribute this strategy to Wasendorf Sn. nd his permanent plan to destroy customer accounts after

-119-

pocketing each one's monies contained in each's customer segregated accounts.

565.  It is unfathomable that PFG would prevail on these plaintiff's arbitrations when PFG was clearly vicariously liable for the conduct of their agents under the Commodity Exchange Acts' strong vicarious liability statute in 7 U.S.C. §2(a)(1)(B), and that the NFA itself would profit handsomely from identical conduct and keep $700,000.00 of stolen customer monies as a fine against PFG.  This $700,000.00 fine appears to have unjustly enriched the NFA and these funds should have been returned to investors such as Plaintiffs herein who had legitimate claims.

566.  That the NFA Business Conduct Committee held PFG responsible for the same conduct that befell Plaintiffs herein shows that the Arbitration process was biased.

567.  Based on the temporal proximity of the fine imposed by NFA of $700,000.00 and the loss of the Plaintiffs' arbitrations which all occurred withing a short time of each other, it can be reasonably inferred that the NFA was aware of the egregious misconduct that befell Plaintiffs and profited by $700,000.00 from these deceptive practices that somehow the Plaintiffs' Arbitrators could not figure out.

568.  Attorney Paul Thomas, Esq. requested that NFA also investigate PFG for based on the Claimants' losses, but NFA's Business Conduct Committee never did anything with respect to these Claimants' complaints. Thus, the subsequent $700,000.00 fine related to other similarly situated customers who suffered in a similar manner to the Claimants' herein.

**NFA purposefully or recklessly failed to discover that Wasendorf's customer segregated accounts were misstated.**

569.  It can also be reasonably inferred from the temporal proximity of these events, that NFA must have known that PFG and Wasendorf, Sn would go out of business.  NFA fined Russel Wasendorf Jr. Susan O'Meara, Nolan Schiff and PFG in February, 2012.  NFA collected this $700,000.00 "fine" just prior to the PFG Bankruptcy, and it appears that NFA did not have to return

this fine to the PFG Bankruptcy Trustee as a preferential transfer. However, the NFA's timing was impeccable and the circumstantial evidence strongly suggests that NFA must have had either constructive or actual knowledge of Wasendorf Sn.'s massive fraud for many years.

570. NFA retained the Berkeley Research Group, ("BFG Report") Inc. for purposes of "self-evaluation" with respect to its 20 year lapse in recognizing the Wasendorf Sn. Fraud. The BFG Report which appears in many ways self-serving and to distract others from scrutinizing NFA too closely, did fault NFA auditors for disregarding red flags that clearly indicated that from its inception, PFG had incurred losses of $21 million dollars by December 31, 2011.

571. The BFG Report also indicated that Wasendorf, Sn. had contributed $69,125,000.00 dollars to PFG to sustain it during this time period.

572. Under these circumstances, the BFG report acknowledges that it would not have been rocket science to understand that there was Fraud going on based on these numbers.

573. As such, the NFA auditors failed to take note of these red flags to investigate Fraud because it should have been uncovered that Wasendorf, Sn. was diverting customer segregated funds to cover PFG shortfalls.

574. NFA defended itself by claiming that it was intimidated by Susan O'Meara's aggressive demeanor, the former CCO of PFG. Susan O'Meara had worked for NFA prior to joining Wasendorf's team. NFA stated that her "aggressive approach" inhibited NFA auditors from doing their job.

575. The BFG report indicated that Susan O'Meara intimidated the NFA.

576. However, NFA certainly was not intimidated when it fined PFG including Susan O'Meara, $700,000.00 for misconduct in February, 2012. *See* NFA BCC Order and Decision, annexed hereto as Exhibit 10.

-121-

577. Therefore, the BFG report itself constitutes fraudulent concealment of the facts of this matter

**NFA's Bad Faith Failure to discover Wasendorf's Theft of Customer Segregated Accounts**

578. NFA was also the DSRO or Designated Self-Regulatory Organization that was supposed to assist the CME and CFTC with supervision and regulating PFG.

579. As part of NFA's duties as PFG's DSRO, NFA was the one to audit its customer segregated accounts pursuant to NFA Bylaw 1001 entitled Financial Requirements Sections 1 through 4(a)-(e) which mandates that both the FCM and the Depositories in this case U.S. Bank and JPMorgan Chase Bank, N.A. report balances of customer segregated accounts on a monthly basis. Section 4(C) of NFA By-law 1001 states for example:

> " In addition to the requirement of CFTC Regulation
> 1.49.(d), in order to be an acceptable depository to
> hold customer segregated funds account identified in
> CFTC Regulation 1.20, the depository must report the
> balances in the FCM's customer segregated funds
> account(s) held at the depository to NFA or a third
> party designated NFA in the form and manner
> prescribed by NFA."

580. NFA By-Law 1001, 4(c) clearly mandates that the depository, such as U.S. Bank and not the FCM such as PFG report their customer balances.

581. Charged with this mandate, the NFA on a monthly basis sent account verification forms to various Depositories including U.S. Bank on a monthly basis to ascertain the amounts of customer segregated accounts in the 1845 account and others.

582. These balances were crucial because these balances helped to calculate and determine whether each FCM had adequate funds in place to sustain margin requirements. After all the CME Group requires a level of liquidity for trading contracts or margin, and the CME Group depends

-122-

upon FCMs and/or Clearing Members to guarantee margin requirements. If an FCM does not have sufficient funds to sustain margin requirements, it is supposed to be shut down by the NFA, CFTC or CME.

583. In this case, as the story goes, clever Wasendorf, Sn. used photoshop to make up his own account verification forms that were supposed to be filled out by U.S. Bank, one of his Depositories and the holder of the 1845 Customer Segregated Accounts.

584. Wasendorf, Sn. created a U.S. Bank, P.O. Box and gave it to the NFA so that the NFA would send monthly verification request forms to U.S. Bank at this "P.O.Box."

585. NFA accepted this information from PFG as to where to send the monthly request form even though NFA was auditing PFG.

586. Alternatively, NFA never asked U.S. Bank where to send the monthly request forms although U.S. Bank was the Depository obligated to fill out and return the monthy account verification forms.

587. These monthly numbers were critical to determining whether PFG was undercapitalized where it did not have enough funds in relation to it customer's funds to satisfy NFA requirements which would have caused it to close its doors as an FCM.

588. Wasendorf, Sn. would receive these forms at the P.O.Box and then forge the account verification forms and send them back tho the NFA with the falsified customer segregated account amounts. By 2012, he stated that there was approximately $200,000,000.00 (Two Hundred Million Dollars) in the 1845 accounts when there was approximately $5,000,000.00 (Five Million Dollars) in this account in 2012.

589. These amounts were also reported to the CFTC probably by the NFA who posted them on the CFTC website on a monthly basis for all to see.

-123-

590. This pattern took place for many, many years, approximately 20 years.

591. First, US Bank during the relevant time frame held customer segregated accounts for at least 7 other Future Commission Merchants ("FCM") who were also subject to the same exact regulations by the NFA and required the same exact compliance by having U.S. Bank mail in monthly account verification forms to the NFA.

592. U.S. Bank received these other 7 FCMs monthly account verification forms at their correct address from the NFA **except** for PFG whose request went to a solitary P.O.Box.

593. U.S. Bank never called the NFA during this time period to inform NFA that U.S. Bank never received account verification forms to fill out on behalf of their 1845 account.

594. NFA, despite sending out at least 7 other monthly request forms to the correct address at U.S. Bank never bothered to contact U.S. Bank by telephone to inquire as to why PFG had a separate P.O. Box, unlike the other 7 FCM's.

595. Nobody at NFA thought it was unusual that NFA would send out all the other requests for account verification to the same address at U.S. Bank except for Wasendorf's account verification request that went to a solitary P.O. Box.

596. Clearly over a 20 year period the NFA had constructive knowledge that this P.O. Box was incorrect and not the same as the other 7 FCM's who used U.S. Bank as its depository.

597. NFA never questioned why U.S. Bank's monthly responses for its other 7 FCM account verification statements contained a different return address on the U.S. Bank envelope and was not the same one as PFG return address which used a P.O. Box.

598. NFA's conscious avoidance of these obvious red flags demonstrates that NFA did not want to do anything to disrupt the applecart especially when Wasendorf, Sn. was sitting on the Advisory Board of the NFA, and was considered a respected member of the NFA.

-124-

599. Secondly, U.S. Bank knew that it was their obligation to send back monthly account verification statements to NFA pursuant to NFA By-law 1001, Section 4(C). U.S. Bank could not "delegate" this task back to Mr. Wasendorf because under the clear NFA By-law, 1001 4(C), it was U.S. Bank's duty to make this report and send it back to NFA.

600. Because NFA was conducting an audit of PFG, the audit required U.S. Bank not PFG to send back account verification forms to state customer segregated account balances.

601. U.S. Bank for approximately 20 years, never informed NFA that no monthly verification forms were ever received by U.S. Bank.

602. U.S. Bank knew that it was not receiving monthly account verification forms for PFG for 20 years.

603. U.S. Bank consciously avoided knowledge that it was not fulfilling its obligations under NFA By-Law 1001-4(C).

604. When U.S. Bank looked at the CFTC website each month and saw that there was reported customer segregated amounts for PFG, US Bank knew that no part of these numbers were coming from U.S. Bank.

605. U.S. Bank had constructive knowledge that the customer segregated amounts reported each month to the CFTC for PFG were incorrect.

606. U.S. Bank had actual knowledge that the reported customer segregated amounts reported each month to the CFTC for PFG were incorrect.

607. U.S. Bank knew that it was its sole duty to make these disclosures pursuant to NFA By-law 1001, 4(C) and this duty could not be delegated back to Wasendorf.

608. Thus, U.S. Bank knew during this 20 year period that someone was filling out the account verification form on its behalf, and that someone was Mr. Wasendorf.

-125-

609. Because these monthly statements were reported on the CFTC website each month, U.S. Bank allowed Wasendorf to continue this Fraud and clearly aided and abetted such inexcusable and unlawful conduct.

610. There came a time in 2011 when Hope Timmerman of U.S. Bank emailed or faxed back to NFA the correct income verification, after receiving a request by email from NFA.

611. Russel Wasendorf, Sn. received a copy of this document and immediately went into high gear. He re-sent NFA a corrected form with apologies signing Hope Timmerman's name to it. He corrected the account statement from the correct amount of approximately $7,000,000.00, to the fraudulent amount of approximately $200,000,000.00

612. Despite these two disparate amounts reported, NFA accepted the corrected amounts without further investigation..

613. NFA never followed up with U.S. Bank to verify the accuracy of the second corrected verification.

614. Because NFA failed to gather the correct account verification information for a 20 year period, it failed to fulfill its obligations to gather proper account information, despite all of the red flags and failed to expel Wasendorf under NFA Rule 2-4 for such fraudulent conduct and permitted PFG to remain an FCM despite its under segregation for approximately 20 years.

615. Because of the reckless nature and bad faith conduct of NFA in failing to learn of the real customer segregation amounts of PFG and based on their conscious avoidance of the obvious ploy using a P.O. Box to send to U.S. Bank the verification statement when all other documents for other FCMS were sent to U.S. Bank' proper address, NFA is liable to Plaintiffs for allowing PFG to continue in operation and to hold and manage their accounts ultimately destroying the value in each one's account.

-126-

**Because the NFA was highly biased against Customers and Acted in Favor of PFG, It Acted in Bad Faith and did not fulfill its mandate to provide a Fair and Equitable Arbitration Forum and therefore the Customers were caused to lose their Arbitration Cases and Fail to Recover their losses.**

616. NFA as a Registered Futures Association is mandated under 7 U.S.C. § 21(b)(10) to

provide a fair Arbitration Forum for customer disputes.

617. NFA's failure to provide a fair forum, and its violation of its own NFA rules and By-

Laws give rise to Plaintiffs' private right of action herein.

618. 7 U.S.C. § 21(b)(10) mandates with respect to NFA that:

"[T]he rules of the association [NFA] provide a fair, equitable, and expeditious Procedures through arbitration or otherwise for the settlement of customer claims and grievances against any member or employee thereof; Provided, That (A) the use of such procedure by a customer shall be voluntary, (B) the term 'customer' as used in this paragraph shall not included another member of the association. . ."

619. However, a review of these plaintiffs' customer arbitrations clearly demonstrate that

NFA did not satisfy this mandate by either failing to provide fair and equitable rules or by

misapplying its rules and acting in an extremely biased manner causing Plaintiffs' to lose their

Arbitrations. These unfair and inequitable rules included:

      a.     Charging exorbitant Filing Fees for the sole benefit of NFA.

      b.     Refusing to hold the arbitrations as a combined proceeding in Oelwein, Iowa

pursuant to the NFA Code of Arbitration 6(m) where all the claimants approximately 16 claimants

(approximately 30 people) resided in Oelwein, and knowing that these claimants claimed

substantial losses. Rather, NFA applied its rules to favor PFG who was located in Chicago and

forced claimants to travel to Chicago, Illinois where PFG attorneys were located.

      c. Refusing to schedule sufficient days for the plaintiffs' hearings and forcing

claimants to continue the proceedings in Chicago, Illinois to finish their hearing .

      d. Solely selecting the Arbitrators who were conflicted and entirely unfair to

-127-

Claimants.

e. Failing to impose sanctions on PFG's wilful conduct in harassing claimants throughout the NFA litigation by bringing at least four pendant cases against Claimants' in Illinois State Court.

f. Failing to enforce its own rules to the disadvantage of Claimants, such as allowing PFG to file a separate motion to dismiss the Third Amended Statement of Claim, although NFA rules require such motions to be stated in a duly filed Answer.

g. Refusing to allow Claimants to proceed on their claims for attorneys fees and punitive damages

620. The imposition of such exorbitant NFA filing and hearing fees also violated NFA's mandate pursuant to 7 U.S.C.§ 21(b)(6), that required NFA to have rules in place that "provide for the equitable allocation of dues among its members, to defray reasonable expenses of administration." By imposing such large fees on Claimants, the NFA members did not have to pay their fair share of membership fees which were transferred onto claimants by way of filing fees.

621. First, the NFA collectively charged the 16 couples or approximately 32 claimants $48,971.51 (Forty Eight Thousand, Nine Hundred and Seventy-One Dollars and Fifty-One cents) for the privilege of filing their joint claims in the NFA forum.

622. These filing fees are outrageous and shock ones'conscience, especially in light of the reasonable filing fee in this Court for example of $400.00 to commence this entire Class Action.

623. These fees are paid to the arbitrators for their time rather arbitrators only receive $425.00 per day as an Honorarium, upon information and belief plus lodging and travel expenses

624. Then, NFA also charges claimants Hearing fees as well. In this case hearing fees were also charged for approximately Five, four day hearings.

-128-

625. NFA did not care about the enormous costs to Claimants in their NFA Arbitrations. For example, NFA Code of Arbitration Rule 6(m) specifically allows full consolidation of cases and a joint hearing where all of the claims are identical. NFA refused to abide by Rule 6(m) with respect to the Claimants' hearing and instead created the need to hold Five separate hearings in Chicago, Illinois only consolidating some of the Claimants' cases. However, with respect to holding a Preliminary Hearing in Chicago, Illinois, then NFA applied Rule 6(m) properly and did consolidate all the Claimants. As such, NFA could charge 5 times the hearing fees which were based on each day that a hearing occurred; and NFA placed an enormous extra burden on Claimants by refusing to fully consolidate all the claims for a joint hearing.

626. Because there is power in numbers, NFA made sure to split up the claims, so as not to make it too hard for the Arbitrators to toss out these cases without even rendering a written decision explaining the Arbitrators's rationale, because none existed.

627. NFA also imposed enormous other costs on Plaintiffs by refusing to hold the arbitrations in Oelwine, Iowa despite the fact that all Claimants representing approximately 32 accounts resided in Oelwine, Iowa. Rather, NFA ordered that these financially strapped Claimants travel to Chicago, Illinois for their four day hearing at their own expense, despite already paying NFA over $48,000.00 in filing fees. PFG was located in Chicago, Illinois at the time as was PFG's attorney Mr. Ivaronne. The hearing location was very convenient for PFG.

628. NFA violated its own policy stated in its Customer Arbitration Guide page 15 applicable in 2011.

> " NFA usually schedules the hearing in a city of the customer's choice, or one that is mutually agreeable to the parties. There can, however, be extenuating circumstances, for example the city preferred by the customer may be one that for health reasons, a Member is unable to travel to. Or a witness essential to the Members's case may not be subject to subpoena in that city."

-129-

629. In this case, there was absolutely no concerns stated in the Customer Arbitration Guide that would have precluded sending Arbitrators to Oelwine for a four day hearing or perhaps one week if consolidated.

630. It is common practice for Arbitrators to travel outside their home forums to arbitrate matters. Except in this case, the NFA knowing there were several Seniors as Claimants, disregarded their own rules and customs and practice and exercised and abused its discretion in forcing Claimants to travel to Chicago. Illinois twice.

631. Unlike with FINRA or The AAA, the parties had absolutely no input or ability to select their arbitrators, and the NFA exclusively selected the Arbitrators.

632. Furthermore, the NFA abused its discretion by scheduling the Schefferts' hearing for only two days, Friday, August 5, 2011 and Monday August 8, 2011 forcing the Schefferts to incur more expenses and discomfort by having to stay in Chicago, Illinois over the weekend.

633. Knowing that two hearing days was insufficient with at least 4 or 5 testifying witnesses, another two days of hearings had to be scheduled; and NFA decided to reschedule these last two hearing days for December 4 and 5, 2011.

634. In fact, when only one of the December, 2011 hearing days was used, NFA refused to refund, $1250.00 to the Schefferts for the last hearing day which was not used.

635. The NFA did not have the right to keep the Scheffert's funds for a hearing day that never occurred, but nobody could stop them.

636. During the litigation, NFA disadvantaged Claimant while favoring respondents.

637. For example, when Claimants' attorney Mr. Paul Thomas Esq. requested a one week adjournment to file a corrected statement of claim, NFA refused and threatened the sanction of rejection of the Schefferts claim altogether. *See* Letters to and from NFA dated August 17, 2009

-130-

annexed hereto as Exhibit 11

638. On the other hand, when respondent Brewer requested a two week extension of time, NFA easily allowed this Extension of Time. *See* Letter of Rita Tandaric dated May 25, 2010, annexed hereto as Exhibit 12.

639. NFA also clearly violated their own rules of procedure to favor PFG for example, when Claimants' attorney filed a Third and Final Amended Statement of Claim on August 5, 2010, NFA should have rejected PFG's subsequent Motion to Dismiss, since it was not filed in the Answer, but filed in a Separate Document. NFA Rule 8(e)(1) specifically precludes: "motions to dismiss for failing to state a claim, and that such motions will not be heard by the Panel. Other motions to dismiss must be included in a timely filed Answer or Reply. . ."

640. Respondents PFG filed their Motion to Dismiss the Third Amended Statement of Claim separately from their Answer, and the NFA accepted this clear violation of its own Rule 8(e)(1). However, when Respondent Brewer tried to join in PFG's Motion to Dismiss, then NFA refused to let Brewer do so relying on NFA rule 8(e)(1), because Brewer did not put this Motion to Dismiss in their Answer. NFA's selective application of its own rules shows extreme bias. *See* NFA Letter, dated November 1, 2010, annexed hereto as Exhibit 13.

641. NFA's rejection of Brewer's Motion to Dismiss was of no prejudice to Brewer who went out of business shortly thereafter and defaulted in the proceedings anyway.

642. In fact, NFA did nothing to sanction PFG when it abused the arbitration process by making multiple filings in Illinois State Court, Cook County for Declaratory and/or Injunctive Relief regarding issues raised in the Arbitration on several occasions during the Arbitration Proceedings. Despite these abusive practices, NFA only wrote a letter to PFG asking it to refrain from continuing this conduct. *See* NFA letter dated October 1, 2009 annexed hereto as Exhibit 14.

-131-

643. PFG disregarded this letter, and again filed a Motion for an Injunction in Cook County, Superior Court in Illinois on September 21, 2010. Mr. Thomas, Claimants' attorney stated for the record that again PFG was harassing Claimants and adding costs to the proceeding. NFA did nothing to sanction PFG for their continued conduct of bringing related actions in Illinois State Court notwithstanding the Arbitration proceedings. NFA should have sanctioned PFG for disregarding NFA's earlier admonishment in its letter dated October 1, 2009, but instead NFA did nothing. Despite Mr. Thomas putting himself on record as protesting such conduct so he could appear to be doing his job, NFA refused to anything but send a non-responsive letter back to Mr. Thomas. *See* Letters dated August 3, 2010 and September 24, 2010 annexed hereto as Exhibit 15.

644. NFA's non-attorney staff also acted unilaterally to dismiss Claimants' request for attorneys' fees although Claimants relied on a valid Iowa Statute Rule 80(a) of Iowa Rules of Civil Procedure and ICA Rule 1.1413. Therefore, under NFA own Code of Arbitration Rule 12, the claim for attorneys fees was proper because NFA Rule 12 specifically authorized attorneys fees based on a statutory or contractual allegation. Thus Claimants' Second Statement of Claim properly alleged a request for attorneys fees and punitive damages and NFA's staff had no right to dismiss this request under NFA Rule 12 without the Arbitrator's consideration of this issue.

645. NFA also disregarded its own rules in refusing to excuse conflicted arbitrators under NFA Code of Arbitration Section 4(C). It came to the NFA's attention that the Expert for PFG Howard Schneider was a long-standing personal friend of one of the Scheffert's arbitrators Donald Horowtiz and the two had been friends for over 30 years. The NFA should have immediately disqualified Donald Horowitz, but did nothing about it. *See* NFA Letter dated August 4, 2011 annexed hereto as Exhibit 16.

-132-

646. In addition, one of the Arbitrators one of Plaintiffs' Hearing knew Rita Tandaric who had worked as a consultant for the Aribrator's own FCM. Rita Tandaric testified on behalf of Respondents and certainly there was a conflict as well and the Arbitrator should have recused himself.

647. Based on these examples of rank unfairness and violations of NFA rules, NFA is liable under 7 U.S.C. § 25(b) as a registered Futures Association acting in bad faith.

**The Arbitrators Were Biased Thus Denying Claimants' A Fair Hearing.**

648. The NFA is also mandated to select fair and neutral Arbitrators. The conduct of the Arbitrators does shock one's conscious, and the NFA is liable for such conduct, since unlike FINRA or the American Arbitration Association, the claimants and respondents are not even allowed to select their own arbitrators. The unfairness and bias of the Proceedings include:

a. The Arbitrators refusal to disqualify Paul Thomas, Esq. who was conflicted and should not have been permitted to proceed representing the Schefferts and others, since he was also representing Perry Comeau in related proceedings and Perry Comeau's interests were adverse to the rest of the Claimants.

b. Awarding Costs to the Schefferts which Paul Thomas, Esq. kept in part to pay for his travel costs, since he had to travel from California to Chicago again for the last Hearing day (the Schefferts could not even attend due to the costs). This award of "costs" was made by the arbitrators even though NFA precluded the issue of attorney's fees and despite the fact that the Schefferts lost their case.

c. Denying Claimants' Schefferts' motion for telephonic testimony on December 4, 2011 and December 5, 2011 after the hearing was continued from August 5 and August 8, 2011; while permitting PFG to conduct further discovery and issuing an Order dated August 8, 2011 following the first set of hearing dates granting PFG's right to further discovery.

-133-

649. On August 2, 2011 just three days prior to the Schefferts' Arbitration in Chicago, Illinois, Mr. Ivarone, Esq. for PFG moved to disqualify Paul Thomas, Esq. based on his conflict of interests. Annexed hereto as Exhibit 17 is a copy of that Motion to Disqualify.

650. Mr. Ivarone made this motion to disqualify opposing counsel after three years of litigation although Mr. Ivarone knew as early as 2009 that Paul Thomas, Esq., who had been introduced to claimants by Perry Comeau, was also representing Perry Comeau in other related cases.

651. For example, Perry Comeau had a claim of approximately $300,000.00 against PFG for his own loses. Under the representation of Mr. Thomas, another NFA claimant Bill Allen agreed to compensate Perry Comeau in the amount of$10,000.00 in full satisfaction of Comeau's $300,000.00 claim. Paul Thomas told Claimant Allen and others:

" By the Comeaus' taking this 'hit for the team' it enhances the value of your case and ensures that our arbitration runs smoothly without the problems it would other have if Perry Comeau was in the arbitration." .

*See,* Letter of Paul Thomas, Esq. dated April 6, 2011 annexed hereto as Exhibit 18.

652. In retrospect, Paul Thomas was favoring his client Comeau who had potential liability to the other Claimants as an Introducing Broker and/or CTA who never explained the risks of investing to the group and who exagerrated the rewards of investing and who was aiding and abetting the Maxwells and PFG.

653. Paul Thomas, Esq. did quite well for Perry Comeau who was potentially liable for $3,000,000.00 in customer loses, but walked away with $10,000.00 as compensation.

654. Perry Comeau decision to forego his $300,000.00 claim against PFG in exchange for $10,000.00 from his neighbor, Bill Allen clearly demonstrates his participation in this RICO Conspiracy and his decision to cover up this fraudent RICO Ponzi Scheme to avoid proceeding

-134-

and to avoid scrutiny and cross-examination by his own attorney Paul Thomas, Esq. who could not

risk representing him at the hearing.

655. Clearly Paul Thomas, Esq. never explained to the group that Perry Comeau was

potentially liable to claimants for his role in aiding and abetting the Maxwells by helping to open

each customer account and misrepresenting the risk involved in these investments.

656. Additionally, Paul Thomas was really doing everything he could to cover up the

Wasendorf misconduct and RICO Ponzi Scheme by failing to bring the correct claims before the

Arbitrators.

657. However, the Arbitrators rejected considertion of Mr. Ivarone's motion to disqualify

Mr. Thomas, and proceeded with the Schefferts' hearing, notwithstanding this conflict of interest.

658. As such the Schefferts' Arbitration Proceeding was tainted and invalid based on this

clear conflict of interest that violates Illinois Rules of Professional Conduct that applied to this

Arbiration

**Because of the Conflict of Interest, Legal Malpractice and Fraud of Paul Thomas, Esq.
Claimant's NFA Counsel, Claimants were caused to Lose Their Valid Arbitration Claims.**

659. A review of the record clearly demonstrates that Paul Thomas, Esq. was not only

conflicted, but actually part of a RICO Ponzi Scheme committing mail fraud and wire fraud. His

role was crucial to protecting PFG, since the facts presented in the Claimants' arbitrations could

potentially expose Wasendorfs' Fraud, if such claims were scrutinized too closely. Thus, Paul

Thomas, Esq. took action to make sure the real facts of the Claimants' losses stayed buried forever.

660. A review of the Record indicates that Paul Thomas, Esq. purposefully failed to allege

the correct claims and failed to include the correct parties (e.g. Comeau, Millenium, the Maxwells),

and in addition decided to drop for no reason the other valid claims that he had interposed to help

protect PFG and to continue to hide this massive fraud from the members of the

public.

661. The proper claims that should have been brought but were conspicuously missing from all of the Statements of Claim sounded in Fraud under the Commodities Exchange Act, Vicarious Liability and Failure to Supervise by PFG.  *See* 7 U.S.C. §§§ 6(a)(1), 6(a)(2)(A), 6(a)(2)(B). 7 U.S.C. §2(a)(1)(B)  These claims are also set forth in similar NFA Provisions, including NFA Compliance Rule.

662. The gravaman of these claims was that the Maxwells and Perry Comeau defrauded claimants by telling them they would be investing in prudent investments where only 10% of their monies would be at risk; where in fact, these naked out-of-the-money puts and calls were extremely risky and bound to lose 95% of the time. Thus, the case was clearly a fraud case.

663. In addition, PFG and Brewer were strictly liable under the Commodities Exchange Act for the conduct of their employees or agents such as the Maxwells and Comeau under the CEA's strict liability provision codified under 7 U.S.C.§ 2(a)(1)(B).

664. PFG and Brewer were also clearly liable for failure to supervise because  FCMs and Introducing Brokers are to supposed to closely supervise these Commodity Trading Advisors.

665. In fact, the NFA's Business Conduct Committee routinely found PFG and Other NFA members liable for exactly the same fraudulent misrepresentation of risk in other Orders. *See* NFA BCC Decision against PFG dated February 8, 2012, annexed hereto as Exhibit 10.

666. By not interposing these proper claims, the Claimants had no chance to prevail under the laws and rules of the United States that governed their case.

667. Although a claim for Fraud were interposed, this was not the Fraud at the heart of the case, but related to the peripheral issue that the Maxwells hid the fact that they were not registered at the NFA and that Garlon Maxwell had filed for bankruptcy, had cease and desist orders from the Iowa Department of Insurance and had tax liens against him and therefore defrauded the group into

-136-

thinking he was a competent investment professional. That was not the fraud regarding the

deceptive practices discussed in NFA BCC Decision dated February 8, 2012 and annexed hereto as

Exhibit 10, that described the same events and fraudulent conduct that should have been raised in

these NFA Arbitrations.

668. In addition, Paul Thomas's intentional conduct to do under his own clients is

manifest by the fact that Mr. Thomas for absolutely no valid reason dropped another claim

originally interposed against PFG for violation of CME Rule 930.

669. Under CME Rule 930, a valid argument can be made at the time that PFG should

have stopped the rogue trading when the clients fell into a margin deficiency. Because PFG

adopted CME Rule 930 in its customer agreement, Mr. Thomas had a valid argument that PFG's

failure to stop trading caused the full loses to claimant's accounts, especially since the real facts

that Wasendorf had pocketed customer monies had not come to light, thus changing the scope of

this fraud.

670. Mr. Thomas expressed this valid claim under CME Rule 930 to Claimants in letters to

the Schefferts dated April 1, 2009 and June 2, 2002, and November 7, 2009 Exhibit 19. In the letter

dated April 1, 2009, Mr. Thomas told the Schefferts:

> "I am very confident we can prove serious margin violations by Peregrine Financial
> which should result in a very satisfactory resolution of the case in your favor."

671. In his follow-up letter dated June 2, 2009, Mr. Thomas told the Schefferts:

> "Our case against the clearing firm Peregrine Financial Group (PFG) is for violation
> of margin rules. PFG is required as an Exchange Member to follow the rules of
> every exchange where it clears trades. In your case it was the Chicago Mercantile
> Exchange (CME) for S&P 500 futures contracts. The CME requires firms like PFG
> to take action when an account gets a margin call. Either money needs to be
> collected or positions need to be liquidated to get the account off margin call. PFG
> did nothing and your accounts were destroyed as a result.
>
> As you probably know most cases settle before hearing and that is likely to happen

-137-

here as well.. . ."

*See* Letter of Paul Thomas, Esq. dated June 2, 2009 annexed hereto as Exhibit 19.

672. Paul Thomas, Esq. an experienced lawyer believed back in 2009 that PFG was a Clearing House Member of the CME, as demonstrated in the quotation above.

673. When this violation of CME Rule 930 was interposed in Claimants Statement of Claims, PFG fought this claim vehemently by having Mr. Ivarone file a Declaratory Judgment Action in Cook County Illinois Superior Court for a Court Order that CME Rule 930 did not apply to Claimants' case. When PFG was admonished for going into State Court, it then attempted to file a Declaratory Judgment before the NFA Arbitrators by way of a special Proceeding.

674. Except, PFG's filing for a Motion for Declaratory Relief to declare CME Rule 930 inapplicable was really just a Motion to Dismiss for Failure to State a Claim. Because NFA prohibits these motions under Rule 8(e), PFG styled their request as a Motion for Declaratory Relief to enjoin application of CME Rule 930.

675. Clearly, NFA violated its Code of Arbitration 8(e) by allowing this type of relief to be requested under the guise of a Motion for Declaratory Judgment.

676. However, it was up to Paul Thomas, Esq. to allow this Declaratory Judgment Motion to proceed because under NFA's Code of Arbitration, a motion for Declaratory relief can only proceed with the consent of counsel under NFA Rule 10. NFA sent a letter to all parties dated October 7, 2009 stating that PFG's motion for Declaratory Relief had to be agreed to by all counsel. *See* NFA Letter dated October 1, 2009 annexed hereto as Exhibit 14.

677. Paul Thomas, Esq. told the Schefferts by letter that the Arbitrators wanted to hear this D.J. action, and never told the Schefferts that he consented to have the D.J. Action heard to bar the CME 930 claim.

-138-

678. Clearly, Paul Thomas, Esq. prevaricated by telling the Schefferts the Arbitrators took up this D.J. Action when he consented to it could have stopped it, but he wanted to appear as if he was zealously litigating this matter when it was just a horse and pony show in actuality.

679. Clearly, Paul Thomas, Esq. committed legal malpractice by agreeing to let this D.J. action proceed when he could have stopped it under Code Rule 10 requiring his consent.

680. Notwithstanding Mr. Thomas's consent to hear the D.J. Action, the Arbitrators did not strike the claim containing CME Rule 930 and held the issue ripe for review at the Arbitrations. Paul Thomas took credit for this victory, when he could have precluded the entire issue from even being submitted to the Arbitrators. *See* Letter dated 3/3/2010 and Order dated 3/3/2010 annexed hereto as Exhibit 20.

681. However, notwithstanding this Order dated 3/2/2010 allowing Claimants to proceed with their claim under CME Rule 930, in August, 2010, Paul Thomas, Esq. *voluntarily and without explanation* dropped this valid claim as to whether PFG violated CME Rule 930 when he filed his Third and Final Amended Statement of Claim.

682. At this point, it is clear that Paul Thomas, Esq. was fully cooperating with PFG and wanted to defeat his own clients' case by removing the one solitary claim under CME rule 930 that could have exposed the entire Wasendorf Scheme that was still in full force and effect during the Claimants' arbitration proceedings from 2009 through 2011.

683. Thus, after the Third and Final Statement of Claim was amended, there were no valid claims left in the case. The only claims considered at the hearings was whether the Maxwells were validly registered and whether PFG should be held accountable for their lack of registration under By-law 1101 which holds FCM's strictly liable for doing business with Non-registrants.

684. The clear defense to this case, was presented by Howard Schneider, Esq. who testified

-139-

that the Maxwells fell under the exemption from registration under 17 C.F.R. 4.14 since they each only had less than 15 accounts in all and did not hold themselves out to the public generally as CTAs. Expert Schneider also went through the regulations and opined that it was not fraud for Garlon Maxwell to withold the fact that he had filed for Bankruptcy and the Commission Rules only required that he disclose that fact to PFG not the customer.

685.   In fact, Paul Thomas, Esq. and his co-counsel Thomas Burke, Esq. never even bothered to ascertain the true number of clients represented by the Maxwells during the relevant time frame, although they were in touch with Garlon Maxwell and Perry Comeau.

686.   There were also facts in the record to show that the Claimants' accounts had been divvied up between Perry Comeau, Amber Mazwell, Amber Maxwell's Father and Garlon Maxwell to show that each one only had 15 accounts in them. Even these CTA's did not know that Howard Schneider would help them a lot by testifying that a married couple equals 1 client under the Commission Rules, so these defendants did not have to even phony up their books to make it look like they only had 15 customers each.

687.   Therefore, the issues presented at the arbitration were far from germane issues, and this entire proceeding was set up to toss the Arbitrators soft-balls for easy home runs.

688. Ironically, in the Behrens' Arbitration hearing, Claimants presented an Expert witness to give testimony that the Maxwells were **not** exempt from registration as CTAs. The Expert pivoted mid-way during his testimony and changed his testimony that perhaps the Maxwells were exempt from registration after all, thus exonerating PFG who would have been strictly liable for any dealings with unregistered agents under NFA By-law 1101.

689.   During this "Expert's" testimony, one of the Arbitrators asked Claimants' expert if he was going to talk about the actual trades that occurred in claimants' accounts and the Expert replied

that he was not asked to give testimony on the nature of the actual trades the actual issue that should have been considered but was not.

690. Clearly the arbitrators knew the gravaman of the case, and the entire cases were dismissed because the Maxwells were exempt from registration under 17 CFR 4.14.

691. Therefore, because of the actions of Paul Thomas, Esq., there was not even an arbitral record of what happened to Claimants' investments and the entire case was disposed of by the Arbitrators without ever hearing any testimony concerning the nature of these out-of the money risky puts and calls which constituted deceptive trade practices and should have been claimed and which PFG was eventually fined $700,000.00 for in another related case. *See* Exhibit 10, NFA Decision dated February 8, 2012.

692. Following the arbitration awards, Mr. Thomas never advised his clients that they could move to vacate the arbitrations, because Mr. Thomas wanted the result that was attained, and he certainly did not want to apprise the Claimants of their rights or that one key basis for a motion to vacate is a conflicted attorney as in this case. Rather he sent them a letter dated February 10, 2012 explaining his position and his false sense of sympathy to fruadulently conceal his active participation in this Scheme to defraud plaintiffs. *See* Letter of Paul Thomas dated February 10, 2012 annexed hereto as Exhibit 21.

693. Claimants would have pursued further proceedings, had they been told by Mr. Thomas about a Motion to Vacate, and Paul Thomas had an ethical obligation and a duty of care to tell the clients about a Motion to Vacate the Arbitral Awards, but he did not want the Claimants to prevail, and he wanted to help cover up this RICO Ponzi Scheme.

694. Then, in August, 2012, Plaintiffs Schefferts, Behrens and Mr. Wakeford received a letter from Paul Thomas, Esq. telling them that now they could recover on their claims against U.S.

Bank. Enclosed hereto as Exhibit 22 is the letter dated July 31, 2012 of Mr. Thomas attempting to reopen Plaintiffs' case.

695. Because U.S. Bank wa part of another Class Action, Plaintiffs Scheffert and Beherns took steps to protect their claims by filing petitions in Bankrtupcy based in part on Paul Thomas's July 31, 2012 letter.

696. Clearly, this letter dated July 31, 2012, Exhibit 22 was another effort by Mr. Thomas to take hold of Plaintiffs cases to again make sure these Claimants would be defeated so as to protect the RICO co-conspirators herein.

697. However, when the case with U.S. Bank settled, in or about 2015 or 2016, plaintiffs were not included in this Class Action Settlement. Thus, again Mr. Thomas' promises were empty and intentionally designed to throw plaintiffs off-base.

## EQUITABLE TOLLING OF THE STATUTES OF LIMITATION

698. Based on the totality of the circumstances that befell these plaintiffs where their moneys were pocketed by Wasendorf, their accounts were destroyed by the Maxwells and Perry Comeau, their attorney committed legal malpractice and cooperated with PFG to ensure that the clients lost; and the NFA's role in protecting the Status Quo where in fact not one claimant who ever appeared before the NFA with a cliam in excess of $100,000.00 ever prevailed in an NFA arbiration against Wasendorf or PFG during the 17 years that NFA reported such statistics, these defendants under equity are estopped form asserting any Statute of Limitations Defense.

699. Although plaintiffs' trading accounts were terminated at Peregrine in October, 2008, and they were told by Garlon Maxwell that they had been financially wiped out around that time, the nature of their losses due to the pocketing of segregated customer monies was impossible to determine until much later beginning in July, 2012 when Russell Wasendorf, Sn. stated in a suicide

-142-

note that he had been pocketing customer moneys in segregated accounts.

700. However, that suicide note was part of the on-going fraudulent concealment of the Total Ponzi Scheme described herein involving these RICO defendants.

701. The fraudulent concealment continued by the CME Group establishing a $100 millin dollar fund to repay only certain PFG customer to throw off the members of the public to the fact that they had allowed this Ponzi Scheme to florish for at least 20 years since it was an essential part of the Scheme to trade over the CME or used Shadow and Fictitious Trades using the Globex which would have allowed real time quotes to exactly match the phony and ficitious trades that had to had gone on upon informatio and belief.

702. Perry Comeau Fraudulently concealed his role in this Scheme by pretending help his neighbors by introducing them to Paul Thomas where the two were determined to protect the RICO Scheme and defeat claimants case.

703. The July 31, 2012 letter of Paul Thomas, Esq. also was fruadulent concealment by soley blaming U.S. Bank, N. A. to cover up his role in this Scheme and the role of the other defendants herein.

704. The Berkley Group Report in 2012 of the NFA also constituted more fraudulent concealment by exonerating the NFA for its role in this Scheme.

705. However, the Schefferts and Behrens and others took steps to diligently prosecute and preserve their rights under the law during the relevant time period, notwithstanding their lack of full understanding of what transpired. They took reasonable and continuous steps to protect themselves and recover their investments demonstrates that they are entitled to Equitable Tolling based on Fraudulent Concealment of this case.

706. Several of the defendants involved in this case including the CME and NFA are self-regulartory agencies, these facts concealing these claims are by self-concealing.

-143-

707. Because the discovery of the real facts that occurred leading to the theft of customer monies is still under scrutiny and would require extraordinary efforts, plaintiffs' claims are timely becauses the law requires only that Plaintiffs use reasonable efforts, as they did. Thus, Equitable Tolling based on Fraudulent concealment is appropriate under the totality of the circumstances.

708. Class members who have limited resources and limited education should be afforded Equitable Tolling based on Fraudulent Concealment, since it was through no fault of their own that this fraud continued for over a twenty year period, undiscovered by anyone else.

709. Class representatives and SubClass A and B members acted within the applicable two year statute of limitations imposed on their claims under the Commodities Exchange Act and NFA rule concerning alleged trading violations in their account when they filed their original Statements of Claim in June, 2009.

710. Based on the relation back doctrine, all of plaintiffs' claims are timely.

711. Because the instant claims could not have been brought in the NFA Arbitration in 2009 when it was undiscovered that Wasendorf was stealing customer monies which did not come to light until 2012, the NFA aribration award do not preclude plaintiffs' claim under Res Judicata.

712. Approximately, two months after the NFA arbitrators threw out Claimants' claim, the NFA's Business Conduct Committee fined Peregrine and Russell Wasendorf, Jr. and others $700,000.00 for virtually identical violations that had befallen the Class Members including PFG's failure to supervise the conduct of brokers engaged in deceptive practices and who were putting customers in out-of-the-money naked puts and calls almost identical to the Class's case which are bound to lose. *See In the Matter of Peregrine Financial Group, Inc.* NFA Case No. 12-BCC-001. Exhibit 10 annexed hereto. That $700,000.00 award did not appear to go into a fund for customer protection, but appears to have been kept by the NFA to support their salaries and other compensation.

-144-

713. Having lost faith in Mr. Thomas, Class representatives, the Schefferts and Behrens decided not to proceed with Mr. Thomas at that time because of costs associated with hiring him as their attorney, but they wanted to recover for their losses and realized that the fraud was much larger and different from the claims known at the time of their NFA arbitrations.

714. After making reasonable inquiries as to how to proceed, they were advised that they could protect their interests by simply filing Notices of Claims in the pending Bankruptcy Case which was handling customer claims against U.S.Bank and JP Morgan, N.A. that was pending as a result of the Peregrine Bankruptcy.

715. Class representatives filed their notices of claims timely by the end of 2012, and did not hesitate to do so in a timely manner. They proceeded in an orderly fashion to get in line for an orderly distribution. Based on the Letter they received from their prior attorney, Paul Thomas, Esq. dated July 31,2012, (Exhibit 22) they were under the distinct impression that they would be entitled to a distribution from at least U.S.Bank, N.A. based on the new evidence of liability due to Wasendorf's stealing of customer monies.

716. Plaintiffs and Class members could not reasonably have discovered the facts constituting defendants' violations until after the law enforcement and regulatory investigations began on July 9, 2012. Until then, Plaintiffs and Class members did not understand the nature of the total conduct giving rise to the Class Action claims alleged herein and believed they were doing everything to protect their rights.

717. During this time CME Group had also established a 100 Million dollar fund to compensate only certain PFG customers and this 100 Million Fund did not include Plaitiffs herein, but did compensate Farmers 100% for their PFG related losses with very few quetions asked.

718. In addition, during the same time frame, a Class Action was also commenced in 2012, *In Re Peregrine Financial Group Customer Litigation,* 1:12-cv-05546 (the "first" class action) which

at first did cover the present Class members herein and alleged in that Complaint all customers of Peregrine; however, such Plaintiffs were late decertified.

719. Therefore, by the end of 2012, after filing their proofs of claim timely and having heard about the First Class Action, plaintiffs could do nothing more to protect their rights in 2013 believing that the filing of the bankruptcy proofs of claims was the proper procedure, and awaited a Class Settlement so that they could finally be made whole. *See* Bankruptcy Proofs of Claim annexed hereto as Exhibit 23.

720. However, Class representatives Sherri and David Scheffert were required to take more action in 2014 and 2015 when Mr. Ira Bodenstein, the Peregrine Trustee objected to their Notice of Claim.

721. Despite the approximately 4000 page Schedule F, Mr. Bodenstein singled out the Schefferts and moved to expunge the Schefferts claim before the Honorable Bankruptcy Judge Carol Doyle. The Schefferts, retained counsel, to vigorously oppose this motion. The Schefferts took reasonable steps to continue to protect their rights and Mrs. Scheffert appeared telephonically before the Bankruptcy Court with counsel in Chicago to plead their case, at their expense.

722. After an oral argument was presented, Mr. Bodenstein, decided to move to withdraw his objection to the Scheffert's Claim; and by Order of the Court dated March 19, 2015, Judge Doyle allowed the claim as a Schedule F general, unsecured claim. Annexed hereto as Exhibit 24 is a true and complete copy of the Order allowing their claim as a general, unsecured claim in the Bankruptcy case. Therefore, it appears despite a Court order Mr. Bodenstein perhaps was able to expunge the Scheffert's claim after all hoping nobody would even notice.

723. During this time, Mr. Bodenstein, the Peregrine Trustee, upon information and belief had assumed the role of Plaintiff in the Class action and would be recovering proceeds from US Bank and JPMorgan on behalf of the Bankruptcy Estate including claim holders, the Schefferts and

-146-

Behrens.

724. However, when the First Class Action settled on or about June, 2015, the Class members herein were not included in the First Class Action notwithstanding their Order entered by Judge Doyle on March 19, 2015.

725. When Sherri Scheffert realized that she was not receiving a Notice of claim form to fill out and she never received any notices from the First Class Action except the original objection to her claim, she decided to consult with counsel. She was concerned about protecting her rights and did not want to get pushed under the carpet again.

726. Despite confusion, it appeared to her that by 2015 to 2016 after the claim forms were distributed and due, she was not being included in the First Class Action after all. She again consulted with an attorney sometime after that to see where she stood and to see what further steps she had to take to protect her rights.

727. It was at this point when Counsel realized that she would not be participating as a Class member in the First Class action and that action needed to be taken. Thus, counsel reviewed the boxes of materials and consulted with an expert and had to review the entire case from scratch to see where the case stood in good faith and after numerous proceedings had occurred.

728. Thus, after counsel evaluated the case, it was filed as soon as the claims were understood and after plaintiffs learned for sure that they were not part of the Class Action Settlement.   Allison Hudson Esq. an attorney working with Mr. Bodenstein confirmed that Plaintiffs would not be recovering under the Class Action, late in 2015 or in 2016 upon information and belief.

729. Because Plaintiffs and Class members could not have reasonably discovered the facts constituting Defendants' violations until sometime after July 9, 2012, and because they did not know that they would be excluded form the Class until approximately 2016, their  claims recently accrued and any applicable statutes of limitations should be equitably tolled.

-147-

730. Because Class members were named originally as Class Plaintiffs in the First Class Action, but were decertified so to speak when the Plan of Allocation was filed on June 18, 2015 (Docket Entry 410-7) *In re Peregrine Financial Group Customer Litigation,* 12-cv-5546, the Class of Plaintiffs also changed and only included those PFG customers who had current account balances as of 2012, The Class members herein are also entitled to Equitable Tolling Under *American Pipe.*

## CLASS ACTION ALLEGATIONS

731. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of PFG futures account holders or customers who held open commodity futures or options positions, swaps, and/or cash collateral or cash deposits for futures collateral in their PFG accounts in 2007 through 2008 as well as from 1992 to 2012. Excluded from the Class are all Defendants, all members of the immediate families of the Defendants, all other officers, directors, and managing agents of the Defendants including all PFG affiliates and subsidiaries.

      a. The Class satisfies the requirements of Rule 23(a), as well as

         23(b)(1)(B) and 23(b)(3).

      b. Numerosity. The members of the Class are so numerous that joinder of all members is impracticable. The size of the Class, which can only be ascertained with exact specificity through discovery.

      c. Typicality. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct.

      d. Adequacy. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in commercial litigation, trial work, and commodities related litigation.

732.    Commonality and Predominance.    Common questions of law and fact exist as to all members of the proposed class and predominate over any questions solely related to each individual.

733.  The questions of law and fact common to the class with respect to the Bank defendants include:

a. whether Defendants Wasendorf and Wasendorf Jr. breached duties to the

Plaintiffs and the members of the proposed class;

i.   whether the Wasendorfs are liable to the proposed class;

ii.  whether the Wasendorfs' assets are sufficient to  compensate the members of the proposed class for their losses, and if not, whether the assets of the Wasendorfs should be equitably divided among all class members according to their respective losses;

iii. Whether U.S. Bank knew or should have known that  PFG was representing that an account maintained by PFG with U.S. Bank was a customer segregated  account;

iv.  whether U.S. Bank in fact maintained a customer segregated account for the benefit of PFG's customers;

v.    whether U.S. Bank is estopped from denying that it  maintained a customer segregated account for the benefit of  PFG's customers;

vi.    whether U.S. Bank disregarded "red flags" suggesting that PFG and Wasendorf might be using the services of U.S. Bank to perpetrate a fraud on their customers;

vii.    whether U.S. Bank had a duty to customers of PFG;

viii. whether U.S. Bank breached a legal duty to customers of PFG;

-149-

ix. whether any breach of duty on the part of U.S. Bank is the legal cause of any damages suffered by customers of PFG;

x. whether PFG represented to customers of PFG that it maintained a customer segregated account with JPMorgan;

xi. whether customers of PFG transferred or deposited funds with JPMorgan, in reliance on PFG's representations that it maintained a customer segregated account with JPMorgan;

xii. whether PFG in fact maintained a customer segregated account with JPMorgan;

xiii. whether JPMorgan improperly transferred funds from a customer segregated account to a non- segregated account under the personal control of Wasendorf or a non-segregated account of an entity he controlled;

xiv. whether JPMorgan knew or should have known of any diversion or misuse of customer funds on deposit with JPMorgan;

xv. whether JPMorgan disregarded "red flags" suggesting that PFG and Wasendorf might be using the services of JPMorgan to perpetrate a fraud on their customers;

xvi. whether JPMorgan owed a legal duty to customer of PFG;

xvii. whether JPMorgan breached a legal duty to PFG customers;

xviii. whether any breach of duty on the part of JPMorgan is the legal cause of any damages suffered by customers of PFG;

xix. whether the CME based on conscious avoidance refused to stop PFG from acting as an FCM despite the red flags namely the undercapitalization and under segregation of customer accounts that were easily detectable since the CME had a birds eye view of the account balances being used for

-150-

transactions over the Exchange.

xx. Whether the CME acted in bad faith in allowing this 20 year ponzi scheme to proceed by allowing PFG to trade as an Omnibus Subaccount allowing it to skirt the rules in place in the CME rule book that would have prevented this 20 year fraud.

xxi. whether Plaintiffs Class members are entitled to damages

734. Other common questions regarding the other defendants herein are listed in this Complaint under the Section listing all Plaintiffs' Claims for Relief.

735. The Class may be certified under Rule 23(b)(3).                    t

736. Questions of law or fact common claims predominate over any questions affecting only individual members.

737. A class action under Rule 23(b)(3) is also superior methods for the fair and efficient adjudication of this controversy.

738. The expense and burden of individual litigation make it difficult for members of the Class to individually redress the wrongs done to them. There will be no unusual difficulty in the management of this action as a class action.

739. Common claims predominate over any questions affecting only individual members.

740. A class action under Rule 23(b)(3) is also superior to all other available methods for the fair and efficient adjudication of this controversy.

741. The expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no unusual difficulty in the management of this action as a class action.

## CLAIM I

### Principal-Agent Liability In Violation of The Commodity Exchange Act Pursuant to 7 U.S.C. § 1, Et. Seq. (As against all defendants)

714.  Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

715.  To the extent that each defendant had employees and/or agents working in furtherance of this fraudulent conduct, each defendant is vicariously liable for the acts of its employees and agents or another person acting on each one's behalf in furtherance of this Scheme pursuant to Section 2(a)(1)(B) of the Commodities Exchange Act.

### CLAIM II
### Fraud by Omission Against Defendant U.S. Bank and JP Morgan (The "Bank Defendants" hereinafter)

716.  Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

717.  U.S. Bank and JPMorgan Chase, NA ('JPMC" hereinafter)(collectively referred to as the "Bank Defendants' hereinafter")  failed to disclose to Plaintiffs and to other members of the proposed class all of the facts known to the Bank Defendants as set forth above, including that (I) PFG was holding the 1845 Account out to be a customer segregated account, (ii) the 1845 Account was not actually treated by US Bank as a customer segregated account, (iii) PFG was using the 1845 Account as a customer segregated account to draw customer funds into the 1845 Account, and (iv) PFG was misappropriating the customer funds in the 1845 Account by failing to segregate them and by spending them or allowing them to be spent for the benefit of PFG, its affiliates, Wasendorf, Sn. and other non-PFG customers.

718.  The Bank Defendants had a legal duty to disclose its knowledge because it had

superior knowledge of the above facts and far more experience dealing with FCMs, segregation requirements, and related requirements than PFG's customers. In addition, Plaintiffs and other members of the proposed class had trust and had confidence in banks like U.S. Bank and JPMC that banks would disclose such knowledge. Further, The Bank Defendants are in a position of influence and superiority over and a fiduciary to Plaintiffs and the other members of the proposed class.

719. The Bank Defendants' knowledge, had it been disclosed, would have been material to Plaintiffs and the other members of the proposed class. The facts known to the Bank Defendants, stated above and throughout the Amended Complaint, substantially affected the interests of the Plaintiffs and the other members of the proposed class, and the non-disclosure of that knowledge induced Plaintiffs and other members of the proposed class to act, including by mailing or wiring their money to PFG and/or JPMC or continuing to entrust their money to PFG. Plaintiffs and the other members of the proposed class would not have mailed or wired their money to PFG or continued to entrust their money to PFG had the Bank Defendants disclosed its knowledge to them.

720. The. Bank Defendants knew that Plaintiffs and other members of the proposed class did not share its knowledge of the facts stated above and throughout the Amended Complaint and knew that Plaintiffs and other members of the proposed class would not have expected those facts to be true.

721. Alternatively, the Bank Defendants acted with reckless disregard for the truth and or consciously avoided to learn the details of the PFG Conversion of Customer Funds, although these Bank defendants had a birds eye view of the financial picture of PFG and should have

-153-

easily discovered the Fraud instead of consciously avoiding it, as they did.

722. The Bank defendants acted with intent to deceive and an intent to induce action by Plaintiffs and other members of the proposed Class because, among other things, the necessary and foreseeable consequences of The Bank Defendants' failure to disclose its knowledge was that Plaintiffs and other members of the proposed class would mail or wire their money to PFG, JPMC or US Bank or continue to entrust their money to PFG for the settlement of Futures and Options Transactions.

723. Plaintiffs and other members of the proposed class acted in justifiable reliance on The Bank Defendants' failure to disclose its knowledge when they mailed or wired PFG their money or when they continued to entrust their money to PFG. Plaintiffs and other members of the proposed class acted in a manner consistent with how a reasonably prudent person in their position would have acted, particularly given (I) their lack of access to the facts U.S. Bank and JPMC knew, (ii) U.S. Bank's and JPMC's fiduciary status, (iii) U.S. Bank's and JPMC's concealment of the information, (iv) their inability to detect the fraud, and (v) the nature of the omitted information. Had The Bank Defendants disclosed its knowledge to Plaintiffs and the other members of the proposed class, they would not have mailed or wired their money to PFG or would not have continued to entrust money.

724. As a direct result, the Plaintiffs was injured and suffered actual damages

## CLAIM III
**Violation of the Illinois Fiduciary Obligations Act, 760 Ill. Comp. Stat. § 65/1 *et seq.*, or, alternatively, of various states' enactments of the Uniform Fiduciaries Act. (Against The Bank Defendants)**

725. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

-154-

726. PFG owed a fiduciary duty to its customers, including Plaintiffs and the other members of the proposed class including Plaintiff's IRA accounts.

727. The Bank Defendants knew that PFG was an FCM in possession of customer funds and that PFG owed a fiduciary duty to its customers.

728. PFG deposited checks that were made payable to itself as a fiduciary into the 1845 Account. PFG also deposited checks and other funds that it possessed as a fiduciary into the 1845 Account.

729. PFG breached its fiduciary duty to Plaintiffs and other members of the proposed class. U.S. Bank allowed PFG to deposit checks into the 1845 Account and accepted wire transfers from the JPMorgan customer segregated account into the 1845 Account. U.S. Bank further allowed PFG to withdraw funds from the 1845 Account for use other than for the Customers to whom the funds belonged. U.S. Bank and JPMC had actual knowledge of PFG's breach of fiduciary duty and misappropriating its customers' funds. The Bank defendants had express fact information that the funds were being used for non-customer purposes in violation of the fiduciary relationship. Alternatively, The Bank Defendants acted in bad faith because it knew of obvious circumstances indicating that PFG was breaching its fiduciary duty to Plaintiffs and other members of the proposed class but deliberately refrained from investigating PFG's activities so as to avoid knowledge that PFG was breaching its fiduciary duty. In doing so, the Bank Defendants acted in a commercially unjustifiable manner because, among other things, it disregarded and refused to learn facts readily available to it that indicated PFG was breaching its fiduciary duty and misappropriating customer funds. It was bad faith for the Bank Defendants to

-155-

remain passive.

730.  The actual and foreseeable result of the Bank Defendants' conduct was the loss of the funds belonging to Plaintiffs and the other members of the proposed class, who have suffered and will continue to suffer damages as a result.

## CLAIM IV
## Breach of Fiduciary Duty (Against the Bank Defendants)

731.  Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

732.  The Bank Defendants were on actual or inquiry notice that a diversion of fiduciary funds including IRA funds by Wasendorf and PFG would occur or was ongoing

733.  The Bank defendants knowingly breached its fiduciary duties to PFG's commodity customers by among other things:

(a) Accepting for deposit funds that were designated for a customer segregated account by Plaintiffs and proposed class members and depositing them instead into PFG's non-customer segregated account (the 1845 Account) or transferring them from JPMC's customer segregated account 5265 into the 1845 account;

(b)  Failing to identify, monitor, or exercise due diligence related to discrepancies and inconsistencies concerning PFG's deposits of Plaintiffs' and other proposed class members' funds;

© Failing to implement and adhere to compliance and monitoring protocols concerning PFG's use of Plaintiffs' and proposed class members' funds;

(d)  Failing to identify, monitor, or exercise due diligence related to the regulatory and compliance "red flags" identified herein;

-156-

(e) Failing to identify, monitor, or exercise due diligence related to PFG not treating the 1845 Account as a customer segregated account;

(f) Failing to prevent PFG and Wasendorf from using funds designated for customer segregated accounts for the operational expenses of PFG;

(g) Failing to prevent PFG and Wasendorf from using funds designated for customer segregated accounts for PFG, its affiliates, Wasendorf, and other non-PFG customers;

(h) Failing to notify Plaintiffs, other members of the proposed class, PFG management, PFG's auditor, or any governmental entity or regulator about PFG and Wasendorf's misappropriation of funds designated for customer segregated accounts; and

(I) Causing and allowing customer assets to be misappropriated for the use of PFG, its affiliates, Wasendorf, and other non-PFG customers.

734.   As a direct and proximate consequence of the conduct of the Bank Defendants, as described in this Amended Complaint, Plaintiffs and other members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to PFG to margin, guarantee, or secure their commodity or options trading or to support securities transactions.   Plaintiffs have been denied the use of their customer funds and property since no later than July 9, 2011, and have been damaged thereby at an amount to be determined at trial.

**CLAIM V**
**Violations of Section 4(d)(b) of the Commodity Exchange Act, 7 U.S.C.§ 6(d)(b) and**
**Violations of 17 C.F.R. 1.20 for Improper Use and Holding of Segregated Customer Monies**
**(Against the Bank Defendants, and the Wasendorfs Sn. And Jr.)**

735.   Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

736.  Section 4(d)(b) of the Commodities Exchange Act, 7 U.S.C. § 6(d)(b), makes it unlawful for any person including any depository, that has received any money, securities or property for deposit in a separate account as provided for in Section 4(d)(a)(2) of the Act, to hold, dispose of, or use any such money, securities, or properly as belonging to the depositing futures commission merchant or any person other than the customers of such FCM.

737.  Regulation 1.20(a), 17 C.F.R.§ 1.20(a) makes it unlawful for any person including any depository, that has received customer funds for deposit in a segregated account as provided for in this section, to hold, dispose of, or use any such funds as belonging to any other person other than the option or commodity customers of the FCM which deposited such funds.

738.  Between at least September, 2008 and July, 2012, during the relevant time period, the U.S. Bank violated Section 4(d)(b) of the Act, 7 U.S.C.§ 6(d)(2), and Regulation 1.20(a), 17 C.F.R. § 1.20(a), by holding PFG's customer segregated funds which they treated as if it were Peregrine's and/or Wasendorf Sn's checking account, and knowingly allowing Wasendorf, Sn. to transfer customer funds from the 1845 account to his various entities that U.S. Bank and Hope Timmerman knew were not for the benefit of Peregrine's customers.

739.  Between September, 2007 and July, 2012, during the relevant time period, the U.S. Bank violated Section 4(d)(b) of the Act, 7 U.S.C.§ 6(d)(2), and Regulation 1.20(a), 17 C.F.R. § 1.20(a), by holding and/or using PFG's customer segregated funds to secure the $6.4 million loan U.S. Bank made to Wasendorf Construction and the $3 million dollar loan and its extension to the Wasendorfs pursuant to the 2008 Guaranty and extensions thereof.

740.  JPMC also violated  Section 4(d)(b) of the Act, 7 U.S.C.§ 6(d)(2), and Regulation  1.20(a), 17 C.F.R. § 1.20(a), during the relevant time period and between 2007 and

-158-

2006 by transferring the Class Members' customers' funds deposited in the 5265 account to U.S. Bank's 1845 account, knowing that the 1845 account was not being used for customer transactions, but rather for non-customer transactions. The acts, omission and failure of Hope Timmerman and the officials, agents or persons acting for U.S. Bank described in this Amended Complaint were done within the scope of their employment, agency or office with U.S. Bank and are deemed to be the acts, omissions and failures of U.S. Bank pursuant to Section 2(a)(1(B) of the Act, 7 U.S.C.§ 2(a)(1)(B), and Regulation 1.2, 17 C.F.R.§ 1.2.

741. As a result of these violations, class members were injured by experiencing losses in their customer accounts due to the Bank Defendants' failure to keep these funds properly segregated.

## CLAIM VI
## Fraud (Against Wasendorf, Sn.)

742. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

743. Wasendorf, Sn. made or caused PFG to make false and misleading representations to Plaintiffs and members of the proposed class concerning customer funds. Wasendorf, Sn. represented or caused PFG to represent that customer funds would be kept in customer segregated accounts and would only be used for the benefit of customers. This representation was false when made because PFG and Wasendorf, Sn. were not properly segregating customer money, but instead were using the funds for the benefit of PFG, its affiliates, Wasendorf, Sn. and other non-PFG customer entities. The misrepresentations were material because they induced Plaintiffs and other members of the proposed class to provide their

-159-

money to PFG and the Bank Defendants, and to continue entrusting PFG with their money to the Bank Defendants and PFG.

744. Wasendorf, Sn. failed to disclose that he was misappropriating customer funds from the 1845 Account and using those funds for the benefit of himself and other non-PFG customer entities.

745. This information was material because Plaintiffs and other members of the proposed class would not have deposited their money with PFG or continued to entrust their money with had they known these facts.

746. Wasendorf, Sn. had a legal duty to disclose his knowledge because he owed a fiduciary duty to Plaintiffs and members of the proposed class. In addition, he had superior knowledge of the above facts and was in a position of influence and superiority over Plaintiffs and the other members of the proposed class. Wasendorf, Sn. admitted that he acted with fraudulent intent and intent to deceive Plaintiffs and other members of the proposed class. Wasendorf, Sn. knew that Plaintiffs and members of the proposed class did not know that he was misappropriating money from their accounts, and knew that Plaintiffs and other members of the proposed class would not have expected those facts to be true. Plaintiffs and other members of the proposed class acted in justifiable reliance on Wasendorf Sn.'s misrepresentations and omissions when they mailed or wired PFG their money or when they continued to entrust their money to PFG. Plaintiffs and other members of the proposed class acted in a manner consistent with how a reasonably prudent person in their position would have acted, particularly given their lack of access to the facts. Wasendorf, Sn. knew, (I) Wasendorf's fiduciary status, (ii) Wasendorf's concealment, (iii) their inability to detect the fraud, and (iv) the nature of the

-160-

omitted information. Had Plaintiffs and the other members of the proposed class known that Wasendorf Sn.'s misrepresentations were false or had he disclosed his knowledge to them, they would not have mailed or wired their money to PFG nor would they have continued to entrust their money to PFG.

747. He also failed to disclose that each customer was not getting the benefit of having a commodities trading account, because to cover his conversion of customer funds, he created a second set of phony books by which he operated the futures and options trading business with fictitious trades which were recorded on these separate set of books rather than actual options and futures trading.

748. As a direct and proximate result of Wasendorf's fraudulent misrepresentations and failures to disclose his knowledge, and his fictitious trading and falsified customer statements, Plaintiffs and other members of the proposed class suffered and will continue to suffer damages.

## CLAIM VII
### Breach of Fiduciary Duty (Against Wasendorf Sn. and Wasendorf Jr.)

752. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

753. As senior officers and/or directors of PFG, Wasendorf, Sn. and Wasendorf Jr. were responsible for preserving the safety and security of monies, securities, and property that Plaintiffs and the members of the proposed class paid, delivered, and entrusted to them and to PFG to allow such customers to trade commodity futures and options contracts through PFG.

754. Wasendorf, Sn. and Wasendorf Jr. exercised dominion and control over PFG's commodity customers' funds and property and were charged with the duty and responsibility to

-161-

adopt, implement, and enforce stringent rules and procedures to segregate and separately maintain such property and to ensure that those assets were not used or applied for any improper purpose, including to fulfill or satisfy the financial obligations and liabilities of PFG or its affiliates.

755. Wasendorf Jr. Verified the pleadings in each Claimants' NFA arbitrations attesting to the truth of their allegations.

756. As such, Wasendorf, Sn. and Wasendorf Jr. owed PFG's commodity customers, including Plaintiffs and the members of the proposed class, a fiduciary duty to preserve and protect their customer funds and property, to segregate and separately maintain these assets (including 4d and 30.7 funds), to act solely in the customer's best interests in connection with its custody and control of their assets, and to avoid any self-dealing or conduct on behalf of PFG to the detriment of customers.

757. Further, as the sole shareholder of PFG, Wasendorf, Sn. owed PFG and its customer and creditors additional fiduciary duties arising from his effective control of PFG and from the insolvency of PFG.

758. Wasendorf, Sn. and Wasendorf Jr. breached their fiduciary duties to Plaintiffs, and the other members of the proposed class by, among other things, intentionally, knowingly, recklessly, willfully or negligently:

a.   Using or directing, authorizing, or causing the use of, the funds of PFG's commodity customers for the benefit of PFG, its affiliates, Wasendorf, and other non-PFG customers;

b. Using, or directing, authorizing, or causing the use of, the commodity customers' funds to margin or guarantee the trades or contracts or to secure or extend the credit of PFG, its

-162-

affiliates, Wasendorf, and other non-PFG customers;

c. Commingling the funds of PFG's commodity customers with the funds of PFG and its affiliates and/or third-parties;

d. Employing procedures at PFG that did not ensure that customer funds, deposited for commodity futures trading, including 4d and 30.7 funds, would be treated as belonging exclusively to customers;

e. Obligating PFG customer funds for purposes other than to purchase, margin, guarantee, secure, transfer, adjust or settle trades, contracts or commodity option transactions of such customers;

f. Maintaining in a separate account or accounts money, securities and property in an amount not sufficient to cover or satisfy all of PFG's current obligations to its foreign futures or foreign options customers; and

g. Commingling foreign futures or foreign options customer funds with the money, securities or property of PFG, with proprietary accounts of PFG and its affiliates, and using such funds to secure or guarantee the obligations of, or extend credit to, PFG or its affiliates or the proprietary accounts of PFG or its affiliates.

759. As a direct and proximate consequence of the conduct of Wasendorf, Sn. and Wasendorf Jr. as described in this Amended Complaint, Plaintiffs and the other members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to PFG to margin, guarantee, or secure their commodity or options trading or to support securities transactions, have been denied the use of their customer funds and property since no later than July 9, 2011, and have been damaged thereby at an amount to be determined

-163-

at trial.

## CLAIM VIII
### Conversion (Against Wasendorf, Sn.)

760.　Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

761.　The funds Plaintiffs and members of the proposed class deposited with PFG were intended solely for the benefit of Plaintiffs and members of the proposed class.

762. The funds belonging to Plaintiffs and members of the proposed class were specific and identifiable. Each Plaintiff and member of the proposed class deposited a determinable amount of funds with PFG. Each Plaintiff has a specific sub-account number assigned to his or her individual account with his or her name attached to each subaccount.

763. Wasendorf, Sn. wrongfully assumed control, dominion or ownership over funds belonging to Plaintiffs and members of the proposed class. Plaintiffs and members of the proposed class never authorized Wasendorf, Sn. to use their funds for his benefit or the benefit of PFG, its affiliates, or other non-PFG customer entities. In fact, Wasendorf, Sn. admitted that he stole millions of dollars from Plaintiffs and members of the proposed class.

764. Plaintiffs and members of the proposed class have an absolute and unconditional right to immediate possession of the property.

765. Plaintiffs and members of the proposed class have suffered and will continue to suffer damages as a direct and proximate result of Wasendorf Sn.'s unlawful conversion of their funds.

## CLAIM IX
### Violations of Section 4b(a)(1)(A) and © of the CEA, as amended,
### (Fraud by Misappropriation) (Against Wasendorf, Sn.)

766.    Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein

767.  Section 4b(a)(1)(A), © of the CEA, as amended, 7 U.S.C. §6b(a)(1)(A), ©, makes it unlawful for any person in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person: (A) to cheat or defraud or attempt to cheat or defraud such other person; or © willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for such other person.

768.  By misappropriating customer funds for purposes other than those intended by its customers, PFG, by and through Wasendorf, violated Section 4b(a)(1)(A), © of the CEA, as amended, 7 U.S.C. § 6b(a)(1)(A), ©.

769.  Wasendorf, Sn. also violated this provision by falsifying his trading books that recorded transactions regarding the customers' futures and options positions.

770.  In furtherance of this Scheme, Wasendorf, Sn. used fictitious and off-the-book trading to complete the losses in each customer's trading accounts to decrease the balances in each customer's trading account to zero.

771.  Therefore, shadow trading was used to destroy customer accounts which tracked the actual values of each options and/or futures contract.

772.  Because Wasendorf, Sn. controlled PFG and willfully aided, abetted, counseled, commanded, induced, and procured the acts constituting the violations by PFG alleged in this count.

773.  Wasendorf Sn. is therefore additionally liable for PFG's violations of Section 4b(a)(1)(A), © of the CEA, as amended, 7 U.S.C. § 6b(a)(1)(A), © and  pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b).

774.  Each and every day that PFG and/or Wasendorf Sn. misappropriated customer funds for purposes other than those intended by its customers constitutes a separate and distinct violation of Section 4b(a)(1)(A), © of the CEA, as amended, 7 U.S.C. § 6b(a)(1)(A), ©.

775.  As a direct and proximate result of the wrongful conduct of the Defendant named in this Count, Plaintiffs and the other proposed class members suffered substantial damages. Plaintiffs and the proposed class members who deposited with or paid to PFG money, securities, or property in order to engage in commodity futures or options contract trading on or subject to the rules of a designated contract market in the United States are each entitled to actual damages for the violations of the CEA alleged herein.

### CLAIM X
### Violation of Section 4b(a)(2)(A), (B) and © of the CEA
### (Fraud in Connection with Commodity Futures Contracts)
### (Against Wasendorf, Sn.)

776.  Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

777.  Section 4b(2)(A), (B) and © of the CEA, 7 U.S.C. § 6b(a)(2) makes it unlawful:

[F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or other agreement, contract, or transaction subject

-166-

to paragraphs (1) and (2) of section 7a (g) of this title, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market -- (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; © willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or in the case of paragraph (2), with the other person....

778. Wasendorf, Sn. and PFG, individually or in concert, in or in connection with commodity futures contracts made for or on behalf of other persons, cheated or defrauded, or attempted to cheat or defraud, customers and willfully deceived or attempted to deceive customers by, among other things, knowingly making transfers of customer segregated funds in a manner designed to avoid detection, improperly diverting customers' cash and commingling it with PFG's own funds, willfully making or causing to be made false reports or statements or willfully entering or causing to be entered false records, and converting customers funds for its own use in violation of 7 U.S.C. § 6b(a)(2)(A), (B), and ©.

779. Wasendorf, Sn. also engaged in fictitious trading, shadow trading tracking the markets and using falsified customer statements to show customer losses in each customer's account.

780. As a direct and proximate result of the wrongful conduct of Wasendorf, Plaintiffs and the other proposed class members suffered and will continue to suffer damages.

781. Plaintiffs and the members of the proposed class who deposited with or paid to PFG money, securities, or property in order to engage in commodity futures or options

-167-

contract trading other than on or subject to the rules of a designated contract market in the

United States are each entitled to actual damages for the violations of the CEA alleged herein.

## CLAIM XI
### Violation of Sections 4(b)(a)(1)(A) and (C)and 4b(a)(2)(A), (B) and (c) of the CEA (Fraud in Connection with  Commodity Futures Contracts) (Against Maxwell Garlon, Amber Garlon and Perry Comeau)

782.  Plaintiffs incorporate by reference all of the foregoing allegations as if fully

set forth herein.

783.  These Defendants committed Fraud in connection with the Sale Options and

Futures Contracts sold over an Exchange by misrepresenting the nature of the investments to

Plaintiffs and assuring these plaintiffs that these were sound and prudent investments that

would preserve capital.

784.  Instead, these defendants used a reckless strategy to purposefully destroy

plaintiff's account by investing their life savings in naked puts and calls that are bound to lose

95% of the time.

785.  In addition, these defendants continued to place trades even where Plaintiffs were

on margin calls.

## CLAIM XII
### Aiding And Abetting Direct Violations Of The Commodity Exchange Act (Against Wasendorf Jr.)

786.  Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth

herein.

-168-

787.  Plaintiffs bring this Count against Wasendorf Jr. under Sections 13 and 25(a) of the CEA (7 U.S.C. §§ 13c, 25(a)) for aiding and abetting direct violations of the CEA and applicable CFTC regulations by PFG and Wasendorf.

788.  Wasendorf Jr. willfully aided, abetted, counseled, induced, violations by PFG and Wasendorf of Section 4d of the CEA (7 U.S.C. § 6d) and Sections 1.20(a), 1.20©, and 30.7(a) of the CFTC Regulations regarding the segregation and maintenance of customer funds, and acted in concert and combination with PFG and each other in such violations by, among other things, intentionally, knowingly, recklessly, or willfully:

(a) Using, or directing, authorizing, or causing the use of, the customer funds of PFG's commodity customers for the benefit of PFG, its affiliates, Wasendorf, and other non-PFG customers;

(b) Using, or directing, authorizing, or causing the use of the customer funds of PFG's commodity customers to margin or guarantee the trades or contracts, or to secure or extend the credit, of PFG or its affiliates, and/or any other customer or person other than the PFG customers for whom the property was held;

© Commingling the funds of PFG's commodity customers with the funds of PFG, its affiliates, Wasendorf, and other non-PFG customers;

(d) Employing procedures at PFG that did not ensure that customer funds, deposited for commodity futures trading, including 4d and 30.7 funds, would be treated as belonging exclusively to commodity customers; and

(e) Obligating PFG customer funds for purposes other than to purchase, margin, guarantee, secure, transfer, adjust or settle trades, contracts or commodity option transactions of

-169-

such customers.

789.   Wasendorf Jr. participated directly or indirectly through PFG in commodities transactions by receiving deposits, money, securities, or property from the Plaintiffs and the members of the proposed class in connection with or with the expectation of a contract of sale of commodities for future delivery and otherwise participated in the transactions set forth in Section 25 of the CEA (7 U.S.C. § 25(a)(1)(A)-(D)).

790.   PFG was capable of operating and meeting its obligations under the CEA and CFTC regulations only through its senior management, including Wasendorf Jr. who had control over PFG and direct supervisory responsibility and authority to ensure that PFG properly implemented and carried out the customer segregation requirements imposed under the CEA and CFTC regulations.

791.   As a direct and proximate consequence of Wasendorf Jr. conduct as described in this complaint, Plaintiffs and the members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to PFG to margin, guarantee, or secure their commodity or options trading, have been denied the use of their customer funds since no later than July 9, 2012, and have been damaged thereby at an amount to be determined at trial.

## CLAIM XIII
**Aiding and Abetting Breach of Fiduciary Duty (Against Wasendorf Jr.)**

-170-

792.   Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

793.   As set forth herein, by misappropriating the funds that Plaintiffs and other members of the proposed class deposited with PFG, Wasendorf breached his fiduciary duty to Plaintiffs and other members of the proposed class.

794.   In his capacity as President and Chief Operating Officer of PFG, Wasendorf Jr. substantially and materially assisted Wasendorf in breaching his fiduciary duty to Plaintiffs and other members of the proposed class in the following respects:

(a) Wasendorf Jr. falsely reassured PFG clients in a communications sent to Mr. Scheffert for example on September 27, 2007, the day they opened their account that "PFG cares about their customers and want to know about your needs and goals. . ." and that "We will be constantly striving to give you the best service possible."

(b)   However, Wasendorf Jr. did not monitor, safeguard, or exercise any due diligence related to customer segregated funds deposited with PFG;

© Wasendorf Jr. did not monitor, safeguard, or exercise any due diligence related to operating funds deposited with non-PFG entities with which Wasendorf Sn. was affiliated;

(d) Wasendorf Jr. did not implement any procedural or internal safeguards or protocol to prevent the misuse or misappropriation of customer segregated funds;

(e)   Wasendorf Jr. caused and allowed customer assets to be misappropriated for the use of PFG, its affiliates, Wasendorf, and other non-PFG customers;

-171-

(f)  Wasendorf Jr. caused and allowed the funds of PFG's customers to margin or guarantee the trades or contracts, or to secure or extend the credit, of PFG or its affiliates, and/or any other customer or person other than the PFG customer for whom the property was held;

(g)  Wasendorf Jr. caused and allowed the commingling of the funds of PFG's customers with the funds of PFG and its affiliates and/or third-parties;

(h)  Wasendorf Jr. caused and allowed unlawful transfers of customer funds and property;

(i)  Wasendorf Jr. caused PFG to operate without appropriate liquidity and risk infrastructure to protect customer funds and property;

795. By virtue of his substantial and material assistance to Wasendorf Sn., upon information and belief Wasendorf Jr. was aware of his role in Wasendorf Sn.'s breach of fiduciary duty and he acted knowingly in assisting Wasendorf, Sn.

796. As a direct and proximate consequence of Wasendorf Jr.'s conduct as described in the foregoing and throughout this complaint, Plaintiffs and other members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to PFG. Customers have been denied the use of their assets since no later than October 2, 2008, and have been damaged thereby at an amount to be determined at Trial.

## CLAIM XIV
### Direct Violations of the Commodity Exchange Act Section 4(d)(b), and 17 CFR 1.20, Et. Seq. (Against Wasendorf, Sn.)

797. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

798. Plaintiffs bring this Count against Wasendorf, Sn. for direct violations of Section

-172-

4d(b) of the CEA (7 U.S.C. § 6(d)(b) and Sections 1.20(a), 1.20© and 30.7(a) of CFTC regulations  regarding the segregation and maintenance of customer funds and CFTC Regulation 166.3 for failure to properly supervise persons or entities under their direction and control by PFG, by and through Wasendorf, Sn..

799.  Defendant Wasendorf Sn. directly violated Section 4d of the Commodity Exchange Act and applicable CFTC regulations by, among other things, expressly directing the transfer of commodity customer funds for an unlawful purpose in direct violation of the CEA's prohibition against utilizing customer funds other than for the benefit of customers.

800.  At the time that Wasendorf, Sn. specifically directed the transfers of customer funds, he had complete control and dominion over such funds and was acting on behalf of PFG's FCM unit, which was engaged in transactions with commodities customers as set forth in Section 22 the CEA (7 U.S.C. § 25).  Wasendorf, Sn. while acting on behalf of and directing the actions of PFG with respect to commodity customers' funds, directed the transfer of such funds in a manner that caused the use of the funds of PFG's customers to secure or extend the credit, of PFG or its affiliates, and/or any other customers or persons other than the PFG customers for whom the property was held. Section 22 of the CEA (7 U.S.C. § 25). Section 25 expressly provides private rights of action for violations of the CEA, including violations of Section 4d (7 U.S.C. § 6d) of the act and Sections 1.20(a), 1.20© and 30.7(a) of CFTC regulations regarding the segregation and maintenance of customer funds.

801. Wasendorf was acting on behalf of and directing the actions of PFG with respect to customers' commodities transactions by receiving deposits, money, securities, or property

-173-

from the Plaintiffs and the proposed class members' in connection with or with the expectation of a contract of sale of commodities for future delivery and otherwise participated in the transactions set forth in Section 25 of the Commodity Exchange Act (7 U.S.C. § 25(a)(1)(A)(D)).

802.  PFG was capable of operating and meeting its obligations under the CEA and CFTC regulations only through its senior management, including Wasendorf, who had dominion over PFG and direct supervisory responsibility and authority to ensure that PFG properly implemented and carried out the customer segregation requirements and related obligations imposed under the CEA and CFTC regulations.

803.  As a direct and proximate consequence of Wasendorf's misconduct as admitted by Wasendorf and described in this complaint, Plaintiffs and the members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to PFG to margin, guarantee, or secure their commodity or options trading, have been denied the use of their assets since no later than October 2, 2008, and have been damaged thereby at an amount to be determined at trial.

## CLAIM XV
### Negligence ( Against Wasendorf, Jr.)

804.  Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

805. At all times relevant hereto, Defendant Wasendorf, Jr. was the President and Chief Operating Officer of PFG. In his capacity as a corporate office of PFG, Wasendorf Jr. had a duty to Plaintiffs and other members of the proposed class to monitor and safeguard customer fund deposited with PFG.

-174-

806. Wasendorf, Jr. was aware that Plaintiffs and other members of the proposed class relied on the proper handling of segregated accounts to preserve customer funds and property.

807. Indeed, Wasendorf Jr. induced this reliance by Plaintiffs and other members of the proposed class. Following the collapse of MF Global, Wasendorf, Jr. reassured PFG clients in a communication dated November 1, 2011 that "We abide by all regulations mandated by the CFTC and the rules of NFA to hold customer funds in segregated accounts that are always separate from operational funds. PFG BEST reports daily and monthly to regulators concerning customer segregated funds."

808. Wasendorf, Jr.'s November 1, 2011 letter was intended to ease customer concerns and cause continued reliance by them on him and PFG.

809. Concurrent with his role at PFG, Wasendorf Jr. was also an officer in non-PFG related entities. These entities wrongfully and unlawfully received funds for their operating expenses from PFG funds that belonged to customers and that were supposed to be held in customer segregated accounts.

810. Despite his duty to Plaintiffs and other members of the proposed class and despite his inducement of continued reliance by them, Wasendorf Jr. breached his duty to Plaintiffs and other members of the proposed class in one or more of the following respects:

(a) Failing to monitor, safeguard, or exercise any due diligence related to customer funds deposited with PFG:

(b) Failing to monitor, safeguard, or exercise any due diligence related to operating funds deposited with non-PFG entities with which Wasendorf Jr. was affiliated.

-175-

© Failing to implement any procedural or internal safeguards or protocol to prevent the misuse or misappropriation of customer funds.

(d) Causing and allowing customer assets to be misappropriated for the use of PFG, its affiliates, Wasendorf, and other non-PFG customers;

(e) Causing and allowing the funds of PFG customers to margin or guarantee the trades or contracts, or to secure or extend the credit, of PFG or its affiliates and/or any other customers or person other than the PFG customer for whom the property was held:

(f) Causing and allowing the commingling of customer funds including IRA funds with the funds of PFG and its affiliates and/or third-parties;

(g) Causing and allowing unlawful transfers of customer funds and property;

(h) Causing PFG to operate without appropriate liquidity and risk infrastructure to protect customer funds and property.

811. As a direct and proximate consequence of Wasendorf Jr.'s conduct as described in the foregoing and through this Amended Complaint, Plaintiffs and other members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to PFG, have been denied the use of their assets since no later than July 9, 2012, and have been damaged thereby at an amount to be determined at trial. The hardship suffered by Plaintiffs and members of the proposed class was the foreseeable result of this aforesaid conduct.

### CLAIM XVI
**Aiding and Abetting Violations of the Commodity Exchange Act pursuant to 7 U.S.C.§ 25(a) and 7 U.S.C. § 13 (c)(A)**(Against all defendants except Wasendorf, Sn. And Jr.)

812. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

-176-

813. Defendants also each knowingly aided and abetted the violations of the CEA alleged herein. Further, each Defendant counseled, induced and/or procured the violations by the other Defendants, as alleged herein

814. Under Section 13(c)(a) of the CEA, 7 U.S.C. § 13, Defendants are liable for willfully intending to assist and actually assisting in the fraudulent activities as alleged herein.

815. Under the Doctrine of Conscious Avoidance or the "Ostrich" Doctrine, once the Scheme was exposed to defendants, their conduct in consciously avoiding the Scheme now allows an inference of knowledge and intent to aid and abet this Scheme.

816. As alleged each defendant aided and abetted the primary violator, Wasendorf Sn.:

(a) U.S. Bank: By knowingly and intentionally releasing customer segregated funds to Wasendorf during the relevant time period for his own personal and business use including the collateralizing of the loans.

(b) JPMC- By transferring customer segregated funds from the 5265 account to US Bank account 1845 to be distributed to Wasendorf and then for assisting PFG with FOREX trading advice based on JPMC's manipulation of the FOREX market which allowed PFG to continue to destroy customer accounts based on market manipulation define by the Commodities Exchange Act as a felony.

© The CME defendants (Exchange Defendants): By allowing PFG and Wasendorf, Sn. to set up an Omnibus Sub Account despite the fact that they were at all times during the relevant time period undercapitalized and under segregated and had no business trading over the

-177-

Exchange. By allowing the rules relating to Omnibus accounts to exist, the CME defendants could see no evil and hear no evil by their own rule-making authority and freely allowed this criminal conduct to occur over the CME without any supervision or surveillance by the CME, which allowed Omnibus accounts to use a gross amount to evaluate the trading in each non-clearing customer's account.

(d) The CME group- By giving Wasendorf and PFG a co-location agreement allowing PFG to use the Globex so that PFG could freely use this electronic platform to close out customer accounts and/to conduct shadow trading in customer accounts which actually never even made it onto the Globex system but were just shadow trading using the Globex technology for price quotations and settlement prices.

(e) Millenium Trust , Steven Brewer and Perry Comeau- By introducing the Class members to PFG to engage in this Scheme and having each customer sign documents allowing this Scheme to continue whereby the customers believed they were investing in Prudent and Safe Investments.

(f) Amber Maxwell, Garlon Maxwell and Perry Comeau- Shadow trading accounts for customers to track the actual market and therefore assist PFG in generating false records and reports to the customers, upon information and belief. Then sharing the proceeds with PFG under the guise of commissions and fees.

(G) NFA by failing to shut down PFG and Brewer prior to 2007 and by allowing Perry COmeau to become registered as a associated person along with his company Black Ink Trading.

817.    As previously alleged, Defendants knowingly provided material assistance to conduct what they knew or had very strong reason to know was a fraudulent Scheme by allowing

-178-

Wasendorf to steal customer monies, and then distribute monies as fees to these co-defendants for over a twenty year period.

818.   Plaintiffs Class Members are each entitled to actual damages for the violations alleged herein.

**CLAIM XVII**
**Breach of Contract under Federal Law and Breach of Federally Imposed Contractual Duties to Hold Assets and Not Commingle Assets (Against Defendant Millenium Trust.)**

819.   Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein

820.   There is a substantial federal interest in the proper establishment and administration of IRA custodial accounts and in preserving and maintaining the security of individuals' retirement savings:

(a) Defendant Millenium acknowledged the substantial federal interest n the IRA agreements recognizing that the IRAs are governed by the Internal Revenue Code.

(b) Federal law imposes the obligations on trustees (including directors and other trustees), that have been previous alleged. *See, e.g.* 26 C.F.R.§§1.408-2(e);

© Separately or in combination with the foregoing, Defendant Millenium agreed to the following duties, among other, in their following standardized contracts;

(d) By reason of the foregoing, Defendants further agreed to perform and also had the fundamental common law duties of a trustee to preserve and maintain trust assets. These duties encompass the duties to determine exactly what property forms the subject matter of the Trust and to use reasonable diligence to discover the location of the Trust property and keep it safe and

-179-

under sufficient control;

(e) Federal law also includes the duty to avoid commingling the assets of the Trust with other assets which is exactly what happened when plaintiffs moneys were transferred from JPMorgan to US Bank's 1845 account. Such duty arose here by reason of Code § 408(a)(5) ("The assets of the trust will not be commingled with other property except in a common trust fund or common investment fund.") and the pertinent Treasury Regulations, 26 CFR §§ 1.408-2(b)(5)(1)(same).

(f) Defendant Millennium had the duty to exercise control over the custody of the assets to preserve them and ensure that they were secure. This duty includes, but is not limited to: (I) checking with the Depository Trust Corporation or others to confirm the assets' existence; (ii) otherwise ensuring non commingling or dissipation of the assets of each trust; © and taking other reasonable steps (as previously alleged) to ensure that the assets were, in fact, being preserved and maintained.

(g) Defendant Millennium failed to perform a contractually obligated administrative reviews of defendants proffered investments before the Plaintiffs invested in Peregrine and the Maxwells and/or as part of their retirement income.

(h) Defendant Millennium failed to perform a contractual obligation by having a business relationship or affiliation with the investment Issuer/seller that the Plaintiffs Selected, Garlon Maxwell, Amber Maxwell and Perry Comeau as well as Steven Brewer and PFG.

(I) Defendant Millenium failed to perform due diligence to discover that Garlon Maxwell, Amber Maxwell and Perry Comeau were unregistered commodities trading advisors under the CEA and these defendants had cease and desist orders issued against them in 2007.

-180-

821. Defendant Millenium systematically breached all their foregoing contractual and other obligations.

822. Because Defendant Millenium systematically breached the foregoing contractual obligations to hold and preserve Plaintiffs' funds and not allow them to be commingled, it was very foreseeable that a third party could or would be able simply to take and convert, commingle, and dissipate the res of each Trust, as is what happened. In fact, the res of each Trust was taken by a third party and his conspirators (Wasendorf Sn.)

823. As a direct, foreseeable and proximate result of Defendant Millennium's breaches of contract and federal common law, Plaintiffs and each Class member has suffered cognizable losses to be determined at trial.

### CLAIM XVIII
### Breach of Fiduciary Duty under Federal Law and Breach of Fiduciary Duties Imposed by Federal Law (As against Defendant Millenium)

824.   Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

825. As the Trustee and/or Custodian of Plaintiffs' IRA accounts, Defendant Millennium owed Plaintiffs and Class members a fiduciary duty under federal regulations and common law. By reason of their fiduciary relationship, Defendant Millennium owed Plaintiffs and Class Members the duties of good faith, fair dealing, loyalty, due care, extreme candor, and honesty with respect to the exercise of the Defendant's discretion and duties under the Trust, and their conduct relating to the Trust res.

826. Defendant breached these fiduciary duties by failing to preserve and keep safe

-181-

the Trust res for each of the Class Members and allowing these IRA monies to be commingled and converted.

827. Defendant Millenium did not review the risk disclosure documents that were signed and did not apprise the Class of the serious risks of investing in these sorts of investments.

828. Millenium breached its fiduciary duty by allowing an unregistered person, Perry Comeau who also had a cease and desist order against him from the State of Iowa to explain the risk disclosure to plaintiffs on behalf of Millennium and to assist plaintiffs in signing the Millenium Adoption Agreements.

829. As a foreseeable result of these breaches, plaintiffs were put in harms way and eventually co-defendants were able to commingle and convert Class Members IRA funds, and Plaintiffs and Class members suffered monetary losses.

830. Defendant Millenium is liable for, and Plaintiffs and Class Members are entitled to actual and punitive damages in an amount to be determined at trial attributable to the conduct of Millennium that was reckless, willful, wanton and without regard to the rights of Plaintiff and Class Members.

## CLAIM XIX
### Breach of Contract to Hold Assets and Not Commingle under State Law
### (As Against Defendant Millenium)

831. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

832. In addition or the in alternative to the foregoing claims, Defendant Millenium also is liable for breach of contract under state law.

-182-

833.  As a foreseeable, direct and proximate result of Millennium's breach of contract under State law, Plaintiffs and each Class member suffered losses and damages.

## CLAIM XX
### Breach of Fiduciary Duty Under State Law (Against Defendant Millennium)

834.  Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

835.  Defendant Millenium foregoing breaches of fiduciary duties also violate state law fiduciary standards which include the duties of good faith, extreme candor, honesty, fair dealing, loyalty, due care and to investigate red flags.  These duties mirror, incorporate and add to the federal duties alleged herein

836.  As a foreseeable, direct and proximate result of Millennium's breach of fiduciary duty under State law, Plaintiffs and each Class member suffered losses and damages and are entitled to actual and punitive damages.

## CLAIM XXI
### Ordinary and Gross Negligence under State Law
### (Against Defendant Millenium Trust)

837.  Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

838.  Defendants' foregoing extreme departures from the standards of ordinary care also violate state common law prohibitions against negligence, and constitute gross negligence.

839.  As a foreseeable, direct and proximate result of Millennium's ordinary and gross

negligence under state common law, Plaintiffs and each Class member suffered losses and
damages.

## CLAIM XXII
### Unjust Enrichment and Restitution under Federal and State Law
### (As against All Defendants)

840. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set
forth herein.

841. By reason of the foregoing, Defendants are obligated to make restitution as well
as pay back their unjust enrichment to each Class Member under federal common law and state
law.

## CLAIM XXIII
### Intentional Infliction of Emotional Distress and Consequential Damages
### (As Against All Defendants)

842. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth
herein.

843. Based on the foregoing, defendants knowingly and willfully took a course of action to
convert plaintiffs life-savings for their personal gain and benefit, leaving some class members
with very little cash on hand and making it difficult for some to make ends meet. This conduct
occurring over a twenty year period is outrageous and shocks one's conscience.

844. As a foreseeable, direct and proximate result of this outrageous and felonious conduct
Plaintiffs and each Class member suffered emotional distress and are entitled to losses and
damages.

## CLAIM XIV
### Punitive Damages (As Against All Defendants)

845.  Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

846.  By reason of the foregoing willful and unconscionable conduct causing severe monetary losses and emotional distress, and as a matter of public policy to punish defendants for such conduct, plaintiffs seek punitive damages for their losses.  Punitive damages are sought in excess of jurisdictional limits of this Honorable Court to be determined at trial.

## CLAIM XXV
### Violations of the Commodity Exchange Act, 7 U.S.C. §§ 25(b)(1) and (2)
### (As Against Defendant CME )

847.  Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

848.  Defendant CME was statutorily required to have in place provisions and capacities for the "prevention of market manipulation" (7 U.S.C.§§ 7(b)(2), "fair and equitable trading" (7 U.S.C. §§ 7(b)(3)), "financial integrity of transactions" (7 U.S.C.§§ 7(b)(5), "compliance with (its) rules" (7 U.S.C. §§ 7(d)(2)), and the "monitoring of trading" "to prevent manipulation, price distortion and disruptions of the delivery or cash-settlement prices." (7 U.S.C. §§ 7(d)(4).

849. Because the trading of PFG customer accounts were based in part on manipulation of the FOREX markets by JPMC as well as fictitious trading, violation of Margin Rules under 930, D. E. and K and/or trading without sufficient margin in place, the CME rules were violated in this RICO Scheme.

850. Defendant CME was also required pursuant to §21(b)(7), to have rules "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles

of trade, in general, to protect the public interest." As alleged with particularity herein, the Exchange Defendants failed to protect the public interest and to preserve fair and/or unmanipulated and fraud-free markets for the trading of futures contracts.

851. Exchanges that fail, in bad faith, to comply with any of the statutory provisions identified in paragraphs 649-651 above are liable for actual damages. 7 U.S.C.§ 25(b)(1) and (b)(2). The conduct of the Exchange Defendants complained of herein results not from ordinary or even gross negligence but rather from Defendants knowing and active furtherance and participation in this Scheme and wrongful course of conduct alleged herein, which conduct was undertaken for the Exchange Defendants' own economic gain and in furtherance of no credible discharge of the Exchange Defendants' legal duties to maintain fair, equitable and unmanipulated Exchanges free of fraudulent conduct as well in compliance with the CEA and CFTC Rule and Regulations.

852. CME's conduct as alleged herein violated its obligation to pass and enforce rules and regulations relating to market and financial integrity and stability. The CME defendant's continuous refusal and unwillingness during the Class Period to properly audit and/or examine PFG's account including its account balances including its adjusted net capital and segregated accounts nor to monitor the trading in the PFG Omnibus Sub accounts in accordance with CFTC and CEA mandates, caused harm to Plaintiffs by allowing Wasendorf Sn. to commit fraud in connection with these unmonitored subaccounts and/or to use real time information found on the Globex to accomplish "virtual" trading accounts for each PFG customer so that PFG could easily and in real time destroy customer accounts and/or to conduct off-the-book transactions.

853. By setting up rules to insulate PFG from scrutiny as in the case of these Omnibus

-186-

Sub account rules which actually shielded the activity in the PFG accounts from any kind of surveillance, PFG's customers were subject to abusive trading practices including fictitious sales.

854. Had the CME defendant, knowing about PFG's past violations, carefully monitored and scrutinized the trades going on in these Omnibus Sub-accounts, instead of consciously avoiding the truth of the matter, there would have been ample evidence of misconduct, because only through a pattern of misconduct could PFG have accomplished the Scope of this Fraud over a twenty year period. However, had the CME had proper rules in place to monitor all customer accounts, not just some accounts, in their two-tiered approach to regulation, it would have been evident that there was no money in each omnibus sub account to even conduct trades or post initial margin.

855. Accordingly, the CME Defendant violated Section 22(b)(1) and (2) of the Commodity Exchange Act, 7 U.S.C.§§ 25(b)(1) and (2).

## CLAIM XXVI

### First Rico Violation-18 U.S.C. § 1962©
### (Against Fraudulent Inducement Defendants)

856. Plaintiffs incorporate by reference each and every allegation as if fully set forth above.

857. Defendants Russell Wasendorf, Sn., Steven Brewer, Millenium Trust, Garlon Maxwell, Amber Maxwell, Perry Comeau, and Paul Thomas and some of the 113 other Introducing Brokers and CTAs (John Does 1-113) (referred to herein as the "RICO Defendants" and/or "Fraudulent Inducement Defendants"), are all "persons" capable of holding a legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3). Defendants have violated 18 U.S.C. § 1962©

-187-

by committing multiple acts described below.

**THE ENTERPRISE**

858.  At all relevant times, defendants Russell Wasendorf, Sn., Russell Wasendorf, Jr.,

Steven Brewer, Millenium Trust, Garlon Maxwell, Amber Maxwell, Perry Comeau, Paul

Thomas and the John Does 1-113 (referred to herein as the "RICO Defendants" or "Fraudulent

Inducement Defendants"), associated in fact with each other, and with others known and

unknown, so as to constitute an "Enterprise" within the meaning of 18 U.S.C. Section 1961(4).

At all times relevant to this Second Amended Complaint, the Enterprise was engaged in, and its

activities affected, interstate and foreign commerce.

859.  This "association in fact" Enterprise had a structure and organization and

existed apart from its predicate acts.  Each RICO Defendant is distinct and separate from the

association-in-fact Enterprise of which he/she is a component part. The RICO Defendants

functioned as a continuing unit and associated with the Enterprise through its involvement in the

underlying racketeering offenses as well as through the continuous concealment and promotion

of the activities of the Enterprise.

860.  The participants of the Enterprise, including the RICO Defendants, meet the

structural features of *Boyle v. United States*, as described in detail in ¶¶. 184-280.  First, each

RICO defendant had a common purpose as each worked together to lure customers into the

commodities markets over a long period based on mailings and wirings which were clear

misrepresentations and material omissions. See, e.g., Amended Complaint,¶ 188.  Defendants

worked together to open the accounts (¶190 above), which were designed specifically to

maximize the risk to investors while allowing Brewer, PFG, Millenium, Comeau and the

-188-

Maxwells to receive large commissions. (Amended Complaint ¶221). Second, the constituent parts of the Enterprise also had relationships between them. For example, Millenium, the IRA Trustee, did not conduct any due diligence when accepting accounts which ended up at PFG, who engaged in unauthorized trading and pocketed investor monies for its own account. (Amended Complaint,¶¶. 236-235.) Shortly after Millenium became involved as the IRA Trustee, the Maxwells met with Steven Brewer of the Brewer Futures Group who apparently introduced the Maxwells to Wasendorf, Sr. (Amended Complaint, ¶228.) The Maxwells, with the participation of Comeau, used Steven Brewer to serve as the Introducing Broker on behalf of the Maxwells, which gave the Maxwells a platform for which they could execute trades at PFG, the FCM. (Amended Complaint, ¶¶215-231.) Moreover, during the time period October 2, 2008 through October 8, 2008, when PFG intentionally allowed the named Plaintiffs accounts to dissipate to almost zero, Millenium was an active participant as it continued to collect fees and commissions, blindly signed off on future commodities investments, and blindly disregarded accepted safeguards of the Plaintiffs IRA accounts. (Amended Complaint ¶¶ 223-229.) PFG's Introducing Brokers continued to fraudulently induce members of the investing public to make extremely risky investments in options. (Amended Complaint, ¶¶250-255). There was also longevity sufficient to permit these enterprise associates to pursue these purposes as the fraudulent inducement of customers' accounts began from at least year 2005 and ran through October 2008. (¶281.)

**CONDUCTING AFFAIRS OF THE ENTERPRISE**

861. Each Claim One RICO Defendant participated in the "operation or management"

-189-

of the Enterprise's affairs. The Maxwells, Brewer, Comeau, Wasendorf, Sn., Wasendorf, Jr. other Introducing Brokers, along with Millenium, each had a role in directing the activities of the Enterprise, which was to fraudulently induce customers to invest in the commodities options market based on clear misrepresentations of the risk involved and material omissions of fact concerning the risk of the investments. Wasendorf Sn., Brewer, the Maxwells and Comeau received these funds for investment but traded them in an unauthorized manner (even disregarding explicit instructions to stop trading in the accounts) which destroyed the equity in the customers' accounts, including the accounts of the named Plaintiffs and other class members, and allowed enterprise members to pocket customer monies, as further described herein.

862. Paul Thomas participated in the "operation or management " of the Enterprise's affairs by helping the Enterprise hiding the underlying causes of actions from exposure to protect the Scheme from being discovered so that the Scheme could continue.

863. These Fraudulent Inducement Defendants were related through their connections to the NFA either as a member of the NFA's advisory board, members, associated persons or attorney appearing before it or others subject to regulation by NFA.

**THE RACKETEERING VIOLATION**

864. In the Southern District of New York, and elsewhere, from in or about 2005 and continuing up through at least October 9, 2008, the aforesaid RICO Defendants, each of whom are persons associated with, or employed by the Enterprise, did knowingly and unlawfully conduct or participate, directly or indirectly, in the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and§ 1961(5), all in violation of 18 U.S.C. § 1962©.

-190-

**Racketeering Acts Involving Wire Fraud**

865.  From on or about January 1, 2005 through July 31, 2012, each aforesaid RICO Defendant committed multiple racketeering acts of wire fraud, resulting from their having devised a scheme and artifice to defraud, for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, as described in detail in Amended Complaint, ¶¶. 172-267, to wit-

a-Perry Comeau, and each Maxwell (Garlon and Amber) opened accounts for customers over the internet;

b-Perry Comeau and each Maxwell transmitted documents to customers to open IRA accounts with Millenium by use of interstate wire;

c-Customer accounts and transfer documents to PFG were sent by wire through Introducing Broker Brewer, to be traded by Garlon Maxwell with the assistance of Amber Maxwell and Perry Comeau;

d- Wasendorf, Sn. (through the operation of PFG) and Millenium (with regard to IRA accounts) caused to be generated and sent to victims by email monthly statements, Margin Call Notices (sometimes also mailed), year-end summaries and tax statements as well as redemptions to their investors throughout the United States and globally who held accounts with such Defendants to apprise them of their profits or losses earned in the investments made in accounts set up by defendants Millennium, the Maxwells, Perry Comeau and Brewer Futures Group at PFG.

**Racketeering Acts Involving Mail Fraud.**

-191-

866. From on or about January 1, 2005 through October 9, 2008, RICO Defendants, as described below, committed multiple racketeering acts of mail fraud, resulting from the RICO Defendants having devised, and intending to devise a scheme and artifice to defraud, for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, as described in detail in the Amended Complaint, ¶¶ 172-267, to wit-

a- Wasendorf, Sn. who operated PFG, and PFG mailed a letter to the Schefferts to an address in Mission, Texas informing them of an immediate request for a margin call. This mailing was to prevent the Schefferts from complying with the margin call, and was in violation of CME Rule 930K (see Amend. Com.,¶¶. 228-240)

b -PFG sent a letter to Millenium on October 5, 2008, which was designed by PFG and Millenium to hide the immediate need for a margin call (AC, para. 241-243). In each instance, PFG and Millenium benefitted, by mailing plaintiffs late Margin Call Notices intended to deceive customers so that they would be unable to salvage the remaining balances in their account;

c- Defendants Wasendorf, Sn., Brewer and Millenium intentionally used the Postal Service to mail or caused to be mailed to victims: (1) customer daily and monthly statements (2) year-end tax statements to their customers, and (3) redemption checks to customers who requested such redemptions, and Margin Call Notices. These RICO Defendants also caused to be mailed moneys from new customers who wanted to open accounts to invest in these investments based on fraudulent representations that these investments were safe.

d. Wasendorf, Jr. by signing and mailing verification forms regarding claimants NFA arbitration forms and signing and mailing other documents used to perpetuate this scheme.

-192-

e-Paul Thomas intentionally used the Postal Service to mail or caused to be mailed the Plaintiffs his retainer agreement and other letters  misleading them and confusing them by assuring them that their case was excellent and that they should recover based on Margin Rule violations of PFG 930.  He also used the postal service to mail Amended and Restated Statement of Claims to the NFA without alleging the correct violations ensuring that Claimants would not prevail on their NFA claims.  He also used the Postal Services to agree to allowing PFG litigation advantages like consenting to have NFA hear PFG's Declaratory Judgment Motion which Defendant Thomas did not and should not have agreed to, but did to the disadvantage of Plaintiffs and to make sure their claims went no where.

## PATTERN OF RACKETEERING

867.  Plaintiffs allege that the course of conduct engaged in and by the RICO Defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5). Plaintiffs can show the relatedness prong because the predicate acts have the "similar purposes, results, participants, or methods of commission or are related to the affairs of the enterprise."

868.  Plaintiff alleges that the continuity of the pattern of racketeering activity is closed ended inasmuch as a series of related predicate offenses extended over at least 4 years (a substantial period of time).  Plaintiffs alleges that the pattern of racketeering activity constituted "open-ended" continuity based upon a threat of continuing racketeering activity because the predicate activity constituted the regular way these RICO Defendants did business.  Because such criminal conduct was part of the regular way the RICO Defendants did business it gives rise to

-193-

the inference that such offenses would have continued indefinitely, if not interrupted, here by the complete diminution of customers accounts' balances.

**INJURY TO PLAINTIFFS**

869. Plaintiffs were proximately and directly incurred monetary injury consisting of the complete destruction of each one's commodities futures and trading accounts held at PFG during the relevant time frame, when the RICO Defendants caused their accounts to be extinguished and terminated. Among other things, as described above, these RICO Defendants directly injured plaintiffs by not timely alerting them that they were on a Margin Call starting on October 2, 2008.

**CLAIM XXVII**
**Second Rico Violation- 18 U.S.C.§ 1962(d)**
**(Against Fraudulent Inducement Defendants for RICO Conspiracy.**

870. Plaintiffs incorporate by reference each and every allegation as if fully set forth above.

871. Defendants Russell Wasendorf, Sn, Wasendorf, Jr., Steven Brewer, Millennium Trust, Garlon Maxwell, Amber Maxwell, Perry Comeau, Paul Thomas and some of the 113 other Introducing Brokers and CTAs (John Does 1-113) (referred to herein as the "RICO Conspiracy Defendants"), are all "persons" capable of holding a legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

**ENTERPRISE**

872. At all relevant times, the RICO Conspiracy Defendants described above and others known and unknown, associated in fact with each other, and with others known and

-194-

unknown, so as to constitute an "Enterprise" within the meaning of 18 U.S.C. Section 1961(4).

At all times relevant to this Amended Complaint, the Enterprise was engaged in, and its activities

affected, interstate and foreign commerce.  The participants of the Enterprise meet the structural

features of *Boyle v. United States*, as described in detail in the Amended Complaint, ¶¶ 177-267,

and as described in the First Claim above.

**CONDUCTING AFFAIRS OF ENTERPRISE**

873.  Each Claim Two RICO Conspiracy Defendant participated in the "operation or

management" of the Enterprise's affairs.

**RACKETEERING CONSPIRACY VIOLATION**

874.     Plaintiffs allege that commencing from at least year 2005, and during and

continuing until late 2008, the above RICO Conspiracy defendants conspired to violate section

1962©, i.e., each defendant agreed to conduct or participate in the affairs of the Enterprise,

through a pattern of racketeering, including acts indictable under 18 U.S.C. §§ 1341 and 1343, as

more fully described in the First RICO Claim for Relief and incorporated by reference herein.

Plaintiffs allege that the conspiratorial objective of that mutual agreement between the RICO

Conspiracy Defendants was intended to obtain Plaintiffs' interests in business and/or property,

and that such conspiratorial conduct violates RICO section 1962(d).  Each Defendant agreed that

conspirators would commit illegal racketeering activities which constitute a pattern of

racketeering, *i.e.*, the effecting of acts of mail and wire fraud, as described in detail in First Claim

for Relief and fully incorporated by reference herein.  As a result of Defendants' agreement that

-195-

conspirators would commit racketeering activities, Plaintiffs sustained economic damages consisting of the total dessication of their PFG futures and options trading subaccounts.

**CLAIM XXVIII**
**Third Rico Violation- 18 U.S.C. § 1962©**
**(Against Wasendorf Sn., JPMorgan Chase, and US Bank-Ponzi Scheme Defendants)**

875.  Plaintiffs incorporate by reference each and every allegation as if fully set forth above.

876.  Defendants Russell Wasendorf, Sn, JP Morgan Chase and U.S. Bank (referred to herein as the "RICO Ponzi Scheme Defendants"), are all "persons" capable of holding a legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3). Defendants have violated 18 U.S.C. § 1962© by committing multiple acts described below.

**THE ENTERPRISE**

877.  At all relevant times, defendants Russell Wasendorf, Sn., JP Morgan Chase and U.S. Bank, associated in fact with each other, and with others known and unknown, such as U.S. Bank employee Hope Timmerman, so as to constitute an "Enterprise" within the meaning of 18 U.S.C. Sections 1961(4).  At all times relevant to this Amended Complaint, the Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

878.  This "association in fact" Enterprise had a structure and organization and existed apart from its predicate acts.  Each RICO Defendant functioned with each other and is distinct and separate from the association-in-fact Enterprise of which he is a component part. Each RICO Defendant associated with the Enterprise through its involvement in the underlying racketeering offenses as well as through the continuous concealment and promotion of the

activities of the Enterprise.

879. The participants of the Enterprise, including the RICO Defendants, meet the structural features of *Boyle v. United States*, as described in detail in the Amended Complaint, ¶¶ 281-384. Here, each Defendant had a common purpose and relationships with each other as they worked together to transfer monies from segregated customer accounts at JP Morgan to accounts which were treated as unsegregated at U.S. Bank, who worked with Wasendorf. Sn. and PFG to conceal the true nature of the monies and divert the monies to the benefit of the Wasendorfs. Defendants worked together for over seven (7) years and thus had the longevity sufficient to permit the associates to pursue the Enterprise's purpose.

880. Each RICO Ponzi Scheme Defendant participated in the "operation or management" of the Enterprise's affairs. JP Morgan Chase knowingly directed the transfer of millions of dollars of customer monies held in customer segregated accounts to U.S. Bank, who in conspiracy with the Wasendorfs caused these monies to be diverted to PFG and the Wasendorfs for the private use of the Wasendorfs.

881. JP Morgan Chase also received customer segregated monies from U.S. Bank's 1845 customer segregated accounts to be further used by Wasendorf, Sn.

882. JP Morgan Chase also assisted Wasendorf, Sn.., in disposing of customer segregated monies in FOREX transactions where JPMC set up Wasendorf, Sn. and PFG to act as counter parties in FOREX transactions with members of the investing public knowing that FOREX was being manipulated by JPMC and others and thus greatly benefitting the vast majority of the time on these FOREX trades in furtherance of this Scheme to deplete customers

-197-

of their investment funds, after pocketing the monies by Wasendorf, Sn. and then redistributed

to the other Ponzi Scheme defendants as fees.

## THE RACKETEERING VIOLATION

883.   In the Southern District of New York, and elsewhere, from in or about 2005 and

continuing up through at least year July 2012, the aforesaid RICO Defendants, each of whom

are persons associated with, or employed by the Enterprise, did knowingly and unlawfully

conduct or participate, directly or indirectly, in the affairs of the Enterprise through a pattern of

racketeering activity within the meaning of 18 U.S.C. § 1961(1) and § 1961(5), all in violation

of 18 U.S.C. § 1962©.

### Racketeering Acts Involving Wire Fraud

884.   From on or about January 1, 2005 through July 2012, each aforesaid RICO

Defendant committed multiple racketeering acts of wire fraud, resulting from their having

devised a scheme and artifice to defraud, for obtaining money and property by means of false

and fraudulent pretenses, representations, and promises, to wit-

a-JP Morgan Chase intentionally and knowingly wired millions of dollars in PFG

customer money held in a segregated account 5265, including the Oelwine Class Plaintiffs, to

U.S. Bank's 1845 account, where the monies were illegally used by the Wasendorf Sn. (Amend.

Comp.,¶¶. 280-305) describing the transfers from year 2005-2009); (AC, para. 320);

b- US Bank knowingly used wire transfers to transfer monies out of the segregate

customer accounts to PFG non-customer accounts for the personal benefit of the Wasendorfs

and their companies (*See* List of Transfers Exhibit 7 to Amended Complaint); see also Amend.

Comp.¶¶ 297-302), numerous transfers from June 2008 through July 2012 from US Bank to

non-customer accounts;

c- Wasendorf Sn. continuously instructed U.S. Bank employee Hope Timmerman to wire transfer monies from the 1845 account to Wasendorf accounts (Amend Complaint, ¶¶ 2889)

d-E-mails in May 2011 between U.S. Bank (through Hope Timmerman), PFG, and the NFA describe confirmations of the account balance of the 1845 account and misrepresentations that those monies were held in customer segregated accounts (AC, para. 371-374.)

**Racketeering Acts Involving Mail Fraud.**

885.   From on or about January 1, 2005 through July 2012, each RICO Defendant, as described below, committed multiple racketeering acts of mail fraud, resulting from the RICO Defendants having devised, and intending to devise a scheme and artifice to defraud, for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit,

a- JP Morgan Chase mailed notices to the NFA regulators confirming the balances of PFG's customer accounts were properly segregated when it consciously avoided the fact that such monies were transferred to U.S. Bank, who knowingly used such customer monies on behalf of the Wasendorfs (Amend. Complaint, ¶¶ 354-358);

b-Wasendorf Sn. established a post office box in Cedar Falls to intercept mail directed at U.S. Bank so that Wasendorf could misrepresent to the NFA and its auditor that it maintained customer segregated accounts (Amend Comp, ¶ 377);

c- from at least 2007 through the date of PFG's collapse in July 2012, PFG (under

-199-

control of the Wasendorfs) mailed customers, including plaintiffs and class members notices to deposit customer funds by wire or mail to JP Morgan account 5265, which was deposited into segregated accounts and thereafter wired to account 1845 for the personal use of Wasendorf, Sn. (Amended Complaint, ¶¶ 354-357);

d- Defendants Wasendorf, Sn., JPMorgan, and U.S. Bank intentionally used the Postal Service to mail or caused to be mailed to victims: (1) customer daily and monthly statements and (2) year-end tax statements to their customers, and (3) margin call notices.

**Racketeering Acts Involving Money Laundering**

886. From on or about January 1, 2005 through July, 2012, Defendant U.S. Bank, JP Morgan and Wasendorf Sn., as described below, committed multiple racketeering acts of money laundering in that they engaged in, and otherwise caused, numerous financial transactions and transfers of proceeds of the mail and wire fraud violations above, which transactions violated 18 U.S.C.§ 1956 (money laundering.) As described in the Amended Complaint, ¶¶ 294-302, and in other sections as well, U.S. Bank engaged in financial transactions with monies transferred to it by JPMC which represented the proceeds of mail and wire fraud violations, as these monies were now no longer held in segregated accounts, by wiring these monies to Wasendorf Sn. who controlled entities such as Wasendorf Construction. The transfer of these funds no longer held in segregated accounts (the proceeds of the mail and wire fraud) to Wasendorf and Wasendorf controlled entities promoted the unlawful misappropriation of Plaintiffs' funds in violation of 18 U.S.C.§ 1956(a)(1)(A), and sought to conceal U.S. Bank's JPMC, and Wasendorf's unlawful activity in violation of 18 U.S.C. §1956(a)(1)(B).

887. From on or about January 1, 2005 through July, 2012, Defendant JP Morgan

-200-

and Wasendorf Sn., as described below, committed multiple racketeering acts of money laundering in that they engaged in, and otherwise caused, numerous financial transactions and transfers of proceeds of the mail and wire fraud violations above, which transactions violated 18 U.S.C.§ 1956 (money laundering.)  As described in the Amended Complaint, ¶¶ 10-18 and in other sections as well, JPMC  engaged in financial transactions involving the settlement of FOREX transactions with PFG and its customers which represented the proceeds of mail and wire fraud violations, as these monies were unlawfully taken out of segregated accounts for FOREX trading which was being manipulated by JPMC and others and thus such profits resulting from these FOREX transactions were unlawful and constituted money laundering since the monies creating these unlawful gains originally came from the customer segregated accounts.  Eventually, these unlawful FOREX profits were wired by JPMC to Wasendorfs' account, since PFG was the FOREX counter party.  The transfer of these FOREX trading profits were therefore proceeds of the mail and wire fraud for the benefit of Wasendorf and Wasendorf controlled entities and promoted the unlawful misappropriation of Plaintiffs' funds in violation of 18 U.S.C.§ 1956(a)(1)(A), and sought to conceal JPMC's and Wasendorf's unlawful activity in violation of 18 U.S.C. §1956(a)(1)(B).

**PATTERN OF RACKETEERING**

888.  Plaintiffs allege that the course of conduct engaged in by the RICO Defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5). Plaintiffs can show the relatedness prong because the predicate acts have the "similar purposes, results,

participants, or methods of commission or are related to the affairs of the enterprise."

889.   Plaintiff alleges that the continuity of the pattern of racketeering activity is closed ended inasmuch a series of related predicate offenses extended over at least seven (7) years (a substantial period of time.)  Plaintiffs alleges that the pattern of racketeering activity constituted "open-ended" continuity based upon a threat of continuing racketeering activity because the predicate activity constituted the regular way the Ponzi Scheme Defendants did business.  Because such criminal conduct was part of the regular way the Ponzi Scheme Defendants did business it gives rise to the inference that such offenses would have continued indefinitely, if not interrupted, here by the bankruptcy of PFG and criminal prosecutions.

**INJURY TO PLAINTIFFS**

890.   Plaintiffs were proximately and directly incurred monetary injuries when the RICO Ponzi Scheme Defendants caused their monies in their accounts to be transferred to U.S. Bank, unlawfully held in non-segregated accounts, and then transferred to the Wasendorfs for their own personal use and then ultimately to be destroyed in untoward trading practices.

**CLAIM XXIX**
**Fourth Rico Violation-18 U.S.C. § 1962(d) (vs Ponzi Scheme Defendants-RICO Conspiracy).**

891.   Plaintiffs incorporate by reference each and every allegation as if fully set forth above.

892.   Defendants Russell Wasendorf, Sn, JP Morgan Chase, and U.S. Bank, are all "persons" capable of holding a legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

**THE ENTERPRISE**

-202-

893.  At all relevant times, defendants described above and others known and unknown, associated in fact with each other, and with others known and unknown, so as to constitute an "Enterprise" within the meaning of 18 U.S.C. Sections 1961(4).  At all times relevant to this Amended Complaint, the Enterprise was engaged in, and its activities affected, interstate and foreign commerce.  The participants of the Enterprise meet the structural features of *Boyle v. United States*, as described in detail in AC, para. 268-364, and as described in the Third Claim above.

**CONDUCTING AFFAIRS OF ENTERPRISE**

894.  Each Claim Four RICO Conspiracy Defendant participated in the "operation or management" of the Enterprise's affairs.

**RACKETEERING CONSPIRACY VIOLATION**

895.  Plaintiffs allege that commencing from at least year 2005, and during and continuing until July 2012, the above RICO Conspiracy defendants conspired to violate section 1962©, i.e., each defendant agreed to conduct or participate in the affairs of the Enterprise, through a pattern of racketeering, including acts indictable under 18 U.S.C. §§ 1341, 1343 and section 1956 as more fully described in the Third RICO Claim for Relief and fully incorporated by reference herein.   Plaintiffs allege that the conspiratorial objective of that mutual agreement between the Defendants was intended to obtain Plaintiffs' interests in business and/or property, and that such conspiratorial conduct violates RICO section 1962(d).   Each RICO Ponzi Scheme Conspiracy Defendant agreed that conspirators would commit illegal racketeering activities which constitute a pattern of racketeering, *i.e.*, the effecting of acts of mail and wire fraud, as

-203-

described in detail in Third Claim for Relief.  As a result of Defendants' agreement that

conspirators would commit racketeering activities, Plaintiffs sustained economic damages when

their accounts were reduced to zero in furtherance of this RICO Ponzi Scheme.

## CLAIM XXX
### Against CME Group for Common Law Fraud

896.  Plaintiffs incorporate by reference all of the foregoing allegations as if fully set

forth herein.

897.  CME Group was during the relevant time period a C Corporation that owned and

fully controlled and operated its wholly owned subsidiary CME.

898.  CME Group conducted Market Regulation and Surveillance over the customers at the

CME and had full access to each customers' accounts during the relevant time period to

supplement the CME's self-regulatory obligations.

899.  CME Group was never registered as a Designated Contract Market pursuant to the

Commodities Exchange Act 7 U.S.C.§§§ 7, 21, 25 and is not a Designated Contract Market, and

therefore is not subject to the statute relating to customer private right of actions.

900.  CME Group made material misrepresentations to the members of the public including

plaintiffs herein that CME Group would independently oversee CME and actively monitor and

surveil customer accounts that were traded over the CME Exchange during the relevant time

period to ensure integrity of these markets.

901.  Instead, CME Group allowed PFG to operate its Ponzi Scheme over the CME

Exchange and did not stop PFG's conduct and failed to regulate the conduct of PFG during this

20 year time period where CME Group material misrepresented that it would monitor and surveil

-204 -

its customers and allowed PFG an undercapitalized FCM to operate and to continue their RICO

Conspiracy under the guise of the Omnibus Rules.

902.  CME Group also did not monitor PFG's net capital.  Because a minimum level of net

capital is required to conduct PFG's affairs over the CME Exchange and because PFG did not

have sufficient net capital during the relevant time period, CME Group misrepresented to the

public the extent of its market Surveillance.  As such CME Group did not discover or consciously

avoided the obvious fact that PFG was grossly undercapitalized and could not sustain positions or

margin requirements during the relevant time period.

903.  Based on these failures to monitor the conduct of one of the CME's customers, PFG

continued to engage in violative conduct of the CME rules such as fictitious trades during the

relevant time period that CME Group never observed.

904.  Plaintiffs relied on the CME Group misrepresentations that they would actively

monitor and surveil their customer accounts based on the Fraud on the Market basis of liability

which presumes reliance.

905.  Plaintiffs were damaged by having their entire life savings dissipated as customers of

PFG using the CME Exchange to deplete customer funds while CME Group never stopped PFG

or expelled PFG from the CME Exchange for it numerous violations which would have prevented

plaintiffs losses.

## CLAIM XXXI
### Against CME Group for negligence and gross negligence

906.  Plaintiffs incorporate by reference all of the foregoing allegations as if fully set

forth herein

907. CME Group had a duty to the members of the public who traded over the CME Exchange to reasonably maintain the Exchanges for the members of the investing public so that the members of the public could receive fair and equitable trading practices in connection with each one's account.

908. CME group acted unreasonably and recklessly with respect to the allowing PFG to continue to trade over the CME Exchange for a twenty year period where PFG was grossly undercapitalized, did not comply with margin requirements or rules; engaged in fictitious trading, and did not have sufficient capital to conduct trading activities during the relevant time frame.

909. As such, PFG used fictitious trades to destroy plaintiffs accounts using the Globex to track real time trades in their Ponzi Scheme whereby Wasendorf Sn. first pocketed plaintiffs accounts and then used the CME to make sure the Plaintiffs accounts were destroyed.

910. Due to CME Group negligent and/or grossly negligent conduct, and immediately expelling Wasendorf Sn as a CME customer, plaintiffs accounts were allowed to destroyed by Wasendorf over the CME Exchange thus proximately causing Plaintiffs' losses.

## CLAIM XXXII
### Against CME Group Breach of Contract

911. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

912. Plaintiffs were third-party beneficiaries to the Co-Location Agreement entered into between PFG and CME Group during the relevant time period.

913. According to this Agreement, PFG was subject to the Exchange Rules including Rule 930 by virtue on entering into the Co-Location Agreement with CME Group.

914. As such, CME Group was obligated to enforce Rule 930 against PFG during the relevant time period, which would have caused CME Group to shut down PFG's trading of Plaintiffs' accounts which were under margined and required CME Group to stop any more trading in Plaintiffs' accounts.

915. Plaintiffs were intended beneficiaries to this Co-Location Agreement based on the numerous literature published by CME Group and CME stating their intentions to protect the integrity of the CME Exchanges. Because members o the public invested in this Exchange, clearly these investors were intended beneficiaries of this Co-Location Agreement.

916. Because Plaintiffs accounts were being ostensibly traded over the CME Exchange, they were in privity with the CME.

917. Because PFG engaged in fictitious trades using the Globex to shadow trade accounts, the CME Group failed to stop the conduct and caused plaintiffs to lose their life savings.

## CLAIM XXXIII
### Against Paul Thomas for Legal Malpractice

918. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

919. During the relevant time period, Paul Thomas in representing Plaintiffs failed to exercise the care, skill and diligence commonly possessed and exercised by an ordinary member of the legal community in the handling of Plaintiffs NFA claims by failing to allege the correct claims upon which relief could be granted.

920. As a result of Paul Thomas's negligence, plaintiffs were caused to lose their NFA arbitrations and fail to recover their life savings that could have been recovered in the NFA

arbitration.

921. Paul Thomas's negligence was a substantial factor in causing Plaintiffs to lose their

NFA arbitrations and had Paul Thomas acted reasonably Plaintiffs would have prevailed at the

NFA level.

922. As such the attorney malpractice was a substantial factor in causing actual damages

that plaintiffs have suffered.

### CLAIM XXXIV
**Against NFA for Violations of the Commodities Exchange Act, 7 U.S.C. §§ 21, 25, Et. Seq.
For Failure to Enforce the Commodity Exchange Act and For Violating NFA Rules and By-
laws**

923. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth

herein.

924. Pursuant to 7 U.S.C.§25(b)(2), the NFA, as a registered futures association, must

enforce any bylaw or rule that is required to be enforced under 7 U.S.C. § 21. The NFA shall be

liable for actual damages sustained by a person resulting from such failure to enforce or the

enforcement of such bylaw or rules.

925. Based on the multiple violations of NFA rules, bylaws and violations of 7 U.S.C. §21,

the NFA as a registered futures association is liable to plaintiffs for actual damages that were a

substantial factor in causing plaintiffs' NFA arbitrations to fail and thus causing them to lose their

life savings rather than recover it in a fair hearing.

926. Because the NFA acted in bad faith, recklessly and negligently by failing to shut down

PFG, Wasendorf, and Brewer based on each one's numerous violations of NFA rules and for

requiring expulsion from NFA and for allowing Perry Comeau to become registered at the NFA

although Perry Comeau admittedly did not understand the Plaintiffs Investments and thus he could not have possibly satisfied NFA proficiency requirements , NFA is liable for damages under 7 U.S.C.§ 25(b)(4).

## CLAIM XXXV
### BREACH OF FIDUCIARY DUTY AGAINST THE CME GROUP

927.  Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

928.  CME Group as the owner of the CME Exchange owes a fiduciary duty to the members of the public who invest over the CME Group's Exchange by virtue of the fact that CME is a designated contract market whose stated purpose is to ensure integrity of the Market place for the public investments.  As a designated contract market, CME must pass rules and enforce the laws and rules of the United States to protect investors from bad faith conduct that occurs over the CME Exchange.

929.  Because CME Group is not a designated contract market, CME Group owes a high degree of care and a Fiduciary duty to all customers including plaintiffs who traded futures and options contracts over the CME during the relevant time frame.

930.  CME Group breached its fiduciary duty to Plaintiffs by allowing Wasendorf and PFG to engage in phone trade, fictitious trades, under margined trades, prearranged sales and other conduct over a 20 year period that caused plaintiffs herein to lose their entire investments through Exchange activity.

931.  The CME group using its market surveillance could have monitored PFG's account and realized these accounts were grossly under margined and immediately shut down trading in

-209-

PFG's account under its Emergency powers and other powers.

## DEMAND FOR JURY TRIAL

932.  Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal

Rules of Civil Procedure, of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Class Members demand judgment:

(A)  certifying the class, appointing Plaintiffs as representatives of and

(B)  appointing Plaintiffs' counsel as class counsel;

©  awarding damages, including pre-judgment interest, on each claim in an

     amount to be established at trial

(D) awarding punitive and treble damages in an amount to be established at trial,

(E) impressing a constructive Trust on the ill-gotten gains of Defendants in the ultimate

    res of which each proposed class member shall have an undivided interest;

(F)  for reasonable attorneys' fees and costs of investigation and litigation; and

(G)  granting such other relief as to this Court may deem just and proper.

November 30 2017

Respectfully Submitted,

*Susan J. Levy, Esq.*

Susan J. Levy, Esq.
Attorneys for Class Plaintiffs
  and Class Members
40 East 10th Street
Suite 2K
New York, New York 10003
Tel: (212) 962-1782
Fax: (212) 962-3711