# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**BRUCE BEHRENS,** *et al.*

       **Plaintiffs,**

    **vs.**

**JPMORGAN CHASE BANK, N.A.,** *et al.,*

       **Defendants,**

**Index No. 1:16-cv-05508-VSB**

**Hon. Vernon S. Broderick**

---

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS, MOTION TO TRANSFER VENUE AND MOTION TO STAY PENDING ARBITRATION; AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTIONS ONLY INTERPOSED IN THE ALTERNATIVE SEEKING TO STRIKE THE UNCONSCIONABLE PROVISIONS OF THE ARBITRATION AGREEMENT AND TO TRANSFER THIS CASE TO IOWA, INSTEAD OF ILLINOIS, BUT PREFERABLY TO LEAVE THIS CASE IN NEW YORK AND RESERVE DECISION FOR A LATER DATE**

February 12, 2018

Susan J. Levy
Attorney for Plaintiffs
40 East 10th Street
Suite 2k
New York, New York 10003
Tel. (212) 962-1782
Fax (212) 962-3711

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.............................................................................................viii

PRELIMINARY STATEMENT........................................................................................1

Transfer of Customer Funds Proximately Causing Losses to Plaintiffs...........................5

ARGUMENT.....................................................................................................................8.

I.. PLAINTIFFS' CLAIMS ARE VALID AND TIMELY AND SHOULD PROCEED..............8

   A. Under Applicable Pleading Standards Plaintiffs' Claims are Plausibly Alleged..............10

     1. Applicable Pleading Standards on A Motion to Dismiss.................................................11

II. BECAUSE DEFENDANTS HAVE FAILED TO SUSTAIN THEIR BURDEN OF
PROOF ON THE STATUTE OF LIMITATIONS DEFENSE, THESE TIMELY
CLAIMS SHOULD PROCEED.................................................................................13

   A. The Claims in the SAC are Timely Under Applicable Pleading Standards......................13

   B. Plaintiffs' Federal Claims Should Proceed under the Discovery Rule, since They
Reasonably Investigated Their Claims after Receiving Inquiry Notice...........................14

     1. Because Storm Warnings Did Not Even Exist until August, 2012 and only
Against PFG and Wasendorf, the Statute of Limitations Did not Accrue Against
these defendants Until August 2012.........................................................................16

     2. Because Plaintiffs Filed Notice of Claims in 2012 and continued to investigate
By joining the Class Action, their claims are timely under the DAR since they
discovered the nature of their claims in 2015 or 2016.............................................18

     3. The RICO and CEA Claims are Timely..................................................................20

   C. These Federal Claims Sounding in RICO and the CEA are Also Timely
Based on Equitable Tolling and based on Fraudulent Concealment................................24

     1. Because this Ponzi Scheme was Self-Concealing, and because there was

actual Concealment, Equitable Tolling is Proper.........................................................26

    2. The SAC properly alleges that Plaintiffs did <u>not</u> learn of the Scheme
       during the Applicable Time Period.........................................................................29

    3. Because Plaintiffs Acted Diligently, Equitable Tolling Applies............................29


   D. Because many of the claims are identical to *In Re Peregrine Financial
      Customer Litigation,* and Because the Non-Piggy Back Carve Out
      Applies under these circumstances, Many of the Federal Claims Herein
      Should be Tolled Under *American Pipe* including the Claims for viola-
      tions by the Bank Defendants of 7 U.S.C. 6(d)(B) and Aiding and
      Abetting..................................................................................................................29

    1. Because the subclass was never decertified by order of the
       court, these plaintiffs should be allowed to proceed as a class...............................35

    2. Because CME and CME Group voluntarily participated in the prior class
       action, they should also be subject to *American Pipe Tolling*...............................37

   E. Plaintiffs' State Law Claims Are Also subject to Tolling. .......................................38

    1. Fraud-by-Omission and Breach of Fiduciary Duty are Timely............................39

    2.. Because the punitive damages claims relate to the fraud and
       breach of fiduciary claims, the claims should also be tolled.................................40


    3. Because the Unjust Enrichment Claim relates to the
       underlying claims that are subject to tolling, it is also timely.............................40

III. BECAUSE THE BANK DEFENDANTS PROXIMATELY CAUSED PLAINTIFFS'
    LOSSES BY TRANSFERRING THEIR LIFE SAVINGS TO WASENDORF, ALL
    CLAIMS ARE VALID AGAINST THE BANK DEFENDANTS.........................................41

   A. Plaintiffs Have Adequately Pled Facts to Support Violation of 7 U.S.C.
     § 6d(b) for unlawfully transferring customer segregated funds to Wasendorf
     and thereby proximately causing Plaintiffs' Damages.......................................................41

    1. Loss Causation Under the Commodities Exchange Act has been plausibly
       alleged based on plaintiffs' actual damages............................................................43

B. Because the SAC Alleges Plaintiffs Had Special Deposits Both at JPMorgan and at US Bank Pursuant to 7 U.S.C.§6d(b) and 17 C.F.R.1.20 its Claims for Breach of Fiduciary Duty and Fraud by Omission Are Also Valid.............................45

1. As in *In Re Pelegrine,* Here too, Breach of Fiduciary Duty and Fraud by Omission have been properly pled against the Bank Defendants.......... ...........46

2. Fraud by Omission is Also Proper Against the Bank Defendants.................... ......49

3. Plaintiffs Have Properly Alleged Proximate Causation under State Law...............49

IV. PLAINTIFFS' CLAIMS AGAINST THE EXCHANGE ARE VALID.................................50

A. The SAC amply pleads violations of 7 U.S.C.§25(b)(1)(A)........................................52

1. The allegations that there was no Clearing member monitoring PFG shows a violation of the CME Rule 960 that resulted in abusive trading practices in violation of 7 U.S.C.§ 4d(b)................................53

2. Because CMEG and PFG entered into a co-location agreement for the GLOBEX, a violation of CME Rule 903 has been plausibly alleged................55

3. The facts alleged in the SAC also show a rule violation of CME 971...............56

4. CME Rules 402(b) and 402(c)(e) were violated because the CME failed to exercise its emergency powers to Shut down trading during the week of October 2, 2008 when the Plaintiffs' Accounts were on a margin call ........................................................................................................57

B. The allegations under 7 U.S.C.§ 25(b)(1)(c) are also valid........................................58

1. By enforcing the Omnibus Rules, CME also violated 7 U.S.C.§6d(b) by allowing segregated customer monies to be used for non customers................................................................................................................59

C. Plaintiffs Have Plausibly alleged Bad Faith Conduct under 7 U.S.C.§25(b)(4)............................................................................................................60

1. Because the CME had wrongful knowledge of PFGs conduct since 1999, Bad Faith has been adequately alleged.........................................62

2. Because the SAC pleads that CME was profiting greatly from this 20 year relationship, an ulterior motive has been adequately

-iii-

    alleged.................................................................................................................63

    3. The SAC also Establishes Constructive Bad Faith..........................................65

    4. A negligence standard applied to non-discretionary rules
       to establish bad faith.......................................................................................67

    5. Plaintiffs Have Adequately Alleged Actual Damages and loss
       Causation..........................................................................................................69

  D. CMEG, the Parent and Alter Ego of CME is Also Liable..................................68

    1. Because CMEG was not a Registered Entity, Common Law
       claims should not be preempted against them............................................71

    2. Because CMEG is not a Registered Entity, 7 U.S.C.§25(b)
       does not apply...................................................................................................69

    3. A valid claim of negligence has been pled against CMEG
       under *Lerner v. Fleet*......................................................................................69

    4. Because CMEG also Breached its Fiduciary Duty to Plaintiffs
       It is also liable for damages including exemplary damages.....................71

    5. The SAC Plausibly Pleads Fraud against CMEG....................................73

        a. Such material misstatements constitute Fraud on the
           Market, therefore Reliance and Damages are presumed.....................74

    6. Because Clearly Plaintiffs were Intended to Gain a Benefit
       from the Globex Co-Location Agreement, they are Third
       Party Intended Beneficiaries.....................................................................74

V. PLAINTIFFS' CLAIMS FOR AIDING AND ABETTING COMMODITIES FRAUD
ARE VALID BASED ON CONSCIOUS AVOIDANCE.........................................................75

  A.. Because U.S. Bank Consciously Avoided this Fraud, Questions of
      Fact Exist regarding aiding and abetting..................................................................75

  B. JP Morgan Also Consciously Avoided Knowledge of Ponzi Scheme
     and Provided Material Assistance to Wasendorf and PFG.....................................79

  C. The Exchange Defendants Also Aided and Abetted Wasendorf...............................80

-iv-

D.  Perry Comeau and Russell Wasendorf Also Aided and Abetted............................81

E.  Plaintiff has Properly Pleaded Causation..................................................81

VI.  PLAINTIFFS' RICO CLAIMS ARE PROPER UNDER 18 U.S.C.§1962 (C)....................81

    A.  Plaintiffs Have Met Applicable Pleading Standards Under RICO .......................82

    B.  Because all three elements of an Association-in-fact enterprise have
        been plausibly alleged, the first element of the RICO case is valid....................83

        1.  This association-in-fact Enterprise had a common purpose..........................83

        2.  Relatedness has been plausibly alleged to describe this Association-
            in-Fact............................................................................86

        3.  Because the SAC properly pleads Longevity, the Claims are
            proper............................................................................87

        4.  The Enterprise Alleged is Separate and Apart From the Pattern
            of  Racketeering Activity...........................................................87

        5.  Defendants had control over the RICO Enterprise....................................89

    C.  Plaintiffs Have Properly Pled Claims Sounding in Mail Fraud and
        Wire Fraud...........................................................................89

        1.  Fraud Has Been Plausibly Alleged..................................................91

        2.  Plaintiffs Have Plausibly Alleged Conscious Avoidance................................93

            a.  plaintiffs have not engaged in impermissible group pleading......................95

        3.  The RICO Scheme Had to Proximately Cause the Injury Not the
            Individual Mailing and Wirings.....................................................96

            a. Defendants Wirings and Mailing Effected Interstate Commerce...................97

    D.  Plaintiffs have also properly pleaded Money Laundering as a Predicate Act
        to support this Fraudulent Scheme under 18 U.S.C.§1956.......................................97

    E.  Plaintiffs Have Properly Pled Proximate Causation under RICO............................99

F. Plaintiffs have Plausibly Alleged A RICO Conspiracy..........................................100

    1. Defendants' Arguments against The RICO Conspiracy Claim Should Fail.....102

VII. BECAUSE THE ARBITRATION PROVISION  IS UNCONSCIONABLE,
MILLENNIUM'S MOTION FOR A STAY SHOULD BE DENIED.................................104

A. The Federal Arbitration Act Does Not Require a Stay of This Case...........................105

    1. This Court should decide the Issue of Arbitrability.................................................105

        a.   Because the contact with Mr. Wakeford violated New York Rules
of Professional Conduct, 22 N.Y.C.R.R. 1200.42, since Mr. Wakeford
was already being represented by counsel, he should not be subject to the
June 2017 Custodial Agreement..........................................................................106

    2. Even under the Liberal Construction of Agreements to Arbitrate,
this Arbitration Provision is Simply Unenforceable under FAA §2.........................107

    3. Because the Arbitration Agreement Containing the Custodial Agreement
Was Never Presented to Plaintiffs, It Cannot be Incorporated by Reference
but rather, It is Procedurally and Substantively Unconscionable Under State
Law and should be Nullified.....................................................................................109

        a. Because the Arbitration Provision Contained in the Custodial Agreement Is
Procedurally Unconscionable, it is Unenforceable Under the FAA § 2 ,
Savings Clause......................................................................................................109

        b. Because Perry Comeau had a cease and desist order against him in the
State of Iowa and could not be acting as an Investment Advisor, these
Documents are unconscionable as a matter of law, because Millennium
did not have the power to bind the Plaintiffs.......................................................112

        c. Because this Arbitration Provision Violates the Commodities Exchange
Act and the Commission Rule 17 CFR 166.5, it should be voided and
deemed unenforceable..........................................................................................114

        (i) Because the claims at issue against Millennium relate to Transactions
in Commodities Futures and Options Trading Over an Exchange that
was conducted by PFG, these claims are only subject to Arbitration
where there has been compliance with 17 C.F.R.166.5......................................117

      d. Because the Millennium Arbitration Provision is Substantively
        Unconscionable, it is Equally Unenforceable.....................................................117

      e. Alternatively, the unconscionable provisions should be stricken,
        and this case should proceed as a Class Arbitration in Iowa............................119

      f. As alternative relief, Plaintiffs' Cross-Move to Stay the Arbitration
        Pending Resolution of the Pending Class Action 16-cv-5508, or
        alternatively staying This Litigation pending the Class Arbitration ..............119

VIII. DEFENDANTS HAVE NOT MET THEIR BURDEN ON A MOTION TO
     TRANSFER, AND PRESENTLY JURISDICTION AND VENUE ARE
     PROPER...........................................................................................................................120

      A. Venue and Jurisdiction are Proper in the Southern District
        of New York; Thus Defendants' Motions should be Denied.........................122

      B. Defendants Have Utterly Failed to Establish Their Entitlement
        To A Discretionary Transfer of Venue Pursuant to 28 U.S.C.
        §1404(a)......................................................................................................123

        1. The Customer Agreement containint a Forum Selection Clause
          Does not apply to this case.....................................................................124

        2. Because there are strong factors militating in favor of New
          York, this case should not be transferred.............................................125.

        3. However, if this Court were to entertain a discretionary transfer of
          venue, at this time, the only venue that would serve the interests of
          Justice under 28 U.S.C.§1404 would be to transfer venue to the
          District of Iowa to Judge Linda Reade who has Extreme Familiar-
          ity with the case and only with respect to Comeau and Wasendorf,
          Jr.............................................................................................................127

IX. THE PRINCIPALS OF RES JUDICATA DO NOT APPLY TO THIS CASE...................127

X. PLAINTIFF DAVID SCHEFFERT'S ALLEGATION OF UNAUTHORIZED
     TRADING IS CONSISTENT WITH AND PART OF THIS FRAUD.................................130

CONCLUSION.............................................................................................................................130

# TABLE OF AUTHORITIES

**CASES**                                                                                     **Page**

*Abrahams v. Young and Rubican, Inc.*
    79 F.3d 239 (2d Cir. 1996 )............................................................................................50

*Accord, Braman v. CME Group*
    14-CV 2646 (N.D. Ill.2014)..........................................................................................15

*In re Amaranth Nat. Gas Commodities Lit.,*
    587 F. Supp.2d 513 (S.D.N.Y.2008).............................................................   ...........41,76

*Amendariz v. Foundation Health Psychcare Services, Inc.,*
    24 Cal 4th 83 (2000)..................................................................................................121,128

*Amendariz v. Foundation Health Psychcare Services, Inc.,*
    24 Cal 4th 83 (2000)........................................................................................................121

*In Re American Express Financial Advisors Securities Litigation*
    672 F.3d 113 (2d Cir. 2011)........................................................................................108

*American Pipe Construction v. Utah,*
    414 U.S. 538 (1974)..................................................................19,30,31,34,35,36,37,38

*Ames v. Merrill Lynch, Pierce, Fenner and Smith,*
    567 F.2d 1175 (2dCir. 1977)......................................................................................119

*Amusement Industry Inc. V. Moses Stern, Et. At.,*
    07- cv-11586 (S.D.N.Y. 2016).....................................................................................49

*Angermeir v. Cohen,*
    14 F.Supp.3d 134( 2014).........................................................................89,90,95,102

*A T & T Mobility LLC v. Concepcion,*
    556 U.S. 333(2011)...................................................................................................110

*A T & T Techs.,*
    475 U.S. at 649, 106 S.Ct. 1415.................................................................................108

*Banco Industrial de Venezuela, C.A. v. CDW Direct, LLC*

11-cv-2082 (JGK) (S.D.N.Y. 2012)........................................................11,62,64

*Basic v. Levinson,*
    485 U.S.224 (1988)...............................................................................77

*BCCI Holdings (Luxemberg) Society Anonyme,*
    56 F.Supp.2d 14 (Dist.Col.1999)...........................................................99

*Bell Atlantic Corp. V. Twombly,*
    550 U.S. 540, 127 S.Ct.1955 (2007).......................................................11

*Benjamin Cir. v. Hampton Affiliates, Inc.,*
    66 N.Y.S.2d 782, 497 N.Y.S.2d 898 (1985).............................................68

Bishop v. Commodity Exch.,
    564 F.Supp. 1557(S.D.N.Y., 1983)........................................................ .69

*Bosco v. Serhant*
    836 F.2d 271 (7th Cir. 1987).........................................................9,66,67

*Braman v. The CME Group, Inc.*
    14-cv-02646 Docket #25 (N.D. Ill.2014)............................................9,63,81

*Brawer v. Options Clearing Corp.*
    807 F.2d 297(2d Cir. 1986); cert. Denied, 484 U.S. 819,108 S.Ct.76(1987)..........61,66

*Breslin Realty Development Corp. v. Schackner,*
    397 F.Supp.2d 390 (E.D.N.Y.2005)........................................................83

*Bridge v. Invest America, Inc.,*
    748 F.Supp.948 (D. RI 1990)...............................................................123

*Calif. Public Employees Ret v. Anz Sec.,*
    137 U.S. 2042, 582 U.S.___,198 L.Ed.2d 584(2017)................................. 10

*C & J Fertilizer, Inc. v. Allied Mut. Ins. Co.,*
    227 N.W.2d 169 (Iowa Sup. Ct. 1975)..................................................112

*Carte Blanch (Singapor) Pte., Ltd.,v. Diners Club In't.*
    2 F.3d 24 (2d Cir. 1995)....................................................................n68

*Cauble v. Mabon Nugent & Co.,*
    594 F. Supp. 985 (S.D.N.Y. 1984)....................................................75,130

*Chenli Chu v. James Francis Kelly and*
   *Peregrine Fin. Group., Inc*
   C.F.T.C.Doc. No.: 07-R029 (Oct. 7, 2009)......................................................................130

*In Re Centennial Industries, Inc., NCR Corp.,*
   12 B.R. 90 (S.D.N.Y. 1981).............................................................................................12

*C.F.T.C. v. International Financial Services (New York),*
   325 F.Supp.2d 482 9S.D.N.Y. 2004)...........................................................9,10,46,52

*C.F.T.C. v. U.S. Bank, N.A.,*
   13-cv-2041 (N.D.IA 2014).......................................................27,.32,45,63,77,78,87,102

*Chavez v. Occidental Chemical Corp.*
   2018 WL 352810, 17 cv-03459-PAE(Jan.10, 18 S.D.N.Y.)....................................35,39

*In Re Checking Account Overdraft Litigation,*
   813 F. Supp. 2d 1365.....................................................................................................118

*C & J Fertilizer, Inc. v. Allied Mut. Ins. Co.,*
   227 N.W.2d 169 (Iowa Sup. Ct. 1975).........................................................................116

*Center Cadillac, Inc. V. Bank of Leumi Trust Company of New York,*
   808 F. Supp. 213 (S.D.N.Y. 1992)..................................................................................92

*In Re Checking Account Overdraft Litigation,*
   813 F. Supp.3d 1365.....................................................................................................121

*In re Commodity Exchange Inc. Gold Futures and Options Trading Litigation*
   213 F. Supp.3d 631 (S.D.N.Y. 2016)............................................................................8,26

*Crown Cork & Seal Co. v. Parker,*
   462 U.S.345(1983)...........................................................................................................30

*In re Crude Oil Commodity Futures Litig.*
   913 F.Supp.2d 41 (S.D.N.Y.2012)..............................................................................13,67

*Cusimano v. Schnurr*
   137 A.D.3d 527, 27 N.Y.S.3d 135 (lst Dep't 2016)........................................................40

*In Re Dairy Farmers,*
   2013 WL 212908...........................................................................................................23

*Damato v. Hermanson,*
  153 F.3d 464 (7th Cir. 1998)..................................................................................76

*Daniel v. Board of Trade of City of Chicago*
  164 F.2d 815 (7th Cir 1947)..................................................................................62

*Deangelis v. Corzine,*
  11-cv-07866 Doc. #382..................................................................................12,.65

*DeAngelis v. MF Global, Inc.*
  11-cv-07866-VMDoc.# 382 (S.D.N.Y.2012) ........................................................38

*DGM Investments, Inc. V. New York Futures Exchange, Inc.,*
  265 F.Supp.2d 254 (S.D.N.Y.2003)..........................................................51,61,62,65,68

*Doctor's Associates, Inc. V. Casarotto,*
  517 U.S.681, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996)..............................................107

*Dyer v. Merrill Lynch, Piece, Fenner & Smith, Inc.*
  928 F.2d 238 (7th Cir.1991)..................................................................................23

*E.F. Hutton & Co. V. Lewis,*
  410 F. Supp. 416 (E.D.Mich 1976)..........................................................................69

*In Re Enron Corp. Securities,*
  529 F.Supp.2d 644..................................................................................74

*ESPN v. Quicksilver,*
  581 F. Supp. 2d 547 (S.D.N.Y. 2007)......................................................................120

*Factors Etc. Inc. v. Pro Arts, Inc.,*
  579 F.2d 215 (2d Cir. 1978)..................................................................................120

*Famular v. Whirlpool Corp.,*
  2017 WL 2470844 (S.D.N.Y. 2017)..........................................................................39

*First Options of Chi, Inc. v. Kaplan,*
  514 U.S.938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)..............................................108

Flickinger v. Harold C. Brown,
  947 F.2d 595 (2d Cir. 1991)..................................................................................75

*In re Foreign Exchange Benchmark Rates Antitrust Litigation, (In re Forex)*

2016 WL 5108131 (S.D.N.Y. 2016)........................................................8,15,16

Frank's Maintenance & Engineering, Inc.
    86 Ill. App. 3d 980 (App.Ct. 1st Dist, 1980)..................................................113

Fraternity Fund Ltd v. Beacon Hill Asset Management, LLC
    479 F. Supp.2d 349 (S.D.N.Y.2007)...............................................................77

Gelboim v. Bank of America Corp.,
    823 F.3d 759 (2d Cir. 2016)......................................................................11,12

Gentile v. Allied Energy Prods., Inc.,
    479 N.W.2d 607(Iowa Ct App. 1991)...........................................................112

Gillman
    534 N.E.2d at 828??...................................................................................118

Great Plains Trust Co. V. Union Pacific R.Co.
    492 F.3d 986 (8th Cir. 2007)....................................................................37,40

Grossman v. Citrus Assoc. F.N.Y.S.Cotton,
    706 F.Supp. 221(S.D.N.Y. 1980)..................................................................62

Grund v. Delaware Charter Guarantee and Trust Co.,
    788 F.Supp.2d 226 (S.D.N.Y.2011).............................................................117

Hecht v. Commerce Clearing House
    897 F.2d 21 (2d Cir. 1990)..................................................................101,104

Holmberg v. Armbrecht,
    327 U.S. 392(1946)....................................................................................24

Home Federal Savings and Loan Assoc. v. Campney,
    357 N.W.2d 613 (S. Ct. Iowa, 1984)...........................................................112

Horbach v. Kaczmarek,
    934 F. Supp. 981 (N.D.,Ill 1996)..................................................................23

Howsam v. Dean Witter Reynolds, Inc.,
    537 U.S. at 79, 123 S.Ct. 588 (2002)..........................................................108

JP Morgan Chase & Co.,
    737 F.Supp.2d 137(S.D.N.Y. 2010)..............................................................94

*Jordan (Bermuda) Inv. Ltd. v. Henter Green Investment Ltd.,*
   154 F.Supp. 2d 682 (S.D.N.Y. 2001) ........................................................................ 90

*Kaufman v. Cohen,*
   307 A.D.2d 113, 760 N.Y.S.2d 157 (lst Dep't 2003).................................................40

*Keiler v. Harlequin Enters. Ltd.,*
   751 F3d 64(2d Cir. 2014).............................................................................................11

*Kehr Packages Inc. v. Fidelcor Inc.,*
   926 F.2d 1406 (3rd Cir. 1991)..................................................................................... 97

*Koch v. Christies*
   699 F.3d 141 (2d Cir.2012)   ...............................................................9,15,16,n17,21,22

*Kohen v. PIMCO LLC.,*
   244 F.R.D.469 9N.D.Ill. 2007).....................................................................................67

*Korwek v. Hunt,*
   827 F.2d 874 92d Cir 1987)......................................................................................36,37

*Kurtz v. Solomon,*
   656 N.E.2d 184, 275 Ill. App.3d 643, ( Ill.App.1995).....................................................46

*Legnani v. Alitalia Linee Aeree Italiane, S.P.A.,*
   400 F.3d 139 92d Cir. 2004........................................................................................129

*Leiva v. Marietta*
   708 N.Y.S.2d 294 (lst Dep't 2000)................................................................................40

*Lentell v. Merrill Lynch & Co., Inc.,*
   396 F.3d 161 (2d Cir. 2005)...........................................................................16,n17,21

*Lerner v. Fleet Bank,*
   459 F.3d 273 (2d Cir. 2006).............................................42,45,46,50,70,91,92,100,124.

*Leon v. Shmukler,*
   992 F. Supp.2d 179 (E.D.N.Y.2014)...........................................................................129

*Levy v. BASF Metals*
   2017 WL 2533501 (S.D.N.Y.)......................................................................................26

*In Re Libor-Based Financial Instruments Antitrust Litigation*

935 F.Supp.2d 666 (S.D.N.Y.2013)................................................15,16,n17,23

*In Re Libor-Based Financial Instruments Lit.,*
2015 WL 6243536 (S.D.N.Y.2015)................................................16,39

*In re London Fixing, Ltd Antitrust Litigation,*
213 F.Supp.3d 530 (2d Cir. 2016)................................................8

*Madanes v. Madanes,*
981 F.Supp. 241 (S.D.N.Y.1997)................................................98

*Mallen v. Merrill Lynch Futures, Inc.,*
623 F. Supp. 203................................................69

*Marciano v. DCH Auto Group,*
14 F. Supp.3d 322 (S.D.N.Y.2014)................................................117

*Marsh v. Femina*
12 Misc.3d 1157(A), 819 N.Y.S.2d 211; 2006 WL 1374018 (Sup.
Ct.N.Y.2006)................................................40

*In Re Maxwell's Newspaper Inc. v. The Travelers Indemnity Inc.,*
192 B.R. 633 (S.D.N.Y. 1996)................................................12

*Mitsubishi Motors Corp. V. Soler ChryslerpPlymouth, Inc.,*
473 U.S. 614 (1985)................................................105

*McLaughlin v. Anderson,*
962 F.2d 187 (2nd Cir 1992)................................................96

*Meridien Intern Bank, L.T.D. v. Government of the Republic of Liberia*
23 F. Supp. 2d 445 (S.D.N.Y.1998)................................................13

*Merrill Lynch Pierce Fenner & Smith, Inc. V. Curran,*
456 U.S.353, 102 S.Ct. 1825 (1982)................................................51

*In Re MF Global Holdings Ltd., Inv. Litig.,*
198 F.Supp.2d 157 (S.D.N.Y. 2014)................................................9,12,42,43

*Minepeco v. Hunt, Et. Al.,*
718 F.Sup. 168 (S.D.N.Y. 1989)................................................89 ,90,96

*Mitsubishi, Motor Works*

473 U.S. at 626, ? 105 S.Ct. At 353?.................................................................103

MLSMK Investments Company v. JP Morgan Chase & Co.,
    737 F.Supp.2d 137 (S.D.N.Y. 2010)..............................................................92

Mobility LLC v. Concepcion,
    556 U.S. 333 (2011).........................................................................................114

Monarch Normandy Square Partners v. Normandy Square Assoc. Ltd.,
    817 F.Supp. 899 (D..KS 1993)......................................................................123

Moss v. BMO Harris Bank, N.A.
    258 F.Supp. 3d 289 (E.D.N.Y.2017)..............................................................82

In Re Nat. Gas Commodity Lit.
    337 F.Supp.2d 498 (S.D.N.Y. 2004)........................................................n17,20

NBN Broadcasting, Inc. v. Sheridan Broadcasting Networks, Inc.,
    105 F.3d 72 (2d Cir. 19    )........................................................................129

New Hampshire Co. v. MF. Global, Inc.,
    108 A,D.3d 463 (lst Dept 2013)................................................................n130

Nilsen v. Prudential-Bache Securities,
    761 F.Supp. 279 (S.D.N.Y. 1991)..................................................................118

In Re Nine West Shoes Antitrust Litig.,
    80 F. Supp.2d 181 (S.D.N.Y.2000)..................................................................26

N.Y. Dist. Council of Carpenters Pension Fund v. Forde
    939 F. Supp. 2d 268 (S.D.N.Y.2013)......................................................101,103

Paine Webber Inc. V. Bybyk,
    81 F.3d 1193 (2d Cir. 1996).........................................................................108

Patry v. Rosenthal & Co.,
    534 F. Supp 545 (D.Kan. 1982).......................................................................69

In Re Peregrine Fin. Group. Cus. Lit.
    12-cv-05546, ( ND/ILL) 2015............................................................33,n35, 46

In Re Peregrine Fin. Group. Cus. Lit.,
    12-cv-05540, (N.D. Ill. 10/15/13)..............................................................31, 46

*In Re Peregrine Financial Customer Litigation*
    2014 WL 4784113 (N.D.Ill.2014)..................................................9,28,30,45,46.49.72,73

*In re Peregrine Financial Group Customer Litigation*
    12-cv-5546 (N.D.Ill.2015)..................................................................21,35,37,41

*Powers v. British Vita, P.L.C.,*
    57 F.3d 176 (2d Cir. 1995)................................................................................92

*PT United Can Co. Ltd. v. Crown Cork & Seal,*
    138 F.2d 65 (2d Cir 1998)..............................................................................123

*Picard v. Kohn,*
    907 F.Supp.2d 392 (S.D.N.Y. 2012...................................................................104

*In re Platinum and Palladium Commodities Lit.,*
    828 F.Supp. 2d 588 (S.D.N.Y.2011)..............................................................44,68

*Ploss v. Kraft Foods Group, Inc.*
    197 F.Supp. 3d 1037 (N.D.III 2016)................................................................ 41

*PT United CanCo. Ltd v. Crown Cork & Seal ,*
    138 F2d 65 (2d Cir 1998).........................................................................124,133

*Ragone Atlantic Video at Manhattan Center,*
    2008 WL 4058480............................................................................................121

*Rahn v. Carkner,*
    659 N.Y.S.2d 143 (3d Dep't 1997)................................................................... 40

*Razor v. Hyundai Motor America,*
    854 N.E.2d 607 (Sup.Ct. Ill. 2006)................................................................113

*Resh v. China Agritech. Inc.*
    857 F.3d 994 (9th Cir 2017)............................................................................37

*Reshkop v. Bewich Healthcare Corp.,*
    95 F3d 285 (3d Cir. 1996)..............................................................................105

*Reves v. Ernst & Young,*
    507 U.S. 170 (1993)..........................................................................................88

*Roby v. Corporation of Lloyds,*
    996 F..Supp. 1353 (2d Cir.1993)..................................................................................125

*Sablonsky v. Edward S. Gordon Co. Inc.*
    535 N.E.2d 643 (N.Y. 1989)......................................................................................118

*Salinas v. United States,*
    555 U.S. 52 (1977)....................................................................................................101

*Sam Wong v. N.Y. Merc. Exch.,*
    735 F.2d 653 (2 Cir. 1984)..........................................................................................61

*Scheurer v. Rhodes*
    416 U.S. 232 *(1974)*..................................................................................................11

*Schmuch v. U.S.,*
    489 U.S. 705,(1989)....................................................................................................96

*Secure Leverage Group Inc. V. Ira Bodenstein*
    2014 WL 2197945 (N.D.ILL. 2014)............................................................................78

*Security Ins. Co. Of Hartford v. TIG Ins. Co.,*
    360 F.3d 322 (2d Cir. 2004)......................................................................................120

*Sidney Hellman Health Center of Rochester v. Abbot Laboratories, Inc.*
    782 F.3d 922 (7th Cir.2015)........................................................................................26

*Sincuski v. Saeli,*
    44 N.Y.2d 442(1978)..................................................................................................39

*SIPC v. Bernard L. Madoff Investment Securities,*
    531 Bank Rep. 439 (S.D.N.Y. 2015)............................................................................9

Southmark Prime Plus v. Flazone,
    768 F. Supp. 487 (D.DE 1991)..................................................................................123

*Sprague v. Household International,*
    473 F. Supp. 2d 966 (WD MI 2005)..........................................................107,113,116

*Staehr v. Hartford Financial Service Group, Inc.,*
    547 F.3d 406 (2d Cir. 2008)............................................................................14,15,16n17

*State of New York v. Hendrickson Bros.,,.*

840 F.2d 1065 (2d Cir. 1988)............................................................................................. 26

*Sumitomo Copper Litigation,*
   995 F. Supp. 451 (S.D.N.Y. 1998)..................................................................................82,83,90

*Thomason-CMF,S.A. v. American Arbitration Ass'n.,*
   64 F.3d 773 92d Cir. 1995)..............................................................................................n68

*Threlkeld & Co. Inc. v. Metallgesellschaft Ltd. (London),*
   923 F.2d 245 (2d Cir. 1991)....................................................................................108

*Timmerman v. Grain Exchange, Inc.*
   915 N.E.2d 113 (App.Ct. Ill. 5th Dist, 2009)...................................110,112,113,114,115

*Trustees of Plumbers and Pipefitters Nat. Pension Fund v.*
   *Transworld Mechanical, Inc.,*
   886 F.Supp. 1134 (S.D.N.Y. 1995)..................................................................................120

*U.S. v. Applins,*
   637 F.3d 59(2d Cir. 2011)...........................................................................................103

*U.S. v. Boyle*
   556 U.S.938, 129 S. Ct. 2237 (2009)................................................................... 82,88

*U.S.v. Brooks,*
   2009 WL 3644122*3 (E.D.N.Y. 2009).................................................................. 91

*U.S. v. De Blasi,*
   712 F.2d 785(2d Cir. 1983)................................................................................................97

*U.S. v. Eisenberg,*
   596 F.2d 522 (2d Cir. 1979)............................................................................................93

*U.S. v. Finkelstein*
   229 F.3d 90 (2d Cir. 2000)............................................................................................92

*U.S. v. Turkette*
   452 U.S. 576 (1981)................................................................................................83

*United States v. Yannott,*
   555 U.S. 52 (1977)...............................................................................................101

*Yang v. Odom,*
  392 F.3d 97 (3rd Cir. 2004)............................................................................................37,63

*Zumpano v. Quinn*
  6  N.Y.3d 666 (2006).....................................................................................................39,98

## STATUTES

7 U.S.C. § 1, et.seq....................................................................................................................58

7 U.S.C. §1(13) ..........................................................................................................................7

7 U.S.C.§2(a)(1)(B) ..................................................................................................................68

7 U.S.C. § 6............................................................................................................................108

7 U.S.C. § 6d(b).........................................................1,10,12,29,30,41,44,45,58,59,64,69,71,83,86,93,97

7 U.S.C.§ 6(d)......................................................................................................................58 ,61

7 U.S.C.§6(a)-(b)......................................................................................................................47

7 U.S.C.§6(o)............................................................................................................................58

7 U.S.C. §7..........................................................................................................................50,51

7 U.S.C.§7(d)(2)(A)(iii).............................................................................................................68

7 U.S.C.§ 9(1)...........................................................................................................................43

7 U.S.C.§ 13-c(a)..................................................................................................................58,70

7 U.S.C. § 25.............................................................................................................................43

7 U.S.C. § 25(a)(1).....................................................................................................................75

7 U.S.C. §25(b).....................................................................................................................50.66

7 U.S.C. § 25(b)(1)................................................................................................................ 51,68

7 U.S.C.§25(1)(b)(1)(A) .....................................................................................................51,52,57

Table of Authorities

**STATUTES (Con.)**                                                                    **Page**

7 U.S.C. §25(b)(1)(C),  §22(b)(1)(C)............................................................57-59

7 U.S.C. § 25(b)(4).........................................................................51,59,66

9 U.S.C. §2..................................................................................106,109

18 U.S.C. § 1956............................................................................97,98

18 U.S.C. §1962(c).........................................................................80,81

18 U.S.C. § 1962(d)....................................................................101,103,104

18 U.S.C. §1965(b).............................................................................122

28 U.S.C. §1391..................................................................................119

28 U.S.C. §1391(b)(2)...........................................................................121

28 U.S.C. §1404............................................................................122,126

28 U.S.C. §1404(a)........................................................................119,122

28 U.S.C. §1406..................................................................................119

## Federal and State Regulations

17 C.F.R. 1, et. seq...............................................................................58

17 C.F.R. 1.20.........................................................................1,44, 55,58

17 C.F.R. 1.30.....................................................................................55

17 C.F.R. 1.32.....................................................................................55

17 C.F.R.1.49......................................................................................55

17 C.R.R.17.00, et. seq........................................................................55

17.C.F.R.30.7...................................................................................................................55

17 C.F.R.166.2...............................................................................................................130

17 C.F.R.166.5..................................................................................................108,113,114

17 C.F.R. 180.3...............................................................................................................115

22 N.Y.C.R.R..1200.42..................................................................................................106

## **Federal and State Rules**

Fed R. Civ. P. 8........................................................................................................81,82

Fed R. Civ. P. 8(a)..................................................................................................94,101

Fed. R. Civ. P 8(d)...................................................................................................56,57

Fed R. Civ. P. 9(b)...................................................................................................90,94

Fed R. Civ. P. 12(b)..............................................................................................119,120

Fed R. Civ. P. 12(h)..............................................................................................119,122

C.P.L.R.§ 202..............................................................................................................38

C.P.L.R. § 203(a)..........................................................................................................38

C.P.L.R. § 213(8)......................................................................................................39,40

New York Pattern Jury Instruction § 2:70.............................................................49,71

## **CME Rules**

402(b)...............................................................................................................52,56,58,61
402(c)(e)..................................................................................................................56,57,67
588...........................................................................................................................56,57,67
559....................................................................................................................................54
560....................................................................................................................................54
903....................................................................................................................................55
903(G).........................................................................................................................53,58
903(H).........................................................................................................................53,58
960.........................................................................................................................51,52,67

960(a)....................................................................................................................................................54
971....................................................................................................................................53,55,56,58,67

## Treatises

3 Newberg on Class Actions § 9.64 [5th Ed.].................................................................................37

Plaintiffs by their Attorney, Susan J. Levy, Esq. respectfully submit this memorandum of law in opposition to Defendants' Motions to Dismiss the Second Amended Complaint ("SAC"), in opposition to Millennium's Motion to Stay their case, and in Opposition to transferring venue.

## PRELIMINARY STATEMENT

In light of the revelation in July, 2012 and thereafter that Russell Wasendorf, Sn. had been orchestrating a 20 year ponzi scheme whereby Plaintiffs' segregated customer accounts were converted and used for non-customer purposes proximately causing Plaintiffs to lose their entire life savings;  Plaintiffs finally have learned the true facts of their case and seek to hold jointly and severally liable the other parties who allegedly also violated well-settled laws and directly caused the losses in Plaintiffs' trading accounts in connection with this Ponzi Scheme which lasted from approximately 1992 to 2012. *See* Government's Sentencing Memorandum, p 5. Annexed to the Declaration of Susan J. Levy dated February 10, 2018 as Exh. 6. Those other Defendants are *inter alia* JPMorgan Chase and US Bank, NA, (The "Bank" Defendants), The Chicago Mercantile Exchange, THE CME Group, Inc. (The "Exchange" Defendants),  These Bank defendants actually did cause Plaintiffs' life savings to be defalcated in the first instance when each Bank Defendant actually transferred Plaintiffs' special deposits which are also "customer segregated accounts" as defined by 7 U.S.C. § 6d(b) and 17 C.F. R. 1.20, et. seq. to Wasendorf who used these proceeds in part to fund, Peregrine Financial Group, Inc. ("PFG") .  In order for PFG to maintain its Adjusted Net Capital Requirement as all Future Commission Merchants ("FCM's") are required to do under CFTC Rule 1.17, Wasendorf had to cheat, because he simply did not have enough capital to meet the Adjusted Net Capital Threshold which is based on a ratio using customer segregated accounts. As early as 1999, the CFTC first caught PFG and fined PFG $90,000.00 for its misconduct. *See*, Declaration of Susan J. Levy, Esq. dated

-1-

February 10, 2018, Exhibit 1,CFTC Docket 00-32 (Sept. 7, 2000); SAC ¶ 434.

To establish the required Adjusted Net capital meant that PFG needed to maintain a certain level of cash on its books in proportion to their customer's segregated account value. Therefore, even if Wasendorf Sn. was sending in falsified income verification statements to the NFA, one of its regulators, in the amount of $215 million dollars when PFG only had about $7,000,000.00 in Customers Segregated Accounts, it must been clear to all those working inside PFG that those numbers were incorrect because those in a position of power had to be constantly reviewing all the balances in the PFG accounts on a daily basis and reconciling their balances on a daily bases due to the CFTC's reporting requirements, 17 C.F.R. 1.35, 1.17.

For Example, Susan O'Meara the Chief Compliance officer at PFG should have known about the actual account balances at PFG because she had to actually comply with the NFA and CFTC regulations including 1.17 which meant she had to know about all the account balances. Just checking the U.S. Bank statements on a daily basis would have shown all PFG staff that the numbers just did not add up. The staff needed to review these balances to comply with its daily calculations under 17 C.F.R. 1.17 and 1.35.

It was in part Susan O'Meara's testimony at Plaintiffs' NFA arbitration that defeated Plaintiffs' meritorious case. She testified willfully against Plaintiffs, and if she did so with unclean hands, none of those Arbitrations are even worth the paper they are written on. The gravaman of the NFA Arbitrations was based on the erroneous belief that the trades in Plaintiffs' futures accounts were legitimate which they never were, but only part of a grand scheme and cover up to hide the fact that Wasendorf through the Bank Defendants were converting Plaintiffs' funds before these fictitious trades were ever attempted to cover up the theft of customer monies.

At Wasendorf's Sentencing Hearing, it was revealed that Wasendorf, Sn. did in

-2-

fact have two sets of books to operate this PONZI Scheme and to record fictitious trades.  *See*

Transcript of Sentencing Hearing, page 11, line 9, January 31, 2013 annexed to the Declaration

of Susan J. Levy, Esq. as Exhibit 2.

Shortly after, the NFA fined Susan O'Meara and others including Wasendorf, Jr. in the

amount of $700,000.00 for their own misconduct.  *See In The Matter of In Re Peregrine*, NFA

Case No.:12-BCC-001 (Feb. 8, 2012, NFA), Levy SAC Exhibit 10; SAC ¶ 437.  During the

same, time frame, the Plaintiffs herein were having their nearly-identical claims thrown out by

the NFA.  SAC ¶¶ 562-567.

Regarding the Exchange Defendants, the SAC makes clear that the Exchange

Defendants gave Wasendorf, Sn. a license to steal and use the Exchanges to cover up the prior

conversion of Customer Segregated Accounts.  PFG was set up for business and could freely

access the Exchanges including the Globex to make it appear that normal trades were being

conducted over these Exchanges where in reality PFG had been engaging in what has been

defined as abusive trading conduct including wash sales, fictitious sales, prearranged sales and

other violations of the CME Rulebook.  Only by engaging in these abusive practices could PFG

hide the fact that it had no money in its customer's accounts and just wanted to get rid of these

customers.

Because the Exchange did not appropriately monitor PFG and allowed it to do whatever it

pleased and never appeared to even look into these Omnibus Subaccounts, it tries now to escape

liaibity for this misconduct.  But, the SAC alleges that the Exchange Defendants allowed PFG to

conduct business over its Exchange for over 20 years during which time a massive Ponzi Scheme

was being conducted.  The Exchange Defendants had the power at any time to shut down PFG

once and for all.  Under the Omnibus Rules that applied to PFG, a Carrying member was

supposed to oversee the trading activity in these accounts, and the Omnibus Rule, CME 960, also required PFG's accounts to be monitored by a carrying member. SAC ¶¶ 472, 509.

Therefore, the Exchange Defendants were also a substantial factor in bringing about the Plaintiffs' losses by allowing PFG to appear to engage in legitimate trading practices when in fact these trades were either fictitious or set up so that PFG acted as a counter party to Plaintiffs' trades or some other abusive system such as prearranged transactions, so that in the end PFG would be able to destroy Plaintiffs' accounts and have a paper trail to make it look legitimate. If PFG acted as the counter party to these nefarious trades, that would be a major violation of the Exchange rules, but nobody was apparently monitoring this potentiality. SAC ¶¶ 47, 52-57. As such, had Plaintiffs' trades truly been placed over the Exchange and truly lost value, as was reported on the customer's account statement; that meant that PFG on behalf of the Plaintiffs could **not** have kept the stolen customer monies as is alleged, rather any trading losses in these customer accounts would have required PFG to hand over the stolen customer's money to an anonymous prevailing third-party counter party which surely would have foiled this Scheme. Therefore, no real trading could have even occurred with an anonymous counter party, and the evidence alleged in the SAC is that only PFG acted as its own counter party in at least FOREX transactions and probably other transactions as well. By acting as its own counter party or by engaging in fictitious trades, Wasendorf wanted to and did keep the proceeds of the customer segregated accounts only for himself and/or his co-conspirators and aiders and abettors.

For Omnibus sub accounts, CME chose not to even monitor the activities in these accounts. *See* SAC Exh. 9. In fact, CME even allowed different margin requirements to apply to Omnibus accounts which actually could have an anti competitive effect on trading. Clearly, a two tier regulatory system occurred one for clearing members and one for non-clearing omnibus

-4-

accounts, such as PFG.

In addition, Wasendorf's Scheme was easily accomplished because the Exchange Rules allowed for a netting of all PFG positions; so for example, if the customers' had 100 open short contracts, then PFG could just initiate positions of 150 long contracts using its own capital (which was stolen from customer segregated accounts), and it would look to the Exchange regulators as though PFG had a net long position of 50 contracts. Again, based on these mind-boggling rules, the Exchange Defendants could consciously avoid the unlawful and abusive trading activity occurring in each customer's account, and as a result, the Exchange Defendants propped up Mr. Wasendorf, and fueled his flames, and earned Exchange fees, Novation fees, and Maintenance fees for a twenty year period; thus, becoming unjustly enriched along the way.

**Transfer of Customer Funds Proximately Causing Losses to Plaintiffs**

The allegations show that as soon as Sherri Scheffert and her husband David, sent their checks into the JPMorgan 5265 account as instructed by Garlon Maxwell and Perry Comeau, these funds were swiftly relayed by wire transfer to the 1845 U.S. Bank account and then flipped over to another Wasendorf account at U.S. Bank with Hope Timmerman, the U.S. Bank customer service liaison by simply stamping the 1845 withdrawal slip with the moniker "known customer" based on this verbal instructions to save Russell Wasendorf, Sn. the trouble of even having to sign his own name to the withdrawal slip sending customer monies into his own accounts. SAC, ¶350, Exh. #7. Once the Plaintiffs' money was out of the 1845 account, it was then transferred *inter alia*, to the proprietary accounts at PFG to be used for PFG's own proprietary trading, including being a counter party for FOREX trades. SAC ¶¶ 52-57.

**Role of Millennium Trust and Perry Comeau**

In March and April of 2007, Perry Comeau on behalf of Millennium Trust assisted the

Class Plaintiffs in transferring their IRA accounts to PFG. Plaintiffs had been investing with the Maxwells as their Commodities Trading Advisor or "CTA" since 2005 and had two other previous FCM's uneventfully trading their accounts; however one year after this transfer to PFG, the entire Class had lost their entire life savings.

Comeau acted as an Investment Advisor, a Commodities trading Advisor and an Introducing Broker in assisting Millennium's transfer of Plaintiffs futures and options IRA accounts to PFG. These IRA accounts were required by law to have a Trustee or Custodian such as Millennium oversee the management of these accounts, and the IRA Trustee/Custodian **was** required to exercise discretion to ensure that the IRA account was used for lawful and prudent purposes. For example, in the Custodial Agreements submitted to the Court, the IRA Trustee could prohibit any investments in life insurance or collectibles. *See* Custodial Agreements annexed to the Affidavit of Sherri Scheffert as Exhibit 2, Article III, ¶¶ 1, 2. In addition, the transfers of Plaintiff's IRA monies could only occur if the IRA Trustee Millennium signed off on these transfer accounts. *See* Opening Account Statements annexed to the Levy Declaration as Exhibit 3. The extent of the IRA Trustees Fiduciary Obligation is at issue in this case. *See Grund* v. *Delaware Charter Guarantee & Trust Co.,* 788 F. Supp.2d 226 (S.D.N.Y. 2011).

However, on March 1, 2007 Perry Comeau's status as a registered NFA Associate Member was pending, and he was approved as a registered NFA principal on September 17, 2008. It was during this time while his commission registration was either pending or approved that he registered Plaintiffs with Millennium and PFG to continue trading futures and options contracts presumptively. As such Perry Comeau was acting as a Commission Registrant. He on behalf of Millennium Trust was soliciting Plaintiffs to invest in Options Contracts traded over the CME.

-6-

During this time period Perry Comeau was also being sued by the Iowa Department of Insurance for improperly acting as an Investment Advisor in the State of Iowa, since he was not registered in the State of Iowa.   As of March 14, 2017, the Iowa Department of Insurance had issued a Cease and Desist order against Perry Comeau.   *See* Declaration of Susan J. Levy, Esq., Exh. 4, p. 2, ¶ 13. .  Because Millennium deputized Comeau to act as its agent in the State of Iowa, and Perry Comeau did not have legal authority to even act as an Investment Advisor in the State of Iowa when he induced Plaintiffs to sign the Millennium documents; the signing of the Millennium Adoption Agreement should be invalid as a matter of law; and Millennium is vicariously liable for any unlawful conduct of their agent Comeau who was operating within the scope of his authority as an agent of Millennium.  Comeau was fined $20,000.00 in May, 2007 and was prohibited from acting in the State of Iowa as an Investment Advisor.  *See* Levy Dec. Exh. 4.         Certainly without Comeau's participation in this Scheme, Millennium could not have acquired control of Plaintiffs' IRA accounts which Millennium without any diligence handed off to JPMorgan and Wasendorf.  In addition, Millennium Trust with the assistance of Perry Comeau was also acting as an Introducing Broker which is defined under the Commodities Exchange Act as anyone who engages in the solicitation or orders to trade in options and futures. *See* 7 U.S.C.§ 1(31).  However, Millennium was unregistered and therefore should not have been allowed to even introduce Plaintiffs' custodial IRA accounts to PFG as it did without first becoming registered.

When the Plaintiffs arrived at Perry Comeau's office to effectuate the transfers in March and April of 2007, they were asked to sign copies of documents.  They were not given any copies to take with them, rather Perry Comeau kept these documents and gave the executed forms to Millennium.  Plaintiffs did sign what is now called the Adoption Agreement, but at no

-7-

time did they ever sign the Custodial Agreement. The Arbitration Agreements were not separately produced or endorsed as is required under 17 C.F.R. 166.5. The Custodial Agreements incorporated by reference to the Adoptions Agreements were never even presented to the Plaintiffs nor made available to them at a later date. The Plaintiffs could have reasonably believed that the Adoption Agreement was in fact the Custodial Agreement based on the totality of the circumstances.

Under the totality of the circumstances as well as established principals of law, these Arbitration Agreements are void or voidable and should not be enforced.

## ARGUMENT

## I.      PLAINTIFFS' CLAIMS ARE VALID AND TIMELY AND SHOULD PROCEED.

Because the SAC alleges a Ponzi Scheme that went undetected from at least 1992 to 2012, proximately causing monetary losses to Plaintiffs and involving may aiders and abettors and co-conspirators, and because Plaintiffs continued to press their claims from at least 2012 until 2016 when they finally learned of their real claims that caused their injuries based on the Financial Expert's report and an attorney's investigation, their claims are timely. In fact the imposition of this claim, eight years after the monetary losses, is par for the course because other similar types of investor frauds were tolled much longer than eight years because these Frauds were often hidden from public scrutiny for many years. *See In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 2016 WL 5108131 (S.D.N.Y 2016)(claims arising in 2003 were equitably tolled 10 years or until 2013 when Complaint was filed); *In re: Commodity Exchange, Inc. Gold Futures and Options Trading Litigation*, 213 F. Supp.3d 631 (S.D.N.Y. 2016)(Claims from 2004 were valid under the Discovery Accrual Rule after a 10 year period, where Class Complaint was filed in 2014); *In Re London Fixing, Ltd. Antitrust Litigation,* 213 F. Supp.3d 530

-8-

(2d Cir. 2016)(Class period commencing in 1999 was valid in light of Equitable Tolling based on Fraudulent Concealment where case was filed 17 years later in 2016);*Accord, Braman v. CME Group.* 14-CV 2646 (N.D. Ill. 2014) *(*Court held: 2005 Class Commodity Exchange Act and Sherman Act claims timely interposed in a 2014 Complaint, after 9 years based on application of the Discovery Accrual Rule)*; Koch v. Christies Int'l*, 699 F.3d 141 (2d Cir. 2012)(Cause of Action for phony wines purchased in 1988 did not accrue until 2000, therefore four year RICO Statute of limitations did not run until 2004, 16 years after losses occurred.)

In fact, under applicable pleading standards, all of Plaintiffs' claims are timely and plausible. The type of Ponzi Scheme alleged in the SAC appears not to be unique and has occurred before, because like many shell games, there are not many variations of how to steal people's money using the Exchanges to dispose of customer monies. In several other cases, the same type of fictitious trading and unlawful transfers of customer's segregated accounts have also occurred and both the Bank Defendants and Exchange Defendants have been held accountable **in addition to the principal**. *See In Re MF Global Holdings Ltd. Inv. Litig.,* 998 F. Supp. 2d 157 (S.D.N.Y. 2014)(JPMorgan and CME settled cases for extremely similar claims as in this case involving release of customer segregated funds were $1.6 billion dollars of customer segregated accounts "went missing" where MF Global used customer segregated funds for its own proprietary trading); *C.F.T.C. v. International Financial Services (New York),* 323 F. Supp.2d 482 (S.D.N.Y. 2004); *SIPC v. Bernard L. Madoff Investment Securities*, 531 Bank. Rep. 439 (S.D.N.Y. 2015); *In Re Peregrine Financial Customer Liti.,* 2014 WL 4784113 *(*N.D. ILL. 2014), *Bosco v. Serhant,* 836 F.2d 271 (7th Cir. 1987.)

*C.F.T.C. v. International Financial Services (New York),* 323 F. Supp. 2d 482 (S.D.N.Y. 2004) is on point and demonstrates that the type of Ponzi Scheme that Wasendorf did

so effectively was not unique to him. In a parallel universe, another Ponzi Scheme was happening whereby customers like Plaintiffs, were fraudulently induced by brokers to invest in Foreign Exchange which is a type of Derivatives investing. Customers put their money into accounts. However, the actual monies were never even invested in Foreign Exchange transactions ("Forex".) Rather, the principals like Wasendorf, just pocked 100% of their customers' monies and then made it look like trades were performed using phony trading statements that paralleled real Forex transactions. *C.F.T.C. v. Int'l Financial*, 323 F. Supp2d 482, 489-490 (S.D.N.Y. 2004.) A review of Wasendorf's Sentencing Hearing reveals in fact that he had another set of Ponzi Scheme Books. *See* Declaration of Susan J. Levy, Esq. dated February 11, 2018, Exh. 2, page 11, line 9. This fact of having a second set of books cannot be ignored and supports Plaintiffs' contentions. In *C.F.T.C. v. Int'l Financial*, the court found that the proximate cause of the customers' losses was the Ponzi Scheme not just the fictitious trades that were said to have occurred as reflected in the falsified account statements. In this case, Plaintiffs have alleged their claims in the alternative as they are entitled to do to cover all the probabilities. But one thing is for sure, the losses were caused on the day JPMorgan wired the money out of the 5265 customer segregated account where their funds were originally located.

### A. Under Applicable Pleading Standards, Plaintiffs' Claims are Plausibly Alleged.

Because Defense counsel have utterly failed to meet their burden on a motion to dismiss and have rejected binding precedent that governs these claims, their motion to dismiss borders on the frivolous. For example, (1) the Bank Defendants have refused to even recognize well-established law pursuant to common law and 7 U.S. C. §6d(b) **prohibiting the use or transfer** of <u>any</u> special deposits such as Plaintiffs' segregated customer accounts, and tries to equate these special accounts with regular deposits unlawfully; (2) Defendants have rejected the

Discovery Rule and have *sua sponte* imposed their own Statute of Repose to block these timely claims to which **no** Statute of Repose applies, *see Calif Public Employees Ret v Anz Sec.,* 137 U.S. 2042 (2017); and (3) Defendants have misstated the issues of loss causation and proximate causation which are well- pled and merely raise questions of fact regarding apportionment.

### 1.   Applicable Pleading Standards on A Motion to Dismiss.

To withstand dismissal, a pleading "must contain sufficient factual matter, accepted as true , to 'state a claim to relief that is plausible on its face.'" All reasonable inferences are construed in favor of the non-moving party. *See Keiler v. Harlequin Enters. Ltd.,* 751 F.3d 64, 68 (2d Cir. 2014).

In considering the plausibility of a complaint, "the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs possession or that the plaintiff knew of when bringing the suit, or matters of which judicial notice may be taken. (Citing cases).)" *Banco Industrial de Venezuela, C.A. v. CDW Direct, LLC.*, 11-cv-2082 (JGK), slip opinion (S.D.N.Y. 2012.)

It does not matter that there may be other plausible explanations for the conduct complained of, because on a motion to dismiss, the Court must accept "a well-pleaded complaint...even if it strikes a savvy judge that actual proof of those facts is improbable and 'that a recovery is very remote and unlikely'" because at the pleading stage, "plausibility is a standard lower than probability" and the court cannot chose from "diverging interpretations" before discovery. *Gelboim v.Bank of America Corp.*, 823 F.3d 759, 781-782 (2d Cir. 2016), *citing Twombly* 550 U.S. at 556 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).  Based on this liberal pleading standard, plaintiffs have well-exceeded their pleading burden.

Defendants' attempt to supply "alternative" facts should fail, such as the CME's

-11-

argument that they "altruistically" established a $100 million dollar settlement fund in *In Re Peregrine Financial Group Cust. Lit.* to compensate only some preferred creditors, farmers and ranchers, who were also futures and options holders just like Plaintiffs herein and who got wiped out with respect to their PFG investments in the same way as Plaintiffs have alleged.  The allegations in the SAC clearly show that the CME was not acting "altruistically" but was actually giving preferential treatment to the farmers and ranchers in violation of the principals of the Bankruptcy Code which mandate only equitable distributions among all unsecured creditors and specifically proscribe preferential transfers such as the CME's "altruistic" $100 Million dollar fund for which there does not appear to be any public accounting on the PFG Bankruptcy Website and for all anybody knows part of that $100 million dollar fund could have reverted back to CME when it should have been handed over to the Trustee instead for an equitable distribution of funds. *See, In Re Maxwells Newspaper Inc. v. The Travelers Indemnity, Inc.,* 192 B.R. 633 (S.D.N.Y. 1996), *In Re Centennial Industries Inc. NCR. Corp.*, 12 B.R. 99 (S.D.N.Y. 1981)  The CME's 100 Million dollar Settlement fund was an excellent attempt to deflect responsibility from themselves and  fraudulently conceal what really happened with their regulatory lapse which could have cost them a lot more than $100 million dollars for their misfeasance in handling this situation for a twenty year period.

Indeed, with similar allegations to the case at bar, CME settled claims in the Class Action for $14,500,000.00 entitled *In Re MF Global Holdings Ltd. Inv. Litig.,* 998 F. Supp. 2d 157 (S.D.N.Y. 2014) for also allowing another FCM, MF Global to transfer customer segregated funds to its own proprietary accounts in an extremely similar case involving stunningly similar facts to the case at bar thus also violating 7 U.S.C. §6d(b) by wiping out customer accounts. *See DeAngelis v. Corzine,* 11-cv-07866, Docs ##630 (page 8), 657 (S.D.N.Y. 1/29/2014, 2/21/2014.)

Therefore, all defense counsel have accomplished in moving to dismiss has been to raise genuine questions of material fact to be determined at trial.

**II.   BECAUSE HAVE FAILED TO SUSTAIN THEIR BURDEN OF PROOF ON THE STATUTE OF LIMITATIONS DEFENSE, THESE TIMELY CLAIMS SHOULD PROCEED.**

Because each and every cause of action under both Federal and State law are timely, this case should proceed to discovery. Defendants have utterly failed to sustain their burden of proof regarding the Statute of Limitations defense. Both the State and Federal Claims are timely under the Discovery Accrual Rule ("DAR"), Equitable Tolling or Equitable Estoppel, *American Pipe* Tolling and Cross-Jurisdictional Tolling.

The SAC plausibly alleges that Plaintiffs made a reasonable investigation of this matter early on and continued to investigate their claims to unmask this self-concealing conspiracy and at no time did lead Plaintiffs sit on their claims. *See* SAC ¶¶ 222, 568.

**A. The Claims in the SAC  are Timely Under Applicable Pleading Standards.**

Courts in this District have held consistently that "while a statute of limitations defense may be raised in a motion to dismiss... such a motion should not be granted unless it appears beyond doubt that the [plaintiffs] can prove no set of facts in support of [their] claims which would entitle [them] to relief." *Meridien Intern Bank, L.T.D. v. Government of the Republic of Liberia*, 23 F. Supp. 2d 439, 445 (S.D.N.Y. 1998.) In addition, "[d]efendants bear a heavy burden in establishing that the plaintiff was on inquiry notice as a matter of law" *In re Crude Oil*, 913 F. Supp. 2d at 59. Ordinarily, questions of timeliness are left for summary judgment (or ultimately trial) at which point the court may determine compliance with the statute of limitations on a more complete factual record. *Sidney Hellman Health Center of Rochester v. Abbot Laboratories, Inc.*, 782 F. 3d 922, 928 (7th Cir. 2015)(reversing dismissal of a civil RICO

complaint for failure to meet the statute of limitations.)

Because the SAC clearly alleges that Plaintiffs' did **not** discover the nature of their present claims until 2016 after continuing to press their claims, and because they were unaware of their claims in 2008, when the Ponzi Scheme alleged in the SAC was still under wraps; Plaintiffs continued to learn from 2012 through 2016 of the real nature of their present claims. Therefore, they are entitled to have their claims heard under both the Discovery Accrual Rule as well as Equitable Tolling; and this Court need not even reach the issues of Tolling under *American Pipe and Construction Co. v. Utah,* 415 U.S. 952, 94 S. Ct.1477 (1974).

Defendants' continual position that Plaintiffs' causes accrued no later than October, 2008 does not comport with the controlling case law in the Second Circuit to the contrary. Put otherwise, Defendants' math does not add up, because the application of both the Discovery Accrual Rule as well as Equitable tolling applies to these facts and extends the running of the applicable statutes of limitation until 2015 or 2016. Because the claims at issue in this case accrued then and not in 2008 when the monetary losses were sustained, Plaintiffs actually had another two years and four years after their discovery of their claims to initiate their case which they timely did in 2016. Thus, the Statute of Limitations defense should not defeat Plaintiffs' claims at the pleading stage.

### B. Plaintiffs' Federal Claims Should Proceed under the Discovery Rule, Since They Reasonably Investigated Their Claims after Receiving Inquiry Notice.

Because the Discovery Accrual Rule ("DAR") is so well-recognized by Federal Courts around the United States and including especially the Second Circuit, it strongly militates in favor of rejecting Defendants' motions to dismiss. *See Staehr v. Hartford Financial Service Group, Inc.,* 547 F.3d 406 (2d Cir. 2008); *In Re Libor-Based Financial Instruments Antitrust Litigation*, 935 F. Supp.2d 666, 697-713 (S.D.N.Y. 2013.)

-14-

The Discovery Accrual Rule delays the commencement of each and every Statute

of Limitations to a time when the cause of action accrued. The Second Circuit has adopted an

Injury Discovery Rule that delays commencement of the Statute of Limitations until a time when

a person of reasonable intelligence would have discovered the wrongful conduct giving rise to

their claim. In applying the DAR, courts must carefully examine the nature of the disclosure also

referred to as "storm warnings" and decide in the first instance whether such disclosures or

"storm warnings" actually provided "inquiry notice" of a cause of action, and if so whether such

disclosures provided inquiry notice to those potential defendants mentioned in the disclosures or

to other unnamed defendants. *See In Re Foreign Exchange Benchmark Rates Antitrust Lit.,* 2016

WL 5108131 *15-17 (S.D.N.Y. 2016). After determining whether the storm warnings or public

disclosures did in fact put a person on inquiry notice, then courts continue to consider what steps

a person took to investigate further. If a person did not proceed to investigate after being put on

inquiry notice, then the Statute of Limitations accrues on the date of the Public Disclosure or the

day inquiry notice occurred; however, if the person does continue to investigate his or her claim

after inquiry notice exists, the court will commence the statute of limitations on the date that the

person of ordinary intelligence actually discovered the cause after doing a reasonable

investigation. *Koch v. Christies, Int'l,* 699 F.3d 141 (2d Cir. 2012).

The Court in *Koch v. Christies Int'l,* relying on *Lentell v Merrill Lynch & Co.,*

*Inc.*, 396 F.3d 161 (2d Cir. 2005) stated and applied the well-accepted Discovery Accrual Rule:

> "Inquiry notice-often called 'storm warnings' in the securities context-give rise to a duty
> of inquiry 'when the circumstances would suggest to an investor of ordinary intelligence
> the probability that she has been defrauded.' In such circumstances, the imputation
> of knowledge will be timed in one of two ways: (l)'[i]f the investor makes
> no inquiry once the duty arises, knowledge will be imputed as of the date
> the duty arose'; and **(ii) if some inquiry is made, 'we will impute knowledge
> of what an investor in the exercise of reasonable diligence[] should have discovered
> concerning the fraud, and in such cases the limitations period begins to run from the**

**date such inquiry should have revealed the fraud." [Emphasis Added.]**

Therefore, Defendants' simple analysis that commenced the running of the

Statute of limitations in October, 2008 simply ignored the DAR. *Staehr v. Hartford*

*Financial Services Group, Inc.*, 547 F.3d 406 (2d Cir. 2008); *Koch v. Christies Int'l*

*PLC.,* 699 F.3d 141 (2d Cir. 2012.)

### 1. Because storm warnings did not even exist until August, 2012 and only against PFG and Wasendorf, the statute of limitations did not accrue against defendants until August, 2012.

In this case, Defendants have utterly failed to carry their "heavy burden"

regarding "Inquiry Notice." *In Re Libor*, 935 F. Supp.2d 666, 700 (S.D.N.Y. 2013)(cases

cited). In fact, Defendants' position that inquiry notice triggered the Statute of limitations as

early as October, 2008 is belied by the record. Defendants have adduced no evidence or

allegations that there were any public disclosures that would have revealed the current claims

at issue herein based on a hidden Ponzi Scheme by PFG and its co-conspirators prior to

2012. The law is clear that storm warnings of monetary losses in general do not suffice to

put a plaintiff on inquiry notice of a specific cause of action without some public disclosure

indicating the actual wrong. *See Staehr v. Hartford Financial Services Group, Inc.*, 547 F.3d

406 (2d Cir. 2008)(Court in reviewing the public disclosures held that none put plaintiffs on

inquiry notice of the wrongs complained of)*; see also, In re FOREX,* 2016 WL 5108131

(Articles not naming defendants did not put plaintiffs on inquiry of unnamed defendants who

were properly added two years later); *Koch v. Christies Int'l,* relying on *Lentell v Merrill*

*Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005)(Inquiry notice occurred in 2000 for a loss

occurring in 1988 when a report was received publically disclosing the fraudulent nature of

the transaction and despite rumors in the media in the 1990s that such wines were not

-16-

genuine.)

Therefore, Defendants' argument that Plaintiffs were well-aware of their instant

causes of action based on their 2008 losses is entirely misplaced because none of those

known losses that gave rise to the NFA arbitration were even known at the time to be

related to the instant Ponzi Scheme that was well-hidden from the public in 2008 due to

*inter alia* Wasendorf's fraudulent filings with the NFA. It was only when Wasendorf left a

suicide note, in July, 2012 that the Fraud was exposed in general terms. But even this storm

warning in 2012 did not satisfy the "Inquiry Notice" Standard, because there was still not

enough evidence in the Public Record to apprise Plaintiffs of these hidden facts.[1]

However, assuming arguendo, there was such Inquiry Notice back in 2012,

Plaintiffs still fall under the DAR because Plaintiffs did not just sit on their claims, rather

they continued to investigate their claims and therefore under the DAR they are entitlted to

further tolling past the initial storm warnings in 2012. Their claims continued to be tolled

through 2016 when this case was finally brought when it was believed that their Allowed

Bankruptcy Claims would not be worth anything based on the information made known, and

---

[1]Therefore, the earliest possible time that any of these claims that are the subject of this suit could have accrued was at the earliest in August, 2012 and only against Wasendorf and PFG because there was some public disclosures related to the Ponzi Scheme. *See Staehr v. Hartford Financial Services Group, Inc.*, 547 F.3d 406 (2d Cir. 2008), *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 168 (2d Cir. 2005);*In Re Libor-Based Financial Instruments Antitrust Litigation*, 935 F. Supp.2d 666, 704 (S.D.N.Y. 2013) *Koch v. Christies' International, PLC.,*699 F.3d 141, 152 (2d Cir. 2012)*; In re Nat. Gas Commoditiy Lit,* 337 F. Supp.2d 498, 512 (S.D.N.Y. 2004). However, these articles appearing in the media would only have related to  Wasendorf and PFG, because the nature of the disclosure did not even mention anything about JPMorgan, Millennium or CME or the others.  The letter written by Paul Thomas to Plaintiffs, also in the Summer of 2012 mentioning a claim against U.S. Bank does not qualify as Inquiry Notice, because that bizarre and one-off letter did not sufficiently  apprise Plaintiffs of anything. *See* SAC Exh.22.  It appears that Paul Thomas in an effort to participate in the RICO conspiracy wrote this letter to trip the Statute of Limitation against these parties which would also qualify as fraudulent concealment through actions.  Clearly, under Second Circuit law, there is a question of fact as to whether such disclosures back in 2012 even qualified as sufficient storm warnings to support Inquiry Notice against all the defendants. *See Staehr v. Hartford Financial Services Group, Inc.*, 547 F.3d 406 (2d Cir. 2008) (Second Circuit held that to meet the threshold of providing Inquiry Notice courts can examine disclosures to see whether a person of reasonable intelligence would have had enough information to investigate further or file a complaint.)

they did not want to wait around any longer for more disappointments. *See*, Levy Dec.

Email from Allison Hudson, Esq. Attorney for the Trustee dated June 28, 2016, Exh. 5.

In the case at bar, Defendants unconvincingly argued in cursory form that

the disclosures made in the Summer of 2012 were of the nature and quality to even provide

the information necessary to continue with an investigation. Although such arguments are

unconvincing, at the pleading stage, this Court need not analyze their logic, because the also

record demonstrates that Plaintiffs upon learning rumors of the Ponzi Scheme in 2012 did

continue to investigate their case. Therefore, under the DAR's first requirement, Plaintiffs

have adequately alleged that the DAR applies to their claims. SAC ¶¶ 698-730, 707,

729.

> **2. Because Plaintiffs Filed Notices of Claims in 2012 and continued to
> investigate by joining the Class Action, their claims are timely under the
> DAR since they discovered the nature of their claims in 2015 or 2016.**

Defendants have adduced no facts to deny the clear allegations in the SAC, that

Plaintiffs continued to investigate their claims, Defendants have utterly failed to bear their

"heavy burden" that Plaintiffs claims accrued in 2012.

Once Plaintiffs realized that their investments were part of PFG's scam, they

consulted with another attorney who began to investigate on their behalf. Then after

investing further, they decided the next reasonable step would be to file notices of claim in

the Bankruptcy case against PFG which they also did. *See* SAC Exhibit 23. By joining the

Class action, they knew that discovery would be conducted on their behalf by Class counsel.

By the end of 2012, their claims were protected or so they thought, and they had effectively

delegated their obligations under the DAR to Class counsel and other counsel. Therefore,

even if the technical requirements of *American Pipe v. Utah*, were not to apply in this case, the fact remains that Plaintiffs proceeded to press their claims in the Class Action showing reasonable inquiry in that forum that should suffice for tolling under the DAR and Equitable Tolling.

When the Bankruptcy Trustee challenged the Schefferts' right to participate in the *Peregrine* bankruptcy case by in 2014, the Schefferts continued to press their claims consistent with their obligations under the DAR as well as Equitable Tolling when by counsel, they appeared telephonically in Chicago to defend their position when the Bankruptcy Trustee, who became the Plaintiff in the Class Action, attempted to expunge their right to participate in the Class Action. After a hearing in March, 2015, *see,* SAC Exhibit 24, and after hearing about what happened to them, the Trustee backed off and decided to withdraw his objection to the Schefferts' claims which meant that the Schefferts as of March, 2015 had in fact an Allowed Claim. Nevertheless, Mr. Bodenstein, the Peregrine Trustee affirmatively reserved his right to object to the Schefferts' claim at a later date.[2]

However, during this entire period, Plaintiffs continued to investigate the details of their case by counsel and through counsel consulted with an economic expert who

---

[2] It was at this point in time in the spring of 2015, an in anticipation of a full blown adversary proceeding that counsel decided that it was necessary to review the entire case from scratch and in more detail in order to prepare for a full blown adversary proceeding in the Bankruptcy Court that was expected based on the Bankruptcy Trustees' explicit reservation of right to reopen the objection. Plaintiffs therefore needed to be ready with evidence to proceed. At this point, Plaintiff Scheffert requested her account statements from Paul Thomas, but he did not respond to her request. Thereafter, she eventually as well as some of other Plaintiffs started to request their account statements from the NFA whose policy it was to retain client records and provide them to their former clients in an equivalent way to a FOIA request. It took a long time to collect records which are still incomplete.

-19-

unravelled these unbelieveable claims by reviewing each account statement in the detail that

only an expert can, and where it was finally revealed that there was a terrible situation that

befell these plaintiffs as described in the SAC, and it was finally discovered that there were

claims *inter alia* of a RICO Conspiracy and based on lack of regulation.  Shortly, after the

Expert tendered his report, and the Claim was discovered, in July, 2016, and the case was

immediately filed.

Therefore, under the Second prong of the Inquiry Notice rule, the Plaintiffs by

continuing to investigate their claims, protected their claims and never sat on their claims

and did everything reasonable they could do including attempting to join the Class action,

defending their bankruptcy case in court, and then filing this case in 2016.  Thus, they are

timely because Plaintiffs immediately proceeded with the filing of their Complaint in July,

2016 after finally learning that they would not recover in the Class Action-- within two years

of learning of their CEA claims and within 4 years of their claims. *See* Levy Dec. Exh. 5,

Email of Allison Hudson, Esq. dated June 28, 2016.

### 3. The RICO and CEA Claims are Timely

In fact, Defense counsels' admission that the RICO claims were discovered no

earlier than August, 2012 based on the Wasendorf's suicide note or the Attorney letter

received at that time certainly demonstrates the validity of the RICO claim which apply the

DAR, that even defense counsel admits started to run in August, 2012.  Therefore because

the SAC was originally interposed in July, 2016, all RICO claims are timely under the DAR.

However, the CEA claims are also timely under the second criteria of the Inquiry

Notice rule, because plaintiffs continued to conduct a reasonable investigation from the

-20-

Summer of 2012 through the Summer of 2016 when the real claims were finally unmasked.

This Court should not dismiss the CEA claims because the Discovery Rule squarely falls

under the standards set forth in *Koch v. Christies Int'l,* relying on *Lentell v Merrill Lynch &*

*Co., Inc.*, 396 F.3d 161 (2d Cir. 2005.)(Court held that after Inquiry notice did not occurr in

1990 when there were some rumors based on articles that the wine plaintiff had purchased in

1988 was fake; rather it was not until 2000 when plaintiff hired an expert to analyze the

authenticity of the wine that the Statute of Limitations Accrued thus requiring him to file by

2004 under RICO.)

Applying the Second Circuit's sound logic in *Koch v. Christies, Int'l* should

allow a finding in this case that the claims did not accrue until 2016, although the losses like

in *Koch* occurred when the wines were purchased or in this case when the options ostensibly

expired worthless. Relying on when the Expert learned of the true nature of the claims

commenced the Statute of Limitations in *Koch* and therefore, here too, the claims accrued no

earlier than July 7, 2016 when Plaintiffs' expert reported his findings concerning customer

account statements. It was at this time, the claims were properly alleged that the majority of

the losses could have been averted had simply the Exchange and others applied the Margin

Rules. But as the case has developed, it appears that whatever method used to cover the

losses, the C ME could not have done anything about it, because they did not appear to have

been monitoring these Omnibus Subaccounts. This terrible consequence in combination

with the revelations of the Class plaintiffs in the companion Class Action entitled *In Re*

*Peregrine Financial Group Customer Litigation*, 12-cv-5546 (N.D. Ill. 2012) support an

inference that the entire RICO scheme did in fact occur during the relevant time frame and

-21-

was unmasked due to Plaintiffs' attorney's continuing investigation which was also dependent on a very slow process regarding gathering of documents from the NFA. Without such records, these claims would not have been discovered at all.

Certainly, the continuous vigilance of lead plaintiffs entitles them to the Discovery Accrual Rule with respect to the RICO claims and each and every Cause of Action in this case.

The Second Circuit's analysis in *Koch v. Christies Int'l*, demonstrates a very generous Discovery Accrual Rule. In fact, the newspaper articles in the 1990s used to first question the wine's provenance, in *Koch,* did not commence the running of statute of limitations, instead the Court continued to toll the Statute of Limitations 10 more years until the year 2000 when the Expert report showed the wines were most likely fraudulent, giving rise to a RICO conspiracy theory. Here, the delay in discovery of the RICO claim is in total only eight years, one half of the time allowed under *Koch v. Christies' International, PLC.*,699 F.3d 141, 152 (2d Cir. 2012.)

The Second Circuit's sound logic in *Koch* should control the outcome of this case as well. In this case, Defendants' argument that the losses occurring in 2008 are equivalent to the *Koch* loss in 1988 merely by virtue of the fact that that is when the transactions occurred. However, just like in *Koch*, in this case at bar, the claims sounding in RICO conspiracy and violations of the Commodity Exchange Act alleged in this case could not possibly have been known to Plaintiffs back in 2008. First, in 2008 PFG and Russel Wasendorf were strong business entities engaged in a hidden Ponzi Scheme which was in full swing in 2008, and even according to U.S. Bank, it had no idea of this Scheme as well

because the Scheme was fraudulently concealed. So, there where no public or private disclosures are apparent to provide notice such as an article in the Wall Street Journal, no inquiry notice can be said to exist at all.

Defendants' flawed logic continues because by October 2010 and October 2012 nothing new was known about this RICO scheme. 2010 and 2012 would have been when the CEA claim and RICO claim expired using a 2008 Accrual date. Therefore, defendants are effectively arguing that there should be no Discovery Accrual rule at all rather a straight loss rule as there is in assault cases for example. *See In Re Libor*, 935 F. Supp.2d 666, 712 (S.D.N.Y. 2013)(Standard to be applied to tolling CEA claims under the DAR: (1) when inquiry notice was triggered, (2) whether plaintiffs actually inquired within two years of the date of inquiry notice, and,(3)if so, whether the complaint was filed within two years of the date on which a person of ordinary intelligence, 'in the exercise of reasonable diligence,' would have discovered his injury.") *see also, E.g. Dyer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 928 F.2d 238, 240 (7th Cir. 1991)(discovery rule applied in claims for violation of the CEA);*In re Dairy Farmers,* 2013 WL 212908, at *7 (discovery rule applies in claims for violation of antitrust laws); *Horbach v. Kaczmarek*, 934 F. Supp. 981, 985 (N.D. Ill 1996)(discovery rule applies to Illinois' five-year statute of limitations).

To the extent that there are any doubts concering the facts of this case, discovery will yield the evidence, but for purposes of a motion to dismiss all facts are to be construed in favor of Plaintiffs herein, the non-movants. Therefore, once Discovery is underway, the extraordinary steps the clients took during the relevant time period will become part of the record. However, at this juncture, the SAC well-pleads the necessary elements to apply the

-23-

DAR to this case. *See* SAC ¶¶ 698-730.

      Additionally, to defeat Defendants' motion to dismiss based on timeliness, it should be pointed out that Defendants have cited to no public disclosures that would specifically make Plaintiffs aware of their CEA or RICO claims because no such articles appear to have been written prior to 2012.

      Therefore, under well settled precedent, this case should proceed based on the fact that the CEA claims did not accrue until 2015 or 2016 when the account statements were finally obtained and reviewed by an Expert.

## C. These Federal Claims Sounding In RICO and the CEA Are Also Timely Based on Equitable Tolling and Based on Fraudulent Concealment.

      Because this Ponzi Scheme was Extraordinary, although not unique, Equity should also toll this case at the pleading stage. *See* Government Sentencing Memorandum, *U.S. v. Wasendorf,* 12-cv-02021-LRR, Doc #51 (N.D.IA 1/22/2013), Levy Dec. Exh. 6, p.4. (Arguing the Scheme was sophisticated and requesting a sentencing enhancement.)

      Justice Frankfurter stated the importance of Equitable Tolling best in the Landmark case of *Holmberg v .Armbrecht*, 327 U.S..392 (1946) when the Court in fact applied Equitable Tolling:

> "Traditionally and for good reasons, statutes of limitation are not controlling measures of equitable relief. Such statutes have been drawn upon by equity solely for the light they may shed in determining that which is decisive. . . namely whether the plaintiff has inexcusably slept on his rights so to make a decree against the defendant unfair.. . . Equity eschews mechanical rules; it depends on flexibility. Equity has acted on the principles that 'laches is not like limitations, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced–an inequity founded upon some change in the condition of relations of the property of parties."

The harshness and unfairness of declining this case would encourage wrongdoers. Serious policy implications should encourage claims to be heard on their merits such as in this case, where the possibility that hard working and honest citizens could eventually become public wards and dependants on public assistance based on lack of financial support and due to unrecovered monetary losses that would result in denying full vindication of Plaintiffs' rights. By allowing Defendants to escape responsibility shifts an unfair burden onto other members of the public who will eventually have to support these folks if they cannot make ends meet because they lost their life savings. Rather, by fairly compensating Plaintiffs, they can continue to support themselves.

Therefore, because the facts of this case are extraordinary because this Ponzi Scheme lasted for a long time at least 20 years, Equitable Tolling is valid. *See* Gov'ts Sentencing Memo, Levy Dec. Exh. 6, page 5 (Ponzi Scheme started in the 1990s.)

Because the Plaintiffs have pled under Rule 9 with particularity that the Federal Claims were Fraudulently Concealed from them, all of their Federal Claims were timely interposed on July 11, 2016 after such Fraudulent Concealment was overcome. Equitable Tolling is indeed an extraordinary remedy and well-suited for this extraordinary set of facts. The press has reported this 20 year Scheme as an extraordinary case as well. *See* Government Sentencing Memorandum annexed to the Levy Dec. as Exh. 6. So too, should this Court recognize that when innocent investors lose their life savings in such a systemic way, and not all responsible parties are held accountable for violations of law, something extraordinary has occurred. By dismissing this case, there will be meaningful opportunity for Defendants to "self-correct" and by imposing explemary damages on these Defendants, they will hopefully never do this again to anybody.

-25-

Because such Fraudulent Concealment requires testimony to support the particular elements, normally, claims sounding in Fraudulent concealment are not dismissed at the pleading stage. *See, Sidney Hellman Health Center of Rochester v. Abbot Laboratories, Inc.,* 782 F. 3d 922, 928 (7th Cir. 2015)(reversing dismissal of a civil RICO complaint for failure to meet the statute of limitations.)

To establish Equitable tolling based on Fraudulent Concealment, requires a plaintiff to allege that: (1) the defendants fraudulently concealed the facts necessary to know about the fraud or the conduct is self-concealing, (2) Plaintiffs did not learn of the nature of the claims within the Statute of Limitations, and (3) Plaintiffs acted with reasonable diligence in trying to understand their claims under the CEA. Because all three criteria have been well-pled in the SAC, all of Plaintiffs claims should be subject to Tolling based on Fraudulent Concealment. SAC ¶¶ 698-730.

### 1. Because this Ponzi Scheme was Self-Concealing, and because there was actual Concealment, Equitable Tolling is Proper.

Under the First criteria, plaintiff need not establish any facts to show concealment, because this Court as a matter of law can and should take judicial notice of the fact that the nature of this 20 years Ponzi Scheme was in fact, self-concealing. SAC, §§ 706

Indeed, these protracted schemes involving self-regulatory agencies such as the CME and NFA have been held by the Courts in this district to be inherently self-concealing and nothing more is required to be pled under the first criteria. *See State of New York v. Hendrickson, Bros.,* 840 F.2d 1065 (2d Cir. 1988); *Levy v. BASF Metals,* 2017 WL 2533501 (S.D.N.Y 2017); *In re Nine West Shoes Antitrust Litig.,* 80 F. Supp. 2d 181, 193 (S.D.N.Y. 2000). *In re: Commodity Exchange, Inc. Gold Futures and Options Trading Litigation,* 213 F. Supp.3d 631 (S.D.N.Y. 2016.)

-26-

Because the Scheme was not uncovered for 20 years where Wasendorf Sn. was filing false reports clearly establishes this first prong. However, the SAC also well-pleads additional facts to establish actual fraudulent concealment including: (1) Misleading statements to Plaintiffs that only PFG was liable for doing business with unregistered agents from attorney Paul Thomas, SAC ¶¶ 702, 703, 715, as well as his decision to drop the valid claims alleging violations of the CME rules by allowing trading to continue while the accounts were on Margin Call which is unheard of normally. Paul Thomas terribly misled plaintiffs that their claims only sounded in failure of their brokers to register as commodity professionals thus imposing vicarious liability on PFG and Brewer. By dropping the claim sounding in a CME violation, Paul Thomas fraudulently concealed the real gravaman of the case and prevented any discovery or testimony regarding the CME violation from occurring. SAC §§ 656,659,660,668,678,681,682.

These efforts by Paul Thomas clearly establish Fraudulent Concealment because it masked the real nature of the claims and left the clients in the dark.

The NFA also fraudulently concealed what happened to Plaintiffs by not conducting an investigation by the Business Conduct Committee in connection with Plaintiffs' claims that would have also shown the inappropriate conduct. By the time the NFA fined PFG and its officers $700,000.00 in February, 2012, for almost identical misconduct, the Plaintiffs's claims had been rejected by the NFA Arbitrators. *See* SAC, Exh. 10.

With respect to the U.S. Bank, N.A. during this time period and thereafter, they too committed Fraudulent Concealment by continuing to deny liability in their public statements. In the public disclosures, U.S. Bank clearly refused to admit liability. *See CFTC*

-27-

*v. U.S. Bank, NA,* 6:13-cv-2041, Doc. #147 (N.D.IA, 2/04/15). Because this denial of

liability is a material omission, fraudulent concealment is established with respect to hiding

their conduct. Due to that fraudulent Omission, plaintiffs were led to believe that U.S. Bank

did not participate in this alleged Scheme. However, once the case was settled and U.S.

Bank contributed $18,000,000.00 to the settlement in 2015 for the *Peregrine Customer*

*Litigation*, the fraudulent omission was corrected, and Plaintiffs learned of their

participation, despite the refusal to admit liability. *Id.*

   With respect to CME and CMEG, shortly after the Peregrine collapsed, Terrence

Duffy, CEO, testified how sorry and shocked he was to see what had transpired and

immediately funded a $100 million dollar fund to compensate only Farmers and Ranchers

*See* Testimony of Terrance Duffy, Senate Committee on Agriculture, Nutrition & Forestry,

dated August 2, 2012, annexed to the Levy Dec.as Exh. 7. This type of self-serving

testimony equates with a strong denial of responsibility by shining a spot light on the FCMs

like Peregrine and MF Global rather than on itself, and by deflecting responsibility from

itself by its material misstatements indicating that it was not responsible for this misconduct,

instead of just owning it. Thus, the CME and CMEG who had an affirmative duty under their

mandate to stop such conduct in the first instance made public statements unilaterally

absolving itself from liability. The $100 million dollar settlement fund also created a

fraudulent circumstance where it appeared that the CME was helping investors out, but in

reality, it was just limiting its liability by creating preferential transfers to some unsecured

creditors namely the farmers and ranchers over the Plaintiffs. *See* Testimony of Terrence

Duffy, CEO of The CME Group, Inc. annexed to the Levy Aff. as Exhibit 7.

   In addition, during the relevant time period form 2008 to 2011 when the

-28-

Plaintiffs were before the NFA, Russell Wasendorf and PFG were quite prominent and well-respected in the Industry and during this time period Russell Wasendorf continued falsifying Account Verification forms to make it look like PFG was a legitimate enterprise.  So, clearly there was more fraudulent concealment giving rise to the fact that this RICO Ponzi Scheme could not be detected during the Statute of Limitations Period.

### 2. The SAC properly alleges that Plaintiffs did <u>not</u> learn of the Scheme during the Applicable Time Period.

The allegations are pled with specificity that Plaintiffs did not learn of the true nature of this Scheme until it was reported to them based on an expert review of their case in 2015 or 2016, as discussed, *supra.* SAC, §§727-729.  Therefore, once they did learn of the nature of the scheme in 2016, they had two years after that to commence their CEA claims or until at least 2017, and 4 years to commence their RICO claims or until 2020.

Therefore, as a result of each Defendants' fraudulent concealing the true nature of the misconduct preventing plaintiffs from learning of the RICO Ponzi Scheme and other claims within the applicable statute of limitations, Plaintiffs have satisfied the Second prong of fraudulent concealment.

### 3. Because Plaintiffs Acted Diligently, Equitable Tolling Applies.

Because this last criteria appears to be identical to the consideration of the application of the Discovery Accrual Rule, the same facts alleged in the SAC to apply the Discovery Accrual Rule can equally be applied to establish Equitable Tolling based on Fraudulent Concealment as well. *See* Discussion *supra* pp.13-20.  Because Plaintiffs have adequately alleged their diligent efforts to discover the facts of this case, they also satisfy the third criteria of Equitable Tolling. SAC §§ 698-730.

**D.**     **Because Many of the Claims Are Identical To *In re Peregrine Financial***

*Customer Litigation,* **and Because the Non-piggy Back Carve Out Applies Under These Circumstances, Many of the Federal Claims Herein Should Be Tolled under** *American Pipe* **Including the Claims for Violations by the Bank Defendants of 7 U.S.C §6d(b) and Aiding & Abetting.**

Because Plaintiffs the Schefferts actually had an Allowed Claim in the Prior

Class Action, *In re Peregrine Financial Group Customer Litigation,* 1:12-cv-05546 Doc.

#66 dated 12/21/12 (Annexed o the Declaration of Lisa Blank, Esq. Doc. #141); SAC, Exh.

23, 24, they were part of the prior Class Action; although they did eventually get decertified

de facto when by email one of the Attorneys, Allision Hudson, Esq. dated June 28, 2016

annexed to the Levy Dec. as Exhibit 5. Therefore, the Plaintiffs in this subsequent case, a

group of approximately 30 families from Oelwein, Iowa, should be entitled to Equitable

tolling under *American Pipe Construction v. Utah,* 414 U.S. 538 (1974) and *Crown Cork &*

*Seal Co. v. Parker,* 462 U.S. 345 (1983). However this Court need not even reach this

analysis, since the two other analyses above suffice. In fact, because Plaintiffs did as a

matter of fact attempt to join the Class Action, they diligently pursued their claims, thus

tolling their claims under a more traditional analysis. However, because there are genuine

questions of fact concerning *American Pipe* Tolling, this claim should proceed as well.

For the past 40 years, courts have allowed Equitable Tolling pursuant to

*American Pipe* in favor of absent Class members who for one reason or another were not

able to proceed in a Class Action, usually after a motion for certification where a portion of

the Class became decertified. At that point, the decertified class members could proceed to

protect their rights as interveners or by commencing their own lawsuits. This *American Pipe*

tolling provision was considered manifestly fair because an absent class member during the

pendency of the Class Action was entitled to rely on Class counsel to press their claims as

part of a Class Action.

-30-

Because defendants were on notice of the claims involved in their case upon the filing of a Class Action, the *American Pipe* Tolling Provision was deemed fair, since there would be no surprise to defendants to expect the asserted claims. *American Pipe* Tolling was also recognized as beneficial to the defense, because it avoided the necessity of filing placeholder lawsuits that would have caused a multiplicity of litigation, if potential class members had to worry about the timeliness of their individual actions forcing them to file protective opt-outs ahead of class certification hearings.

In evaluating whether a plaintiff is entitled to Equitable Tolling under *American Pipe*, courts consider whether defendants were put on notice of the claims in the Original Filing. Therefore, in this case, because these defendants were amply apprised of the claims in this case, many of which are identical, such as a violation of 7 U.S.C. §6d(b) and Aiding and Abetting, *American Pipe* tolling is appropriate.

Defendants' contention that these Plaintiffs were originally excluded from the Class in the Prior Class is belied by a plain reading of the Consolidated Complaint annexed to the Declaration of Lisa Blank, Esq. Doc.# 141 which was filed on December 21, 2012. Therefore, Plaintiffs are entitled to Equitable Tolling under *American Pipe,* from at least December 21, 2012 until at least October 13, 2015, when the Final Judgment and Order of Dismissal with Prejudice was entered. *See In Re Peregrine Fin. Group. Cus. Lit.,* 12-cv-05546, Doc. #440 (N.D. Ill. 10/13/15.)

Indeed, Paragraph 1 of the Consolidated Amended Complaint (Doc. #66, annexed to the Declaration of Lisa Blank, Esq.) includes the Class Plaintiffs in this Class action at issue to include **all 24,000** Plaintiffs, including the 11,000, that were later excluded leaving 13,000 who did recover. Paragraph #1 defines the putative Class members in the prior case

in the same way as in this case:

> "1. Plaintiffs are former customers of Peregrine Financial Group, Inc.,
> ("PFG"). They sue on behalf of themselves and approximately **24,000**
> other similarly situated persons who have lost money as a result of the
> collapse of PFG in July, 2012." [Emphasis Added.]

Clearly, this first paragraph included many more than the 13,000 plaintiffs who

eventually did recover. *See* Wasendorf, Sentencing Hearing page 10, line 17, Levy Dec.,

Exh. 2. The 11,000 other Class Members represented decertified customers, just like

Plaintiffs, because when the Final Judgment was entered, it appears that only those

customers who had open accounts in 2012 got compensated. However, initially, there was

no way to know that Class Counsel would narrow the Class as they eventually did.

In fact, in a related case, *C.F.T.C. v. U.S. Bank, N.A.*, 13-cv-2041 (N.D. IA 2014),

Chief Judge Linda Reade defined the relevant time period where the Wasendorf Fraud was

occurring to include funds held in customer segregated accounts from June, 2008 through

July 2012 which includes the Plaintiffs' claims herein in that relevant time period as well.

*See* Summary Judgment Decision and Order page 8, 13-cv-02041 (N.D. IA 2014.) In the

Government's Memorandum annexed to the Levy Dec. as Exh. 6, it clearly states that this

Ponzi Scheme was ongoing for 20 years. When the Final Order was issued in Wasendorf's

case, restitution was ordered for approximately 13,000 plaintiffs which must have been those

tallied up from the Class Action Settlement. *See* Wasendorf, Sn. Sentencing Hearing, p. 63.

Therefore, it appears that somewhere along the way approximately 11,000 plaintiffs were

decertified including Plaintiffs in the Chicago Class Action based on these facts and the

inferences drawn from these facts. Clearly, Class Counsel initially included all 24,000

Plaintiffs in plain English in the first paragraph of the Consolidated Class Complaint.

The Consolidated Complaint continues to include these Plaintiffs in paragraphs 3 and 4:

"3. Plaintiffs' money was stolen from purported 'customer segregated accounts' maintained by PFG with JPMorgan and U.S. Bank (the "Banks"). The theft from the accounts at JPMorgan and U.S. Bank could not have occurred without the Banks' breaches of their legal duties owed to Plaintiffs. and,

4. JPMorgan improperly transferred millions of dollars in PFG customer money from a customer segregated account at JPMorgan to an account at U.S. Bank controlled by Wasendorf, who in turn diverted these funds to his own unauthorized uses."

This Consolidated Class Action Complaint continues to describe Class

Representatives in paragraphs ##9-21 as PFG account holders who held customer segregated accounts for commodities futures and options trading just like Plaintiffs herein. No dates are placed in these decretal paragraphs to limit the Class in any way. It was only later, when the Final Order was entered and the Plan of Allocation released that the Class was narrowed and then were these Plaintiffs de facto Decertified. *See* Email of Allison Hudson, Esq. Attorney for the Trustee, dated June 28, 2016 annexed to the Levy Dec. as Exhibit 5.

More evidence that the Plaintiffs here were part of the original Class was the existence of the Schefferts' Allowed Claim filed in the Bankruptcy Case that eventually took over as Class Plaintiff. *See* SAC Exhibit 23, 24. Therefore, when the Class Action was settled and a Final Order was entered, it was unclear even who was in the Class and who was excluded, since there had never even been a separate Class Certification Motion with an order clearly stating that a particular class had been decertified.

Rather the Final Order, Section e, implies that these Plaintiffs were included in the Prior Class after all where it defined an Allowed Claim as:

> "A Claim:(a) timely filed against PFG in the Bankruptcy Case by the applicable bar date established by the Bankruptcy Court that is no longer subject to objection in the Bankruptcy Case; or (b) that is allowed in the Bankruptcy Case (I) by a Final Order or (ii) by an agreement between the holder of such Claim and the Trustee."

*See In re Peregrine Financial Group Cust. Liti.*, 12-cv-05546, Doc. 440, p.3 (N.D. Ill,

-33-

10/13/15).

Defendants' reliance on the definition of the Settlement Class in the Final Order

dated October 13, 2015 to exclude Plaintiffs herein just means that upon the Final Order

being entered, the tolling provision in *American Pipe* ended, and the Plaintiffs had two or

four more years to bring their claims from October 13, 2015 when the Final Order was filed.

The Settlement Class states:

> "v. "Settlement Class" means all persons or entities who held money, property,
> and or securities pursuant to 7 U.S.C. § 6d(a)(2) at PFG as of July 10, 2012."

However, this definition was not dispositive either, because Plaintiffs herein did

own property, because a "claim" can be considered property, and therefore these Plaintiffs

did have claims as of July 10, 2012. By including the word "property" in the Class definition

all other claims as of July 10, 2012 were proper. In fact, because no futures or options

investors can use anything other than cash or a treasury bill to margin accounts, clearly

"property" had to have a broad definition to include all claims. Entire companies make it

their business to purchase from creditors their "claims" for pennies on the dollar, therefore it

is reasonable that "property" certainly includes claims.

The Commodity Future Customer Claim Form  also included Plaintiffs' Claims

as well where Plaintiffs were instructed that if they held any "OTHER CLAIM" other than a

4(d) relationship, those plaintiffs were directed to file a separate claim form. *See* Customer

Claim Form, SAC ¶¶ 227-229. Based on this instruction, Plaintiffs were included in the

prior class, but eventually got cut out.

Eventually, there was a significant narrowing of the broader definition of Class,

and this exclusionary conduct was not in the pleadings or Claim forms, but was made known

to Plaintiffs when no notices of claims were even mailed to them, although the Trustee

-34-

certainly had their addresses and sent them an Objection. When Plaintiffs did not receive any Claim forms, a red flag appeared.[3]

Plaintiffs actually never learned of their exclusion, but figured it out, along with the other 11,000 decertified class plaintiffs alleged in the Consolidated Class Action Complaint, Paragraph 1 where the definition of a Class Plaintiff specifically included 24,000 customers, not just the 13,000 who were actually compensated.

Therefore based on this clear record, Plaintiffs having been decertified de facto, now are entitled to Equitable Tolling under *American Pipe*. The Plaintiffs here had two more years to commence claims under the CEA or by October 13, 2017 and four more years to commence their RICO claims, by October 13, 2019.[4]

Additionally, because New York appears to recognize Cross-Jurisdictional Tolling, all of the Pendant State law claims sounding in breach of fiduciary duty, and fraud by omission are also equitably tolled here as well. *Chavez v. Occidental Chemical Corp.*, 2018 WL 352810, 17-cv-03459-PAE (Jan. 10, 18 S.D.N.Y). As such both these Federal and State claims are timely.

## 1. Because the subclass was never decertified by order of the court, these plaintiffs should be allowed to proceed as a class.

Defendants' position that the present Class Action cannot enjoy Equitable Tolling under *American Pipe* because it is proceeding as a sub-class is actually not the state of the

---

[3] Defendants' suggestion that the Third Consolidated Complaint changed the Class is belied by the fact that there were alternative allegations and Class Counsel left the definition loose. However, even if Defendants' were correct, then *America Pipe* tolling would have extended until May 5, 2015 when the Third Amended Complaint was filed, thus making all the claims timely as well. *See In Re Peregrine Fin. Group. Cus. Lit.*, 12-cv-5546 Doc. #398 (N.D. Ill. May 5, 2015.)

[4] Although there was no RICO claim stated in the Class Action, because Mail Fraud and Wire Fraud are predicate Acts and because the facts in the original class action overlap with this class action and are very similar to Fraud by Omission and violations of the Anti-Fraud CEA statute, no defendants can deny notice that there were claims of fraud over a long period of time to support Mail and Wire Fraud.

-35-

law, because there is an exception for cases where the court did not specifically decertify the

Class by way of order after a motion, just as in this case. Rather, in June, 2016 shortly

before the instant case was brought, the Scheffferts formed a reasonable belief that they

would not be entitled to participate in the Class, and it was at this point that they became

decertified, de facto because the court never even decertified them in a formal motion. *See*

Email of Allison Hudson, Esq. dated June 28, 2016 annexed to the Levy Dec. as Exh. 5

Therefore, under *American Pipe* Tolling, the start day to commence the running of the

Statute of Limitations was actually June 28, 2016.

Defendants' reliance on a certain line of cases to dissallow *American Pipe*

Tolling are inapposite here because in those cases, it was clear that the court decertified

certain subclasses because these subclasses were improper under Rule 23 or the Class

Representatives were improper. The courts interpreting *American Pipe and Crown, Cork*,

rightly concluded that in most cases, if the court decertified a sub-class holding that it was an

improper class, it would be unfair to then allow that decertified class to piggy back onto

another Class Action. *See Korwek v. Hunt*, 827 F.2d 874 (2d Cir 1987).

However, the Second Circuit in *Korwek v. Hunt*, 827 F.2d 874 (2d Cir 1987)

specifically implied that in a case where a valid subclass was **not** decertified, as in this case,

it would be possible for that proper subclass to continue on in another Class Action, just as

in the case at bar. The Second Circuit explained:

> "This Court notes that it leaves for another day the question of whether the filing
> of a potentially proper subclass would be entitled to tolling under *American
> Pipe*."

*Korwek v. Hunt*, 827 F.2d 874, 879(2d Cir 1987.)

That day has now presented itself, and today is the day mentioned above where a

proper subclass, such as this Oelwein group, as stated in the SAC, can continue in this

litigation enjoying the protections of *American Pipe* tolling because there is no record that

this proper subclass was ever decertified by motion nor any court order. Decertification by

osmosis is not enough to precluded *American Pipe* Tolling under equity. Therefore, this

Oelwein subclass should be allowed to proceed in this Class Action based on this carve out

exception to the non-piggy back rule which is gaining traction and has been recognized

already in a number of cases. *See Resh v. China Agritech, Inc.*, 857 F.3d 994 (9th Cir 2017);

*Yang v. Odom*, 392 F.3d 97 (3d Cir. 2004)("We hold that *American Pipe* tolling applies to

the filing of a new class action where certification was denied in the prior suit based on the

lead plaintiffs' deficiencies as class representatives, but that *American Pipe* tolling does not

apply where certification was denied based on deficiencies in the purported class itself");

*Great Plains Trust Co. V. Union Pacific R. Co.,* 492 F.3d 986, 997 (8th Cir. 2007)("*American

Pipe and Crown Cork & Seal* require that the statute of limitations for class claims be tolled

during the pendency of a previous class certification petition, at least where there is any issue

as to the adequacy of the first representatives", *see also,* 3 Newberg on Class Actions §9:64

(5th Ed)[5]

## 2. Because CME and CME Group voluntarily participated in the prior class action, they should also be subject to *American Pipe tolling.*

Based on the inappropriate conduct of the Exchange Defendants elbowing their

way into the prior Class Action, *In re Peregrine*, by voluntarily setting up a Settlement Fund

listed right on the *Peregrine* Class Action Website with their own Docket Entry, and

instructions to claimants on how to file a proof of claim; CMEG and CME should not escape

---

[5] In this case, each of the 30 class members can proceed individually and each case can be consolidated, and plaintiffs would seek permission to do so, if necessary

Equitable Tolling under *American Pipe. See* Web page and Instructions annexed to the Levy

Dec. as Exhibit 8.  By voluntarily joining in in the Bankruptcy Litigation, the Exchange

Defendants created preferential transfers to the Farmers and Ranchers who should have been

treated the same as the Schefferts, all unsecured creditors.  CME and CMEG should have

been sued as defendants, just as in a strikingly similar case where the Trustee joined CME

Group and CME for its alleged regulatory breaches in the case of *DeAngelis v. MF Global,*

*Inc.*, 11 cv- 07866-VM Doc. # 382, ¶¶ 255, 399-404, 533-576 (S.D.N.Y. Nov. 5, 2012)

where CMEG settled with the Trustee for $14,500,000.00 based on similar claims as is

alleged in the SAC.     **E.     Plaintiffs' State Law Claims Are Also subject to Tolling.**

Because most of the same principals apply to the State Pendant Claim as to the

Federal Claims, and all these State Claims can be tolled under state's law. The Pendant State

law claims including: Fraud-by-Omission, Breach of Fiduciary Duty, Punitive Damages and

and Unjust Enrichment are all timely.[6]

Because this Court should apply New York's choice of law rules to these pendant

state claims, it can reasonably apply either New York, Illinois or Iowa law to these claims,

since they are all substantially the same, and therefore no true conflict exists.  However, to

the extent such rules do differ, this Court should first apply a center of gravity or interest

analysis test to determine which state has the greatest interest in applying its law. Because

this is not a diversity case, C.P.L.R. 202 does not appear to even apply.

C.P.L.R. 203(a) recognizes the Discovery Accrual Rule,[7] as well as Equitable

---

[6]  Plaintiffs withdraw their claims for intentional infliction of emotional distress against all Defendants as well as punitive damages against only the CME, since punitive damages are limited for CEA registrants.

[7] CPLR 203(a) states in relevant part:

"Accrual of cause of action and interposition of a claim.  The time within which an action must be commenced, except as otherwise expressly prescribed, shall be computed from the time the cause of action

-38-

Estoppel which acts like Equitable Tolling. *See Zumpano v. Quinn,* 6 N.Y.3d 666 (2006); *Simcuski v. Saeli*, 44 N.Y.2d 442 (1978). Therefore, all the pendant claims alleged in the SAC are also valid for the same reasons expressed for the Federal claims, *supra*.

### 1. Fraud-by-Omission and Breach of Fiduciary Duty are Timely.

In New York, Fraud and Fraud-by-Omission are governed by C.P.L.R. § 213(8) which includes its own discovery rule without any statue of repose.[8]

Because the SAC alleges that the expert review of the case was completed in 2016 after gathering the documents and account statements of plaintiff, the case is in time because it was also commenced in 2016 within the two years mandated by C.P.L.R.§ 213(8). *See* SAC ¶¶ 726,727.

In addition, because Federal Courts in New York also recognize cross-jurisdictional tolling, the Fraud-by-Omission claim and Breach of Fiduciary Duty Claims including violations of Illinois Fiduciary Obligations Act were also tolled against the Bank Defendants since the Plaintiffs had valid allowed claims and became decertified in 2016. *See Chavez v. Occidental Chemical Corp.*, 2018 WL 352810, 17-cv-03459-PAE (Jan. 10, 2018, S.D.N.Y)(the Court permitted Equitable Tolling under Cross-jurisdictional tolling for claims reinstated over 16 years after they were dismissed); *see also, Famular v. Whirlpool Corp.* 2017 WL 2470844 (S.D.N.Y. 2017); *In re Libor-Based Financial Instruments Lit.,* 2015 WL

---

accrued to the time the claim is interposed."

[8] "[A]n action based on fraud; the time within which the action must be commenced shall be **the greater of** six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it." [Emphasis Added]

6243526 (S.D.N.Y. 2015.)

The Breach of Fiduciary Duty claims should also be treated identically to the

Fraud-by-Omission claims with respect to the Statute of Limitations requiring the

application of C.P.L.R. 213(8) because where the breach of Fiduciary Duty claim is related

to a Fraud, as in this case, New York courts also apply C.P.L.R. § 213(8). *See*

*Cusimano v. Schnurr,* 137 A.D.3d 527, 27 N.Y.S.3d 135 (1st Dep't 2016)(Court applying

CPLR 213(8) to breach of fiduciary duty claim); *Kaufman v. Cohen,* 307 A.D.2d 113, 760

N.Y.S.2d 157 (1st Dep't 2003)(same).

### 2. Because the punitive damages claims relate to the fraud and breach of fiduciary claims, this claims should also be tolled.

Because the punitive damages claims is a separate cause of action in New York

based on wanton and willful conduct, this claim for exemplary damages can and should be

alleged as a separate claim. Therefore, if the other claims to which it relates, in this case,

Breach of Fiduciary Duty Claim, Fraud-by-Omission and Unjust Enrichment are timely, then

so should the Punitive Damages claim. However, Punitive Damages cannot stand alone if

the underlying claim for relief is only negligence, however, that is not the case alleged

herein. *See Leiva v. Marietta*, 272 A.D.2d 209 (1st Dep't 2000), 708 N.Y.S.2d 294 (1st Dep't

2000); *Rahn v. Carkner,* 659 N.Y.S.2d 143 (3d Dep't 1997); *Marsh v. Femina,* 12 Misc.3d

1157(A), 819 N.Y.S.2d 211; 2006 WL 1374018 (Sup. Ct. N.Y. 2006).

### 3. Because the Unjust Enrichment Claim also relates to the underlying claims that are subject to tolling, it is also timely

The claim of Unjust Enrichment proscribes enrichment to one party at the

expense of another and is typically linked to other causes of action in this case the CEA

claims and other claims. As such, Federal Courts usually allow tolling of Unjust Enrichment

-40-

claims if the other claims to which they relate are proper and timely as well. Therefore, because the other claims in this case are timely, than so too should the unjust enrichment claim be allowed to proceed. *See Ploss v. Kraft Foods Group, Inc.,* 197 F. Supp. 3d 1037, 1074 (N.D. Ill 2016)(Holding: "If an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to the related claim—and of course unjust enrichment will stand or fall with the related claim") *but see In re Amaranth Nat. Gas. Commodities Lit.,* 587 F. Supp.2d 513 (S.D.N.Y. 2008)(Claim for unjust enrichment was denied **only** because of pleading defect failing to show sufficient relatedness between parties and not based on timeliness or preemption.)

## III.  BECAUSE THE BANK DEFENDANTS PROXIMATELY CAUSED PLAINTIFFS LOSSES BY TRANSFERRING THEIR LIFE SAVINGS TO WASENDORF, ALL CLAIMS ARE VALID AGAINST THE BANK DEFENDANTS.

Because Plaintiffs have plausibly alleged that it was the Bank Defendants who actually transferred their life savings to Wasendorf, when no such transfers were permitted by law except for the customer's use, since these funds were held as customer segregated funds; Plaintiffs have more than plausibly established liability in the same way as the Class Action in *In Re Peregrine Financial Group, Cus. Lit.,* 12-cv-05546, Doc. #66 (N.D. ILL. 12/21/2012) of which this Court can take judicial notice in deciding this Motion.

### A.  Plaintiffs Have Adequately Pled Facts to Support Violations of 7 U.S.C. §6d(b) for Unlawfully Transferring Customer Segregated Funds to Wasendorf And Thereby Proximately Causing Plaintiffs' Damages.

None of the Bank Defendants can explain their clear and intentional conduct in making unlawful transfers of customer segregated accounts for the benefit of Wasendorf and the Bank Defendant which fleeced Plaintiffs' of their life savings. Rather under both their Fiduciary Obligations as well as under the CEA, §4d(b), the Bank Defendants could **only** use

-41-

or transfer these proceed for the customer's benefit. The Bank Defendants present argument

trying to pretend the customer's accounts were just regular accounts, not customer

segregated accounts which are special accounts, is specious, because the Bank Defendants

have disregarded controlling law in this Circuit and others that apply to special deposits.

*Lerner v. Fleet Bank,* 459 F.3d 273, 294-295 (2d Cir. 2006.) Thus, their unconvincing

arguments and unapologetic conduct should give rise to Exemplary Damages.[9]

As such, the SAC clearly states a claim for relief against the Bank Defendants.

Section 4d(b) speaks for itself and clearly means that any time a customer's segregated

accounts are received by a Depository Bank or Exchange, and "held," "disposed of" or

"used" for anyone other than the customer, Commodities Fraud has occurred. Because that

is all that needs to be done, a violation has been amply pled against the Bank defendants,

because the allegations in the SAC amply describe continuous transfers of customer funds

out of their §4d(b) accounts and into the pockets of Wasendorf and others. *See* SAC ¶¶.345-

362.

*In re MF Global Holdings, Ltd. Inv. Litigation,* 998 F. Supp.2d 157, 171-173

(S.D.N.Y. 2014) is on point and shows details of how customer segregated accounts were

taken from a customer for the use of another in that case another FCM. ("CAC stated that

intra-company transfers were 'tracked if at all, by recording manually on spreadsheets and

---

[9] Section 4d(b) states in relevant part:

> **"Duties of Clearing Agencies, Depositories, and Other s in Handling Customer Receipts**
> It shall be unlawful for any person, including but not limited to any clearing agency of a contract
> market or derivative transaction execution facility and any depository, that has received any
> money, securities, or property for deposit in a separate account as provided in paragraph (2) of this
> section, to hold, dispose of, or use any such money, securities or property as belonging to the
> depositing futures commission merchant or any person other than the customers of such futures
> commission merchant.

-42-

journal entries,' and that such tracking was applied inconsistently CAC 130".)

Just as in *MF Global,* where JP Morgan transferred $500 million dollars of customer segregated moneys to MF Global for its own proprietary trading, here too, JP Morgan engaged in the exact same fee-generating conduct proximately causing Plaintiffs losses. *See MF Global Holdings, Ltd. Inv. Lit.*, 11-cv-07866-VM Doc 469 (S.D.N.Y. 3/19/2013.)  In *MF Global,* JP Morgan requested assurances, that these transfers complied with regulatory mandates, (which they did not), and even though MF Global did not give JP Morgan these assurances, JPMorgan made the unlawful transfers anyway.  Clearly, the conduct was unspeakable, because it caused customers to lose their savings and allowed this conversion to take place.

### 1. Loss Causation Under the Commodities Exchange Act, has been Plausibly alleged based on plaintiffs' actual damages.

Because the CEA requires allegations of loss causation based on actual damages, Plaintiffs have clearly alleged that their funds were lost when JPMorgan initiated transfers from its segregated account, 5265 into to US Bank's 1845 account and then to Wasendorf which was not being used as a customer segregated account.  SAC ¶¶ 363-369.  The amounts of the losses are clearly alleged to be actual damages which states a claim under the loss causation requirements under the CEA, §22.  Indeed, the CEA does not require the pleading of proximate causation as is required in a RICO case.  All that plaintiffs must show to sustain a CEA claim is that an allegation of actual damages.  *See* 7 U.S.C. §25.  Actual damages are akin to a strict liability standard, because the framers of the Commodities Exchange Act realized that proving proximate causation of actual damages could be too difficult.  Rather, to establish liability, all that is needed is a showing that the violations caused the losses complained of.  For example, in the case of market manipulation in

-43-

violation of 7 U.S.C. § 9(1) of the Commodities Exchange Act, all a plaintiff has to prove in establishing a claim is that the manipulative conduct caused price artificiality. Once that is shown, actual damages are assumed and the allegations of losses in a trading account will suffice to prove damages. *See In Re Platinum and Palladium Commodities Lit.*, 828 F. Supp. 2d 588, 681 (S.D.N.Y. 2011)(Court reject loss causation under the analysis in *Dura Pharmaceutical*.)

Therefore, the claim for damages against the Bank defendants for a violation of §4d(b) has been adequately pled where the transfers were performed thus taking the funds out of customer segregated accounts. *See* ¶¶ 442-450.

Defendants' argument that Plaintiffs did not sustain losses by their conduct and point out that there were abusive trading practices that also occurred must fail because once the monetary transfers were accomplished by the Bank Defendants, in part 1 of this Ponzi Scheme, the abusive trading practices were just a way to white wash the losses previously sustained, or so a jury could find.

Moreover, the fact that Plaintiffs herein did not have open accounts in 2012 when the Peregrine Bankruptcy occurred also known as §4(d) customers is equally irrelevant to establishing causation, because the SAC clearly alleges that the Plaintiffs' losses had already occurred in 2007 or 2008. Clearly the way the Scheme unfolded meant that the abusive trading practices happened **after** the initial losses occurred in each of Plaintiffs' accounts and were used to clean up the "mess" so to speak, and make it look as if the trading practices caused the losses not the monetary transfers by the Bank Defendants which literally looted these customers accounts.

In fact, had the PFG Bankruptcy happened in 2013, the next year, all of those

-44-

4(d)-2012 customers who recovered in the PFG Class Action, would have met with the same

fate as the Schefferts, and only the 2013 customers would have recovered, because the 2012

customers were on the same conveyor belt as the Schefferts, where they would eventually get

pushed out of the markets with zero balances in their accounts. So in 2008, it was Plaintiffs'

turn to lose out, rather than in 2012, and they were just 4 years too early than the §4(d)

customers in 2012 who still appeared to have a cash balance in their accounts. But for the

PFG Bankruptcy, this Scheme would have continued and the 2012-§4(d) customers would

have met with the same fate as the Scheffert's.

**B.      Because the SAC Alleges Plaintiffs Had Special Deposits Both at JPMorgan
         and at US Bank Pursuant to 7 U.S.C. §6d(b) and 17 C.F.R. 1. 20, its Claims
         for Breach of Fiduciary Duty and Fraud by Omission Are Also Valid.**

Because the SAC clearly pleads that the Plaintiffs' PFG trading funds were

deposited into JPMorgan Chase's Customer Segregated Account 5265 and subsequently

transferred into another customer segregated account at U.S. Banks,1845, Plaintiffs' deposits

constituted special deposits that imposed a Fiduciary Obligation on the Banks. SAC ¶¶ 450,

495,499, 542,545, 564. Based on this reason alone, Plaintiffs' claims sounding in Breach of

Fiduciary Duty and Fraud by Omission are valid at the pleading stage. *See Lerner v. Fleet

Bank,* 459 F.3d 273, 294-295 (2d Cir. 2006); *CFTC v. US Bank, N.A.*, 13-cv-2041, Summary

Judgment Order Doc. #112, pp. 7-8 (11/19/14 N.D. Iowa); *In Re Peregrine Financial Group

Customer Litigation,* 2014 WL 4784113 (N.D.Ill. 2014).

Defendants misunderstand the law surrounding an imposition of a Fiduciary Duty

regarding Bank Deposits because in all cases where special deposits such as customer

segregated accounts under 17 C.F.R. 1.20 are made into a Banking Institution or other

Institution, a Fiduciary duty will arise in favor of the depositor and applicable to the

-45-

depository bank such as the Bank defendants in this case. Thus, the SAC clearly pleads at SAC ¶¶ 450, 495,499, 542, 545, 564 that Plaintiffs' accounts were held by both Bank Defendants as customer segregated accounts, thus making these deposits subject to Fiduciary standards. *See See Lerner v. Fleet Bank,* 459 F.3d 273, 294-295 (2d Cir. 2006), *see also Kurtz v. Solomon,* 656 N.E.2d 184, 190, 275 Ill. App.2d 643, 212 Ill. Dec. 31 (1995).

The Bank Defendants have erroneously relied on decisional law negating a fiduciary duty between banks and customers and non-customers only in cases relating to regular deposits which these special deposits accounts clearly were **not.**

### 1.   As in *In Re Peregrine*, Here too, Breach of Fiduciary Duty and Fraud by Omission have been properly pled against the Bank Defendants.

The clear law regarding special deposits in this case and the imposition of a Fiduciary Duty was demonstrated in the companion Class Action entitled *In Re Peregrine Financial Group Customer Litigation,* 2014 WL 4784113, *1, 8 (N.D.Ill. 2014), 12-cv-5546 Document #256, where Judge Ellis denied U.S. Bank's Motion to Dismiss the Breach of Fiduciary Duty claim and the Fraud by Omission claims based on nearly identical facts as alleged in the SAC where plaintiffs had special deposits on accounts as customer segregated accounts .

Because the facts relating to US Bank, NA and JPMorgan Chase are identical to the claims in this case regarding these special accounts that were held in the same way in the Class Action, the Bank Defendants' motion to dismiss these claims should be barred by collateral estoppel; or the companion class action should be given great weight based on identity of issues.

The strong reasoning and logic of Judge Ellis's opinion should control this case at the pleading stage as well.  In evaluating virtually identical claims, Judge Ellis emphatically

recognized that deposits made under §4d(b), and 17 C.F.R. 1.20 as is alleged in the SAC are

special deposits that impose a fiduciary duty without any further allegations of bad faith or

misconduct and without establishing any contact between the Customers, Non-Customers

and Depositories. Rather these special deposits impose a fiduciary obligation on the Banks to

make sure these funds are protected and not converted as in this case. As stated by Judge

Ellis quite plainly, nothing more needs to be alleged.

> "Plaintiffs have also alleged that a fiduciary duty arose because the
> deposit of their funds into the 1845 Account constituted a special
> deposit." 'A special deposit is the delivery of either money or chattel
> to a bank under a special agreement, or under circumstances sufficient
> to create a trust.' *Mid-City Nat'l Bank of Chicago v. Mar Bldg. Corp.*,
> 339 N.E.2d 497, 503, 33 Ill. App.3d 1083 (1975). A special deposit is
> found where the bank has a duty 'to hold a sum to be kept separate
> from the bank's other funds.' *Seaway Nat'l Bank v. Cain*, 629 N.E.2d
> 660, 665 257 Ill. App. 3d 865, 196 Ill Dec. 115 (1993). 'The deposit
> is for some specific purpose not contemplating a credit or general
> account." *Mid-City*, 339 N.E.2d at 503. Here Plaintiffs allege that the
> deposits in the 1845 Account were special deposits governed by the
> CEA. The CEA required Peregrine 'to hold customers' property in
> trust and to treat it as belonging to those customers rather than to '
> Peregrine. *Grede v. FC Stone, LLC*, 746 F.3d 244, 247 (7th Circuit.
> 2014)(citing 7 U.S.C.§ 6d(a)-(b)). The Complaint includes allegations
> that U.S. Bank acknowledged that the 1845 Account was a customer
> segregated account governed by the CEA and thus the Court can infer
> that U.S. Bank and Peregrine had an agreement to treat the 1845
> Account as a special deposit on behalf of the customer whose funds
> were deposited in that account. Discovery may not bear that out, but
> at this stage, the Court will allow Plaintiffs to proceed on their breach
> of fiduciary duty and fraud by omission claims based on the 1845
> Account being a special deposit held on behalf of Peregrine's
> customer."

Likewise, the JPMorgan Chase account 5265 is also alleged to be a customer

segregated account and therefore a special account just like the U.S. Bank 1845 Account.

*See* SAC¶¶ 4,6,93-97,100, 330, 332, 340. During the relevant time period, JP Morgan

allowed $94 million dollars to be transferred from the 5265 customer segregated account to

-47-

the US Bank 1845 account. *See C.F.T.C. v. U.S.Bank,* 13-cv-2041-LRR page 49.

Therefore, the claims in this case sounding in breach of fiduciary duty and fraud by omission equally apply to Defendant JPMorgan Chase as well as U.S. Bank, at the pleading stage, because they too were under the same special duty to protect Plaintiffs' customers funds from defalcation. By transferring these customer segregated accounts to the 1845 account at US Bank, JPMorgan caused the losses in the first instances by removing Plaintiffs funds from their accounts. JPMorgan had to know that these segregated customer funds were not being used for customer margin trading accounts, since the allegations make clear that when JPMorgan actually transferred these traunches into the 1845 account the language "customer segregated account" was conspicuously missing in some instances from the U.S. Bank account transfer forms. SAC ¶¶ 447, 450 Therefore, JP Morgan knowingly transferred these special deposits to US Bank into accounts marked as regular deposits that could and were used for any general purposes including paying Mr. Wasendorf's ex-wife divorce settlement as well as other personal and proprietary uses. The traunches that were transferred from JPMorgan to US Bank were in round lots hardly corresponding to the individual sub-accounts of each individual investors. SAC ¶¶ 45, 340. So, a clear inference is that all the customers' deposits were combined together and became in effect unsegregated as a matter of fact. To make matters worse, much of these special deposits sent to JPMorgan representing Plaintiffs' life-savings were held as IRA monies which also imposes another duty upon the Banks Defendants because IRA monies are also special deposits as well.

Therefore, both Banks should be held jointly and severally liable for breaching their Fiduciary duties in releasing such monies to the Russell Wasendorf, Sn. *See Lerner v. Fleet Bank,* 459 F.3d 273 (2d Cir. 2006).

### 2. Fraud By Omission is Also Proper Against the Bank Defendants.

Judge Ellis's decision denying U.S. Bank's Motion to Dismiss based on

Plaintiff's Fraud by Omission Claim is equally applicable to this companion case where

Plaintiffs have validly alleged plausible facts to support a Fraud by Omission Claim against

both U.S. Bank and JPMorgan Chase.   SAC ¶¶ 11, 414.

To establish a claim for Fraud by Omission, a plaintiff must plead a fiduciary

relationship or relationship of trust which would require the Banks to deal honestly with each

customer.   The other element necessary to establish the claim constituting Fraud by

Omission is the failure of the Fiduciary to speak when it has information that could prevent

the harm to Plaintiffs.   Clearly, the SAC alleges that the Bank Defendants omitted to inform

Plaintiffs' of the personal use and dissipation of the plaintiffs segregated accounts and that

the use of these proceeds were being made for non-trading purposes.   Therefore, just like in

the companion Class Action, the Fraud by Omission claims are equally valid herein.   *In re*

*Peregrine, Financial Group Customer Litigation,* 2014 WL 4784113 (N.D.Ill. 2014), 12-cv-

5546 Document #256.

### 3. Plaintiffs Have Properly Alleged Proximate Causation under State Law.

Under New York State law, proximate causation is defined to mean that the

conduct complained of was "a substantial factor in bringing about the harm."   It has been

held to be reversible error to charge a New York Jury with the charge that the proximate

cause of an injury was "the substantial factor" because there can be many concurrent causes

of an injury and more than one cause, as is alleged in this case. See, New York Pattern Jury

Instruction, §2:70; *see Amusement Industry Inc. v. Moses Stern, Et. Al.*, 07-cv-11586

(S.D.N,Y 2016)(Finding common law proximate cause on fraud claim.).   Clearly,

-49-

notwithstanding the other potential factors that substantially caused harm to Plaintiffs under

New York law, the SAC clearly pleads that the Bank transfers caused the losses to Plaintiffs

in their trading accounts. SAC¶¶ 452, 546, *See See Lerner v. Fleet Bank,* 459 F.3d 273, 278

(2d Cir. 2006)(Second Circuit allowed common law claims of aiding and abetting breach of

fiduciary duty to proceed against the Depositories although the RICO claim was dismissed

recognizing the difference in proximate cause: "A plaintiff must make a different showing of

proximate cause–one that is often more difficult to make–when bringing suit under eh RICO

statute than when bringing a common-law cause of aciton.") *see also, Abrahams v. Young*

*and Rubicam, Inc.,* 79 F.3d 234, 239 (2d Cir. 1996)(In distinguishing a lesser standard of

care to be applied to proximate causation regarding a negligence claim the Court held: "The

duty to act with reasonable care establishes a general standard of conduct and is not limited

to protecting certain classes of person from particular kinds of harm.)

## IV. PLAINTIFFS' CLAIMS AGAINST THE EXCHANGE ARE VALID.

The good faith allegations in the Second Amended Complaint clearly establish a

prima facia case against the Chicago Mercantile Exchange ("CME") and its parent and alter

ego the the CME Group, Inc. (Collectively the "Exchange Defendants.)

The Exchange Defendants are charged with the duty to regulate the markets

pursuant to the Scheme of the Commodities Exchange Act, 7 U.S.C. §7, Et. Seq. ("CEA"

hereinafter) and have competing roles one as a private C corporation to maximize

shareholder value and the other as a governmental regulator to provide a stable and fair

contract market for members of the investing public such as Plaintiffs.

Exchange Defendants acknowledge the strong private right of action afforded to

Plaintiffs, but dispute that they have violated Plaintiff's rights. 7 U.S.C. §25(b); *Merrill*

-50-

*Lynch Pierce Fenner & Smith, Inc. Curran.* 456 U.S.353, 102 S. Ct. 1825 (1982); *DGM*

*Investments, Inc. v. New York Futures Exchange, Inc.*, 265 F. Supp. 2d 254, (S.D.N.Y.

2003). However, what they cannot dispute is that the Exchange Defendants for over a 20

year period failed to stop the Ponzi Scheme whereby PFG engaged in abusive trading tactics

to dispose of the evidence of the Ponzi Scheme by pretending to engage in legitimate market

transactions which were actually fictitious to push customers out of the market place never to

return with zero balances in their trading accounts. Had the Exchange Defendants been

properly monitoring, examining and watching the actual trading accounts under PFG,'s

control it would have become clear that the trades were aberrant and destabilizing to the

marketplace such as during the week of October 2, 2008 through October 8, 2008. SAC, ¶¶

80, 87, 115-119, 274. In addition, it was the Exchange Defendants' obligation to stop PFG

from performing any trades since it was grossly undercapitalized and under segregated.

Because these allegations do constitute causes of action against the Exchange Defendants,

this case should proceed to discovery.

In order to establish liability against an Exchange, a plaintiff must plausibly

allege that the Exchange or Board of Trade: (1) either violated one or more of its rules,

regulations or by-laws in breaching its Mandate under 7 U.S.C. §7 **or** in enforcing one of its

rules, regulations or by-laws breached any laws under the Commodities Exchange Act or

Commission rule, (2) acted in Bad Faith and (4) caused damages. *See* 7 U.S.C.

§25(1)(b)(1)(A)(B)(C), 25(b)(4).[10]

---

[10] Indeed, Section 7 U.S.C. § 25(b)(1) imposing liability on an Exchange states:
**Liabilities of organization and individuals; bad faith requirement;**
**Exclusive remedy**(1)
      **(A)**      A registered entity that fails to enforce any bylaw, rule regulation or resolution that it is
            required to enforce by section 7, 7a-1, 7a-2, 7b-3 or 24a of this title.
      **(B)**      A licensed board of trade that fails to enforce any bylaw, rule regulation, or resolution

## A. The SAC amply pleads violations of 7 U.S.C. §25(b)(1)(A).

Because the allegations in the SAC show that the CME failed to enforce at least

four rules that it was required to enforce under §22, codified as 7 U.S.C. §25(b)(1)(A), a

valid private right of action has been alleged against the Exchange Defendants. First, CME

did not enforce their Omnibus Rules along with CME Rule 960 which required that all

PFG's accounts be supervised by a Clearing Member also referred to as a Carrying Member;

Second, CME violated its Rule 903(G) and 903(H) by failing to have any Clearing Member

approve PFG's use of the Globex; Third, CME violated its Rule 971 because no clearing

member or itself ever reported the under segregation and undercapitalization of PFG which

would have been obvious had anyone in a regulatory position bothered to look at the daily

accounts of PFG that should have shown that there was only about $7,000,000 of segregated

customer monies available to support trading for approximately 13,000 customers. Simple

math demonstrates that based on these numbers, there was simply not enough funds in these

customer's segregated accounts to even initiate or maintain derivative positions for each

customer. As such, to destroy customer accounts and ensure success of the Ponzi Scheme,

trades were being placed on occasion without sufficient margin which is also a clear

violation of the CME and NFA rules or a fair inference can and should be drawn on this

Motion to Dismiss that the trades were fictitious as well as the Account statements. *See*

SAC ¶701; *C.F.T.C. v. International Financial Services,(NY), Inc.,*323 F. Supp.2d 482, 489

---

that it is required to enforce by the Commission, or

(C)     Any registered entity that in enforcing any such bylaw, rule, regulation or resolution
        violates this chapter or any Commission rule, regulation, or order, shall be liable for
        actual damages sustained by a person who  engaged in any transactions on or subject to
        the rules of such registered entity to the extent such person's actual losses that resulted
        from such transaction and were caused by such failure to enforce or enforcement of
        such bylaws, rules regulation or resolutions.

(S.D.N.Y. 2004)(Ficitious trades occurred to ensure that Plaintiffs lost all funds in their

account.)

Fourth, the CME violated 7 U.S.C. § 25(b)(1)(A) by failing to exercise its

Emergency Powers, CME rule 402(b) and 402(c)(e), to shut down trading in each customer's

trading account, for example, when trades were being placed despite appearing as though

each Plaintiff was on a Margin Call.  Even if these trades were in large part fictitious, the

CME by failing to monitor the accounts, allowed PFG to abuse trading rules to cover up the

prior theft when the funds were first converted by the Bank Defendants.

### 1. The allegations that there was no Clearing member monitoring PFG shows a violation of the CME Rule 960 that resulted in abusive trading practices in violation of § 4(d)(b).

The allegations in the SAC make clear that there was no ostensible Clearing

member monitoring PFG's accounts, as is required under CME Rule 960[11], and it is also

---

[11] OMNIBUS AND CARRYING BROKER ACCOUNTS 960.
OMNIBUS AND CARRYING BROKER ACCOUNTS

a.   All clearing members must maintain a complete list of all omnibus and carrying broker accounts maintained on their books. Such list shall be promptly provided to the Exchange upon request. Information for each such account must include account name, number and address, and classification of the account as either customer or house. Additionally, the identities and position of the beneficial owners of any omnibus account must be immediately disclosed to the Exchange upon request.

b.   A clearing member carrying an omnibus account shall have the responsibility for ensuring that each person carried in the account does not exceed speculative limits unless granted an exemption pursuant to Rule 559.

c.   Each clearing member carrying an omnibus account must at all times reflect in its records the gross long and short positions held in such omnibus account.

d.   Clearing members may only carry omnibus accounts for entities that have received a notice from the clearing member (i) expressly prohibiting the omnibus account from acting for customers of the Exchange, directly or indirectly, that are Sanctioned Parties as defined by Rule 543 and (ii) requiring it to send a similar notice to its omnibus customers.

e.   Each clearing member that maintains an omnibus account with another clearing member shall also bear financial responsibility to the Exchange for that omnibus account.

f.   Clearing members may only carry omnibus accounts for entities that have received a notice from the clearing member (i) notifying the omnibus account of the EU Retail Customer restrictions contained in Rule 570 and (ii) requiring it to send a similar notice to its omnibus customers

-53-

alleged that the CMEG on behalf of the CME was directly dealing with PFG rather than dealing with PFG through a Carrying member with respect to PFG's use of the Globex in violation of CME Rule 903(G) and 903(H).SAC,¶502. These allegations show a failure of oversight and demonstrate a clear violation of the CME Omnibus Rules.[12]  SAC Exh. 9.

Therefore, because there are plausible allegations of lack of oversight by any Clearing house member, a violation of CME rule 971 also resulted because nobody was monitoring PFG's accounts to see that these accounts were grossly under margined and undercapitalized which allowed continuing violations of §4d(b) of the Commodities Exchange Act as well as its companion regulation 17 C.F.R. §1.20.

A review of CME 960(d) appears to allow a party like PFG who was sanctioned in 1999 by the CFTC for being under segregated to continue to trade over the CME Exchange by merely associating with a willing Clearing Member who agrees to be responsible to the CME for any margin deficiencies in that sanctioned party's account. See CME 960(e), CFTC Fine, annexed to the Levy Dec. as Exhibit 1.

CME rule 960(a) also requires each carrying member to keep a list of all of the positions of each beneficial owner of each account.  To keep a record of each beneficial owner's account would have required the Clearing Member for PFG to actually review each trade in PFG's customer's accounts on a daily basis.  In this case, the SAC has amply alleged that there was no such oversight and no entity was even monitoring the Plaintiffs' accounts. *See* SAC ¶¶ 293,472. As such, a Clearing violation of the Omnibus rules is alleged.

---

[12] Although the SAC alleges that the Omnibus Rules allowed for the lack of regulation, it appears that a close reading of the Omnibus rules only allow for lack of reporting special accounts when there is no violation of position limits. However, the rest of the time, Carrying members should be overseeing and reporting Omnibus subaccount holders positions.

-54-

A close reading of the Omnibus Rules in combination with the Omnibus

regulations promulgated by the CFTC, 17 C.F.R. 17.00 et. seq. demonstrate that Clearing

members overseeing non-clearing omnibus accounts only have to look at net positions for

determining special accounts or reportable accounts, which only relate to violations of

position limits which Clearing member must report to the CME. [13] Therefore, a fair reading

of CME rule 960(a) would require each Clearing Member overseeing an Omnibus Account

to monitor and review each customer's account on a daily basis to determine what is going

on in each customer's account and to monitor violations of position limits under CME Rules

559, 560.

Therefore, under CME 960, there was an obligation to catch abusive trades, to see

that trades were being placed without adequate margin and that there were hardly any trades

occurring at all based on the lack of capitalization. Had the clearing member observed these

abusive activities, that Clearing member would have had to report the conduct to the CME's

business conduct committee who would have been able to shut down trading.

Therefore, because the allegations in the SAC make clear that there was simply

no Clearing member overseeing PFG's customer account, no monitoring was done, no

reporting to the CME business conduct committee, and no actions were taken to shut down

trading. SAC ¶¶ 474-476.

**2. Because CMEG and PFG entered into a co-location agreement for the**

---

[13]In other words, because a violation of position limits is a major violation that can move
a market uneconomically clearing members must report any such position limits in their omnibus
subaccounts. For example, CME rules mandate that a hedger can only own up to 25 contracts for
NYMEX Platinum Futures. Therefore, a clearing member can just look to see if the customer
owns 30 long Platinum contracts and 10 short offsetting Platinum contracts, he or she really
owns 20 long positions. Therefore, the Clearing member does not have to report the transaction
because there is a gross outstanding position of 20 contracts which is under the 25 contract limit.

**GLOBEX, a violation of CME Rule 903 has been plausibly alleged.**

CME Rule 903 indicates that a non-clearing member such as PFG can only place trades over the Globex, the electronic trading platform with the express permission and consent of a clearing or carrying member. However, the allegations in the SAC demonstrate that PFG had direct access to the Globex trading platform. The Globex Co-Location Agreement is a direct contract between only CMEG and PFG and there is no clearing member as a signatory on that Contract. SAC Exh. 5. Therefore a fair inference can and should be drawn at this pleading stage that PFG was exercising Globex privileges directly with the CME without the approval of any Clearing member. As a result, PFG used the Globex to conjure up fictitious trades in real time and then sent statements to unwitting customers believing their accounts had actually been traded.

**3. The facts alleged in the SAC also show a rule violation of CME 971.**

The SAC alleges a Rule violation of CME 971. CME rule 971 requires in part that all Clearing Members report and maintain customer segregated accounts appropriately. A fair reading of CME Rule 971 would include a reporting of any omnibus sub accounts that are maintained by the Clearing member.[14] Therefore, question of facts exist as to whether PFG's carrying member complied with CME rule 971 by ensuring that PFG complied with 17 C.F.R. 1.20 by making sure PFG filed its FCM segregation reports and other reports.

As such the allegations make clear, there was a rule violation of CME 971 by

---

[14] CME Rule 971 states:

"**SEGREGATION, SECURED AND CLEARED SWAPS CUSTOMER ACCOUNT REQUIREMENTS.**
A. All clearing members must comply with the requirement set forth in CFTC Regulations 1.20 through 1.30, 1.32, 1.49 and 30.7, and Part 22 of the CFTC Regulations. This includes, but is not limited to the following. . ."

*See www.cmegroup.com/rulebook/cme*

virtue of the violations of 7 U.S. C. §6(d)b). 17 C.F.R. 1.20 was also violated because

customer segregated accounts were not being kept segregated rather, Wasendorf was taking

proceeds from customer segregated accounts to support the proprietary trading of PFG. Had

the CME or the Carrying member of PFG looked inside the accounts to see the totals in the

PFG account, it could have figured out that PFG was not fulfilling its net capitalization

requirements or red flags would have occurred to indicate that there was insufficient funds in

each account to sustain the level of trading that a firm with $215 million dollars in customer

segregated accounts should have been sustaining. Thus, a violation of CME 971 has been

alleged.

### 4. CME Rules 402(b) and 402(c)(E) Were Violated Because the CME Failed to Exercise its Emergency Powers to Shut down Trading During the Week of October 2, 2008 When Plaintiffs' Accounts Were on a Margin Call.[15]

Although CME has taken the position that it only had to shut down

under margined trading in its Clearing Members accounts and not the accounts of omnibus

non-clearing members under Rule 930E, this position is indefensible and belied by the clear

intent of the Emergency Rules CME 402(b) and 402(c)(e) which apply to **all** types of

customers trading over the Exchange not just clearing members. As such, any market

disruption can trigger these Emergency Rules and an under margined account in an Omnibus

subaccounts is just as disruptive to a contract market as a clearing member's account.[16]

---

[15]Plaintiffs have pled in the alternative as they are allowed to do, to cover all possible violations of law under Fed. R. Civ. P 8(d)

[16]The Emergency Rules, CME 402(b)(2) states:
" **Sanctions:**
If the Panel finds that a party, including a Member, has violated a Rule the Panel may take one or more of the following actions:
2. Order a party or its customers to liquidate such portion of the open contracts in the party's ;proprietary or customer's accounts, or both, as the Panel deems appropriate to ensure the integrity of Exchange contracts or to ensure an orderly and liquid market."
CME Rule 402.C(1)(e) states:

The SAC alternatively describes an emergency situation, where Wasendorf appeared to trade accounts during the week of October 2, 2008 in violation of Margin Rules. Because the normal custom and practice would have been to shut down all trading, clearly the allegations in the SAC of CME's failure to exercise its Emergency Powers to protect the integrity of the market constitutes a well-pled violation of 7 U.S.C. § 25(b)(1)(a) giving rise to a claim for liability herein.   Alternatively, had all of these trades been fictitious as is also alleged, the CME should have realized this fictitious situation which would have revealed the Ponzi Scheme. *See* Fed. R. Civ. P. 8(d)(1)(2)(3) (Plaintiff may plead in the alternative even if inconsistent.)

## B.  The Allegations under 7 U.S.C. § 25(b)(1)(C) Are Also Valid.

Significantly, the Exchange Defendants have utterly failed to address the claims sounding under another independent provision §22(b)(1)(C) conferring liability on them, where a violation of the CEA or a Commission rule pursuant to 7 U.S.C. § 1, et. seq. or 17 C.F.R. 1, et. seq. results from the enforcement of a CME rule, by-law, regulation or rule. Under this scenario, the SAC alleges a violation of 7 U.S.C.§25(b)(1)(C) based on the enforcement of the Omnibus rules, as well as CME rule 903(G), 903(H), 960, 971, 402(b) and 402(C) or based on the manner in which CME enforced these rules to ignore non-clearing members, such as PFG,  from the scope of their rules; and causing a violation of a host of laws and rules including: 7 U.S.C. § 6d(b), 17 C.F.R. 1.20, 7 U.S.C. § 6(o); 7

---

"The BCC [Business Conduct Committee] is authorized to determine whether an emergency exists and whether emergency action is warranted.  The following events and/or conditions may constitute emergencies:

e. Any circumstance in which it appears that a Member or other Person or entity has failed to perform contracts or is in such financial or operation condition or is conducting business in such a manner that such Person or entity cannot be permitted to continue in business without jeopardizing the safety of customer funds, Member or the Exchange..."

U.S.C.§ 13-c(a).

Thus, the way that CME enforced its rules including CME rules 960, 971, 402, 588 and other rules to exclude any positions in omnibus subaccounts like those in PFG's customers' accounts during the relevant time period, also demonstrate Plaintiffs' entitlement to relief.

In this case, the clear admonitions and arguments put forth by CME that their customer protection rules did not apply to the Omnibus sub account holders like PFG created a two tier system of regulation one for Clearing house members and other set of rules for non-clearing house members.  In fact, the above-discussed rules were allegedly only applied with respect to clearing firms not omnibus sub account firms.  Therefore, by applying these CME rules the way the CME did in effect left PFG, a non-clearing firm completely unregulated, because the CME delegated all regulatory functions to the Clearing firms to regulate non-clearing firms such as PFG.  Based on these regulatory lapses, violations of the Commodities Exchange Act  occurred including a violation of 7 U.S.C. §6d(b) because clearly the application of the CME rules did not prevent this 20 year Ponzi Scheme involving conversion of customer segregated funds by Wasendorf.  Therefore, based on the application of these rules, a prima facia case has also been established under 7 U.S.C. § 25(b)(1)(C).

### 1.    By enforcing the Omnibus Rules, CME also violated 7 U.S.C.§ 6d(b) by allowing segregated customer monies to be used for non-customers

A clear example of a violation of 7 U.S.C. § 25(b)(1)(C) is demonstrated by the enforcement of how the Omnibus Rules were actually enforced which allowed clear violation of 7 U.S.C. 6d(b). The SAC alleges that only net positions held by PFG was even monitored; therefore, it was easy for  PFG to violate 7 U.S.C. 6d(b) because PFG's own proprietary accounts were considered in relation to the customer segregated monies which could be

-59-

diverted as they were and used for non-customer purposes. As alleged, in cases where

fictitious trades were made or where accounts were purposefully traded down to zero when

on margin call, all of the funds in Plaintiffs' accounts were not being used for the benefit of

the customers but were being used as part of the Ponzi Scheme. As such, these accounts

were wiped out. However, even if the trades did occur on occasion, the monies in each

customer's accounts were being unlawfully used to generate CME fees, clearing fees,

exchange fee, maintenance fees, and novation fees. As such 7 U.S.C. 6d(b) was again being

violated this time by the CME because §4d(b) prohibits any depository or clearing house "to

. .use any such money, [for purposes] other than the customers. . . ."

Because these exorbitant CME fees were based on unlawful conduct in the first

place that went undetected due to CME's notorious Omnibus Rules, the use of the proceeds

of customer segregated monies to pay CME fees constitutes a violation of 7 U.S.C. § 6d(b)

## C. Plaintiffs Have Plausibly Alleged Bad Faith Conduct Under 7 U.S.C. §25(b)(4).

Because Wasendorf's Ponzi Scheme lasted over 20 years, involving

approximately 24,000 customers placing trades over the CME Exchange through PFG and

generating excessive fees, an inference of bad faith conduct on the part of the Exchange can

be inferred on this basis alone. *See* Consolidated Complaint _____. Clearly a 20 year

Ponzi Scheme such as this one, could not have been due to mere negligence, because

eventually had negligence been involved, it would have been noticed and rectified. Rather

allegations of wrongful knowledge and ulterior motive on behalf of the CME exist and

inferences of such ulterior motive should be drawn based on alleged conflicts of interest

whereby many of the members of the CME board are also active investors in the CME

Exchange. Therefore, a reasonable inference can and should be drawn that the CME board

of directors put profits over customer protection. *See DGM Investments, Inc. v. N.Y. Futures Exch. Inc.,* 265 F. Supp.2d 254, 260 (S.D.N.Y. 2003)(Claims sustained against the Exchange where members of the Settlement committee were also investors in the same markets.)[17]

In order to establish Bad Faith Conduct against an Exchange for failing to maintain stable contract markets and to prevent disruptive trading practices, a plaintiff must allege: (1) wrongful knowledge, (2) whose dominant purpose is to promote the Exchanges Ulterior Motive. *Sam Wong v. N.Y. Merc. Exch.*, 735 F.2d 653 (2d Cir. 1984.) However, the Courts have construed this standard broadly and in some cases have allowed claims to proceed based on negligence, *see . See Bosco v.Serhant,* 836 F. 2d 271, 277-278 (7th Cir. 1987, as well as based upon constructive bad faith or recklessness . *See, Brawer v. Options Clearing Corp.*, 807 F.2d 297, 303 n.9 (2d Cir. 1986)("We do not mean to foreclose the possibility that [exchange actions] might be so arbitrary as to constitute constructive bad faith.") *cert denied*, 484 U.S.819, 108 S.Ct. 76 (1987)**, *see also, DGM Investments, Inc. v. N.Y. Futures Exch. Inc.,* 265 F. Supp.2d 254, 260 (S.D.N.Y. 2003)("Although irrational or arbitrary behavior in some circumstances may support an inference of bad faith, the behavior has to be 'so arbitrary' so as to justify an inference of constructive bad faith".)

The Court in the Southern District of New York enunciated the standard in *Sam Wong & Son. Inc. V. New York Mercantile Exch.,* 735 F.2d 653, 677(2d Cir. 1984):

> " The  Commodity Exchange Act, which embodies the statutory model
> of exchange self-regulation, mandates that we strike a balance that
> does not insulate exchange officials from answering serious questions
> posed by injured traders.  To do otherwise would drastically curtail the
> private right of action deemed essential to the regulatory framework

---

[17]In fact, the record indicates that by 1999, CME had knowledge that PFG was undercapitalized and under segregated when the CFTC fined PFG for this gross misconduct. Notwithstanding this knowledge, CME continued to allow PFG to actively participate as a non-clearing member generating substantial fees for the CME.  Therefore, valid inferences of bad faith conduct based on ulterior motive have been adequately pled

established by Congress. Therefore, when self-interest or other
ulterior motive unrelated to proper regulatory concern is alleged to
constitute the sole or dominant reason for the exchange action, a
complaint is sufficient even though the action was not beyond the
bounds of reason.

*DGM Inv. Inc. V. New York Futures Exch., Inc.*, 265 F. Supp.2d 254, 261 (S.D.N.Y. 2003.)

Rule 8 appears to apply since the claims against the CME, however, even under

Rule 9(a), the allegations in the SAC, alleged upon information and belief, are valid because

"pleading requirements may be relaxed when the information is exclusively within the

defendant's knowledge as long as the factual basis for allegations based upon information

and adequately set forth." *Grossman v. Citrus Assoc. F.N.Y.S.Cotton*, 706 F. Supp. 221

(S.D.N.Y. 1989); *Daniel v. Board of Trade of City of Chicago*, 164 F.2d 815 (7th Cir 1947.)

In addition, a review of what a plaintiff is required to allege regarding bad faith

conduct differs depending on whether the alleged rule violation is based upon discretionary

or non-discretionary conduct. In cases of non-discretionary rules being violated, courts have

applied a lower standard of negligence to satisfy bad faith pleading requirements. *Bosco v.
Serhant,* 836 F. 2d 271, 277-278 (7th Cir. 1987) .

### 1. Because the CME had wrongful knowledge of PFGs conduct since 1999, Bad Faith has been adequately alleged.

Because the CME knew as far back as 1999 that PFG had been misreporting its

capital requirements and was under segregated based on a CFTC audit, it had actual

knowledge of what was happening in that customer funds were depleted as was PFG's net

capital. *See* SAC ¶ 499. As such, CME should not have permitted PFG to continue in

business or it should have placed a special monitor on its activities to make sure it was not

engaging in abusive trading practices. *See* SAC ¶ 500. A similar argument was stated by

U.S. Bank against PFG where it accused the C.F.T.C. of "unclean hands" where the CFTC

also failed to take appropriate action and shut down trading at PFG. *See C.F.T.C. v. U.S. Bank, N.A.*, 13-CV-2041 slip op (N.D.IA 2014.)  Knowing that PFG was fined $90,000.00 in 1999 for misreporting its capital requirements was clear evidence that PFG should have been expelled from the CME.  Instead, CME under its Omnibus Rule 960, allowed PFG a "sanctioned" party to continue trading with a Clearing House member acting as a quasi "monitor."  However, this set up did not stop PFG from continuing with avengence to misstate capital requirements, misreport net capital and customer segregated amounts. Therefore, wrongful knowledge has been adequately pleaded based on conscious avoidance because the CME avoided realizing these violations under its Omnibus rules.

### 2. Because the SAC pleads that CME was profiting greatly from this 20 year relationship, an ulterior motive has been adequately alleged.

In establishing an ulterior motive, plaintiffs need to allege that members of the CME or the CME had a dominant interest in putting their own profits ahead of their regulatory obligations.

During this time frame, there were just too many conflicts of interest at the CME and CMEG to deny a finding of ulterior motive to gain profits at the expense of the public. For example, the CME Group's 2010 Form 10-K page notes that twenty of the CME Group's 38 board members own trading rights or "are officers or directors of firms who own trading rights on our exchanges.[18]  For example, Jack Sanders who allegedly cleared trades at one time for PFG was a board member of the Exchange. He therefore would be the one to have monitored PFG.  He would also be collecting clearing fees as well.  Jack Sanders was also an owner of a high frequency trading firm enjoying oversized profits where it was alleged that

---

[18]" Page 31 http:/files.shareholder.com/downlads/CME/2108553774x0x529156/D-ED01-46E1-911B-A90183B37953/Most RecentAnnualREport.pdf.

the CME gave preference to his firm under the secretive and preferential contracts. *See Braman v. The CME Group. Inc.*, 14-cv-02646 Docket #25 (N.D. Ill. 2014)(Second Amended Complaint ¶ 64, n.34.[19]

In addition, the CME has its own proprietary trading group that trades over the CME exchange also to make profits called GFX Group. Here, allegedly, CME through GFX Group took positions against its customers, another apparent conflict of interest. *See* http://www.bloomberg.com/new/2014-08-28/cme-unit-that-trades-with-clients-earnings-millions-with-futures.html. Thus, the CME as a C corporation as well as a regulator has a clear ulterior motive to maximize its own profits at the expense of investors using the Exchange to execute trades.

In another example of CME's ulterior motive to put profits by way of fees over customer regulation was amply demonstrated where CME allowed its Clearing Member MF Global, to transfer customer moneys out of customer segregated accounts right into its own proprietary trading accounts, just like in this case. The Consolidated Amended Complaint in *Deangelis v. Corzine*, 11-cv–07866 Doc.#382 alleges in paragraph 404:

> "[U]nder the noses of CME audit staff, approximately $900 million of customer funds was illegally transferred out of segregation by MFGI employees in the Chicago office and misappropriated by the D & O Defendants."

---

[19]In *Braman v. The CME Group. Inc.*, 14-cv-02646 Docket #25 (N.D. Ill. 2014)(Second Amended Complaint ¶ 64, n.34, plaintiffs in support of their argument of ulterior motive regarding bad faith against the CME alleged:

> "The atmosphere on the Board of Directors at the CME Group, Inc, is ripe with conflicts of interests. For example Jack Sandner has been a member of the CME Group's Board of directions since 1978 (and although retired from consulting there since 2013), he is also on the Board of Directions and owns an equity interest in the HFT [High Frequency Trading] firm Virtu Financial, LLC. Another CME Group Board of Director, William Shepard, was a back of the HFT firm, Jump Trading LLC. And also Twitch Trading. Jump Trading has also been the subject of subpoena for HFT practices."

Plaintiffs in *Deangelis v. Corzine,* also alleged that "Defendant CME Group, through the CME Exchanges, realized as much as 10% or more of annual income from high volume of trading activity by MFGI [MF Global, Inc.] and its customers." *See* Consolidated Complaint, ¶ 96. Although it has not been established how much profits in fees were generated by PFG over the 20 year Ponzi Scheme, it was more than it should have been and it should have been zero.

Notably, it made no difference that MF Global was a Clearing member rather than a non-clearing member, as defendant CME points out, because CME failed equally to stop MF Global, and again refused to exercise its Emergency Powers to shut down trading even when it had actual knowledge that MF Global was illegally transferring customer monies to its own accounts in violation of 7 U.S.C. § 6d(b), which is exactly what is being claimed in this case too. Since those allegations, in *Deangelis v. Corzine,* sufficed to generate a $14,500,000.00 settlement with the CME Group based on the same types of claims of regulatory misconduct as are alleged herein, these allegations should also suffice to allege ulterior motive whereby CME consistently put its profits as a C corporation over customer protection. *See* CME Settlement Agreement, *Deangelis v. Corzine,* 11-cv-7866 Doc. #630 (S.D.N.Y2012)

Thus, based on this well-accepted theory of ulterior motive and self-motivation to gain profits, bad faith has been established in the SAC. *See DGM Investments, Inc. v. N.Y. Futures Exch. Inc.,* 265 F. Supp.2d 254, 260 (S.D.N.Y. 2003)*(*Plaintiffs established a prima facie case of bad faith by showing Exchange members were putting their own profit interest first, since they were also trading in the markets they were regulating.)

**3. The SAC also Establishes Constructive Bad Faith.**

-65-

The CME 's fatal flaw in its motion to dismiss, is its failure to realize that recklessness based on arbitrary conduct such as is alleged in this case, based on all the years that CME did not catch the abusive trading practices occurring in the PFG customer accounts can and does in this case rise to the level of constructive bad faith for purposes of pleading a valid claim against a Commodities Exchange, such as the CME herein. *Brawer v. Options Clearing Corp.*, 807 F.2d 297, 303 n.9 (2d Cir. 1986)("We do not mean to foreclose the possibility that [exchange actions] might be so arbitrary as to constitute constructive bad faith.") *cert denied*, 484 U.S.819, 108 S. Ct. 76 (1987), *see also, DGM Investments, Inc. v. N.Y. Futures Exch. Inc.,* 265 F. Supp.2d 254, 260 (S.D.N.Y. 2003)("Although irrational or arbitrary behavior in some circumstances may support an inference of bad faith, the behavior has to be 'so arbitrary' as to justify an inference of constructive bad faith").

Thus, because the CME continuously allowed disruptive practices to occur on the Chicago Mercantile Exchange due to the enforcement of the Omnibus Rules which virtually shielded non-clearing members, like PFG, from normal market regulations, and allowed under margined trades to occur, an inference can and should be drawn that such reckless conduct rises to the level of constructive bad faith at the pleading stage.

Such conduct occurring for a twenty year period is also negligent which can be relied on under these circumstances as well to satisfy a bad faith standard. *See Bosco v. Serhant,* 836 F. 2d 271, 277-278 (7th Cir. 1987.) Because the facts described in the SAC show an extraordinary circumstance, a fair inference can be drawn that the CME's failure to monitor trading practices of its customers such as PFG was recklessness, arbitrary and does meet applicable pleading standards for an inference of constructive bad faith conduct.

Therefore, Plaintiffs have plausibly met the standards under 7 U.S.C. 25(b) to

-66-

allow their private right of action against the CME defendants.

### 4. A negligence standard applied to non-discretionary rules to establish bad faith .

Because the failure to enforce non-discretionary rules such as are alleged in the

SAC are held to a negligence standard, Plaintiffs have adequately alleged that the non-

discretionary rules including CME 960 and 971 were negligently enforced, thus satisfying 7

U.S.C. §25(b)(4). *See Bosco v.Serhan*t, 836 F.2d 271. (7th Cir. 1987.)

In *Bosco v.Serhan*t, 836 F.2d 271. (7th Cir. 1987), the court held:

"[T]he law does not always use the words 'bad faith' in their ordinary language sense,[citations omitted], and, in the present setting, involving an exchange's failure to enforce its rule in accordance with the exchange's own interpretation, the courts, including our own, have treated the term "bad faith" as if it read "negligence." [citations omitted],.. ".

Clearly, negligence has been well-pleaded against CME because PFG was

allowed to trade or use the Globex to engage in shadow trades without supervision from

CME who negligently failed to monitor the trades in the PFG accounts even though a 1999

CFTC audit made clear that PFG did not have enough cash in its accounts to sustain trades

for its customers. Thus, CME through negligent enforcement of its non-discretionary rules

allowed this Ponzi Scheme to continue.

### 5. Plaintiffs have adequately alleged actual damages and loss causation.

Because the SAC has properly alleged the actual damages sustained by Plaintiffs,

due to the various CEA violations, they have met their pleading burden. *See In re Crude Oil*

*Commodity Futures Litig.*, 913 F. Supp.2d 41, 61 (S.D.N.Y. 2012). In other words, unlike in

RICO cases, under the CEA, Plaintiffs are not required to plead how they sustained actual

damages. *See Kohen v. PIMCO LLC.*, 244 F.R.D.469, 474 (N.D. Ill. 2007.) Courts have

even rejected the application of the *Dura* loss causation requirement prevalent in typical

security cases applicable. *See In Re Platinum and Palladium Commodities Lit, supra.*.

Therefore, in this case, the allegations in the SAC clearly allege that the rule

violations discussed *supra,* in fact did cause an unstable contract market in violation

§5(d)(d)(A)(iii), codified as 7 U.S. C. § 7(d)(2)(A)(iii) which states:

> "The board of trade shall establish, monitor, and enforce compliance with the
> rules of the contract market, including–
> (iii) rules prohibiting abusive trade practices on the contract market."

Because the allegations in the SAC show that the CME rule violations discussed above

including violations of CME rules 960, 903, 971, 402(b)(2), and 402(c)(1)(e) caused

violations of the CEA including §4(d)(b) and §5(d)(2)(A)(iii), plaintiffs have properly pled

causation for violations under the Commodities Exchange Act.

### D. CMEG, the Parent and Alter Ego of CME is Also Liable.[20]

Plaintiffs have also alleged viable claims of common law fraud, negligence,

breach of fiduciary duty, breach of contract and punitive damages against CMEG.[21] CMEG

is the parent company of CME and is therefore also liable for all of the acts of CME under 7

U.S.C.§ 2(a)(1)(B). *See DGM Investments, Inc. v. N.Y. Futures Exch. Inc.,* 265 F. Supp.2d

254, 260 (S.D.N.Y. 2003)(Court imposed vicarious liability on parent company NYBOT);

*Benjamin Cir. V. Hampton Affiliates, Inc.* 66 N.Y.S.2d 782, 784, 497 N.Y.S.2d 898 (1985).

### 1. Because CMEG was not a Registered Entity, Common Law claims should

---

[20]Veil Piercing is appropriate in this case. CME and CMEG are one in the same including their names which are nearly identical. CMEG for example has filed notices of claims for losses sustained on behalf of CME. Each share offices, directors, the rule book , and CMEG even signs settlement agreements on behalf of CME. As such, veil-piercing is appropriate. *See, Thomason-CSF, S.A. v. American Arbitration Ass'n,* 64 F.3d 773, 777 (2d Cir. 1995.)("In some instances, the corporate relationship between a parent and its subsidiary [is] sufficiently close as to justify piercing the corporate veil and holding one corporation legally accountable for the actions of the other"); *Carte Blanch (Singapor) Pte., Ltd. V. Diners Club In't,* 2 F.3d 24, 26 (2d Cir. 1995)(Courts pierce corporate veils "to prevent fraud or other wrong or where a parent dominate and controls a subsidiary.")

[21]Plaintiffs withdraw their claim for punitive damages against CME.

-68-

**not be preempted against them.**

Because the CEA has been interpreted not to preempt common law claims in general, the common claims against, non-registrants such as CMEG should proceed. *See Bishop v. Commodity Exch.,* 564 F. Supp. 1557 (S.D.N.Y. 1983)(Although CEA regulates Exchanges, no general state law preemption.) *Mallen v. Merrill Lynch Futures, Inc.,* 623 F. Supp. 203, 205-206 (No preemption permitted under CEA of common law claims; §22 of the CEA did not preempt common law claims); *Patry v. Rosenthal & CO.,* 534 F. Supp 545, 551 (D.Kan. 1982);(no preemption by CEA of common law claims); *E.F.Hutton & Co. v. Lewis,* 410 F. Supp. 416 (E.D. Mich 1976)(same).

## 2. Because CMEG is not a registered entity. 7 U.S.C. § 25(b) does not apply.

Because the plain language of § 22(b) creates exclusive liability only for "registered entities," because CMEG is unregistered, the provisions of §22(b) should not deprive Plaintiffs from seeking other common law claims which are not preempted under the CEA. Clearly, the CEA requires registration. The C.F.T.C. would have to approve the rules of any registered entity as well. The blatant disregard to follow these norms whereby scrutiny would certainly fall on the CME's Omnibus rules, and may even deprive CMEG from becoming approved, now should bar CMEG from seeking protection under §22(b) which only applies to registered entities.

## 3. A valid claim of negligence has been pled against CMEG under *Lerner v. Fleet*.

Because CMEG is an unregistered entity, preemption of common law negligence under the Commodity Exchange Act should not apply, and such preemption of common law negligence should only apply, if at all, against a registered entity such as CME.

CMEG, in addition to the depository banks was a custodian of Plaintiffs'

-69-

customer segregated funds as defined under §4(d)(b); therefore, a proper claim sounding in common law negligence has been stated against CMEG under the seminal case of *Lerner v. Fleet Bank,* 459 F.3d 273 (2d Cir. 2006). CMEG was a custodian of these funds like the Depository banks because CMEG had to hold, use and account for these special deposits on a daily basis in order to mark-to market each account, to margin trades, to pay clearing fees and/or novation fees. As such, under *Lerner v. Fleet*, any custodian holding or using customer monies has a duty of ordinary care to safeguard the funds when these funds qualify as special accounts as in this case.

To establish a prima facie case of negligence, a plaintiff must allege: (1) a duty of care (2) a breach of that duty and (3) damages. Regarding, the first criteria, the Second Circuit in *Lerner v. Fleet Bank,* 459 F.3d 273 (2d Cir. 2006) denied defendants' motion to dismiss the negligence claim against the Bank Defendants. *Id.* at. 290. The depositories in *Lerner v. Fleet*, were also the custodians of plaintiffs' special accounts, escrow accounts; whereas in the case at bar, the special deposits were held as customer segregated accounts under 7 U.S.C. § 6d(b). The CMEG, like the depository banks in *Lerner*, had control over plaintiffs' customer segregated accounts and was only supposed to use these accounts for the customer's trading purposes, not for Wasendorf's own purpose to convert funds by using the Exchanges.

The Court in *Lerner v. Fleet*, articulated the duty owed by a custodian where a duty of care under a negligence standard arose where such custodians had actual or constructive knowledge of the diversion of customer funds or gained a benefit from the criminal diversion. *Id.* at 287-288. Applying these principals to CMEG clearly demonstrates that a duty of care arose regarding negligence. The SAC alleges that CMEG was gaining a

benefit by reaping large fees for transactions, SAC ¶¶328,329.  CMEG also had constructive

knowledge of Wasendorf's under segregation based on the 1999 settlement with the CFTC.

*See*  Settlement Order, CFTC annexed to the Levy Dec. as Exh. 1.  Constructive knowledge

against CMEG is also amply alleged where abusive trading practices were ongoing in side

the Omnibus accounts.  Therefore the CMEG had constructive knowledge that the

customers' margin accounts were not being traded appropriately and in this case that

knowledge can be used to impute negligence.

Here, the SAC also alleges that CMEG's failure to shut down Wasendorf's

trading and his continued use of the Exchanges was a substantial factor in bringing about

Plaintiffs' losses.  *See* N. Y.'s Pattern Jury Instruction §2:70, Proximate Causation (2018.)

Therefore, a claim has been stated for negligence against the CMEG because it

failed to protect these funds from defalcation.

Questions of fact exist as to whether CMEG's application of the Omnibus rules

breached a duty of ordinary care in safeguarding Plaintiff's customer segregated accounts are

at issue herein.  Here, had CMEG exercised ordinary care and monitored what was going on

inside these PFG accounts, it would have been obvious that these accounts were abnormal

and abusive, and CME could have easily prevented the abusive trades, fictitious trades

and/or under margined trades from even occurring in the first place. It could have directed

CME to exercise its Emergency Powers to stop the abusive trading practices which would

have foiled Wasendorf's scheme over this 20 year period.

Instead, CMEG fell down on its duties to the members of the investing public

who did entrust their life-savings to CMEG.

### 4. Because CMEG also breached its fiduciary duty to plaintiffs, It is also liable for damages including exemplary damages.

-71-

Because the customer segregated funds held and used by CMEG for customer futures and options investing are recognized as special accounts, CMEG also owed a fiduciary duty to safeguard these accounts and protect these accounts from defalcation. *See In Re Peregrine Financial Group Customer Litigation,* 2014 WL 4784113 (N.D.Ill. 2014), 12-cv-5546 . In *Peregrine*, the Court held that depositories were held to a fiduciary standard with respect to safeguarding customer segregated accounts. In this case, the same logic that convinced the court in *Peregrine* to hold depositories to a fiduciary standard should equally apply to CMEG because CMEG is also holding and using customer segregated monies in the same manner as the depository banks to transfer customer segregated funds to depositories on a daily and even intra-day basis due to CMEG's obligations to continually mark-to-market these margin accounts; therefore the same fiduciary standards should apply to CMEG as to depository banks. In fact, CMEG actually appears to have equal control over these special accounts as do the depositories. Therefore, it would be logically inconsistent and unfair to hold the CMEG and the depositories to different standards of care, since both groups can "hold" "use" and "transfer" customer funds under 7 U.S.C. §6d(b). Therefore, both depositories and the Exchanges should be held to the same fiduciary standard. Indeed, even the Commodities Exchange Act has adopted a fiduciary standard as well and that is why §22(b)(4) requires allegations of bad faith conduct to accompany a breach against a registered board of trade.

Applying the Fiduciary duty standard in this case, raises questions of fact as to whether CMEG satisfied its Fiduciary Obligations in failing to monitor Plaintiffs' margin accounts daily and allowing the CME Omnibus rules to regulate these accounts. The SAC alleges that the Omnibus rules allowed Plaintiffs' accounts to go virtually unmonitored.

This regulation-lite mentality should not relieve CMEG, just a C-Corporation, from liability

for breach of fiduciary duty where U.S. Bank and JP Morgan and PFG have been held to a

fiduciary standard, and if such a breach is established, Plaintiffs would be entitled to

exemplary damages as well. *See In Re Peregrine Financial Group Customer Litigation,* 2014 WL

4784113, *1, 8 (N.D.Ill. 2014), 12-cv-5546 Document #256.

### 5. The SAC Plausibly Pleads Fraud against CMEG.

Because all the elements of a Common law Fraud case exist against the CMEG

based on material misrepresentations made to the members of the public including Plaintiffs-

- that these Exchanges were highly regulated and monitored to ensure market integrity; the

conduct alleged in the SAC clearly demonstrates reliance based on a fraud on the market

theory as well as damages.

In order to state a claim for common law fraud requires: (1) a material

misrepresentation or omission of fact, (2) reliance, and (3) damages. *See In Re Peregrine*

*Financial Group Customer Litigation,* 2014 WL 4784113, *5 (N.D.Ill. 2014), 12-cv-5546

Document #256.  SAC ¶¶170, 465-467.

First, as alleged in the SAC, CMEG represented that it could monitor each

individual account itself including Plaintiffs thus bypassing the Omnibus rules altogether.

The Second Amended Complaint alleges in its Handbook:

> "Through CME Group's Market Regulation department, CME Clearing's Risk
> Management team has access to specific account position information for
> Clearing Members' large individual customer accounts.  Such position
> information which is maintained on a highly confidential basis, allows the
> identification of concentrated positions as they arise and the aggregation of
> position that may be owned by common principals through several different
> Clearing Members."

*See* SAC ¶170.

This statement is a material misrepresentation, because in reality, the clear admission of CMEG is that it simply did not have to monitor PFG's accounts because it was a non-clearing member. However, the above statement indicates that CMEG will also directly monitor large individual customer accounts referring to non-clearing members, such as PFG. Had CMEG made this investigation to look into PFG's Omnibus Account, it would have seen that these large non-clearing customers were under segregated or using abusive trading practices to wipe out customer accounts like trading accounts while each customer was on a margin call rather than stopping such trading.[22]

### a.   Such material misstatements constitute Fraud on the Market, therefore Reliance and Damages are presumed.

Because the alleged material misrepresentations were made as public statements aimed at members of the investing public and because this is a Class action, plaintiffs are entitled to rely on a fraud on the market theory of liability to get to a jury. Therefore, reliance and damages are presumed for pleading purposes. *See Basic v. Levinson,* 485 U.S. 224, 241 (1988), *In re Enron Corp. Securities,* 529 F. Supp.2d 644, 680-690 (S.D. TX 2006.)

### 6. Because Clearly Plaintiffs Were Intended to Gain a Benefit from the

---

[22]Indeed, other material misrepresentations led members of the public to rely on CMEG and therefore entrust their life savings to it. Terrence Duffy, Executive Chairman, at the CME Group, Inc. testified:

"As discussed above, no one has a greater interest than CME Group in ensuring that its industry-leading markets are perceived as–and in fact are–safe, open and fair. CME Group does so by vigorously regulating the users of our markets. There is substantial evidence that such private regulation has served the markets and market participants very well. We have established a robust set of safeguard designed to ensure these functions operated free from conflicts of interest or inappropriate influence."

"Our ability to attract and retain business fundamentally depends on our customer' confidence in the integrity of our markets, and exceeding our customers' expectations in that regard is one of the cornerstones of our business model. Ensuring that our markets are defined by effective an appropriately balanced regulation is a competitive advantage that draws institutional commercial and individual customer to CME Group."

Testimony of Terrence A. Duffy, Executive Chairman, CME Group, Inc. Before the Senate Committee on Banking April 24, 2012

-74-

### Globex Co-Location Agreement, they Are Third Party Intended Beneficiaries.

Although Plaintiffs were not included in the language of the Globex Co-Location Agreement Contract, SAC. Exh. 5., they are still third-party beneficiaries according to the exception to the general rule. Here, customers, brokers and clearing firms are all considered third party beneficiaries of each others contracts with respect to trading activity because such agreements directly confer benefits on the third-parties such as in this case. Therefore, these Plaintiffs should be allowed to proceed on their breach of contract claim. *Flickinger v. Harold C. Brown*, 947 F.2d 595, 599 (2d Cir. 1991), *Cauble v. Mabon Nugent & Co.*, 594 F. Supp. 985, 991(S.D.N.Y. 1984.)(Court held that FCM was a third party beneficiary to customer agreement between clearing member and commodity customer.)

In fact, the reason for having the Globex was directly for the benefit of the customer, Plaintiffs. The Globex is an electronic trading platform, that revolutionized the CME and turned into a formidable company because as the name says, one can literally trade globally from their iphone 24 hours a day. Prior to the Globex, customers had to call in orders to floor brokers, and the market closed at 4:30 p.m. So, giving the Globex to PFG or any FCM was for the benefit of the customer, and therefore, this arrangement intended to confer a benefit on Plaintiffs. Instead, unfortunately, the Globex was used in this case, to allow shadow trading without any supervision by the CME. Now, Plaintiffs seek to enforce breach of this contract because it was entered into without a Carrying member and it allowed Wasendorf to perpetuate a massive fraud. When CMEG filed a claim in Bankruptcy, it appears that PFG had not paid their Globex monthly fees to CMEG for several months prior to its collapse, indicating that the CME was giving out Globex services in part for free.

## V. PLAINTIFFS' CLAIMS FOR AIDING AND ABETTING COMMODITIES

**FRAUD ARE VALID BASED ON CONSCIOUS AVOIDANCE.**

Defendants have satisfied the elements of aiding and abetting as defined under

Commodities Exchange Act pursuant to 7 U.S.C.§ 25(a)(1) as well as 7 U.S.C.§ 13-c(a).[23]

To establish a claim for aiding and abetting under the CEA, this Court applies the

same criteria used for aiding and abetting under federal criminal law. *See Amaranth Natural*

*Gas Commodities Litigation*, 730 F.3d 170, 181 (2d Cir. 2013)*5. The Second Circuit has

rejected the Seventh's Circuit standard as articulated in *Damato v. Hermanson*, 153 F.3d

464, 473 (7th Cir. 1998) and instead has stated:

> We . . . continued to follow Judge Hand's statement in *Peoni* that aiding and
> abetting requires the defendant to 'in some sort associate himself with the
> venture, that he participate in it as in something that he wished to bring about,
> that he seek by his action to make it succeed.' 100 F.2d at 402; see also United
> States v. Frampton, 382 F.3d 213, 222 (2d Cir. 2004)(citing *Peoni* as the
> 'traditional understanding of the law of aiding and abetting'). . ."

*In re Amaranth*, at 182.

Because there is no question that Wasendorf, Sn acted as the principal of PFG in

violating 7 U.S.C §§6(a) and 6(d), as he has been adjudicated guilty and is now serving his

jail sentence. However, with respect to the other elements of aiding and abetting, questions

of fact exist as to whether each of the other Defendants aided and abetted Wasendorf's CEA

violation.

**A. Because U.S. Bank Consciously Avoided this Fraud, Questions of**

---

[23]CEA §22, codified as 7 U.S.C.§ 25(a)(1) states in pertinent part:

> (1) Any person (other than a registered entity or registered futures association) who violates this
> chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation
> of this chapter shall be liable for actual damages resulting from one or more of the transactions
> referred to in subparagraphs (A) through (D) of this paragraph and caused by such violation to any
> person. . .

7 U.S.C.§ 13c(a) also defines aiding as abetting as:

Any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the
commission of, a violation of any of the provisions of this chapter. . .may be held responsible for such
violation as a principal.

**Fact Exist Regarding Aiding and Abetting.**

Because findings of fact have already been made against U.S. Bank's and because

U.S. Bank by virtue of its Consent Order cannot now deny any of these findings, Plaintiffs'

claim against it for aiding and abetting is valid and should proceed to discovery. *See*

Summary Judgment Order, *CFTC v. US Bank, NA,* 6:13-cv-2041, Doc. #147 (N.D.IA,

2/04/15.)

To establish knowledge and Intent to satisfy a claim for aiding and abetting, one

may show that a defendant consciously avoided the obvious facts while continuing to aid and

abet the principal. As such, Conscious Avoidance which differs from constructive

knowledge does support an allegation for aiding and abetting a primary violator. *See*

*Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC.*, 479 F .Supp.2d 349, 368

(S.D.N.Y. 2007).

In *Fraternity Fund Ltd. V. Beacon Hill Asset Management, LLC.*, 479 F .Supp.2d

349, 368 (S.D.N.Y. 2007),the Court explained:

> " Conscious avoidance therefore involves a culpable state of mind whereas
> constructive knowledge imputes a state of mind on a theory of negligence.
> Reflecting this analysis, the Second Circuit has held in the criminal context that
> conscious avoidance may satisfy the knowledge prong of an aider and abettor
> who consciously avoids confirming facts that, if known, would demonstrate the
> fraudulent nature of the endeavor he or she substantially furthers."

Under this standard, Plaintiffs have adequately alleged aider and abetter liability

with respect to U.S. Bank because as alleged in the SAC, U.S. Bank knew that it had to

cooperate with the NFA by submitting income verification statements monthly on behalf of

PFG which it never did. U.S. Bank also had knowledge it was not complying with this

income verification requirement, because Wasendorf had instructed U.S. Bank to ignore this

obligation. Therefore, clearly U.S. Bank consciously avoided knowing the obvious that

-77-

Wasendorf was over reporting balances of customer segregated accounts to make it look like PFG was a profitable company when it was not.[24] The NFA's requirement was not voluntary, but mandatory. Thus, U.S. Bank consciously avoided knowing the obvious, that a massive Ponzi Scheme was underway. SAC ¶¶¶. 12, 21, 414.

U.S. Bank's also consciously avoided knowledge that Wasendorf was committing fraud when Wasendorf submitted a document to U.S. Bank to get his construction loan stating a balance in the 1845 account at U.S. Bank in the amount of $90 million dollars. This submission was falsified and U.S. Bank had records to indicate that the 1845 account never exceeded $54 million dollars based on its own internal records. *See* Summary Judgment Order, *CFTC v. US Bank, NA,* 6:13-cv-2041, Doc. #147 (N.D.IA, 2/04/15.) page 55

More evidence of Conscious Avoidance is the testimony of Hope Timmerman, who stated that she never knew that the 1845 account was a customer segregated account. See SAC ¶448. Because it was her duty to investigate these accounts and know her customer and because the Firstar letter clearly stated that the 1845 account was a segregated account, she Consciously Avoided knowing the status of the 1845 account. Hope Timmerman also aided and abetting by signing Wasendorf's name to deposit slips or by just stamping the moniker "known customer" to save time. Finally, when Hope Timmerman was faxed an income verification form, she failed to correct the obviously incorrect P.O. Box on this form. SAC ¶¶ 423, 584.

---

[24]The NFA Handbook regarding reporting states on page 31:
"[E]ach member FCM must instruct each depository, as required by NFA, holding customer segregated funds under CFTC Regulation 1.20, customer secured amount funds under CFTC Regulation 30.7 or cleared swaps collateral under CFTC Regulation 22.2 to report the balances in the FCM's customer segregated funds, customer secured amount funds and cleared swaps customer collateral accounts to a third party designated by NFA in the form and manner prescribed by NFA."

-78-

Therefore based on the ample pleadings describing U.S. Bank Conscious

Avoidance that there was a major Ponzi Scheme underway for a long period of time, and

based on its continued conduct in releasing customer segregated monies to Wasendorf for his

own personal use, a valid claim for aiding and abetting has been pled.    *See* SAC ¶¶ 12, 21,

361,414, 598, 603, 615.

## B.  JP Morgan Also Consciously Avoided Knowledge of Ponzi Scheme and Provided Material Assistance to Wasendorf and PFG.

Because JPMorgan also transferred customer segregated monies directly to the

1845 Account at U.S. Bank which U.S.Bank treated as an unsegregated account and because

JPMorgan consciously avoided its obligations to ensure that these monies were only being

used for the benefit of the customers, a claim for aiding and abetting is also valid against

JPMorgan based on Conscious Avoidance. *See* ¶¶ 5, 19, 93, 94, 400, 440, 442, 443, 446,

447, 450, 512.

The SAC clearly alleges that JP Morgan made transfers of $94 million dollars

from its customer segregated account 5265 into the US Bank 1845 account, but never

bothered to find out how the 1845 account was being used.  Knowing its obligation to

preserve customer monies only for customer uses, the transfers initiated by JP Morgan into

the 1845 account aided and abetted the dissipation of customer moneys including Plaintiffs'

life savings in this RICO Ponzi Scheme.  These transfers were remarkably similar to the

$500 million dollars it also transferred out of customer segregated accounts into the MF

Global proprietary accounts that MF Global, like PFG could use for its own unlawful

purposes.  Thus, JPMorgan in this case too, needs to restore the assets in these accounts.

Significantly, the SAC demonstrates the depth of the assistance provided by JP

Morgan to Wasendorf by allowing PFG to act as Prime Brokers to trade FOREX with PFG

customers.  SAC, Exh.3.  In fact, the FOREX customers did not even realize that PFG was

actually the Counter party, but thought JPMorgan was instead.  *See Secure Leverage Group,*

*Inc. v. Ira Bodenstein*, 2014 WL 2197945 (N.D. Ill. 2014).  Knowing that PFG was cash-

poor, J.P. Morgan allowed PFG to raise cash by allowing PFG to act as a counter party

during the time that JPMorgan was admittedly manipulating the FOREX market. SAC, Exh.

4.  This arrangement demonstrates that JPMorgan was giving substantial assistance to PFG

and helping them raise needed cash by unlawfully entering into FOREX positions at the

customer's expense.  Thus, there are substantial allegations of JPMorgan's assistance in

facilitating the Ponzi Scheme occurring.  SAC Exh. ##3, 4, ¶ 816(b).

## C.  The Exchange Defendants Also Aided and Abetted Wasendorf.

Because the Exchange Defendants decided to apply Omnibus Rules to monitor

PFG rather than its regular rules, it also consciously avoided knowing that PFG was

engaging in abusive and unlawful trading practices such as fictitious sales, off-exchange

transactions, and/or trading under margined accounts.  By allowing these trades to clear

without even examining their propriety and by not having anyone continuously review these

trades for other reasons such as to see if position limits were being violated or to evaluate

whether margin requirements were being met or any other reason, The Exchange Defendants

materially assisted this Ponzi Scheme.

In addition,  CMEG through its alter ego CME allowed PFG to use the Globex

which meant that PFG could track the markets in real time and shadow trade and then send

falsified statements to Plaintiffs to make it look like real trades had transpired, where in

reality these trades never even took place and were fictitious. Because PFG was only supposed to go through a clearing member to acquire Globex Privileges, again CMEG gave material assistance directly to Wasendorf.

### D.  Perry Comeau and Russell Wasendorf Also Aided and Abetted.

Because Perry Comeau helped Plaintiffs fill out their Millennium opening documents, and because Russell Wasendorf, Jr. as COO of PFG guaranteed his Father's construction loan with U.S. Bank, both aided and abetted Wasendorf, Sn.'s. Scheme. Each either knew or consciously avoided learning the facts that Wasendorf Sn. was operating a Ponzi Scheme. Clearly Russell Wasendorf, Jr. had access to all of the accounts statements at PFG and should have seen the discrepencies in the financial reporting. Comeau also should have realized that the investments of the Maxwells were entirely inappropriate for this type of portfolio, and that trading was occurring while on margin calls. These aberrant facts were ignored by Comeau who did nothing to stop the trading in Plaintiffs' accounts.

### E.    Plaintiffs have Properly Pleaded Causation.

With respect to aiding and abetting, Plaintiffs have properly pled causation because under §22(a), plaintiff need only allege actual damages caused by the principal, and not the aiders and abetters *See  Braman v. CME Group.* 14-cv-02646 (N.D. Ill. 2014).

## VI. PLAINTIFFS' RICO CLAIMS ARE PROPER UNDER 18 U.S.C. §1962(C).

The SAC details a RICO Ponzi Scheme whereby Wasendorf along with  US Bank and JPMorgan (the "Bank Defendants) conspired to and did convert customer segregated funds for their own gain by way of fees or by handing the monies directly to Wasendorf by unlawfully transferring monies out of customer segregated accounts. Because each set of

-81-

Defendants substantially profited from these unlawful transfers made as part of their association-in-fact enterprise and proximately caused plaintiffs' injury, each is liable.

## A. Plaintiffs Have Met Applicable Pleading Standards Under Civil RICO.

To State a RICO claim, "a plaintiff must allege that defendants "conduct[ed] or participat[ed]... in the conduct of [an] enterprise's affairs through a pattern of racketeering activity.' 18 U.S.C.§ 1962©." *Sumitomo Copper Litigation*, 995 F. Supp. 451, 453 (S.D.N.Y. 1998.) Congress intended a broad reading of RICO and New York Courts recognize such breadth in the RICO statute. As the District Court observed in *Moss*:

> "The fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Id.*

*Moss v. BMO Harris Bank, N.A.*, 258 F. Supp.3d 289, 297-298 (E.D.N.Y. 2017.)

Defendants' argument that the RICO claim fails because there has been no allegations of a hierarchical structure in the Association-in-fact Enterprise as pleaded herein between the Bank defendants and Wasendorf is simply a misstatement of the prevailing law, under *U.S. v. Boyle,* 556 U.S. 938 (2009), the seminal case describing the requirements for an Association-in-fact Enterprise. In *Boyle*, the United States Supreme court made clear that an Association-in-fact Enterprise does **not** require any structural hierarchy and can just be an ad hoc organization. As the Supreme Court held:

> "As we said in *Turkette,* an association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a 'chain of command' decisions may be made on an ad hoc basis . . . ."

*U.S. v. Boyle,* 556 U.S.938, 948, (2009).

Defendants have also failed to apply proper legal standards regarding proximate

-82-

causation with respect to mail fraud and wire fraud because the Plaintiffs' losses have to be proximately caused by the Fraudulent Scheme not by the individual mailings and wirings as Defendants have incorrectly asserted. However, in this case, the Bank wirings proximately caused Plaintiffs' losses and therefore proximate cause is easily alleged.

B.      **Because all three elements of an Association-In-Fact enterprise have been plausibly alleged, the first element of the RICO case is valid.**

In *U.S. v. Boyle,* 556 U.S. 938 (2009), the Court resolved a split in the circuits and ruled that a RICO Association-in-fact Enterprise need not have an "ascertainable structure," and ruled that the RICO Association-in-fact enterprise, must have at least three structural features: (1) a common purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the Enterprise's purpose. *Id.*, at 947, *citing to United States v. Turkette*, 452 U.S. 576, 583 (1981)(holding: an association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct.") Courts in the Second Circuit have found that the pleading of the Enterprise element in RICO is liberally construed. See *Breslin Realty Development Corp. v. Schackner*, 397 F. Supp.2d 390, 403 (E.D.N.Y. 2005) (finding the enterprise element adequately alleged as a plaintiff need comply only with the notice pleading set forth in Rule 8 of the Federal Rules of Civil Proc. to allege enterprise). *See also In re Sumitomo Copper*, 995 F. Supp. 451, 454 (S.D.N.Y. 1998).

1.      **This association-in-fact Enterprise had a common purpose.**

First, regarding common purpose, the SAC describes, at paragraph 879, that for over seven years the Ponzi scheme Defendants, U.S. Bank, JP Morgan, and Wasendorf Sr., worked together with a common purpose to transfer the monies from segregated accounts to

accounts treated as unsegregated at US Bank, whose senior employees were working with Wasendorf to divert the monies for the benefit of Wasendorf and to generate fees for the Bank. In fact, JPMorgan had no legitimate business reason to even transfer the segregated monies to US Bank, as the monies were not legally subject to transfer, unlike monies in a regular account. Thus, the enterprise members had a common purpose, *i.e.*, to work together to defraud account holders.

The SAC is also clear that the common purpose also required that Plaintiffs **had to lose everything as part of the Scheme.** SAC __. The SAC alleges that had any of the Plaintiffs profited from their trading activity, the Ponzi Scheme would have been ruined, because their money had already been distributed to Wasendorf long before the trading activity occurred, and there were no funds left for Plaintiffs' investment purposes.

Plaintiffs have also alleged the "common purpose" because each RICO defendant **had to** violate the law in order to make this Scheme work. The law is clear that funds placed in customer segregated accounts are equivalent to placing these funds in a locked vault and cannot be transferred under 7 U.S.C.§6d(b) for **any** purpose other than for the benefit of the customers. Therefore, the only transfers that U.S. Bank and JP Morgan could possibly effectuate was to the CME who could lawfully use the proceeds for trading purposes.[25]

JPMorgan's argument that it was just taking instructions from Wasendorf is incredible as a matter of law, and such argument appears to be manifestly frivolous and should be withdrawn, since the JPMorgan customer segregated account 5265 where plaintiffs

---

[25] For example, if the accounts increased in value the CME could by wire transfer place profits in these customer segregated accounts; if the accounts experienced legitimate losses, the Banks could wire out funds to counter parties in most cases the CME itself which routinely novated all trades onto its own books on a nightly basis.

had their cash was not a regular account and was never a regular account that was subject to ordinary transfers based on PFG's instructions. Rather, a special account, unlike a regular account can only be transferred to the CME Exchange for futures and options trading. Indeed, why on earth would any transfers be necessary when the JPMorgan 5265 account was itself a customer segregated account and customer funds could be directly transferred to the CME Exchange and did not have to be transferred anywhere else at all. Because there was no commercially viable reason even to transfer Plaintiffs' funds from JPMorgan to US Bank, a clear inference should be drawn that these transfers back and forth were solely to divert and convert these customer proceeds for the benefit of the RICO defendants..

JPMorgan's recent argument that these transfers were in the regular course of business and were as if the accounts were ordinary not special deposits is specious and just supports a finding that there was a common purpose with US Bank and Wasendorf to divert customer monies for its own profits.

Clearly, JPMorgan is charged with knowing the simple difference between a regular account and a special account. JPMorgan's alternative facts that it was doing nothing wrong by making the transfers should be rejected on a Motion to Dismiss, since Plaintiffs' plausible statement of facts should be credited at the pleading stage rather than JPMorgan's alternative facts.

Hence, a clear question is raised for the trier of fact as to the mind set of JPMorgan when it transferred this $94 million dollar traunch held in special accounts which was not subject to transfer at all unlike in a regular account. Its conduct is consistent with the same conduct where it knowingly transferred customer segregated monies in th *In re MF*

-85-

*Global Holdings, Ltd. Inv. Litig.* 998 F. Supp. 2d 157, 173 (S.D.N.Y. 2014) case as well to
the tune of 500 million dollars.

Therefore, JPMorgan's continued argument that it just followed Wasendorf's
instruction and transferred customer money to U.S. Bank not to Wasendorf himself does not
save their case for dismissal because a RICO Enterprise can be defined by ad hoc and
indirect action. So, the fact that JPMorgan was a mere intermediary lobbing the money to
U.S. Bank who ultimately made the final distribution to Wasendorf simply demonstrates
concerted activity and underscores the coordination of this plot.

**2. Relatedness has been plausibly alleged to describe this Association-in-Fact.**

The relationships between Wasendorf and U.S. Bank and its employees such as
Hope Timmerman is established by the SAC. ¶ 884(j). The allegations make clear they had a
close relationship of trust whereby Hope Timmerman agreed to transfer customer segregated
accounts from the 1845 account to Wasendorf personally. *See* SAC ¶¶ 348(a)-351. Both
Hope Timmerman and Wasendorf gave each other permission to sign each other's names to
documents relating to the customer segregated accounts such as transfer slips and income
verification forms again showing a strong relationship and relatedness among the two.
Therefore, there is ample relatedness to establish an Association-in-fact enterprise.

Likewise, there are relationships alleged between U.S. Bank and JPMorgan that
are ample whereby these two banking institutions made wire transfers back and forth to and
from the 1845 account to the 5265 accounts in furtherance of the Scheme. SAC ¶¶ 729, 884.
Wasendorf personally was eventually getting all of the customer funds and without any paper
trail other than the wire transfer receipts. So, clearly after passing $94 million dollars from
the JPMorgan 5265 account to the U.S. Bank 1845 account during the relevant time period

including Plaintiffs life-savings, relatedness between U.S. Bank and JPMorgan is amply demonstrated.

There are also strong allegations of relatedness between JPMorgan and Wasendorf as well, whereby JPMorgan took instructions directly from Wasendorf and transferred customer monies from the segregated 5265 account to the 1845 account at US Bank which JPMorgan must have clearly figured out was not being used at all as a customer segregated account, since often there was no such designation on the U.S. Bank statements and transfer slips designating it as a customer segregated account.   *See* SAC .¶ 879. In violation of bank secrecy laws and 7 U.S.C. §6d(b), JPMorgan formulaically made these illicit transfers to allow this scheme to progress.

More evidence of relatedness between JPMorgan and Wasendorf supporting an Association-in-Fact is alleged, where to boost up PFG which was allegedly always losing money during the relevant time period, JPMorgan allowed PFG to become a prime broker for FOREX transactions which coincidentally were being manipulated by JPMorgan.  SAC Exhs. ## 3, 4.  Thus, by allowing PFG to act as a prime broker, PFG with the help of JPMorgan was assured to gain profits to keep its operations afloat so that it could continue in business and continue to divert and convert customer funds.

### 3.  Because the SAC properly pleads Longevity, the Claims are proper

Because the allegations in the SAC show that these relationships last from the early 1990s to 2012, a period of approximately 20 years, longevity is established.  *See* Summary Judgment Order, *CFTC v. US Bank, NA,* 6:13-cv-2041, Doc. #147 (N.D.IA, 2/04/15.)

### 4.  The Enterprise Alleged is Separate and Apart From the Pattern of Racketeering Activity

US Bank argues, at page 24, that because the Defendant Banks worked together to effect wire transfers of monies, and these transfers are the transactions upon which the wire fraud and money laundering violations are based, the alleged Enterprise is not "separate and apart" from the Pattern of Racketeering. US Bank misses the importance of *Boyle, supra*, at 946-947 wherein the Court stated that although the existence of an Enterprise is a separate element that must be proved, the evidence used to prove the Pattern of Racketeering activity and the evidence establishing an Enterprise "may in particular cases coalesce." *Ibid.* Thus, here, the SAC adequately alleges the *Boyle* factors, i.e., common purpose, relationships, and longevity, factors which are not necessarily needed to show predicate acts of wire fraud or money laundering. The fact that the existence of the Association-in-Fact Enterprise, separately proved, wherein there are some facts which may "coalesce" in part with the predicate acts, does **not** cause the pleading of one uniform Enterprise consisting of nothing but its predicate acts.

### 5. Defendants had control over the RICO Enterprise.

US Bank, at pages 24-25, and JP Morgan, at pages 18-19, each allege that they did not have sufficient control over the Enterprise to meet the "participation in the operation or management of the enterprise," test set forth in *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). However, Defendants' argument fails because in *Reves*, the Court interpreted the "conduct" and "participate" language in Section 1962(c) as only requiring that one must have **some** part in directing affairs. The court stated that "RICO liability is not limited to those with primary responsibility for the Enterprise's affairs, not limited to those with a formal position in the enterprise, and encompasses a defendant who merely has *some* part in directing the enterprise's affairs." Id.

-88-

JPMorgan argues that its transfer of monies from segregated accounts to the 1845 account at US Bank, is merely providing "commercial services" to the other members of the Enterprise.  This argument ignores that JPMorgan played the fundamental role of illegally transferring monies from segregated accounts, to the US Bank accounts, which because of the facts described above must have caused JPMorgan to know that the 1845 account was not being treated as a segregated account.  Therefore, **at a minimum**, JP Morgan was "consciously avoiding" the fact that these monies were to be used for the benefit of persons other than the account holders.  This fact is clearly having "some part" in directing the affairs of the group, which are adequately described in the SAC, para. 879-882.

Likewise, US Bank argues that the allegations that it "caused . . . monies to be diverted to PFG and the Wasendorfs," is not sufficient to find it had "some part" in directing the affairs of the Enterprise.  This argument is entirely misplaced as the SAC adequately alleges, in the above paragraphs 879-882, how each Enterprise member had indispensable roles, direction, and relationships in operating the enterprise.

### C. Plaintiffs Have Properly Pled Claims Sounding in Mail Fraud and Wire Fraud.

Defendants' argument that Plaintiffs have not alleged the mail and wire fraud predicates with specificity is belied by the record which (1) ignore established law in this Circuit addressing the proper standards alleging fraud under Rule 9(b); (2) describe with particularity that the fraudulent misrepresentations and omissions made in furtherance of the Scheme, and (3) misstate that Plaintiffs have had to 'rely' upon the fraudulent misrepresentations and/or omissions.  Regarding the first two issues, courts in this Circuit have recognized an exception to the civil RICO requirements in civil RICO cases such as the instant SAC.  *See Angermeir, Minpeco S.A. v. Hunt, Et. Al.*, 718 F. Supp. 168, 178 (S.D.N.Y.

1989).  The court in *Angermeir* stated that normally "[a]llegations of predicate mail and wire

fraud acts... state the contents of the communications, who was involved, [and] where and

when they took place, and [should] explain why they were fraudulent."  **But,** Courts in the

Second Circuit have applied a different standard in cases where "[a] plaintiff claims that

...mails or wires were simply used in furtherance of a master plan to defraud," but does not

allege that "the communications [themselves]...contained false or misleading information."

*Angermeir,* 14 F. Supp.3d at 145, citing to *In re Sumitomo Copper, supra* 995 F. Supp. 451.

The *Angermeir* court held that in such cases, including "complex civil RICO actions

involving multiple defendants, Rule 9(b) does not require that the temporal or geographic

particulars of each mailing or wire transaction made in furtherance of the fraudulent scheme

be stated with particularity."  *Id.* Instead, Rule 9(b) requires only that the plaintiff delineate

with adequate particularity in the body of the complaint, the specific circumstances

constituting the overall fraudulent scheme." *Id.* at 146, (citing cases); *see also, Jordan*

*(Bermuda) Inv. Co. Ltd. v. Hunter Green Investment Ltd.*, 154 F. Supp. 2d 682, 692

(S.D.N.Y. 2001)(stating that Rule 9(b) only requires that a plaintiff plead the intent element

of fraud in general terms. Thus, this case alleges mailing and wiring, *see* SAC ¶¶ 11, 345,

512, which clearly were "in furtherance of a master plan to defraud." *Angermeir,* 14 F.

Supp.3d at 145, citing to *In re Sumitomo Copper, supra* 995 F. Supp. 451.  Therefore, in the

Second Circuit, Plaintiffs have met their pleading burden as described based on the ample

pleadings to describe the Fraudulent Scheme in the SAC.

Here, the allegations of wirings during the relevant time frame establish that the

conduct was done when Plaintiffs had their funds in the JPMorgan 5265 account which was

transferred to the US Bank 1845 account and then into Wasendorf's personal account.  Thus,

-90-

based on these specific allegations, Rule 9(a) has been met.[26] SAC, Exh. 7.

## 1. Fraud Has Been Plausibly Alleged.

Defendants' argument that the allegations do not frame a complaint based on

Fraud are misplaced because the SAC adequately pleads facts to show Fraud and Scienter

based on a standard showing "strong circumstantial evidence of conscious misbehavior or

recklessness." [27] This standard is the accepted standard under Rule 9(b), which has been

expressly applied in civil RICO cases. In alleging fraud, a party must state with particularity

the circumstances constituting fraud. Fed. R. Civ. P. section 9(b). But, malice, intent,

knowledge and other conditions of a person's mind may be alleged generally. Id. The

Second Circuit has held that in interpreting Rule 9(b)'s knowledge relaxation requirement,

plaintiffs must still allege facts that give rise to a strong inference of fraudulent intent."

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) *citing* case.

"The requisite 'strong inference' of fraud for purposes of Rule 9(b) may be

---

[26] The Allegations of Mail Fraud are also valid. Because the Mail Fraud Statute operates like the Wire Fraud Statute , a proper allegation has been made that the mails were used to further the fraudulent scheme of diverting and converting customer monies to the RICO defendants for their gain. Because these futures and options investments generally mailing confirmations regarding the acquisitions of positions, such purpose would constitute a predicate act of mail fraud as well. Therefore, any monthly statements mailed out by defendants or yearly tax statements would also qualify since the mails were being used to send out these monthly confirmations and yearly tax statements showing taxable income or distributions. Any letters sent through the mail relating to these accounts would also qualify. Thus, the Court may and should take judicial notice of the fact that mails were routinely used in the defendants' regular course of business as part of the scheme to defraud plaintiffs. Discovery should proceed to ascertain exactly which mails were made. *See United States v. Brooks,* 2009 WL 3644122 *3 (E.D.N.Y. 2009)(Court holding: "[T]he government only has to prove that the defendants 'caused' the mailing, namely that they mast have acted 'with knowledge that the use of the mails will follow in the ordinary course of business or where such use can be reasonably foreseen even though not actually intended." Thus, based on the use of the mails in the regular course of business relating to the transfer of customer monies, the SAC also sates a valid claim under Mail Fraud.

[27]. U.S. Bank alleges in its MTD, page 20-23 that it did not engage in any predicate activity of wire fraud and money laundering. Similarly, JP Morgan alleges that it merely held Peregrine customer monies in customer accounts and executed requests to transfer them to customer accounts at another bank (US Bank) and therefore there is no inference it knew of any wrongdoing.

established either: (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 291, citing case. This standard has been followed in courts in this district. In *MLSMK Investments Company v. JP Morgan Chase & Co.*, 737 F. Supp.2d 137, 142-144 (S.D.N.Y. 2010), the court discussed that although fraudulent intent in Rule 9(b) may be averred generally,[28] "[i]n addition to alleging the particular details of a fraud, ... plaintiffs must allege facts that give rise to a strong inference of fraudulent intent which may be established either (1) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (2) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Although the motive and opportunity prong require the receipt of "concrete benefits," the test is framed in the disjunctive and thus only requires satisfaction of the second criterion, i.e., whether the facts constituted "strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner, supra,* 459 F.3d at 291.

Also, and alternatively, this Circuit has adopted the doctrine of "conscious avoidance," otherwise known as "willful blindness," to find mail or wire fraud violations. *See Powers v. British Vita, P.L.C.*, 57 F.3d 176, 186 (2d Cir. 1995) (plaintiff raised an inference of intent to defraud based on facts demonstrating "conscious behavior" evincing such intent by defendant*); U.S. v. Finkelstein*, 229 F.3d 90, 97 (2d Cir. 2000) (money laundering) (court could infer that if Finkelstein did not actually know the millions of dollars

---

[28] See of *Center Cadillac, Inc. v. Bank of Leumi Trust Company of New York*, 808 F. Supp. 213, 229 (S.D.N.Y.1992) (finding that the plaintiffs adequately alleged mail fraud and wire fraud violations against Bank Leumi in a RICO case).

-92-

he was illegally laundering were drug moneys, he knew there was a high probability of that fact and *consciously avoided* knowledge); *U.S. v. Eisenberg*, 596 F.2d 522, 528 (2d Cir. 1979) (ITSP-finding conscious avoidance instruction warranted).

## 2. Plaintiffs Have Plausibly Alleged Conscious Avoidance.

The allegations against U.S. Bank for handing customer segregated monies directly to Wasendorf are well-pled and clearly support the finding that US Bank had "strong circumstantial evidence of conscious misbehavior or recklessness," and, at a minimum, "conscious avoidance." *See* SAC ¶¶ 884(b); © and (d). As alleged, a U.S. Bank employee, Hope Timmerman, acted pursuant to the direct instructions of Wasendorf, Sr., to wire monies from the 1845 account to Wasendorf Sr. accounts, an action which clearly evidences "fraudulent intent." Moreover, the misrepresentations by US Bank solidify the allegations that it knowingly, recklessly, or, at a minimum, with conscious avoidance, participated in the fraudulent scheme by allowing Plaintiffs funds to be placed into Wasendorf's personal pockets.

Regarding JPMorgan, the allegations of "conscious misbehavior or recklessness" is clear. JPMorgan incredibly argues it was just taking instructions from Wasendorf when it transferred monies held in segregated accounts and therefore wired customer monies into account 1845 for the personal use of Wasendorf. See SAC, para. 885(a) through (d), describing mailings in furtherance of this scheme to defraud. JPMorgan's argument has little merit, since the JPMorgan customer segregated account 5265 where plaintiffs had their cash was not a regular account and was never a regular account that was subject to transfers based on PFG's instructions. Rather, a special account, which is alleged in the SAC, unlike a

-93-

regular account can only be transferred to the CME Exchange for futures and options trading. Therefore, a strong inference can and should be drawn that these transfers back and forth from JPMorgan to US Bank without any valid commercial purpose was solely to divert and then convert these customer proceeds for the benefit of the RICO defendants.

Because JPMorgan can be held liable for avoidinig knowledge by refusing to differentiate between a regular account and a special account, its arguments that it transferred the funds as if they were regular accounts should not serve to exonerate them. The recognition of these funds as special deposits subject to 7 U.S.C. § 6(d)(a) supports the allegations that JPMorgan acted with "strong circumstantial evidence of conscious misbehavior or recklessness" with regard to the transfers, which were part of a scheme to defraud. SAC, para. 885, supra. JPMorgan's alternative facts that it was doing nothing wrong by making the transfers should be rejected since Plaintiffs' plausible statement of facts should be credited at the pleading stage.[29]

Hence, a question is raised for the trier of fact as to the mind set of JPMorgan when it transferred $94 million dollars held in special accounts which was not subject to transfer at all unlike in a regular account. So, the fact that JPMorgan was an intermediary transferring funds to U.S. Bank who ultimately made the final distribution to Wasendorf, simply demonstrates concerted activity and underscores the coordination of this plot.

---

[29] In addition, evidence of JP Morgan's fraudulent intent is alleged in the SAC because the initial transfer of funds from JPMorgan to Wasendorf was not in numbers corresponding to each customers' subaccounts rather these bulk transfers were in round lots indicating a commingling of customer monies for the common purpose of defalcating the funds for unlawful purposes. For example, if Sherri Scheffert had $33,506.03 in her account and for some reason it was being transferred to another segregated customer account, it should have been transferred in that number, rather than as $1,000,000.00. By commingling the funds into round lots, there was no more distinction between the funds and that was the first step in ensuring destruction of these funds altogether.

Accordingly the SAC adequately pleads facts to plausibly show that the strong inference of fraud by each Bank defendant; at a minimum, based on their "conscious avoidance or willful blindness" of the wrongdoing.

## a. Plaintiffs have not engaged in impermissible group pleading.

Defendants ignore the law in this Circuit that in complex fraud cases a reference to "RICO Defendants" provides sufficient specificity for pleading purposes, particularly where they are specifically identified in the SAC. The issue of group pleading was addressed specifically in *Angermeri v. Cohen,* 14 F. Supp.3d 134, 143-144 (S.D.N.Y. 2014)(denying a motion to dismiss a civil RICO complaint when the complaint identified the defendants as "all defendants." finding that the defendants were provided sufficient notice under Rule 8(a) and Rule 9(b)). In *Angermeri,* the court held Fed. R. Civ. P. 8(a) was satisfied when the complaint made numerous allegations specific to each defendant, and made references that "each Defendant" was involved in the fraudulent scheme. *Id.* In *Angermeir*, the complaint alleged facts supporting a plausible inference as to which corporate defendant injured the Plaintiff; and it specifically alleges the role each individual defendant played in the scheme. Therefore, the court found that the complaint did not simply "lump' defendants together, as defendants argued.[30] *Id.*

.      Because the SAC makes repeated reference that "Each RICO Defendant" engaged in the fraudulent and deceptive activity, the SAC clearly provides each defendant with proper

---

[30] Thus, the court in *Angermeir,* found the complaint "satisfied the requirements of Rule 8(a) because it gives [Defendants] fair notice of the basis for [Plaintiffs] claims." *Id.* at 144, *citing case.* Moreover, the court in *Angermeir*, specifically cited to precedent that "Nothing in Rule 8 prohibits collectively referring to multiple defendants where the complain alerts defendants that identical claims are asserted against each defendant.") *Id.*

notice of its illegality,(alleging that "Each RICO Defendant" was alleged to have conducted

the RICO violation); (referencing each Defendant's motive and intent) Accordingly, the SAC

complies with Rule 8(a) pleading requirements.

### 3. The RICO Scheme Had to Proximately Cause the Injury Not the Individual Mailing and Wirings.

Defendants also incorrectly argue that Plaintiffs' injury must be proximately

caused by the predicate acts of using mails and wires to deliver account statements, tax

statements or redemption checks to clients.

Case law is clear that defendants' deceptive and fraudulent scheme, rather than

the sometime actual mailings and wirings used in furtherance of the scheme, constitutes the

RICO violation which must proximately cause injury.  This distinction is buttressed by the

literal language of § 1964© which affords a private right of action to "[a]ny person injured in

his business or property by reason of a violation of Section 1962 of this chapter." (emphasis

added.) *See, Schmuch v. U.S.* , 489 U.S. 705, 710-711 (1989)( RICO Scheme not the mailing

or wirings must proximately cause the injury; and held: "to be part of the execution of [a]

fraud...the use of the mails need <u>not,</u> be an essential element of the scheme.  It is sufficient

for the mailing to be incident to an essential part of the scheme or a step in the plot."; *see*

*also*, *McLaughlin v. Anderson*, 962 F.2d 187, 192 (2d Cir 1992)(following *Schmuch* and

stating that the mailing itself need not be fraudulent but merely be pleaded so that the letter

was incidental to an essential part of the scheme or step in the plot); *see also Minpeco v.*

*Hunt, Et. Al.,* 718 F. Supp. 168, 178 (S.D.N.Y. 1989) (Court held: "Minpeco established that

the defendants used the mails and wires to plan and execute the conspiracy to manipulate the

market, which caused its injury.")

Thus, defendants' contention that RICO "injury" must be caused by the specific predicate mailings or wirings is unsupportable. *See Kehr Packages Inc. V. Fidelcor Inc.,* 926 F.2d 1406, 1418, (3rd Cir. 1991)(holding that in determining the duration of a mail and wire fraud scheme, the relevant criminal conduct is the defendants' deceptive or fraudulent activity, rather than innocent mailings that may continue for along time.)

Applying these principals to the case at bar, it is clear that the mails and wirings alleged in the SAC were a step in the plot, and were incidental to the overall Fraudulent Scheme. SAC ¶¶¶ 860, 865, 866. Moreover, even if *arguendo* the mailing and wirings were required to cause the injury which they are not, the SAC adequately describes how these wirings directly and proximately did in fact cause the injury when these funds were actually moved by wire transfer out of Plaintiffs' segregated customer accounts and eventually and into Wasendorf's pocket book. Therefore, plaintiffs have met their pleading burdens.

### a. Defendants Wirings and Mailing Effected Interstate Commerce.

Defendant U.S. Bank's argument that its wirings were only internal or intrastate and did not constitute any interstate communications or reliance by Plaintiffs who were located in Iowa is also incorrect because it is well-established that any intrastate communications that leads to an interstate communication satisfies the wire fraud pleading requirements. *See U.S. v. De Blasi,* 712 F.2d 785, 791 (2d Cir. 1983); *BCCI Holdings (Luxemberg) Society Anonyme,* 56 F. Supp.2d 14, 52 (Dist. Col. 1999). So for example, if an internal transfer confirmation led to a yearly tax statement showing a balance in Plaintiffs account that was the result of this fraudulent Scheme and that yearly tax statement was sent to plaintiffs in Iowa, a valid interstate communication occurred under the RICO statute.

### D.  Plaintiffs have also properly pleaded Money Laundering as a

-97-

**Predicate Act to support this Fraudulent Scheme under 18 U.S.C.§ 1956.**

Defendants misstate the law and fail to recognize the allegations in the SAC

regarding the money laundering predicate which has been plausibly alleged. *See* MTD ___.

First, Defendants inaccurately state that the § 1956 violations are subject to Rule 9(b)

pleading requirements when the courts are clear that the heightened pleading requirements of

Rule 9(b) apply only to claims sounding in fraud or mistake. *See Madanes v. Madanes,* 981

F. Supp. 241, 253 (S.D.N.Y. 1997).  Accordingly, the money laundering allegations are

assessed under the less stringent "notice pleading" requirements under Rule 8(a).

To establish a claim under 18 U.S.C. § 1956 money laundering, one must

plausibly allege that the defendant conducted or attempted to conduct financial transactions

with illicit proceeds, knowing the transaction is designed to conceal or disguise the nature or

source of the funds.  Here the SAC satisfies both standards.

First the illegal or illicit proceeds alleged are clearly the transfer and use of

customer segregated accounts which are being physically moved from bank accounts to

Russell Wasendorf's personal pockets.  As alleged, these monies can only be transferred for

the customers' use in this case to trade over the CME Exchange.  Therefore, these illicit

monetary transfers to non-cme accounts clearly violate 7 U.S.C. § 6d(b) and are also being

made where the Bank defendants are simultaneously debiting fees for themselves from these

customer segregated accounts.

Illicit monetary transfers are also going from PFG's account to JPMorgan for any

profits from JPMorgan's propping up of PFG as a Prime Broker to trade FOREX for

JPMorgan during the time when JPMorgan happens to be manipulating FOREX as well.

Therefore any transfers or use of these proceeds or fees in the FOREX market is also

-98-

violative of 18 U.S.C. 1956.

Wasendorf and his army of unregistered introducing brokers and commodities trading advisors and others made sure that the customers' account statements reflected that they had engaged in losing trades in the commodities futures and options markets by shadow trading real time trades that were bound to fail or by engaging in real transactions with customer monies where PFG was the counter party getting the paper or actual profits. When the customers got the bad news, they would believe their losses were due to natural market volatility in a turbulent market rather than the fact the trades were phony and never transpired and their losses were due to conversion not futures and options investing at all.[31]

### E.    Plaintiffs Have Properly Pled Proximate Causation under RICO.

Because the Bank Defendants wiring of Plaintiffs' monies to Wasendorf proximately caused their losses, Plaintiffs have sufficiently alleged proximate causation under RICO. *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) *citing* case.

In *Lerner v. Fleet,* a Scheme was alleged whereby a crooked attorney pocketed client escrow moneys in a Ponzi Scheme, similar to this one, where here Wasendorf, pocketed investor monies. In *Lerner,* the claims against the four defendant banks were based on the fact that the Banks there failed to report insufficient funds in attorney escrow accounts to the New York Attorney Fund for Client Protection as required by New York State law and

---

[31]The SAC alleges that during the relevant time frame there was only $7,000,000.00 in PFG's customer segregated account (not $215 million )to support the trading activity of 13,000 customers. Therefore, each customer did not even have enough cash in their accounts to even post initial margin to make a trade. Or, the money laundering activities were easily hidden, when naked puts were initiated bringing in a premium. However, since these trades were mostly fictitious and never monitored by the CME or CMEG, when it came time to pay up, there was no real counter party to cover these short positions. Thus, this cover up was easy to do when you had unregistered brokers aiding and abetting the initial conduct and helping to cover up the initial diversion of funds. Thus, a valid claim for money laundering under 18 U.S.C. § 1956 has been properly pled

that this failure demonstrated the Banks' participation in the RICO ponzi Scheme. However, the Court in *Lerner* rightly observed that the allegations in the SAC did not satisfy the proximate causation standard, in part because unlike here, it was not specially alleged that the plaintiffs even kept their funds in the defendants' Bank accounts.

The case-at-bar presents a much stronger set of fact than in *Lerner v. Fleet*, because here, the allegations make clear that Plaintiffs did deposit there funds in the 5265 JPMorgan customer segregated account, and the Banks actually took affirmative steps to move the money from a lawful position in a customer segregated account to Wasendorf. Unlike in *Lerner,* where the crocked Attorney Schick, had full check writing authority to divert client funds all by himself by merely writing a check to himself out of special escrow accounts; in the case at bar, Wasendorf did not appear to have check writing authority in either the 1845 or 5265 accounts and he first need to transfer the cash itself to a checking account. Thus, this extra step missing from *Lerner v. Fleet*, does allow for proximate cause.

The Banks' active not passive participation here does properly allege RICO proximate causation, because the Banks conduct in *Lerner v. Fleet,* by failing to notify the New York State Fund for Client Protection of the diversions simply did not rise to the level of establishing RICO proximate causation.[32]

### F. Plaintiffs have Plausibly Alleged A RICO Conspiracy.

Plaintiffs have plausibly alleged facts to support the existence of a RICO conspiracy. SAC ¶¶12, 654, 870-874. As described in *Angermeir, supra,* 14 F. Supp. 3d at

---

[32]However, the Second Circuit nevertheless held that the Bank Defendants' Conduct in *Lerner v. Fleet* did satisfy the lesser pleading standards required to plead state common law claims based on aiding and abetting breach of fiduciary duty and negligence. *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) *citing* cases.

154 "to establish a RICO conspiracy, a plaintiff must plead that a defendant agreed to participate in the affairs of the enterprise through a pattern of racketeering activity." *N.Y. Dist. Council of Carpenters Pension Fund v. Forde,* 939 F. Supp.2d 268, 282 (S.D.N.Y. 2013); *Salinas v. United States,* 555 U.S.52, 66 (1977); *accord United States v. Yannott,* 541 F. 3d 112, 122 (2d Cir. 2008.)

Therefore, plaintiffs "must allege some factual basis for a finding of conscious agreement among the defendants." *Picard v. Kohn,* 907 F. Supp.2d 392, 400 (S.D.N.Y. 2012)(quoting *Hecht,* 897 F.2d at 26 n.4). In addition, "a defendant's agreement to join a conspiracy can be inferred from circumstantial evidence of the defendant's status in the enterprise or knowledge of wrongdoing." *N.Y. Dist. Council of Carpenters Pension & Origination,* 939 F. Supp. 2d at 282 (internal quotation marks omitted). And, the Court analyzes a complaint's allegations of a §1962(d) conspiracy under the "more liberal pleading requirement of Rule 8(a)." *Hecht v. Commerce Clearing House,* 897 F. 2d 21, 26 n.4 (2nd Cir. 1990.)

Here, the SAC satisfies applicable pleading standards. Similar to *Angermeir, supra,* Plaintiffs allege the existence of an agreement to violate section 1962(C),SAC ¶¶12, 654, 870-874. Like the complaint in *Angermeir,* here, Plaintiffs also allege facts that support an inference that such an agreement did exist and incorporates by reference the proceeding allegations in the SAC.

For example, the SAC ¶351, describes in sufficient detail and there is evidence in the public record of which this Court can take judicial notice, that Wasendorf and Hope Timmerman agreed that only Wasendorf would send the NFA account verification statements rather than US Bank, and that Timmerman would only report to Wasendorf rather

than other employees of PFG. *See* Summary Judgment Order, *CFTC v. US Bank, NA,* 6:13-cv-2041, Doc. #147 (N.D.IA, 2/04/15.)

Both also agreed that Timmerman could sign the debit slips on behalf of Wasendorf using the stamp "known customer" to initiate transfers in and out of the 1845 account. SAC ¶350. Therefore, there is sufficient evidence in the record that there was an agreement between Wasendorf and US Bank to engage in a pattern of racketeering activity. In addition, the SAC adequately alleges that JPMorgan by initiating $94 million dollars in transfers to US bank for no good reason also agreed to this RICO activity since the funds were destined for Wasendorf.

The court in *Angermeir*, relied on cases which have held that evidence that Defendants received or expected to receive a share of the profits from the conspiracy is evidence of the agreement to violate the substantive provisions of civil RICO. *Id.* at 156. The SAC contains similar plausible allegations. SAC¶15. Accordingly, the SAC adequately alleges civil RICO conspiracy under Rule 8(a).

### 1. Defendants' Arguments against The RICO Conspiracy Claim Should Fail.

U.S. Bank unconvincingly argues, at page 25, that the RICO conspiracy claim fails because (1) a substantive RICO claim has not been adequately alleged, and (2) there is inadequate pleading of a conscious agreement among the defendants. JPMorgan, at page 19-20, also alleges the Plaintiffs failed to state a claim for conspiracy arguing that there was no agreement because the predicate acts were based on JPMorgan's absence of knowledge.

With regard to US Bank's first contention, the proposition that a conspiracy claim cannot stand if there is no underlying substantive violation is not consistent with the view of the Supreme Court, nor recent views of the Second Circuit and this court. *See Salinas v.*

-102-

*U.S.,* 522 U.S. 52, 61-66 (1997) (for a section 1962(d) claim it is only required is that a plaintiff alleges and proves that the defendant *agreed* to the overall goal of the conspiracy.) The Court in *Salinas* further stated "A person ... may be liable for [RICO] conspiracy even though he was incapable of committing the substantive offense."); and a "[d]efendant need only know of, and agree to, the general criminal objective of a jointly undertaken scheme."). *Salinas*, 522 U.S. at 63-64. *See United States v. Applins*, 637 F.3d 59, 74-75 (2d Cir. 2011) ("[t]he Supreme Court [in *Salinas*] also rejected the proposition that a conviction for RICO conspiracy requires proof that a substantive offense was committed."); *New York Dist. Council of Carpenters Pension Fund v. Forde*, 939 F. Supp.2d 268, 282 (S.D.N.Y. 2013) (finding that the RICO conspiracy violation was adequately alleged stating "[t]he Court of Appeals has recognized that under the law of *Salinas* other substantive elements of a RICO claim are not required to be pleaded as against defendants charged with RICO conspiracy pursuant to § 1962(d)," *citing* to *Applins*. *See also Rehkop v. Bewick Healthcare Corp.*, 95 F.3d 285, 290 (3rd Cir. 1996) (reversing the dismissal of a section 1962(d) claim finding that if Rehkop was harmed by reason of the conspiracy, he may pursue a section 1962(d) claim even if the section 1962© claims have been dismissed).

Accordingly, even if the Bank Defendants are correct that Plaintiffs failed to state a substantive claim, *which they are not*, the SAC's conspiracy claim should survive. The SAC plausibly alleges an unlawful agreement between conspirators to defraud Plaintiffs which proximately caused injury and thus this claim could be pursued (independently) even without proof of a section 1962© claim. The proof for alleging a RICO conspiracy is sufficient if the Plaintiff alleges facts that support an inference that an agreement existed. *Angermeir v. Cohen,* 14 F. Supp. 3d 134, 154 (S.D.N.Y. 2014) (denying a motion to dismiss

a civil RICO complaint, finding the civil RICO conspiracy claim was adequately alleged

based on the pleading of sufficient facts to plead an agreement.  See also *Picard v. Kohn,*

907 F. Supp.2d 392, 400 (S.D.N.Y. 2012).  Also, "a defendant's agreement to join a

conspiracy can be inferred from circumstantial evidence of the defendant's status in the

enterprise or knowledge of wrongdoing."  *N.Y. Dist. Council of Carpenters Pension &*

*Origination*, 939 F. Supp. 2d at 282 (internal quotation marks omitted).  And the Court

analyzes a complaint's allegations of a §1962(d) conspiracy under the "more liberal pleading

requirement of Rule 8(a)."  *Hecht v. Commerce Clearing House*, 897 F. 2d 21, 26 n.4 (2nd

Cir. 1990.)

## VII.  BECAUSE THE ARBITRATION PROVISION IS UNCONSCIONABLE, MILLENNIUM'S MOTION FOR A STAY SHOULD BE DENIED.

Because the Arbitration Provision contained in the Custodial Agreements shown

to Plaintiffs for the first time in 2017 are substantively and procedurally unconscionable and

violate the clear mandates of the Commodities Exchange Act and Commission Regulation 17

C.F.R 166.5, these Arbitration provisions are unenforceable under Section 2 of the Federal

Arbitration Act and well-accepted Federal Law.  In addition, because this Arbitration

Provision was based on mistake, lack of manifestation of assent and deceptive business

conduct, lack of good faith and fair dealing-- these other contractual affirmative defenses

equally prohibit application of the Arbitration Provision contained in the Custodial

Agreement.  Because the Custodial Agreement is a blanket contract of adhesion, the Courts

highly scrutinize such agreements for fairness  *See Sprague v. Household International*, 473

F. Supp. 2d  966, 971 (W.D. MI 2005)("The Supreme Court observed that 'generally

applicable contract defenses such as fraud, duress, or unconsciounabilty may be applied to

invalidate arbitration agreements..." *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681,

687, 116 S. Ct. 1652, 134 L. Ed.2d 902 (1996.)

### A. The Federal Arbitration Act Does Not Require a Stay of This Case.

The inquiry before this Court is two-fold: (1) whether the parties agreed to

arbitrate; and (2) if so, whether the scope of the Arbitration Provision encompasses the

asserted claim. *See Mitsubishi,* 473 U.S. at 626-628, 105 S. Ct. At 3353-55, *accord,*

*Threlkeld & Co., Inc. V. Metallgesellschaft Ltd. (London)*, 923 F.2d 245 (2d Cir. 1991.)

Because the facts surrounding the Arbitration Clause herein demonstrate that there was no

assent to this Arbitration Provision, this provision should be invalidated.

### 1. This Court Should Decide the Issue of Arbitrability.

Millennium admits that this Court should decide the issue of Arbitrability, except

in the case of Richard Wakeford; however, because Richard Wakeford also believed his

account was closed in 2008 at Millennium, after the losses he sustained; and had no idea that

Millennium had maintained some of his cash in their account from 2008 through 2017,

therefore Mr. Wakeford should be treated in the same way as the others, since he had no

further business with Millennium from 2008 until 2017, when Millennium contacted Richard

Wakeford, although he was already represented by counsel.   Therefore, this Court should

decide all of the issues of Arbitrability. *See In Re American Express Financial Advisors*

*Securities Litigation*, 672 F.3d 113, 130-131 (2d Cir. 2011)("The Supreme Court has

distinguished between 'question[s] of arbitrability,' which are 'issue[s] for judicial

determination [u]nless the parties clearly and unmistakably provide otherwise.' *AT & T*

*Techs.,* 475 U.S. at 649, 106 S. Ct. 1415, *see also First Options of Chi, Inc. V. Kaplan,* 514

U.S. 938, 944-945, 115 S. Ct. 1920, 131 L. Ed.2d 985 (1995); *PaineWebber Inc. V. Bybyk,*

81 F. 3d 1193, 1198-1199 (2d Cir. 1996), and "other gateway matters, which are

presumptively reserved for the arbitrator's resolution." *see also*, Howsam, 537 U.S. at 84,

123 S. Ct. 588.

Even assuming arguendo that Mr. Wakeford was bound by the 2017 Custodial

Agreement, which he emphatically denies, still the language of that Arbitration Provision

does not specifically address issues of Arbitrability and therefore there is no manifestation of

assent to allow and Arbitrator to determine this gateway matter.

> ### a. Because the contact with Mr. Wakeford violated New York Rules of Professional Conduct, 22 N.Y.C.R.R. 1200.42, since Mr. Wakeford was already being represented by counsel, he should not be subject to the June, 2017 Custodial Agreement.

Because Mr. Wakeford has clearly explained that as far as he knew he had no

funds on account anywhere after Garlon Maxwell explained to him that he had lost his

investments in 2008; it came as quite a surprise that after this litigation was commenced,

Millennium contacted Mr. Wakeford and informed him that he still had funds on deposit in

his IRA account. Mr. Wakeford immediately asked for a redemption. However, the 9 year

delay in contacting Mr. Wakeford by phone prior to the commencement of legal proceedings

should estop Defendant from claiming that he was a customer subject to the June, 2017

Custodial Agreement which is much more favorable to Millennium than the 2008

agreement.[33]

---

[33]Millennium had no right to contact Mr. Wakeford who was represented by counsel, and their unethical contact with Mr. Wakeford should be admonished. As soon as counsel found out about it, this communication was confirmed with Mr. Caputo who did admit to it. Clearly, New York State Rules of Professional Conduct clearly proscribes this type of improper communication. 22 N.Y.C.R.R. 1200.42 states in relevant part:

**Communication with person represented by counsel.**

(a) In representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the other lawyer or is authorized to do so by law.

(b) Notwithstanding the prohibitions of paragraph (a), and unless otherwise prohibit by law, a lawyer may cause a client to communicate with a represented person unless the represented person is not legally competent, and may counsel the client with respect to those communications provided

## 2. Even under the Liberal Construction of Agreements to Arbitrate, this Arbitration Provision Is Simply Unenforceable under FAA § 2.

The Arbitration Provision at issue herein is plainly unenforceable under the

Federal Arbitration Act, § 2, the Savings Clause.[34]

The United States Supreme Court clearly recognized Congress's intent to hold

Arbitration Agreements to the same standards as any other contracts made under State

Contract law and explained with respect to §2;

> "Courts must place arbitration agreements on an equal footing with other contracts." Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S., 440, 443, 126 S. Ct.1204, 163 L. Ed.2d 1038 (2006);and enforce them according to their terms. Volt v. Information Sciences, Inc. v. 1746 Board of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 478 109 S.Ct. 1248, 103 L. Ed.2d 488 (1989)."

The Final phrase of §2, however permits arbitration agreements to be declared

unenforceable, 'upon such grounds as exist at law or in equity for the revocation of any

contract. This Savings Clause permits agreements to arbitrate to be invalidated or stricken by

'generally applicable contract defenses, such as fraud duress, or Unconscionabilty. . .'" AT

---

the lawyer gives reasonable advance notice to the represented person's counsel that such communications will be taking place.

In this case, it came as a shock to Mr. Wakeford's attorney, that Millennium who was also being represented by counsel, had reached out to Mr. Wakeford without his attorneys knowledge or consent which would have been withheld. Now, it seems plain, that this contact was not altruistic to return missing funds of which Mr. Wakeford had no knowledge. Rather this unethical contact is now being used to support a spurious argument to bootstrap Mr. Wakeford into some unfair 2017 Customer Agreement that Millennium's wishes to impose upon him. However, because Mr. Wakeford was simply not a customer in 2017 by any stretch of the imagination, the 2017 Customer Agreement should not be considered in this Motion in any way.

Therefore, based on "unclean hands" this court should reject any attempt to enforce a 2017 Customer Agreement against Mr. Wakeford who thought he had left Millennium back in 2008.

[34] The Savings Clause states in relevant part:

"Validity, irrevocability, enforcement of agreements to arbitrate

A written provision in a maritime transaction or contract evidencing a transaction in commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and unenforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. [Emphasis Supplied]. 9 U.S.C § 2,

&T Mobility LLC v. Concepcion,556 U.S. 333, 339 (2011); *Accord, Threlkeld & Co., Inc. v. Metallgeselischaft Ltd. (London),* 923 F.2d 245 (2d Cir. 1991.)(". . .[I]t is still the rule that parties may not be compelled to submit a commercial dispute to arbitration unless they have contracted to do so.")

Therefore, a review of the Arbitration Provision contained in the Custodial Agreement at issue herein violates State Contract law because the Custodial Agreements were never even presented to the Plaintiffs with the Adoption Agreement nor mailed to them or made otherwise available for their evaluation. Clearly, the Plaintiffs either did not even have an opportunity to consider the Custodial Agreement or perhaps reasonably mistook the Adoption Agreement for the Custodial Agreement and agreed to its terms. In each case, this Arbitration Provision is hidden in the Custodial Agreement that was never separately endorsed as required under 17 C.F.R. §166.5 nor was it made known to Plaintiff. For these reasons and others, these Agreements are unconscionable and demonstrate lack of assent and fraud.

Under Iowa, New York and Illinois State contract law, these arbitration provisions are equally unenforceable because each state recognizes the contract defenses of Unconscionabilty, mistake, lack of assent and fraudulent inducement. In addition, the mandatory Arbitration provisions at issue herein violate Section 4, the Anti-Fraud provision of the Commodities Exchange Act 7 U.S.C.§6 and its accompanying regulation 17 C.F.R. § 166.5 which specifically proscribes the type of Arbitration Clause at issue herein; therefore on this independent basis, the Arbitration Clause it is equally unenforceable because it violates 17 C.F.R. § 166.5. Because the Commodities Exchange Act is also a Federal Statue, there can be no preemption by the FAA in this case, unlike with respect to a State statute;

-108-

rather the two Federal laws should be read together to nullify this unconscionable Arbitration Provision.

**3.    Because The Arbitration Agreement Containing the Custodial Agreement Was Never Presented to Plaintiffs, It Cannot Be Incorporated by Reference but rather, It Is Procedurally and Substantively Unconscionable Under State law and Should Be Nullified.**

Because Plaintiffs herein never even learned of the Arbitration Provision at issue herein prior to this litigation, its making was procedurally unconscionable; in addition, enforcement of these unfair and one-sided Arbitral provisions would be also be substantively unconscionable, especially the indemnification provision, this Arbitration Agreement should be nullified under either Iowa, Illinois and New York state Contract Law.

To establish that a contract or contract provision is unconscionable and therefore unenforceable under state law, courts consider both procedural and substantive unconscionabilty.  Under Iowa law, where the Adoption Agreement was signed, five factors are considered in determining whether a contract is unconscionable including: (1) assent, (2) unfair surprise, (3) notice, (4) disparity of bargaining power, and (5) Substantive Unconscionabilty *See Home Federal Saving and Loan Assoc. V. Campney*, 357 N.W.2d 613 (Sup. Ct. Iowa, 1984); *C & J Fertilizer, Inc. V. Allied Mut. Ins. Co.,*227 N.W.2d 169, 181 (Iowa Sup. Ct. 1975); *accord*, *Gentile v. Allied Energy Prods., Inc.* 479 N.W.2d 607, 609 (Iowa Ct App. 1991.)

**a.    Because the Arbitration Provision Contained in the Custodial Agreement Is Procedurally Unconscionable, it is Unenforceable Under the FAA § 2, Savings Clause.**

Under Illinois law as well as Iowa and New York law, the failure to present the Custodial Agreement to Plaintiffs renders the Arbitration Provision unenforceable under

Procedural Unconscionabilty which considers whether the circumstances surrounding the formation of the contract were fair and reasonable. The law is clear that failure to furnish a required document will unwind a proceeding based on unconsciounabilty. *Timmerman v. Grain Exchange, Inc. LLC.,* 915 N.E.2d 113 117-118 (App.Ct. Ill, 5th Dist. 2009).

The Appellate Court held in *Timmeraman v. Grain Exchange, Inc.,* in abrogating the Arbitration Agreement and refusing to stay the litigation at issue therein based on procedural unconsciounabilty defined the issues:

> "Procedural Unconscionabilty consists of some impropriety during the process of forming the contract that deprives a party of a meaningful choice.[Citation Omitted] It refers to situation where a term is so difficult to find, read or understand that plaintiff cannot fairly be said to have been aware he was agreeing to it, and it also takes into account a lack of bargaining power. <u>Razor v. Hyundai Motor America, 222 Ill. Dec. 25 408 N.E.2d 403 (1980).</u>'Factors to be considered are all the circumstances surrounding the transaction [,] including the manner in which the contract was entered into, whether important terms were hidden in a maze of fine print; both the conspicuousness of the clause and the negotiations relating to it are important, albeit not conclusive factors in determining the issue of Unconscionabilty.

Therefore, under Illinois law, where the Custodial Agreement was never even presented to Plaintiffs in Perry Comeau's office when the three page Adoption Agreement was signed containing small print purporting to incorporate the Custodial Agreement by reference therein; Procedural Unconsciounabilty resulted because the party to be bound lacked any reasonable opportunity to review or understand the content of the Arbitration provision prior to entering into the Adoption Agreement. *See Razor v. Hyundai Motor America*, 854 N.E.2d 607, 623 (Sup. Ct. Ill. 2006)(Supreme Court rejected unconscionable provision of contract where customer had not been presented with the provision prior to

entering the contract);[35] *Timmerman v. The Grain Exchange, LLC.*, 915 N.E.2d 113 (App. Div 5th Dist. 2009); *Frank's Maintenance & Engineering, Inc.* 86 Ill. App.3d 980 (App. Ct. 1st Dist, 1980); *accord, Sprague v. Household International*, 473 F. Supp.2d 966 (Court invalidated Arbitration Provision based on Unsconciounabilty under Missouri State law.

Plaintiffs have explained that they did not receive a copy of the Custodial Agreement when they signed the Adoption Agreement. Therefore, they could not have consented to a document never produced to them and therefore there was no manifestation of assent.

Millennium's bait and switch tactic is also procedurally unconscionable where the evidence demonstrates when the three page Adoption Agreement, excluded the Custodial Agreement and excluded any mention of an Arbitration or Indemnification Provision, Plaintiffs confusingly but reasonably could have easily mistook the Adoption Agreement for the Custodial Agreement when they consented to it having received it in the fine print. Again, such procedural Unsconciounabilty should not be countenanced by this Court. *See also, Timmerman v. Grain Exchange, Inc.*, 915 N.E.2d 113 (App. Ct. Fifth Dist. 2009)(Court refused to stay case and apply Arbitration agreement and found provision unconscionable because Arbitration rules incorporated by reference in the one page Agreement were not

---

[35]In *Razor v. Hyundai Motor America* The Supreme Court of Illinois held:
"As previously noted, procedural Unsconciounabilty refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it. Surely, whatever other context there might be in which a contractual provision would be found to be procedurally unconscionable, that label must apply to a situation such as the case at bar where plaintiff has testified that she never saw the clause; nor is there any basis for concluding that plaintiff could have seen the clause, before entering into the sale contract. '[A] limitation of liability given to the buyer afer he makes the contract is ineffective.' Frank's Maintenance, 86 Ill. App.3d at 991 n.2, 42 Ill. Dec. 25, 408 N.S.2d 403."

presented to plaintiff or made otherwise available to him when contract was formed.)[36]

Because the case at bar is extremely similar to the *Timmerman v. Grain Exchange, LLC* case, the same result should be reached. The presentation of the Adoption Agreement referring to the Custodial Agreement containing the Arbitration and indemnification Provision is simply too attenuated to pass muster. The blatant failure to furnish the plaintiffs with the documents containing the Arbitration provision, just like in *Timmerman*, dooms the validity of the transaction with respect to the Arbitration Provision.

Therefore, because there was confusion, lack of assent, mistake, and a clear failure to furnish the document containing the Arbitration clause, this case meets all the well-settled criteria mandating a nullification of the Arbitration Provision based on Unconscionability.

> **b.    Because Perry Comeau had a cease and desist order against him in the state of Iowa and could not be acting as an Investment Advisor, these documents are unconscionable as a matter of law because Millennium did not have the power to bind the Plaintiffs.**

Because Perry Comeau had a cease and desist order against him in March, 2007 issued by the Iowa Department of Insurance prohibiting him from giving investment advice in the State of Iowa, these agreements cannot be considered valid, since it was Perry Comeau acting as agent for Millennium Trust who advised the clients and assisted them in executing these documents while in his office. *See* Levy Dec. Exh.4. Clearly, under the totality of the

---

[36]As the Illinois Appellate Court sagaciously reasoned in *Timmerman*:

"The National Grain and Feed Association Rules (hereinafter the rules) are not set forth in the contracts, and no specific reference to arbitration is included in the contracts. Copies of the Rules were not provided to plaintiffs by Grain Exchange, nor were the plaintiffs informed by Grain Exchange where they could obtain copies of the Rules. The plaintiffs were not informed that the Rules required the arbitration of any disputes. Nevertheless, the Rules contain an arbitration provision. . ." 915 N.E.2d at 116-117.

circumstances, there is more unconscionabilty to obviate this Custodial Agreement.

Because the Custodial Agreement combined many categories of investments into one global document, it related to all sorts of investments including cash, mutual funds, securities and of course commodities and futures and options. Thus, the Iowa Cease and Desist order precluded Comeaus' actions, since the Custodial Agreement covered investments in the State of Iowa. Therefore, because Comeau had no legal authority to act with respect to these investments covered by the Custodial Agreement, these documents should be voided based on procedural Unconsciounabilty.

In fact, under these circumstances, a strong case for vitiating these contracts exist based on the doctrine of Procedural Unconscionability for lack of bargaining fairness, because Plaintiffs were relying on someone whom the State of Iowa determined was unreliable as a matter of law. Because courts will carefully scrutinize contracts of Adhesions, like these at issue for fairness, the agreements here should fail scrutiny. For example, where members of the public are rushed into the signing of an Arbitration Agreement or where not all of the documents are presented or where the parties are not informed that they should seek counsel, procedural Unconsciounabilty has been found thus nullifying the transaction. *See Sprague v. Household International,* 473 F. Supp. 2d 966, 972 (W.D. MI 2005)(Rushing to have party sign contract is an indicia of procedural Unconscionability.)

Therefore, in this case, the clear evidence demonstrates that the Plaintiffs were too unsophisticated to transfer the Millennium Accounts without assistance. Somehow Millennium retained Perry Comeau in this RICO Conspiracy to make sure the accounts were properly transferred. Without the assistance of Perry Comeau, these transactions would not

have been completed and the Plaintiffs accounts would have just remained with their prior

FCM and IRA Trustees.

Therefore, these entire transactions should be avoided under the concept of Procedural

Unconsciounabilty, since to allow the validity of these transactions would allow for

unscrupulous advisors looking to cheat clients to freely act as advisors in the State of Iowa.

Any such conduct of unregistered advisors assisting clients should therefore constitute

procedural Unconsciounabilty as a matter of law.

### c. Because this Arbitration Provision Violates the Commodities Exchange Act and Commission Rule 17 CFR 166.5, it should be voided and deemed unenforceable.

Because the Millennium transfer documents including the Adoption Agreement,

Special Investment Authorization[37] and Custodial Agreement violate the clear mandates of the

Commodity Exchange Act's anti fraud provisions, §4, et. seq. and corresponding Commission

Rule 17 CFR 166.5, the Arbitration Provision embedded in these documents is unenforceable

under 17 C.F.R. 166.5 which specifically controls this situation.

Indeed the mandates of 17 C.F.R. 166.5 govern pre-dispute arbitration

agreements in the context of futures and options contract traded over an Exchange as in the

case at bar. 17 C.F.R. 166.5 specifically mandates that only Arbitration Agreements that are

**not** made conditions precedent to investing in the Commodities Future and Option Markets

are valid. There is also specific cautionary language that is required as well as the

requirement that the Arbitration provision be in bold face letters and separately endorsed. A

review of the documents presented clearly demonstrate a total disregard for the mandatory

---

[37]Because there is nothing in the Special Investment Authorization regarding any
agreements to arbitrate, this document appears to be irrelevant to this discussion regarding the
applicability of the Arbitration Agreement herein.

provisions of 17 C.F.R. 166.5 because no where have these Arbitration provisions been

separately endorsed nor are these provisions in bold face type telling the customers that the

signing of the Arbitration Provision is not mandatory.[38]

      Millennium through Perry Comeau, a commission registrant, acted in direct

violation of 17 C.F.R. 166.5, because the Millennium documents made the Arbitration

Provision a condition precedent to investing which is specifically prohibited by 17 C.F.R.

166.5.  17 C.F.R. 166.5 was entirely disregarded by Millennium and their agent, Commission

Registrant Perry Comeau.  Therefore, this Arbitration Provision at issue herein cannot be

enforced or be enforceable even under the most liberal reading of the Federal Arbitration Act,

which does not preempt the Commodity Exchange Act.

      Clearly, Millennium was acting through Perry Comeau as an Introducing Broker

---

[38]Indeed,17 CFR 166.5(b) states in relevant part:

**Voluntariness:** The use by customers of dispute settlement procedures shall be
voluntary as provided in paragraphs © and (g) of this section.

C **Customers.**  No Commission registrant shall enter into any agreement or understanding with a customer
in which the customer agrees prior to the time a claim or grievance arises, to submit such claim or grievance
to any settlement procedure except as follows:

**(1) Signing the agreement must not be made a condition for the customer to utilize the
services offered by the Commission registrant.**
**(2) If the agreement is contained as a clause or clauses of a broader agreement the customer
must separately endorse the clause or clauses containing the cautionary language and
provisions specified in the section. ,. .**
**(7) Cautionary Language.**  The Agreement must include the following language printed in large
boldface type:

 By signing this agreement, you (1) may be waiving your right to sue in a court of law, and (2) are
agreeing to be bound by arbitration of any claims or counterclaims which you or [name][SIC] may
submit to arbitration under this agreement.  You are not however, waiving your right to elect
instead to petition the CFTC to institute reparations proceedings under Section 14 of the
Commodity Exchange Act with respect to any disputes that may be arbitrated pursuant to this
agreement.  In the event a dispute arises, you will be notified if [name][SIC] intents to submit the
dispute to arbitration. If you believe a violation of the Commodity Exchange Act is involved and if
you prefer to request a section 14 'Reparations' proceeding before the CFTC, you will have 45
days form the date of such notice in which to make that election.
You need not sign this agreement to open or maintain an account with [name][sic] See 17 CFR
166.5  [Emphasis Supplied]

to introduce these IRA accounts to Peregrine Financial Group. Therefore, there is no question that these investments were for commodities trading in United States Future Markets to which 17 C.F.R. 166.5 applies. *See Nilsen v. Prudential-Bache Securities*, 761 F. Supp. 279, 285 (S.D.N.Y 1991)(Court holding that 17 C.F.R. 180.3 [predecessor statute] applied to claims traded over United States Contract Markets, thus trading occurring over an Exchange in London was arbitrable). 17 C.F.R. 180.3, the precursor to 17 C.F.R. 166.5 was so important to the Framers of the CEA that it was even given retroactive effect and. *See  Ames v. Merrill Lynch, Pierce, Fenner and Smith*, 567 F.2d 1175 (2d Cir. 1977.)

In fact, with the enactment of the Commodities Exchange Act in 1976, Congress almost excluded all Arbitration Provisions relating to contracts traded over any Exchange with a specific intent to protect investors from the exact type of unfair Arbitration Provision that Millennium now seeks to enforce herein.

However, instead, as a compromise, Congress only allowed Arbitration Provisions that complied with 17 C.F.R. 166.5 and its predecessor 17 CFR 180.3. The clear import of this rule was to prohibit the use of mandatory Arbitration provisions and to proscribe their use as condition precedents to trading over any United States Exchange as in this case. In such cases, Arbitration provisions relating to any futures and options trading over an Exchange had to comply with 17 C.F.R. 166.5, and therefore such Arbitration provisions needed to be separately endorsed next to bold face type explaining that the customer did not have to consent to Arbitration.

Therefore, Millennium through it agent Comeau, blatantly violated these mandatory provisions, and Millennium's attempt to now seek to enforce the Arbitration provision is simply futile, since by its own admission, the Millennium Arbitration Clauses

-116-

were conditions precedent to investing through Millennium; and such conditions precedent

are specifically proscribed by 17 C.F.R. 166.5.

i. **Because the claims at issue against millennium relate to transactions in commodities futures and options trading over an exchange that were conducted by pfg, these claims are only subject to arbitration where there has been compliance with 17 C.F.R. 166.5.**

Because the claims in this case relate to trading losses over a United States

Exchange, these disputes are not arbitrable under the Agreement presented by Millennium

because the claims do not fall within the scope of the arbitration agreement as a matter of law.

*Marciano v. DCH Auto Group,* 14 F. Supp.3d. 322, 327 (S.D.N.Y.2014).  For the same

reasons discussed supra, only issues of damages not related to trading over an Exchange could

even be arbitrated assuming that 17 C.F.R. 166.5 was complied with which it was not.

Therefore, absent compliance, the claims at issue in this case, cannot be reasonably linked to

the Arbitration Agreement presented by Millennium, although this Agreement may have been

proper with respect to unrelated issues other than to futures and options trading over an

Exchange.

Therefore, based on the totality of the circumstances, the Arbitration Provisions

should not be enforced and this entire case should proceed in Court.  See Grund v. Delaware

Charter Guarantee and Trust Co., 788 F. Supp.2d 226 (S.D.N.Y.  2011)(Claims alleged

against IRA Trustee for negligence and breach of Fiduciary Duty sustained in Federal Court.)

d. **Because the Millennium Arbitration Provision is Also Substantively Unconscionable, it is Equally Unenforceable.**

The Millennium Arbitration Provision is equally unconscionable based on the

doctrine of Substantive Unconscionability.  Under Substantive Unconsciounabilty, courts

consider issues of fairness in deciding whether to enforce Arbitration Provisions.  In holding

a contract provision substantively unconscionable, courts have held: "[a]n agreement is

substantively unconscionable if it 'is grossly unreasonable or unconscionable in the light of

the mores and business practices of the time and place as to be unenforceable according to its

literal terms." *Sablosky v. Edward S. Gordon Co. Inc.,* 535 N.E.2d 643, 647 (N.Y.

1989)(quoting *Gillman v. Chase Bank, N.A.,*73 NY2d 1, 11, 534 N.E.2d 824, 828)(quotations

omitted). "Substantively, courts consider whether one or more key terms are unreasonably

favorable to one party." *Sablosky*, 535 N.E.2d at 647. *Ragone Atlantic Video at Manhattan

Center,* 2008 WL 4058480 *5 (S.D.N.Y 2008)(Here defendants waive fee shifting provisions

of arbitration contract to remove the substantively unconscionable provision.)

Now, clearly in this case where plaintiffs have had their entire life savings

wiped out, and based on the parties relative means, it would be substantively unconscionable

to uphold the fee shifting provisions contained in the Millennium Arbitration Agreement,

even if this Court were to find that the Arbitration Agreement is valid. *See In Re Checking

Account Overdraft Litigation,* 813 F. Supp.2d 1365 (Fee shifting provisions just allowing one

party to bear the costs of the litigation were unconscionable); Amendariz v. Foundation

Health Psychcare Services, Inc., 24 Cal 4th 83 (2000)(California Supreme Court required

employer to bear costs of arbitration); *Van Voorhies v.Land/Home Financial Services,* 2010

WL 3961297 * 7 (Superior. Ct. Conn 2006)(Court held "cost-splitting provision of the

arbitration provision is substantially unconscionable).

It would be quite harsh and unfair to expect these Plaintiffs in their current

economic condition to bear the costs of any Arbitration, especially in addition to the instant

litigation. Thus, the Arbitration Contract at issue herein should be voided based on

substantive unconsciounabilty. In addition, other substantively unconscionable provisions

should also preclude enforcement of this Contract including the mandatory forum in Chicago.

Plaintiffs should not have to incur more costs therefore, the Forum should be Oelwein, Iowa.

> **e.    Alternatively, the unconscionable provisions should be stricken, and  this case should proceed as a Class Arbitration in Iowa.**

Although Plaintiffs request denial of Millennium's motion, alternative relief

requested is for this Court to strike any unconscionable provisions of the Millennium

Agreements including striking: (1)the indemnification provision, and choice of forum

provision (2) ordering Millennium to pay costs, (3) Allowing this Arbitration to proceed in

Oelwein, Iowa at the Defendants expense and as a Class Arbitration which is not prohibited.

Because the Arbitration Provision does not contain any Class Waivers, this

Arbitration should be allowed to proceed as a Class Arbitration and not individually, since

these Class Plaintiffs are Class representatives, if would be unfair and costly to make each

party proceed individually at this point.  Because the issues are identical among all the Class,

Plaintiffs seek this relief in their cross-motion which has been made only for alternative

relief.

> **f. As alternative relief, Plaintiffs' cross-move to stay the arbitration  pending resolution of the Pending Class Action 16-cv-5508, or alternatively staying litigation pending the Class Arbitration.**

Because this Court has the authority to stay any litigation or arbitration in the

interests of justice and as justice so requires, Plaintiffs request a stay of either the Arbitration,

in the event it is recognized, because Plaintiffs believe that they can achieve full and fair

relief in the instant Court case pending in this Court.  Or, Plaintiffs request a stay of the

litigation, pending the outcome of the Class Arbitration. As such, Plaintiffs would request

such a stay to preserve costs.  Plaintiffs are not seeking protracted litigation and would like to

-119-

pursue their legal remedy in this Court even absent Millennium, first. If full and fair relief

cannot be achieved in this Class Action, then the Stay should be lifted so that Plaintiffs can

then proceed in a Class Arbitration against Millennium Trust. *See Security Ins. Co. Of

Hartford v. TIG Ins.* Co., 360 F.3d 322 (2d Cir. 2004); *Trustees of Plumbers and Pipefitters

Nat. Pension Fund v. Transworld Mechanical, Inc.*, 886 F. Supp. 1134 (S.D.N.Y.

1995)(court has discretion to Stay any proceeds); *see also,* 2008 WL 919621 (S.D.N.Y.

2008)(same).

## VIII.   DEFENDANTS HAVE NOT MET THEIR BURDEN ON A MOTION TO TRANSFER, AND PRESENTLY JURISDICTION AND VENUE ARE PROPER.

Defendants Comeau and Wasendorf Jr. have asserted extremely frivolous

arguments seeking to transfer this case. First, they argue that Venue and Jurisdiction is

improper in New York under 28 U.S.C. §1406 and 28 U.S.C. §1391, and Secondly, they argue

under 28 U.S.C. §1404(a) alternatively for a transfer of venue based on convenience to

Chicago, Illinois, although each has failed sustain their burden of proof by clear evidence

including affidavits or other statements as to how anyone will be more convenienced in

Chicago, Illinois. *See Factors Etc. Inc. v. Pro Arts, Inc.* 579 F.2d 215, 218 (2d Cir.

1978)(Defendants bear heavy burden in showing how witnesses will be inconvenienced and

outlining their testimony); *ESPN v. Quicksilver,* 581 F. Supp.2d 542, 547 (S.D.N.Y, 2008).

In light of the fact that no other Defendants have joined in this motion, and the

other Defendants have effectively waived any objections to venue an personal jurisdictions;

with respect to the other defendants, venue and jurisdiction is proper in this court. Fed. R.

Civ. P. 12b(2) & (3), 12(h). If there is a transfer it should only be regarding these two

Defendants, and therefore the case would have to be bifurcated.

Defendants have made absolutely no showing of how any witnesses will be

inconvenienced by having to travel to New York instead of traveling to Chicago. Defendants have also failed to establish their burden indicating who they plan on calling and what their testimony would be. Under the standards for a discretionary transfer of venue under §1404(a), this motion should be denied based on this reason alone.

In fact, because Comeau lives in Iowa and Wasendorf, Jr. lives in Florida clearly each cannot in good faith make any showing of convenience to transfer to Chicago; and clearly the only reason for such a frivolous request is to forum shopping which should be frowned upon.

Their only other argument that the PFG Customer Agreement's Forum Selection clause governs is equally meritless for a variety of reasons including the fact that PFG is no longer in business and not a party to this case. The PFG Forum Selection Clause could only be invoked by PFG's successor in this case Mr. Bodenstein, the Bankruptcy Trustee according to paragraph 38 of th Customer Agreement that does not include either Mr. Comeau or Mr. Wasendorf, Jr. as intended third party beneficiaries.

Since Comeau was never an employee of PFG but rather a customer himself who apparently sued PFG for his trading own losses in the amount of approximately $500,000.00 as a customer under the PFG Customer Agreement, and then settled his case for only $10,000.00, it is entirely frivolous for him to even allege that he is covered under it as a broker. *See* Settlement Agreement of Perry Comeau, annexed to the Levy Dec. as Exh.9.

A review of the PFG Customer Agreement appears to only cover PFG which is now defunct and its brokers involved the actual handling of these margin account. Thus the Customer Agreement would not cover Wasendorf, Jr. either who had no role in the trading or handling of these customer account.

-121-

Their attempt to piggy back onto the PFG the customer agreement should be rejected because neither Russell Wasendorf nor Perry Comeau were intended beneficiaries of this contract under Section 38 which says that only successors or assigns are intended beneficiaries. Thus, although Comeau and Wasendorf Jr. are being accused *inter alia* of conspiracy and aiding and abetting does not establish the type of privity with PFG for purposes of applying the Forum Selection Clause.

### A. Venue and Jurisdiction are Proper in the Southern District of New York; Thus Defendants' Motions should be Denied.

Because a substantial part of the conduct giving rise to the facts of this case took place in New York where $94 Million dollars in customer segregated accounts was transferred or deposited in New York in connection with PFG's customers, Venue was properly laid in the first instance here under 28 U.S.C. §1391(b)(2).[39]  In fact, PFG gave its customers wiring instructions to send money totaling 94 million right into New York's JPMorgan Branch. *See* Levy Dec. Exh. 10.  Plaintiffs also sent their checks to JPMorgan's 5265 account consisting of their life savings to JPMorgan's Bank right here to New York City. *See* Levy Dec. Exh. 10. Therefore,  venue is proper under 28 U.S.C. 1319(b) (2) because a substantial part of the events underlying this Scheme did occur in New York; and New York courts have a strong interest in regulating New York banking activities within its District such as in this case.

In addition, Personal Jurisdiction is also proper over all Defendants.  First, with respect to the other non-moving Defendants, each has now waived any objections to personal jurisdiction and venue under Fed. R. Civ. Pro. 12(b)(2) & (3), 12(h); *see also, Layden v.*

---

[39] (2) 28 U.S.C. 1391(b)((2) states that venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

*Mizuho,* 2015 W.L. 1499185 *5 (S.D.N.Y. 2015)(Requiring such objections to be raised in a

Motion to dismiss or answer which ever comes first.)

With respect to Comeau and Wasendorf Jr., this Court has jurisdiction over them

based on the RICO Ends of Justice Jurisdiction based pursuant to 18 U.S.C. §1965(b)[40]

because under this Statute only one defendant needs to be subject to personal jurisdiction in

New York, and the others may be joined based on the ends of justice. *See PT United Can Co.*

*Ltd. V. Crown Cork & Seal,* 138 F.2d 65 (2d Cir. 1998)(Second Circuit recognizes nationwide

service of process where one defendant is venued in New York); *Monarch Normandy Square*

*Partners v. Normandy Square Assoc. Ltd.,* 817 F. Supp. 899 (D. KS 1993), *Southmark Prime*

*Plus v. Flazone,* 768 F. Supp. 487 (D. DE 1991); *Bridge v. Invest America, Inc.,* 748 F. Supp.

948 (D. RI 1990.)

### B. Defendants' Have Utterly Failed To Establish Their Entitlement To A Discretionary Transfer of Venue Pursuant to 28 U.S.C. § 1404.

To establish a discretionary transfer of venue under 28 U.S.C. §1404(a)

requires a consideration of public interest and private interest factors including the ends of

justice. There are nine factors that the district courts weigh in considering a transfer based on

convenience.[41] In this case, the strong balance weighs in favor of keeping this case in New

York. Most notably the voluminous documents involved in this case including over

---

[40]18 U.S.C. 1965(b) stated: "In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

[41]  (1) convenience of witnesses; (2) the location of relevant documents and relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of the operative facts; (5) the availability of process to compel attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded to the plaintiff's choice of forum; and (9) trial efficiency and the interest of justice based on the totality of circumstances.

approximately 7 boxes of documents so far consisting of account statements and prior pleadings and motions before the NFA.  See Levy Dec. Exh.11, NFA Hearing Document List. It would be logistic nightmare to try to move these documents.

A review of these factors demonstrates that absent any showing of inconvenience in the moving papers, the most important factor based on convenience of any witnesses has simply been ignored and this factor is an extremely important factor in successfully transferring venue.  In addition, a review of the other factors also clearly militate in favor of New York based on the voluminous boxes of documents in Plaintiffs' counsel's office which would be difficult to move anywhere else; based on the fact that JPMorgan and CME have offices in New York and can produce documents here as well and are subject to subpoenas in New York; venue is proper in New York.  In addition, New York courts are very familiar with these types of cases such as *Lerner v. Fleet Bank,* 459 F.3d 273 (2d Cir. 2006) which  may not even be recognized in the State of Illinois.

Considering the other facts also militate in favor of leaving this case in New York because neither Comeau or Wasendorf, Jr. have explained their economic circumstances to explain why it would be inconvenient to come to New York, but not Chicago.  What would be oppressive financially would be to require another lawyer who charges by the hour to be involved in this case, since Chicago requires that local counsel be present, and it is often quite difficult and costly to find appropriate local counsel.

In addition, because the Plaintiffs' choice of forum is given some deference, its selection of New York should weigh in favor of denying the §1404(a) motion.

## 1. The Customer Agreement containing a Forum Selection Clause Does not  apply to this case.

Because the facts alleged show that the PFG customer agreement was based on

a fraudulent ponzi scheme, courts in New York would not necessarily give any weight to this Forum Selection clause. *See Roby v. Corporation of Lloyds*, 996 F. Supp. 1353, 1363 (2d Cir. 1993)(Forum Selection Clauses may not be enforced based on Fraud.) In addition, neither Russell Wasendorf Jr. nor Perry Comeau can be considered third party beneficiaries of the PFG customer agreement, because Section 38, specifically states that only heirs and successors to PFG are the intended third party beneficiaries. "This Agreement, including all authorizations, shall inure to the benefit of PFG and PFG's successors and assigns whether by merger. . .." Because neither Wasendorf Jr. nor Comeau are intended third party beneficiaries of the PFG Customer Agreement, it should be not serve as a basis to transfer venue. Lastly, because the PFG customer agreement only governs claims involving PFG's conduct as an FCM, the claims in this case are much broader in scope and are not even covered by the PFG customer agreement such as the RICO claim. In fact, because PFG is not a party-defendant, this customer agreement should not be considered at all in effecting a transfer of venue. At this point, because PFG claims are all being resolved in a Bankruptcy proceeding which does not even have jurisdiction over the non-bankrupt parties, this PFG customer Agreement should be disregarded. Clearly, the issues in this case fall outside the Customer Agreement and not at all covered by it.

## 2. Because there are strong factors militating in favor of New York, this case should not be transferred.

Because plaintiffs' counsel does not have offices around the United States and would incur unnecessary costs trying to litigate this case in another venue at this time, this case should remain here in the interests of justice. It should not be ignored how difficult a case like this is to try in a court of law. It should also not be ignored that as opt-outs, these Plaintiffs appear to treated as incidental to the Class, and apparently they cannot get a large

firm to help them right now.  Considering how hard it is to get competent counsel involved

for Plaintiffs, but how easy it is for Defendants to hiring an army of attorneys ready and

willing to defeat Plaintiffs' meritorious claims; therefore, to efficiently allow Plaintiffs' their

day in court does require considerations of the ends of justice under the totality of the

circumstances.  If there are no attorneys willing or able to represent these plaintiffs, then we

will all just have a system of large corporations suing each other because eventually only

those entities will be able to afford to file cases.

    It appears that in the interests of justice, Plaintiffs should be entitled to have

their case heard in New York like so many Plaintiffs have been able to do.  The fact is

Plaintiffs' counsel may not be able to litigate this case anywhere else at this time which is a

major consideration that should be given substantial weight in deciding this motion.  The

facts show that Mr. Wasendorf, Jr. was earing a salary of $30,000.00 per month while at PFG

and Perry Comeau a successful nurse anesthetist made no showing of financial hardship.  He

had an extra $500,000.00 for investments which when failed turned into a claim which he

mysteriously settled with PFG paying him $10,000.00.  Therefore, he does not appear to be in

financial distress, and he should be able to afford to come to New York

    With respect to the public interest factors, at issue, it should be noted that in

the interests of Justice, it would do Plaintiffs a terrible disservice to transfer this case to a

district like Chicago, where the Commodities Industry is extremely dominant and the law

appears to favor the Industry.  For example, the Bankruptcy Trustee *In Re Peregrine*, did not

even bother to sue the CME for its alleged regulatory lapses, although CME was allowed to

advertise its settlement fund right on Peregrine's Website and it was listed as a Docket Entry.

*See* Levy Dec. Exh. 8.This type of relationship would seem to discourage litigation against

-126-

CME in that Forum. By contrast, the MF Global Trustee in New York took a more aggressive

approach and joined CME group as a party-defendant in its extremely similar compliant in

New York and did receive a $14,500,000.00 settlement for the same type of conduct being

alleged in this present suit regarding the CME's alleged regulatory lapses. Considering this

public interest reality, this case should remain in the Southern District of New York where

justice will be served.

> **3. However, if this Court were to entertain a discretionary transfer of
> venue, at this time, the only venue that would serve the interests of
> justice under 28 U.S.C.§ 1404 would be to transfer venue to the District
> of Iowa to Judge Linda Reade who has Extreme Familiarity with this
> case; and only with respect to Comeau and Wasendorf, Jr.**

Although Plaintiffs at this point strenuously object to entering a discretionary transfer

of venue since there has been absolutely no showing by Defendants' Comeau and

Wasendorf, Jr. to warrant such relief; nevertheless, if this Court were to consider a

discretionary transfer of venue, and we hope it does not, then the appropriate place to

transfer this case with respect to **only** Comeau and Wasendorf, Jr. would be to the Northern

District of Iowa, where Judge Reade is familiar with this case, and where all Plaintiffs reside

as well as Defendant Comeau. Plaintiffs clearly are in a financial hardship, having lost their

life savings in this alleged scam. As Seniors, they may have medical emergencies or may not

be able to travel when this case gets to trial. They have submitted affidavits explaining their

financial hardships. They should not have to spend on an Arbitration and this Litigation, but

are saving and planning to come to New York for a trial. Plaintiffs would like to reserve the

right to transfer venue at a later date if necessary. If this court were to transfer today, and we

hope it does not, then we request a transfer of this case to Iowa, for the convenience of

Plaintiffs, some of whom are under financial hardships.[42]   Because we are a long way off from trial, and discovery can be achieved outside New York, we request that any transfer be reserved for a later date, or, if ruled on now, only with respect to Comeau and Wasendorf, Jr.

## IX.    THE PRINCIPALS OF RES JUDICATA DO NOT APPLY TO THIS CASE.

Because all of the claims in this instant Federal law suit relate to the Ponzi Scheme engaged in by Wasendorf, Sn. and others that was first revealed to the public in July, 2012, it would have been an impossibility to allege the present claims in the previous NFA Arbitrations.  When the Plaintiffs' NFA Arbitrations were commenced in 2009, the information available was based on the erroneous belief that the trading losses occurring in each investor's account were legitimate losses based on legitimate market transactions which we now allege never even occurred.  In fact, back in 2009, there was no knowledge that the Bank Defendants were involved in this Scheme by immediately transferring customer money to Wasendorf before any trades could even take place.  In fact, in this case, the allegations amply demonstrate that U.S. Bank had just loaned Wasendorf approximately $9 million dollars as a construction loan in September, 2008, and Wasendorf must have really needed a cash infusion which happened just one month later by closing out Plaintiffs' accounts and reconciling his Ponzi scheme books. Hurting each Plaintiff by sending a margin call notice making it look like a legitimate margin call occurred, where the allegations support a fair inference that such margin calls were fictitious and based on phantom trading at this point. However, if the trades were "real", then clearly PFG arranged to be the counter party to make

---

[42] At the time this case was filed, it was not clear which other jurisdictions were valid chosing between Delaware, Minnesota, Illinois and New York.  However, it appears now that venue and jurisdiction are in Iowa, since U.S. Bank does business in Iowa.  Because Plaintiffs have a right to counsel of their choice, they decided to bring the case in a jurisidiction where they could afford to retain counsel in the most economical fashion possible.

sure it kept the stolen proceeds.

Based on the overwhelming evidenced in this case and detailed in *In Re Peregrine,* it goes without saying that the claims in this case **could not have been brought** prior to 2012, at the earliest, including especially the RICO claim. Therefore, the doctrine of Res Judicata which precludes only claims that could have been brought in a prior proceeding is entirely inapposite in this case. *See, Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 400 F.3d 139 (2d Cir. 2004); *NBN Broadcasting, Inc. v. Sheridan Broadcasting Networks, Inc.,* 105 F.3d 72 (2d Cir. 1997); *Leon v. Shmukler*, 992 F. Supp.2d 179 (E.D.N.Y. 2014).

In addition, because the Arbitral Awards have no written opinion attached to them there is no record as to which claims were actually decided. The recitation of such claims were literally copied from the Statement of claims, but based on a review of these arbitration transcripts, it can be said that many of the issues including the fraud issue based on the nature of the investments was not part of the case, and was dropped by Paul Thomas and never litigated as a matter of fact. Under these circumstances, Res Judicata is also not necessarily applied.

Lastly, because there was no final adjudication on the merits, because plaintiffs had not exhausted their remedies and were never told that they could move to vacate the arbitral awards by Paul Thomas, they did not exhaust that right which is also a pre-requisite to applying Res Judicata. Because no other defendants have asserted this defense, it would only apply to Russell Wasendorf, Jr. and the others have waived it. However, it does not apply to any defendants, since none of the claims at issue in the NFA Arbitration could been brought in that forum and at that time.

## X.  PLAINTIFF DAVID SCHEFFERT'S ALLEGATION OF UNAUTHORIZED TRADING IS CONSISTENT WITH AND PART OF THIS FRAUD.

Plaintiffs' claim that there was also unauthorized trading in his account as part of the Fraud is consistent with his allegations in the SAC ¶¶ 322, 323. Mr. Scheffert's specific instructions to stop trading were ignored thus constituting unauthorized trading in violation of 17 C.F.R. 166.2[43], *see also Cauble v. Mabon Nugent & Co.*, 594 F. Supp. 985, 991(S.D.N.Y. 1984). *See also Chenli Chu v. James Francis Kelly and Peregrine Financial Group, Inc.* CFTC Docket No.: 07-R029 (Oct. 7, 2009.)  Both of these claims are entirely consistent and demonstrate that in order to dissipate customer funds, Defendants could not listen to customer instructions, because Wasendorf had already taken these funds for himself. U.S. Banks footnote #2 on page 16 of its memorandum therefore is entirely inaccurate.  It tries to assert that these claims were inconsistent where in fact they were entirely consistent. Attached to the Levy Declaration as Exhibit 12, is the letter submitted to Judge Doyle showing that the unauthorized trading claim was in the alternative to the fraud claim.

### CONCLUSION

WHEREFORE, based on the foregoing, it is respectfully requested that Defendants' motions to dismiss, transfer and stay be denied in full or to strike the unconscionable portions of the Arbitration Agreements and to further stay one of these proceedings or to transfer only two of the Defendants to Iowa (only as opposed to Illinois) in the Interests of Justice or to reserve decision on the transfer motion and for all further and other relief deemed just and proper.

---

[43] Again, CME is supposed to prevent unauthorized trading.  Rather, it collected $141 million dollars from MF Global, Inc. due to a trader's unauthorized trading.  However, how did the trader Wooley even place his trades either without proper margin or by using house money.  Either way CME did not prevent such unauthorized trading and was fully reimbursed for this market abuse.  *See New Hampshire Co. V. MF. Global, Inc.,* 108 A.D.3d 463 (1st Dep't 2013.)

February 12, 2018

Respectfully Submitted,

*Susan J. Levy*

Susan J. Levy, Esq.
Attorney for Plaintiffs
Bruce Behrens, Et. Al.
40 East 10th Street
Suite 2K
New York New York 10003
212-962-1782 (Tel)
(212) 962-3711 (Fax)