UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
BRUCE BEHRENS, et al.,                      :
                              Plaintiffs,   :
                                            :
              -v-                           :
                                            :
JPMORGAN CHASE BANK N.A., et al.,           :
                                            :
                              Defendants.   :
                                            :
-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___3/31/2019___

No. 16-cv-5508 (VSB)

**<u>OPINION & ORDER</u>**

<u>Appearances</u>:

Susan J. Levy
Susan J. Levy, Esq.
New York, NY
*Counsel for Plaintiffs*

Eric R. Sherman
Dorsey & Whitney LLP
Minneapolis, MN

Dai Wai Chin Feman
Dorsey & Whitney LLP
New York, NY
*Counsel for Defendant U.S. Bank National Association*

Christopher J. Houpt
Lisa R. Blank
Victoria Whitney
Mayer Brown LLP
New York, NY

Thomas S. Kiriakos
Sean T. Scott
Tyler R. Ferguson
Mayer Brown LLP
Chicago, IL
*Counsel for Defendant JPMorgan Chase Bank, N.A.*

Abby F. Rudzin
O'Melveny & Myers LLP
New York, NY
*Counsel for Defendants Chicago Mercantile Exchange Inc., and CME Group Inc.*

Julie Negovan
Grieising Law, LLC
Brooklyn, NY
*Counsel for Defendants Perry Comeau and Russell Wasendorf, Jr.*

Lisa L. Shrewsberry
Traub Lieberman Straus & Shrewsberry LLP
Hawthorne, NY
*Counsel for Defendant Paul Thomas*

Gregory Boyle
Kevin Murphy
Jenner & Block LLP
Chicago, IL

Adam Unikowsky
Jenner & Block LLP
New York, NY
*Counsel for Defendant National Futures Association*

Nicholas A. Caputo
Caputo & Popovic, P.C.
Chicago, IL

Louis V. Fasulo
Fasulo, Braverman & DiMaggio LLP
New York, NY
*Counsel for Defendant Millennium Trust Company, LLC*

<u>VERNON S. BRODERICK, United States District Judge</u>:

Plaintiffs Bruce Behrens, Kathleen Behrens, Sherri Scheffert, David Scheffert, and

Richard Wakeford bring this action against Defendants asserting violations of the Commodity

Exchange Act ("CEA"), 7 U.S.C. §§ 1, et seq., and the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. §§ 1961, et seq., along with various state common law

claims. Before me are approximately thirteen motions, including: (1) Defendant Millennium

Trust Company, LLC's ("Millennium") motion to stay this action pending arbitration and Plaintiffs' cross-motion to strike their arbitration agreements with Millennium; (2) the motions of Defendants U.S. Bank National Association ("U.S. Bank"), JPMorgan Chase Bank, N.A. ("JPMorgan"), Chicago Mercantile Exchange (the "Exchange"), Perry Comeau, Russell Wasendorf, Jr., CME Group Inc. ("CME Group"), Paul Thomas, and the National Futures Association (the "NFA") (collectively, the "MTD Defendants") to dismiss the Second Amended Complaint; (3) Defendants Comeau's and Wasendorf, Jr.'s motions for sanctions and Plaintiffs' cross-motion for sanctions; and (4) Plaintiffs' motion to amend the Second Amended Complaint.[1]  Because the claims over which I have original subject matter jurisdiction are time barred, and I decline to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims, the MTD Defendants' motions to dismiss are granted.  Because Plaintiffs and Millennium entered into valid and enforceable arbitration agreements, Millennium's motion to stay is granted.  Because Plaintiffs' proposed amendments to the Second Amended Complaint would be futile, Plaintiffs' request to amend is denied.  Because Comeau and Wasendorf, Jr. have each failed to follow the procedural requirements set forth in Federal Rule of Civil Procedure 11, each of their motions for sanctions is denied.  Accordingly, the remaining motions are denied as moot.

---

[1] In addition to Millennium and the MTD Defendants (collectively, "Defendants"), Plaintiffs named Russell Wasendorf, Sr., Steven Brewer, Garlon Maxwell, and Amber Maxwell in the Second Amended Complaint (the "Non-Appearing Defendants").  Plaintiffs served the Non-Appearing Defendants, (Docs. 28, 32, 33, 55), but they have failed to appear in this action, and to date Plaintiffs have taken no action with regard to the Non-Appearing Defendants.

## I.   __Background__[2]

Plaintiffs are five individuals, proceeding on behalf of themselves and all others similarly situated, who allege that they invested with Peregrine Financial Group, Inc. ("Peregrine"), a futures commission merchant. (SAC ¶¶ 1, 66.)[3] Plaintiffs allege that they suffered significant thefts from and losses in their Peregrine accounts prior to and during the market crash that occurred in approximately October 2008. (*Id.* ¶¶ 22, 80, 87, 103, 108.) These thefts and losses were caused by a massive conspiracy—referred to in the Second Amended Complaint as the "RICO Ponzi Scheme," (*id.* ¶ 13)—in which some or all Defendants conspired to permit Russell Wasendorf, Sr., Peregrine's CEO and Chairman, to steal customer funds from segregated accounts held by Peregrine, (*id.* ¶¶ 12, 37, 327). According to Plaintiffs, Wasendorf, Sr. carried out the scheme by, among other means, intercepting accurate account statements issued by certain Defendant banks and sending forged statements to regulators and other interested parties so that Peregrine would appear to have a sufficient amount of funds in segregation to meet regulatory requirements. (*See, e.g.*, *id.* ¶ 369.) Plaintiffs also contend that Wasendorf, Sr. conspired with certain of the broker and trading advisor Defendants to "purposefully cause losses in each plaintiff's account by selling naked puts and/or naked calls in each plaintiff's account during the volatile week of October 2 through October 8, 2008 . . . which ensured a total collapse

---

[2] The facts set forth herein are taken from the allegations contained in the Second Amended Complaint, (Doc. 105), documents attached to the Second Amended Complaint, and documents referenced in the Second Amended Complaint, which I may properly consider on a motion to dismiss under Rule 12(b)(6). *See, e.g.*, *Faber v. Metro. Life Ins. Co.*, No. 08 Civ. 10588(HB), 2009 WL 3415369, at *1 n.1 (S.D.N.Y. Oct. 23, 2009) ("In considering a motion to dismiss, the Court may consider documents attached as an exhibit to the complaint or incorporated into the complaint by reference, [and] documents that are integral to the plaintiff's claims, even if not explicitly incorporated by reference."), *aff'd*, 648 F.3d 98 (2d Cir. 2011). I also "consider matters of which judicial notice may be taken . . . including public records." *Smith v. City of New York*, No. 12 Civ. 4572(KPF), 2013 WL 6158485, at *1 (S.D.N.Y. Nov. 25, 2013). I assume Plaintiffs' allegations contained in the Second Amended Complaint to be true for purposes of these motions. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). However, my reference to these allegations should not be construed as a finding as to their veracity, and I make no such findings. I summarize only those facts relevant to my ruling in this Opinion & Order.

[3] "SAC" refers to Plaintiffs' Second Amended Complaint, filed on December 1, 2017. (Doc. 105.)

of each account." (*Id.* ¶ 119.) Plaintiffs assert that these "naked puts and calls will cause losses 95% of the time," and thus constituted "a perfect strategy to wipe out plaintiffs' remaining account balances so that Wasendorf S[r]. and his co-conspirators could nicely reconcile their books after having previously pocketed the investment funds in plaintiffs' accounts." (*Id.* ¶ 120.) Plaintiffs maintain that "[d]uring the week of October 2, 2008 through October 9, 2008, [their] entire investments were wiped out" as a result. (*Id.* ¶ 115.)

On June 30, 2009—less than a year after their "entire investments were wiped out"— Plaintiffs filed arbitrations before the NFA against Peregrine and their introducing broker to recoup their investment losses. (*See, e.g.*, *id.* ¶ 709, Ex. 19.) The arbitrators awarded Plaintiffs no damages. (SAC Ex. 21.) Plaintiffs allege that the arbitrations "would have made them whole but for" various injustices that the NFA allegedly perpetrated against them. (SAC ¶ 546.) Plaintiffs also allege that they lost the arbitrations due to their attorney's malpractice and fraudulent concealment. (*Id.* ¶ 703.)

On July 9, 2012, Wasendorf, Sr. attempted suicide. (*Id.* ¶ 112.) In a suicide note, Wasendorf, Sr. admitted to committing fraud and described how he concealed his theft and misappropriation of customer funds by, among other things, establishing fake bank P.O. Boxes to intercept regulatory balance confirmation requests to which he then responded with forged bank account statements. (*See id.*; U.S. Bank Mem. 4.)[4] The Second Amended Complaint characterized the suicide note as "self-serving" because although Wasendorf, Sr. admitted to committing fraud, "he did not go far enough because he tried to arrogate to himself this entire fraud, when there were many John Does with the requisite intent and knowledge to share the

---

[4] "U.S. Bank Mem." refers to Defendant U.S. Bank National Association's Memorandum of Law in Support of its Motion to Dismiss Plaintiffs' Second Amended Complaint, filed on December 14, 2017. (Doc. 112.)

blame upon information and belief." (SAC ¶ 112.) The next day, Peregrine filed for bankruptcy, (*id.* ¶¶ 363, 427; U.S. Bank Mem. 4), and the Commodity Futures Trading Commission ("CFTC") filed an action against Wasendorf, Sr. and Peregrine, (*see CFTC v. Peregrine Fin. Grp., Inc.*, No. 12-cv-5383 (N.D. Ill.)). The CFTC's complaint alleged details regarding Wasendorf, Sr.'s fraud, including allegations regarding his use of certain Defendant bank accounts to carry it out. (*See id.* ECF No. 1.)

Wasendorf, Sr. was indicted on thirty-one counts of making and using false documents which were submitted to the CFTC. (*United States v. Wasendorf, Sr.*, No. 12-cr-2021 (N.D. Iowa) (ECF No. 2).) Wasendorf, Sr. pled guilty on September 17, 2012 to one count each of mail fraud, embezzlement of customer funds, making false statements to the CFTC, and making false statements to a futures association, (*see id*. ECF Nos. 29, 39), and was sentenced to 50 years' imprisonment on January 31, 2013, (*id.* ECF No. 70).

On July 13, 2012, multiple plaintiffs filed class actions in the Northern District of Illinois against Wasendorf, Sr. and certain of the Defendants in this action. (*See* SAC ¶ 225.) The class actions were consolidated as *In re Peregrine Financial Group Litigation*, No. 12-cv-5546 (N.D. Ill.) (ECF No. 50) (the "Illinois Class Action"). (*Id.*) The Illinois Class Action sought to recover funds that putative class members believed were on deposit with Peregrine as of its collapse. (*See* Illinois Class Action ECF Nos. 66, 398.) The class definition included "all persons or entities who held money, property, and/or securities pursuant to 7 U.S.C. 6d(a)(2), at [Peregrine], as of the bankruptcy of [Peregrine] on July 10, 2012." (*Id.* ECF No. 398.) Plaintiffs were excluded from this class "[b]ecause none of [them] owned money, securities or property in 2012." (SAC ¶ 225.)

Plaintiffs filed claims in the Peregrine bankruptcy case, (SAC ¶¶ 714–15), but chose not

to bring their own lawsuit at that time because they "were under the distinct impression that they would be entitled to a distribution" from the bankruptcy or the class action, (*id.* ¶ 715; *see also id.* ¶¶ 724–28.)  However, this belief was incorrect as Plaintiffs were not included within the definition of the plaintiff class, which encompassed only those plaintiffs who held cash deposits with Peregrine in 2012.  (*Id.* ¶¶ 225, 724–28.)

## II.    Procedural History

Plaintiffs commenced this action by filing their complaint on July 11, 2016.  (Doc. 1.) On October 11, 2017, Plaintiffs filed their First Amended Complaint, (Doc. 79), and on December 1, 2017, filed their Second Amended Complaint, (Doc. 105).

Between December 14 and December 29, 2017, Defendants U.S. Bank, JPMorgan, the Exchange, Comeau, Wasendorf, Jr., and the CME Group filed their motions to dismiss.  (Docs. 111, 113, 116, 118, 123, 133.)  On February 12, 2018, Plaintiffs filed their opposition to the foregoing motions, along with a declaration and numerous affidavits, including exhibits, in support.  (Docs. 150–56.)  Between March 7 and April 6, 2018, Defendants filed their replies. (Docs. 168, 169, 170, 171, 180, 181.)

On November 9, 2017, Millennium filed its motion to stay.  (Doc. 87.)  On February 12, 2018, Plaintiffs filed their opposition, along with a declaration and numerous affidavits, including exhibits, (Docs. 150–57), and their cross-motion to strike and/or sever provisions of the arbitration agreements, (Doc. 157).  On April 6, 2018, Millennium filed its reply.  (Doc. 179.)

On April 6, 2018, Comeau and Wasendorf, Jr. filed their motions for sanctions.  (Docs. 182, 183.)  On July 13, 2018, Plaintiffs filed oppositions to the motions for sanctions, including declarations, with exhibits, (Docs. 207–10), along with their cross-motion for sanctions, with affidavits and exhibits in support, (Docs. 211–16).

On July 12, 2018, Thomas filed his motion to dismiss, along with a memorandum of law and declaration, with exhibits, in support. (Docs. 203–05.) On September 28, 2018, Plaintiffs filed an opposition, (Doc. 225), and on October 19, 2018, Thomas filed a reply, (Doc. 227).

On September 28, 2018, Plaintiffs filed their motion to amend, (Doc. 223), and on October 19, 2018, Defendant Thomas filed an opposition, (Doc. 227).

On October 22, 2018, the NFA filed its motion to dismiss, along with a memorandum of law in support. (Docs. 228, 229.) On January 13, 2019, Plaintiffs filed their opposition, (Doc. 234), and on February 4, 2019, the NFA filed its reply, (Doc. 236).

### III. Discussion

#### A. *Motions to Dismiss*

The MTD Defendants contend that Plaintiffs' claims pursuant to the CEA and RICO, along with certain state law claims, are untimely pursuant to the applicable statutes of limitations. In response, Plaintiffs argue that they timely filed their claims pursuant to the discovery accrual rule, and/or that their claims were timely because the applicable statutes of limitations were tolled. Because, as outlined below, I find that Plaintiffs' federal claims against the MTD Defendants are time-barred, I decline to exercise pendent jurisdiction over Plaintiffs' state law claims against the MTD Defendants and dismiss the Second Amended Complaint as to the MTD Defendants

#### 1. Applicable Law

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner*, 496 F.3d at 237. A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Finally, although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

The pleading requirements at the motion to dismiss stage apply with particular force to civil RICO claims. *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 397 (S.D.N.Y. 2000). "Because the mere assertion of a RICO claim has an almost inevitable stigmatizing effect on . . . defendants, courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Id.* (internal quotation marks omitted). Furthermore, at the motion to dismiss stage, dismissal of a complaint on the grounds that the statute of limitations has expired is appropriate only if the "complaint clearly shows the claim is out of time." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 266 (S.D.N.Y. 2013) (quoting *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999)); *see also Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 209 (S.D.N.Y. 2014) ("Because the defendants bear the burden of establishing the expiration of the

statute of limitations as an affirmative defense, a pre-answer motion to dismiss on this ground may be granted only if it is clear on the face of the complaint that the statute of limitations has run." (internal quotation marks omitted)).

### 2. Application

#### a. Discovery Accrual Rule

A CEA claim must be brought "not later than two years after the date the cause of action arises," 7 U.S.C. § 25(c), and RICO claims are subject to a four-year statute of limitations, 28 U.S.C. § 1658(a); *Rotella v. Wood*, 528 U.S. 549, 553 (2000). Neither the CEA nor the RICO statute elaborates on the circumstances under which their respective statute of limitations begins to run. *See Levy v. BASF Metals Ltd.*, No. 1:15-cv-7317-GHW, 2017 WL 2533501, at *5 (S.D.N.Y. June 9, 2017), *aff'd*, 917 F.3d 106 (2d Cir. 2019); *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 675 (S.D.N.Y. 2016). Where a federal statute "is silent on the issue" of when a cause of action accrues, courts apply a "discovery accrual rule" whereby "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 148–49 (2d Cir. 2012) (internal quotation marks omitted). A plaintiff has discovered an injury when "circumstances would have suggested to a person of ordinary intelligence the probability that he had been defrauded." *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 473–74 (S.D.N.Y. 2016).

Under Second Circuit precedent, courts apply an "inquiry notice" analysis to determine when plaintiffs reasonably should have discovered their injury:

> Inquiry notice—often called "storm warnings" in the securities context—gives rise to a duty of inquiry "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded." In such circumstances, the imputation of knowledge will be timed in one of two ways: (i) "[i]f the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose"; and (ii) if some inquiry is made, "we will impute

knowledge of what an investor in the exercise of reasonable diligence[] should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud."

*Koch*, 699 F.3d at 151 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005)); *see also id.* at 153 ("[O]nce there are sufficient 'storm warnings' to trigger the duty to inquire, and the duty arises, if a plaintiff does not inquire within the limitations period, the claim will be time-barred."). In short, courts first ask at what point the circumstances were such that they "would suggest to [a person] of ordinary intelligence the probability that she has been defrauded." *Id.* at 151 (internal quotation marks omitted). If plaintiffs do not then inquire within the applicable limitations period, they are deemed to have knowledge of their injury at the point at which the duty to inquire arose, and the period of limitations starts to run on that date. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 697–98 (S.D.N.Y. 2013), *vacated and remanded on other grounds sub nom. Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016).

I find that the applicable statutes of limitations began to run, at the earliest, as of October 2008 and, at the latest, as of July 10, 2012. As of October 2008, Plaintiffs' entire investments had been "wiped out" over the course of a week, (SAC ¶¶ 115, 508), there was "insufficient margin to support any trading in [Peregrine's] customer accounts," (*id.* ¶ 509), it was "impossible for any customer to satisfy a margin call in excess of $5,000.00," (*id.* ¶ 178), and Peregrine allowed trades in customer accounts to continue despite their margin deficiencies, in violation of Chicago Mercantile Exchange Rule 930, (*id.* ¶ 28). These events and warnings led Plaintiffs to hire an attorney and sue Peregrine in 2009. When a plaintiff receives *actual* notice of an injury, *inquiry* notice is no longer relevant. *See Levy*, 2017 WL 2533501, at *5. Based on the foregoing, I find that Plaintiffs were on actual notice of their injuries as early as October

2008. *See Koch*, 699 F.3d at 148–49 (opining that under the discovery accrual rule, "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock" (internal quotation marks omitted)); *Levy*, 2017 WL 2533501, at *5 (finding that plaintiff "discovered her injury, thus beginning the statute of limitations for her CEA claims, . . . when she was forced to pay a margin call and lost her entire investment," not when a class action was filed seven years later apprising plaintiff of defendants' conspiratorial actions).

Plaintiffs contend that the fraud did not begin to become known to them until the discovery of Wasendorf, Sr.'s suicide note on July 10, 2012 and that the suicide note only exposed the fraud in "general terms," and only as to Wasendorf, Sr. and Peregrine. (Pls.' Opp. 17 & n.1.)[5] However, "[t]he specificity required to trigger inquiry notice is not necessarily specificity with regard to each defendant, but rather specificity that notifies a plaintiff that he has been injured." *In re LIBOR*, 27 F. Supp. 3d at 484–85 (internal quotation marks omitted); *see also Levy*, 2017 WL 2533501, at *5 ("Plaintiff's argument that she did not know of the specific wrongdoing of the specific defendants in this case has no significance in light of RICO's accrual rule."). By 2008, Plaintiffs knew that they had lost their money; by 2009, Plaintiffs were claiming that Peregrine's fraud was to blame for that loss; and by July 10, 2012, Plaintiffs knew about Wasendorf, Sr.'s confession and the "nature of their losses," (SAC ¶ 699). These facts would put "a reasonable investor of ordinary intelligence" on inquiry notice that fraud might have been committed.

Plaintiffs do not contend that they conducted any investigation into the purported fraud after Wasendorf, Sr.'s 2012 disclosure. Instead, the chronology set forth in Plaintiffs' pleading

---

[5] "Pls.' Opp." refers to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss, filed on February 12, 2018. (Doc. 151.)

demonstrates that Plaintiffs had discovered their claims, and were actively prosecuting them, long before 2012, and that they conducted no subsequent investigation in response to Wasendorf, Sr.'s public admission to "pocketing customer moneys in segregated accounts." Indeed, rather than conducting any additional investigation in 2012, Plaintiffs merely continued in their efforts to prosecute the claims related to their 2009 actions against Peregrine.[6] (*See* Pls.' Opp. 18–19 (claiming that "[b]y the end of 2012 . . . [Plaintiffs] had effectively delegated their obligations . . . to class counsel and other counsel" and had "proceeded to press their claims in the Class Action showing reasonable inquiry . . . that should suffice for tolling under the [discovery accrual rule]").) Thus, even assuming that Plaintiffs were not on actual notice of their injuries as of October 2008, Plaintiffs cannot rely on any lack of discovery to justify filing this case more than four years after Wasendorf, Sr.'s admission to having stolen funds from customers' accounts.

Accordingly, I find that the CEA and RICO limitations periods began to run at the earliest in October 2008, and at the latest on July 10, 2012. *See, e.g.*, *Shak*, 156 F. Supp. 3d at 474–75. Because the instant action was filed more than two years (the limitations period for CEA claims), and four years (the limitations period for RICO claims), after the latest possible date on which the statutes of limitations could have commenced—July 10, 2012—Plaintiffs' CEA and RICO claims were not timely filed pursuant to the discovery accrual rule.

---

[6] Plaintiffs contend that in 2015 they conducted an investigation by looking at account statements that had been in their possession since 2008. (*See* SAC ¶ 727; Pls.' Opp. 20.) However, Plaintiffs describe the 2015 inquiry not as a "discovery" of previously unknown claims, but as a "review [of] the entire case from scratch to see where the case stood." (SAC ¶ 727); *see also Needham & Co. v. Access Staffing, LLC*, No. 15 Civ. 2487 (NRB), 2016 WL 4399288, at *10 (S.D.N.Y. Aug. 12, 2016) (finding investigation not reasonable when it could have been conducted years earlier).

b. <u>Equitable Tolling</u>

Plaintiffs further argue that the MTD Defendants should be prevented from raising a statute of limitations defense because they concealed their fraudulent conduct.

The doctrine of equitable tolling should only be applied in "rare and exceptional circumstance[s]." *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) (internal quotation marks omitted). The Second Circuit has found such tolling to be appropriate where "extraordinary circumstances" prevented the plaintiff from filing a complaint on time and where "the party seeking equitable tolling . . . acted with reasonable diligence throughout the period he seeks to toll." *Id.* (citing *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996)). The doctrine of equitable tolling is applied in the court's discretion "as a matter of fairness" when a plaintiff has been prevented from exercising her rights. *Id.* (internal quotation marks omitted).

In order for equitable tolling to be available on the basis of fraudulent concealment, a plaintiff must prove that (1) the defendant concealed the existence of the unlawful conduct, (2) the plaintiff remained ignorant of the violation until sometime within the statute of limitations, and (3) this continuing ignorance was not the result of a lack of diligence. *In re London Silver Fixing, Ltd. Antitrust Litig.*, 213 F. Supp. 3d 530, 572 (S.D.N.Y. 2016). "A claim of fraudulent concealment must be pleaded with particularity, in accordance with the heightened pleading standards of Rule 9(b)." *Id.* (quoting *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 399 (S.D.N.Y. 2010)). Allegations that generalize among multiple defendants do not suffice because "the doctrine of fraudulent concealment tolls the statute of limitations only as to those defendants who committed the concealment." *Griffin v. McNiff*, 744 F. Supp. 1237, 1256 n.20 (S.D.N.Y. 1990); *see also O'Brien v. Nat'l Prop. Analyst Partners*, 719 F. Supp. 222, 232 (S.D.N.Y. 1989) ("Allegations that *other* defendants acted to deceive plaintiffs from filing suit

do not plead fraudulent concealment against *all* defendants. The doctrine of fraudulent concealment tolls the statute of limitations *only* as to those defendants who committed the concealment." (internal quotation marks omitted)).

Plaintiffs claim to have met this burden with regard to U.S. Bank based on the fact that U.S. Bank "den[ied] liability" in the litigation brought by the CFTC, leading Plaintiffs "to believe that U.S. Bank did not participate in this alleged Scheme." (Pls.' Opp. 27–28.) Similarly, Plaintiffs point to the 2012 congressional testimony of an Exchange representative in which he stated that he was "sorry and shocked" about the Peregrine collapse and was considering remedial measures. (*See id*. at 28.) Plaintiffs contend that this "testimony equates with a strong denial of responsibility" and shows the Exchange "deflecting responsibility from itself." (*Id*.) However, Plaintiffs point to no case law indicating that denying culpability defeats a statute of limitations defense. Indeed, the law requires a plaintiff to identify *material facts* that were wrongfully concealed. *See Koch*, 699 F.3d at 157; *cf. Levy*, 2017 WL 2533501, at *8 (finding that statute was not tolled where "Plaintiff was not continually ignorant of the existence of unlawful conduct during the pendency of the statute of limitations"); *Redd v. Leftenant*, No. 16-CV-4919 (JFB)(SIL), 2017 WL 3973926, at *3 (E.D.N.Y. Sept. 7, 2017) (concluding that plaintiff was not prevented from filing suit against defendant for false arrest based on prior lawsuits alleging false arrest). Moreover, such a denial does not constitute an "extraordinary circumstance" that "stood in [Plaintiffs'] way and prevented timely filing." *Menominee Indian Tribe of Wis. v. United States*, 136 S. Ct. 750, 755 (2016) (internal quotation marks omitted).

Plaintiffs further argue that certain of the MTD Defendants' acts were "self-concealing." (Pls.' Opp. 26.) Courts have recognized that some types of claims are considered self-concealing—namely, bid-rigging and price-fixing conspiracies—because their nature requires

secrecy.  *See, e.g.*, *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065, 1083–84 (2d Cir. 1988) (finding, in bid-rigging case, that "[t]he passing off of a sham article as one that is genuine is an inherently self-concealing fraud" and that "[i]n order to endure, it must remain concealed").  However, this exception to the requirement of demonstrating affirmative concealment by a defendant applies only when "the wrong itself was of such a nature as to be self-concealing."  *In re LIBOR*, 935 F. Supp. 2d at 710 (internal quotation marks omitted).  Here, Plaintiffs allege, among other things, that some or all of the MTD Defendants failed to exercise their regulatory responsibilities properly, and (in conclusory fashion and without particularity) that they did so knowingly or with ulterior motives.  (Pls.' Opp. 22–27.)  These conclusory assertions are on their face insufficient to warrant the application of this exception.  The self-concealing exception therefore does not apply.  *See In re LIBOR*, 935 F. Supp. 2d at 711 (rejecting self-concealing exception where there was public discourse about allegedly rigged LIBOR rates).

Even if Plaintiffs could demonstrate that the MTD Defendants wrongfully concealed certain material facts, Plaintiffs do not explain how those alleged acts of concealment prevented Plaintiffs from learning about the nature of their claims.  Plaintiffs argue only that they "pled with specificity that Plaintiffs did not learn of the true nature of this Scheme until it was reported to them . . . in 2015 or 2016."  (Pls.' Opp. 29; *see also id.* at 26 (claiming, with regard to second criteria of the fraudulent concealment test, merely that "Plaintiffs did not learn of the nature of the claims within the Statute of Limitations").)  However, Plaintiffs' supposed ignorance is not sufficient; the law requires Plaintiffs to show that the MTD Defendants' allegedly wrongful concealment "prevented [their] discovery of the nature of the claim within the limitations period."  *Butala v. Agashiwala*, 916 F. Supp. 314, 319–20 (S.D.N.Y. 1996) (rejecting fraudulent concealment because "plaintiffs fail to describe how they were prevented from investigating the

fraud"). Moreover, any contention that the MTD Defendants somehow concealed unlawful conduct is wholly inconsistent with Plaintiffs' June 2009 arbitration seeking to recover the same trading losses they seek to recover here. *See, e.g.*, *Levy*, 2017 WL 2533501, at *8 (denying equitable tolling where plaintiff "filed a similar complaint seeking damages from the same . . . injury"); *Wang v. Palmisano*, 51 F. Supp. 3d 521, 533 (S.D.N.Y. 2014) (refusing to equitably toll limitations period "in light of Plaintiff's decision to bring parallel actions against [other defendants] over the course of a half-decade").

Lastly, Plaintiffs do not identify any steps they took to determine whether they had a claim against the MTD Defendants during the limitations period.[7] Nor do Plaintiffs explain— nor could they plausibly do so under the circumstances—why, despite having the account statements in their possession since 2008, (*see* SAC ¶ 727; Pls.' Opp. 20), they did not conduct the investigation that led to them purportedly becoming aware of the "true nature of the Scheme" until 2015. Instead, Plaintiffs admit that they "delegated their obligations" to investigate their claims to third parties and filed claims here only because "they did not want to wait around any longer" for potential recovery from their bankruptcy claim. (Pls.' Opp. 18.) Plaintiffs even concede that they did not begin to review their case in earnest with counsel and experts until "the spring of 2015." (*Id.* at 19–20.)

Accordingly, I find that Plaintiffs have failed to establish the "extraordinary circumstances" necessary to justify the application of the fraudulent concealment doctrine.

---

[7] Although Plaintiffs assert that "this last criteria appears to be identical to the consideration of the application of the Discovery Accrual Rule" so no additional showing is required, (Pls.' Opp. 29), the inquiry notice standard— determining when a reasonable person would have understood that he had been injured—is objective while equitable tolling requires plaintiffs to plead with particularity under Rule 9(b) what they actually did to investigate a potential claim against the defendant. *See In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998) (rejecting allegation of diligence where plaintiffs pleaded no details of inquiries they made).

### c. *American Pipe* Tolling

Plaintiffs also maintain that they are entitled to class action tolling pursuant to the rule set forth in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974). Under *American Pipe*, "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." 414 U.S. at 554. To qualify for such tolling, a later individual action must challenge the same conduct as the class action, such that the class action is "sufficient to alert the defendants sued there to preserve the evidence regarding that conduct" and "the relevant evidence, memories, and witnesses . . . are the same for both actions." *Shak*, 156 F. Supp. 3d at 475 (quoting *Cullen v. Margiotta*, 811 F.2d 698, 720–21 (2d Cir. 1987)). In other words, the statute of limitations is not tolled if the later individual action "raises a new *factual theory*." *In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 4634541, at *135 (S.D.N.Y. Aug. 4, 2015).

The rule set forth in *American Pipe* is not applicable to Plaintiffs in this matter. First, class tolling does not apply if a plaintiff "never could have been part of the putative class" in the prior class action. *Bd. of Trs. ex rel. Gen. Ret. Sys. of Detroit v. BNY Mellon, N.A.*, No. 11 Civ. 6345(RJS), 2012 WL 3930112, at *10 (S.D.N.Y. Sept. 10, 2012). The first paragraph of the consolidated amended complaint in the Illinois Class Action defined the putative class members as "former customers of Peregrine . . . who have lost money as a result of the collapse of [Peregrine] in July 2012." (Pls.' Opp. 31–32.) Plaintiffs do not claim to have lost money as a result of the collapse of Peregrine in July 2012, but rather based on theft and trading losses ending no later than 2008. (*See, e.g.*, SAC ¶ 225 (acknowledging that Plaintiffs were excluded from the Illinois Class Action).) By 2012, Plaintiffs' losses were nearly four years old, and they

had already litigated their arbitrations against Peregrine to conclusion.

Furthermore, even if I assume Plaintiffs could have been members of the Illinois Class Action, "the *American Pipe* tolling rule does not apply to permit putative class members to file a subsequent class action," but instead only permits subsequent individual suits. *Korwek v. Hunt*, 827 F.2d 874, 878 (2d Cir. 1987); *see also Auscape Int'l v. Nat'l Geographic Soc'y*, 409 F. Supp. 2d 235, 249 n.69 (S.D.N.Y. 2004) ("A second class action does not get the benefit of the filing date of the first."); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 221 (E.D.N.Y. 2003) ("[T]he class action tolling exception does not permit filing of additional class action claims as opposed to subsequent individual lawsuits."). Courts have "expressed concern that members of a putative class may abuse the *American Pipe* rule by . . . attempting to 'piggyback one class action onto another and thus toll the statute of limitations indefinitely.'" *Musa v. SuperShuttle Int'l, Inc.*, No. 12-CV-2418 (DLI)(RLM), 2013 WL 5507143, at *4 (E.D.N.Y. Sept. 30, 2013) (quoting *Korwek*, 827 F.2d at 878). As a result, to apply *American Pipe* tolling to later class action suits "would be inimical to the purposes behind statutes of limitations and the class action procedure." *Korwek*, 827 F.2d at 879. Therefore, if Plaintiffs could have been members of the Illinois Class Action, the instant case presents the circumstances cautioned against in *Korwek* as Plaintiffs are attempting to "piggyback" new class claims onto the prior Illinois Class Action, which was resolved years ago.[8]

---

[8] I also note that "*American Pipe* tolling can apply to a statute of limitations only when the earlier-filed class action 'involved exactly the same cause of action subsequently asserted.'" *In re Bear Stearns Cos., Inc. Secs., Derivative, & ERISA Litig.*, 995 F. Supp. 2d 291, 303 (S.D.N.Y. 2014) (quoting *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 467 (1975)). The class action must give the defendant "fair notice not only of the substantive claims being brought . . . but also of the number and generic identities of the potential plaintiffs." *Id.* at 303–04 (internal quotation marks omitted). The facts Plaintiffs assert to support their claims here are not exactly the same as the claims asserted in the Illinois Class Action. In this action, Plaintiffs' claims revolve around the assertion that the value of their Peregrine accounts fell to zero in 2008 because Wasendorf, Sr. falsified Peregrine account statements. Plaintiffs extensively discuss their trading activity at Peregrine, the particulars of the losing trades, and the margin calls that followed. The Illinois Class Action, by contrast, contained no allegations related to market losses, "shadow trading," margin calls, or the particulars of any plaintiff's trades. Rather, the plaintiffs in the Illinois Class

Thus, *American Pipe* cannot save Plaintiffs' claims.

### d. Remaining State Law Claims

In addition to their claims under the CEA and RICO statute, Plaintiffs assert numerous common law claims, without stating which state's common law they seek to apply. Under 28 U.S.C. § 1367(c)(3), as Plaintiffs acknowledge, (SAC ¶ 82), the exercise of supplemental jurisdiction over state law claims is within a district court's discretion if the court has "dismissed all claims over which it has original jurisdiction."[9] The Second Circuit counsels against exercising supplemental jurisdiction in such a situation, stating "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 183 (2d Cir. 2004) (internal quotation marks omitted).

Having found that all of Plaintiffs' claims against the MTD Defendants that were based on a federal question under 28 U.S.C. § 1331—namely, the CEA and RICO claims—are barred by the applicable statutes of limitations, and there being no other basis for federal jurisdiction against these parties, I decline to exercise supplemental jurisdiction over Plaintiffs' remaining state common law claims against the MTD Defendants. *See* 28 U.S.C. § 1367(c)(3). Accordingly, those claims are dismissed. *See, e.g.*, *Levy*, 2017 WL 2533501, at *9.

---

Action alleged that Wasendorf, Sr. had misappropriated portions of the funds they collectively had deposited with Peregrine and had believed were still on deposit there until July 9, 2012. Unlike Plaintiffs here, the Illinois Class Action plaintiffs consistently "received account information from [Peregrine] that did not show a discrepancy or shortfall in their account balances" until that date. (*See In re Peregrine Fin. Grp. Litig.*, No. 12-cv-05546 (N.D. Ill.) (ECF No. 66 ¶ 122); *see also* ¶ SAC 225 (noting that claims in the instant action are different from those in the Illinois Class Action).) The Illinois Class Action thus arguably did not place the MTD Defendants on notice that they might face claims of former Peregrine customers who received falsified Peregrine statements or who sought to recover trading losses suffered years earlier. *See Shak*, 156 F. Supp. 3d at 477 (denying application of *American Pipe*, finding that "thematic similarity—the common claim of a form of price manipulation—is insufficient to create the requisite overlap between the two cases").

[9] I note that there is no diversity jurisdiction because Plaintiffs, who are all Iowa residents, named an Iowa resident—Perry Comeau—as a Defendant. (SAC ¶¶ 86–121, 196–206.)

## B. *Motion to Stay*

Millennium requests that I stay all claims against it because each of the five named Plaintiffs entered into written agreements requiring that disputes between them and Millennium be arbitrated. Plaintiffs oppose the motion on the ground that the arbitration agreements are not valid and enforceable. Because I find that the parties entered into valid and enforceable arbitration agreements, Millennium's motion is granted and Plaintiffs' claims against Millennium are dismissed.

### 1. Background

In early 2007, Plaintiffs established self-directed individual retirement accounts ("Self-Directed IRAs") with Millennium, a qualified directed custodian of Self-Directed IRAs. (Millennium Br. 3, 4.)[10] In creating their respective Self-Directed IRAs, each Plaintiff entered into a written Self-Directed IRA Adoption Agreement ("Adoption Agreement") with Millennium. (*See* Reder Aff. ¶¶ 7–11, Exs. 1–5.)[11] By executing the Adoption Agreement, each Plaintiff expressly acknowledged that he/she also received a copy of the Self-Directed IRA Custodial Agreement ("Custodial Agreement") and accompanying Disclosure Statement, that he/she understood it, and that he/she would be bound by its terms. (*See* Reder Aff. Exs. 1–5.) The Custodial Agreement, in turn, reiterates that it is an agreement between Millennium and each person who executes an Adoption Agreement, and again states that the Adoption Agreement signed by each Plaintiff incorporates the terms of the Custodial Agreement. (*See* Moran Aff. ¶¶ 6–19, Exs. 6–14.)[12]

---

[10] "Millennium Br." refers to the Memorandum of Law in Support of Millennium's Motion to Stay Plaintiffs' Amended Complaint Pending Arbitration, filed on November 9, 2017. (Doc. 89.)

[11] "Reder Aff." refers to the Affidavit of Jeanne Reder, filed on November 9, 2017. (Doc. 90.)

[12] "Moran Aff." refers to the Affidavit of Jean Moran, filed on November 9, 2017. (Doc. 91.)

Each of the named Plaintiffs has terminated his or her respective contractual relationship with Millennium. (Reder Aff. ¶¶ 7–10; Moran Aff. ¶¶ 15–18.) Bruce Behrens left Millennium in December 2010, Kathleen Behrens left in June 2010, Sherri Scheffert left in January 2009, and Plaintiff David Scheffert left in October 2009. (Reder Aff. ¶¶ 7–10; Moran Aff. ¶¶ 15–18.) The Custodial Agreements in effect when those Plaintiffs left Millennium contain the same mandatory arbitration provision, which states in relevant part:

> Except as provided below, disputes between the parties to this Agreement shall first be submitted to private binding arbitration at the demand of either party. In any arbitration, each party shall appoint one person who is not in its employ or under contract with it to serve as arbitrator, and the two arbitrators shall name a third arbitrator. Except as otherwise agreed by the parties, the Arbitration Rules of the American Arbitration Association shall apply to the arbitration proceeding. The parties agree that, except below, no court action shall be taken by either party prior to arbitration, and the majority decision of the arbitration panel shall be binding on both parties and in any subsequent action in court.

> Notwithstanding the above, the Custodian shall have the right to bring suit against Account Owner or the Custodial Account in a court of competent jurisdiction for the recovery of any sums owed Custodian under this agreement, including but not limited to, fees costs, expenses and sums paid by Custodian in error to or for the benefit of the Custodial Account. In such event all court costs, legal expenses, reasonable compensation of time expended by the Custodian in the performance of its duties, and other appropriate and pertinent expenses and costs shall be collected by the Custodian from the Custodial Account.

(Moran Aff. Exs. 7–9, Art. XVII.) This arbitration provision is identical to the one appearing in the Custodial Agreement in effect in early 2007 when all Plaintiffs executed their Adoption Agreements. (*See* Moran Aff. ¶¶ 15–19; *compare* Exs. 7–9, Art. XVII, *with* Ex. 6, Art. XVI.)

Plaintiff Richard Wakeford left Millennium in June 2017. (Moran Aff. ¶ 19.) The arbitration provision in the Custodial Agreement in effect at his departure provides, in relevant part:

> The Account Owner, his or her authorized representatives, or designated beneficiaries and Custodian must first attempt in good faith to resolve by negotiation any dispute arising out of or relating to this Agreement. In the event

that the Account Owner and Custodian are unable to resolve their dispute by negotiation, any controversy, claim, counterclaim, crossclaim, or other dispute arising out of or relating to this Agreement or the breach, termination, interpretation or validity thereof, including the determination of the scope or applicability or enforceability of this Agreement to arbitrate, whether sounding in tort, contract or statute, must be settled by individual, confidential, binding arbitration before a sole arbitrator.

(Moran Aff. Ex. 14, Art. XVIII.)

## 2. Applicable Law

The Federal Arbitration Act ("FAA") was enacted "to reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). It makes "written arbitration agreements 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of a contract.'" *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 629–30 (2009) (quoting 9 U.S.C. § 2). Pursuant to the FAA, a federal court "shall" stay an action pending arbitration in any suit involving "any issue referable to arbitration" pursuant to a written arbitration agreement. 9 U.S.C. § 3. Any arbitration agreement affecting interstate commerce is subject to the terms of the FAA. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

It is "beyond dispute that the FAA was designed to promote arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 345 (2011). Indeed, the FAA "reflects an emphatic federal policy in favor of arbitral dispute resolution," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985), and it evinces a "liberal federal policy favoring arbitration agreements," *AT&T Mobility*, 563 U.S. at 345–46 ("[O]ur cases . . . have repeatedly described the [FAA] as embodying a national policy favoring arbitration, and a liberal federal policy favoring arbitration agreements" (internal citation and quotation marks omitted)). "This

policy, as contained within the [FAA], requires courts to enforce the bargain of the parties to arbitrate." *KPMG LLP v. Cocchi*, 565 U.S. 18, 21 (2011) (internal quotation marks omitted). By its terms, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

### 3. Application

To determine whether a parties' dispute is subject to arbitration, courts in the Second Circuit "consider '(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement.'" *Marciano v. DCH Auto Grp.*, 14 F. Supp. 3d 322, 327 (S.D.N.Y. 2014) (quoting *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011)).[13]

#### a. Validity of the Agreements

In determining whether parties entered into a valid agreement to arbitrate, courts look to the applicable state law governing the formation of contracts generally. *See Cap Gemini Ernst & Young U.S., L.L.C. v. Nackel*, 346 F.3d 360, 364 (2d Cir. 2003) ("[I]n evaluating whether the parties have entered into a valid arbitration agreement [for purposes of the FAA], the court must

---

[13] As a general matter, the court has the power to decide whether the parties' dispute should be arbitrated. *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1198 (2d Cir. 1996). However, the arbitrator, rather than the court, will decide whether the parties' dispute should be submitted to arbitration when there is "clear and unmistakable evidence from the arbitration agreement . . . that the parties intended that the question of arbitrability shall be decided by the arbitrator." *Id.* at 1198–99 (internal quotation marks omitted). Millennium—which drafted the contracts containing the arbitration provisions—contends that the arbitration provision applicable to Wakeford satisfies this standard. (Millennium Br. 11.) However, because "a court should construe ambiguous language against the interest of the party that drafted it," *PaineWebber*, 81 F.3d at 1199 (internal quotation marks omitted), and because I do not find the arbitration provision applicable to Wakeford to be unambiguous as to the parties' intent regarding the question of arbitrability, I find that, in this instance, I have the authority to decide the question as opposed to the arbitrator. *See Katz v. Feinberg*, 167 F. Supp. 2d 556, 564 (S.D.N.Y. 2001) (concluding that agreement did not evince a clear willingness to submit the arbitrability question to the arbitration panel), *aff'd*, 290 F.3d 95 (2d Cir. 2002).

look to state law principles.").  Illinois contract law applies here as the Plaintiffs' Custodial

Agreements contain an Illinois choice-of-law provision.[14]  (*See* Moran Aff. Exs. 6–9, 14.)  The

cardinal rule for contract interpretation, whether under Illinois or New York law, is to ascertain

and give effect to the intention of the parties.  *Joyce v. DLA Piper Rudnick Gray Cary LLP*, 888

N.E.2d 657, 661–62 (Ill. App. Ct. 2008); *Abiele Contracting, Inc. v. N.Y.C. Sch. Constr. Auth.*,

91 N.Y.2d 1, 9 (N.Y. 1997).  Where a contract is unambiguous, the court will ascertain the

parties' intent by looking to the plain language used in the contract itself.  *Kirschenbaum v.

Northwestern Univ.*, 728 N.E.2d 752, 762 (Ill. App. Ct. 1999); *Edwards v. Poulmentis*, 307

A.D.2d 1051, 1052 (2d Dep't 2003).

    Moreover, both Illinois and New York law permit parties to a contract to incorporate by

reference terms appearing in a separate document.  *See Wright v. Mr. Quick Inc.*, 486 N.E.2d

908, 910 (Ill. 1985) ("It is well established that one instrument can incorporate the terms of

another," where "[a]ll that is required is an expression of the parties' intent to incorporate those

terms."); *Creative Waste Mgmt., Inc. v. Capitol Envtl. Servs., Inc.*, 429 F. Supp. 2d 582, 602

(S.D.N.Y. 2006) (applying New York law and finding that "a paper referred to in a written

instrument and sufficiently described may be made a part of the instrument as if incorporated

into the body of it" (internal quotation marks omitted)).  When terms are incorporated into the

parties' main contract, those terms are as much a part of the parties' contract as if they had been

expressly set forth in the main contract.  *See Wilson v. Wilson*, 577 N.E.2d 1323, 1329 (Ill. App.

Ct. 1991); *Creative Waste Mgmt.*, 429 F. Supp. 2d at 602; *see also Kirschenbaum*, 728 N.E.2d at

762 ("Contracts which specifically incorporate other documents by reference are to be construed

---

[14] As outlined below, the validity of the arbitration provisions does not depend on the application of Illinois rather than New York law, as both states' laws are consistent on all material matters concerning contract formation.

as a whole with those other documents.").

Here, the Adoption Agreement of each Plaintiff incorporates the Custodial Agreement's terms, including the arbitration provision. (*See* Moran Aff. ¶ 4; *see also* Reder Aff. Exs. 1–5 ("I acknowledge that I have received a copy of the [Custodial Agreement] and the accompanying Disclosure Statement, and I understand and agree to be bound by the terms, and conditions in both.").) Because the Adoption Agreement clearly references the Custodial Agreement and unambiguously reflects the parties' intent to make it part of the parties' contract, each Custodial Agreement's terms—including the unambiguous arbitration provision—is made part of Plaintiffs' contracts with Millennium. *See Wright*, 486 N.E.2d at 910 (finding that incorporation by reference requires only that the main document express the parties' intention that the additional terms be incorporated).

### b. Scope of the Agreements

Plaintiffs' claims against Millennium are within the arbitration provisions' broad scope. The liberal federal policy favoring arbitration requires courts to "construe arbitration clauses as broadly as possible" and to resolve any doubts about their scope in favor of arbitration. *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc*., 58 F.3d 16, 19 (2d Cir. 1995) (internal quotation marks omitted). Indeed, courts must find in favor of arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* (internal quotation marks omitted).

The arbitration provision that applies to Plaintiffs Bruce Behrens, Kathleen Behrens, Sherri Scheffert, and David Scheffert broadly requires them to submit whatever "disputes" they may have with Millennium to binding arbitration. Similarly, the arbitration provision that applies to Wakeford broadly calls for the arbitration of any "dispute" relating to the Custodial

Agreement or the parties' relationship. Thus, Plaintiffs' arbitration provisions clearly require all of Plaintiffs' claims to be resolved in arbitration.

c. Enforceability of Arbitration Provisions

Plaintiffs' arguments that the arbitration provisions are unenforceable, (Pls.' Opp. 104–20), are unpersuasive. First, Plaintiffs assert that the arbitration provisions are procedurally and substantively unconscionable. "Procedural unconscionability consists of some impropriety during the process of forming the contract depriving a party of a meaningful choice," whereas "[s]ubstantive unconscionability concerns the question whether the terms themselves are commercially reasonable." *Frank's Maint. & Eng'g, Inc. v. C. A. Roberts Co*., 408 N.E.2d 403, 410 (Ill. Ct. App. 1980). However, "[e]ven where there is some disparity in bargaining power, there is no inherent unfairness or unconscionability in an arbitration clause if both parties are bound by it and know of its existence." *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 170 n.5 (2d Cir. 2004); *see also Morgan v. Bill Kay Chrysler Plymouth,* No. 01 C 3871, 2002 WL 31133102, at *4 (N.D. Ill. July 17, 2002) ("Applying Illinois law, numerous courts in this district have rejected the position that for an arbitration agreement to be mutual, both sides must promise to arbitrate at least some specified set of claims."). The arbitration provisions at issue here bind both Plaintiffs and Millennium; provide that Plaintiffs shall have the right to assert any claims in arbitration that could be raised in court; and provide that the arbitrator(s) shall have the authority to award such relief as may be available in court. In short, the arbitration provisions do not unreasonably favor Millennium and are thus not substantively unconscionable. *See Isaacs v. OCE Bus. Servs., Inc*., 968 F. Supp. 2d 564, 569 (S.D.N.Y. 2013) ("When both an employer and its employees are bound to an agreement to arbitrate [and] when the terms of the agreement are equally applicable to both parties . . . the arbitration agreement is not unreasonably favorable to

the employer.").  Even agreements that "concededly favor" the party requesting arbitration are generally upheld when the advantage is not "grossly unreasonable."  *Rosenfeld v. Port Auth. of N.Y. & N.J.*, 108 F. Supp. 2d 156, 165 (E.D.N.Y. 2000); *see also Sanchez v. CleanNet USA, Inc.*, 78 F. Supp. 3d 747, 756 (N.D. Ill. 2015) (finding that "mutuality of obligations in an arbitration agreement is not essential under Illinois law as long as there is valid consideration"); *Forbes v. A.G. Edwards & Sons, Inc.*, No. 08 Civ. 552(TPG), 2009 WL 424146, at *5 (S.D.N.Y. Feb. 8,2009) (finding an agreement not unconscionable where employer was not bound to arbitrate its disputes).  Because there must "be a showing that . . . a contract is both procedurally and substantially unconscionable," *Barreto v. Jec II, LLC*, No. 16-cv-9729 (KBF), 2017 WL 3172827, at *4 (S.D.N.Y. July 25, 2017) (internal quotation marks omitted), and because the arbitration clauses are not substantively unconscionable, I need not reach the issue of whether the provisions are procedurally unconscionable, *see Fensterstock v. Educ. Fin. Partners*, No. 08 Civ. 3622(TPG), 2012 WL 3930647, at *7 (S.D.N.Y. Aug. 30, 2012).

Furthermore, Plaintiffs seek to invalidate the arbitration provisions pursuant to 17 C.F.R. § 166.5.  However, that statute applies only to a "Commission registrant"—a person registered under the CEA as a futures commission merchant, retail foreign exchange dealer, introducing broker, floor broker, commodity pool operator, commodity training advisor, or associated person.  *See* 17 C.F.R. § 166.5.  Plaintiffs allege no facts in the Second Amended Complaint or their papers in opposition to the motion to stay that Millennium was a "Commission registrant." Indeed, Plaintiffs seemingly concede that Millennium is not a "Commission registrant" but that Millennium performed as such based on the acts or omissions of Defendant Comeau, whom Plaintiffs assert was Millennium's agent.  However, there are no facts alleged supporting that conclusory statement.

Lastly, Plaintiffs' attempt to distance themselves from these agreements by arguing that they did not read and/or understand the documents is unavailing. *See Kutluca v. PQ N.Y. Inc.*, 266 F. Supp. 3d 691, 701 (S.D.N.Y. 2017) (noting that "a party will not be excused from his failure to read and understand the contents" of a document (internal quotation marks omitted)); *see also Navman Wireless N. Am., Ltd. v. Tex. Oilfield Servs., LLC*, No. 16 C 11356, 2017 WL 1199751, at *2 (N.D. Ill. Mar. 30, 2017) (opining that under Illinois law, "a person who signs a written contract is bound by its terms regardless of his or her failure to read and understand its terms" (internal quotation marks omitted)). "In the absence of fraud or other wrongful act on the part of another contracting party, a party who signs or accepts a written contract . . . is conclusively presumed to know its contents and to assent to them." *Kutluca*, 266 F. Supp. 3d at 701 (internal quotation marks omitted).

### d.  Dismissal of Claims

Although § 3 of the FAA requires a federal court to stay an action to resolve a dispute subject to an arbitration agreement, courts have the discretion to dismiss—rather than stay—an action when all of the issues in it must be arbitrated. *E. Fish Co. v. S. Pac. Shipping Co.*, 105 F. Supp. 2d 234, 241 n.10 (S.D.N.Y. 2000); *Berger v. Cantor Fitzgerald Sec.*, 967 F. Supp. 91, 96 (S.D.N.Y. 1997). In this case, the parties' agreements to arbitrate encompass all of the issues raised against Millennium in the Second Amended Complaint. Accordingly, dismissal of the claims is appropriate.

### C.  *Motions for Sanctions*

Defendants Comeau and Wasendorf, Jr. move for sanctions pursuant to Federal Rule of Civil Procedure 11(b)(1) against Plaintiffs and their counsel, asserting that Plaintiffs' claims relate to losses already litigated in the NFA arbitrations. (*See* Docs. 182, 183.) Plaintiffs filed a

cross-motion for an order (1) imposing sanctions on counsel for Comeau and Wasendorf, Jr., (2) precluding Julie Negovan—counsel for Comeau and Wasendorf, Jr.—from representing those Defendants based on certain alleged conflicts of interest and violation of the New York Rules of Professional Conduct, and (3) precluding Nicholas Ivarone—counsel for Wasendorf, Jr.—from representing Wasendorf, Jr. or collecting fees based on purported violations of the New York Judiciary Law and the New York Rules of Professional Conduct. (*See* Doc. 216.) I address these motions below.

## 1. Applicable Law

Rule 11(b)(1) provides that "[b]y presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances[,] it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." A pleading or motion violates Rule 11 if it is "frivolous, legally unreasonable, or factually without foundation, even though not signed in subjective bad faith." *Wechsler v. Hunt Health Sys., Ltd.*, 216 F. Supp. 2d 347, 356 (S.D.N.Y. 2002). Courts have wide discretion in deciding when sanctions are appropriate. *See Perez v. Posse Comitatus*, 373 F.3d 321, 325 (2d Cir. 2004); *see also Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 63 (2d Cir. 2012) (stating that "sanctions under Rule 11 are discretionary, not mandatory"). Rule 11 sanctions should be granted with caution and applied only when "a particular allegation is utterly lacking in support." *In re Highgates Equities, Ltd.*, 279 F.3d 148, 154 (2d Cir. 2002) (internal quotation marks omitted).

Rule 11 also sets forth certain procedural requirements. Rule 11 requires that "[a] motion

must be served under Rule 5, but it must not be filed or presented to the court if the challenged paper . . . is withdrawn or appropriately corrected within 21 days after service." Fed. R. Civ. P. 11(c)(2). This provision is commonly known as the "safe harbor provision." A motion that fails to comply with the safe harbor provision of Rule 11 must be denied. *See, e.g.*, *Fierro v. Gallucci*, 423 F. App'x 17, 18–19 (2d Cir. 2011) (summary order) (affirming denial of sanctions for failure to comply with 21-day service requirement); *Bryant v. Britt*, 420 F.3d 161, 163 n.2 (2d Cir. 2005) (finding that, because movant "failed to comply" with Rule 11(c), there was "no error in the district court's decision" to deny sanctions); *Targum v. Citrin Cooperman & Co.*, No. 12 Civ. 6909(SAS), 2013 WL 6087400, at *4 (S.D.N.Y. Nov. 19, 2013) ("A motion that fails to comply with the safe harbor provision of Rule 11 must be denied." (internal quotation marks omitted)). "The safe-harbor provision is a strict procedural requirement." *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 175 (2d Cir. 2012).

### 2. Application

I must dismiss the parties' motions for sanctions because they do not comply with the safe harbor provision outlined in Rule 11. There is no indication that Comeau, Wasendorf, Jr., or Plaintiffs complied with Rule 11's procedural requirement that a motion for sanctions be served on the offending party twenty-one days before it is filed with the court. None of the parties filed an affidavit of service indicating that their motion for sanctions was served on the offending party prior to being filed and none of the parties indicated through sworn affidavit or otherwise that a copy of their motion had been served on the offending party prior to being filed. While Comeau and Wasendorf, Jr. vaguely state in their motions that "[a]ll of these issues were brought to Plaintiffs' attention . . . as early as September 2016," (Doc. 182 at 7; Doc. 183 at 8), that allegation is insufficient to satisfy the safe harbor provision. *See, e.g.*, *Star Mark Mgmt.*, 682

F.3d at 175 ("An informal warning in the form of a letter without service of a separate Rule 11 motion is not sufficient to trigger the 21-day safe harbor period."); *Targum*, 2013 WL 6087400, at *9 (finding that neither letter to offending party nor teleconference with the court regarding anticipated motion satisfied safe harbor provision); *Castro v. Mitchell*, 727 F. Supp. 2d 302, 308 (S.D.N.Y. 2010) (concluding that any statement by counsel or even the judge at the pre-trial conference was insufficient to qualify as compliance with the safe harbor requirement).

Because "[c]ompliance with Rule 11's safe harbor provision is mandatory . . . failure to do so will result in a denial of the sanctions motion." *Libaire v. Kaplan*, No. 06-1500, 2008 WL 794973, at *12 (E.D.N.Y. Mar. 24, 2008); *see also In re Pennie & Edmonds LLP*, 323 F.3d 86, 89 (2d Cir. 2003) ("[T]he 'safe harbor' provision functions as a practical time limit, and motions have been disallowed as untimely when filed after a point in the litigation when the lawyer sought to be sanctioned lacked an opportunity to correct or withdraw the challenged submission."); *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1328–29 (2d Cir. 1995) (rejecting motion for sanctions under Rule 11 because non-movant was not served twenty-one days prior to the sanctions motion); *Targum*, 2013 WL 6087400, at *9 ("Regardless of the merits of [the sanctions] motion, [defendant's] failure to comply with Rule 11's safe harbor requirement bars any award of sanctions.").

Consequently, the motions for sanctions submitted by Comeau, Wasendorf, Jr., and Plaintiffs are denied.[15]  Moreover, because I have dismissed all of Plaintiffs' claims against

---

[15] I also decline to invoke my inherent powers to impose sanctions in light of the fact that the parties have failed to properly avail themselves of the remedies provided for in Rule 11.  As the Supreme Court has stated, "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991).  Here, I find, as other courts have, that using my inherent powers to implement Rule 11 sanctions would be inappropriate since the parties did not meet the procedural requirements of Rule 11's safe harbor provision.  *See, e.g.*, *Richtone Design Grp., L.L.C. v. Classical Pilates, Inc.*, No. 06 Civ. 0547 NRB, 2007 WL 1098706, at *2 n.1 (S.D.N.Y. Apr. 10, 2007) (concluding that "[w]hile we do not question that we retain the inherent power to impose sanctions . . . we believe that the invocation of this Court's inherent powers in situations such as this, where the moving party might

Comeau and Wasendorf, Jr., *see generally supra*, Plaintiffs' requests to preclude Comeau's and Wasendorf, Jr.'s attorneys from representing those Defendants in this action are denied as moot.

### D.    *Leave to Amend*

Federal Rule of Civil Procedure 15(a)(2) provides that "[t]he court should freely give leave [to amend] when justice so requires."  Plaintiffs seek leave to amend the Second Amended Complaint to add certain additional pendent state law claims against Defendant Thomas, including claims related to breach of fiduciary duty, fraudulent misrepresentation, and aiding and abetting breach of fiduciary duty, among others.  (*See generally* Doc. 226.)  Because all of Plaintiffs' federal claims against Thomas are time barred, *see supra*, leave to amend to add the proposed pendent state law claims against Thomas would be futile and is therefore denied.  *See Wallace v. N.Y.C. Dep't of Corr.*, 112 F. App'x 794, 795 (2d Cir. 2004) (summary order) (affirming district court's denial of leave to amend where the statute of limitations had run and amendment would be futile).

### IV.    <u>Conclusion</u>

For the foregoing reasons, the motions to dismiss of the MTD Defendants, (Docs. 111, 113, 116, 118, 123, 133, 203, 228), are GRANTED and Plaintiffs' Second Amended Complaint is dismissed as to the MTD Defendants.  To the extent that Plaintiffs' allegations can be construed to give rise to state law claims, I decline to exercise jurisdiction over such claims and they are dismissed without prejudice to filing those claims in state court.

Millennium's motion for a stay of proceedings pending arbitration, (Doc. 87), is granted and Plaintiffs' claims against Millennium are dismissed.  Plaintiffs' cross-motion to strike the

---

have availed itself of Rule 11, would have the unwanted and undesirable effect of rendering Rule 11's separate motion and safe harbor provisions meaningless" (internal quotation marks omitted)).

Millennium arbitration agreement and/or stay the arbitration pending the outcome of this litigation, (Doc. 157), is DENIED.

Because Plaintiffs' proposed amendment to the Second Amended Complaint would be futile, Plaintiffs' motion to amend, (Doc. 223), is DENIED.

Defendants Comeau and Wasendorf, Jr.'s motions for sanctions, (Docs. 182, 183), and Plaintiffs' cross-motion for sanctions, (Doc. 216), are DENIED.

Defendants Comeau and Wasendorf, Jr.'s motions in the alternative to transfer venue and Plaintiffs' cross-motion arguing that venue is appropriate in this district, (Doc. 158), are DENIED as moot.

Finally, Plaintiffs are directed, within twenty-one days of the date of this Opinion & Order, to submit a letter explaining why I should not dismiss this action as to the Non-Appearing Defendants for failure to prosecute pursuant to Federal Rule of Civil Procedure 41(b).


SO ORDERED.

Dated: March 31, 2019
    New York, New York

Vernon S. Broderick
United States District Judge